IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DUETSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) and ROTHEMBAUM SPORTS GMBH, <br><br> Plaintiffs, <br><br> v. <br><br> ATP TOUR, INC., JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8 and JOHN DOE 9, <br><br> Defendants. | C.A. No. _____ <br><br> **TRIAL BY JURY DEMANDED** |

## COMPLAINT AND JURY DEMAND

The Plaintiffs, Duetscher Tennis Bund (the German Tennis Federation ("GTF") and the Rothenbaum Sports GMBH (the "GTF Tournament") (collectively, the "GTF Plaintiffs"), by and through their attorneys, demand a trial by jury on all issues so triable and allege upon knowledge as to their own acts and otherwise upon information and belief, the following:

### NATURE OF THE ACTION

1.  Defendant ATP Tour, Inc. ("ATP") is a non-profit membership corporation that was originally created for the benefit and protection of men's professional tennis players and men's professional tennis tournaments. The ATP has been hijacked by a majority of its Board of Directors and by certain executive officers. The ATP (via these officers and directors) along with the owners of certain, preferred men's tennis tournaments (who would otherwise compete

with each other throughout the United States and around the world), have agreed, *inter alia*, to do the following: (i) limit the number and output of top-flight professional men's tennis tournaments while excluding all others and, thereby, deriving monopoly profits therefrom; (ii) fix the prices that can be paid to attract professional men's tennis players to those tournaments; (iii) pool their broadcast rights while limiting the media outlets that can be used to broadcast and market tournaments to further, illegally, derive monopoly profits therefrom; (iv)boycott any potentially competing tournaments that refuse to join or support their illegal cartel; and (v) divide calendar-based markets for tournaments among themselves.

2.    Via these actions, the ATP has appropriated property rights, which formally belonged to competing tennis tournaments, while simultaneously eliminating the ability of those tournaments to compete with one another or the ATP.  These actions are damaging the GTF Plaintiffs, men's professional tennis players, the consumers of men's professional tennis and the markets in which all three participate in violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.  Further, via these actions, the ATP has violated its fiduciary duties to the GTF Plaintiffs and interfered with the GTF Plaintiffs' business and contractual relationships.

3.    The ATP has named its anticompetitive plan the "Brave New World" plan.  Via this plan, the ATP has artificially taken control of the supply of men's professional tennis players and of men's professional tennis tournaments.  It has done so to establish a favored class of tournaments, in which the ATP has a significant proprietary interest, while relegating all of the ATP's other member tournaments to a disfavored status whereby they are precluded from competing with the ATP's favored tournaments.  In doing so, the ATP, via its Brave New World plan, violates the antitrust laws of the United States, violates the ATP's fiduciary duties to the GTF Plaintiffs and tortiously interferes with the GTF Plaintiffs' business and contractual

2

relationships. Accordingly, the GTF seeks a declaration that the ATP's Brave New World plan is illegal and violates the ATP's fiduciary duties; an injunction to halt the ATP's Brave New World plan and to prohibit the ATP from further antitrust violations; and damages to be determined at trial that would be automatically trebled under federal law. The GTF does so to eliminate the ATP's illegal, anticompetitive arrangements so that the GTF may compete in a free and open marketplace.

## THE PARTIES

4. The GTF is a non-profit tennis federation incorporated under the laws of the Federal Republic of Germany, with its principal place of business in Hamburg, Germany. The GTF has the most members of any tennis federation in the world. As part of its mission to develop and promote the sport of tennis, the GTF has run the GTF Tournament for over 100 years as, currently, the majority owner of the tournament.

5. The GTF Tournament is a world-class, men's professional tennis tournament. It is played on clay and traditionally occurs two weeks prior to the French Open each year. The GTF Tournament is played at a state of the art facility in Hamburg Germany, which includes a 13,500 seat main court complete with a retractable roof, sponsor facilities and a luxury box capable of entertaining hundreds of persons daily. Traditionally, the GTF Tournament has attracted many of the top men's tennis players in the world, including numerous United States citizens and residents and, correspondingly, fans, sponsors and broadcasters from around the world, including the United States.

6. The ATP is a non-profit, membership corporation organized pursuant to the laws of Delaware. Its predecessor, the Association of Tennis Professionals, was founded in 1972 as an organization of men's professional tennis players. This association announced, in 1988, that it

3

would "assume control of the game" of men's professional tennis, and by January 1990, the modern ATP - a combined organization of tournaments and players - began operation of the ATP Tour. The ATP now governs all men's professional tennis tournaments, other than the four Grand Slams (which are governed by the International Tennis Foundation (the "ITF")). The Grand Slams, however, are mandatory tournaments for top men's players under the current ATP Rules and the Brave New World plan. Further, the Grand Slams provide the most points for players in the ATP rankings, which in turn, govern a player's seeding into the Grand Slam tournaments.

7. The John Doe Officers and Directors defendants, yet to be named, are those officers and directors of the ATP who are revealed by future discovery and/or investigation to have participated in or acquiesced, in whole or in part, in the ATP's illegal conduct, tortious conduct or to have otherwise breached their fiduciary duties to the GTF. The GTF Plaintiffs specifically reserve the right to amend their complaint to add specific Officer and Director defendants to the full extent contemplated by the Federal Rules of Civil Procedure.

8. The John Doe Cartel Tournament defendants, yet to be named, are those ATP tournaments who are revealed by future discovery and/or investigation to have participated in, in whole or in part, the ATP's illegal or tortious conduct. The GTF Plaintiffs specifically reserve the right to amend their complaint to add specific Cartel Tournament defendants to the full extent contemplated by the Federal Rules of Civil Procedure. (Collectively, where appropriate, the ATP, the Officers and Directors defendants and the Cartel Tournament defendants shall be referred to collectively as the "ATP Defendants").

4

## JURISDICTION & VENUE

9. The GTF Plaintiffs bring this action for injunctive relief to prevent the implementation of the Brave New World and other anticompetitive actions as violations of Section 1 and 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. §§ 26, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. §§ 15, and for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. They also bring claims for breach of the ATP's fiduciary duties of loyalty, due care and good faith and intentional interference with contractual and business relationships.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1337 (antitrust claims), 1367 (supplemental jurisdiction) and 1332 (diversity jurisdiction).

11. Venue in this district is proper under 28 U.S.C. § 1391(b)(2), 15 U.S.C. §§ 15 and 22 and, where applicable, the ATP's Amended and Restated Bylaws (the "Bylaws"), which provide, in relevant part, that "the Delaware Courts [defined as the Chancery Court of the State of Delaware and the United States District Court for the District of Delaware] shall have exclusive jurisdiction over any dispute or controversy between [any member] and [the ATP]."[1]

---

[1] By submitting to the jurisdiction of and bringing its action before this Court, the GTF does not stipulate to the validity of or waive its right to challenge any particular provision of the Bylaws or any other rule or regulation of the ATP, to the extent these Bylaws, rules and regulations have been used, manipulated or changed, as set forth below, by the ATP in furtherance of its illegal, anticompetitive actions.

066145.1001

## THE HISTORICAL BACKGROUND

12.    The first GTF Tournament was held in 1892 -- 115 years ago.  This year will mark the one-hundredth and first staging of the tournament, which has been held in Hamburg, Germany since 1901.  As such, the GTF Tournament was a viable and important tennis event almost one-hundred years before the creation of the modern ATP (in 1988).

13.    The GTF Tournament has been and continues to be a world-class event.  Today, as a result of tens of millions of dollars of capital investments, the GTF Tournament annually draws over 100,000 spectators from all around the world.  Its center-court comfortably seats 13,500 spectators, plus sponsors and media in a world-class tennis facility complete with separate player and media facilities; separate corporate and sponsorship facilities; media facilities and a state-of-the-art retractable roofing system.

14.    Because of its history, prestige, good will and world class facilities, the GTF Tournament has previously, in an open market, successfully competed for the best weeks on the men's professional tennis calendar, for the top men's professional tennis players, including those from the United States, and for top-class sponsors, including those from the United States, while selling its broadcast rights to world-class broadcasters, including those in the United States and attracting fans from around the globe, including the United States.

15.    In the current ATP-dominated marketplace and under the ATP's Brave New World plan, however, the GTF may no longer compete for its calendar week, for men's professional tennis players, for top-class sponsors, or to sell its broadcast rights to world-class broadcasters.  The GTF Plaintiffs have and would continue to fare much better and would be more profitable if the GTF Tournament was able to compete in markets for players services, markets for the production of men's professional tennis events, and markets for the sale of

6

broadcast rights that were free of the anticompetitive conduct and restraints that are and will be imposed by the ATP.

16.    In recognition of the GTF Tournament's history, value and prestige, the GTF Tournament has always held the ATP's top available sanction, which is currently that of a "Masters Series" Tournament. This is a consequence of the GTF Tournament's long history, its considerable good will with players, broadcasters and sponsors and its world-class facilities.

17.    Regardless, the GTF Tournament has, is and will continue to be injured by the ATP's illegal and anticompetitive behavior. The GTF desires the freedom to run the GTF Tournament in an open market, as it did successfully for decades, though is currently precluded from doing so under the ATP's anticompetitive Brave New World plan.

18.    The ATP began in 1972 when approximately fifty of the top men's tennis players in the world paid $400 each as dues to form a union of male professional tennis players (the "player-ATP"), in large part to counterbalance the power of the ITF. The player-ATP's boycott of the Wimbledon tournament in 1973 demonstrated the player-ATP's political and financial power in the world of men's professional tennis and solidified the player-ATP's status as the organization of men's professional tennis players.

19.    By 1988, the world of men's professional tennis was dominated by the Men's International Professional Tennis Counsel (the "MIPTC"). The MIPTC's rules and regulations, though benign by the standards of the Brave New World, so upset the players and tournaments that certain player representatives and tournament organizers sued the MIPTC in the seminal antitrust case of *Volvo North America, Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55, (2d Cir. 1988), in which the Second Circuit held that the MIPTC's actions raised serious, colorable antitrust concerns.

7

20.     Against the backdrop of *Volvo*, and in rebellion against the MIPTC's control over men's professional tennis and its anticompetitive exercise of this control, the player-ATP declared in 1988 that it was assuming control of the game. This declaration became a reality in 1990 with the birth of the modern ATP -- which began as a "unique" collaboration of tournaments and players, both of whom became members of the ATP.

21.     Given the ATP's membership, it is not surprising that the ATP's operations are controlled and managed by a seven-person Board of Directors, which consists of: (i) three representatives of its tournament members (one each from Europe, the Americas, and the rest of the world); (ii) three representatives of its players (one each from Europe, the Americas, and the rest of the world); and (iii) the Executive Chairman/President of the ATP, currently Etienne de Villiers.

22.     Since its creation, the ATP has existed as a Delaware non-profit, membership corporation. Its primary purposes have been to further and protect the interests of its member men's professional tennis players; to further and protect the interests of its member men's professional tennis tournaments and to further and develop the sport of tennis generally consistent with the interest of its members.

23.     The ATP, via its Brave New World, has betrayed these interrelated purposes. Instead, the ATP Defendants have created a cartel involving some of the ATP's top tournament and player members; have taken an increased financial interest therein; are excluding other ATP members who might compete with this cartel thereby creating monopoly profits; are taking these monopoly profits for themselves and their favored tournaments; and are using these monopoly profits to reward complicit players via "bonus" programs that reward top players for playing, to the exclusion of practically all competing tournaments, in the ATP's chosen tournaments. In

8

doing so, the ATP has betrayed its purposes, violated its duties to the GTF Plaintiffs, and caused significant damage to the consumers of professional men's tennis.

24. Until recently, the ATP recognized four, basic, categories of ATP tournaments:

    a. The Masters-Cup: a multimillion dollar end-of-year tournament owned, in part, by the ATP which the top eight players in the world must play, but are rewarded for doing so by the tournament's large prize money;

    b. The Masters Series: the ATP's premiere tournaments, which provide the highest prize monies and ATP ranking points of the regular ATP tournaments;

    c. The International Series (gold and regular), which provide an intermediate level of prize monies and ATP ranking points; and

    d. The Challenger-related Series: a series of over one hundred events held in more than forty countries, which provide the lowest prize monies and ATP Tour ranking points

25. Initially, tournaments generally fell within the ATP's tournament hierarchy based upon their merits and ability to compete in the marketplace. The GTF Tournament, for example, has always held the ATP's highest available sanction because of its quality, value and history as a tournament.

26. The ATP has now decided and is taking action in furtherance of its new prime continuing objective to minimize competition with certain favored tournaments while, contemporaneously, taking an ever-increasing financial interest in those tournaments.

27. The ATP attempted this previously to a much lesser degree. Beginning in or about 1999, for example, the ATP began to take anticompetitive actions to artificially inflate the value of certain tournaments in which the ATP and its cartel had or was developing a proprietary

9

interest, including the ATP-owned Masters Cup in order to sell broadcast rights to ISL (the "ISL Deal"). These actions by the ATP cost the GTF Plaintiffs millions of dollars in lost revenues and damages, while increasing the value of ATP-owned property, until 2002 when the ISL deal collapsed.

28.    These prior actions by the ATP significantly injured the GTF Plaintiffs by damaging their broadcast rights, relationships with sponsors and relationships with broadcasters.

29.    Further, they injured other participants in the marketplace. A brief Pacer search reveals that this activity has already lead to at least two antitrust cases against the ATP, both of which are illustrative of the ATP's illegal behavior and anticompetitive intent, and both of which the ATP settled shortly after their filing. (*See, e.g.*, *Indianapolis Tennis Championships, Inc. et al. v. Mark Miles, et al.*, Case No. IP02 -0196-C-H/K (S.D.Ind.) (challenging, *inter alia*, the ATP's anticompetitive and illegal manipulation of players and its calendar to eliminate competition, injure the plaintiffs and, artificially, inflate the value of certain chosen tournaments and the ATP's property interests therein); *Michael Bryan, et al. v. ATP Tour, Inc., et al.*, Case No. H-05-3082 (S.D.Tx.) (challenging the ATP's "sadly ironic" illegal and anticompetitive manipulation of its rules to eliminate doubles tennis specialists from its tournaments, and the ATP's costs associated therewith to increase the ATP's monopoly profits for its cartel members).

30.    Undaunted, and with knowledge of the illegality of its actions, the ATP's is now implementing its Brave New World, which, per the decision of the ATP Defendants, will go into effect beginning 2009. Though the ATP has not disclosed all aspects of its Brave New World plan, "applications" to the ATP for top tournament spots on the 2009 calendar, *i.e.*, "Masters 1000" sanctions, were due to the ATP on or before March 16, 2007.

10

## THE BRAVE NEW WORLD

A.     **General Aspects of the Plan.**

31.     The ATP's Brave New World[2] was developed in a series of ATP Board meetings in the fall and winter of 2006 that took place in New York, elsewhere in the United States and in London and Shanghai, China.

32.     Despite the fact that historically the vast majority of men's professional tennis tournaments have been reasonably profitable while competing for men's tennis players and providing top flight tennis involving many, though not all, of the world's top players, the ATP Defendants desired to increase the power and value of their cartel. The ATP Defendants decided that the fact that many of the world's top players were withdrawing from their favored tournaments, often after playing in other tournaments owned by other ATP members, was damaging the value of their favored tournaments and limiting the profits being made by the ATP Defendants.

33.     Accordingly, the ATP decided to reduce the number of top flight and world-class tournaments and to eliminate any and all competition with these tournaments, thereby artificially increasing the value of property rights associated with these tournaments (which are owned directly or indirectly by the ATP Defendants). To accomplish this, in the words of the ATP's Chief Executive Officer, Etienne de Villiers, the Brave New World plan introduces "major, sweeping changes." According to Mr. de Villiers, these major, sweeping changes will immediately increase the ATP Defendants' revenues by 20%.

---

[2] It is doubtful the ATP intended the aptly Orwellian nature of this name. The title "Brave New World" derives from Aldus Huxley's famous novel of that name, which in turn references Shakespeare's famous play, "The Tempest." Both works of art, however, involve concepts of "negative utopia" where the things that we value as a society have been destroyed in a pursuit for purported utopian ideals.

066145.1001

34.    To accomplish this, the ATP's Brave New World creates three tiers of ATP tournaments: The Masters Cup and the Masters Series 1000, Masters Series 500 and the ATP 250, and separates the "top-tier" of these tournaments, the Masters Cup and the Masters 1000, from the others by guaranteeing that they will exist free from competition. The remaining tournaments, all current ATP members, will exist on an ongoing basis as a "minor league" of tennis unable, because of ATP's Brave New World's framework, to compete with the Masters 1000 tournaments for calendar dates or for players or to provide top-class tennis for consumers. The ATP's Brave New World, therefore, is intended to decrease competition and set prices thereby increasing the value of assets that, pursuant to the Brave New World plan, will be owned by the ATP itself, such as the Masters Cup, the Masters 1000 Sanctions and the pooled broadcast rights of the Masters 1000 tournaments, or that will be owned by the ATP Defendants or their favored tournaments.

35.    The key elements of the ATP's Brave New World are:

   a.   A reduction in Masters Series Events. The current Masters Series events will be reduced by two. The remaining Masters Series events -- the new "Masters 1000" events -- will be provided the best weeks on the ATP calendar, regardless of what tournament previously held those weeks, as well as mandatory player participation guarantees;

   b.   The taking and sale of a Masters 1000 Sanction to a new tournament in China for millions of dollars, which will go to the ATP;

   c.   An increased financial commitment from the Masters 1000 tournaments beginning in 2009, which includes increased prize money; financial payments

12

to a "bonus pool" for players who play in the mandatory, *i.e.*, Masters 1000, tournaments; and increased payments to the ATP;

d.  Revenue sharing between the Masters 1000 tournaments;

e.  The pooling of all media rights for the nine Masters 1000 tournaments with the newly formed ATP Media. Media rights of the next category of tournaments, the sixteen "Masters 500" tournaments, will also be pooled with and controlled by ATP Media;

f.  The adoption of "ATP branding architecture" to promote and market the ATP's "global tour" through the development and sale of ATP branded intellectual property that, of course, is owned by the ATP; and

g.  Compulsory player participation in all Grand Slams and Masters 1000 events. Players must also participate in four Masters 500 events and, to maximize their ranking points and, therefore, their ranking and its attendant bonuses, two ATP 250 events. Additionally, the ATP intends on imposing stricter mandatory participation requirements on its top players, including increased fines and immediate suspensions for missed mandatory Masters 1000 tournaments.

36.    Via these elements, the Brave New World creates approximately eight "chosen" tournaments that will constitute the only top-tier men's professional tennis played globally on an annual basis (other than the four Grand Slams). These tournaments will have fifty of fifty of the top men's professional tennis players, as they will be compelled, under the threat of suspension, to play these tournaments. The rest of the world's tennis tournaments (again, all ATP members),

13

will compete for the opportunity to have a handful of these players participate in their tournaments.

37.    As such, consumers, broadcasters, sponsors, etc. will have only eight opportunities annually to attend, watch, broadcast, sponsor, etc. a world-class ATP tournament, thereby, as intended by the ATP, artificially increasing the value of these chosen, Masters 1000 tournaments and the ATP's Masters Cup, and the ATP's interest therein and increasing the ATP Defendants' cartel's monopoly profits.

38.    This will effectively insulate certain tournaments from competition, damage markets and artificially inflate the value of certain property rights of the ATP and the ATP Defendants. Simultaneously, it will impair large parts of all of the asset value of numerous ATP members – the vast majority of which will be relegated to a semi-permanent "minor league" status (semi-permanent in that ostensibly, they will be permitted, every ten years to "apply" for a Masters 1000 sanction). Most importantly, it will injure consumers who will have practically no world-class men's professional tennis options in a marketplace free from competition.

39.    The Brave New World framework accomplishes these anticompetitive goals by (1) utilizing the ATP's already monopolistic control over player participation in tournaments via commitment agreements, the ATP Ranking System, the ATP Bonus Pool and broadened penalty provisions; (2) developing and utilizing the ATP's monopolistic control over tournament participation in the marketplace through the use of a "special events rule", by establishing fixed limits on tournament prize money and player compensation; (3) manipulating the ATP tour calendar to move disfavored tournaments from prime calendar weeks so that those weeks may be given to favored tournaments (in whose broadcast rights the ATP is contemporaneously taking a financial interest); and (4) reducing output of top-flight men's professional tennis tournaments by

14

taking the sanctions of two current European Masters Series tournaments, reducing their sanctions and subsequently selling one of these sanctions to a tournament in China.

**B.     The Anticompetitive "Application Process" Breaches The John Doe Officers and Directors Defendants' Fiduciary Duties.**

40.     As discussed previously, historically tournaments have, generally, fallen within the ATP tour structure based upon their competitive merits.  There are, for example, currently nine master's series tournaments because there are nine, traditional, established men's tournaments that are generally capable of holding such an event annually on the ATP tour.

41.     The Brave New World, however, artificially reduces the number of top-tier events.  It does so to decrease production in the markets relevant to this case thereby artificially increasing the value of property rights owned by the ATP Defendants.

42.     This decrease is not the natural result of competition.  Rather, it is the result of the ATP Defendants' conscious decision to eliminate their competitors and, thereby, competition in the relevant markets.  This fact is highlighted by the Brave New World application process (the "Application Process").

43.     The Application Process is anticompetitive.  Further, by adopting the Application Process, the ATP and the John Doe Officers and Directors defendants are violating their fiduciary duties to many of their members, including the GTF Plaintiffs.

44.     First, the Application Process was not open, at all, to any tournaments other than the current masters series tournaments and a delegation from China to whom the ATP has already decided to sell a Masters 1000 sanction at a greatly inflated price (after it reduces the number of Masters Series tournaments).  Accordingly, the vast majority of ATP tournament members are precluded, regardless of their current ability to develop new facilities or otherwise compete for a top-tier tennis tournament, from even applying for a Masters 1000 sanction.

15

45.    Second, the Application Process was not, in reality, open to the GTF Tournament (or the Monte Carlo Masters Series tournament). The ATP Defendants decided, regardless of any "Application Process", that the Hamburg and Monte Carlo tournaments would be "downgraded" thereby destroying these tournaments. This is evidenced, *inter alia*, by the following:

a.    The fact that the ATP is only accepting applications for the GTF Tournament's traditional calendar week for a combined men and women's tournament. One of the ATP Defendants' chosen tournaments, the Madrid Masters Series tournament, has repeatedly expressed a desire to run such a tournament during the GTF Tournament's week and the GTF Tournament (and the other European Masters tournaments) have repeatedly indicated that it is not interested in doing so. Accordingly, it is clear that the ATP has, in effect, given this prime calendar week, which was earned by the GTF Tournament through decades of competitive efforts, to the Madrid Tournament;

b.    Similarly, the ATP has scheduled an indoor, hard-court European Masters 1000 tournament in the fall. The only tournament with indoor, hard-court facilities, however, is the ATP's favored tournament, the Paris Masters Series tournament, which will have this sanction, again without competition.

c.    This leaves the GTF Tournament, Monte Carlo and Rome to "compete" for one Masters 1000 sanction. There is, however, no meaningful opportunity for such competition. The ATP and Mr. de Villiers have made repeated statements in meetings and otherwise that the GTF Tournament (and Monte

16

Carlo) would be downgraded long before any purported applications were even due to the ATP. Further, the ATP has approached the GTF Defendants now on multiple occasions, prior to the submission of the GTF Tournaments' purported application, to discuss paying the GTF Defendants for their "downgraded" status. This payment would be made, ironically, from the ATP Defendants' monopoly money.

46.     Ultimately, the ATP and the John Doe Officers and Directors defendants are downgrading, and destroying as top-tier men's professional tennis tournaments, two of its members, including the GTF Tournament, while precluding the vast majority of their membership from even competing for top-tier status. They are not doing so because these tournaments do not meet their membership requirements or because the GTF or Monte Carlo Tournaments cannot otherwise produce top-tier men's professional tennis tournaments. As set forth above, the GTF Tournament has done so for over 100 years.

47.     Further, while ATP is precluding its own members from meaningfully applying for a Masters 1000 sanction, at its January 2007 meeting, the John Doe Officers and Directors defendants "agreed that the Chinese sanction would be subject to a matter of negotiation and not an open application." Upon information and belief, the award of the Chinese sanction, and decision to divide geographic markets by reducing the number of tournaments in Europe as a result, was based on the payment of a substantial fee to the ATP by the Chinese tournament and perhaps other individual ATP Defendants.

48.     The ATP announced on or about March 27, 2007, that the Chinese sanction has been awarded to Shanghai, despite the fact that Shanghai did not submit a Masters 1000 Application. Thus, despite the fact that Shanghai has no history or tradition of success as a top-

066145.1001

tier men's professional tennis tournament; has never competed as such a tournament in the marketplace; and is not a current ATP member, the ATP and the John Doe Officers and Directors defendants have agreed to give Shanghai a top-tier sanction in the ATP, in return simply for the payment of a substantial fee.

49.     Thus, the ATP Defendants have determined, free from market forces and competition, who will and who will not be a member of their illegal cartel. In doing so they have acted in their own financial interests, and the financial interests of a few, select tournaments. All other men's professional tennis tournaments, however, are forbidden either directly, or indirectly, from even participating in the application process to be a top-tier men's professional tennis tournament.

**C.     The Elimination Of Competition –Control Over Player Participation.**

50.     As recognized by Mr. de Villiers, the most important component of any men's professional tennis tournament is the players. Without an opportunity to compete for top players, a tournament cannot provide top-flight men's professional tennis in the marketplace. The ATP Defendants, however, have provided themselves with complete control over the supply of top quality men's professional tennis players, and they are in the process of channeling these players exclusively into their chosen tournaments to reduce output and increase the value of those tournaments and those tournaments' property rights, including those held by the ATP. In doing so, the ATP controls both the markets for players and tournaments and, via this control, limits the output of both thereby injuring consumers.

51.     Traditionally players, due to injury and training concerns, cannot be expected to reasonably play more than sixteen or seventeen tournaments annually (including the two-week Grand Slam tournaments) during the approximately forty-five week tennis season.

52.     The Brave New World, however, will compel the players to play each and every of the ATP's favored tournaments, including its cartel members.  To quote Mr. de Villiers: "There are no options for these events, it's eight of eight for the players.  If you (a top player) don't show up, you will be fined and suspended."

53.     As such, the ATP's mandatory tournaments, alone, will constitute the vast majority of a reasonable annual men's professional tennis player's annual playing schedule. Thus, the approximately one hundred and fifty remaining tournaments, at all levels, will be left to compete among themselves (to the extent any competition is allowed by the ATP), but not with the chosen tournaments, for each of the top players' remaining three or four annual appearances.  The supply of top players to these tournaments is so limited, however, that these tournaments and their fans, broadcasters and sponsors will have no opportunity to participate in world-class men's professional tennis.   This, of course, will increase the value of the tournaments that do actually provide world-class men's tennis, the ATP's interest therein and the ATP Defendants monopoly profits derived therefrom.

54.     In addition to the threat of outright fine and suspension, the ATP Defendants have created other sticks and carrots which the ATP is using to compel player participation in its favored tournaments thereby exercising monopoly control over the supply of men's professional tennis players and damaging its competitors (who ironically are also ATP members), players, sponsors, broadcasters and consumers.  These include:

> a.   The use of mandatory Commitment Agreements.   Pursuant to these Commitment Agreements, players in good standing with the ATP who are positioned within the Top 50 in the ATP's ranking must now, generally, execute and deliver to the ATP a written Commitment Agreement at the end

of each year to be eligible to play in ATP Tournaments the next calendar year. Under the Brave New World plan, the ATP will use these Commitment Agreements to force players to play each Masters 1000 tournament into which they are accepted and to fine and punish players who miss required tournaments -- beginning in 2009, each top 50 player must play each of the eight ATP Masters 1000 tournaments, the Grand Slams and, if they qualify, the ATP's Masters Cup. Accordingly, the top players will have thirteen mandatory tournaments, including all of the ATP's favored tournaments. Players who do not agree to these commitments can and will be excluded from playing men's professional tennis on the ATP tour;

b. The use of the ATP's annual ranking system. Pursuant to the ATP's Brave New World plan, the Masters 1000 tournaments will offer at least twice the ATP ranking points of any other ATP tournament. Further, players who miss these tournaments will receive zero ranking points, which cannot be made up by playing other tournaments. This will compel player participation in the ATP's favored tournaments because a player must have a high ranking to qualify, and be seeded, in the top men's professional tennis tournaments, as defined by history, *i.e.*, the Grand Slams and the GTF Tournament, and as required by the ATP, *i.e.*, the ATP's favored tournaments. As such, a player's ATP ranking determines what tournaments a player may (and must) play, but also determines where in the draw of the tournament the player will be seeded, thereby affecting how easy it will be for the player to advance to the later rounds of the tournaments (as seeded players sometimes receive first round

20

"byes" and face unseeded players in the early rounds of tournaments). Further, a player's ranking is generally the basis upon which sponsors and other companies that enter into endorsement contracts with professional tennis players contractually assess how well a player has performed as a tennis player during the course of a multi-year endorsement contract. As such, via its ranking system, the ATP controls, directly and indirectly, hundreds of millions of dollars of endorsement income, and by manipulating its ranking system, it can determine which players receive substantial endorsement ranking bonuses and which do not.

c. The Brave New World's bonus program: The concept of the Brave New World's Bonus Program is simple: the ATP sets aside funds that could be paid to players by individual tournaments, competing in the marketplace, and instead awards them (in amounts reaching into the millions of dollars) to those players who meet their Commitment Agreement requirements and who acquire the most ATP Rankings points in doing so. In doing so, the ATP Defendants share a small portion of their monopoly profits with the players thereby ensuring their compliance in the ATP Defendants' illegal, anticompetitive system.

d. The Brave New World's penalty provisions: The Brave New World also includes significant player penalty provisions. Any player who does not attend required events will lose a significant portion of the bonus they would have received under the ATP's Bonus Pool. Further, players who do not play and do not attend the event and perform promotional activities elsewhere will

21

(a) forfeit 50% of their ATP bonus for the year; (b) will be assessed a withdrawal fine; and (c) will be suspended from a subsequent ATP "Masters 1000" event within the next twelve months (receiving, of course, a "zero pointer" for that tournament). Subsequent Masters 1000 withdrawals will have cumulative suspensions and will result in the player losing their "good standing status."

**D.    The Elimination Of Competition -- Control Over Tournaments.**

55.    The Brave New World also eliminates competition via its control over ATP tournaments that will be forbidden from competing with the ATP Defendants' chosen tournaments for players, broadcasters, sponsors, calendar dates and/or fans.

56.    The Brave New World accomplishes this through a number of mechanisms including, *inter alia*, the following:

a. The Special Events Rule. The special events rule precludes players from playing in non-ATP tournaments that might compete with the ATP and/or its tournaments. As player are beholden to the ATP for their livelihood, they have no choice but to comply. Specifically, the ATP's Rule provides the ATP with both calendar and geographic market protections. It provides that player may not compete in a "special event" (a non-ATP or Grand Slam tournament) if it is scheduled within the calendar week(s) of any meaningful ATP tournament. Further, players may not compete in a "special event" if it is scheduled within thirty days before or after the tournament week and within 100 miles or the "same market area" of most ATP tournaments or within the tournament week of any ATP tournament in which a player is entered,

22

including the Sunday night after such tournament final. Thus, the ATP's special events rule effectively precludes any tournament organizer, such as the GTF, from producing a tournament outside the ATP, because the top players are simply precluded from playing in such a tournament and because the ATP has taken to rearranging is calendar on an annual basis. Thus, even in the unlikely event that an independent tournament organizer could find a week in which it might run a tournament, the ATP will move a protected tournament into that week at its discretion the next year, thereby precluding all Top-50 players from playing in that independent tournament.

b. Price fixing: The Brave New World establishes the prize money each class of tournament may pay while precluding tournaments from paying and players from receiving any additional funds. Players, for example, cannot not accept money or anything of value provided directly or indirectly, to influence or assure their competing in any ATP Tournament, other than prize money unless authorized by the ATP. The ATP caps, however, the prize money that may be paid by its non-favored tournaments well below the level paid by its favored tournaments, thereby precluding its non-favored tournaments from competing for players.

57.    The ATP, therefore, via its Brave New World plan, is and will continue to forbid the existence of independent tournaments. Further ATP tournaments may not compete with one another, financially, in the marketplace for player services and players from competing with one another for fees and awards from tournaments. In this manner, the ATP Defendants have fixed the compensation that could otherwise be paid to players at tennis events. This creates a benefit

23

to the ATP and its favored events created by contract, coordination and conspiracy and constitutes the fixing of the price that these tournaments must pay for the players' services at a lower level to reduce their costs vis-à-vis the costs incurred by other events.

**E.      The Elimination Of Competition – Additional Control Over Tournament Sanctions And The Calendar.**

58.     Though the GTF Tournament, like many tennis events, existed long before the birth of the ATP, due to the control now exerted by the ATP, no ATP tournament may independently schedule its own event.  Rather, tournaments now, pursuant to the ATP's Brave New World, must submit periodic requests to the ATP for a sanction for the ATP Tour and a position on the ATP calendar.  The ATP, in its sole discretion, decides when and where the event will be held, if the event is to be held at all.  Accordingly, the ATP now holds the very existence of its tournament members -- their sanctions -- in its hands.

59.     This was not always the case.  Traditionally, tournaments competed for and obtained calendar positions on the men's professional tennis calendar.  Successful tournaments, such as the GTF Tournament, were able to compete for and obtain prime calendar spots.  The GTF Tournament, for example, has traditionally taken place on a clay surface, two weeks prior to the French Open, which is also played on clay.  This is an excellent week on the calendar because, due to the importance of the French Open, players want to play on clay during that week in preparation for that Grand Slam tournament.

60.     The ATP, however, is now using its power to manipulate the calendar to move tournaments out of their traditional, good calendar dates and to move favored tournaments into those dates where they can flourish, free from competition.  It did so previously -- for example, at the heart of the *Indianapolis Tennis Championships* Complaint, referenced in paragraph 29 above, was the ATP's plan to move the Washington and Indianapolis hard court tournaments

24

from their traditional week, two weeks prior to the U.S. Open (a Grand Slam played on a hard court surface) and to place a Masters Series tournament into that calendar position -- after the ISL deal. It is doing it now to decrease production and thereby to create monopoly profits for the ATP Defendants.

61.    This anticompetitive behavior, which the ATP Defendants have taken in breach not only of the antitrust laws, but also their fiduciary duties, expands within the Brave New World. The ATP Defendants, for example, intend on not only downgrading the GTF Tournament's sanction, but they also intend on moving the GTF Tournament from its traditional date and replacing the GTF Tournament on that date with a "Masters 1000" tournament, with whom the GTF Tournament may not compete because that tournament is guaranteed geographic and calendar market protections precluding all such competition.

**F.    A Reduction In Output – An Elimination Of Existing Masters Series Tournament Sanctions.**

62.    As part of its Brave New World conspiracy, the ATP has decided to reduce the number of top-flight men's professional tennis tournaments, thereby artificially reducing the output of top-flight men's professional tennis and artificially inflating the value of the ATP Defendants' interest therein.

63.    With a few notable exceptions, the current Masters' Series tournaments have been told, by the ATP, that they will have to apply for Masters 1000 sanctions. It now appears that this application process has been closed off to other ATP tournaments. For example, the Hamburg, Monte Carlo, Rome, Madrid and Paris tournaments were the only tournaments invited to apply for available Masters 1000 sanctions in Europe. Further, it will result in the removal of at least two current Masters Series tournaments, as only three Masters 1000 sanctions have been made available on which these five tournaments may bid.

25

64.    Though the ATP has invited (only) five of its tournaments to "apply" for "Masters 1000" status in Europe, it is apparent that the ATP has already determined which of its current Masters Series tournaments it plans on "downgrading" -- the GTF's tournament in Hamburg, and the Masters Series tournament in Monte Carlo. These tournaments are being "downgraded" because they are not "favored tournaments" or part of the ATP's illegal cartel.

65.    Regardless, the ATP's downgrading of tournaments combined with the market protections provided to the Masters 1000 tournaments will provide consumers such as tennis fans, broadcasters and sponsors, with even fewer options, and corresponding higher costs, in the markets associated with world class men's professional tennis.

**G.    The Elimination Of Competition -- The Pooling Of Broadcast Rights.**

66.    Pursuant to the current Masters 1000 Applications, "all ATP Masters 1000 domestic and international television rights [these broad rights will be referred to collectively as the "television rights"] will be pooled and exploited by ATP Media." Further, "[t]he television/digital media rights pooled will be operated on a transparent basis, and will divide the net profits, as agreed between the participating tournament members." Finally, "[t]he applicants acknowledge that ATP Media shall have the sole right to determine the use and commercial exploitation of the Media Rights granted to it and ATP Media shall be the contracting party to contracts with [broadcasters]."

67.    Notwithstanding the fact that this pooling of broadcast rights is illegal, as set forth below, and the fact that such pooling failed as a commercial matter previously when the ISL deal collapsed, it will have a substantial effect on the property rights of current ATP tournaments and consumers who will have ever fewer opportunities to watch world-class tennis.

68.    The ATP previously attempted to take and pool the television rights of certain tournaments, including the GTF Tournament, in 1999. This taking by the ATP had a disastrous effect upon the GTF and the GTF Tournament, as it destroyed the GTF's pre-existing business and contractual relationships with broadcasters with whom the GTF had always, on an individual basis, sold its broadcast rights in a previously open market.

69.    Regardless, in 1999 the ATP took and pooled the television rights of the Masters Series tournaments and sold them for $1.2 billion to ISL. In doing so, the ATP planned on the following: creating a global series of "premier tournaments," creating a "simplification of the structure" of men's tennis, allegedly, to "enhance its appeal" and develope a "global brand" of tennis. It would seem these are, yet again, the ATP's illegal and anticompetitive goals.

70.    Television rights are at the center of the ATP's Brave New World. According to some reports, television sports rights were worth $15 billion in 2001, with North America accounting for just under one-half of this amount. Generally, broadcasters compete for these rights on national and regional levels. This competition has resulted in a spiraling growth in the value of these rights (though, ironically, not to the extent anticipated by ISL, who overbid for the ATP's television rights in 2001, thereby leading to ISL's subsequent declaration of bankruptcy and now, to the ATP's new efforts to gather, pool and artificially inflate the value of certain broadcast rights).

71.    The ATP anticipates that, by pooling of television rights of the world-class men's professional tennis tournaments while simultaneously drastically reducing the supply of world-class men's professional tennis, it can increase the collective value of these rights. Given that these rights will be pooled in ATP Media, which will receive a significant portion of the gross revenue created by these rights, the ATP has the most to gain from its proposed changes. The

27

clear losers are the vast majority of tennis tournaments, especially the decommissioned masters' tournaments, who will find themselves trying to sell their own individual television rights in a market now controlled by the ATP in which they may not, per the ATP's Brave New World plan, compete for players or prime calendar spots; broadcasters who will have to pay more for fewer broadcast options; and the end consumers -- fans -- who will have considerably fewer top-flight men's professional tennis broadcast options.

## THE BRAVE NEW WORLD IS ILLEGAL UNDER THE SHERMAN ACT.

**A.    The Defendants' Activities Have Created An Antitrust Injury To The GTF Plaintiffs, The Relevant Markets And Consumers Therein.**

72.    The ATP Defendants have and continue to injure the GTF Plaintiffs, consumers and competition by, *inter alia*, fixing the price that competing tournament may pay their winners, limiting the output of key tennis players, pooling and limiting the existence of broadcast rights and limiting the media and geographic outlets for tournaments.  These restrictions on price and output are illegal, paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit, and they injure consumers and competition generally.

73.    The ATP Defendants have established and operated a worldwide cartel in the production of men's professional tennis tournaments.  The members of this cartel have agreed to limit competition among themselves in the critical areas of scheduling and player availability – while at the same time manipulating the scheduling and players available to non-favored tournaments, both sanctioned and non-sanctioned, in order to reduce output, restrain and/or eliminate competition and acquire a monopoly.

**1.    The Relevant Markets.**

74.    The cartel has restrained competition in and acquired, and has attempted and conspired to acquire, a monopoly in the market for the production of men's professional tennis

28

events or a relevant submarket. This is a global market, though there may be relevant antitrust submarkets worldwide, in developed countries and within the United States. The ATP Defendants, though based in the United States, have restrained competition in, and acquired, and have attempted and conspired to acquire, a monopoly in all of the relevant geographic markets for the production of men's professional tennis events around the world.

75.    Additionally, the cartel has also restrained competition in and acquired, or attempted or conspired to acquire, a monopoly in the market for the tennis playing services of men's professional players or a relevant submarket. The relevant geographic market for the tennis playing services of men's professional tennis players is global, though there may be relevant antitrust submarkets worldwide, in developed countries and within the United States. The ATP's actions in this market, however, occur within the United States marketplace, as the ATP is a United States corporation, and they involve, in part, the exportation and importation of players from the United States who are United States nationals or reside in the United States. For example, currently two of the world's current top ten players (Andy Roddick and James Blake) and three of the top twenty-five and four of the top fifty are United States citizens. Further, traditionally, many of the top men's players are United States residents (such as, currently, Tommy Haas, Dmitry Tursunov and Xavier Malisse). The ATP's action in the United States markets are damaging markets on a global basis.

76.    Having sought and achieved monopoly power in the market for the production of men's professional tennis events and services of men's professional players, the ATP Defendants have conspired and continue to conspire to unreasonably restrain and monopolize a third market – the market for the rights to broadcast men's professional tennis events, or relevant submarkets. The ATP has done so by illegally taking and pooling the broadcast rights of its members,

artificially limiting the output of men's professional tennis broadcasts, and forbidding any non-favored men's professional tennis tournament (other than the Grand Slams) from competing with the ATP Defendants' pooled broadcast rights. The ATP has done this directly, by taking direct control of these rights and indirectly, by controlling and eliminating the supply of top men's players and/or top calendar weeks to anyone but its preferred tournaments. The market for these rights is a global market, though there may be relevant antitrust submarkets worldwide, in developed countries and within the United States, that is being injured by the ATP's actions in the United States. The ATP Defendants have restrained competition in, and acquired, and have attempted and conspired to acquire, a monopoly in all of the relevant geographic markets around the world for the rights to broadcast men's professional tennis events, including the broadcast of such events within the United States, such as that by the GTF Tournament on the Tennis Channel and ESPN 2 in 2007.

77.    Finally, by seeking and achieving monopoly power in the markets set forth above, the ATP Defendants have sought and achieved monopoly power and have conspired and continue to conspire to unreasonably restrain and monopolize in numerous submarkets including, *inter alia*, the submarkets for sponsorship rights, marketing rights and the provision of goods and services at men's tennis events.

### 2.    The Defendants Are Causing Substantial Injuries To These Markets.

78.    The ATP Defendants have and continue to cause substantial injuries to the relevant markets.

79.    Since its creation in 1999, the ATP has steadily increased its stranglehold on the relevant markets using methods such as those condemned by the *Volvo* court. The ATP has employed the same basic agreements and conduct that were challenged in the *Volvo* case. With

the adoption of the Brave New World plan, the ATP made its agreements and conduct even more restrictive, exclusionary, and anticompetitive than those at issue in the *Volvo* case.

80.    The ATP Defendants have and continue to damage the following relevant markets:

  a. The markets for men's professional tennis tournaments, or relevant submarket(s), including the market for world-class events, such as the GTF Tournament.    The ATP has and continues to injure these markets by eliminating men's professional tennis events' ability to compete with the ATP Defendants' cartel events, by controlling men's professional tennis players and forcing them to play, almost exclusively, the ATP Defendants' favored events to the exclusion of all other events, and by boycotting non-favored events, thereby relegating these events to a permanent minor-league status. The ATP Defendants have done this to increase the value of their own tournaments and tournament-related assets and to create and increase monopoly profits derived therefrom;

  b. The market for men's professional tennis players, or relevant submarket(s). The ATP Defendants control this market via their power to punish and reward men's professional tennis players, all of whom must be ATP members to participate in any meaningful men's professional tennis tournaments. The ATP has damaged and continues to damage this market by eliminating tournaments' abilities to compete for these players or these players' abilities to compete for tournaments. In doing so, the ATP has damaged tournaments and players, as well as consumers, who would have more opportunities to

31

066145.1001

participate as fans, sponsors and broadcasters of tournaments, if tournaments were allowed to compete and exist in the relevant geographic markets;

c. The market for broadcasting men's professional tennis events, or relevant submarket(s). The ATP Defendants control this market via their pooling of tournament broadcast rights into the ATP Defendants' ATP Media. The ATP has damaged and continues to damage this market by artificially creating a handful of world-class ATP men's professional tournaments and precluding all other tournaments from competing with these tournaments, thereby leaving broadcasters with only a handful of broadcast options and by controlling the remaining broadcast rights of tournaments of any consequence so that these tournaments, and their broadcasters, may not compete with the ATP Defendants' favored tournaments (and produce better tournaments by doing so). This reduction of broadcast options creates substantial monopoly profits for the ATP Defendants while injuring non-favored tournaments, broadcasters and consumers who, otherwise, would have considerably more opportunities to watch broadcast men's professional tennis and broadcast world-class men's professional tennis in a competitive market;

d. The market for the fans of live men's professional tennis, or relevant submarket(s). The ATP controls this market via all of the controls set forth above, including, *inter alia*, its control of tournaments, players, the calendar and tennis broadcasts. The ATP has and continues to damage this market by artificially creating a handful of world-class ATP men's professional tournaments and precluding all competition with these events, thereby leaving

32

fans with only a handful of live top-class ATP men's professional tennis options and by controlling all remaining men's professional tennis tournaments (other than the Grand Slams) so that these tournaments may not compete with the ATP Defendants' favored tournaments (and produce better tournaments by doing so). This reduction of live tennis options creates substantial monopoly profits for the ATP Defendants while injuring non-favored tournaments and consumers who, otherwise, would have considerably more opportunities to watch live men's professional tennis and world-class men's professional tennis in a competitive market; and

e. The market for sponsoring men's professional tennis events, or relevant submarket(s). The ATP controls this market via all of the controls set forth above, including, *inter alia*, its control of tournaments, players, the calendar and tennis broadcasts. The ATP has damaged and continues to damage this market by artificially creating a handful of world-class ATP men's professional tournaments and precluding all competition with these events, thereby leaving sponsors with only a handful of sponsorship options, all controlled by the ATP Defendants, and by controlling all remaining men's professional tennis tournaments (other than the Grand Slams) so that these tournaments may not develop better tournaments that might compete with the ATP Defendants' favored tournaments for sponsorship rights. This reduction of sponsorship options creates substantial monopoly profits for the ATP Defendants while injuring non-favored tournaments and sponsors who,

33

otherwise, would have considerably more opportunities to sponsor men's professional tennis in a competitive market.

81.    The GTF Plaintiffs have been, continue to be and shall be injured in each of these markets globally, in Germany and in the United States. The GTF Plaintiffs, for example, have traditionally competed for the top United States men's tennis players, who have regularly played in the GTF Tournament. This year the GTF Plaintiffs anticipate that United States citizens Andy Roddick and James Blake as well as United States residents, Tommy Haas, Dmitry Tursunov and Xavier Malisse will play in the 2007 GTF Tournament. The GTF Plaintiffs, also, traditionally have sold broadcast and sponsorship rights in the United States. This year, for example, the GTF Tournament will be broadcast on the Tennis Channel and ESPN 2. Further, the GTF Tournament draws fans of live tennis from the United States on an annual basis. Pursuant to the Brave New World, however, the GTF tournament will effectively be precluded from competing for these top men's players, for United States sponsorship or broadcast rights or for United States-based tennis fans. Further, to the extent the GTF Plaintiffs' injuries take place outside the United States, they are being caused by the ATP Defendants' actions in the United States and in the United States geographical markets.

82.    Thus, the GTF Tournament, and other ATP tournaments, cannot even compete with the ATP's chosen tournaments even with an ATP sanction. For example, the prize money tournaments may offer is capped by the ATP and may only be raised with the ATP's permission, thereby eliminating tournaments' ability to compete for players and the players' ability to provide their services in an open market.

83.    Similarly, the barriers faced by any men professional tennis player who desires to compete in non-ATP events is daunting. First, there are no such events. Further, as set forth

34

above, the rankings determine player acceptances and seeding for all Tournaments. Accordingly, players are compelled to play by the ATP's rules and to maximize their ATP Rankings points or they will be precluded from playing tennis professionally at any meaningful level. Finally, the ATP's Brave New World compels the participation of top men's tennis players in so many tournaments yearly, that such players cannot reasonably play further tournaments without risking breakdown or injury.

84.    Worst of all, because of the ATP Defendants' actions, the market is not responsive to consumer preferences. In a free market, for example, consumers in the global market, including those in the United States who routinely travel to Hamburg, Germany to support the GTF Tournament, would be free to support the GTF Tournament, which in turn would be free to compete for the best men's tennis players in the world, thereby bringing these players into the marketplace there and providing top-quality tennis for consumption. This would, in turn, create competition for everything from broadcast rights and marketing to the right to sell concessions, all of which provide choice and options to consumers in the relevant marketplaces, including those that specifically exist in the United States. The ATP Defendants' actions, however, already limit the GTF Tournament's ability to compete in the relevant markets or with the ATP. The Brave New World plan will provide the coup de grâce to the GTF Tournament's ability to compete for the Top 50 players in the world, including numerous United States citizens and residents. This will directly harm consumers in the United States who, previously, have attended tournaments around the world live or watched these tournaments on television or other broadcast medium to see some, though not always all, of the best professional men's tennis players in action.

35

066145.1001

85.    Accordingly, instead of decisions in the relevant markets being made by the owners and producers of men's professional tennis tournaments and events, completely unfettered subjective and discretionary anticompetitive determinations are made by the competitors of the GTF Tournament, who control the ATP.  This substitution of regulation for competition is normally considered *per se* unlawful.

**B.    The Defendants' Actions Constitute Joint Action.**

86.    Section 1 of the Sherman Act is directed only at joint action, and does not prohibit independent business actions and decisions.  However, courts have consistently held that, since joint ventures—including sports leagues and other such associations—consist of multiple entities, they can violate § 1 of the Sherman Act.  Much like the Men's International Professional Tennis Council in *Volvo*, however,  the ATP is "an association consisting of representatives of national tennis associations, tournament owners and directors, and professional tennis players." *Volvo*, 857 F.2d at 71.  As such, its actions constitute joint action for purposes of determining whether antitrust violations have occurred.

**C.    The ATP Defendants' Actions Affect Interstate Commerce**

87.    The ATP Defendants' anticompetitive conduct has taken place in interstate commerce and has restrained trade and commerce among the States and in the markets identified, and the Brave New World will continue to do so in the future.

<u>Count I</u>

**(Violations of Section 1 of the Sherman Act)**

**<u>Contract, Conspiracy, or Combination in Restraint of Trade, 15 U.S.C. § 1</u>**

88.    The GTF Plaintiffs repeat and re-allege paragraphs 1-87 as though fully set forth herein.

36

89.     The ATP and certain of its member tournaments are horizontal competitors and independent legal entities engaged in an ongoing conspiracy, contract, or combination, among themselves and with certain of their directors and officers, the primary object of which is to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

90.     As alleged herein, the ATP Defendants' Brave New World scheme unreasonably restrains trade by:

    a.  limiting output in the relevant market by reducing the number of top-tier professional men's tennis tournaments;

    b.  restraining and eliminating competition among tournaments for the services of top tennis players by imposing mandatory player restrictions and penalties that drastically reduce players' abilities to participate in tournaments excluded from the unlawful cartel;

    c.  fixing prices by capping the amount of prize money and other compensation that tournaments may offer to compete for the services of top players;

    d.  dividing and allocating markets for tournaments by manipulating the bidding process for awarding top-tier tournament sanctions and manipulating tournament schedules with respect to geographic location and calendar dates to favor members of the cartel;

    e.  pooling television and media rights to cartel tournaments to obtain supra-competitive profits from the sale of those rights, while restraining the ability of non-cartel tournaments to compete fairly with the cartel broadcasts; and

37

f. boycotting potential competitors by collectively refusing to deal with qualified tournaments that do not meet or abide by the terms of the cartel's unlawful scheme.

91. The ATP Defendants' anticompetitive conduct has had a significant adverse effect on competition in the relevant market for the production of top-tier professional men's tennis tournaments, causing direct and proximate harm to consumers and market participants as described above.

92. The anticompetitive conduct orchestrated, facilitated and enforced by the ATP Defendants in this case is precisely the type of pernicious agreement that is ordinarily condemned as a matter of law as illegal *per se* because of the certainty that such practices are anticompetitive. The ATP Defendants' conduct therefore is subject to the *per se* analysis.

93. The ATP Defendants' conduct also constitutes an antitrust violation under the "quick-look" analysis. The challenged agreements and actions are not reasonably necessary to further any legitimate, pro-competitive goal of the ATP, or of the cartel, and they constitute naked restrictions on price and output. No elaborate analysis is needed to demonstrate the anticompetitive character of the agreements and the overall anticompetitive nature of the scheme.

94. The ATP Defendants' conduct further constitutes an antitrust violation under full Rule of Reason analysis. The ATP possesses market power and monopoly power in the relevant markets and the ATP's challenged agreements and conduct do not produce pro-competitive efficiencies at all, much less pro-competitive efficiencies that could possibly exceed the anticompetitive consequences and effects of those agreements and conduct. Even if there were some conceivable justification for the ATP Defendants' agreements and conduct, they are broader than necessary to achieve such a purpose, and therefore unreasonably restrain trade.

38

95.    The actual, probable and intended affects of the ATP Defendants' anticompetitive agreements and conduct have caused and continue to cause injury to the GTF Plaintiffs. Further, they have distorted and caused injury to competition in the United States and around the world, including in the market for men's professional players services, the market for production of men's professional tennis tournaments, and the market for sponsorship and broadcasting rights to men's professional tennis tournaments.

96.    The GTF Plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

## Count II
### (Violation of Section 2 of the Sherman Act)
#### Monopolization

97.    The GTF Plaintiffs repeat and re-allege paragraphs 1-96 as though fully set forth herein.

98.    At all relevant times, the ATP possessed monopoly power and substantial market power in the relevant markets.

99.    The ATP Defendants willfully obtained and exercised complete dominance and monopoly power over men's professional tennis players and men's professional tennis tournaments, and willfully obtained and exercised the power to control the prizes and payments to men's professional tennis players, the scheduling and the existence of men's professional tennis tournaments, the sponsorship and broadcasting rights to men's professional tennis tournaments, and the power to exclude competitors from the relevant markets.

100.    The ATP Defendants have willfully maintained the ATP's monopoly power in the relevant markets. It was the ATP Defendants' conscious objective to further the ATP's

39

dominance and to solidify its monopoly in the relevant markets by announcing the Brave New World.

101.    The ATP Defendants willfully obtained and maintained the ATP's monopoly power in the relevant markets by restrictive and exclusionary conduct rather than by means of legitimate competitive activities, business acumen or historical accident. The ATP Defendants have used their monopoly power to shield tournaments favored by the cartel from the rigors of competition and prevent the development of competing tournaments. The ATP Defendants have divided markets, limited output, and otherwise excluded competition to maintain the ATP's monopoly.

102.    By virtue of its monopoly and market power, the ATP Defendants have required all of the top men's professional tennis players in the world to agree to commitment agreements and regulations as a pre-condition to meaningful participation in ATP tournaments. In this manner, the ATP Defendants have exerted control over the men's tennis players services market and have impaired competition and achieved monopoly power in the men's professional tennis tournament market with respect to all events, both ATP sanctioned and non-sanctioned events.

103.    Having achieved monopoly power in the market for the production of men's professional tennis events, the ATP Defendants have used and leveraged that power to unreasonably restrain trade in and monopolize the market for sponsorship rights and the rights to broadcast men's professional tennis on television, or on other medium, in the United States and globally.

104.    The ATP Defendants' willful maintenance of monopoly power has made it difficult or impossible for competitors to engage in fair competition. The conduct taken by the ATP Defendants and its cartel have injured consumers; competition in the relevant markets; and

40

the GTF Plaintiffs (and others similarly situated) in their capacities as owners and producers of a professional men's tournament by:

    a.  Restraining their ability to freely compete with all other professional men's tennis tournaments on an equal footing;

    b.  Favoring tournaments in which the ATP has a proprietary and/or property interest to the exclusion of the GTF Plaintiffs and others;

    c.  Impairing the GTF Plaintiffs' ability to compete freely in the market for the playing services of men's professional tennis players or to obtain a sufficient supply of players for its tournaments;

    d.  Impairing the ability of players to compete freely in the market for the sale of their playing services;

    e.  Effectively prohibiting the GTF from owning or producing other men's professional tennis tournaments that they might otherwise choose to own and produce; and,

    f.  Restraining the ability of the GTF Plaintiffs to fairly participate and/or compete in the market for the rights to broadcast men's professional tennis events in the United States or globally.

105.    The ATP Defendants' anticompetitive conduct has directly and proximately caused injury and damage to the GTF Plaintiffs' business and property interests, as set forth above.

106.    The actual, probable and intended affects of the foregoing acts and practices, and the continuing course of the ATP Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the relevant markets.

41

107.    The plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

### Count III
### (Violation of Section 2 of the Sherman Act)
### Attempt to Monopolize

108.    The GTF Plaintiffs repeat and re-allege paragraphs 1-107 as though fully set forth herein.

109.    The ATP Defendants have engaged in restrictive, exclusionary, and anticompetitive conduct, as described above, with the specific intent to monopolize the relevant markets.

110.    The ATP Defendants have succeeded in monopolizing the relevant markets. Further, there is a dangerous probability that the Brave New World plan will succeed in further solidifying and entrenching the ATP's monopoly in the relevant markets.

111.    The ATP Defendants' anticompetitive conduct has directly and proximately caused injury and damage to the GTF Plaintiffs' business and property interests, as set forth above.

112.    The actual, probable and intended affects of the foregoing acts and practices, and the continuing course of the ATP Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the relevant markets.

113.    The GTF Plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

066145.1001

**Count IV**
**(Violation of Section 2 of the Sherman Act)**
**Conspiracy to Monopolize**

114.    The GTF Plaintiffs repeat and re-allege paragraphs 1-113 as though fully set forth herein.

115.    The ATP Defendants and the members of its cartel have conspired and combined with one another to monopolize trade and commerce in all of the relevant markets.    The substantial terms of the conspiracy were, among others, that the ATP Defendants and their co-conspirators would take action, which they would represent to other non-favored members and to the public to be in the interest of all ATP Tournament Members, while knowing that the action was taken to bestow disproportionate and almost exclusive benefit upon the ATP Defendants and their co-conspirators.

116.    In furtherance of the combination and conspiracy, the ATP Defendants and the cartel have taken the concerted action and committed the overt acts in furtherance of the conspiracy as set forth herein.    The ATP Defendants' co-conspirators include all those who have entered into the anticompetitive agreements described in this Complaint, whether voluntarily or through coercion, including the commitment agreements, the ATP's tournament rules, regulations, and commitments, the agreements among the ATP and certain broadcasters and sponsors, and the Brave New World-related applications and agreements.

117.    The ATP Defendants and their co-conspirators specifically intended that the effect of their unlawful combination and conspiracy would be to achieve and maintain a monopoly in the markets identified.

43

118.    The ATP Defendants' anticompetitive conduct has directly and proximately caused injury and damage to the GTF Plaintiffs' business and property interests, as set forth above.

119.    The actual, probable and intended affects of the foregoing acts and practices, and the continuing course of the ATP Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the relevant markets.

120.    The GTF Plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

## Count V
## Breach of the ATP Defendants' Fiduciary Duty of Loyalty

121.    The GTF Plaintiffs repeat and re-allege paragraphs 1-120 as though fully set forth-herein.

122.    The ATP is a non-profit, membership corporation.    Accordingly, pursuant to Delaware law, the ATP and the ATP Officer and Director defendants have a duty to act in the best interest of the corporation's members, and must set aside their parochial interests.    Further, the ATP and the ATP Officer and Director Defendants are not permitted to use their position of trust and confidence to further their own private interests.    Rather they owe their members, including the GTF Plaintiffs, a fiduciary duty of loyalty.

123.    As set forth above, the primary purpose of the ATP is to administer a men's professional tennis circuit, while doing so in the best interest of tournaments, players and the sport of tennis generally.    In doing so, the ATP is obligated to serve as a neutral arbiter over a democratic ATP Tour, not as a competitor or owner of tournament assets in a tour dominated by a few interests.

44

066145.1001

124.    Via its Brave New World plan, however, the John Doe Officers and Directors defendants are violating these tenants, and their individual duties of loyalty to their membership. The Individual Defendants have breached their duty of loyalty to the ATP and its members because they put their own interests ahead of the ATP's and its members.

125.    First, some or all of the John Doe Officers and Directors defendants derive income, in the form of bonuses paid from tournaments selected for inclusion among the top-tier Masters 1000 tournaments. They have acted to increase these bonus amounts rather than to protect the interests of many of the ATP's tournament members, including the GTF Tournament.

126.    Further, the ATP has consolidated property rights from some, but not all of its tournament members, which should belong to those individual members, in itself, such as the broadcast rights of the Masters 1000 tournaments, thereby injuring the tournaments whose rights are not pooled.

127.    Further, the ATP, as set forth in detail above, is engaging in anticompetitive behavior to control the supply of these broadcast rights by artificially limiting the number of top-flight ATP tournaments. This will benefit the ATP, its individual board members, and a favored class of tournament members, but this benefit is not shared by all of the ATP's tournament members. In fact, a many of the ATP's tournament members will suffer a significant injury, so that the ATP Defendants may, in effect, subsume those tournaments' property rights and take them for the benefit of ATP Defendants.

128.    This, and the ATP Defendants' violation of the United States antitrust laws, constitute ongoing violations of the ATP and the ATP Officer and Director Defendants' duty of loyalty to its non-favored tournaments, such as the GTF Tournament.

45

129.    The GTF Plaintiffs have suffered and will continue to suffer injury as a result of the ATP Defendants breach of their fiduciary duty of loyalty to the GTF Plaintiffs.

**Count VI**
**Breach of the ATP Defendants' Fiduciary Duty of Due Care**

130.    The GTF Plaintiffs repeat and re-allege paragraphs 1-129 as though fully set forth-herein.

131.    The ATP and the John Doe Officers and Directors defendants owe the ATP's members, including the GTF Plaintiffs, a duty of due care.

132.    The ATP and the ATP Officer and Director Defendants have failed to make a good faith effort to be informed and exercise appropriate judgment, as required by this duty through their refusal to listen to or allow the European tournament representative to participate in certain meetings and the ATP Defendants' ongoing and continuing illegal, anticompetitive actions, in violation of the federal antitrust concerns.  The pursuit of the ATP's clearly illegal scheme is without the bounds of reason and, therefore, constitutes a violation of the duty of due care.

133.    The GTF Plaintiffs have suffered and will continue to suffer injury as a result of the ATP Defendants' breach of their fiduciary duty of loyalty to the GTF Plaintiffs.

**Count VII**
**Breach of the ATP Defendants' Fiduciary Duty of Good Faith**

134.    The GTF Plaintiffs repeat and re-allege paragraphs 1-133 as though fully set forth-herein.

135.    The ATP and the ATP Officer and Director Defendants owe the GTF Plaintiffs a fiduciary duty of good faith.

46

136.    The ATP and the ATP Officer and Director Defendants have breached this duty by (1) acting in subjective bad faith, by taking the property rights of tournaments and intentionally harming the ATP's members who might compete with the ATP in an open market; and (2) demonstrating a conscious disregard for their responsibilities by intentionally violating applicable positive law, *i.e.*, the federal antitrust laws of the United States, and an actual intent to do harm, if not to the corporation itself, then definitely to certain minority members thereof.

137.    The GTF Plaintiffs have suffered and will continue to suffer injury as a result of the ATP Defendants' breach of their fiduciary duty of good faith to the GTF Plaintiffs.

## Count VIII
## Interference with Contracts, Business Relationships and Prospective Business Advantage

138.    The GTF Plaintiffs repeat and re-allege paragraphs 1-137 as though fully set forth herein.

139.    The GTF Plaintiffs have long-standing business relationships with tennis players, with sponsors with consumers and with broadcasters.    In addition to its valid business relationships, the GTF entered into a valid and enforceable contracts with sponsors and broadcasters, based on the parties' mutual understanding that the GTF Tournament would take place during its traditional week, two weeks prior to the French Open.

140.    The ATP Defendants have had knowledge of the existence of these contractual and business relationships for an extended period of time.

141.    Despite the knowledge of the ATP Defendants, and in an effort to restrain trade and injure competition, the ATP Defendants have intentionally attempted to interfere with these contracts and/or business relationships, all without justification.

142.    The GTF Plaintiffs have been damaged in that their ownership interests, property rights and contractual relationships as heretofore stated will be significantly impaired by the ATP

47

mandating a change in the scheduling of the GTF Tournament, and via the ATP's Brave New World. Additionally, the GTF has been damaged in that the ATP Defendants' conduct, in interfering with these business relationships, without justification, limits the GTF's ability to negotiate favorable terms with respect to its ongoing business relationships for calendar years 2007 and beyond.

**Count IX**
**Preliminary and Permanent Injunctive Relief**

143. The GTF Plaintiffs repeat and re-allege paragraphs 1-142 as though fully set forth herein.

144. The actions complained of by the GTF Plaintiffs, as previously set forth, will result in irreparable harm.

145. There is a strong likelihood that the GTF Plaintiffs will succeed on the merits of its claims.

146. The public interest will be furthered by the entry of a permanent injunction restraining the ATP Defendants' unlawful acts.

147. The harm to the GTF Plaintiffs and the interests of competition substantially outweighs the harm, if any, to the ATP Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Duetscher Tennis Bund and the Rothenbaum Sports GMBH respectfully request that the Court enter judgment in its favor and against the Defendants ATP Tour, Inc. and John Does 1-9 as follows:

A. An award to the GTF Plaintiffs of three times the damages that they have sustained as a result of the ATP Defendant's antitrust violations as provided for by Section 4 of

48

the Clayton Act, 15 U.S.C. Section 15, including the damages sustained while this litigation is pending, the amount of which is ongoing and is not presently known.

      B.    An award to the GTF Plaintiffs of compensatory damages caused by the ATP Defendants' tortious interference with existing contractual relationships, tortious interference with current and prospective business relationships and prospective economic advantage, in an amount presently unknown but to be determined at trial.

      C.    An award to the GTF Plaintiffs of punitive damages in an amount to be determined at trial.

      D.    Declaratory relief issued pursuant to 28 U.S.C. §§ 2201-2202 that defendants' Brave New World plan is unlawful in violation of Sections 1 and 2 of the Sherman Act and the common law.

      E.    A preliminary and permanent injunction barring the ATP Defendants, and all persons and entities acting in concert with them, from further violating the rights of the GTF Plaintiffs, and others similarly situated, including but not limited to provisions barring the ATP Defendants from the following:

      (i)    implementing, directly or indirectly, the Brave New World plan and from engaging in any of the unlawful and anticompetitive conduct alleged herein; or

      (ii)    Retaliating against the GTF or the GTF Tournament in any way, whether through the administration of the ATP, or by or through any entity related to the ATP, or otherwise.

      F.    An award of the GTF Plaintiffs' costs of litigation, including reasonable attorneys' fees as provided for by Section 4 of Clayton Act, and other applicable laws.

      G.    An award of pre-judgment and post-judgment interest, as provided by law.

    

H.    Such other and further relief as the Court may deem just.


Dated: March 28, 2007

                                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                        *Richard H. Morse for*

                                        C. Barr Flinn (No. 4092)
                                        Chad S.C. Stover (No. 4919)
                                        The Brandywine Building
                                        1000 West Street, 17th Floor
                                        Wilmington, DE 19801
                                        (302) 571-6692
                                        bflinn@ycst.com
                                        cstover@ycst.com
                                        *Attorneys for Duetscher Tennis Bund (the German*
                                        *Tennis Federation) and the Rothenbaum Sports GMBH*

OF COUNSEL:

Robert D. MacGill
Hamish S. Cohen
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana  46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W.
Suite 500
Grand Rapids, Michigan  49503
(616) 742-3930

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DUETSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) and ROTHEMBAUM SPORTS GMBH,

**DEFENDANTS**

ATP TOUR, INC., JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8 and JOHN DOE 9,

(b)    County Of Residence Of First Listed Plaintiff:
(Except In U.S. Plaintiff Cases)

County Of Residence Of First Listed Defendant:
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c)    Attorneys (Firm Name, Address, And Telephone Number)
C. Barr Flinn, Esquire (#4092)
Chad S.C. Stover, Esquire (#4919)
Young Conaway Stargatt & Taylor, LLP
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6692

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government
      Plaintiff

☒ 3 Federal Question
      (U.S. Government Not a Party)

☐ 2 U.S. Government
      Defendant

☐ 4 Diversity
      (Indicate Citizenship of
      Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place An X In One Box For Plaintiff And
(For Diversity Cases Only)    One Box For Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## V. NATURE OF SUIT    (Place An X In One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 U.S.C. 881<br>☐ 630 Liquor Laws<br>☐ 640 R R & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 U.S.C. 158<br>☐ 423 Withdrawal 28 U.S.C. 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☒ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates, etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 U.S.C. 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>Habeas Corpus<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl Ret Inc Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 U.S.C. 7609 |  |

## IV. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTSE UNLESS DIVERSITY.)
15 U.S.C. § §1-2
Brief description of cause:
Cause of action for Breach of Fiduciary Duties and Antitrust Violations.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $**

Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY    (See instructions)

JUDGE:                    DOCKET NUMBERS:

DATE
3/28/07

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    (a)    **Plaintiffs - Defendants**. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)    **County of Residence**. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c)    **Attorneys**. Enter firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.    **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties**. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause.

V.    **Nature of Suit**. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.    **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII.    **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases**. This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ‾ 0 7 ‾ – 1 7 8

## ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

### *NOTICE OF AVAILABILITY OF A*
### *UNITED STATES MAGISTRATE JUDGE*
### *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____10_____ COPIES OF AO FORM 85.

_____3/28/07_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____Dustin Frohlich_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action