# YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. BARR FLINN
DIRECT DIAL: 302-571-6692
DIRECT FAX: 302-576-3292
bflinn@ycst.com

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

**CONFIDENTIAL AND
FILED UNDER SEAL**

October 12, 2007

**BY ELECTRONIC FILING**

The Honorable Gregory M. Sleet
United States District Court
  for the District of Delaware
844 North King Street
Lockbox 19
Wilmington, Delaware 19801

   Re: *Deutscher Tennis Bund, et al. v. ATP Tour, Inc. et al.,*
      C.A. No. 07-178-GMS

Dear Chief Judge Sleet:

  Plaintiffs respectfully submit this letter in support of their request that documents and communications drafted and/or exchanged by the ATP in relation to its settlement with the Monte Carlo Plaintiff ("Monte Carlo") be provided to the Court for *in-camera* review and, if appropriate, subsequent production.

  This Court has held that evidence of settlement negotiations otherwise inadmissible under FRE 408 may be discoverable under F.R.C.P. 26 broad provisions. *See Block Drug Co. v. Sedona Labs.*, 2007 WL 1183828, at *1 (D. Del. Apr. 19, 2007). The standard for discovery of these documents is a "more 'particularized showing' that the evidence sought is relevant and calculated to lead to the discovery of admissible evidence." *Id.* Plaintiffs can make such a particularized showing.

  Evidence in antitrust cases focuses on agreements or conspiracies made to restrain or monopolize trade. These agreements or conspiracies can be subtle and often involve circumstantial evidence that establishes the conduct in restraint of trade.

  Discovery taken to date establishes that the ATP has conspired with others to take a centralized commercial role in men's professional tennis; to take its members property rights, including the Plaintiffs' ATP Membership for its own; and to decrease output into and out of relevant markets so as to artificially increase the value of the assets it has taken from its members

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
October 12, 2007
Page 2

(the "Conspiracy"). The ATP is doing this in a purposeful and knowing disregard of its corporate structure, its fiduciary duties and the antitrust laws of the United States.[1]

The Conspiracy involves, among others, the ATP, certain Chinese entities, individuals and entities associated with the Madrid tournament, the individuals and entities who will run the Tennis Masters Cup ("co-conspirators") and a few distinct tournament members who have been welcomed (as active participants or otherwise) into the Conspiracy to secure its monopoly on players' services. Central to the Conspiracy is the development of absolute control over the supply-side market of ATP players to tournaments obtained via the use of "carrots" such as monopoly-funded bonus pools and "sticks" such the immediate suspension of players who miss mandatory tournaments. This will compel the top players to play in the co-conspirators' tournaments; preclude their participation in other tournaments thereby reducing the supply-side input of world-class men's professional tennis; and secure monopolistic control of this market for the ATP and its conspirators. The success of the Conspiracy is already evidenced by the ATP's appropriation and sale of Plaintiffs' ATP Membership to co-conspirators in China, London and Madrid.[2]

The Monte Carlo settlement is a key part of the Conspiracy. The settlement incorporates key aspects of the ATP's Brave New World plans. From its inception, the Brave New World contemplated only a minor downgrade of Monte Carlo as the ATP conspirators did not require Monte Carlo's week on the calendar to effectuate their schemes. They could not afford, however, to require players to play in Monte Carlo as that might affect player participation in their favored tournaments (by overburdening players). Accordingly, it is not surprising that the ATP settled with Monte Carlo now, in furtherance of its illegal schemes, in a manner where Monte Carlo retains its week with no player commitment benefits.

Ultimately, the ATP bargained for terms and conditions in its agreement with Monte Carlo that preclude Monte Carlo from any mandatory player participation privileges while simultaneously requiring that Monte Carlo attract, on average, six of the top ten players in the world so as to retain its Masters 1000 sanction. The ATP's reasons for doing so are not only relevant and calculated to lead to the discovery of admissible evidence but may be of critical importance to this Court and the jury impaneled by this Court. For example, the Settlement Agreement does not explain: (a) why the ATP did not pay Monte Carlo damages when the ATP has admitted that damages were appropriate; (b) why Monte Carlo must attract, on average, six of the top ten players annually to retain its sanction; (c) its prospects for doing so; (d) the effect of this requirement on player participation; or (e) the effect of this requirement on the ability of other tournaments to attract players in a dramatically limited and controlled player participation market.

---

[1] The Plaintiffs intend on seeking leave from the Court on Monday, October 15, 2007 (pursuant to the Court's case management Orders) to amend its complaint to set forth the ATP's actions in further detail and add a party plaintiff and certain ATP Directors as Defendants.

REDACTED

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
October 12, 2007
Page 3

   The ATP's document production to date includes *no* correspondence between the ATP and any of its co-conspirators concerning negotiations for player participation guarantees despite the fact that these guarantees are a central component of the Conspiracy. This failure occurs despite the fact that e-mails reference meetings, negotiations and communications relating thereto. Such correspondence, whether relating to the settlement or otherwise, would constitute direct or circumstantial evidence of the conspiracy alleged by the Plaintiffs.

   Finally, the Plaintiffs cannot rely on the ATP's representation that any discrete category of relevant documents is not reasonably likely to lead to the discovery of admissible evidence. For example, it took the Plaintiffs over one month, two Subpoenas Duces Tecum, numerous 26(f)-related telephone calls, tens of letters, and an Order from the United States District Court for the Southern District of Indiana[3] to obtain 1,200 pages of documents relating to Mark Miles, the former CEO of the ATP over a burdensome objection, the last four hundred pages of which were only produced after the ATP mandated an attorneys'-eyes-only review by Plaintiffs' counsel. These documents revealed, *inter alia*, that Ion Tiriac, the owner of the Madrid tournament, told Mr. Miles in February 2007 that the ATP refused to permit him to sell another sanction but was negotiating instead to permit him to move the Madrid tournament into the Hamburg tournament week well before the ATP had officially announced that the Hamburg tournament would be moved and downgraded. Plaintiffs respectfully submit that the ATP's internal and external communications relating to Monte Carlo settlement may similarly illuminate these negotiations as admissible evidence of the ATP's conspiracy.

   The ATP's intent and actions are illuminated and set forth not just in "key" documents such as the Settlement Agreement itself. Rather, to date, the clearest indications of the ATP's scheme are buried in e-mails or other more informal documents that the writers never believed would see the light of day. This further illuminates the need for a full (albeit reasonable) production of the "behind-the-scenes" documents such as those relating to the Monte Carlo settlement. Simply put, the production of lawyer-cleansed agreements, presentations or Settlement Agreements, without more, is insufficient. Given this reality, and the broad scope of discovery appropriate in antitrust litigation, the production of the Documents is just and proper and a "particularized" showing has been made.

   An *in-camera* inspection by the Court of the correspondence exchanged between Monte Carlo's counsel and the ATP's counsel appropriately balances the need for information regarding co-conspirator agreements with the ATP's concerns under Rule 408. Plaintiffs respectfully request that the Court agree to examine in camera the documents exchanged between counsel for the ATP and counsel for Monte Carlo and make its own determination.

Respectfully Submitted,

C. Barr Flinn (No. 4092)

---

[3] That Court denied a Motion to Quash before receiving Plaintiffs' Response, based solely on Defendant's submission. *See* 1:07-mc-00129-LJM-JMS

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
October 12, 2007
Page 4

cc: Clerk of the Court (by electronic filing/hand delivery)
Lawrence C. Ashby, Esquire (by electronic filing/hand delivery)
Philip Trainer, Jr., Esquire (by electronic filing/hand delivery)
Bradley R. Ruskin, Esquire (by e-mail)
Jennifer R. Scullion, Esquire (by e-mail)
Robert D. MacGill, Esquire (by e-mail)
Hamish S. Cohen, Esquire (by e-mail)