IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) and ROTHEMBAUM SPORTS GMBH, | ) ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 07-178-GMS |
| ATP TOUR, INC., JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8 and JOHN DOE 9, | ) ) ) ) ) | **CONFIDENTIAL – FILED UNDER SEAL** |
| Defendants. | ) ) |  |

**DEUTSCHER TENNIS BUND'S AND ROTHENBAUM SPORTS GMBH'S
MOTION FOR LEAVE TO AMEND COMPLAINT**

Plaintiffs Deutscher Tennis Bund (German Tennis Federation) (the "GTF") and Rothenbaum Sport GmbH (the "Hamburg Tournament") (collectively, the "GTF Plaintiffs"), by and through their undersigned attorneys, move the Court, pursuant to Federal Rules of Civil Procedure (the "Rules") 15 and 21 to grant the GTF Plaintiffs leave to amend their Complaint. In support of their Motion, the GTF Plaintiffs respectfully show the Court as follows:

1. On March 28, 2007, the GTF Plaintiffs filed their original Complaint (D.I. 1) against the ATP Tour, Inc. ("ATP"), alleging, *inter alia*, that the ATP and certain yet-to-be

named co-conspirators (the "Cartel") had, were and were continuing to conspire and take actions, in violation of the United States antitrust laws, to control inputs and limit outputs in numerous markets relating to men's professional tennis via the ATP's Brave New World Plan (the "Plan") and otherwise. Per the Complaint, the Cartel members have acted to procure illegal monopoly profits that will be shared among the ATP and members of its illegal Cartel, thereby injuring both the GTF Plaintiffs and the relevant markets.

2.      When the GTF Plaintiffs filed their initial Complaint, the GTF Plaintiffs could not have predicted the nature or magnitude of the Cartel's activities. The Court may find ultimately that the ATP and its Cartel have not approached discovery in accordance with the letter or spirit of the Rules so as to facilitate a just, inexpensive and expeditious resolution of this matter. Nonetheless, discovery provided to date has demonstrated, *inter alia*, the following:

a.      The ATP and certain of its officers and directors have acted, in disregard of its 501(c)(3) corporate status, to become a commercial entity designed not to run men's professional tennis for the benefit of its members, but rather to rule professional tennis as a for-profit entity at the head of a small, well-defined Cartel;

b.      As part of this scheme, the ATP has effectively taken the top-tier ATP Membership owned ▮▮ by the GTF and ▮▮ by the Qatar Tennis Federation ("QTF") (the "Membership") by "downgrading" the Hamburg Tournament and, subsequently, selling licenses relating to components of the Membership to entities in Shanghai, China, Madrid, Spain and London, England;

c.      The ATP and its Cartel have taken control of numerous markets and are using this control to derive substantive monopoly profits while eliminating the ATP's own

2

members as possible competitors through "downgrades" or outright elimination. For example, the ATP will now require, under threat of suspension from the sport, all Top-50 men's professional tennis players (the "Players") to play in each of the ATP's chosen tournaments while simultaneously precluding the Players, via ATP rules and practical realities, from playing in other ATP or non-ATP tournaments. This has already had the effect of increasing the value of assets the ATP has taken from its tournaments, such as their membership rights (which the ATP now sells as "sanctions") as well as their broadcast and sponsorship rights, while, as admitted by the ATP, relegating its non-Cartel tournaments to a permanent, second-tier status, or in the case of some ATP Members, such as those in Kitzbuhel, Austria and Metz, France, resulting in the outright elimination of their memberships and tournaments.

3.    The ATP and its Cartel have not surrendered information regarding their actions willingly or openly.  For example,



4.    Further, the ATP has yet to produce documents created and/or received by the ATP from May, 2007 to the present, despite the fact that the ATP has finalized and implemented the key elements of its Plan in this time period. Despite this continuing omission, which the Plaintiffs will attempt to resolve via negotiation per the Court's instructions, it is also now apparent that the ATP's actions have significantly injured the QTF in two material respects:

a.    

b.    The ATP's and its Cartel's actions have caused significant damage to the QTF's Qatar ExxonMobil Open, which will no longer be able to compete for players' services, broadcasters or sponsors because the ATP – the non-profit entity designed to promote the business of tennis for all of its members, including the QTF – has monopolized all three markets for itself and its cartel via the complete control of the relevant markets it has seized.

5.    Based on these circumstances, the terms of the Court's scheduling order, Rules 15 and 21 and the interests of justice, the GTF Plaintiffs now respectfully seek leave to amend their Complaint to: (a) add the ATP Director Defendants as defendants to this action; (b) add the QTF as a party-plaintiff and (c) otherwise amend the factual and legal counts of the Complaint so as to reflect what has been discovered by the GTF Plaintiffs to date via discovery. The Plaintiffs' proposed Amended Complaint is attached hereto as Exhibit A.

6.    "Rule 15 of the Federal Rules of Civil Procedure permits a party to amend the complaint by leave of court or by written consent of the adverse party." *Martek Biosciences Corp. v. Nutrivona, Inc.*, C.A. No. 03-864 GMS, 2005 WL 1745680, at *2 (D. Del. July 19, 2005). "Leave to amend a complaint should be 'freely given when justice so requires.'" *Id.*

4

(quoting Fed. R. Civ. P. 15(a)). "This liberal philosophy limits the district court's discretion to deny leave to amend." *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). Thus, "[u]nder the Supreme Court's holding in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed2d 222 (1962), '[i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and/or] futility of amendment ... the leave sought should, as the rule requires, be 'freely given.'" *Martek Biosciences*, 2005 WL 1745680, at *2.

7.      Justice requires granting leave to amend the Complaint. The Amended Complaint seeks relief for alleged violations of the ATP's fiduciary duties and the antitrust laws of the United States. Prosecution by the GTF Plaintiffs and the QTF of their actions directly against the persons responsible for their injuries is not only just and proper, it will also vindicate the public's significant interest in the private prosecution of violations of the antitrust laws of the United States.

8.      Further, the amendment is not sought after undue delay, in bad faith or with any dilatory motive. In fact, the GTF Plaintiffs have, from the outset of this litigation, prosecuted this litigation in as expedited manner as reasonably possible, in full accord with the Federal Rules and Orders of the Court. Additionally, this Motion is being filed in full compliance with the Court's current Scheduling Order. (D.I. 30) Finally, it is not "bad faith" to amend to sue all proper defendants. *See id.* Thus, the GTF Plaintiffs have diligently pursued this litigation in good faith without delay or dilatory tactics.

9.      The filing of the Amended Complaint will not prejudice the ATP or the Director Defendants, and it should not prejudice this Court's docket. The Director Defendants have

already been actively engaged in this litigation as the directors of the ATP.  Messrs. Jovanovic and Pearce have already been deposed and the parties were already working to schedule the depositions of the remaining Director Defendants prior to the December 3, 2007 fact discovery cut-off.  Finally, any responsive documents in the possession, custody or control of the Director Defendants should have already been gathered and produced in this matter or will have to be gathered and produced, regardless, once the parties resolve issues relating to the ATP's need to provide the supplemental production of documents created after May 2007.

10.     Further, the parties have been proceeding for some time as if the QTF had a key role in these proceedings.  Depositions of the QTF's representatives are scheduled for October 23- 26 in London, England.  The QTF will endeavor to produce documents relating to this litigation or otherwise responsive to the ATP's initial 116 document requests (exclusive of subparts) as soon as possible and prior to these depositions being completed.  To the extent the ATP or the Director Defendants believe that this is in any manner prejudicial, the QTF and the GTF Plaintiffs will work cooperatively to address any reasonable concerns raised by the defendants to ensure that they receive discovery to the full extent contemplated by the Rules in an expeditious manner prior to the December 3, 2007 discovery cut-off date.

11.     In the May 3, 2007 Proposed Coordinated Scheduling Order (D.I. 7, ¶ 5), the ATP stated that it had no present belief that the joinder of the Director Defendants would require any material change to the parties' proposed Scheduling Order, and the parties subsequently agreed, in the event of a joinder, to work cooperatively to comply with the Court's established schedule (D.I. 19, ¶ 12).  Accordingly, the GTF Plaintiffs and the QTF submit that the Complaint may be amended and discovery conducted without necessitating any additional changes to the Court's scheduling order or otherwise prejudicing the Court's docket.

6

12.    Finally, the attached Amended Complaint is being filed under seal as it contains information marked as being "Confidential" by the ATP in discovery. In actuality, however, the ATP's claimed confidentiality does not trump the public's right to access to this document because the Amended Complaint does not contain information that the ATP reasonably should, in good faith, mark as being Confidential as it is not "(a) proprietary or commercially sensitive business information or (b) information subject by law or by contract to a legally protected right of privacy" as required by the Protective Order entered by this Court on August 3, 2007. (D.I. 30 and 31). *See Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir. 2004) (the "presumptive right to public observation is at its apogee when asserted with respect to documents relating to matters that directly affect an adjudication."); *SEC v. TheStreet.com*, 273 F.3d 222, 231 (2d Cir. 2001) (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir.1995) (alterations omitted)). The ATP has requested additional time to determine whether to agree that the Amended Complaint need not be filed under seal. If the ATP maintains its position that it should be filed under seal, the GTF plans to invoke the dispute resolution procedures in Sections 8.1 and 8.2 of the Protective Order. (D.I. 30)

13.    This Motion is not made for purposes of delay or any other improper purpose.

WHEREFORE, Plaintiffs Deutscher Tennis Bund (German Tennis Federation) and Rothenbaum Sport GmbH respectfully request that the Court: (a) grant the requested leave to amend; (b) order that the Amended Complaint attached hereto as Exhibit A be deemed filed as of the date of the Court's order; (c) order that the Amended Complaint is filed unsealed; and (d) enter all other relief as is just and proper. Pursuant to Local Rule 15.1, plaintiffs have attached a copy of the Amended Complaint formatted to indicate for the Court where material has been changed as Exhibit B.

7

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
Chad S.C. Stover (No. 4919)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6692
bflinn@ycst.com
cstover@ycst.com

*Attorneys for Deutscher Tennis Bund (the German
Tennis Federation) and the Rothenbaum Sports GMBH*

OF COUNSEL:

Robert D. MacGill
Hamish S. Cohen
Jennifer W. Adams
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W.
Suite 500
Grand Rapids, Michigan 49503
(616) 742-3930

Dated: October 15, 2007

REDACTED PUBLIC VERSION FILED 10/25/07

8

## CERTIFICATE OF SERVICE

I, Chad S.C. Stover, hereby certify that October 15, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Lawrence C. Ashby, Esquire
> Philip Trainer, Jr., Esquire
> Carolyn Hake, Esquire
> Ashby & Geddes
> 500 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on October 15, 2007, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Bradley I. Ruskin, Esquire
> Jennifer R. Scullion, Esquire
> PROSKAUER ROSE
> 1585 Broadway
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Chad S.C. Stover*
C. Barr Flinn  (No. 4092)
Chad S.C. Stover (No. 4919)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
cstover@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis
Federation) and the Rothenbaum Sports GMBH.*

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), ROTHENBAUM SPORT GMBH, and QATAR TENNIS FEDERATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 07-178-GMS |
| ATP TOUR, INC., ETIENNE DE VILLIERS, CHARLES PASARELL, GRAHAM PEARCE, JACCO ELTINGH, PERRY ROGERS, and IGGY JOVANOVIC, | ) ) ) ) | **TRIAL BY JURY DEMANDED** |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

The Plaintiffs, Deutscher Tennis Bund (the German Tennis Federation ("GTF")), the Rothenbaum Sport GmbH (the "GTF Tournament" or "Hamburg Tournament"), and the Qatar Tennis Federation ("QTF") (all collectively, the "Plaintiffs"), by and through their attorneys, demand a trial by jury on all issues so triable and allege, upon knowledge as to their own acts and otherwise upon information and belief, the following:

## NATURE OF THE ACTION

1.      Defendant ATP Tour, Inc. ("ATP") is a non-profit membership corporation, under section 501(c)(6) of the Internal Revenue Code, originally created for the benefit of men's professional tennis players and tournaments. The ATP, however, has now taken a centralized

commercial role in men's professional tennis; is taking its members' property rights, including the Plaintiffs' ATP Memberships, for its own; and is intentionally decreasing output into and out of relevant markets so as to artificially increase the value of the assets it has taken from its members. The ATP is doing this in a purposeful and knowing disregard of its corporate structure, its fiduciary duties and the antitrust laws of the United States.

2.    The ATP has been hijacked by a majority of its Board of Directors and certain executive officers. The ATP (via these officers and directors), along with the owners of certain favored men's tennis tournaments (who would otherwise compete with each other throughout the United States and around the world), have agreed, *inter alia*, to (i) control and reduce the supply of top professional men's tennis players' services by requiring those players to participate in all of the ATP's favored tournaments in order to meaningfully participate in the Tour, thereby precluding the non-favored ATP tournaments, and all non-ATP tournaments, from conducting events that will attract meaningful fan or sponsor support; (ii) limit the number and output of top-flight professional men's tennis tournaments while excluding all others from competition, thereby deriving Cartel-related, monopoly profits; (iii) fix the prices that can be paid to attract professional men's tennis players to those tournaments; (iv) pool their broadcast rights while limiting the media outlets that can be used to broadcast and market tournaments to further, illegally, derive monopoly profits; (v) boycott any potentially competing tournaments that refuse to join or support their illegal cartel; and (vi) divide calendar-based markets for tournaments among themselves.

3.    Via these actions, the ATP and these officers and directors have taken the Plaintiffs' ATP Membership and property rights and appropriated other property rights, which formerly belonged to competing tennis tournaments, while simultaneously eliminating the ability

of those tournaments to compete with one another or the ATP. These actions are damaging the Plaintiffs, men's professional tennis players, men's tennis tournaments, the consumers and sponsors of men's professional tennis, and the markets in which all four participate, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. Further, via these actions, the ATP and these officers and directors have violated their fiduciary duties to the Plaintiffs, interfered with the Plaintiffs' business and contractual relationships, and converted the Plaintiffs' property.

4. The ATP has, ironically, named its anticompetitive plan the "Brave New World" plan.[1] Via this plan, the ATP and these officers and directors have artificially taken control of the supply of men's professional tennis players' services and tournaments. They have done so to establish a favored class of tournaments, in which the ATP and certain of its board members have a significant proprietary interest, while relegating all of the ATP's other member tournaments to a disfavored status whereby they are precluded from competing with the ATP's favored tournaments. In doing so, the ATP and these officers and directors, via their Brave New World plan, violate the antitrust laws of the United States and their fiduciary duties to the Plaintiffs, tortiously interfere with the Plaintiffs' business and contractual relationships, and convert the Plaintiffs' property. Accordingly, the Plaintiffs seek a declaration that the ATP's Brave New World plan is illegal and violates the ATP's, and certain of its directors', fiduciary duties; an injunction to halt the ATP's Brave New World plan and to prohibit the ATP from further antitrust violations; and damages to be determined at trial that would be automatically

---

[1] It is doubtful the ATP intended this aptly Orwellian name. "Brave New World" derives from Aldous Huxley's novel of that name, which in turn references Shakespeare's play, "The Tempest." Both works of art invoke concepts of "negative utopia" or dystopia, in which the things we value most as a society are destroyed in the pursuit of purported utopian ideals.

trebled under federal law. The Plaintiffs do so to eliminate the ATP's illegal, anticompetitive arrangements so that the Plaintiffs may compete in a free and open marketplace.

## THE PARTIES

5.      The GTF is a non-profit tennis federation incorporated under the laws of the Federal Republic of Germany, with its principal place of business in Hamburg, Germany. The GTF has the most members of any tennis federation in the world. As part of its mission to develop and promote the sport of tennis, the GTF has run the GTF Tournament for over 100 years. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

6.      The QTF is a federation incorporated under the laws of the Emirate of Qatar, with its principal place of business in Doha, Qatar. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████ The QTF also presently owns an ATP International Series Membership (the "Qatar Membership") and operates an ATP event that is staged annually in Doha, Qatar and is known as the Qatar Exxon Mobil Open (the "Qatar Tournament").

7.      The GTF Tournament is a world-class, men's professional tennis tournament. It is played on clay and traditionally occurs two weeks prior to the French Open each year. The GTF Tournament is played at a state-of-the-art facility in Hamburg, Germany, which includes a 13,500 seat main court complete with a retractable roof, sponsor facilities and a luxury box capable of entertaining hundreds of persons daily. Traditionally, the GTF Tournament has attracted many of the top men's tennis players in the world, including numerous United States citizens and residents and, correspondingly, fans, sponsors and broadcasters from around the world, including the United States.

8.    The ATP is a non-profit, membership corporation organized pursuant to the laws of Delaware. Its predecessor, the Association of Tennis Professionals, was founded in 1972 as an organization of men's professional tennis players. This association announced in 1988 that it would "assume control of the game" of men's professional tennis, and by January 1990, the modern ATP - a combined organization of tournaments and players - began operation of the ATP Tour. The ATP now governs all men's professional tennis tournaments, other than the four Grand Slams (which are governed by the International Tennis Foundation ("ITF")). The Grand Slams are mandatory tournaments for top men's players under the current ATP Rules and the Brave New World plan. Further, the Grand Slams provide the most points for players in the ATP rankings, which in turn, govern a player's seeding into the Grand Slam tournaments.

9.    Charles Pasarell is a member of the ATP's Board of Directors. He has served as a Tournament Representative on the Board of Directors from 1990 to the present. Pasarell is also employed as Tournament Director of the Indian Wells Masters Series Event. Upon information and belief, Pasarell resides in Rancho Mirage, California and is a citizen of the State of California.

10.    Graham Pearce has served on ATP's Board of Directors as a Tournament Representative from 2000 to the present. Pearce is also employed as Tournament Director of the Auckland ATP tournament known as the Heineken Open. Upon information and belief, Pearce resides in Auckland, New Zealand and is a citizen of New Zealand.

11.    Jacco Eltingh has served on ATP's Board of Directors as a Player Representative from November 2005 to the present. Eltingh is a former tennis professional who retired from the sport in 1998. Upon information and belief, Eltingh resides in Epe, Netherlands and is a citizen of the Netherlands.

12.     Perry Rogers has served on ATP's Board of Directors as a Player Representative from November 2005 to the present. Rogers is also employed as President of Agassi Enterprises and Prism Sports Management. Upon information and belief, Rogers resides in Las Vegas, Nevada and is a citizen of the State of Nevada.

13.     Iggy Jovanovic has served on ATP's Board of Directors as a Player Representative from January 2006 to the present. Prior to his election to the Board, Jovanovic was employed as Communications Director of ATP. Upon information and belief, Jovanovic resides in Sydney, Australia and is a citizen of Australia.

14.     Etienne de Villiers has served as Executive Chairman of ATP's Board of Directors and as President of ATP from January 2006 to the present. Prior to his current appointment, de Villiers served as non-executive Chairman of ATP starting in June 2005. Upon information and belief, de Villiers resides in London, England and is a citizen of the United Kingdom. (Collectively, Pasarell, Pearce, Eltingh, Rogers, Jovanovic, and de Villiers are the "Director Defendants", and collectively with the ATP, the "ATP Defendants").

## JURISDICTION & VENUE

15.     The Plaintiffs bring this action for injunctive relief to prevent the implementation of the Brave New World plan and other anticompetitive actions as violations of Section 1 and 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. §§ 26, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. §§ 15, and for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. They also bring claims for breach of the ATP's fiduciary duties of loyalty, due care and good faith; tortious interference with contractual and business relationships; and conversion.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1337 (antitrust claims), 1367 (supplemental jurisdiction) and 1332 (diversity jurisdiction).

17.     The Plaintiffs' claims and injuries as alleged herein arise from, depend upon, and are inextricably intertwined with the direct, substantial, reasonably foreseeable, and harmful effects of defendants' anticompetitive conduct on domestic trade and commerce in the United States.

18.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2), 15 U.S.C. §§ 15 and 22 and, where applicable, the ATP's Amended and Restated Bylaws (the "Bylaws"), which provide, in relevant part, that "the Delaware Courts [defined as the Chancery Court of the State of Delaware and the United States District Court for the District of Delaware] shall have exclusive jurisdiction over any dispute or controversy between [any member] and [the ATP]."[2]

19.     This Court has personal jurisdiction over the Director Defendants pursuant to 10 Delaware Code § 3114.

## THE HISTORICAL BACKGROUND

20.     The first GTF Tournament was held in 1892—115 years ago.  2007 marked the one-hundred and first staging of the tournament, which has been held in Hamburg, Germany since 1901.  As such, the GTF Tournament was a viable and important tennis event almost a century before the creation of the modern ATP in 1988.

---

[2] By submitting to the jurisdiction of and bringing their action before this Court, the Plaintiffs do not stipulate to the validity of or waive their rights to challenge any particular provision of the Bylaws or any other rule or regulation of the ATP, to the extent these Bylaws, rules and regulations have been used, manipulated or changed, as set forth below, by the ATP Defendants in furtherance of their illegal, anticompetitive actions.

21.    The GTF Tournament has been and continues to be a world-class event. Today, as a result of tens of millions of dollars of capital investments, the GTF Tournament annually draws tens of thousands of spectators from all around the world. Its center-court comfortably seats 13,500 spectators, plus sponsors and media, in a world-class tennis facility complete with separate player and media facilities, separate corporate and sponsorship facilities, and a state-of-the-art retractable roofing system.

22.    The clay-court GTF Tournament competed for, obtained, and is traditionally held in the calendar position two weeks before the French Open, which is also played on clay courts. This calendar position, which is a component of the Hamburg Membership, has great value because the top men's professional tennis players want to play each other in a world-class, clay court tournament during this calendar week as a lead-in to the French Open—

23.    Because of its history, prestige, good will and world class facilities, the GTF Tournament has previously, in an open market, successfully competed for the best weeks on the men's professional tennis calendar, for the services of the top men's professional tennis players, including those from the United States, and for top-class sponsors, including those from the United States, while selling its broadcast rights to world-class broadcasters, including those in the United States, and attracting fans from around the globe, including the United States.

24.    Because of the GTF Tournament's history, value and prestige, the GTF Tournament has always held the ATP's top available membership classification, which is currently that of a "Masters Series" Tournament. This is a consequence of the GTF

8

Tournament's long history, its considerable good will with players, broadcasters, and sponsors, and its world-class facilities.

25.     The Qatar Tournament has been played during the first week of the ATP calendar, two weeks prior to the Australian Open, since its inception in 1993. The Tournament awards over $1 million in prize money and has attracted such luminary winners as Boris Becker, Jim Courier, Stefan Edberg, Ivan Ljubicic and Roger Federer.

26.     The ATP began in 1972 when approximately fifty of the top men's tennis players in the world paid $400 each as dues to form a union (the "player-ATP"), in large part to counterbalance the power of the ITF. The player-ATP's boycott of the Wimbledon tournament in 1973 demonstrated the player-ATP's political and financial power in the world of men's professional tennis.

27.     By 1988, the world of men's professional tennis was dominated by the Men's International Professional Tennis Counsel (the "MIPTC"). The MIPTC's rules and regulations, though benign by the standards of the Brave New World, so upset the players and tournaments that certain player representatives and tournament organizers sued the MIPTC in the seminal antitrust case of *Volvo North Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55 (2d Cir. 1988), in which the Second Circuit held that the MIPTC's actions raised serious, colorable antitrust concerns.

28.     Against the backdrop of *Volvo*, and in rebellion against the MIPTC's anticompetitive exercise of its control over men's professional tennis, the player-ATP declared in 1988 that it was assuming control of the game. This declaration became a reality in 1990 with the birth of the modern ATP, which began as a "unique" collaboration of tournaments and players, both of whom became members of the ATP.

29.     The ATP's operations are controlled and managed by a seven-person Board of Directors, which consists of: (i) three representatives of its tournament members (one each from Europe, the Americas, and the rest of the world); (ii) three representatives of its players (one each from Europe, the Americas, and the rest of the world); and (iii) the Executive Chairman/President of the ATP, currently Etienne de Villiers.

### THE DEVELOPMENT OF THE ATP'S CENTRALIZED COMMERCIAL ROLE

30.     From its creation until 1997, the ATP operated, consistent with its purpose, its By-Laws, and its Articles of Incorporation, as a service organization on behalf of its player and tournament members.

31.     During this period, the ATP, consistent with its By-Laws, recognized two categories of tournament membership: the Championship Division (which included the world-class GTF Tournament) and the World Series Division. The ATP's approximately 100 tournament members were placed into these tournament categories in 1990 based on their competitive merits. Because the GTF Tournament was, in 1989, a leading tournament with prize money in excess of one million dollars, the GTF obtained a Championship Division Membership (the "GTF Membership"). The GTF has held its Championship Division Membership to this day.

32.     Pursuant to the express provisions of the ATP By-Laws and Articles of Incorporation, and the custom and practice of the ATP and its Tournament members, the Plaintiffs' Membership exists as a Championship Membership in perpetuity so long as it is retained in good standing. As the Plaintiffs have always complied with the applicable, lawful rules and regulations of the ATP, and as the Plaintiffs are in good standing with the ATP, the Membership remains, or should remain, a top-tier ATP membership.

10

33.    Until 1997, the ATP, consistent with its By-Laws and its corporate status, intentionally blurred the distinction between its tournament members so as to act, collectively, on their behalf.  For example, World Series tournaments could occupy the same calendar weeks as Championship tournaments and could compete for players with these tournaments.  As a result, world-class tennis existed throughout the world, throughout the calendar and at both levels of ATP tournament membership.

34.    In 1997, however, certain ATP Board of Directors members and management decided that the ATP should cease acting as a non-profit corporation on behalf of all of its members and, instead, take a commercial role in men's professional tennis. 

35.    Specifically, in 1997, the ATP began to do the following:

a.    To reduce the number of its tournament members so as to reduce output and competition in the relevant markets. 

and

11

b.    To free its top tournaments from some competition while at the same time pooling the television and sponsorship rights in these tournaments and taking a financial share therein. The ATP did this by giving its Masters Series tournaments calendar exclusivity; by creating some player participation requirements for these tournaments; and by forcing these tournaments to participate in pooling agreements of their rights, in a joint financial entity, negotiating with them on an individual, non-transparent basis and paying them as little as necessary to create for the ATP the greatest possible profit margin.

36.    The GTF Tournament, during the 1990's, free from ATP interference, was remarkably successful in the relevant markets. The GTF Tournament, *inter alia*, during that time period (a) maintained its traditional week, two weeks prior to the French Open; (b) competed for and obtained top men's professional tennis players, resulting in world-class fields year after year; (c) competed for and obtained broadcasters in Germany, the United States, and around the world; (d) competed for and obtained sponsorship agreements with the United States-based IMG and other United States and global entities; and (e) competed for and obtained both live and broadcast fans.

37.    The GTF Tournament also was profitable during this time, until 1999, which enabled the GTF to (a) promote the sport of tennis in Germany, (b) promote Germany and the City of Hamburg, (c) make over ▓▓▓▓▓▓▓ of capital improvements to the GTF Tournament facilities, including the addition of a state-of-the-art retractable roof, and (d) fund its charitable activities.

38.    In the fall of 1998, the ATP, in furtherance of developing its centralized commercial role, began negotiating with organizations such as ISL for sale of the pooled

television and broadcast rights of the Masters Series tournaments, 

39.    At this time, the GTF was still independently selling its rights in the open market. In October of 1998, however, the GTF received letters from the ATP and from the ATP's counsel, Proskauer Rose LLP, demanding that the GTF cease and desist from negotiating the sale of its own rights in the marketplace. Specifically, on October 15, 1998, the ATP wrote to the GTF stating that the GTF must cease taking actions that were "not consistent with [its] obligations to the ATP Tour and ATP Tour's best interest." On October 16, 1998, Proskauer Rose LLP wrote to the GTF stating that GTF's attempts at operating in an open marketplace were inconsistent with "your fiduciary duties to the Tour" and that, if the GTF did not submit to and agree to the taking and pooling of its rights, the ATP would seek "substantial damages and other relief and ... revoke immediately the ATP [membership] of the [GTF Tournament]." The ATP made similar threats to revoke the membership of other Championship Tournaments at the time.

40.    Threatened with the loss of its membership and the corresponding loss of its ability to conduct a meaningful men's professional tennis tournament, the GTF had no choice but to provide its rights to the ATP for pooling and sale to ISL in 1999.

41.    The ISL deal was a financial and public relations disaster for men's professional tennis except for a handful of ATP executives. By late 2001, ISL slid into bankruptcy, leaving the Masters' Series tournaments with limited or no sponsorship or broadcast agreements. ISL's collapse left the ATP and many of its tournaments operating at

significant losses in 2002.

42.    The ISL deal and collapse were particularly onerous to the GTF.  As set forth above, the GTF had independent broadcast and sponsorship arrangements in 1998.  As part of the ISL arrangement, the GTF was forced to repurchase its sponsorship and broadcast rights from IMG and others, ███████████████████████ Because of this, ████████████ ████████████████████████████████████████████████ Additionally, in doing this, the GTF significantly damaged its business relationships with its independent broadcasters and sponsors, thereby significantly damaging the GTF's ability to sell broadcast and sponsorship rights in the years following the ISL collapse.

43.    From 2002 to 2005, the ATP continued to pursue a more centralized commercial role in competition with its tournament members and to reduce output of tournament members. Politically weakened by the ISL collapse, however, the ATP's repeated attempts to downgrade or eliminate several current Masters' Series tournaments (though never the GTF Tournament) or to take unilateral control of the relevant markets were generally unsuccessful.

44.    For example, following the ISL collapse, Tennis Properties Limited ("TPL") was created as a new and separate entity to hold the pooled Masters Series rights. ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

45.    In or about October, 2002, following ISL's collapse, the ATP and its then serving Directors, including Pasarell and Pearce, commissioned and adopted, as its official policy, a report and series of commercial goals created by a consultant. ███████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████ despite the fact that this role put the ATP in

competition with its tournament members in violation of its fiduciary duties.

46.    At this time, the ATP and its then-serving Directors, including Pasarell and Pearce, decided to pursue, *inter alia*, the following business strategy:



47.    These goals were established in furtherance of two related purposes. First, the ATP wished to continue and significantly increase its development as the centralized commercial force in men's professional tennis, regardless of how this would affect its relationship with its members.



49.    From 2002 to 2005, the ATP had some success in pursuing these two purposes. The ATP, however, was unable to implement fully its plan to take economic control of the sport.





51.     Regardless, the actions taken by the ATP prior to the development of the Brave New World plan significantly injured the Plaintiffs by damaging their broadcast rights and relationships with sponsors and broadcasters.

52.     Further, they injured other participants in the marketplace.  For example, a recent claim was filed and later settled involving anti-competitive conduct.  *Michael Bryan, et al. v. ATP Tour, Inc., et al.*, Case No. H-05-3082 (S.D.Tx.) (challenging the ATP's "sadly ironic" illegal and anticompetitive manipulation of its rules to eliminate doubles tennis specialists from its tournaments, and the ATP's costs associated therewith, to increase the ATP's monopoly profits for its cartel members).

53.     Undaunted, and with knowledge of the illegality of its actions, the ATP is now implementing its Brave New World plan, which, per the decision of the ATP Defendants, will go into effect beginning 2009.

### THE BRAVE NEW WORLD

**A.     The Creation Of The Brave New World Plan.**

54.     In 2005, Mark Miles, who had been CEO of the ATP since 1990, stepped down.  On information and belief, he did so under political pressure brought about by legal and political opposition to the ATP's burgeoning commercial metamorphosis.

55.     Miles was replaced by de Villiers.  The original plan was that de Villiers would serve as Executive Chairman and that the ATP would hire a separate President.  By January 2006, however, de Villiers, with approval of the ATP Board, had consolidated his power and was acting as Executive Chairman and President of the ATP.



57.     De Villiers, a former for-profit executive, approached his job as head of the ATP as though he was running a for-profit corporation. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓ (1) the ATP would continue and finalize its development as a commercial entity, regardless of its corporate status, history or purpose, by taking the property rights of its member tournaments for itself; and (2) the ATP would create product scarcity to artificially drive up demand for its own gathered assets and, therefore, their value.

58.     In furtherance of these goals, by or about February or March, 2006, the ATP Defendants had come up with a plan to consolidate the ATP's financial power and control over the business markets that the ATP should, per its not-for-profit corporate status, have been developing and nurturing for all of its tournament members, and to reduce output within these markets. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ by the spring of 2006, the plan's name had crystallized as the Brave New World.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ First, the Brave New World further dramatically increased the commercial role of the ATP. ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



60.     Second, it provided the ATP with complete control over the relevant markets. The Brave New World plan, for example, forces all of the top 50 players to play the ATP Defendants' favored tournaments, and it isolates those tournaments from any competition in the relevant markets while reducing the output of men's professional tennis in the marketplace, resulting in the derivation of a monopoly profit. As part of this plan, the Brave New World, from its inception, provided for the downgrade in the Plaintiffs' Membership and of the GTF Tournament to a "AA" tournament and the Monte Carlo Tournament to a "AAA" tournament, both below the Masters Series events.





63.    First, de Villiers and the ATP Defendants were aware that, over eight years, Miles was able to implement only minor portions of his plans to commercialize the ATP and to dramatically increase the number, type, and value of the ATP's assets.



64.    Further, on information and belief, the ATP Defendants promised Masters 1000 memberships as well as sanction protections to certain other Masters Series tournaments. To the extent the Masters Series tournaments or Webster expressed concerns about their former competitor and sometime business partner, the GTF Tournament, who had previously always stood with them, they were told by the ATP Defendants that the Plaintiffs would be fully and properly compensated for their downgraded Membership.

65.    Ultimately, apart from Hamburg and Monte Carlo, the other Masters Series events were guaranteed Masters 1000 sanctions. No non-Masters Series tournaments were even permitted to bid for Masters 1000 positions.



 with Madrid receiving a combined event in the GTF Tournament's week. This left Italy, Hamburg and Monte Carlo to "compete" for one position—a position that from the very first outline of the Brave New World would be provided to the Italian Masters Series tournament.

67.    In March of 2007, de Villiers met with the President of the GTF, Dr. Georg von Waldenfels, and stated that the ATP would consider a payment of approximately € 4 – 8 million for the upcoming downgrade of the GTF Tournament and the move of that tournament from its traditional week to the summer schedule—even though the GTF had not yet even submitted its Masters 1000 application and, purportedly, the ATP Defendants had made no decision in the "open and transparent bidding process."

68.     What de Villiers did not tell Dr. von Waldenfels at that meeting was that the ATP
had already decided to take the Plaintiffs' Membership.  In fact, a ten-year license to this
Membership had already been sold,  to Shanghai

The ATP subsequently sold Shanghai's TMC rights to entities in London,
England                                                          Finally, the ATP sold the right to
conduct an ATP event during the GTF's traditional week to Madrid for

69.     Stated plainly, prior to the Plaintiffs even submitting their Masters 1000
application (under protest and with a reservation of all rights), the ATP Defendants had already
sold or promised to sell licenses to the bundle of rights included in the GTF Membership to three
entities for more than

70.     The "open and transparent bidding process" culminated when, on August 31,
2007, the ATP announced that "eight additional venues ... have been awarded '1000' status for
the new-look 2009 ATP Tour. The eight are Indian Wells, Miami, Rome, Madrid, Cincinnati,
Canada, Shanghai and Paris. The '1000' tournaments will replace the existing Masters Series
...."

71.     Equally unsurprisingly, on October 4, 2007, the ATP announced that it had
reserved a reduced ATP 500 "sanction," and a position in the summer ATP calendar after
Wimbledon, for the GTF Tournament.  The ATP knew, when it did so, that the GTF Tournament
would not be successful at this level and during this week.

21



72.    The calendar week reserved for the GTF Tournament previously belonged to the Austrian Open tournament in Kitzbühel, Austria. █████████████████████████ ████████████ The Austrian government offered to purchase this membership so as to save this venerable and important tournament, played on beautiful clay courts nestled in the Austrian Alps, ████████████████████████ ████████████ The ATP, however, inappropriately utilized its right to refuse membership sales ███████████████████████████ ████████ Instead, the value of the Kitzbühel membership appears to be poised to be used as a down-payment on Madrid's upgrade to a combined, ten-day event now to be held during the GTF Tournament's traditional week. Thus, as part of the Brave New World, the venerable Kitzbühel tournament, a tournament which predates the ATP by many years, will be no more as of January 1, 2009.

**B.    The Elements Of The Brave New World.**

73.    Under the Brave New World, the ATP Defendants have decided to reduce the number of top-flight and world-class tournaments and to eliminate any and all competition with these tournaments, thereby artificially increasing the value of property rights associated with these tournaments (which are owned directly or indirectly by the ATP Defendants). ████



74.    To accomplish this, the Brave New World creates three tiers of ATP tournaments:

22

The Masters Cup and the Masters Series 1000, the Masters Series 500, and the ATP 250, and separates the "top tier" of these tournaments, the Masters Cup and the Masters 1000, from the others by guaranteeing that they will exist free from competition. These tournaments will have calendar and geographic market protection (and, in fact, exclusivity).

75.    More importantly, the Masters 1000 tournaments will not have to compete for player participation. As stated by the ATP, "[t]he eight tournaments named will attract a mandatory player field, ensuring guaranteed top player participation at all events. The commitment will be backed by new rules and sanctions that include suspension for missed mandatory tournaments."

76.    Finally, "by 2011 six of the nine '1000' level tournaments will be combined events. Cincinnati and Rome will become combined ATP and WTA tournaments and in addition Canada will have the ATP and WTA tournaments running simultaneously in Toronto and Montreal." These combined events will last longer than one week, thereby increasing the demand on players, who traditionally only play approximately 12 ATP tournaments a year, and reducing the weeks available for other, non-Masters 1000 tournaments (thereby necessitating, for example, the outright destruction of ATP members such as Kitzbühel and Metz).

77.    The GTF Tournament, like the remaining tournaments, all current ATP members, will exist on an ongoing basis as a "minor league" of tennis unable, because of ATP's Brave New World plan, to compete with the Masters 1000 tournaments for calendar dates or for players' services or to provide top-class tennis for consumers. The ATP's Brave New World plan, therefore, is intended to decrease competition and set prices thereby increasing the value of assets that, pursuant to the Brave New World plan, will be appropriated and owned by the ATP itself, such as the Masters Cup, the Masters 1000 Sanctions, and the pooled broadcast rights of

the Masters 1000 tournaments, or that will be owned by the ATP Defendants or their favored tournaments.

78.　　The key elements of the ATP's Brave New World plan are:

a.　A reduction in Masters Series Events. The current Masters Series events will be reduced by two. The remaining Masters Series events—the new "Masters 1000" events—will be provided the best weeks on the ATP calendar, regardless of what tournament previously held those weeks, as well as mandatory player participation guarantees;

b.　The taking of the GTF Membership and its sale, in parts, for millions of dollars, which will go to the ATP;

c.　An increased financial commitment from the Masters 1000 tournaments beginning in 2009, which includes increased prize money; financial payments to a "bonus pool" for players who play in the mandatory, *i.e.*, Masters 1000, tournaments; and increased payments to the ATP;

d.　Revenue sharing among the Masters 1000 tournaments;

e.　The pooling of the Masters 1000 tournaments' media rights with the newly formed ATP Media. Media rights of the next category of tournaments, the sixteen "Masters 500" tournaments, will also be pooled with and controlled and exploited by ATP Media;

f.　The adoption of "ATP branding architecture" to promote and market the ATP's "global tour" through the development and sale of ATP-branded intellectual property that, of course, is owned by the ATP;

g.　Compulsory player participation in all Grand Slams and Masters 1000 events,

24

enforced for the first time in the history of men's professional tennis, with immediate suspensions for non-complying players; and

h. Requiring player participation in at least four of eleven ATP 500 events (whose rights will also be pooled into ATP Media).

79. Via these elements, the Brave New World elevates eight favored tournaments to constitute the only top-tier men's professional tennis played globally on an annual basis (other than the four Grand Slams). These tournaments will have the participation of fifty of fifty of the top men's professional tennis players, as they will be compelled, under the threat of suspension, to play these tournaments. The rest of the world's tennis tournaments (including all other ATP members) must attempt to compete based, in varying degrees, on their status as either an ATP 500 or ATP 250 event for the opportunity to have one or two of these players participate in their tournaments during the few free weeks in the players' schedules.

80. As a result, consumers, broadcasters, and sponsors will have only eight opportunities annually to attend, watch, broadcast, or sponsor a world-class ATP tournament, thereby (as intended by the ATP) artificially increasing the value of these favored tournaments and the ATP's Masters Cup and the ATP's interest therein, and increasing the ATP Defendants' cartel's monopoly profits.

81. This will effectively insulate these favored tournaments from competition, damage markets, and artificially inflate the value of certain property rights of the ATP and the ATP Defendants. Simultaneously, it will impair large parts of all of the asset value of the remaining ATP member tournaments – the vast majority of which will be relegated to a semi-permanent "minor league" status (semi-permanent in that, ostensibly, they will be permitted every ten years to "apply" for a Masters 1000 sanction). Most importantly, it will injure

25

consumers who will have practically no world-class men's professional tennis options due to the ATP Defendants' restrictions on competition.

82.    The Brave New World plan accomplishes these anticompetitive goals by (1) utilizing the ATP's already monopolistic control over player participation in tournaments via commitment agreements, the ATP Ranking System, the ATP Bonus Pool and broadened penalty provisions; (2) developing and utilizing the ATP's monopolistic control over tournament participation in the marketplace through the use of a "special events rule" and by establishing fixed limits on tournament prize money and player compensation; (3) manipulating the ATP tour calendar to move disfavored tournaments from prime calendar weeks so that those weeks may be given to favored tournaments (in whose broadcast rights the ATP is contemporaneously taking a financial interest); and (4) reducing the output of top-flight men's professional tennis tournaments by taking the sanctions of two current European Masters Series tournaments, reducing their sanctions, and subsequently licensing the core rights associated with one of these memberships to entities in China, London and Madrid.

## C.    The Elimination Of Competition –Control Over Player Participation.

83.    As recognized by de Villiers, the most important component of any men's professional tennis tournament is the players.    Without an opportunity to compete for top players' services, a tournament cannot provide top-flight men's professional tennis in the marketplace.    The ATP Defendants have appropriated for themselves complete control over the supply of top quality men's professional tennis players' services, and they are in the process of channeling these players' services exclusively into their chosen tournaments to reduce output and increase the value of those tournaments and their property rights, including those held by the

ATP. In doing so, the ATP controls the markets for both players' services and tournaments and, via this control, limits the output of both, thereby injuring consumers.

84.     Traditionally, due to injury and training concerns, players cannot be expected to reasonably play more than sixteen or seventeen tournaments annually (including the two-week Grand Slam tournaments) during the approximately forty-five week tennis season.

85.     The Brave New World plan, however, will compel the players to play each and every one of the ATP's favored tournaments, including its cartel members. To quote de Villiers, "There are no options for these events, it's eight of eight for the players. If you [a top player] don't show up, you will be fined and suspended."

86.     As such, the ATP's mandatory tournaments alone will constitute the vast majority of a reasonable annual men's professional tennis player's playing schedule. Thus, the remaining tournaments, at all levels, will be left to compete among themselves (to the extent any competition is allowed by the ATP) —but not with the chosen tournaments—for each of the top players' remaining three or four annual appearances. The supply of top players' services to these non-favored tournaments is so limited, however, that these tournaments and their fans, broadcasters, and sponsors will have no opportunity to participate in world-class men's professional tennis. This, of course, will increase the value of the tournaments that do actually provide world-class men's tennis, the ATP's interest therein, and the ATP Defendants' monopoly profits derived therefrom.

87.     The ATP Defendants, in addition to the threat of outright fine and suspension, have created other sticks and carrots to compel player participation in its favored tournaments, thereby exercising monopoly control over the supply of men's professional tennis players'

services and damaging its competitors (who ironically are also ATP members), players, sponsors, broadcasters and consumers. These include:

    a.  The use of mandatory Commitment Agreements. Players in good standing with the ATP who are positioned within the Top 50 in the ATP's ranking must now execute and deliver to the ATP a written Commitment Agreement at the end of each year to be eligible to play in ATP Tournaments the next calendar year. Under the Brave New World plan, the ATP will use these Commitment Agreements to force these players to play each Masters 1000 tournament into which they are accepted and to fine and punish players who miss required tournaments. Beginning in 2009, each top-50 player must play each of the eight ATP Masters 1000 tournaments, and if he qualifies, the ATP Masters Cup and four of eleven ATP 500 events. Accordingly, the top players are required to play thirteen mandatory ATP tournaments (including the favored ATP tournaments). The remaining available weeks are filled by the four Grand Slam events each year (in which participation is also mandatory for the top-50 players). Players who do not agree to these commitments can and will be excluded from playing on the ATP tour.

    b.  The use of the ATP's annual ranking system. Pursuant to the ATP's Brave New World plan, the Masters 1000 tournaments will offer at least twice the ATP ranking points of any other ATP tournament. Players who miss these tournaments will receive zero ranking points, which cannot be made up by playing other tournaments. This will compel player participation in the ATP's favored tournaments because a player must have a high ranking to qualify,

and be seeded, in the top men's professional tennis tournaments, as defined by history (*i.e.*, the Grand Slams and the GTF Tournament) and now as required by the ATP (*i.e.*, the ATP's favored tournaments). As such, a player's ATP ranking not only determines what tournaments a player may — and must — play, but also determines where in the draw of the tournament he will be seeded, thereby affecting how easy it will be for him to advance to the later rounds of the tournaments (as seeded players sometimes receive first round "byes" and face unseeded players in the early rounds of tournaments). Further, a player's ranking is generally the basis upon which sponsors and other companies that enter into endorsement contracts with professional tennis players contractually assess or reward a player's performance during the course of a multi-year endorsement contract. As such, via its ranking system, the ATP controls, directly and indirectly, hundreds of millions of dollars of endorsement income, and by manipulating its ranking system, it can determine which players receive substantial endorsement ranking bonuses and which do not.

c. The Brave New World's bonus program. The concept of the Brave New World's Bonus Program is simple: the ATP sets aside funds that could be paid to players by individual tournaments competing in the marketplace, and instead awards them (in amounts reaching into the millions of dollars) to those players who meet their Commitment Agreement requirements and who acquire the most ATP Rankings points in doing so. In doing so, the ATP Defendants share a small portion of their monopoly profits with the players,

29

thereby ensuring their compliance in the ATP Defendants' illegal, anticompetitive system.

d. The Brave New World's penalty provisions. The Brave New World also includes significant player penalty provisions. Any player who does not attend a required event will lose a significant portion of the bonus he would have received under the ATP's Bonus Pool. Further, players who do not play and do not attend the event and perform promotional activities elsewhere will (a) forfeit 50% of their ATP bonus for the year; (b) be assessed a withdrawal fine; and (c) be suspended from a subsequent ATP "Masters 1000" event within the next twelve months (receiving, of course, a "zero pointer" for that tournament). Subsequent Masters 1000 withdrawals will have cumulative suspensions and will result in the player losing his "good standing status."

**D.    The Elimination Of Competition — Control Over Tournaments.**

88.    The Brave New World also eliminates competition via its control over ATP tournaments that will be forbidden from competing with the ATP Defendants' chosen tournaments for players' services, broadcasters, sponsors, calendar dates, and/or fans.

89.    The Brave New World accomplishes this through a number of mechanisms including, *inter alia*, the following:

a. The Special Events Rule. The special events rule precludes players from playing in non-ATP tournaments that might compete with the ATP and/or its tournaments. As players are beholden to the ATP for their livelihood, they have no choice but to comply. Specifically, the ATP's Rule provides the ATP with both calendar and geographic market protections. It provides that player

30

may not compete in a "special event" (a non-ATP or Grand Slam tournament) if it is scheduled within the calendar week(s) of any meaningful ATP tournament. Further, players may not compete in a "special event" if it is scheduled within thirty days before or after the tournament week and within 100 miles or the "same market area" of most ATP tournaments or within the week of any ATP tournament in which a player is entered, including the Sunday night after such tournament final. Thus, the ATP's special events rule effectively precludes any tournament organizer, such as the GTF, from producing a tournament outside the ATP, because the top players are simply precluded from playing in any such tournament and because the ATP rearranges its calendar on an annual basis. Thus, even in the unlikely event that an independent tournament organizer could find a week in which it might run a tournament, the ATP will move a protected tournament into that week at its discretion the next year, thereby precluding all Top-50 players from playing in that independent tournament.

b.  Price fixing:  The Brave New World plan establishes uniform amounts the ATP's Cartel members can pay players while simultaneously compelling players to play these tournaments. In doing so, it precludes competition between ATP members for players as the Cartel members will, regardless of prize money or guarantees, have guaranteed player participation and the non-Cartel members will, regardless of prize money or guarantees, have limited or no top-player participation.

90.     The ATP, therefore, via its Brave New World plan, is forbidding and will continue to forbid the existence of independent tournaments. Further, ATP tournaments may not compete with one another financially in the marketplace for player services, and players may not compete with one another for fees and awards from tournaments. In this manner, the ATP Defendants have fixed the compensation that could otherwise be paid to players at tennis events. This creates a benefit to the ATP and its favored events, by contract, coordination and conspiracy, and constitutes the fixing of the price that the favored tournaments must pay for the players' services at a lower level to reduce their costs vis-à-vis the costs incurred by other events.

### E.     The Elimination Of Competition – Additional Control Over Tournament Memberships And The Calendar.

91.     Though the GTF Tournament, like many tennis events, existed long before the birth of the ATP, due to the control now exerted by the ATP Defendants, no ATP tournament may independently schedule its own event. Rather, tournaments now, pursuant to the ATP's Brave New World plan, must submit periodic requests to the ATP for a sanction for the ATP Tour and a position on the ATP calendar. The ATP Defendants, in their sole discretion, decide when and where the event will be held, if the event is to be held at all. Accordingly, the ATP Defendants now hold the very existence of its tournament members — their sanctions — in their hands.

92.     This was not always the case. Traditionally, tournaments competed for and obtained calendar positions on the men's professional tennis calendar. Successful tournaments, such as the GTF Tournament, were able to compete for and obtain prime calendar spots. The GTF Tournament, for example, has traditionally taken place on a clay surface, two weeks prior to the French Open, which is also played on clay. This is an excellent week on the calendar

because, due to the importance of the French Open, the top players want to play each other on clay during that week in preparation for that Grand Slam tournament.

93.    The ATP Defendants, however, are now using their power to manipulate the calendar to move tournaments out of their traditional, good calendar dates and to move favored tournaments into those dates where they can flourish, free from competition. The ATP had attempted to do this previously, but with limited success.

94.    This anticompetitive conduct, which the ATP Defendants have undertaken in breach not only of the antitrust laws, but also of their fiduciary duties, comes to fruition within the Brave New World plan. The ATP Defendants, for example, not only downgraded the Plaintiffs' Membership, but have also moved the GTF Tournament from its traditional date and replaced it with a "Masters 1000" tournament on that date. The Plaintiffs may not compete with the Masters 1000 because that tournament is provided player participation, geographic and calendar market protections which preclude all such competition.

**F.    A Reduction In Output – An Elimination Of Existing Masters Series Tournament Memberships.**

95.    As part of their Brave New World conspiracy, the ATP Defendants have decided to reduce the number of top-flight men's professional tennis tournaments, thereby artificially reducing the output of top-flight men's professional tennis and artificially inflating the value of the ATP Defendants' interest therein.

96.    With a few notable exceptions, the current Masters Series tournaments were told by the ATP that they would have to apply for Masters 1000 sanctions. It now appears that this application process was closed off to other ATP tournaments. For example, the Hamburg, Monte Carlo, Rome, Madrid, and Paris tournaments were the only tournaments invited to apply

for available Masters 1000 sanctions in Europe. Further, the application process resulted in the removal of at least two current Masters Series tournaments, as only three Masters 1000 sanctions were available on which these five tournaments could bid.

97.     Though the ATP invited (only) five of its tournaments to "apply" for "Masters 1000" status in Europe, it is apparent that the ATP Defendants had already determined which of the ATP's current Masters Series tournaments would be downgraded: the GTF's tournament in Hamburg and the Masters Series tournament in Monte Carlo. These tournaments are being downgraded because they are not favored tournaments or part of the ATP Defendants' illegal cartel.

98.     Regardless, the ATP Defendants' downgrading of tournaments, combined with the market protections provided to the Masters 1000 tournaments, will provide consumers such as tennis fans, broadcasters, and sponsors with even fewer options, and corresponding higher costs, in the markets associated with world class men's professional tennis.

G.     The Elimination Of Competition — The Pooling Of Broadcast Rights.

99.     Pursuant to the current Masters 1000 Applications, "all ATP Masters 1000 domestic and international television rights [these broad rights will be referred to collectively as the "television rights"] will be pooled and exploited by ATP Media." Further, "[t]he television/digital media rights pooled will be operated on a transparent basis, and will divide the net profits, as agreed between the participating tournament members." Finally, "[t]he applicants acknowledge that ATP Media shall have the sole right to determine the use and commercial exploitation of the Media Rights granted to it and ATP Media shall be the contracting party to contracts with [broadcasters]."

34

100. Notwithstanding the fact that this pooling of broadcast rights is illegal, as set forth herein, and the fact that such pooling previously failed as a commercial matter when the ISL deal collapsed, it will have a substantial effect on the property rights of current ATP tournaments and consumers who will have ever fewer opportunities to watch world-class tennis.

101. The ATP previously attempted to take, pool, and exploit the television rights of certain tournaments, including the GTF Tournament, in 1999. This taking by the ATP had a disastrous effect upon the GTF and the GTF Tournament, as it destroyed the GTF's pre-existing business and contractual relationships with broadcasters with whom the GTF had always, on an individual basis, sold its broadcast rights in a previously open market.

102. In 1999, the ATP coerced the pooling of television rights of the Masters Series tournaments and sold them to ISL. In doing so, the ATP planned on the following: creating a global series of "premier tournaments," creating a "simplification of the structure" of men's tennis, allegedly to "enhance its appeal, and develop a "global brand" of tennis. It would seem these are, yet again, the ATP's illegal and anticompetitive goals.

103. Television rights are a feature of the Brave New World plan. According to some reports, television sports rights were worth $15 billion in 2001, with North America accounting for just under one-half of this amount. Generally, broadcasters compete for these rights on national and regional levels. This competition has resulted in a spiraling growth in the value of these rights.

104. The ATP anticipates that, by pooling of television rights of the world-class men's professional tennis tournaments while simultaneously drastically reducing the supply of world-class men's professional tennis, it can increase the collective value of these rights. Given that these rights will be pooled in ATP Media, which will receive a significant portion of the gross

revenue created by the exploitation of these rights, the ATP has the most to gain from its proposed changes. The clear losers are the vast majority of tennis tournaments, especially the decommissioned Masters Series tournaments, who will find themselves trying to sell their own individual television rights in a market now controlled by the ATP in which they may not, per the Brave New World plan, compete for players or prime calendar spots; broadcasters, who will have to pay more for fewer broadcast options; and the end consumers — fans — who will have considerably fewer top-flight men's professional tennis broadcast options.

### THE BRAVE NEW WORLD IS ILLEGAL UNDER THE SHERMAN ACT.

**A.    The Defendants' Activities Have Created An Antitrust Injury To The Plaintiffs And To The Relevant Markets And Consumers Therein.**

105.    The ATP Defendants have injured and continue to injure the Plaintiffs, consumers, and competition by, *inter alia*, fixing the price that competing tournaments may pay their winners; limiting the output of key tennis players; pooling and limiting the existence of broadcast rights; and limiting the media and geographic outlets for tournaments. These restrictions on price and output are illegal, paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit, and they injure consumers and competition generally.

106.    The ATP Defendants have established and operate a worldwide cartel in the production of men's professional tennis tournaments. The members of this cartel have agreed to limit competition among themselves in the critical areas of scheduling and player availability, while manipulating the scheduling and players available to non-favored tournaments (ATP members and non-members alike), in order to reduce output, restrain and/or eliminate competition, and acquire a monopoly.

36

1.    **The Relevant Markets.**

107.    The cartel has restrained competition in and acquired, and has attempted and conspired to acquire, a monopoly in the market for the production of men's professional tennis events or a relevant submarket. This is a global market (though there may be relevant antitrust submarkets worldwide) in developed countries and within the United States. The ATP Defendants, though based in the United States, have restrained competition in, acquired, and have attempted and conspired to acquire, a monopoly in all of the relevant geographic markets for the production of men's professional tennis events around the world.

108.    Additionally, the cartel has also restrained competition in and acquired, or attempted or conspired to acquire, a monopoly in the market for the tennis playing services of men's professional players or a relevant submarket. This is a global market (though there may be relevant antitrust submarkets worldwide) in developed countries and within the United States. The ATP's actions in this market, however, occur within the United States marketplace, as the ATP is a United States corporation, and they involve, in part, the exportation and importation of players from the United States who are United States citizens or reside in the United States. For example, currently two of the world's current top ten players (Andy Roddick and James Blake), three of the top twenty-five, and four of the top fifty are United States citizens. Further, many of the top men's players are United States residents (such as, currently, Tommy Haas, Dmitry Tursunov and Xavier Malisse). The ATP's action in the United States markets are damaging markets on a global basis.

109.    Having sought and achieved monopoly power in the markets for the production of men's professional tennis events and services of men's professional players, the ATP Defendants have conspired and continue to conspire to unreasonably restrain and monopolize a third market:

the market for the rights to broadcast men's professional tennis events, or relevant submarkets. The ATP has done so by illegally taking and pooling the broadcast rights of its members, artificially limiting the output of men's professional tennis broadcasts, and forbidding any non-favored men's professional tennis tournament (other than the Grand Slams) from competing with the ATP Defendants' pooled broadcast rights. The ATP has done this directly, by taking direct control of these rights, and indirectly, by controlling and eliminating the supply of top men's players' services and/or top calendar weeks to anyone but its preferred tournaments. The market for these rights is a global market (though there may be relevant antitrust submarkets worldwide, in developed countries, and within the United States), that is being injured by the ATP's actions in the United States. The ATP Defendants have restrained competition in, and acquired, and have attempted and conspired to acquire, a monopoly in all of the relevant geographic markets around the world for the rights to broadcast men's professional tennis events, including the broadcast of such events within the United States, such as that by the GTF Tournament on the Tennis Channel and ESPN 2 in 2007.

110. Finally, by seeking and achieving monopoly power in the markets set forth above, the ATP Defendants have sought and achieved monopoly power and have conspired and continue to conspire to unreasonably restrain and monopolize in numerous submarkets including, *inter alia*, the submarkets for sponsorship rights, marketing rights, and the provision of goods and services at men's tennis events.

### 2. The Defendants Are Causing Substantial Injuries To These Markets.

111. The ATP Defendants have caused and continue to cause substantial injuries to the relevant markets.

112.    Since its creation in 1988, the ATP has steadily increased its stranglehold on the relevant markets using methods such as those condemned by the *Volvo* court. The ATP has employed the same basic agreements and conduct that were challenged in the *Volvo* case. With the adoption of the Brave New World plan, the ATP made its agreements and conduct even more restrictive, exclusionary, and anticompetitive than those at issue in the *Volvo* case.

113.    The ATP Defendants have damaged and continue to damage the following relevant markets:

a.    The markets for men's professional tennis tournaments, or relevant submarket(s), including the market for world-class events such as the GTF Tournament and the Qatar Exxon Mobil Open. The ATP has injured and continues to injure these markets by eliminating men's professional tennis events' ability to compete with the ATP Defendants' cartel events; by controlling men's professional tennis players and forcing them to play, almost exclusively, the ATP Defendants' favored events to the exclusion of all other events; and by boycotting non-favored events, thereby relegating these events to a permanent minor-league status. The ATP Defendants have done this to increase the value of their own tournaments and tournament-related assets and to create and increase monopoly profits derived therefrom;

b.    The market for men's professional tennis players' services, or relevant submarket(s). The ATP Defendants control this market via their power to punish and reward men's professional tennis players, all of whom must be ATP members to participate in any meaningful men's professional tennis tournaments. The ATP has damaged and continues to damage this market by

39

eliminating tournaments' abilities to compete for these players' services or these players' abilities to compete for tournaments. In doing so, the ATP has damaged tournaments and players, as well as consumers, who would have more opportunities to participate as fans, sponsors, and broadcasters of tournaments if tournaments were allowed to compete and exist in the relevant geographic markets;

c.   The market for broadcasting men's professional tennis events, or relevant submarket(s). The ATP Defendants control this market via their pooling of tournament broadcast rights into the ATP Defendants' ATP Media. The ATP has damaged and continues to damage this market by artificially creating a handful of world-class ATP men's professional tournaments and precluding all other tournaments from competing with these tournaments, thereby leaving broadcasters with only a handful of broadcast options; and by controlling the remaining broadcast rights of tournaments of any consequence so that these tournaments, and their broadcasters, may not compete with the ATP Defendants' favored tournaments (and produce better tournaments by doing so). This reduction of broadcast options creates substantial monopoly profits for the ATP Defendants while injuring non-favored tournaments, broadcasters, and consumers who otherwise would have considerably more opportunities to watch broadcast men's professional tennis and broadcast world-class men's professional tennis in a competitive market;

d.   The market for the fans of live men's professional tennis, or relevant submarket(s). The ATP Defendants control this market via all of the controls

set forth above, including, *inter alia*, its control of tournaments, players, the calendar and tennis broadcasts. The ATP Defendants have damaged and continue to damage this market by artificially creating a handful of world-class ATP men's professional tournaments and precluding all competition with these events, thereby leaving fans with only a handful of live top-class ATP men's professional tennis options; and by controlling all remaining men's professional tennis tournaments (other than the Grand Slams) so that these tournaments may not compete with the ATP Defendants' favored tournaments (and produce better tournaments by doing so). This reduction of live tennis options creates substantial monopoly profits for the ATP Defendants while injuring non-favored tournaments and consumers who otherwise would have considerably more opportunities to watch live men's professional tennis and world-class men's professional tennis in a competitive market; and

e.   The market for sponsoring men's professional tennis events, or relevant submarket(s). The ATP controls this market via all of the controls set forth above, including, *inter alia*, its control of tournaments, players, the calendar and tennis broadcasts. The ATP has damaged and continues to damage this market by artificially creating a handful of world-class ATP men's professional tournaments and precluding all competition with these events, thereby leaving sponsors with only a handful of sponsorship options, all controlled by the ATP Defendants; and by controlling all remaining men's professional tennis tournaments (other than the Grand Slams) so that these

41

tournaments may not develop better tournaments that might compete with the
ATP Defendants' favored tournaments for sponsorship rights. This reduction
of sponsorship options creates substantial monopoly profits for the ATP
Defendants while injuring non-favored tournaments and sponsors who
otherwise would have considerably more opportunities to sponsor men's
professional tennis in a competitive market.

114.    The Plaintiffs have been, continue to be and shall be injured in each of these
markets globally, in Germany, Qatar and in the United States. The Plaintiffs, for example, have
traditionally competed for the services of the top United States men's tennis players, who have
regularly played in the Plaintiffs' tournaments. This year, United States citizens Andy Roddick
and James Blake, as well as United States residents, Tommy Haas, Dmitry Tursunov and Xavier
Malisse, played in the 2007 GTF Tournament. The Plaintiffs also traditionally have sold
broadcast and sponsorship rights in the United States. This year, for example, the GTF
Tournament was broadcast on the Tennis Channel and ESPN 2. Further, the plaintiffs'
tournaments draw fans of live tennis from the United States on an annual basis. Pursuant to the
Brave New World plan, however, in the future the GTF tournament will effectively be precluded
from competing for these top men's players' services, for United States sponsorship or broadcast
rights, or for United States-based tennis fans. Further, to the extent the Plaintiffs' injuries take
place outside the United States, they are being caused by the ATP Defendants' actions in the
United States and in the United States geographical markets.

115.    Thus, the GTF Tournament, and other ATP tournaments, cannot even compete
with the ATP's chosen tournaments even with an ATP membership. For example, the prize
money tournaments may offer is capped by the ATP and may only be raised with the ATP's

permission, thereby eliminating tournaments' ability to compete for players' services and the players' ability to provide their services in an open market.

116.    Similarly, the barriers faced by any men's professional tennis player who desires to compete in non-ATP events is daunting. First, there are no such events. Further, as set forth above, the rankings determine player acceptances and seeding for all tournaments. Accordingly, players are compelled to play by the ATP's rules and to maximize their ATP rankings points or they will be precluded from playing tennis professionally at any meaningful level. Finally, the ATP's Brave New World plan compels the participation of top men's tennis players in so many tournaments yearly that such players cannot reasonably play additional tournaments without risking breakdown or injury.

117.    Because of the ATP Defendants' actions, the market is not responsive to consumer preferences. In a free market, for example, consumers in the global market, including those in the United States who routinely travel to Hamburg, Germany to support the GTF Tournament, would be free to support the GTF Tournament, which in turn would be free to compete for the services of the best men's tennis players in the world, thereby bringing these players into the marketplace there and providing top-quality tennis for consumption. This would, in turn, create competition for everything from broadcast rights and marketing to the right to sell concessions, all of which provide choice and options to consumers in the relevant marketplaces, including those that specifically exist in the United States. The ATP Defendants' actions, however, already limit the Plaintiffs' ability to compete in the relevant markets or with the ATP. The Brave New World plan will provide the coup de grâce to the Plaintiffs' ability to compete for the services of the Top 50 players in the world, including numerous United States citizens and residents. This will directly harm consumers in the United States who previously

43

have attended tournaments around the world live or watched these tournaments on television or other broadcast medium to see some of the best professional men's tennis players in action.

118.    Accordingly, instead of decisions in the relevant markets being made by the owners and producers of men's professional tennis tournaments and events, completely unfettered subjective and discretionary anticompetitive determinations are made by the competitors of the Plaintiffs, who control the ATP.    This substitution of regulation for competition is normally considered *per se* unlawful.

**B.    The Defendants' Actions Constitute Joint Action.**

119.    Section 1 of the Sherman Act is directed only at joint action, and does not prohibit independent business actions and decisions.    However, courts have consistently held that, since joint ventures—including sports leagues and other such associations—consist of multiple entities, they can violate § 1 of the Sherman Act.    Much like the Men's International Professional Tennis Council in *Volvo*, the ATP is "an association consisting of representatives of national tennis associations, tournament owners and directors, and professional tennis players." *Volvo*, 857 F.2d at 71.    As such, its actions constitute joint action for purposes of determining whether antitrust violations have occurred.

**C.    The ATP Defendants' Actions Affect Interstate Commerce**

120.    The ATP Defendants' anticompetitive conduct has taken place in interstate commerce and has restrained trade and commerce among the States and in the markets identified, and the Brave New World plan will continue to do so in the future.

44

**IN IMPLEMENTING THE BRAVE NEW WORLD, DEFENDANTS HAVE VIOLATED THEIR FIDUCIARY DUTIES TO THE PLAINTIFFS.**

A.     **The ATP Director Defendants Have Breached Their Fiduciary Duties To The Plaintiffs By The Adoption Of The Brave New World.**

121.     The ATP is a 501(c)(6) not-for-profit corporation.

122.     Pursuant to the ATP's Bylaws, ████████████████████████████

████████████████████████████████

123.     Pursuant to the ATP's 501(c)(6) status, the ATP must act to effectuate the improvement of business conditions for men's professional tennis for the benefit of all of the ATP's members.  The ATP may not engage in a regular business of a kind ordinarily carried on for profit.  Further, none of the net proceeds of the ATP may inure to the benefit of any private shareholder or individual.

124.     The Brave New World plan and other actions taken by the ATP Defendants violate the 501(c)(6) status of the ATP, the ATP's Bylaws, and the Director Defendants' fiduciary duties to the Plaintiffs.  The ATP Defendants have, *inter alia*, commercialized the ATP so that the ATP is now engaged in a regular business of a kind ordinarily carried on for profit; taken actions to benefit the ATP and the ATP's business partners while simultaneously "diminishing the tournament values" of the ATP's non-Cartel tournament members and causing "serious damage" to quality tournament members; and taken actions that inure to the benefit of the ATP itself and its Cartel members.

125.     On information and belief, each of the Director Defendants has voted to implement the Brave New World plan and other, related actions by the ATP.

126.    Additionally, on information and belief, the Director Defendants have done so with knowledge not just that they are violating the ATP's Bylaws and the ATP's 501(c)(6) status, but also with knowledge that the ATP's actions constitute affirmative violations of the antitrust laws of the United States.

## B.    The ATP Director Defendants Have Breached Their Fiduciary Duties To The Plaintiffs By Self-Dealing.

127.    At the same time as creating their illegal cartel, the ATP and Director Defendants have also made official decisions that have inured to the financial benefit of certain Tournament Members to the detriment of others, including specifically the Plaintiffs.





130.    Certain of the Director Defendants have personally received other significant financial and economic benefits as a result of their status as members of the Board.



131.    In addition, certain of the Director Defendants have participated in the activities of TPL in a manner that creates conflicts of interest with their duties to the ATP tournament members as a whole.



135.    These and other transactions, from which certain of the ATP Defendants have personally benefited, have artificially provided certain tournaments with a competitive advantage to the detriment of other tournaments, such as the Plaintiffs, who have not been artificially afforded such benefits.

136.    The ATP Defendants have taken the Plaintiffs' Membership and sold licenses to rights associated with it for more than ███████████████████████████████ ██████ The ATP Defendants have not disclosed these sales or the monies derived therefrom to their tournament or player members.

137.    On information and belief, the ATP Defendants have already utilized funds obtained via their illegal and anticompetitive actions to secret away millions of dollars into various financial accounts.





139.    These and other self-dealing transactions constitute breaches of the fiduciary duties of loyalty and good faith by the ATP Defendants, and the Plaintiffs have been and will continue to be damaged as a result of these breaches.

**C.    The ATP Defendants Have Violated Their Fiduciary Duties of Loyalty and Good Faith to the ATP Members By Appropriating Property Rights.**

140.    As described herein, the ATP and Director Defendants have appropriated the property rights of certain ATP member tournaments, including the Plaintiffs.

141.    The coercive process by which certain of the Masters Series tournaments, including the GTF Defendants, were forced to apply for Masters 1000 Memberships (the "Application Process") exemplifies and illustrates the ATP's appropriation of these rights.

142.    Ultimately, the ATP and the Director Defendants have voted to downgrade — and destroy as a top-tier men's professional tennis tournament — one of the ATP's members, the GTF Tournament, not because the GTF tournament does not meet the ATP's rules or membership requirements or comply with its Bylaws, or because the GTF Tournament cannot otherwise produce a top-tier men's professional tennis tournaments, but because doing so will further their individual financial interests and the financial interests of a few favored tournaments.

143.    Through the means and actions detailed above, the ATP has appropriated or actively sought to appropriate for itself (a) sponsorship rights and payments, (b) rights and payments associated with calendar weeks on the ATP Tour, (c) branding rights owned by Tournament members including the rights to convey title sponsorship without the encumbrance of ATP nomenclature such as ATP 1000, ATP 500, or ATP 250, and (d) the broadcast and television rights of its tournament members, including the Plaintiffs, to the detriment of the rightful owners of those rights.

144.    These appropriations of property rights constitute breaches of the ATP's, and the Director Defendants', fiduciary duties of loyalty and good faith to the Plaintiffs. Plaintiffs have suffered, and will continue to suffer, significant damages as a result of these breaches.

**D.    The ATP Defendants Have Violated Their Fiduciary Duties of Loyalty and Good Faith to the ATP Members By Purposefully Harming Some Members To Benefit Themselves And Their Favored, Financially-Aligned Members.**

145.    Pursuant to its corporate status ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the ATP may not make disproportionate disbursements or act in to the benefit of itself or a distinct category of its membership while simultaneously acting to harm other categories of its members.

146.    The ATP Defendants have converted the Plaintiffs' Membership and sold it to other entities while relegating the Plaintiffs and the GTF Tournament to a minor league status in a disfavored portion of the ATP's calendar. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



147.    The ATP Defendants, as part of their plan to increase their own profits and financial power and the profits and financial power of their chosen favored tournament members,

have taken definite and concrete steps to denigrate and injure the ATP's European clay court tournament members via calendaring, marketing efforts, the pending downgrade and movement of the GTF Tournament, and the outright elimination of the Kitzbühel and Metz tournaments.

148.



the ATP Defendants have put their own interests, and the interest of a small subgroup of members with whom they have made significant financial arrangements, above the interests of the vast majority of the ATP's membership.

**E.      The ATP Defendants' Knowing Violations of Law Have Breached Their Fiduciary Duty of Due Care.**

149.    The ATP Defendants have purposefully sought to create an illegal cartel in knowing violation of the antitrust laws of the United States.  They have attempted to buy off certain member tournaments, and, upon information and belief, other parties who may have raised objections to their illegal scheme, in an attempt to avoid interference with or the legal consequences of their scheme.

150.    The ATP Defendants have also purposefully operated a not-for-profit membership corporation as a for-profit commercial concern, earning profits that have, by design, inured to the

benefit of certain members at the expense of others. In doing so, they have purposefully violated both the ATP's tax-exempt corporate status and its Bylaw 2.3.

151. The ATP Defendants have also consciously and intentionally disregarded the interest of entire categories of full ATP members in favor of other members.



152. These purposeful violations of law constitute a breach of the ATP Defendants' duty of due care, and the Plaintiffs have been and will continue to be damaged as a result.

### Count I

### (Violations of Section 1 of the Sherman Act)

### Contract, Conspiracy, or Combination in Restraint of Trade, 15 U.S.C. § 1

153. The Plaintiffs repeat and re-allege paragraphs 1-152 as though fully set forth herein.

154. The ATP and certain of its member tournaments are horizontal competitors and independent legal entities engaged in an ongoing conspiracy, contract, or combination, among themselves and with certain of their directors and officers, the primary object of which is to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

155. As alleged herein, the ATP Defendants' Brave New World scheme unreasonably restrains trade by:

    a. limiting output in the relevant market by reducing the number of top-tier professional men's tennis tournaments;

b. restraining and eliminating competition among tournaments for the services of top tennis players by imposing mandatory player restrictions and penalties that drastically reduce players' abilities to participate in tournaments excluded from the unlawful cartel;

c. fixing prices by capping the amount of prize money and other compensation that tournaments may offer to compete for the services of top players;

d. dividing and allocating markets for tournaments by manipulating the bidding process for awarding top-tier tournament sanctions and manipulating tournament schedules with respect to geographic location and calendar dates to favor members of the cartel;

e. pooling television and media rights to cartel tournaments to obtain supra-competitive profits from the sale of those rights, while restraining the ability of non-cartel tournaments to compete fairly with the cartel broadcasts; and

f. boycotting potential competitors by collectively refusing to deal with qualified tournaments that do not meet or abide by the terms of the cartel's unlawful scheme.

156. The ATP Defendants' anticompetitive conduct has had a significant adverse effect on competition in the relevant market for the production of top-tier professional men's tennis tournaments, causing direct and proximate harm to consumers and market participants as described above.

157. The anticompetitive conduct orchestrated, facilitated and enforced by the ATP Defendants in this case is precisely the type of pernicious agreement that is ordinarily

condemned as a matter of law as illegal *per se* because of the certainty that such practices are anticompetitive. The ATP Defendants' conduct therefore is subject to the *per se* analysis.

158.    The ATP Defendants' conduct also constitutes an antitrust violation under the "quick-look" analysis. The challenged agreements and actions are not reasonably necessary to further any legitimate, pro-competitive goal of the ATP, or of the cartel, and they constitute naked restrictions on price and output. No elaborate analysis is needed to demonstrate the anticompetitive character of the agreements and the overall anticompetitive nature of the scheme.

159.    The ATP Defendants' conduct further constitutes an antitrust violation under full Rule of Reason analysis. The ATP possesses market power and monopoly power in the relevant markets and the ATP's challenged agreements and conduct do not produce pro-competitive efficiencies at all, much less pro-competitive efficiencies that could possibly exceed the anticompetitive consequences and effects of those agreements and conduct. Even if there were some conceivable justification for the ATP Defendants' agreements and conduct, they are broader than necessary to achieve such a purpose, and therefore unreasonably restrain trade.

160.    The actual, probable, and intended effects of the ATP Defendants' anticompetitive agreements and conduct have caused and continue to cause injury to the Plaintiffs. Further, they have distorted and caused injury to competition in the United States and around the world, including in the market for men's professional tennis players' services, the market for production of men's professional tennis tournaments, and the market for sponsorship and broadcasting rights to men's professional tennis tournaments.

161.    The Plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

**Count II**
**(Violation of Section 2 of the Sherman Act)**
**Monopolization**

162.    The Plaintiffs repeat and re-allege paragraphs 1-161 as though fully set forth herein.

163.    At all relevant times, the ATP possessed monopoly power and substantial market power in the relevant markets.

164.    The ATP Defendants have willfully obtained and exercised complete dominance and monopoly power over men's professional tennis players' services and men's professional tennis tournaments, and have willfully obtained and exercised the power to control the prizes and payments to men's professional tennis players, the scheduling and the existence of men's professional tennis tournaments, the sponsorship and broadcasting rights to men's professional tennis tournaments, and the power to exclude competitors from the relevant markets.

165.    The ATP Defendants have willfully maintained the ATP's monopoly power in the relevant markets.   It was the ATP Defendants' conscious objective to further the ATP's dominance and to solidify its monopoly in the relevant markets by announcing and beginning to implement the Brave New World plan.

166.    The ATP Defendants willfully obtained and maintained the ATP's monopoly power in the relevant markets by restrictive and exclusionary conduct, rather than by means of legitimate competitive activities, business acumen, or historical accident.  The ATP Defendants have used their monopoly power to shield tournaments favored by the cartel from the rigors of competition and prevent the development of competing tournaments.  The ATP Defendants have

divided markets, limited output, and otherwise excluded competition to maintain the ATP's monopoly.

167.    By virtue of its monopoly and market power, the ATP Defendants have required all of the top men's professional tennis players in the world to agree to commitment agreements and regulations as a pre-condition to meaningful participation in ATP tournaments. In this manner, the ATP Defendants have exerted control over the market for men's tennis players' services and have impaired competition and achieved monopoly power in the men's professional tennis tournament market with respect to all events, both ATP-sanctioned and non-sanctioned events.

168.    Having achieved monopoly power in the market for the production of men's professional tennis events, the ATP Defendants have used and leveraged that power to unreasonably restrain trade in and monopolize the market for sponsorship rights and the rights to broadcast men's professional tennis on television and other media in the United States and globally.

169.    The ATP Defendants' willful maintenance of monopoly power has made it difficult or impossible for competitors to engage in fair competition. The conduct taken by the ATP Defendants and its cartel have injured consumers, competition in the relevant markets, and the Plaintiffs (and others similarly situated) in their capacities as owners and producers of a professional men's tournament, by:

   a.   Restraining their ability to freely compete with all other professional men's tennis tournaments on an equal footing;

   b.   Favoring tournaments in which the ATP has a proprietary and/or property interest to the exclusion of the Plaintiffs and others;

c.  Impairing the Plaintiffs' ability to compete freely in the market for the playing services of men's professional tennis players or to obtain a sufficient supply of players' services for their tournaments;

d.  Impairing the ability of players to compete freely in the market for the sale of their playing services;

e.  Effectively prohibiting the Plaintiffs from owning or producing other men's professional tennis tournaments that they might otherwise choose to own and produce; and,

f.  Restraining the ability of the Plaintiffs to fairly participate and/or compete in the market for the rights to broadcast men's professional tennis events in the United States or globally.

170.  The ATP Defendants' anticompetitive conduct has directly and proximately caused injury and damage to the Plaintiffs' business and property interests, as set forth above.

171.  The actual, probable and intended effects of the foregoing acts and practices, and the continuing course of the ATP Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the relevant markets.

172.  The Plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

**Count III**
**(Violation of Section 2 of the Sherman Act)**
**Attempt to Monopolize**

173.    The Plaintiffs repeat and re-allege paragraphs 1-172 as though fully set forth herein.

174.    The ATP Defendants have engaged in restrictive, exclusionary, and anticompetitive conduct, as described above, with the specific intent to monopolize the relevant markets.

175.    The ATP Defendants have succeeded in monopolizing the relevant markets. Further, there is a dangerous probability that the Brave New World plan will succeed in further solidifying and entrenching the ATP's monopoly in the relevant markets.

176.    The ATP Defendants' anticompetitive conduct has directly and proximately caused injury and damage to the Plaintiffs' business and property interests, as set forth above.

177.    The actual, probable and intended effects of the foregoing acts and practices, and the continuing course of the ATP Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the relevant markets.

178.    The Plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

**Count IV**
**(Violation of Section 2 of the Sherman Act)**
**Conspiracy to Monopolize**

179.    The Plaintiffs repeat and re-allege paragraphs 1-178 as though fully set forth herein.

180.    The ATP Defendants and the members of their cartel have conspired and combined with one another to monopolize trade and commerce in all of the relevant markets. The substantial terms of the conspiracy were, among others, that the ATP Defendants and their co-conspirators would take action, which they would represent to other non-favored members and to the public to be in the interest of all ATP Tournament Members, while knowing that the action was taken to bestow disproportionate and almost exclusive benefit upon the ATP Defendants and their co-conspirators.

181.    In furtherance of the combination and conspiracy, the ATP Defendants and the cartel have taken the concerted action and committed the overt acts in furtherance of the conspiracy as set forth herein. The ATP Defendants' co-conspirators include all those who have entered into the anticompetitive agreements described in this Complaint, whether voluntarily or through coercion, including the commitment agreements, the ATP's tournament rules, regulations, and commitments, the agreements among the ATP and certain broadcasters and sponsors, and the Brave New World-related applications and agreements.

182.    The ATP Defendants and their co-conspirators specifically intended that the effect of their unlawful combination and conspiracy would be to achieve and maintain a monopoly in the markets identified.

183.    The ATP Defendants' anticompetitive conduct has directly and proximately caused injury and damage to the Plaintiffs' business and property interests, as set forth above.

184.    The actual, probable and intended effects of the foregoing acts and practices, and the continuing course of the ATP Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the relevant markets.

185.    The Plaintiffs and competition will continue to be so injured unless the ATP Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

## Count V
### Breach of the ATP Defendants' Fiduciary Duty of Loyalty

186.    The Plaintiffs repeat and re-allege paragraphs 1-185 as though fully set forth herein.

187.    The ATP is a non-profit, membership corporation. Accordingly, pursuant to Delaware law and the ATP's bylaws, the ATP and the ATP Director defendants have a duty to act in the best interest of the corporation's members and must set aside their parochial interests. Further, the ATP and the ATP Director Defendants are not permitted to use their position of trust and confidence to further their own private interests. Rather, they owe their members, including the Plaintiffs, a fiduciary duty of loyalty.

188.    The primary purpose of the ATP is to administer a men's professional tennis circuit in the best interest of its tournament and player members and the sport of tennis generally. In doing so, the ATP is obligated to serve as a neutral arbiter over a democratic ATP Tour, not as a competitor or owner of tournament assets in a tour dominated by a few interests.

189.    Via the Brave New World plan, however, the Director Defendants are violating these tenets and their individual duties of loyalty to their membership. The Director Defendants have breached their duty of loyalty to the ATP and its members because they put their own interests ahead of the ATP's and its members.

190.    The Director Defendants have voted to downgrade and therefore destroy the value

of an ATP member tournament, the GTF Tournament, as part of the Brave New World plan from

which they will personally derive financial and economic benefits.



192.    As set forth in detail above, the Board and certain of the members of the Board of

Directors have breached their duty of loyalty to the Plaintiffs by actively voting to place their

own financial interests and those of their favored tournaments ahead of those of the Plaintiffs and

other ATP Member tournaments.

193.    The ATP Defendants have consolidated and pooled property rights from some of

its tournament members, such as the high-value broadcast rights of the Masters 1000

tournaments, and appropriated them for itself, compensating them minimally, if at all, for this

appropriation.  In doing so, the ATP Defendants have injured both those tournaments whose

rights have been appropriated and those whose rights are not pooled and are left unable to

compete with the ATP.

194.    The ATP Defendants are engaging in anticompetitive conduct to control the

supply of these high-value broadcast rights by artificially limiting the number of top-flight ATP

tournaments.  This will benefit the ATP, its individual board members, and the ATP's favored

tournament members, at the expense of the ATP's other tournament members.  Many of the

ATP's tournament members will be injured by the ATP Defendants' control of those broadcast

rights.

61

195.   What is more, the ATP Defendants are engaging in anticompetitive conduct to control the supply of men's professional tennis players' services by mandating that the top fifty ranked players play in all of the ATP's favored tournaments in order to meaningfully participate in the Tour. The end result of this anticompetitive conduct is that the vast majority of the ATP's tournament members, and non-ATP tournaments, will be forced to compete for the limited amount of players' services available during the few weeks unoccupied by favored ATP tournaments.   This will benefit the ATP, its individual board members, and its favored tournament members only.   The vast majority of the ATP's tournament members, other than the Masters 1000 events, and non-ATP tournaments will be injured by the ATP Defendants' actions in artificially controlling the top players' services.

196.   These actions, and the ATP Defendants' violation of the United States antitrust laws, constitute ongoing violations of the ATP and the ATP Director Defendants' duty of loyalty to its non-favored tournaments, such as the Plaintiffs.

197.   The Plaintiffs have suffered and will continue to suffer injury as a result of the ATP Defendants' breach of their fiduciary duty of loyalty to the Plaintiffs.

**Count VI**
**Breach of the ATP Defendants' Fiduciary Duty of Due Care**

198.   The Plaintiffs repeat and re-allege paragraphs 1-197 as though fully set forth herein.

199.   The ATP and the Director Defendants owe the ATP's members, including the Plaintiffs, a duty of due care.

200.   The ATP and the Director Defendants have failed to make a good-faith effort to be informed and exercise appropriate judgment by refusing to listen to or allow the European

62

tournament representative to participate in certain meetings regarding the Brave New World plan and by their ongoing and continuing illegal, anticompetitive actions, in violation of the federal antitrust laws. The pursuit of the ATP's clearly illegal scheme is outside the bounds of reason and, therefore, violates the duty of due care.

201.    Further, the ATP Director Defendants have contravened the ATP's bylaws, which require that the ATP engage only in such activities as are permitted within the scope of Section 501(c)(6) of the Internal Revenue Code of 1986 and prohibit the ATP from engaging in any activity that would invalidate its tax exempt status under that provision. By engaging in commercial activities that have created revenue inuring to the benefit of certain of the ATP's member tournaments only, to the detriment of other member tournaments, including specifically the Plaintiffs, the ATP has acted *ultra vires* in contravention of its fiduciary duty of due care.

202.    The Plaintiffs have suffered, and will continue to suffer, injury as a result of the Defendants' breach of their fiduciary duty of due care to the Plaintiffs.

### Count VII
### Breach of the ATP Defendants' Fiduciary Duty of Good Faith

203.    The Plaintiffs repeat and re-allege paragraphs 1-202 as though fully set forth herein.

204.    The ATP and the Director Defendants owe the Plaintiffs a fiduciary duty of good faith.

205.    The ATP and the ATP Director Defendants have breached this duty by the actions set forth herein, including but not limited to (1) acting in subjective bad faith, by taking the property rights of tournaments and intentionally harming the ATP's members who might compete with the ATP in an open market; and (2) demonstrating a conscious disregard for their

responsibilities by intentionally violating applicable positive law, *i.e.*, the federal antitrust laws of the United States, with the actual intent to do harm to certain tournament members of the ATP.

206.    The ATP and the Director Defendants have also breached this duty by acting in bad faith in intentionally and tortiously interfering with the contractual or business arrangements of its member tournaments, including those of the Plaintiffs.

207.    The Plaintiffs have suffered and will continue to suffer injury as a result of the ATP Defendants' breach of their fiduciary duty of good faith to the Plaintiffs.

## Count VIII
### Tortious Interference with Contracts, Business Relationships and Prospective Business Advantage

208.    The Plaintiffs repeat and re-allege paragraphs 1-207 as though fully set forth herein.

209.    The Plaintiffs have long-standing business relationships with tennis players, sponsors, consumers, and broadcasters.   In addition to its valid business relationships, the Plaintiffs entered into valid and enforceable contracts with sponsors and broadcasters, based on the parties' mutual understanding that the GTF Tournament would take place during its traditional week, two weeks prior to the French Open.

210.    The ATP Defendants have had knowledge of the existence of these contractual and business relationships for an extended period of time.

211.    Despite the knowledge of the ATP Defendants, and in an effort to restrain trade and injure competition, the ATP Defendants have intentionally attempted to interfere with these contracts and/or business relationships, all without justification.

212.     The Plaintiffs have been damaged in that their ownership interests, property rights and contractual relationships will be significantly impaired by the ATP mandating a change in the status and scheduling of the GTF Tournament and via the ATP's Brave New World plan. Additionally, the Plaintiffs have been damaged in that the ATP Defendants' conduct, in interfering with these business relationships, without justification, limits the Plaintiffs' ability to negotiate favorable terms with respect to their ongoing business relationships for calendar years 2007 and beyond.

## Count IX
## Conversion

213.     The Plaintiffs repeat and re-allege paragraphs 1-212 as though fully set forth herein.

214.     The Plaintiffs have a right to the continued possession and control of their full Championship (top-tier) Membership and all of the rights created by law and contract relating thereto, subject only to their remaining in good standing as ATP members. The Plaintiffs are and have always been in good standing.

215.     The ATP Defendants have wrongfully exerted dominion and control over the Plaintiffs' Membership by improperly and unlawfully taking the right and benefits of Plaintiffs' Memberships in the manner described in this Amended Complaint.

216.     The Plaintiffs have suffered and will continue to suffer injury as a result of the ATP Defendants' conversion of their Membership.

## Count X
### Permanent Injunctive Relief

217.    The Plaintiffs repeat and re-allege paragraphs 1-216 as though fully set forth herein.

218.    The actions complained of by the Plaintiffs, set forth herein, will result in irreparable harm in discrete and identifiable ways.

219.    The public interest will be furthered by the entry of a permanent injunction restraining the ATP Defendants' unlawful acts in such a way as to provide a remedy for the irreparable harms demonstrated by the evidence at the trial of this action.

220.    The irreparable harms that will be established by the evidence and the interests of safeguarding competition substantially outweigh the harm, if any, to the ATP Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Deutscher Tennis Bund, the Rothenbaum Sport GmbH, and the Qatar Tennis Federation respectfully request that the Court enter judgment in their favor and against Defendants ATP Tour, Inc., Etienne de Villiers, Charles Pasarell, Graham Pearce, Jacco Eltingh, Perry Rogers, and Iggy Jovanovic as follows:

A.    A monetary award to the Plaintiffs of three times the damages that they have sustained as a result of the ATP Defendants' antitrust violations as provided for by Section 4 of the Clayton Act, 15 U.S.C. Section 15, including the damages sustained while this litigation is pending, the amount of which is ongoing and is not presently known;

B.    A monetary award to the Plaintiffs of compensatory damages caused by the ATP Defendants' tortious interference with existing contractual relationships, tortious interference

with current and prospective business relationships and prospective economic advantage, in an amount presently unknown but to be determined at trial;

      C.    An award of the Plaintiffs' costs of litigation, including reasonable attorneys' fees as provided for by Section 4 of Clayton Act, and other applicable laws;

      D.    An award of pre-judgment and post-judgment interest, as provided by law;

      E    An award to the Plaintiffs of punitive damages in an amount to be determined at trial; and, or:

      F.    A preliminary and permanent injunction barring the ATP Defendants, and all persons and entities acting in concert with them, from further violating the rights of the Plaintiffs, and others similarly situated, including but not limited to provisions barring the ATP Defendants from the following:

      (i)    implementing, directly or indirectly, the Brave New World plan and from engaging in any of the unlawful and anticompetitive conduct alleged herein; or

      (ii)    Retaliating against the Plaintiffs in any way, whether through the administration of the ATP, or by or through any entity related to the ATP, or otherwise; and

G.    Such other and further relief as the Court may deem just and proper.


Dated: October 15, 2007

                                    YOUNG CONAWAY STARGATT & TAYLOR, LLP


                                    _____
                                    C. Barr Flinn (No. 4092)
                                    Chad S.C. Stover (No. 4919)
                                    The Brandywine Building
                                    1000 West Street, 17th Floor
                                    Wilmington, DE 19801
                                    (302) 571-6692
                                    bflinn@ycst.com
                                    cstover@ycst.com

                                    Robert D. MacGill
                                    Hamish S. Cohen
                                    Jennifer Westerhaus Adams
                                    Matthew B. Barr
                                    BARNES & THORNBURG LLP
                                    11 South Meridian Street
                                    Indianapolis, Indiana  46204
                                    (317) 236-1313

                                    Daniel Gravelyn
                                    300 Ottawa Avenue N.W.
                                    Suite 500
                                    Grand Rapids, Michigan  49503
                                    (616) 742-3930

                                    *Attorneys for Deutscher Tennis Bund (the German
                                    Tennis Federation), the Rothenbaum Sport GmbH, and
                                    the Qatar Tennis Federation*


INDS02 JADAMS 926832v1

# Exhibit B
## (Redacted in its Entirety)

DB01:1356783.1

# Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) and ROTHEMBAUM SPORTS GMBH, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 07-178-GMS |
| ATP TOUR, INC., JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8 and JOHN DOE 9, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## RULE 7.1.1 STATEMENT

Pursuant to 7.1.1 of the Local Rules of the United States District Court for the District of

Delaware, I hereby certify that counsel for Deutscher Tennis Bund ("German Tennis

Federation") and Rothembaum Sports GmbH have made a reasonable effort to receive the

written consent of ATP Tour, Inc to file the attached Amended Complaint, but ATP Tour, Inc.

refused to provide its consent at this time.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
Chad S.C. Stover (No. 4919)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6692
bflinn@ycst.com
cstover@ycst.com

*Attorneys for Deutscher Tennis Bund (the German
Tennis Federation) and the Rothenbaum Sports GMBH*

OF COUNSEL:

Robert D. MacGill
Hamish S. Cohen
Jennifer W. Adams
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W.
Suite 500
Grand Rapids, Michigan 49503
(616) 742-3930

Dated: October 15, 2007

## CERTIFICATE OF SERVICE

I, Chad S.C. Stover, hereby certify that October 15, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Lawrence C. Ashby, Esquire
> Philip Trainer, Jr., Esquire
> Carolyn Hake, Esquire
> Ashby & Geddes
> 500 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on October 15, 2007, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Bradley I. Ruskin, Esquire
> Jennifer R. Scullion, Esquire
> PROSKAUER ROSE
> 1585 Broadway
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Chad S.C. Stover*

C. Barr Flinn  (No. 4092)
Chad S.C. Stover (No. 4919)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
cstover@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis Federation) and the Rothenbaum Sports GMBH.*