# YOUNG CONAWAY STARGATT & TAYLOR, LLP

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

C. BARR FLINN
DIRECT DIAL:   (302) 571-6692
DIRECT FAX:    (302) 576-3292
bflinn@ycst.com

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

February 1, 2008

**REDACTED – PUBLIC VERSION**

The Honorable Gregory M. Sleet
Chief Judge
United States District Court for the District of Delaware
844 North King Street, Lockbox 19
Wilmington, Delaware 19801

> Re:   *Deutscher Tennis Bund, et al v. ATP Tour, Inc., et al.*
>          Civil Action No. 07-178 (GMS) _____

Dear Judge Sleet:

Pursuant to the Court's December 3, 2007 Order, and only if the Court determines that motions for summary judgment are an efficient and appropriate manner of proceeding, Plaintiffs respectfully request permission to file motions for summary judgment as to Counts I, V, VI and VII of their Amended Complaint. The undisputed material facts demonstrate Plaintiffs' entitlement to judgment as a matter of law on the specific claims in these Counts as follows:

- Count I (Violations of Sherman Act Article 1 (the "Act")): Defendants' violations are established by (a) Defendants' admissions; (b) case law relating to horizontal market divisions and pro- and anticompetitive activities in sports-related markets; (c) the nature of the player services market; and (d) the Defendants' pooling of broadcast rights; and

- Counts V, VI and VII (Breach of Fiduciary Duties): Defendants breached their fiduciary duties of (1) loyalty by self-dealing in taking actions to place their personal interests ahead of members of the ATP Tour, Inc. ("ATP"); (2) due care by failing to review relevant documents and contracts; by excluding a Board Member from key meetings; and by acting in deliberate disregard of the interests of an entire body of members; and (3) good faith by intentionally violating applicable positive law and acting to place the interests of co-conspirators above those of other, otherwise equally situated members.

## I.     Violations of the Act.

"Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *NCAA v. Bd. of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 107-08 (1984). Price fixing and/or horizontal market divisions are considered *per se* illegal under Section 1 because the probability that these practices are anticompetitive is so high. *Id.* at 101. The undisputed material evidence demonstrates that the Defendants have committed price fixing (by regulating the prize money tournaments may pay players); have

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
February 1, 2008
Page 2

restricted output (by limiting the number of world-class tournaments, by pooling broadcast and sponsorship rights, and by forcing the top players to play their cartel-member tournaments while excluding other tournaments from competing for these players' services); and have horizontally divided markets (via their player controls and geographic and calendar market protections).

### A.    The Defendants Admitted Violations Of The Act.

The Defendants have admitted that they acted intentionally to reduce output and control inputs in the relevant markets so as to restrain trade, fix prices and horizontally divide the relevant markets so as to damage competition in violation of the Act.  For example:



- ATP Board member Zeljko Franulovic (a former top player and ATP officer from 1989 to 2005) testified that the Defendants agreed to restrain competition among tournaments for the services of top players (Deposition of Zeljko Franulovic at 275:8-12) (the key pages of the Franulovic Dep. are attached as Ex. 2); that the Defendants imposed player restrictions and penalties to effectively eliminate the ability of players to participate in non-favored ATP tournaments (*id.* at 275:14-22); that tournaments were awarded sanction status under the BNW without regard to any competitive merit (*id.* at 275:23-276:5); and that the BNW's express, anticompetitive purpose and effect is to enrich the Defendants and their cartel members while placing other ATP members at a significant competitive disadvantage (*id.* at 279:13-21).  This testimony is uniformly supported by ATP documents and other testimony from the Defendants.

### B.    The Defendants' Actions Are *Per Se* Illegal.

Antitrust law distinguishes pro-competitive from anticompetitive behavior.  Pro-competitive behavior relates to the goal of preserving the essential character and integrity of the game, such as a regulation prohibiting types of tennis rackets.  *Gunter Harz Sports, Inc. v. United States Tennis Ass'n. Inc.*, 511 F. Supp. 1033 (D. Neb. 1981).  Anticompetitive behavior includes the preclusion of player participation in certain events or the pooling television rights.  *Volvo North America, Corp. v. Men's Int'l. Prof'l. Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988).

Defendants' conduct is anticompetitive as a matter of law.  It constitutes price fixing and horizontal market divisions relating to, *inter alia*, player services, broadcasting and sponsorship sales.  The conduct does not relate to the "essential character and integrity of the game"; it relates

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
February 1, 2008
Page 3

to economic competition in the marketplace. Accordingly, Defendants' conduct is subject to a *per se* analysis which establishes that Defendants' price fixing (as to player compensation, broadcasting and sponsorship) and horizontal market divisions (as to calendar week, geographic markets and player service divisions) are illegal as a matter of law.

### C.  Defendants Have Damaged Competition In The Player Services Market.

The undisputed facts demonstrate that men's professional tennis tournaments compete for the services of men's professional tennis players, and that the Defendants have significantly damaged competition in this specific market.

It is undisputed that top players only play a finite number of tournaments each year; that player participation affects a tournament's viability; and that player participation in a particular market influences a tournament's ability to secure sponsors, television broadcasters, earned media and fans. *See, e.g.*, Deposition of Etienne de Villiers at 291, 292-94 (key pages of the de Villiers Dep. are attached as Ex. 3). Against this backdrop, ATP Chairman de Villiers and numerous others admitted that one purpose of the BNW is to channel players and "insure maximum player participation in [Defendants'] premium events." *Id.* at 327-28. For example, ATP Board Member and owner of the Indian Wells Masters Series tournament Charles Pasarell admitted that player participation affects a tournament's ability to compete for sponsors, television broadcasters and fans and to derive value therefrom. Deposition of Charles Pasarell at 154-57 (key pages of the Pasarell Dep. are attached as Ex. 4). Pasarell also admitted that the tournaments compete with one another and the ATP. *Id.* at 63-64 (Masters 1000 tournaments given sanction protection in exchange for their agreement not to compete with the ATP during that period). Further, ATP Board member Perry Rogers testified that the ATP determined that it could maximize its revenues by pooling broadcast rights of its top tournaments, reducing the output of these tournaments and "channeling" the players into these tournaments. Deposition of Perry Rogers at 63-65, 75-78, 91-92 (key pages of the Rogers Dep. are attached as Ex. 5).

Given finite player availability, the "channeling" of players to one set of tournaments necessarily precludes other tournaments from competing for those players' services. Accordingly, even if one accepts the ATP's market definition (entertainment generally), it is undisputed that Plaintiffs and others compete in this market and that the ATP seeks to preclude such competition on an ongoing basis by "channeling" players into specific, favored tournaments and eliminating all other tournaments' ability to compete for top players.

### D.  Defendants' Pooling Of Broadcast Rights Is Illegal.

As demonstrated by the history of the Sports Broadcasting Act of 1961, 15 U.S.C. § 1291, the pooling and sale of television rights by a sports league or governing body, except when done for sale on free, terrestrial television and by the four major United States sports leagues (NFL, MLB, NBA and NHL), constitutes an unreasonable restraint of trade. It is undisputed that the Defendants' BNW includes a complete pooling of broadcast rights. As the ATP has no exemption, this pooling is illegal as a matter of law.

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Gregory M. Sleet
February 1, 2008
Page 4

## II.   Defendants Have Breached Their Fiduciary Duties (Counts V, VI & VII).

Corporate officers and directors may not use their position of trust and confidence to further their private interests. *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061-62 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005). Further, they must proceed with a critical eye and on an informed basis when assessing all material information relevant to a decision. *Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985). Finally, they must avoid acting in subjective bad faith or with a conscious disregard for their responsibilities. *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64-67 (Del. 2006) The undisputed material facts demonstrate that the Defendants have violated each of these duties. For example:

- Pasarell's tournament, via a series of self-dealings between Pasarell and the ATP, received ███████████████████████████████████ ████████████████████████████ (despite the ATP's claim that ATP 1000 sanctions were awarded via a "transparent bidding process"). Ex. 4, pp. 55-56, 70-71. It is undisputed that Pasarell had a significant financial interest in the BNW, as it was designed specifically to create more sponsorship and broadcast revenue for *his* tournament (at the same time it involved downgrading competing tournaments). *Id.* at 158-62, 177-78. ████████████████████████████ [1] *See* Ex. 3, pp. 324-25 (the vast majority of tournaments, to be included in the tier known as the "ATP 250," are not considered part of the ATP's "premium tour.").

- The Defendants, via the BNW, have channeled top players into a narrow range of events in which the ATP has taken a significant financial interest. For example, de Villiers testified: (a) the BNW was designed to increase the sponsorship and broadcast value of the ATP's favored tournaments, in which the Defendants have taken a ████ interest via ATP Media, Inc. (Ex. 3 at 77-78, 80); (b) by moving the Tennis Masters Cup ("TMC"), an asset owned by the ATP, from Shanghai to London, and compelling the top players to play therein as part of the BNW (and providing Shanghai a Masters 1000 sanction outside of the bidding process), the ATP hoped to yield a ████████████████ net profit (*id.* at 66-67); and (c) simultaneously, the ATP was precluding most of its membership from competing for players to increase the value of its TMC (*id.* at 77-78, 80, 324-25).

- Per de Villiers' own admission, the ATP Board members "understood that there was a provision in the TPL agreement that prohibited downgrades of any member prior to December 31, 2009." Ex. 3 at 179-80. ████████████████████████████

---

[1] Further, in 2006, approximately ████████ was exchanged in a transfer for partial ownership in Pasarell's tournament. *Id.* at 22. Though the ATP normally would collect 10% of all such transactions, *i.e.*, ████████, it agreed, as a result of Pasarell's involvement, ██████████████████████████ *Id.* at 97-98 and 114.

Young Conaway Stargatt & Taylor, LLP
The Honorable Gregory M. Sleet
February 1, 2008
Page 5

███████████████████████████████████████████ Nonetheless the Defendants voted to downgrade Hamburg and induce these breaches prior to that date. Ex. 3 at 179. By inducing a breach of a contract with the DTB, Defendants violated their duties of loyalty and due care to ATP members.[2]

- Defendants awarded an ATP 500 sanction to the Dubai tournament, owned in part by Ion Tiriac, the owner of the Madrid tournament and a member of the Defendants' cartel, over the QTF's Doha tournament, which offered a substantially superior application for that sanction. *Id.* at 484-89. Defendants did this via a private negotiation outside the bidding process to further their own, narrow interests in disregard of the interest of their entire membership (other than Tiriac) because the Dubai tournament was the ATP's "preferred" tournament. *Id.* at 488.

## III.    Judicial Economy Considerations Weigh Against Summary Judgment Proceedings.

Record evidence and applicable law confirm that no party can file a motion for summary judgment that will eliminate the need for a trial on most counts of the Amended Complaint. Motions for summary judgment on these four discrete issues arising under several Counts of the Amended Complaint (identified *supra*) can be filed if authorized. Such motions offer the prospect of resolving only four issues of law before trial.

These four legal issues can be resolved more efficiently in trial proceedings. Objections to testimony (expert and non-expert), proffered jury instructions and Fed. R. Civ. P. 50 motions will most expeditiously, inexpensively and justly resolve each of these four issues. Resolution of these issues at trial would provide the Court with a more complete factual context for an appropriate resolution. By contrast, pre-trial motions on these four issues would consume significant judicial resources without a corresponding reduction in the judicial resources required for a trial on the merits. For these reasons, Plaintiffs respectfully submit that considerations of judicial economy weigh heavily against protracted motion practice when a full and fair resolution of these same issues can occur most justly in the context of trial proceedings. If, however, the Court does determine that motions for summary judgment are an efficient and appropriate manner of proceeding, Plaintiffs respectfully request permission to file motions for summary judgment as set forth above.

Respectfully submitted,

*/s/ C. Barr Flinn*

(No. 4092)

cc:  Clerk of the Court (redacted version by electronic filing)
     Philip Trainer, Jr., Esquire (redacted version by e-mail)
     Bradley I. Ruskin, Esquire (by e-mail)

---

[2] Further, the ATP violated ███████████████████████████████████████ ██████████████ and some, if not all, of the Defendants tortiously interfered with the Agreement by acting outside the scope of their fiduciary duties to induce the ATP's breach, thereby injuring Plaintiffs.

# EXHIBIT 1
# REDACTED IN ITS ENTIRETY

# EXHIBIT 2

00001

1

2       IN THE UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF DELAWARE

4   -----------------------------X

5  DEUTSCHER TENNIS BUND (GERMAN

6  TENNIS FEDERATION) and

7  ROTHENBAUM SPORTS GMBH TENNIS,

8          Plaintiffs,

9       VS.

10  ATP TOUR, INC., et al.,        07-178(GMS)

11          Defendants.

12   -----------------------------X

13

14   VIDEOTAPED DEPOSITION OF ZELJKO FRANULOVIC

15          New York, New York

16           September 5, 2007

17

18

19

20

21

22

23  Reported by:
   Bonnie Pruszynski, RMR
24

25

00274

1

2  correct, to the best of your knowledge and belief?

3      A    Yes, I did.

4      Q    You relied on your lawyers separately

5  to associate legal conclusions with the factual

6  allegations, fair statement?

7      A    It is.

8      Q    But you, for your part, verified the

9  factual allegations made specifically in the

10  court?

11      A    Yes.

12      Q    All right.  Now, Exhibit 163, is this

13  a true and correct copy of the complaint that was

14  filed on your behalf?

15      A    I don't see the signature, but that's

16  okay.

17      Q    And you recognize this as the

18  complaint you filed?

19          MR. UNGER:  That signature is of our

20      Delaware local counsel.

21      Q    Sir, focusing on page two of the

22  complaint, and the first full sentence on that

23  page, is it true and correct as you understand

24  matters that the ATP and certain of its directors

25  conspired and agreed to implement a new plan that

00275

1

2  would limit the output of the number of top-tier

3  professional men's tournaments?

4          MR. RUSKIN:  Objection to the extent

5      it asks for a legal conclusion.

6          MR. UNGER:  You can answer.

7  A    Yes.

8  Q    Is it true, sir, that the ATP and

9  certain of its officers and directors, agreed to

10  restrain competition among tournaments for the

11  services of top tennis players?

12  A    Yes.

13          MR. RUSKIN:  Same objection.

14  Q    Is it true, sir, that the ATP

15  management and the ATP and certain of its officers

16  and directors agreed to implement the services of

17  top tennis players by imposing mandatory player

18  restrictions and penalties that effectively

19  eliminated player's ability to participate in

20  tournaments excluded from the Masters 1000 tier?

21          MR. RUSKIN:  Same objection.

22  A    Yes.

23  Q    Is it true that the ATP board members

24  other than yourself and certain officers have now,

25  as of September 4, September 5, 2007, awarded

**Franulovic, Zeljko 9-5-2007**              **Page 275**

00276

1

2  top-tier sanctions in the Masters 1000 category

3  without regard to competitive merit?

4          MR. RUSKIN:  Same objection.

5  A    Yes.

6  Q    And those awards have been to

7  Cincinnati, Canada, Indian Wells, Miami, Madrid,

8  Shanghai and Rome?

9          MR. UNGER:  Are you saying as of

10     today?

11  Q    As of today?

12  A    As of today, yes.  Monte Carlo.

13          MR. UNGER:  Answer.

14  Q    Yes?

15  A    And Monte Carlo.

16  Q    Well, my question, though, is the

17  Masters 1000 category, I want to be specific to

18  that, is it fair that the Masters 1000 category

19  with the associated player requirements eight of

20  eight and related penalties have been issued to a

21  select group of eight tournaments, not including

22  Monte Carlo?

23          MR. RUSKIN:  Asked and answered.

24     Objection, lack of foundation.  Objection,

25     mischaracterizes the prior testimony.

**Franulovic, Zeljko 9-5-2007**                    **Page 276**

00277

1

2    A    The sanction awarded Monte Carlo is

3 the same as to the others, except for the

4 different player commitment.

5    Q    All right.

6    A    So the branding and the prize money

7 and points?

8    Q    Players, top 50 players are not

9 required to play Monte Carlo, right?

10    A    Correct.

11    Q    Under the, under a settlement

12 agreement that you reached with the ATP, agreed?

13    A    Agreed.

14    Q    All right.  Players are not going to

15 be penalized for failing to play Monte Carlo, are

16 they?

17    A    They are not.

18    Q    They are not going to be penalized by

19 being suspended for not playing Monte Carlo?

20    A    Correct.

21    Q    They are not, they are not going to

22 have -- strike that.

23        Based on those circumstances, is it

24 fair to say that in years beginning 2009, Monte

25 Carlo will be at a competitive disadvantage

00278

1

2  compared to the other Masters 1000s in competing

3  for players?

4      A    Yes.

5      Q    And those competitive disadvantages

6  that Monte Carlo will be facing beginning in 2009

7  are competitive disadvantages that spring from the

8  Brave New World plan approved by other members of

9  the board of directors, not yourself?

10        MR. RUSKIN:  Objection to form.

11     Q    Agreed?

12     A    Say again.

13     Q    Those competitive disadvantages that

14  the Monte Carlo event will labor under beginning

15  in 2009 vis-a-vis the other Masters 1000

16  tournaments stem from the Brave New World plan

17  approved by other members of the board of

18  directors other than yourself?

19        MR. RUSKIN:  Objection to form,

20     objection, lack of foundation.

21     A    Yes.

22     Q    Okay.  Now, the tournament sanctions

23  awarded to those other Masters 1000 events as of

24  September 5, 2007, those tournament sanctions were

25  awarded without regard to competitive merit,

00279

1

2  agreed?

3      A      Yes.

4      Q      Yes?

5      A      Yes.

6      Q      Under the terms of the Brave New

7  World, as matters now stand, under just two

8  elements of the Brave New World plan that has been

9  voted in by board members other than yourself, the

10  ATP will yield at least $58 million in additional

11  revenues, agreed?

12          MR. RUSKIN:  Objection to form.

13      Q      Let me restate the question.

14          Under two elements of the Brave New

15  World plan, Shanghai at 28 million, and one

16  estimate for London of 28 million, the ATP would

17  yield prospectively under the Brave New World plan

18  these two components approximately $55 million,

19  agreed?

20          MR. RUSKIN:  Objection to form.

21      A      Yes.

22          MR. RUSKIN:  Objection.  The witness

23  testified previously that he didn't know the

24  number for London.

25      Q      I'm referring to the data you now

# EXHIBIT 3

00001

1

2     IN THE UNITED STATES DISTRICT COURT

3         FOR THE DISTRICT OF DELAWARE

4   ------------------------------X

5   DEUTSCHER TENNIS BUND (GERMAN

6   TENNIS FEDERATION) and

7   ROTHENBAUM SPORTS GMBH TENNIS,

8   and QATAR TENNIS FEDERATION,

9         Plaintiffs,

10    VS.                    Case No. 07-178-GMS

11   ATP TOUR, INC., ETIENNE DE

12   VILLIERS, CHARLES PASAELL,

13   GRAHAM PEARCE, JACCO ELTINGH,

14   PERRY ROGERS and IGGY JOVANOVIC,

15         Defendants.

16   ------------------------------X

17

18   VIDEOTAPED DEPOSITION OF ETIENNE DE VILLIERS

19         New York, New York

20         January 8, 2008

21

22

23  Reported by:
    Bonnie Pruszynski, RMR
24

25

00066

1

2 based on certain assumptions, 24 million would be

3 yielded to the corporation, the ATP Tour, Inc.,

4 from the 02 event, if the assumptions proved to be

5 true?

6     MR. RUSKIN: Objection to form.

7   Objection. I don't know what you mean by

8   your assumptions.

9   Q    Financial assumptions.

10     MR. RUSKIN: Objection to form.

11   Objection to foundation.

12   Q    Because of the interruption, let me

13 start over.

14     You understood, without a question in

15 your mind, that based upon certain financial

16 assumptions that you utilized in connection with

17 your role as president of the corporation, that

18 the corporation would yield approximately 24 to

19 $30 million by staging a TMC event in London;

20 agreed?

21     MR. RUSKIN: Objection to form.

22   A    We were hoping that that could be the

23 result, because we believed that that's what we

24 could achieved by selling it elsewhere. The value

25 that that had been achieved by the WTA in selling

00067

1

2 the year-end tournament to others or to bid out

3 the event to -- to someone similar to Shanghai.

4 We were looking, as a benchmark, to have more

5 control over the asset in a territory that was

6 strategically far more important for the sport,

7 which would allow us -- which would allow the

8 sport to grow and would be of benefit to the

9 stakeholder, but to not have to take a financial

10 haircut in order to meet those strategic goals.

11      Q      Mr. Galloway, you asked Mr. Galloway

12 to present to you a financial analysis which would

13 tell you, based on certain financial assumptions

14 what the likely outcome was for the corporation,

15 the ATP Tour, Inc., from this move, didn't you?

16      A      We modeled the event.

17      Q      Mr. Galloway did that for you?

18      A      I did, I did this together with him,

19 and the people from Deloitte.

20      Q      You, yourself, personally, did some

21 of the numbers?

22      A      I, personally, helped construct the

23 model, yes.

24      Q      All right.  With Mr. -- now, were you

25 the primary author of the model or was it

00077

1

2  possibly tournaments that fall outside of the 500

3  category and 1000 category, such as Queens and/or

4  Halle, given where they sit strategically in the

5  overall calendar, would also, hopefully, be put

6  into a TV package that would be sold and promoted

7  as offering tennis fans the opportunity to follow

8  the ATP World Tour.

9      Q      Queens and Halle, where are they

10 classified right now?

11     A      Queens and Halle would currently be a

12 250.

13     Q      Now, relative to the Brave New World

14 plan, how is the value of the ATP's ownership

15 interest going to be increased -- strike that.

16          How will the value of the TMC, the

17 ATP's value in the TMC interest be increased under

18 the Brave New World plan?

19     A      Will the value be increased?

20     Q      Yes, the value of the TMC event owned

21 by the ATP.

22     A      Right.

23          The deal is structured in such a way

24 that we, at the ATP, will sell the sponsorship for

25 that event.  We will also, together with ATP

00078

1

2   Media, sell the television rights for that event.

3   We, together with the 02 and the All England Club

4   and the LTA, will market the event, and in

5   success, if tennis grows and the awareness of this

6   event and the interest shown in this event and,

7   therefore, the attendance to this event both on --

8   on-site and through television, if all of those

9   grow, then the various revenue streams that I

10  highlighted will grow as well, and there is a

11  formula whereby AEG, we earn the first $8 million

12  of the -- of any sponsorship that is sold.  The

13  AEG had a right to a minimum facility fee and if

14  they do not achieve that minimum as facility fee,

15  we can be clawed back to, if memory serves,

16  $6.2 million or $6.8 million.  And then all of the

17  common costs with a fixed facility fee are then

18  deducted from any net funds.  And once all of the

19  costs have been paid, the facility fee has been

20  paid, obviously, the players have been paid their

21  prize money, then the back end of that is shared

22  between the AEG, the player group, the ATP and I

23  believe a small share will go to LTA and the All

24  England Club.

25       MR. MAC GILL:  We need to change

**de Villiers, Etienne 2008 01/08 v1**              **Page 78**

00080

1

2    Q    Now, with respect to that, to the

3    growth that would be, that envisioned under the

4    Brave New World, part of the growth would enure to

5    the benefit of the TMC event; agreed?

6    A    Part of the growth would improve the

7    prospects, hopefully, yes.

8    Q    Of the TMC event?

9    A    Correct.

10    Q    Did you do a financial assessment

11    yourself or did anyone do an assessment for you

12    which would assess how much the value of the ATP's

13    TMC events would increase under the Brave New

14    World plan?

15    A    Not that -- no study was done

16    specifically to see what incremental value would

17    be achieved.  What we did was look to see whether

18    the approach that we were taking was a viable

19    approach, given the risk that we were taking on

20    board.

21    Q    You understood just only generally

22    that Brave New World plan would increase the value

23    of the TMC event owned by the ATP, but no

24    particular assessment of by how much?

25        MR. RUSKIN:  Objection, form.

00179

1

2          We took the view that we would go

3 ahead with the plan if and when we were ready to

4 do so, and I was never aware of -- I was never

5 clear in my mind as to whether everyone understood

6 or knew, but I believe that everybody understood

7 that there was an agreement that existed with --

8 with the TPL tournaments.

9     Q     You believe everyone on your board of

10 directors, prior to the January 18, 2007, vote,

11 understood that there was a provision in the TPL

12 agreement that prohibited downgrades of any member

13 prior to December 31, 2009?

14     A     I believe that was understood.

15     Q     And that is the reason that you do

16 not bring that before the board as a formal

17 matter, a description of this fact that existed in

18 the TPL agreement?

19     A     That's not the reason.  It never

20 occurred to me that we had to do that.  We were

21 very clear in our minds that we had the

22 flexibility to start a year later if so, if -- if

23 so determined.

24     Q     Did any board member, did any board

25 member give you any feedback on this TPL provision

00291

1

2    A    We understand each other.

3    Q    Fair enough.

4         You reviewed, prior to the break

5 Exhibit 369 on the player participation numbers;

6 right?

7    A    Yes.

8    Q    And you are going to look overnight

9 to see if you can get a better format; right?  On

10 Exhibit 369?

11        MR. RUSKIN:  We'll take that under

12    advisement.

13        MR. MAC GILL:  All right.  I am going

14    to offer into evidence at this point,

15    Exhibit 369.  I would ask if you have any

16    form related objections, that you make them

17    now.

18        MR. RUSKIN:  Objection to -- so I

19    will object as not the appropriate time to

20    make objections.  We will do that at the

21    appropriate time in connection with the

22    pretrial order and we reserve all of our

23    objections.

24 BY MR. MAC GILL:

25    Q    Now, sir, relative to the

**de Villiers, Etienne 2008 01/08 v1**          **Page 291**

00292
1
2  tournament's ability to secure player services, do

3  you agree that the player field affects the

4  ability to attract sponsors of tournaments?

5      A      It is one of the factors that effects

6  the tournament's viability.

7      Q      All right.  And does -- does the

8  quality of the player field also affect the

9  ability to attract a good broadcaster in your

10  experience with the ATP?

11      A      My experience is mixed on that.

12  There are certain tournaments that have very, very

13  fine player fields where no television interest in

14  that particular market is forthcoming.  There are

15  others where there are local players, who are not

16  necessarily ranked players, will be sufficient to

17  attract a very lucrative television deal.

18          So, it's not a function purely of the

19  player field that makes a tournament attractive to

20  a sponsor or to a broadcaster, but it is certainty

21  a -- an input.

22      Q      A what?

23      A      An input.

24      Q      An input.  And is it fair, if it's --

25  is it fair to say that the player field has at

**de Villiers, Etienne 2008 01/08 v1**            **Page 292**

00293

1

2  least an important influence on the quality of the

3  broadcasting or broadcasters that a tournament can

4  attract?

5       A    Well, again, there are a number of

6  issues that will affect a broadcaster's decision

7  to buy or cover a particular tournament.  It has

8  to do with when in the schedule it might be for

9  them, what part of the year, what other

10  programming they might have that would serve a

11  particular market, and a number of other factors,

12  but there is no denying that player fields are an

13  important part of the overall mix of

14  considerations.

15       Q    And in terms of this overall mix, I

16  take it it's fair, based on your experience with

17  the ATP, that you have also come to learn that the

18  quality of the player field has an influence on

19  the number of fans that attend the event; agreed?

20       A    Again, again our research tells us

21  that that is somewhat different from market to

22  market.

23            It is certainty an important factor,

24  but it is not the only factor that will attract

25  fans to an event.

**de Villiers, Etienne 2008 01/08 v1**          **Page 293**

00294

1

2    Q    But, at least in a general sense, is

3  it fair to conclude this line of questioning, sir,

4  by the following: That top player participation

5  influences, at to least some degree, a

6  tournament's ability to secure sponsors, secure TV

7  broadcasters, secure earned media and secure fans

8  on site?

9        MR. RUSKIN:  Object to form.

10    A    Repeat that, please?

11    Q    Sure.

12        Is it fair to say that top player

13  participation at a tournament influences a

14  tournament's ability to secure sponsors, to secure

15  television broadcasters, to secure earned media

16  for the tournament and to secure fans on-site at

17  the tournament?

18        MR. RUSKIN:  Objection to form.

19    A    At least to some degree.  I would not

20  characterize it as top players, I would

21  characterize it, rather, as marquis players or

22  players that are relevant to that particular

23  market.

24    Q    Fair point.

25        So, is it fair to say to correct my

00324
1

2    A    I think so, yes.

3    Q    And there is the -- and this is --

4  this is a particular exhibit that was created for

5  this PowerPoint.

6        Did you create this particular

7  exhibit or did your management?

8        MR. RUSKIN:  Hang on.  We are just

9    talking about this page?

10       MR. MAC GILL:   Yes, just this page,

11   page 7758.

12       MR. RUSKIN:  Fine.

13   A    This was recreated by my management

14  team and I -- I looked at it, yes.

15   Q    Did you present this document at the

16  board meeting, yourself?

17   A    The document was made available to

18  the board members, and it was posted on an

19  internet site and was then discussed during the

20  meeting.

21   Q    Did you lead the discussion on this

22  meeting agenda and discussion guide, yourself, as

23  chairman of the board?

24   A    Typically, I would insure that there

25  was a -- that the issues were debated.

00325

1

2    Q    Okay.  And that the information in

3 this packet was, in fact, presented either by you

4 or somebody you designated?

5    A    As memory serves, I, hopefully, would

6 have gone through all of this.

7    Q    Now, just one question more question

8 on page six.

9         There is a, in this chart there is an

10 ATP World Tour and that then an ATP premium tour

11 depicted beneath that.  Do you see that?

12    A    I do.

13    Q    As matters then stood, the ATP

14 Premium Tour included the ATP Masters 1000's, the

15 ATP Open 500's, Tennis Masters Cup and the World

16 Team Cup.  Do you see that?

17    A    I do.

18    Q    The premium tour at that time at

19 least did not include, as things were then

20 envisioned, the ATP 250's?

21    A    The ATP Premium Tour?

22    Q    Yes.

23    A    The ATP Premium Tour did not include

24 the 250's.

25    Q    Ultimately, as things turned out, the

00327

1

2 clarifying what the word "agree" might mean.

3    Q    All right. Fair enough. And, you

4 know, you are just elaborating on what was

5 actually said there in those minutes; right? The

6 board agreed, you think might also be, perhaps,

7 described as the board arrived at a consensus?

8    A    On the eight of eight.

9    Q    All right. And that eight of eight

10 consensus or that eight of eight agreement is

11 consistent with what is written here on page 7757

12 of Exhibit 313, is it not?

13       MR. RUSKIN:  Objection, form.

14    Objection, directly mischaracterizes the

15    prior testimony and the prior sentence.

16    Q    You may answer.

17    A    Yes. This was not -- I would not

18 characterize it as that.

19    Q    I'm referring to the previous page,

20 sir, if you don't mind.

21       I'm referring to this, "insure

22 maximum player participation in our premium

23 events," that line of page 7757. My question is

24 simply this: Is it fair to say that the ultimate

25 consensus or the ultimate board agreement was at

00328

1

2  least generally consistent with some of the

3  information presented in Exhibit 313, especially

4  the information on page five?

5      MR. RUSKIN:  Objection to form.

6  A    Especially the information on page

7  five?

8  Q    Yes, which is Bates number 7757.

9  Where it says, "build a Premium Tour that has

10 certain features, insure maximum player

11 participation at our premium events," et cetera.

12 A    The discussion that we had, to my

13 best recollection, in Shanghai was specifically to

14 the ATP Masters 1000, and that there was quite a

15 -- quite a range of opinions as regarded the 500,

16 working with the open 500 player commitment.

17     MR. MAC GILL:  Sir, I think it might

18 be a good time to take a break tonight, and

19 what we can do is resume in the morning.

20     THE WITNESS:  Thank you.

21     THE VIDEOGRAPHER:  The time is

22 approximately 6:12.

23     We are now going off the record.

24        oOo

25

00484

1

2          MR. RUSKIN:  I ask that perform

3   civilly in the deposition.

4     Q     Will you admit that, sir, without

5   seeing documents?

6          MR. RUSKIN:  Asked and answered.  He

7   can answer again.

8     A     I would need to see the document.

9     Q     Now, in terms of transactions with

10  Mr. Tiriac, in relation to what you did with him

11  in Madrid, and what you did with him vis-a-vis

12  Kitzbuhel, you weren't done, as a part of your

13  Brave New World negotiations, with Mr. Tiriac,

14  were you, sir?

15         MR. RUSKIN:  Objection to form.

16    A     Please repeat.

17    Q     There was one final part of the deal

18  with Mr. Tiriac, beyond what you did in Kitzbuhel,

19  beyond what you did on the waiver of the fine, and

20  beyond what you did with him vis-a-vis Madrid;

21  agreed?

22         MR. RUSKIN:  Objection to form.

23    A     I have no idea what you are referring

24  to.

25    Q     Well, its right in front of you, sir,

**de villiers, Etienne 2008 01/09 v2**              **Page 484**

00485

1

2  in terms of this particular exhibit.

3       Mr. Tiriac and Dubai offered you a

4  bid premium of $573,500, didn't they, in

5  connection with their application?

6    A    Mr. Tiriac has no direct involvement

7  in the running of Dubai, other than providing

8  Dubai with a lease, a third-party -- a third -- an

9  arm's length lease of the membership. Mr. Tiriac

10  --

11    Q    So now you are admitting Mr. Tiriac

12  does lease to Dubai.

13    A    I'm not admitting any of it. I'm

14  saying that the Dubai lease was leased to -- the

15  entity that currently holds that gold entity.

16       And, again, I have said on a number

17  of times, I am not sure and do not know whether

18  that particular membership is the Bartoni

19  membership or whether it is a separate membership

20  that Mr. Tiriac is leasing.

21    Q    All right. Fine. Cast that aside

22  for a minute, sir.

23       Did Dubai offer a $573,500 bid

24  premium, yes or no?

25    A    Initially they did, yes.

00486

1

2    Q    And tell the court and jury what the

3  bid premium is that Doha offered?

4    A    It appears from this document that it

5  was $10 million.

6    Q    All right.  So, you had an offer that

7  would go to treasury, net, to Doha of $10 million

8  as compared to $573,500 from Dubai and the ATP

9  board chose Dubai over Doha?

10    A    Again, I --

11    Q    Did that happen?

12      MR. RUSKIN:  Objection to the form of

13    the question.  You can answer.

14    A    What the board reviewed was the

15  financial data, and I did not remember -- do not

16  recall the bid premium being as broad as it

17  appears to be the differential, but what I do

18  remember --

19    Q    No, no.  My question at this point,

20  did they --

21      MR. RUSKIN:  He's in the middle of

22    answering a question.

23    Q    My question -- he's not being

24  responsive.

25    A    I'm responding.  I'm responding.

00487

1

2      MR. RUSKIN:  He's trying to answer

3      the question.

4      Q      My question is:  Did Dubai, did the

5  board select Dubai over Doha?

6      MR. RUSKIN:  That wasn't the

7      question.  There was more to the question.

8      If there was anything that you need to add,

9      you should state what you need to add to

10      answer the question.

11      A      We made it clear to all of the

12  applicants that there was going to be more than

13  one step in the -- in the selection of the various

14  candidates.

15          We made it also very clear that the

16  criteria upon which we would select tournaments

17  would be beyond purely financial considerations.

18          We looked to a number of situations,

19  one of which was the rigor of the business plan,

20  another was the extent of interest and

21  participation of the sport in a particular area, a

22  third was the relationship that was enjoyed with

23  that particular tournament, a number of other

24  issues.  But, finally, we also reserved the right,

25  and each of the tournaments understood this, that

**de villiers, Etienne 2008 01/09 v2          Page 487**

00488
1

2  we could go back to the tournament and -- and not

3  require them, but to express a request to increase

4  their offer if they wished to be considered.

5        And, as far as I recall, Dubai was

6  the preferred choice by virtue of the fact that it

7  was a far better run tournament, by virtue of the

8  fact that it had committed significant monies to

9  the sport, and that Mr. Drewett went back to Dubai

10  and extracted more favorable terms.

11  Q    What did he get?

12  A    I do not recall what the number is.

13  Q    Did Mr. Drewett go back to Doha?

14  A    The choice --

15  Q    Did Mr. Drewett go back to Doha?

16  A    The sense was that, given a threshold

17  of financial criteria, the preferred candidate

18  would be Dubai because --

19  Q    Did Mr. Drewett go back to Doha as he

20  did Dubai?

21  A    He would have gone back to Doha had

22  Dubai not stood up to what the board expected or

23  wanted by way of an increased premium.

24  Q    But the answer is he didn't, did he?

25  A    He didn't.  He didn't, as it

00489

1

2  transpired because Dubai met the ask of the ATP

3  board.

4     Q     What was the ask of the ATP board?

5     A     I don't recall the number.

6     Q     How many millions of dollars did ask

7  from Dubai?

8     A     I don't recall the number.

9     Q     Can you give an order of magnitude?

10    A     I can't.

11    Q     Was it millions?

12    A     It was.

13    Q     And did you secure from Dubai close

14  to $10 million?

15    A     I do not recall the number.

16    Q     Did ask you them to match this

17  $10 million?

18    A     I do not believe we asked to match

19  the $10 million.

20    Q     Did you come close to so million?

21    A     I don't recall the number.

22    Q     So, you solicited a payment,

23  unilaterally, to Dubai in this process without

24  ever going back to Doha?

25         MR. RUSKIN:  Objection, form.

**de villiers, Etienne 2008 01/09 v2**          **Page 489**

# EXHIBIT 4

00001
1

2
        UNITED STATES DISTRICT COURT
3       FOR THE DISTRICT OF DELAWARE

4
  ------------------------------
5                 Civil Action No.
  DEUTSCHER TENNIS BUND      07-178(GMS)
6 (GERMAN TENNIS FEDERATION)
  and ROTHENBAUM SPORTS GMBH
7 TENNIS,

8       Plaintiffs,

9   -against-

10 ATP TOUR, INC.,

11      Defendant.

12 ----------------------------

13 MONTE-CARLO COUNTRY CLUB and    Civil Action No.
  SOCIETE MONEGASQUE POUR      07-198(GMS)
14 L'EXPLOITATION DU TOURNOS
  DE TENNIS,
15
       Plaintiffs,
16
   -against-
17
  ATP TOUR, INC., ETIENNE DE
18 VILLIERS, and CHARLES PASARELL,

19      Defendants.

20 -------------------------------

21     DATE:  December 6, 2007
        TIME:  9:00 a.m.
22

23     Videotape deposition of CHARLES PASARELL,
  taken by and before JOYCE SILVER, a Certified
24 Shorthand Reporter and Notary Public of the State of
  New York, and JAMES ROBERTS, Videographer, held at
25 the office of PROSKAUER ROSE, LLP, 1585 Broadway, New

**Pasarell, Charles 12-6-2007**        **Page 1**

00022

1

2  and some of it was for half, yes.

REDACTED

12      Q.    All right.  Now, Mr. Pasarell, in terms

13  of the Brave New World, you're aware, of course, of

14  what the Brave New World is.  Correct?

15      A.    In general, yes.

16      Q.    And you have been involved yourself as a

17  member of the board of directors with conceptualizing

18  the Brave New World from the beginning, haven't you?

19          MS. SCULLION:  Objection, vague.

20      A.    Yes.

21      Q.    And ultimately, as a board member, you

22  voted to approve all elements of the Brave New World

23  at various times, did you not?

24      A.    No.

25      Q.    Okay.  What portions of the Brave New

REDACTED

REDACTED

23    Q.    All right.  So now just going through

24  this, during the Melbourne meeting, sir, in 2007, you

25  also approved the minimum standards for the combined

00063

1

2    A.   Is your question relating just to -- I

3  haven't read the second half of that page. Just to

4  the first --

5    Q.   Just the player commitment component.

6    A.   Okay. Yes.

7    Q.   All right. And then your general

8  recollection is that Mr. Franulovic again voted no on

9  this aspect as well?

10    A.   I guess so. I don't know. I'm not sure.

11  I can't tell you.

12    Q.   Now, looking at the next paragraph -- on

13  the next page, did you vote in favor of the motion

14  made and seconded to approve the following concept

15  regarding category protection for successful

16  applicants in the ATP 1000 category, and specifically

17  the two paragraphs that come under that heading which

18  describe the category protection?

19    A.   Yes.

20    Q.   All right. And you understood at the

21  time that you voted in favor of this category of

22  protection for ATP Masters 1000s, "...that successful

23  tournament member applicants for the two new combined

24  Masters 1000 events will be granted category change

25  protection in exchange for individual non-compete

00064

1

2  agreements consistent with past ATP practice for a

3  10-year period subject to compliance with ATP rules,

4  bylaws, minimum standards and conditions specified in

5  the completed application."

6         Do you understand that to be the case?

7  A.    Yes.

8  Q.    And did you, also, understand that AMS

9  tournament members in 2009 who currently don't have

10  contractual category change protection will be

11  offered category change protection in exchange for

12  individual non-compete agreements consistent with

13  past ATP practice for a 10-year period subject to

14  compliance with ATP rules, bylaws and minimum

15  standards." Yes?

16  A.    Yes.

17  Q.    And you understood this category change

18  protection will be given only if these AMS

19  tournaments agreed not to compete with the ATP?

20         MS. SCULLION:  Objection, lacks

21  foundation.

22  Q.    Agreed?

23  A.    Yes, I think -- yeah.

24  Q.    Now, Mr. Pasarell, just -- you now

25  recall, based on reviewing the minutes, seeing

**Pasarell, Charles 12-6-2007**                    **Page 64**

00070

1

2  2007, is it fair to say that these format changes

3  reduced the number of Masters Series events from nine

4  to eight?

5      A.    I think initially it did, but there's

6  nine.

7      Q.    All right. So initially -- let's just

8  focus on the vote at January of 2007. As of the time

9  of that vote in which you cast your votes yes, it had

10  the effect of changing the top tier of tournament

11  number of members from nine to eight. Agreed?

12     A.    Yes.

13     Q.    Now, Mr. Pasarell, moving away now for a

14  minute from the proceedings in January and your

15  votes -- proceedings in January and your votes with

16  the Brave New World, I want to focus in a little bit

17  on the Indian Wells tournament.

18          You've described in your earlier

19  testimony the sanction protection that had been

20  afforded Indian Wells. Do you recall that line of

21  testimony?

22     A.    Yeah, I guess so.

REDACTED

**Pasarell, Charles 12-6-2007**                    **Page 70**

REDACTED

00097

1

2   Q.   There was not?

3   A.   No.

4   Q.   There was no        transfer fee paid

5 to the ATP in this transaction with you and

6 Mr. Moore, was there?

7   A.   No.

8   Q.   There wasn't a transaction -- there

9 wasn't a 10 percent fee on the competitive offer made

10

11               REDACTED

12 there?

13   A.   No.

14   Q.   What happened is a result of whatever

15 involvements you had for your part, you and Mr. Moore

16 on the one hand and the ATP on the other, is somehow,

17 some way there was a        transfer fee that

18 was agreed to.  Right?  Right?

19   A.   That's what was agreed to, yes.

20   Q.   And that was agreed to by you, Mr. Moore

21 and representatives of the ATP.  Right?

22   A.   And the new investors.

23   Q.   And you -- the conversations that you had

24 on the subject of how much to pay in transfer fees

25 included your conversations with Mr. De Villiers as

00098
1

2  well, right?

3     A.    Actually, no.

4     Q.    Mr. Moore -- you'll admit Mr. Moore had

5  conversations with Mr. De Villiers?

6     A.    Yes.

7     Q.    And this was all occurring in June of

8  2006, wasn't it.  Yes?

9     A.    I guess so.

10    Q.    And this was all during the time that the

11  Brave New World was being conceptualized, right?

12    A.    Let's see, Etienne -- I'm trying to get

13  the dates straight.  Etienne, that's when he came on

14  board, right?

15    Q.    Well, I believe the evidence is,

16  Mr. Pasarell, that he had been there for quite some

17  period of months as of June 2006, and this was the

18  second time that he had been to Wimbledon meetings

19  was June of 2006, right?

20    A.    I guess so.

21    Q.    Okay.  Well, think about it.  This is

22  important timing because Brave New World was being

23  worked on during the entire year 2006, wasn't it?

24    A.    I'm trying to remember -- I'm really

25  trying to remember the dates when Mr. De Villiers

**Pasarell, Charles 12-6-2007**                    **Page 98**

REDACTED

00154

1

2  to 2006, the top 50 players play?

3      MS. SCULLION:  Objection, asked and

4  answered.  Argumentative.  Harassing for the fifth

5  time.

6    A.    I would have to look at records.  I

7  wouldn't -- I couldn't tell you off the top of my

8  head.

9    Q.    Now, top --

10      MS. SCULLION:  Counsel, we have been

11  going for more than an hour and it is now 12:40.  I

12  think it's time for a lunch break.

13      MR. MacGILL:  I just have one last

14  subject to clear up.

15    Q.    Sir, does top player participation

16  influence a tournament's ability to secure sponsors?

17      MS. SCULLION:  Objection, lacks

18  foundation and vague.

19    Q.    Does top player participation in a

20  tournament influence a tournament's ability to secure

21  sponsors?

22      MS. SCULLION:  Same objections.

23    A.    Yeah, it can.

24    Q.    How?

25    A.    I think just by the fact that you know

00155
1

2  that you're going to have top players playing and

3  people like to come out and see them.

4      Q.    And based on your 40 years of experience,

5  that if a tournament historically has top player

6  participation, that influences positively a

7  tournament's ability to secure sponsors.  Agreed?

8      A.    Yeah, I would agree with that.

9      Q.    All right.  Top player participation

10  historically at a tournament, does that have a

11  positive influence on a tournament's ability to

12  secure a television broadcaster in terms of an

13  agreement to broadcast the tournament?

14          MS. SCULLION:  Objection, incomplete

15  hypothetical.

16      A.    Yeah, it could.

17      Q.    Based on your some 40 years of

18  experience, does top player participation in a

19  tournament influence positively a tournament's

20  ability to secure fans that attend the tournament?

21          MS. SCULLION:  Objection, incomplete

22  hypothetical, vague.

23      A.    It could.

24      Q.    And, sir, based on all the work -- just

25  to tie up this line of questioning, based on all the

00156

1

2  work that you yourself did in connection with the

3  Brave New World plan, did you come to know yourself

4  that a key driver for creating value in tournaments

5  is to be able to deliver top players in tournaments

6  competing against each other?

7         MS. SCULLION:  Objection to form.  Vague.

8     A.    I don't quite the understand your

9  question.

10    Q.    Let me restate the question.  Based on

11  your some 40 years of experience in tennis, based on

12  your participation in the Brave New World plan

13  efforts, did you realize that a key driver for

14  creating value in tennis tournaments is to secure top

15  player participation at those tournaments?

16         MS. SCULLION:  Same objection.

17    A.    It can help create value, yes.

18    Q.    Value in the sense of increased value of

19  the tournaments themselves?

20         MS. SCULLION:  Same objection, vague.

21    A.    I think more directly on the ability to

22  sell more tickets, bring more sponsorships, getting

23  some television.

24    Q.    Okay.  And all would have the effect, if

25  you get these top players to particular tournaments,

**Pasarell, Charles 12-6-2007**                    **Page 156**

00157

1

2 of creating more value in the tournaments that have

3 those top player participations. Agreed?

4        MS. SCULLION: Same objections.

5    A.    It could.

6        MR. MacGILL: Okay. Let's go ahead and

7 take a lunch break.

8        THE VIDEOGRAPHER: Going off the record

9 at 12:38 p.m. This is the end of tape three in the

10 deposition of Charles M. Pasarell, Jr.

11        (Recess taken.)

12        THE VIDEOGRAPHER: Going back on the

13 record at 1:18 p.m. This is the beginning of tape

14 four in the deposition of Charles M. Pasarell, Jr.

15 BY MR. MacGILL:

16    Q.    Mr. Pasarell, I wanted to go to a second

17 element of the Brave New World plan, that is ATP

18 media pooling. Pooling of television rights in ATP

19 media is a requirement of the Brave New World as

20 passed by the board. Agreed?

21        MS. SCULLION: Objection, lacks

22 foundation, vague.

23    A.    Yeah, I'm not sure if it's -- I think it

24 is. I think it's a requirement, but, yeah. But I

25 think it's done voluntarily by most tournaments,

00158

1

2 yeah.

3    Q.    So with respect to this particular

4 requirement, what's the objective sought to be

5 established by the ATP board as you understand it,

6 from the pooling of these television rights?

7         MS. SCULLION:  Objection, vague.

8    A.    To help make the game grow.

9    Q.    Why does pooling of the rights make a

10 difference?

11   A.    I think it presents a unified package.

12 It -- it improves the production, production of those

13 events so they're presented in a much better way.  I

14 think you can promote the game a lot better by having

15 a sort of a unified way of presenting tennis on

16 television.

17   Q.    And is one of the objectives that the ATP

18 board had, as you understood it, at the time that it

19 required the ATP media pooling, to provide leverage

20 for the ATP 1000s in their negotiations with

21 broadcasters?

22   A.    Please -- I don't understand the

23 question.

24   Q.    Was one of the objectives of the Brave

25 New World's ATP media pooling requirement to secure

**Pasarell, Charles 12-6-2007**                    **Page 158**

00159
1
2 leverage for the ATP 1000s in their negotiations with
3 television broadcasters?
4     A.    Yes.
5     Q.    And that was true for the domestic
6 television broadcasters, that market?
7     A.    Again, I don't understand your question.
8     Q.    Just in terms of the leverage that the
9 ATP board was seeking to create for the ATP 1000s,
10 was that to create leverage in the market of domestic
11 television broadcasters and international television
12 broadcasters?
13          MS. SCULLION:  Objection to form and
14 vague.
15     Q.    Counsel has objected to the form.  It is
16 compound technically, so I need to break my question
17 down into two parts, if you don't mind.
18          Was one of the intentions of requiring
19 the ATP media pooling as a part of the Brave New
20 World to provide leverage for the ATP 1000s in their
21 negotiations with domestic television broadcasters?
22          MS. SCULLION:  Objection to form.  Vague.
23     Q.    You may answer.
24     A.    Yeah, I think so.  Yes.
25     Q.    And then separately, was one of the

00160

1

2  objectives of requiring the ATP media pooling

3  arrangement under the Brave New World to create

4  leverage for ATP 1000s in their negotiations with

5  international television broadcasters as well?

6         MS. SCULLION: Objection to form. Vague.

7  A.    Yes, I think so.

8  Q.    Now, Mr. Pasarell, with respect to that

9  strategy, was it your expectation as an ATP board

10  member that that leverage that you've described will

11  enhance the value of contracts with television

12  broadcasters secured for ATP 1000 tournaments in the

13  domestic markets?

14         MS. SCULLION: Objection to form. Vague.

15  A.    Again, I'm trying to understand your

16  question clearly.

17  Q.    Let me restate. You've described this

18  ATP media pooling requirement. Relative to that

19  requirement, was one of the objectives of that

20  requirement to secure more money from domestic

21  television broadcasters for the ATP 1000s because of

22  the pooling arrangement and leverage?

23         MS. SCULLION: Objection, vague.

24  A.    Yeah, if at all possible. Yes.

25  Q.    And the same is true with international

**Pasarell, Charles 12-6-2007**                    **Page 160**

00161
1

2  markets. True?  Agreed?

3       MS. SCULLION:  Same objection.

4  A.   Yes, if possible.

5  Q.   In terms of these values -- strike that.

6       Turning from the ATP 1000s, Mr. Pasarell,

7  to the ATP 500s, did the ATP board, as you understood

8  it, intend to provide leverage for the ATP 500s in

9  their negotiations with domestic broadcasters by the

10  ATP media pooling requirement?

11      MS. SCULLION:  Same objection.

12  A.   Again, please.

13  Q.   Sorry.

14  A.   Okay.

15  Q.   I understand.  I want to focus on ATP

16  500s.

17  A.   Okay.

18  Q.   Okay?  Now, you talked about the media

19  pooling requirements and the intentions associated

20  with the ATP 1000s in your prior testimony.  Did the

21  ATP board, as you understand stand, have the same

22  intentions for the ATP 500s in providing them

23  leverage in negotiations with TV broadcasters?

24      MS. SCULLION:  Same objections.

25  A.   Yes.

**Pasarell, Charles 12-6-2007**                    **Page 161**

00162
1

2    Q.    And that's true for the domestic market?

3    A.    Yes.

4    Q.    And it's true in the ATP 500 case, also

5  in the international market.  Agreed?

6          MS. SCULLION:  Same objection.

7    A.    Yes.

8    Q.    Now, did you, in connection with your

9  deliberations here, make any assessment of how much

10  more money might be secured from television

11  broadcasters as a result of these television -- this

12  ATP media pooled negotiation?

13          MS. SCULLION:  Objection to form.  Vague,

14  lacks foundation.

15    A.    No, I really didn't make --

16    Q.    No calculation?

17    A.    No, not really.

18    Q.    Did anyone present to the board a

19  calculation or an estimate of how much more money

20  could be procured from domestic television

21  broadcasters as a result of this ATP pooling?

22          MS. SCULLION:  Objection to form.  Vague.

23    A.    I don't think it provided -- I think we

24  basically are dealing with year by year, you know,

25  what we think what we're going to do next year and

**Pasarell, Charles 12-6-2007**                    **Page 162**

00177

1

2    Q.    Did you conclude yourself that the

3  creation of the ATP 1000 and the ATP 500s would allow

4  those tournaments to increase their ticket prices

5  based on better fan interests in tennis?

6    A.    No, that's not something I --

7    Q.    You didn't focus on that yourself?

8    A.    No.

9    Q.    Was this concept of creating these ATP

10  1000s and ATP 500s, built at least, in part, on a

11  concept of creating more revenue for those

12  tournaments in terms of sponsor support?

13    A.    I think it would need to because they are

14  being asked to put up a lot of money, prize money.

15    Q.    And did you believe when you voted in

16  favor of this Brave New World, that, in fact, that

17  this -- these ATP 1000 and ATP 500 formats would, in

18  fact, yield more payments from sponsors because of

19  the format?

20    A.    It's pure speculation, but I would hope

21  so.

22    Q.    It was one of the premises for reasons

23  that you stated, right?  Yes?

24    A.    I'm sorry?

25    Q.    This was one of the premises of this ATP

**Pasarell, Charles 12-6-2007**                    **Page 177**

00178

1

2 1000 and ATP 500s that these formats would allow

3 these two types of tournaments to create more sponsor

4 revenue to support the increased prize money,

5 et cetera?

6    A.    Yes.

7    Q.    Now, the sponsors that will support the

8 ATP 1000 and the ATP 500s in this format, will come

9 from the United States and the rest of the world as

10 well?

11    A.    Yes.

12    Q.    All right.  Now, did you have any data

13 that any one provided to the board that suggested how

14 much more sponsor revenue might be achieved for the

15 benefit of the ATP 1000 and ATP 500 events as a

16 result of the Brave New World plan?

17    A.    No, I can't recall having any.

18    Q.    Did Deloitte prepare some calculations

19 for you which estimated how much more revenue might

20 be procured from the sponsorship market as a result

21 of the Brave New World?

22    A.    I don't recall seeing that, no.

23    Q.    Okay.  Do you recall whether anybody

24 provided you data which might have influenced your

25 thinking on this point of how much more revenue might

**Pasarell, Charles 12-6-2007**                    **Page 178**

# EXHIBIT 5

00001

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4  DEUTSCHER TENNIS BUND (GERMAN )
   TENNIS FEDERATION) and       )
5  ROTHENBAUM SPORTS GIMBH      )
   TENNIS,              )
6                )
     Plaintiffs,        )
7                )
     vs.            ) CIVIL NO. 07-178(GMS)
8                )
   ATP TOUR, INC.,         )
9                )
     Defendant.        )
10 _____ )

11

12

13          VIDEO DEPOSITION OF ROGER PERRY

14   Taken at the offices of Laurie Webb and Associates
              517 South Ninth Street
15

16            LAS VEGAS, NEVADA 89101

17        On Wednesday, November 7, 2007
                At 9:04 a.m.
18

19

20

21

22

23

24 REPORTED BY:  YVETTE RODRIGUEZ, CCR #860

25

**Perry, Roger 11-7-2007**                    **Page 1**

00063

1 BY MR. MACGILL:

2    Q.  Okay.  And did all board members agree to

3 what you asked for in exchange for this player service

4 requirement?  Let -- let me back up.

5        I think I've left -- I think I've missed a

6 step in your logic, Mr. Rogers.  I want to make sure I

7 understand kind of the elements of logic involved here.

8 As you, the player representative/board members

9 communicated this subject to your colleagues on the

10 board, did you make it clear that part of the exchange

11 for the eight of eight service requirements was pooling

12 the media rights so as to maximize revenues?

13        MR. RUSKIN:  Objection.  Compound.

14        THE WITNESS:  I don't recall if we made it

15 clear that we would be pooling the media rights so as

16 to maximize revenues.

17 BY MR. MACGILL:

18    Q.  All right.  Let me break it down into two

19 parts.  But from the standpoint of your -- of your

20 prospective, you and your -- the other two player

21 representatives, did the three of you communicate to

22 your fellow board members that the eight of eight

23 player service requirement in the Brave New World

24 should be dealt with in a way that maximized media

25 revenue in the sense of ATP media should have the --

**Perry, Roger 11-7-2007**                    **Page 63**

00064

1    the television rights pooled in it?

2        A.   Yes.

3        Q.   Now, who -- who communicated this ex -- the

4    need for this exchange of the eight of eight service

5    requirements for the pooling of media rights?  Was that

6    you --

7        A.   Yes.

8        Q.   -- or another board member?

9        A.   Yes, it was me.

10       Q.   It was you personally?

11       A.   Yes.

12       Q.   All right.  Do you recall -- can you give us

13   the general effect -- the general logic that you used

14   to your colleagues in the boardroom on this subject?

15       A.   Sure.  The general logic was that we would

16   all be in, if we were all in.  That is, that we would

17   work on our side and create a product that was more

18   predictable, by having the players be required to show

19   or suspensions would follow.  As long as we could

20   ensure that that sacrifice to the players could be

21   monetized to the benefit of all the members as best as

22   possible.  And so the exchange there -- the quid pro

23   quo, for lack of a better phrase -- was that we wanted

24   to ensure that the ATP would then be accountable and

25   aggressive for going out and monetizing that commitment

00065

1  from the players.

2      Q.  Okay.  I understand.

3          So as you communicated the essence of this

4  logic that you've just now described, did you have the

5  impression that this exchange of the eight of eight

6  player service requirement for the pooling of media

7  rights was understood by the tournament members on your

8  board?

9      A.  Yes.

10     Q.  Did any tournament members disagree with the

11  logic of this exchange of the eight of eight for the

12  pooling of ATP media rights in the manner that you've

13  described?

14     A.  Not that I recall.

15     Q.  And did everyone vote in favor of this

16  exchange that you've described --

17     A.  I don't recall --

18     Q.  -- ultimately?

19     A.  I -- I don't recall the exact, so --

20     Q.  All right?

21     A.  -- I don't know.

22     Q.  But the majority did --

23     A.  Yes.

24     Q.  -- Mr. Rogers?

25     A.  Yes.

00075

1  BY MR. MACGILL:

2    Q.  Is it fair to say that -- that the

3  individual -- that the tournaments participating in the

4  pooling arrangement, as matters now stand, are not

5  guaranteed to secure the same amount of revenue they

6  would if they sold their rights individually?

7    A.  I'm not aware of any guarantee that would

8  ensure a certain level of compensation for the

9  tournaments on a --

10    Q.  All right.  Fair enough.  I think you've

11  answered the question.  Fair enough.

12        And, Mr. Rogers, the entire strategy in

13  relation to this one component of pooling of -- of

14  rights was, I think, in your words, to maximize

15  revenue --

16    A.  Yes.

17    Q.  -- from the broadcast rights?

18    A.  That would be one -- one of the strategies,

19  yes.

20    Q.  Now, with respect to one of those strategies,

21  did -- what makes you convinced that this part of the

22  Brave New World agreement will, in fact, procure more

23  monies from broadcasters?

24    A.  Every sports league in the world.

25    Q.  Okay.  Can you give us more examples.  I

**Perry, Roger 11-7-2007**                    **Page 75**

00076

1   mean, can you give us some practical examples that are

2   the basis for your conclusion that pooling ATP media

3   rights for 1000s and 500s will maximize revenues?

4       A.   Sure.  The --

5       Q.   Okay.  If you can.

6       A.   -- the National Basketball Association, they

7   have approximately 30 teams, and those teams pool their

8   rights so that the NBA can maximize revenues for those

9   teams.

10      Q.   Is the NFL another example?

11      A.   NFL is another example.  Major League

12  Baseball would be another example.

13      Q.   And you know that?  Did you do any

14  independent research, or is that something based on

15  your experience in law and in sports, you've been able

16  to ascertain over many years?

17      A.   Well, it's research that's from that

18  experience.  I've had direct conversations with

19  David Stern.  Another great example of owning the media

20  rights and growing the sports as a result is actually

21  the PGA Tour.  They have done -- Mr. Finchem has done a

22  great job growing revenue, prize money, sponsorship

23  attendance by providing a product that was clear for

24  the broadcasters and allowing broadcasters to have

25  certainty over an entire schedule.  And I think that

**Perry, Roger 11-7-2007**                    **Page 76**

00077

1 the last part is probably the most important part, is

2 to --

3    Q. All right.

4    A. -- provide the broadcasters with the season.

5 My family owns NBC for Nevada, so I have experience in

6 broadcasting.

7    Q. All right. And that's still the current --

8 your family still owns the NBC affiliate in Nevada?

9    A. Yes. In Reno and Las Vegas, and actually

10 throughout the state.

11    Q. All right. And so that is another background

12 that you have, personally, on how agreements could be

13 made to maximize revenue in this particular broadcast

14 market?

15    A. That's correct.

16    Q. Now, did you share with your board members

17 this -- this concept that it -- if -- if the -- if

18 these tournaments were to agree or made to agree to

19 pool their rights that, in fact, one -- or one result

20 would be to maximize revenue from broadcasters?

21    A. Yes. What we discussed specifically was that

22 if we were to pool the rights, you could provide

23 broadcasters with a more certain schedule that would

24 allow them to invest in the entire sport, and that that

25 was important for us.

**Perry, Roger 11-7-2007**                              **Page 77**

00078

1    Q.  And did you share that logic in -- logic

2    of -- of how this agreement of pooling media rights

3    would maximize revenue in the boardroom itself with

4    your colleagues on the board?

5    A.  Yes.  Most specifically, I talked to the

6    board members about a tour that Andre and I had

7    developed in 1993, where there were various swings of

8    the calendar, and that each swing would be packaged so

9    that a broadcaster could engage in tennis at a time

10   that was appropriate for their purposes, but to do it

11   in a regular way, in a more -- more specifically, we

12   divided -- Andre and I divided the tours of the seasons

13   and said that that entire season should be sold to

14   broadcasters so that NBC, for example, could buy the

15   clay court season and CBS could buy -- purchase the

16   hard court season.

17       But that -- Andre and I were looking at it

18   then the way other leagues looked at their rights,

19   which is to provide broadcasters with a product that

20   was more than just one week here, one week there.

21   Q.  And that was one of, I presume, several

22   examples that you can give based on your own experience

23   of how this agreement could be used to maximize

24   revenues for broadcasters?

25   A.  Yes.

**Perry, Roger 11-7-2007**                    **Page 78**

00079

1    Q.  Did other board members disagree with you or

2    did they agree with you on this subject of this

3    strategy to pool media rights to maximize revenues

4    secured from broadcasters?

5    A.  I don't recall other board members

6    disagreeing with me on that -- on that point.

7    Q.  Now, relative to this aspect of the plan of

8    pooling rights and maximizing revenue, was your

9    concept, Mr. Rogers, one that you focused on broadcast

10   markets in the United States and throughout the world

11   as well at the same time?

12   A.  Yes.  We discussed specifically, Euro Sport.

13   And what was happening there.  And we discussed -- and

14   I might get this wrong, but it's CCTV or CCCTV.  But

15   the Chinese broadcasters, and what they wanted to do

16   with tennis, and how we can provide them with a more

17   regular product.

18   Q.  All right.  Now, relative to this plan, I

19   take it, this would be more revenue for the ATP -- for

20   the ATP -- strike that.

21        I take it this plan, if executed according to

22   the logic you provided, would deal more revenue to the

23   tournaments and cause more expense to the broadcasters?

24   Is that the logic?

25   A.  Can -- can you -- I'm sorry I lost it.  Can

**Perry, Roger 11-7-2007**                    **Page 79**

00081

1    Q.  Mr. Rogers, another part of this Brave New

2  World plan, did that include a strategy that by -- by

3  creating the ATP 1000s and the ATP 500s, for example,

4  that you could also increase the price of tickets by

5  providing a new and better product?

6    A.  I don't recall discussing the ticket prices

7  directly.

8    Q.  Did you --

9    A.  But I do recall that we examined ticket

10  prices.  But I don't recall talking about increasing

11  the ticket prices.

12    Q.  Did you -- did you yourself come to the

13  conclusion that by implementing the Brave New World

14  plan that you would, in fact, increase the price of

15  tickets for tournament members and/or the ATP?

16    A.  No.  No, I did not.

17    Q.  That was not part of the analysis?

18    A.  It wasn't what I concluded.  I know we

19  examined ticket prices.  Most specifically, we examined

20  the ticket prices of each tournament.  And we were

21  surprised at how inexpensive the tickets were in Italy.

22  And we -- what came back to us is that, believe it or

23  not, the Italians had an expectation of paying less

24  money for sporting events than other countries.

25        I remember that specifically.  But I do not

**Perry, Roger 11-7-2007**                    **Page 81**

00091

1    Q.  So in terms of what you can speak from, in

2  terms of the top of your head today, like the ATP

3  1000s, the board had at least three measures of

4  encouragement to channel players to the ATP 500s under

5  the Brave New World plan:  One, its specification of

6  the location of the tournament; two, the week

7  allocated; and, three, the ranking system, agreed?

8    A.  Yes.  At least three, yes.

9    Q.  At least three.  And there could be more.

10  But you -- those are the three incentives for

11  channeling players to the ATP 500s under the Brave New

12  World plan that you can think of today?

13    A.  Yes.

14    Q.  Okay.  Fair enough.

15        Now, the ATP 250 events don't have -- don't

16  have the player -- the same player service requirements

17  of the ATP 1000 events, agreed?

18    A.  Yes.

19    Q.  And they don't have the -- the ATP 250s also

20  don't have the favored locations as compared to the

21  ATP 500, fair statement?

22    A.  Yes.

23    Q.  And generally speaking, the ATP 250s of the

24  Brave New World are in less favorable weeks, agreed?

25        MR. RUSKIN:  Than what?

**Perry, Roger 11-7-2007**                    **Page 91**

00092

1       THE WITNESS:  Less favorable than what?

2  BY MR. MACGILL:

3     Q.   Than the ATP 500s.

4     A.   Well --

5     Q.   Generally speaking.

6     A.   -- you said generally speaking, so I would

7  say yes.

8     Q.   All right.  And then finally, the ATP 250s

9  don't have the ranking system incentives to the same

10  extent that the ATP 500 or the ATP 1000s have, agreed?

11     A.   That's correct.

12     Q.   And is it fair to say that based on this

13  element of the Brave New World plan at the time that

14  you worked to implement it, that you understood that

15  the player services would be channeled largely to the

16  ATP 1000s and the ATP 500s?

17     A.   Yes.

18     Q.   And the business rationale, from your

19  standpoint -- strike that.

20          Now, with respect -- just backing up a

21  minute -- in relation to these various incentives, you

22  described -- you, based on your -- your educational

23  background, your legal training, and your personal

24  relationships, you've represented Andre Agassi for many

25  years on the ATP tour, agreed?

**Perry, Roger 11-7-2007**                    **Page 92**

# EXHIBIT 6

# REDACTED IN ITS ENTIRETY