# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

February 8, 2008

The Honorable Gregory M. Sleet
United States District Court
844 King Street
Wilmington, DE 19801

Re:    Deutscher Tennis Bund, et al. v. ATP Tour, Inc., et al., C.A. No. 07-178-GMS

Dear Chief Judge Sleet:

ATP Tour, Inc. ("ATP") and the individual ATP Director Defendants (collectively, "Defendants") hereby respond to the Plaintiffs' February 1, 2008 letter concerning their request for permission to file motions for summary judgment on certain "issues." Defendants also filed their own letter on February 1, 2008 seeking permission to move for summary judgment dismissing all of Plaintiffs' claims in their entirety.

Like Defendants, Plaintiffs agree that the issues in this case are ripe for summary judgment and, therefore, that both sides should be permitted to file their respective motions.[1] Defendants believe that, when fully briefed in cross-motions, the law and the record will compel both denial of Plaintiffs' proposed motions and grant of summary judgment for Defendants.

We will not reiterate here why Defendants have a sound motion for summary judgment. We simply note a few of Plaintiffs' more egregious misstatements of law and mischaracterizations of the record – and why many, if not all, of the "issues" Plaintiffs raise are immaterial in any event. Indeed, Plaintiffs' letter is a prime example of why summary judgment motions in this case are needed to avoid wasting judicial and party resources on a trial of claims that, in the end, are based on nothing more than Plaintiffs' sour grapes, speculations, and convoluted, international conspiracy theories, none of which support any claim for relief for Plaintiffs.

---

[1] We note that Plaintiffs improperly and confusingly try to hedge their bets. They argue in the first two-thirds of their letter why, in their view, the Court should consider their motions for summary judgment. We assume that they did not intend to waste the Court's time with this. Yet, in Section III, Plaintiffs reverse course 180 degrees to argue that no summary judgment motions should be filed and that Plaintiffs only seek summary judgment on "four discrete issues." If Plaintiffs in fact only intend to seek summary judgment on "discrete issues" and not whole claims, their proposed motions are procedurally improper. *E.g., Coffman v. Fed. Labs., Inc.* 171 F.2d 94, 98 (3d Cir. 1948) (Rule "does not contemplate a summary judgment for a portion of a single claim in suit."); *Cekoric v. Clopay Bldg. Prod. Co., Inc.*, 2007 WL 120036, at *6 (W.D. Pa. Jan. 10, 2007) (same). Regardless of whether Plaintiffs seek to file any proper motions, Defendants respectfully submit that they should be permitted to file their motions, which seek dismissal of each of Plaintiffs' claims in their entirety.

The Honorable Gregory M. Sleet
February 8, 2008
Page 2 of 4

### Antitrust Claims

Plaintiffs' entire presentation is premised on the notion that Defendants' restructuring is subject to "*per se*" analysis under Section 1 of the Sherman Act. Pltf. Ltr. at 1-3. A *per se* analysis is not appropriate for examining structural issues in professional sports, however, because the industry requires horizontal "agreements" among participants. As the Supreme Court stated in *NCAA v. Brd. of Regents, Univ. of Okla.*, 468 U.S. 85, 101 (1984) – cited by Plaintiffs – it is "inappropriate to apply a *per se* rule" to a sports association because sports is "an industry in which horizontal restraints on competition are essential if the product is to be available at all." The cases in the two decades since *NCAA* similarly rejecting a *per se* analysis for professional sports associations are legion. *E.g.*, *NHL Players' Assn. v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719 (6th Cir. 2003); *St. Louis Convention & Visitors Comm'n. v. NFL*, 154 F.3d 851, 856-57, 61 (8th Cir. 1998); *Chicago Prof'l Sports v. NBA* ("Bull II"), 95 F.3d 593, 600 (7th Cir. 1996); *Sullivan v. NFL*, 34 F.3d 1091, 1096 (1st Cir. 1994). Indeed, in contrast to the NCAA federation addressed by the Supreme Court, when professional sports leagues, circuits, and tours are, like ATP, sufficiently integrated entities, their internal agreements on structure, output, broadcasting, etc. – *i.e.* intrabrand regulations – do not violate Section 1. *E.g.*, *"Bulls II"*, 95 F.3d at 600; *Am. Needle. v. New Orleans Saints*, 496 F. Supp. 2d 941 (N.D. Ill. 2007); *Seabury v. PGA*, 878 F. Supp. 771 (D. Md. 1994); *Lokomotiv Yaroslavl v. NHL*, 06 CV 9421 (S.D.N.Y. Nov. 15, 2006) (Exhibit A).

Plaintiffs' analysis also ignores that they cannot prove any "antitrust injury" because, fundamentally, they are complaining only that the Hamburg tournament was not selected for its preferred "tier" <u>within</u> the ATP's new structure. Far from condemning calendaring, ranking points, and player commitments for different "tiers" of tournaments, Plaintiffs unabashedly insist that the Hamburg tournament is entitled to this treatment – *i.e.* it should be placed in ATP's "top tier" of tournaments. None of this is "antitrust injury" because none of it seeks to protect competition, only the self-interests of a single ATP member tournament, Hamburg. Indeed, Plaintiffs urge that ATP <u>protect</u> member tournaments <u>from</u> market forces by giving priority within the Tour to "tradition" over commercial interests. The absence of antitrust injury compels dismissal of Plaintiffs' antitrust claims.

Plaintiffs also misread the law with respect to pooling of broadcast rights. Although the Sports Broadcasting Act of 1961 ("SBA") declares that certain pooling arrangements do not violate the antitrust laws, it does not declare that all others are unlawful. To the contrary, it is well-established that non-SBA pooling arrangements are subject to an ordinary analysis under the antitrust laws. For example, in *Bulls II*, the Seventh Circuit held that the pooling arrangement at issue there was not exempt under the SBA because it involved sales to cable networks. That did not end the antitrust analysis, however: the Seventh Circuit found that there was sufficient evidence of the pro-competitive reasons for the pooling that it remanded the issue for trial under a Rule of Reason analysis. *Bulls II*, 95 F.3d at 601; *see also Kingray, Inc. v. NBA*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002). Virtually every professional sports league in the U.S. sells certain exclusive, pooled television rights that fall outside the SBA (*e.g.* PGA, NASCAR,

The Honorable Gregory M. Sleet
February 8, 2008
Page 3 of 4

AVP, NFL, NBA, NHL, and MLB).[2] Here, the undisputed facts (including admissions from Plaintiffs) show that ATP's proposed pooling arrangement is pro-competitive because, *inter alia*, it is not designed to restrict the number of broadcasts, but instead is designed to make every pooled tournament available to consumers and to do so in as many geographic regions as feasible.

### Fiduciary Duty Claims

Again, although the parties have diametrically opposite views of the lawfulness of ATP's actions, both Plaintiffs and Defendants agree that Plaintiffs' fiduciary duty claims can and should be resolved as a matter of law on the undisputed facts.

As explained in Defendants' February 1 letter, Plaintiffs' "fiduciary duty" claims fail as a matter of law because, *inter alia*, (a) the claims are at best derivative,[3] yet no demand was made on ATP or excused, and (b) ATP's restructuring of its Tour is a quintessential "business judgment" entitled to protection, regardless of whether these particular Plaintiffs agree with it. The undisputed facts likewise will show that there is no basis for Plaintiffs' mish-mosh of claims that the ATP's restructuring purportedly constitutes unlawful self-dealing.  For example:

- Plaintiffs' attack on Mr. Pasarell ignores that the long-term sanction agreement concerning the Indian Wells tournament (a) was approved by a vote that did not include Mr. Pasarell and that took place before most of the Director Defendants were members of the ATP Board, (b) was supported by ample benefit to the Tour and its members, and (c) was executed more than three years before this action was brought and, therefore, falls outside the applicable statute of limitations. 10 *Del. C.* § 8106. Also, ATP's restructuring affects all ATP tournaments, including all "top tier" tournaments like Indian Wells.  It is not self-dealing for a director to approve a transaction that arguably benefits one class of members more than another, even if the director belongs to the arguably benefitted class.  *Solomon v. Armstrong*, 747 A.2d 1098, 1118 (Del. Ch. 1999); *Gilbert v. El Paso Co.,* 1988 WL 124325 at *9-10 (Del. Ch.).

- What Plaintiffs now deride as "channeling" of players is nothing more than the player commitments, ranking points, incentives, and penalties that support "top tier" tennis – and that Plaintiffs themselves have admitted ATP should be using as part of a tour structure and, indeed, that Plaintiffs specifically urged ATP to adopt as part of ATP's restructuring.  Plaintiffs also ignore that any "financial interest" ATP has in the restructuring is to increase revenues which are then invested back in the Tour for the benefit of all members (players and tournaments) pursuant to ATP's non-profit status.

- Plaintiffs' claim that Defendants have breached their fiduciary duty and tortiously interfered with their contract by causing ATP to breach the "TPL Agreement" to which

---

[2] Similarly, such entities commonly and lawfully pool other rights, such as intellectual property and branding rights. *See, e.g., Am. Needle, supra* (rejecting antitrust challenge to NFL pooling of exclusive license to produce branded clothing).

[3] The derivative nature of the claims is underscored by the fact that Plaintiffs seek no damages based on any alleged breach of fiduciary duty. *See* First Amended Complaint, Prayer for Relief (seeking damages solely for antitrust and tortious interference claims).

The Honorable Gregory M. Sleet
February 8, 2008
Page 4 of 4

ATP and Plaintiff DTB are parties. Plaintiffs ignore that (a) DTB has asserted no claim for breach of that contract (which is governed by English law), (b) DTB later signed another contract specifically agreeing that ATP had "sole discretion" to reclassify the Hamburg tournament and change the week that the tournament will be played within the ATP Tour, and (c) even if a breach were properly alleged, directors of a corporation acting within the scope of their agency cannot be held liable for allegedly inducing the corporation to breach its own contract where, as here, no wrongful means were used.[4]

- Plaintiffs' dispute concerning ATP's decision to award a "500" sanction to the Dubai tournament instead of the Doha tournament is a classic example of the kind of second-guessing that the business judgment rule precludes. That ATP "preferred" the Dubai tournament (based on a variety of factors, including how the tournament has been operated, the quality of the facilities, etc.) only demonstrates that ATP exercised the power it is granted by its members. Plaintiffs offer only pure speculation and an ever-expanding "cartel" theory – with not a single record citation – to try to claim otherwise.

*          *          *

Defendants agree that the issues in this case are ripe for summary judgment and that the interests of justice will be served by permitting both sides to file their respective motions. Defendants are confident that such motions will show that Plaintiffs have no basis in law or fact for either their federal antitrust claims or their state law tort and fiduciary duty claims and, therefore, that summary judgment will result in dismissal of those claims in their entirety.

Respectfully submitted,

Philip Trainer, Jr. (#2788)

cc:     Clerk of Court (by electronic filing/hand delivery)
        C. Barr Flinn, Esq. (by electronic filing/hand delivery)
        Robert D. MacGill, Esq. (by e-mail)

---

[4] Restatement (Second) of Torts, § 770; *Local Union 42 v. Absolute Envtl. Serv.*, 814 F.Supp. 392, 400 (D. Del. 1993) (applying § 770 and granting defendant's motion for summary judgment); *Grand Ventures, Inc.,* v. *Paoli's Restaurant, Inc.*, 1996 WL 30022 (Del. Super. Jan. 4, 1996) (same).

# EXHIBIT A

```
6BF3YARH            Hearing
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ----------------------------x
 2
 3    NON-COMMERCIAL PARTNERSHIP
 3    HOCKEY CLUB LOKOMOTIV
 4    YAROSLAVL,
 4
 5            Plaintiff,
 5
 6        v.                    06 CV 9421 (LAP)
 6
 7    NATIONAL HOCKEY LEAGUE,
 7    CALGARY FLAMES LIMITED
 8    PARTNERSHIP D/B/A CALGARY
 8    FLAMES, AND EDMONTON INVESTORS
 9    GROUP LTD. D/B/A/ EDMONTON
 9    OILERS,
10
10            Defendants.
11
11    ----------------------------x
12        and
12    ----------------------------x
13
13    ANO HOCKEY CLUB METALLURG
14    MAGNITOGORSK,
14
15            Plaintiff,
15
16        v.                    06 CV 9936 (LAP)
16
17    NATIONAL HOCKEY LEAGUE AND
17    LEMIEUX GROUP L.P. D/B/A
18    PITTSBURGH PENGUINS,
18
19            Defendants.
19
20    ----------------------------x
20                    New York, N.Y.
21                    November 15, 2006
21                    2:30 p.m.
22
22    Before:
23
```

```
23          HON. LORETTA A. PRESKA,
24
24                   District Judge
25
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

6BF3YARH                Hearing

1  APPEARANCES

2

2  ALEXANDER BERKOVICH
3     Attorney for Plaintiffs

3

4  PROSKAUER ROSE
4     Attorneys for Defendants
5  BY:  BRADLEY I. RUSKIN
5       SCOTT A. EGGERS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT: All right. Counsel, thank you for your
2   arguments and papers. This has been nothing other than a
3   complete treat to have you here.
4          We all at least agree that on a motion for a
5   preliminary injunction, the movant must establish that one,
6   absent such relief it will suffer irreparable injury; and two,
7   either, A, a likelihood of success on the merits, or B,
8   sufficiently serious questions going to the merits and a
9   balance of hardships tipping decidedly toward the moving party.
10          For the moment, I do not address the enhanced standard
11  required when one is interfering with the status quo.
12          With respect to irreparable injury, if an injury can
13  be appropriately compensated by an award of monetary damages,
14  then an adequate remedy at law exists and no irreparable
15  injury may be found to justify the specific relief.
16  Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir.
17  2004).
18          "A showing that the movant will suffer irreparable
19  harm if the preliminary injunction is not granted is the most
20  important prerequisite for the issuance of a preliminary
21  injunction." Transperfect Translations International, Inc., v.
22  Merill Corp, Number 2004 WL 2725032 at *4 (S.D.N.Y.,
23  November 30, 2004) (Quoting Bell & Howell: Mamiya, Co. v. Masel
24  Supply, Co., 719 F.2d 42, 45 (2d Cir. 1983)) "A party's delay
25  in moving for preliminary injunctive relief undercuts the sense

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

74

6BF3YARH                  Hearing

1  of urgency that typically accompanies such a motion."
2  Transperfect 2004 WL 2725032 at *4  (Citing Tough Traveler Ltd.
3  v. Outbound Products, 660 F.3d 964, 968 (2d Cir. 1995)
4          As the plaintiffs point out here, the contracts
5  between the plaintiffs and the players acknowledge that the
6  players' services are unique, and a loss of those services
7  cannot be compensated by money damages.  Indeed, that is the
8  general rule in personal services contracts, including those
9  involving professional athletes.
10         The unique facts of these cases, however, persuade me
11  that plaintiffs are unlikely to be able to prove that they
12  cannot be compensated by money damages.  Put more plainly,
13  these cases were always about money, the only issue is how
14  much.
15         As the parties have laid out in detail in their
16  papers, particularly in the declaration of William L. Daly,
17  deputy commissioner of the NHL, for many years the NHL and the
18  IIHF had been parties to comprehensive agreements that
19  governed, among other things, the transfer of players to the
20  NHL from the IIHF sanctioned hockey leagues in their home
21  countries, and the member federations of the IIHF.
22         Broadly speaking, the purpose of this NHL IIHF
23  agreement was to create an orderly and efficient time framework
24  to facilitate the transfer of players from the IIHF member
25  federations to the NHL, and to provide monetary assistance to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6BF3YARH                Hearing

1    those federations to help support the growth and development of
2    ice hockey in IIHF member countries.
3        For example, the current version of the NHL IIHF
4    agreement provides that the NHL pay a "development fee" of
5    $200,000 for each player from a IIHF league who transferred to
6    an NHL club, requesting "in exchange the NHL receives right to
7    sign the players to play in the NHL, despite their having
8    effective contracts in their home countries."
9        The IIHF and its members determine distribution of the
10   amounts paid by the NHL, but Mr. Daly opines that those funds
11   go primarily to the home teams of the transferred players.
12       As also set out in Daly declaration, the RIHF, a
13   member of the IIHF, declined to join the current NHL IIHF
14   agreement.  In negotiations leading up to the RIHF's decision
15   to opt out of the current agreement, the primary question from
16   the RIHF was how much money it would receive in compensation
17   for each player.  This is of course according to Mr. Daly.
18       Although the NHL indicated that more compensation
19   might be available, the parties were unable to reach an
20   agreement that satisfied the RIHF's monetary demands.
21       As Mr. Daly recounts in his declaration, during the
22   course of these negotiations, including a May 2006 meeting in
23   Riga, Latvia, and a June 2006 meeting in New York, the
24   principal issue was money, and at the June meeting, the issue
25   was specifically the amount of compensation that plaintiff

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

76

6BF3YARH                Hearing

1  Metallurg would receive for the transfer of Mr. Malkin.
2        Mr. Daly details that on June 29, 2006, he received an
3  e-mail from Sergey Arutyunyan, general director of the RIHF,
4  demanding the payment of one million dollars as compensation
5  for the transfer of Mr. Malkin to the Pittsburgh Penguins.  In
6  response, Mr. Daly e-mailed Mr. Arutyunyan, noting that under
7  the NHL IIHF agreement, if the transferred player signs an NHL
8  contract, but instead of playing for the NHL, he plays
9  primarily for a minor league team, the NHL pays additional fees
10 referred to as minor league assignment fees to the IIHF.
11       It was Mr. Daly's contention that the pooling of such
12 minor league assignment fees together with the $200,000
13 transfer fee would amount to approximately a million dollars
14 being paid by the NHL for the transfer of Mr. Malkin.
15       In a July 2006 meeting in Chicago, Mr. Tretiak,
16 president of the RIHF, is said by Mr. Daly to have told him
17 that if Mr. Tretiak could secure a million dollars for transfer
18 of Mr. Malkin, Mr. Tretiak was confident that he would receive
19 the approval of the plaintiffs for the transfer.
20       In response, in July, and again in August of 2006,
21 Mr. Daly agreed to structure the transfer fee and the minor
22 league assignment fees so as to total one million dollars for
23 the transfer of Mr. Malkin.
24       During the latter part of July, however, Mr. Daly
25 learned that the RIHF was then demanding a million dollars in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77

6BF3YARH                Hearing

1  addition to the $800,000 in minor league assignment fees for
2  the transfer of Mr. Malkin. Mr. Daly refused.
3          Indeed, the plaintiffs' true intent was confirmed as
4  late as October 4, 2006, in Mr. Berkovich's letter to Messrs
5  Ruskin, Daly and Shero, the last the general manager of the
6  Pittsburgh Penguins. In that letter, Mr. Berkovich concluded
7  by demanding that the NHL and the Pittsburgh Penguins not use
8  Mr. Malkin in the 2006/2007 season, but "to the extent that the
9  Pittsburgh Penguins nevertheless is interested in obtaining the
10  services of Mr. Malkin for the 2006/2007 hockey season, you
11  should contact me with your proposal."
12          At oral argument, as we've heard, I did ask counsel
13  what the latter part of that sentence could possibly mean if it
14  was not money, and did not get a satisfactory response.
15          I also note that plaintiffs have themselves
16  characterized themselves as "sellers" of the services of hockey
17  players.
18          I also note that Ted Saskin, executive director and
19  general counsel of the NHLPA, confirms Mr. Daly's conclusion
20  that the negotiations to persuade the RIHF to sign the current
21  NHL IIHF agreement were unsuccessful "primarily because of the
22  monetary demands that the RIHF made regarding Malkin and his
23  imminent transfer to the Pittsburgh Penguins." He also
24  confirms Mr. Daly's summary that the principal discussion at
25  the June 2006 New York meeting was the amount of money

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

78

6BF3YARH                Hearing

1    Mr. Malkin's Russian club would receive for his transfer.
2           I note that there are no affidavits in the record
3    specifically refuting or contradicting the focus on money that
4    has been detailed at length by Mr. Daly, Mr. Saskin and others.
5           Thus, despite the general case law, and despite the
6    acknowledgment in the players' contracts, the evidence in the
7    record persuades me that plaintiffs can be adequately
8    compensated by money damages. The only question is, and always
9    has been, how much.
10          Continuing on the irreparable injury issue, I look to
11   the delay that is evident in plaintiffs proceeding here. And I
12   find that plaintiffs' delay severely undercuts that sense of
13   urgency that typically accompanies a motion for preliminary
14   injunction.
15          I note in passing that in the year 2000, Mr. Mikhnov
16   participated in and was chosen in that year's NHL draft.
17   Mr. Taratukhin was also selected in the 2001 NHL draft. And as
18   we know, in 2004, Mr. Malkin came to the United States to
19   participate in the NHL draft and was drafted in the first
20   round, second overall, by the Pittsburgh Penguins.
21          On June 30 of 2006, two of the three players submitted
22   their two week termination notices to their respective teams,
23   Messrs Mikhnov and Taratukhin. On August -- actually, I think
24   all three did on August 30. Am I right on that, counsel?
25          MR. RUSKIN: Yes, your Honor.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

79

6BF3YARH                Hearing

1    THE COURT:  Thank you, counsel.  On August 7
2    Mr. Malkin signed the new one year contract with plaintiff
3    Metallurg.  On August 13 of this year, Mr. Malkin submitted his
4    two week termination notice as to the August 7 contract.  On
5    September 1, Mr. Taratukhin signed his contract with the
6    Flames.  On September 5, Mr. Malkin signed his contract with
7    the Penguins.  In mid-September the players all reported to
8    their respective team training camps.  On October 3 of this
9    year, Mr. Mikhnov signed his contract with the Oilers.  On
10   October 4, the NHL 2006/2007 season began.  And these actions
11   were commenced on October 18 and 19.
12        Based on these facts, it appears that plaintiffs will
13   be unable to show irreparable injury required to justify the
14   issuing of a preliminary injunction because of their delay in
15   seeking such relief.
16        First, putting aside for a moment the players' earlier
17   expresses of interest in playing in the NHL, and their
18   participation in the NHL draft, plaintiffs slept on their
19   rights for months following the players June 2006 giving of
20   their two week termination notices.
21        At the risk of mixing metaphors, plaintiffs hid in the
22   tall grass while the players terminated their Russian
23   contracts, signed the NHL contracts, joined their NHL teams,
24   began practicing with the teams, and the NHL season began.
25        It was only after the players were engaged in the NHL

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

80

6BF3YARH            Hearing

1    season playing with their respective teams that plaintiffs came
2    forward to seek relief at the time of maximum inconvenience to
3    the defendants.
4           While in some circumstances the delay from the June
5    giving of the notices of termination to the mid-October request
6    for relief might not necessarily constitute fatal delay, here
7    the fact that the players trained with their new teams and
8    actually commenced playing with them during the regular NHL
9    season makes the delay unconscionable.
10          Second, when the facts of the delay are read together
11   with the facts concerning plaintiffs' constant demands for more
12   money for the transfer of players to the NHL, it becomes clear
13   that the delay was in an effort to obtain more money.  Thus,
14   further undercutting any claim of irreparable injury.
15          Accordingly, I find that plaintiffs are unlikely to be
16   able to demonstrate irreparable injury.
17          I also note in passing plaintiffs' apparent
18   concession, at least with respect to the antitrust claim, that
19   the alleged harm is monetary.  Plaintiffs' reply brief at 10,
20   they say "There is a direct causal connection between an
21   antitrust violation here and the alleged harm suffered by
22   plaintiffs.... Indeed, the scheme prohibiting NHL clubs from
23   negotiating with and compensating Russian hockey clubs for the
24   services of Russian hockey players has no legitimate
25   procompetitive justification (and defendants provided none)."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

81
6BF3YARH              Hearing

1    Emphasis added.
2           Moving briefly to the likelihood of success on the
3    merits.  I will not deal with misappropriation.  Plaintiffs
4    have cited no case law in support of this cause of action.
5    Defendants point out that it is a common law doctrine
6    concerning improper taking of property rights or other
7    intellectual property rights.  It does not appear to apply
8    here.  And there doesn't seem to be much argument in the briefs
9    to the contrary.
10          Also, with respect to unjust enrichment, it doesn't
11   seem anybody talks about this claim much, so I won't either.
12          With respect to tortious interference, I note
13   preliminarily at this stage, without making a final finding,
14   that it does not appear likely that plaintiffs will be able to
15   prove that there were contracts in existence.  This is based
16   first on the Russian law experts.  And again, without making a
17   final finding on this, under Rule 44.1, at this point in time,
18   it appears that Ms. Beliakova's declaration is more persuasive.
19   This is particularly because of not only her explanation, but
20   her attachment of the actual statutes that she relies on.
21          It also appears that the labor law, including the
22   provision for the Article 80 notice prevails over other
23   inconsistent statutes.
24          So preliminarily on the law as stated by the experts,
25   it does not appear plaintiffs will be able to show the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

82

6BF3YARH                Hearing

1   existence of contracts at the time.
2          In addition, however, we have the admissions made by
3   the various individuals negotiating on behalf of plaintiffs,
4   with respect to the IIHF NHL agreement. All of those
5   statements, which I will not reiterate here, are to the effect
6   that the two week termination provision of Article 80 remains
7   in effect, particularly Mr. Tretiak, the proposer of the
8   legislation to close this supposed loop hole, urged others to
9   work to move now because the loop hole was going to change, and
10  the like.
11         The statements and conduct of those negotiating these
12  agreements, together with the conduct of Metallurg in inducing
13  Mr. Malkin to sign a new contract after he had exercised his
14  termination rights under the prior contract, also appeared to
15  concede the point.
16         Thus, it appears unlikely that plaintiffs will be able
17  to demonstrate the existence of a contract at the relevant
18  time.
19         In addition, on the facts in the record at this time,
20  it does not appear that plaintiffs will be able to satisfy the
21  but for requirement in showing that but for defendants'
22  actions, the players would not have defected. The players'
23  affidavits make clear that they always wanted to play in the
24  NHL, everyone agrees here that the NHL is the premiere hockey
25  league in the world. The players had participated in the NHL

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83

6BF3YARH                Hearing
1   draft, as I mentioned, some years ago.
2           And thus, it seems unlikely that plaintiffs will be
3   able to show that but for defendants' conduct, the players
4   would still be playing for the plaintiffs.
5           With respect to aiding and abetting a breach of
6   fiduciary duty, the parties dispute the governing law.
7   Plaintiffs cite Maryland state law for the proposition that
8   employment contracts contain an implied duty that an employee
9   must act solely for the benefit of his or her employer with
10  respect to all matters falling within the scope of his
11  employment.  I am not entirely sure why we would be looking at
12  Delaware law.
13          Defendants contend that there was no aiding and
14  abetting a breach of fiduciary duty because the Russian players
15  did not owe their teams any duty under Russian law.  Plaintiff
16  does not respond to this in the reply papers that I can recall.
17          Aside from why we would rely on Maryland law,
18  defendants' expert persuades me that it is unlikely that
19  plaintiffs will be able to show that the players had any
20  fiduciary duty to the plaintiffs at all.
21          With respect to tortious interference with business
22  relations, of course everyone seems to agree that unlawful or
23  wrongful means are required here.  Defendants contend that
24  there was no tortious interference with business relationships
25  because there are no allegation of any wrongful means to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

84

6BF3YARH                Hearing

1   achieve the alleged interference.  Rather, the defendants
2   contend that they were pursuing their legitimate business
3   objectives of securing assets for their respective teams.
4           Plaintiffs respond that signing the Russian players
5   "with full knowledge of plaintiffs' contracts" constitutes
6   theft and was authorized by the NHL's August 2, 2006, memo, as
7   a result of its desire to punish the players for the RIHF's
8   refusal to join the latest NHL IIHF agreement.
9           Again, as I've noted, it does not seem that there was
10  any wrongful means employed by the defendants on this record.
11  On this record, it's clear that the players wanted desperately
12  to play for the NHL, and took all steps to do so.  That
13  defendants had knowledge of the plaintiffs' contracts does not
14  seem to be relevant here.
15          And as was noted during oral argument, the NHL's
16  August 2, 2006, memorandum is virtually the same memorandum,
17  although as counsel points out without the bold typing, but is
18  virtually the same memorandum that had been in effect for some
19  years.
20          Accordingly, it seems that plaintiffs will be unlikely
21  to prevail on the merits of this claim.
22          Plaintiffs also assert a claim for conversion and do
23  not seem to dispute that New York law governs the standard
24  here.  Under New York law, a conversion claim requires "one who
25  owns and has a right to possession of personal property to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

85

6BF3YARH              Hearing

1    prove that the property is in the unauthorized possession of
2    another, who has acted to exclude the rights of the owner."
3    Key Bank v. Grossi, 227 A.D.2d 841, 843 (3d Dep't 1996).
4            Defendants of course assert that the services of these
5    players are not personal property and thus that plaintiffs
6    cannot prove up a claim for conversion.  Plaintiffs do not
7    respond that I recall in their papers, and accordingly it seems
8    unlikely that they will prevail on this point.
9            Finally, with respect to the alleged Section 1 claim,
10   Section 1 of the Sherman Act prohibits "every contract,
11   combination... or conspiracy in restraint of trade."  Although
12   the plain language of the act would suggest that every contract
13   in restraint of trade violates the antitrust laws, the Supreme
14   Court has long held that the Sherman Act prohibits only
15   unreasonable restraints of trade.
16           Thus, in order to prevail, "a plaintiff claiming a
17   Section 1 violation must first establish a combination or some
18   form of concerted action between at least two legally distinct
19   economic entities unilateral conduct on the part of a single
20   person or enterprise falls outside the purview of this
21   provision in the antitrust law."  Capital Imaging Associates v.
22   Mohawk Valley Medical Associates, 996 F.2d 537, 542, (2d Cir.
23   1993).
24           The Court also recognized that certain conduct is
25   immune from the scrutiny of the antitrust laws.  "It has long

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86

6BF3YARH            Hearing

1   been recognized that in order to accommodate the collective
2   bargaining process, certain concerted activity must be held to
3   be beyond the reach of the antitrust laws." Clarett v. NFL,
4   369 F.3d 124, 142 (2d Cir. 2005).
5           Here defendants contend that there is no cognizable
6   claim under Section 1 of the Sherman Act because the NHL policy
7   on transfer fees and restraint of trade falls within the
8   purview of the collective bargaining agreement, and is thus
9   immune from antitrust scrutiny under the non-statutory labor
10  exception. Clarett 369 F.3d, 140.
11          As counsels pointed out in the papers, it seems likely
12  that defendants will be able to demonstrate that in fact this
13  policy on transfer fees has been a mandatory subject of the
14  collective bargaining agreements.
15          In addition, there seem to be various other problems
16  with the antitrust claim. First, there does not seem to be any
17  antitrust injury here, thus no injury to competition. Also it
18  appears, as we noted during oral argument, that plaintiff does
19  not appear to be market participants in the market which they
20  defined. And finally, the activities here at issue seem to be
21  included within the meaning of the Supreme Court's recent
22  Texaco case as the core activities of a joint venture. And
23  thus, would not constitute a combination in restraint of trade.
24          For all of these reasons, it appears that plaintiffs
25  are unlikely to prevail on the merits of the claim. And for
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

87

6BF3YARH                    Hearing

1   all of the reasons stated above, the requests for the
2   preliminary injunctions are denied.
3        Counsel, have I forgotten anything first of all at
4   this moment? Counsel? Anybody?
5        MR. RUSKIN: No, your Honor.
6        THE COURT: Hearing nothing, would you folks confer,
7   and after you've had a chance to talk with your clients, let me
8   know in the next day or two how you would like to proceed
9   please.
10       MR. RUSKIN: Yes, your Honor.
11       THE COURT: Anything else?
12       MR. BERKOVICH: No, your Honor.
13       THE COURT: Thank you, gentlemen. Good afternoon. It
14  was a pleasure having you.
15       MR. RUSKIN: Thank you, your Honor.
16              o0o
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300