# YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. BARR FLINN
DIRECT DIAL: (302) 571-6692
DIRECT FAX: (302) 576-3292
bflinn@ycst.com

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

February 8, 2008

**REDACTED – PUBLIC VERSION**

The Honorable Gregory M. Sleet
Chief Judge
United States District Court for the District of Delaware
844 North King Street, Lockbox 19
Wilmington, Delaware 19801

Re:   *Deutscher Tennis Bund, et al v. ATP Tour, Inc. et al.*
       Civil Action No. 07-178 (GMS)

Dear Chief Judge Sleet:

Defendants identify no appropriate grounds for summary judgment. Each "summary judgment" issue requires resolution of material questions of fact. Defendants do not and cannot contend that no material facts exist sufficient to preclude any subsequently filed summary judgment motion. Accordingly, defendants have not made a showing that they could reasonably be entitled to judgment as a matter of law on any of plaintiffs' claims.

**I.     Facts Preclude Summary Judgment On Plaintiffs' Antitrust Claims.**

Defendants dedicate two pages to alleged pro-competitive aspects of the Brave New World ("BNW"), but do not request leave to file a motion for summary judgment on "pro-competitive" grounds. Regardless, the key "undisputed facts" identified by defendants in that section are disputed. For example: (1) the fact that player compensation will increase almost 30% overnight under the BNW is actually evidence of the defendants' creation and use of monopoly proceeds; (2) numerous defendants, as well as plaintiffs' officers and employees, testified that tournaments compete with one another and the ATP; (3) plaintiffs did not willingly participate in any illegal cartel previously and/or in defendants' current cartel; (4) Hamburg entered into previous agreements with the ATP under threat of membership revocation and by doing so was damaged financially; and (5) the BNW, constitutes horizontal agreements in restraint of trade which are substantively different in type and severity than anything that existed previously in the relevant marketplaces.

Ultimately, tournaments have historically competed for players. Prior to the BNW, for instance, Andy Roddick could elect to play in a small tournament in Houston rather than in a Masters series tournament. The BNW, however, will channel top players into defendants' chosen tournaments under the threat of suspension, thereby precluding competition, damaging the relevant markets and injuring plaintiffs. This is not pro-competitive. Regardless, defendants have not moved for leave to file dispositive motions on any of these issues.

**A.     The ATP Is Not A "Single Entity."**

**1.     Courts Routinely Hold that Sporting Leagues Are Not Single Entities.**

The vast majority of courts that have considered § 1 claims in the sports context have not treated sports leagues as single entities.[1] *See, e.g., Fraser v. Major League Soccer, L.L.C.,* 284

---

[1] The ATP is less of a unified entity than these sports leagues. For example, while NFL teams must cooperate for there to be NFL football because it takes two teams to have a football game. Tennis

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
Chief Judge
February 8, 2008
Page 2

F.3d 47, 59 (1st Cir. 2002); *St. Louis Convention & Visitors Comm'n v. National Football League*, 154 F.3d 851 (8th Cir. 1998); *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir. 1994); *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir.), cert. denied, 469 U.S. 990 (1984); *North American Soccer League v. National Football League*, 670 F.2d 1249, 1256-58 (2d Cir.), cert. denied, 459 U.S. 1074 (1982); *McNeil v. National Football League*, 790 F. Supp. 871 (D. Minn. 1992).

Courts have relied on a number of *facts* to consistently determine that the NFL is not a single entity, including the fact that: its member teams are separately owned and operated; its member clubs do not share expenses, capital expenditures, profits or losses with any other member; each club is managed independently; profits vary widely from team to team, and teams do not exchange or share their accounting books or records; and members compete in the acquisition of coaches, management personnel, and players. *See McNeil*, 790 F. Supp. at 879 n.10 (citations omitted).

Record evidence demonstrates that the ATP is less of a single entity than the NFL. The ATP's tournament members are separately owned and operated. They do not share expenses, capital expenditures, profits or losses with any other member; they are managed independently; profits vary widely from tournament to tournament; tournaments do not exchange or share their accounting books or records;[2] and tournaments compete in the acquisition of players (and in tennis, unlike NFL football, sponsors, broadcasters, etc.). Defendants have not and cannot demonstrate that they may reasonably be entitled to summary judgment as to plaintiffs' § 1 claims pursuant to a "single entity" defense.

Defendants cite dicta in *Chicago Prof'l Sports v. NBA ("Bulls II")*, 95 F.3d 593, 598 (7th Cir. 1996), for the proposition that § 1 of the Sherman Act does not apply to the ATP as a "single entity" sports league. This is incorrect factually and legally. First, this dicta is contradicted by the vast weight of applicable case law. Second, the *Bulls II* court declined to determine whether the NBA was sufficiently integrated as a "single entity" as a matter of law; held that such determinations must be made on a case-by-case basis; and remanded for a district court determination. *Id.* at 599. The court stated "[s]ports are sufficiently diverse that it is essential to investigate their organization and ask *Copperweld's* functional question one league at a time -- and perhaps one facet of a league at a time." *Id.* at 600. Thus, even if one accepts *Bulls II* as controlling, which it is not, *Bulls II* still would require a fact-based "functional determination," which would preclude dispositive motions.

Further, even within the *Bulls II* analysis, leagues should not be considered single entities "when curtailing competition for players who have few other market opportunities." *Id.* at 600. Record evidence establishes defendants control of men's professional tennis players and their "channeling" of these players, thereby eliminating competition in this marketplace. Given this control, the broadest possible reading of *Bulls II* does not support the filing of dispositive motions in this matter.

---

tournaments need not so cooperate. But for the ATP's player controls and market power, Hamburg could, unilaterally and independently, organize and schedule a tennis tournament and compete for the best players, calendar weeks, sponsors and broadcasters.

[2] In fact, the ATP has and continues to refuse to produce financial records of its tournament members obtained by Deloitte & Touche as part of the BNW process on the grounds that these records are confidential and are not shared by the tournament members with the ATP.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
Chief Judge
February 8, 2008
Page 3

### 2. Joint Venture Law Does Not Support Defendants' Contention.

Defendants improperly cite *Texaco v. Dagher*, 547 U.S. 1, 6 (2006) for the proposition that § 1 of the Sherman Act does not apply to joint ventures. *Dagher* merely held that certain "core" activities of a joint venture are not *per se* unlawful. The Court took no position, however, regarding the application of § 1 of the Sherman Act to joint ventures under a Rule of Reason analysis. *Id.* at 1280 n.2.

Separately, the ATP is not analogous to a "joint venture," in which competitors "pool their capital and share the risks of loss as well as the opportunities for profit." *See Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 356 (1982). The ATP tournament members operate independently from one another. They do not share expenses, capital expenditures, profits, or losses as members of joint ventures do; instead, each tournament undertakes unique financial risks and opportunities, leading to varied financial results. Regardless, even if the ATP operated as a "joint venture," there is nothing "core" or essential about the conduct at issue. The markets for men's professional tennis functioned well without any player participation requirements and without a reduced top tier of tournaments.[3] The ATP's imposition of unnecessary restraints distinguishes this case from *Dagher,* where the court held that price setting is essential to the very existence of a merchant, and does not support the filing of dispositive motions in this matter. *See id.* at 1280.

### B. Plaintiffs' Antitrust Injuries.

To prove antitrust injury, a plaintiff need only show: (a) harm or the danger of harm to competition; and (b) an injury to the plaintiff arising from that harm. *See, e.g., Tunis Bros. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1992); *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 625 (7th Cir. 2003). Record evidence exists sufficient to demonstrate both.

Record evidence confirms harm or danger of harm to competition by, *inter alia,* defendants' decision to: (1) make agreements amongst themselves and, at a minimum, with ATP members and other organizations in Shanghai, Madrid and Dubai to control the player participation market as well as sponsorship markets, broadcast markets and the market for the sale of tournament memberships; (2) "channel" players into favored tournaments (some of which are cartel members) and away from non-favored tournaments (all of which are ATP members) thereby significantly damaging competition in the player services market; (3) appropriate for the cartel player services which are the key and necessary input for a tournament to compete in other, related submarkets. Accordingly, by controlling player participation, defendants and their co-conspirators have significantly damaged competition in the markets for sponsorships, international fans, broadcasters, etc.

Injuries to the plaintiffs arising from this harm include, inter alia the fact that: (1) plaintiffs, and others, will have to pay excess amounts for the services of top men's professional players that will, effectively, preclude them from competing in this marketplace; (2) plaintiffs' inability to compete for player services will significantly impair their ability to attract fans, broadcasters and sponsors; (3) plaintiffs have been precluded from competing in the marketplace

---

[3] The undisputed evidence establishes that men's professional tennis was seeing increased profits and financial growth during the four years leading up to the adoption of the BNW. Moreover, the Hamburg tournament experienced its most successful years during the 1990s, prior to any forced pooling of rights or market divisions by the ATP.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
Chief Judge
February 8, 2008
Page 4

for the sale of memberships and men's professional tennis tournaments, by the defendants' and their cartels' monopolization of this marketplace; (4) defendants, in fact, converted plaintiffs' membership and sold it in the marketplace for approximately ▮▮▮▮ and (5) that as a proximate result of defendants' illegal actions, plaintiffs will lose approximately ▮▮▮▮ in capital investments that will be rendered valueless by defendants' illegal activities.[4]

## II. Fiduciary Duty Claims.

Defendants incorrectly contend that the business judgment rule applies unless there is evidence of "irrationality," bad faith or gross negligence and that there is no such evidence. There is, however, evidence of such facts. *See* Plaintiffs Feb. 1 Letter, 4-5. More fundamentally, the settled precedent confirms that, even in the absence of bad faith, gross negligence or irrationality, the entire fairness standard applies, not the business judgment rule, when the board action that is challenged required the affirmative vote of an interested director. *See In re Ply Gem Indus., S'holders Litig.*, 2001 Del. Ch. LEXIS 84, at *27 n. 33 (Del. Ch. June 26, 2001) ("Plaintiffs must allege sufficiently that the merger [transaction] would not have been approved without the vote of the directors who were interested or disqualified."); *cf.* Revised Model Nonprofit Corporation Act § 8.31 (1987), *available at* http://www.muridae.com/nporegulation (stating that the votes of interested directors may not be counted). It is undisputed that the action challenged here, the approval of the BNW, required the affirmative vote of an interested director. ATP Bylaws § 12.9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Defendants have admitted both that the BNW could not have been adopted by the ATP had it not been for the affirmative vote of director Pasarell and that Pasarell had a personal interest in approving the BNW. (Pasarell Dep. at 42-65 (attached hereto as Ex. B).) The BNW benefited Pasarell, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Pasarell Dep. at 12:5-13:6) The BNW included a grant to "Indian Wells" of an ATP 1000 sanction, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[5] (Pasarell Dep. at 55-56) Such unusual benefits constitute a bribe to secure Pasarell's critical vote for the BNW. The approval by this interested director precludes the application of the business judgment rule to the BNW.

---

[4] This is evidenced by the testimony of numerous defendants; the testimony of Ayman Azmy and non-deposed officers of plaintiffs; the admissible expert reports of Gary Kleinrichert of FTI Consulting and sports economist, Andrew Zimbalist; the history of the ATP in which tournaments, pre BNW were free to buy and sell their memberships to other entities and/or the ATP itself; and the post BNW universe in which the ATP, in stark contrast, unilaterally takes, creates and sells "sanctions." *See Murray v. NFL*, 1996 WL 363911, at *23 (E.D. Pa. June 28, 1996) (where market exists for sale and purchase of interest in NFL franchises; teams and NFL compete in that marketplace; and NFL adopts rule to limit participation in that market, NFL's actions may violate § 1).

[5] Mr. Pasarell and his tournament also received other favors from Mr. Pasarell's status as an ATP board member and close friend of board member and then-President de Villiers. *See* Plaintiffs' Feb. 1, 2008 Letter, 4-5.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
Chief Judge
February 8, 2008
Page 5

    Accordingly, it is defendants' burden to prove that the BNW was entirely fair to its members. *Weinberger v. UOP*, 457 A.2d 701, 710 (Del. 1983). There is ample evidence to the contrary, including evidence that defendants downgraded tournaments whose owners were not represented on the ATP board (Hamburg), while benefiting a tournament whose owner sat on the board and approved the transaction (Indian Wells). Directors of a non-profit Delaware corporation owe their fiduciary duties to all of the corporation's members and may not discriminate among members to advance their own personal interests. *See Baring v. Watergate East, Inc.*, 2004 Del. Ch. LEXIS 148, at *20-21 (Del. Ch. 2004).[6]

    Defendants' suggestion that the fiduciary duty claims are derivative claims and therefore required a pre-suit demand is meritless. The claims do not allege a harm to the ATP suffered by all its members indirectly in proportion to their ownership interests in the ATP. *See Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004). They rather allege a harm suffered directly and by only some members of the ATP, including plaintiffs. First Amended Complaint (D.I. 45) at ¶¶ 124, 135, 139 and 144 (alleging specific harm to plaintiffs). The fiduciary duty claims are therefore direct claims and are appropriately before this Court.

### III. Tortious Interference and Conversion.

    Defendants' sole basis for requesting leave to file summary judgment briefing on plaintiffs' tortious interference claim is that plaintiffs "existing sponsorship agreements remain unaffected by the upcoming restructuring," with the result that there supposedly was no interference with a contractual right. (Defendants' Opening Letter at 5) This is incorrect;

[REDACTED]

Additionally, there is considerable record evidence that defendants engaged in a wrongful exercise of dominion over the property of plaintiffs by, inter alia, taking and selling plaintiffs' membership and other property rights. *Carlton Investments v. TLC Beatrice Int. Holdings, Inc.*, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995).

                                    Respectfully submitted,

                                      /s/ C. Barr Flinn

                                      (No. 4092)

cc:    Clerk of the Court (Redacted version by electronic filing)
        Philip Trainer, Jr., Esquire (Redacted version by e-mail)
        Bradley I. Ruskin, Esquire (by e-mail)

---

[6] The *Solomon* and *Gilbert* cases cited by defendants are not to the contrary. (Defendants' Opening Letter at 5, n.7.) Neither case addresses a transaction that was approved by a director with a material personal interest in the transaction. It was not argued in *Gilbert* that the directors had personal interests in the transaction. *Gilbert*, 1988 WL 124325, at *6. In *Solomon*, they had personal interests, but there was no suggestion that they were material to the directors in any manner that could possibly have affected their ability to make unbiased decisions. *Solomon*, 747 A.2d at 1118.

# EXHIBITS A-C
## REDACTED IN THEIR ENTIRETY