# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEUTSCHER TENNIS BUND (GERMAN   :
TENNIS FEDERATION), ROTHENBAUM   :   C.A. No. 07-178-GMS
SPORT GMBH, and QATAR TENNIS   :
FEDERATION,   :
   :
           Plaintiffs,   :
   :
   against   :
   :
ATP TOUR, INC., ETIENNE DE VILLIERS,   :
CHARLES PASARELL, GRAHAM PEARCE,   :
JACCO ELTINGH, PERRY ROGERS, and IGGY :
JOVANOVIC,   :
   :
           Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE
## EXPERT OPINIONS PROFFERED BY ANDREW ZIMBALIST

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: May 13, 2008

{00216362;v1}

Pursuant to Federal Rule of Evidence 702 and the *Daubert* standard, defendants respectfully move to exclude the opinion testimony proffered by plaintiffs' economic antitrust expert, Andrew Zimbalist ("Zimbalist"), under *Daubert* and Fed. R. Evid. 702.

## PRELIMINARY STATEMENT

ATP Tour, Inc. ("ATP") operates a worldwide men's professional tennis tour. Plaintiffs are members of ATP and currently operate a tennis tournament in Hamburg, Germany. ATP decided to restructure the tour beginning in 2009 in order to make it more attractive to consumers, and to better compete with other tennis, sports, and entertainment products. As part of the new tour structure, ATP is refining its tournament calendar and ranking system, which will result in the Hamburg tournament being categorized in the tour's second tier (rather than the first tier) beginning in 2009. (The top two tiers will comprise approximately the top third of the tour.)

To support their antitrust claims, plaintiffs have proffered the expert opinions of Zimbalist, who has opined, *inter alia*, that the relevant market at issue is a world-wide market for "the production of top-tier men's professional tennis," and that ATP possesses "economic power" in that market. (Ex. 1, p. 2.)[1] In reaching these conclusions, Zimbalist utilized an ad hoc, untested, and unreliable methodology. He failed to analyze the crucial question of cross-elasticity of demand between "top-tier men's professional tennis" and potential substitutes for it. Indeed, Zimbalist did not even consider whether any other sports or entertainment products could be substitutes for any consumers of "top-tier men's professional tennis." Moreover, he admits to having relied upon data he knew to be inaccurate when applying his (unreliable) methodology to identify the relevant markets. All of Zimbalist's opinions are infected by his failure to reliably define the relevant markets. Indeed, Zimbalist was recently precluded from testifying in another

---

[1] Citations to "Ex.\_" refer to exhibits attached to and submitted with this memorandum of law.

antitrust case in which he offered market definition testimony based upon a methodology that was, if anything, more rigorous than the method he used here. *Kentucky Speedway, LLC v. NASCAR, Inc.*, 2008 WL 113987 (E.D. Ky. Jan. 7, 2008). Zimbalist's testimony in this matter should likewise be excluded for failure to comply with the dictates of Rule 702 and *Daubert*.

## ARGUMENT

A party offering expert testimony bears the burden of establishing that: (1) the expert is qualified; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the type of inquiry mandated by *Daubert*; and (3) the testimony sufficiently assists the trier of fact. Fed R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).[2] *Daubert* demands that every expert conduct his courtroom analysis with the same standards and intellectual rigor that generally prevails in the expert's field. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Courts regularly apply *Daubert* to screen unreliable economic testimony in antitrust cases.[3]

When defining relevant markets in an antitrust case, it is well-understood that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co v. U.S.*, 370 U.S. 294, 325 (1962). Thus, the key test for determining whether one product is a

---

[2] *Daubert* enumerated several factors that are pertinent to assessing the reliability of an expert's testimony under the second prong of this test: (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted within the relevant community. 509 U.S. at 592-94.

[3] *See, e.g., Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003 (10th Cir. 2002); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000); *Kentucky Speedway, LLC v. NASCAR, Inc.*, 2008 WL 113987 (E.D. Ky. Jan. 7, 2008).

substitute for another in defining a relevant product market is whether there is a cross-elasticity of demand between them. *Allen-Myland, Inc. v. IBM, Corp.*, 33 F.3d 194, 207 (3d Cir. 1994).

Here, Zimbalist admittedly failed to analyze the cross-elasticity of demand between his purported market and any other product — including other men's and women's professional tennis products — because, he claims, he did not have sufficient price data to do so. (Ex. 2, pp. 67-68.) He similarly failed to conduct a SSNIP test[4] due to his purported lack of pricing data. (*Id.* at 68.)[5] More importantly, Zimbalist flatly admitted that he had no intention of analyzing the substitutability of other professional sports and entertainment events for ATP's top-tier tennis events – even though he was aware of evidence showing that tennis competes against other sports – based not on any scientific analysis but rather on his "predisposition" to believe that major sports are not in the same market as each other. (*Id.* at 30-32, 76-77.)

Instead of making any scientific effort to analyze cross-elasticity of demand, Zimbalist employed an unscientific and subjective methodology to define the market. He started with the concept that "top tier men's professional tennis" – which he defined as tournaments in which "a high proportion (well over 50 percent) of the top players generally participate" – is the product at issue in this case. (Ex. 1, pp. 7-8; Ex. 2, pp. 28-29.)[6] He reached this conclusion based upon his

---

[4] The SSNIP ("a small but significant non-transitory increase in price") test is a type of cross-elasticity test used by the U.S. Department of Justice and the Federal Trade Commission when examining questions of market definition in their analyses of proposed mergers. (*See* Ex. 3.)

[5] Of course, failure to obtain relevant data is no excuse for an expert's failure to conduct tests to support his opinions. *See, e.g., Lantec, Inc. v. Novell, Inc.*, 2001 U.S. Dist. LEXIS 24816, *26-27 (D. Utah 2001) ("Dr. Beyer testified that important information was not available to him. But that does not justify the reliance on anecdotal evidence to create haphazard testimony."), *aff'd*, 306 F.3d 1003 (10th Cir. 2002).

[6] Zimbalist concluded that the tournaments that produce this product consist of: ATP's nine current top-tier tournaments (the "Masters Series"), ATP's annual championship event (the "Masters Cup"), Davis Cup events, and the four Grand Slams events (Wimbledon, The U.S. Open, The French Open, and The Australian Open). (Ex. 1, p. 8.) The Grand Slam and Davis Cup events are not part of, produced by, or sold by ATP.

review of the First Amended Complaint and other documents in the case, even though no such product (or market) is alleged or described by plaintiffs. (Ex. 2, p. 33.) He admitted that this product definition "is not precise" (Ex. 4, p. 21), making it impossible to reliably identify the producers, buyers, and/or sellers of any such product, let alone its substitutes. Moreover, this product definition is incurably vague and circular, given that it is (a) based upon an after-the-fact review of a given tournament's success in attracting top players in a given year (or over some unspecified period of time), and (b) affected by the very player participation rules that are challenged as anticompetitive in this action.

Zimbalist next opined that ATP's current second-tier tournaments (now known as the "ISG" tier) are the closest substitutes for "top-tier men's professional tennis," and proceeded to compare these purported substitutes across a series of "practical indicia." (Ex. 1, pp. 8-11.) He identified no recognized criteria for identifying appropriate substitutes to test. Instead, he simply asserted that it was "apparent" to him that ISG tournaments are the closest possible substitutes because they have "some of the top players playing in them." (Ex. 2, pp. 29-30.)[7]

Similarly, Zimbalist's comparison of Masters Series events to ISG events across a smattering of "practical indicia" (*see* Ex. 1, pp. 8-11; Ex. 2, pp. 43-44) is not based upon any recognized standards or accepted methodology. Crucially, Zimbalist identified no accepted criteria for selecting the appropriate "indicia" to compare using his method. Nor did he explain how to evaluate the criteria so chosen. He simply opined that ISG events are "in very different

---

[7] Zimbalist similarly failed to conduct any analysis to define the relevant geographic markets at issue, asserting only that it is "apparent" that men's professional tennis functions in a worldwide market, based on the facts that tennis players come from around the world, and that ATP promotes itself as a worldwide product. (Ex. 2, pp. 87-88.) Of course, these factors say nothing about the geographic scope of substitutability for "top-tier men's professional tennis" events from consumers' perspective. Indeed, Zimbalist ultimately acknowledged that the geographic market for attendees at "top-tier men's professional tennis" events is likely local or regional at most. (Ex. 4, p. 8; Ex. 2, pp. 56-57, 84-85, 219.)

markets" from "top-tier men's professional tennis" events. (Ex. 2, pp. 43-44.) Nevertheless, having concluded that ISG tournaments are not close substitutes based only on this "practical indicia" test, Zimbalist flatly opines that "more remote candidates are *a fortiori* also considered to be in different markets." (Ex. 1, p. 13.) Zimbalist himself admitted that he had never defined a relevant market using only a "practical indicia" test. (Ex. 2, p. 73.)

A comparison between Zimbalist's methodology in this case and the one rejected by the court in *Kentucky Speedway* is striking. In that case, Zimbalist defined the relevant product markets to be the sanctioning and hosting of the highest tier of racing events on NASCAR's annual tour. 2008 WL 113987, at **1-2. Zimbalist used the same "practical indicia" test, in addition to a "modified SSNIP test," to reach this conclusion. (Ex. 2, pp. 72-73.) The court held Zimbalist's approach inadmissible under *Daubert* as untested, not subject to peer review, uncontrolled by any standards, not generally accepted by the scientific community, and created solely for litigation. 2008 WL 113987, at *4. The court additionally faulted Zimbalist for considering only the second-tier series of NASCAR races as possible substitutes for NEXTEL races, and failing to examine whether "other sports, and possibly other means of entertainment in general" could be possible substitutes for consumers of NEXTEL races. *Id.*

The only difference between Zimbalist's work in *Kentucky Speedway* and his analysis here is that in that case Zimbalist conducted ***additional testing*** to define the markets. Here, Zimbalist used ***only*** the "practical indicia" test. Just as in *Kentucky Speedway*, Zimbalist's analysis cannot withstand the mandates of *Daubert* and should be excluded.

**CONCLUSION**

For all the foregoing reasons, defendants respectfully request that the Court grant their motion to exclude the expert opinions proffered by Andrew Zimbalist.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

PROSKAUER ROSE LLP
Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

*Attorneys for Defendants*

Dated: May 13, 2008

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEUTSCHE TENNIS BUND (GERMAN TENNIS
FEDERATION), ROTHENBAUM SPORT GMBH, AND
QATAR TENNIS FEDERATION,

Plaintiffs,

v.

ATP TOUR, INC., ETIENNE DE VILLIERS, CHARLES
PASARELL, GRAHAM PEARCE, JACCO ELTINGH,
PERRY ROGERS, and IGGY JOVANOVIC

Defendants.

## Liability Report   by  Andrew Zimbalist

## January 14, 2008

## I. Introduction.

My name is Andrew Zimbalist. I am the Robert A. Woods Professor of Economics at Smith College in Northampton, Massachusetts, where I have been teaching since 1974. I have been a visiting professor at Doshisha University in Kyoto, Japan, at the University of Geneva in Switzerland and at Harvard University. I received my B.A. degree from the University of Wisconsin and my M.A. and Ph.D. in economics from Harvard University.

I have consulted extensively in the area of sports economics for sports' players' associations, for cities, for teams, for companies, for owners and for law firms. I have also served as an expert witness in several sports-related litigations. I have testified numerous times before the U.S. Congress, state legislatures and city councils on sports-related (and other) matters.

I have published 18 books and dozens of articles in the areas of sports economics, economic development and comparative economic systems. Since 1990 the principal focus of my research, teaching and professional work has been sports economics. Sports economics is a branch of applied microeconomics that includes the fields of industrial organization, antitrust analysis, labor economics and public finance.

For several years, I did a biweekly commentary on the business of sports for NPR's Marketplace and I contribute op-eds frequently on the sports business to leading newspapers and magazines. A full list of my publications, my testimonies in legal proceedings, and my other professional activities is included in my curriculum vitae which appears in Appendix C to this report. I am being remunerated for my services in this matter at my current standard rate of $850 an hour.

1

## II. Assignment and Conclusion

I have been asked by the attorneys for the plaintiffs to undertake an economic analysis of the liability issues in this litigation. To this end, I determine: (a) the relevant market or markets in which the plaintiffs allege that the ATP and those acting in concert with it are engaging in anticompetitive acts; (b) whether the ATP has market power in the relevant market(s) at issue in this litigation; (c) if the ATP does have economic power whether this power was obtained through superior economic efficiency or anticompetitive acts; (d) if the latter, whether these acts resulted in anticompetitive harm; and, (e) whether there are business justifications for the acts undertaken by the defendant.

To carry out this assignment I have read a large number of the discovery documents and depositions in this case, as well as the associated exhibits, the financial information made available by the ATP and the German Tennis Federation (GTF), some relevant press articles and internet reporting, and legal decisions in related cases. I have also reviewed some of the pertinent economic literature in this area. The discovery and other documents I have examined are listed in Appendix B.

The conclusions I have reached, as a matter of antitrust economics, are as follows: (a) the relevant product market is the production of top-tier men's professional tennis and the relevant geographic market is the world (there are also input and joint output markets); the ATP possesses economic power in this market; the ATP obtained this power as a result of anticompetitive acts; and, the ATP's anti-competitive acts have engendered economic harm to the players, to many tournaments, to sponsors, to broadcasters and, most importantly, to consumers of top-tier men's professional tennis, in the United States and globally. The ensuing report sets forth the basis for

2

my conclusions. If additional relevant information becomes available, I reserve the right to supplement my opinions.

## III. Background

The Association of Tennis Professionals (ATP) was formed in 1972 to represent the interests of male professional tennis players as the sport was becoming professionalized. The Men's International Professional Tennis Council (MIPTC), in partnership with the International Tennis Federation (ITF)[1], was established in 1974. The MIPTC was the first stable sanctioning body for male professional tennis. It organized a professional tennis tour through the late 1980s. In 1988, the Second Circuit of the U.S. Court of Appeals ruled that Volvo, IMC and ProServ brought legitimate antitrust concerns in their litigation against MIPTC. The ensuing settlement resulted in the takeover of the men's tour by the ATP.

Despite the ATP's origins as an association of men's professional tennis players that, among other things, introduced the ranking system to bring some fairness into the selection and seeding process for men's tournaments, the ATP transformed itself into a tour body in 1989. It took over the management of the men's tour from the MIPTC in January 1990. During the 1990s, the ATP became a commercial entity and functioned increasingly as a cartel of the top-tier tournaments. Via the ATP cartel, these tournaments collaborate to artificially restrict output, to pool media and sponsorship rights nationally and worldwide, to set controls over the functioning of the player market and to fix prices, inter alia.

---

[1] The ITF is a federation comprised of the nearly 200 national tennis federations across the world. The ITF directly governs only the Davis Cup, but it functions as the umbrella organization that approves tennis rules, anti-doping policies, equipment guidelines, etc. The four largest and economically most successful tennis tournaments each year, the Australian Open, the French Open, Wimbledon and the U.S. Open, are run by the national tennis federations of each country, subject to the oversight of the ITF. These federations have formed a Grand Slam committee which essentially functions as an informal forum for discussion and coordination among the four tournaments and also for coordination with the ATP. These same four national federations play a central role in the ITF.

3

Tournament representatives on the Board of Directors are elected for three different regions. The Masters' tournaments receive a disproportionate number of votes in these elections, such that the top-tier tournaments (in contrast to the second- and third-tier tournaments) can effectively control the selection of the board director for their region. The board representatives and their hired executives benefit directly and indirectly from the ATP cartel's practices and in many respects function as residual claimants, variously via ownership interests in ATP tournaments, consulting arrangements with ATP tournaments, and compensation linked to ATP revenue.

The player representatives to the Board of Directors are elected indirectly.  Evidence strongly suggests that the player directors are increasingly separate from the players themselves. Depositions in this case show that they have minimal contact with the players and the ATP Vice President for Player Relations, Mr. Silva, displays a manifest concern for manipulating and controlling players, not representing them.  The players themselves have directly expressed their sense of exclusion and alienation from the decision making process and its outcomes in a March 2007 joint letter to Mr. de Villiers signed by dozens of top players, stating that they found many elements of the  Brave New World plan to be "unacceptable".  In his deposition, player representative on the Board of Directors Perry Rogers stated that he hadn't consulted with players on his decision to support the new "8 of 8" requirement.  Rather, Rogers states that he and the other player representatives viewed the 8 of 8 rule as a trade for the pooling of media rights which they believe maximized revenue to guarantee player prizes.  Further, the player representatives on the ATP Board of Directors apparently make little effort to share basic financial information with the players, so that, for instance, they did not disclose the value of the ATP's sanctioning contracts with Shanghai and London, worth in excess of $30 million.[2]   The

---

[2] Rogers' deposition, p. 169.

4

2005 transition memorandum from former ATP CEO Mark Miles to current CEO Etienne de Villiers lays this problem out clearly: "When it comes to effectively representing players in the Tour's policy making process and effectively communicating regarding policy issues, the Tour is simply failing… it's not an exaggeration to say the system is dysfunctional."[3]

The MIPTC and the ITF were direct partners, because the ITF held three seats on the MIPTC's board of directors. The ATP and the ITF (and the Grand Slam committee) are not direct partners, but since the late 1990s at least, they have chosen to collaborate with regard to ranking points, scheduling and some ownership. As such, the collusion in effect between these two bodies (and the Grand Slam committee) enables the joint monopolization of top-tier men's professional tennis.

The ATP's efforts to pool broadcasting and sponsorship rights were not economically successful in the late 1990s and early years of this decade. Yet the ATP managed to set its tour on a growth path after the setbacks in 2001-02 with the bankruptcy of ISL. Since 2002, tour attendance, revenue and profitability have been growing, as has the participation rate in the top-tier events of the leading players. Notwithstanding the tour's growth over the past five years, the ATP cartel, on the basis of ambiguous research, has gone forward with its Brave New World plan to introduce new market restraints. This report analyzes the nature and anticompetitive impact of these restraints.

## IV.  Relevant Market

Market definition is conducted in antitrust analysis to determine the smallest group of products (or single product) that can be profitably monopolized. If this group of products (or single product) were supplied by one company, the company would be able to artificially restrict

---

[3] MILES0052-0069 (Exhibit 272), at 0062.

output and charge a price significantly above the average economic cost of production. Under competition, price would equal average cost. Under monopoly, price generally exceeds average cost and economic profits result.[4]

Economists use the notion of product substitutability to delineate a market. Two products are in the same market if a small increase in the price of one good would cause a large enough number of consumers to switch to the other good, such that the firm with the higher relative price would be unable to capture additional profit.[5] In such a case, consumers perceive the two goods to be close substitutes for each other.

From an economic standpoint, as a matter of accepted practice, evidence of product substitutability can be qualitative and/or quantitative. Qualitative evidence can relate to such things as past buyer responses, product characteristics, seller conduct or the views of persons with expertise in the industry.

Quantitative evidence can consist of practical indicia, such as disparity in prices, sales levels or profitability, or estimates of the cross elasticity of demand, or conducting a SSNIP ("a small but significant non-transitory increase in price") test. In economic theory, the degree of product substitutability is often expressed by the concept of the cross elasticity of demand, which is the percent change in the quantity demanded of product A divided by the percent change in the price of product B. With sufficient amounts of accurate and appropriate data, the cross elasticity of demand between product A and product B can, in theory, be estimated with regression analysis. However, limited data availability almost always precludes such an analysis and cross elasticity estimates have been employed very infrequently in antitrust cases. A further

---

[4] The term economic profits includes opportunity cost or the competitive rate of return on capital. Hence, if economic profits are present, it means that the firm is earning above a competitive rate of return on its investment. Similarly, average cost refers to the economic notion of cost and, hence, includes opportunity cost.
[5] See, United Stated Department of Justice and the Federal Trade Commission, 1992 Horizontal Merger Guidelines, available at www.ftc.gov/bc/docs/horimer.htm (revised April 8, 1997.)

complicating problem is what has come to be known as the "cellophane fallacy." The cellophane fallacy refers to the problem that product substitutability is more properly measured at a competitive price level. If a producer is already charging a monopoly price, then consumers may have a more sensitive response to a further price increase.[6]

A somewhat more tractable test for substitutability is the SSNIP test. SSNIP stands for "a small but significant non-transitory increase in prices." Namely, if a company can raise the price of its product by 5 percent or more and sustain this higher price without lowering its profitability, then it is evidence of monopoly market power. Here again, the measurement is complicated by the so-called cellophane fallacy.[7]

Thus, as a matter of economic practice, the determination of an applicable antitrust market may be determined, based on the circumstances, with either quantitative or qualitative evidence. In this instance, a qualitative and quantitative review of the evidence is sufficient to allow me to determine the applicable market, utilizing practical indicia and statements by the ATP, and those working in concert with it.

Based on this evidence, in the instant litigation, I have reached the conclusion that the relevant product market is the production of top-tier men's professional tennis. I come to this determination by considering what the apparent nearest substitute product is and observing the evidence that clearly shows that these products are not close substitutes for each other.

---

[6] See, for instance, Gene Schaerr, "The Cellophane Fallacy and the Justice Department's Guidelines for Horizontal Mergers," Yale Law Journal 94 (1985), pp. 671-93, or Richard Schmalensee, "Horizontal Merger Policy: Problems and Changes," Journal of Economic Perspectives 1 (1987), pp. 41-54.

[7] On January 9, 2008 Etienne de Villiers testified during his deposition that Price Waterhouse gathered ticketing and financial information from the ATP's tournaments as part of the ATP's Brave New World analysis and that this information was subsequently produced to Deloitte & Touche's Sports Group, located in the United Kingdom. Despite requests for the production of this information since June 2007, the ATP has refused to produce it at this time. Accordingly, I reserve the right to conduct either a cross elasticity or SSNIP test for market definition in the event that the ATP produces, willingly or pursuant to a Court order, this data. Such analyses, however, are not necessary to support my opinions and conclusions set forth herein.

At least since the 1990s, the top tier of men's professional tennis has been denoted by what is today referred to as the Masters tournaments (of which currently there are nine), the Masters Cup, the Davis Cup and the four Grand Slam tournaments. These tournaments distinguish themselves in that a high proportion (well over 50 percent) of the top players generally participate in them. For instance, in 2007 on average the nine Masters tournaments had 9.22 players participate from among those who were ranked in the top ten. The next highest ranking tier was the International Series Gold (ISG) which averaged under 3 participating players out of the top ten. Similarly, as shown in Table One below, the average number of top ten players participating during 2000-07 was 8.18 for the Masters' tier and only 2.56 for the ISG tier. The next tier, the International Series (IS), enjoyed the participation of only 1.32 of the top ten players in its average tournament during 2000-2007.

**Table One**
**Average No. of Top 10 Players Participating by Tier**
**2000-2007**

| Year | IS | ISG | Masters |
|------|------|------|---------|
| 2000 | 1.40 | 3.00 | 8.44 |
| 2001 | 1.38 | 2.60 | 8.44 |
| 2002 | 1.33 | 2.80 | 9.00 |
| 2003 | 1.34 | 3.00 | 7.78 |
| 2004 | 1.14 | 2.00 | 7.11 |
| 2005 | 1.09 | 2.44 | 7.56 |
| 2006 | 1.34 | 2.33 | 7.89 |
| 2007 | 1.51 | 2.33 | 9.22 |
| Average | 1.32 | 2.56 | 8.18 |

Source:
http://tennis-data.co.uk/alldata.php.

Thus, I identify the ISG tier as the nearest substitute to the Masters' tier. Again, no ticket

practical indicia demonstrate that these tiers are in different markets.

9

**Table Two**

**Average Tournament Data by Tier and Year**

**2006-2007**

| | 2006 | | | 2007 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | IS | ISG | Masters | IS | ISG | Masters |
| Attendance | 42,893 | 64,282 | 123,569 | | | |
| Revenues and Expenses ($) | | | | | | |
| Sponsorship Revenue | 1,650,739 | 2,219,585 | 4,112,023 | 1,759,639 | 2,369,675 | 4,221,597 |
| Ticket Revenue | 498,176 | 972,277 | 3,822,554 | 539,515 | 977,015 | 4,299,781 |
| Ticket Revenue per Spectator | 11.61 | 15.13 | 30.93 | | | |
| Television Revenue | 94,695 | 78,161 | 548,584 | 98,593 | 91,188 | 604,672 |
| Total Revenue | 2,824,843 | 4,447,654 | 10,412,485 | 2,942,643 | 3,788,778 | 11,118,814 |
| Prize Money | 604,460 | 794,935 | 2,505,880 | 611,399 | 802,336 | 2,576,749 |
| Net Income | 103,384 | 235,389 | 706,931 | 131,753 | 119,941 | 1,129,070 |
| Number of Tournaments Reporting Revenue and Expenses | 30 | 4 | 6 | 29 | 2 | 5 |

Notes:
* Averages exclude ATP/WTA combined events. The source document does not identify combined events by tier.

Sources:
Attendance: ATP0008335-8340.
Revenue and Expenses: ATP0082512-41.

The distinction between Masters and ISG tournaments' market performance is striking, as shown in Table Two above. It is important to underscore that the disparities indicated in Table Two are almost certainly substantial understatements of the true differentials between these two

tiers, because the averages for the Masters' tier exclude the performance of the tier's two highest

revenue tournaments – Miami and Indian Wells.  These combined tournaments are excluded

because the source document does not identify the combined tournaments at each tier, so

including them would create inconsistencies when comparing tiers.[8]  In 2006, the average

Masters' tournament reported attendance 1.9 times as great as the average ISG tournament,

despite the fact that the average ticket revenue per spectator (average ticket price) was 2.0 times

higher at Masters' tournaments.  If the Masters and ISG products were viewed by consumers as

substitutes for each other, the expectation would be that higher Masters' prices would lead to

lower Masters' attendance.[9]  Similarly, in 2007, Masters' average sponsorship revenue was 1.8

times that of ISG average sponsorship revenue, Masters' average ticket revenue was 4.4 times

that of ISG average ticket revenue, Masters' average television revenue was 6.6 times that of

ISG average television revenue, Masters' average total revenue was 2.9 times that of ISG

average total revenue, Masters' average prize money was 3.2 times that of ISG average prize

money, and Masters' average net income was 9.4 times that of ISG average net income.

　　　　Furthermore, it is evident from the policy of the ATP itself that it regards the Masters'

tier as a distinct product to which consumers have a different response than the ISG tier.  For

instance, in his deposition, ATP board member Perry Rogers talked about the low status held by

the ISG tour:  Q: "… you're referring to International Series Gold as having a history, which is

terrible?"  A: "Yes…. I know that we had a discussion about International Series Gold.  Etienne

and I had had a discussion about it, and that we didn't feel that it had been a successful category.

I also know that I discussed it with Charlie Pasarell who didn't feel that it had been a successful

---

[8] Methodological notes about the sources and uses of data in this report appear in Appendix A.
[9] The ticket revenue per spectator calculation cited here is based on aggregate data for the year for the entire series.
Ticket price data per tournament is not available.  If the historical ticket price series were available along with other
necessary data, and if a regression estimated a statistically significant cross elasticity of demand, even then it would
not be solid evidence that the two goods were substitutes for each other because of the cellophane fallacy.  Given the
twofold price differential between the Masters and ISG tiers, there is at least a prima facie likelihood that the
cellophane problem would affect the results.

11

category.  I have yet to actually meet someone that [sic] thinks that it was a successful category."[10]

Zeljko Franulovic is a current ATP Board member, who played on the men's professional tour for fourteen years, two of them ranked in the top ten, has run professional tennis events, including the Masters Cup predecessor from 1990 to 1996, and has served as an officer of the modern ATP from 1989 to 2005, among other executive positions.  In his deposition in this case in September 2007, Mr. Franulovic testified regarding the fate of the Monte Carlo tournament and the second tier of tournaments in general after the Brave New World is implemented, as follows:

Q:  All right.  Players are not going to be penalized for failing to play Monte Carlo, are they?

A:  They are not.

Q:  They are not going to be penalized by being suspended for not playing Monte Carlo?

A:  Correct.

Q:  … Based on those circumstances, is it fair to say that in years beginning 2009, Monte Carlo will be at a competitive disadvantage to the other Masters 1000s in competing for players?

---

[10] Deposition of Perry Rogers, pp. 223-224. The foregoing definition of the relevant market is supported by various testimony and ATP documents produced in this case, and will be discussed in the text below.  Specifically, when industry experts opine and ATP commissioned studies propose that reducing output and raising prices will lead to increased profits, this denotes a belief that ATP has market power.  If the ATP had competitors in the production of top-tier men's professional tennis, then raising prices would cause consumers to shift their purchases to the ATP's competitors and the ATP would find that it could not sustain a rise in prices and increase its profits.  Thus, for instance, the McKinsey Report (exhibit 98 at ATP0078922) recommends the standard monopolist strategy of "creat[ing] product scarcity to drive up demand," something that the ATP would not be able to accomplish unless it had market power in the market for the production of top-tier men's professional tennis.   ATP board member Perry Rogers in his deposition, pp. 76-81, states that the strategy behind pooling television rights is to be able to raise prices and increase profits; again, this strategy could not be successfully pursued if the ATP did not have monopoly power in the market to produce top-tier men's professional tennis.

A: Yes.

Q: And those competitive disadvantages that Monte Carlo will be facing beginning in 2009 are competitive disadvantages that spring from the Brave New World plan approved by other member of the board of directors, not yourself?

...

A: Yes.[11]

Indeed, a central part of the policy being contested in this litigation revolves around the ATP's effort to draw yet a sharper distinction between the Masters' (to be ATP 1000) and the ISG (to be ATP 500) tiers. This policy is manifested in the requirement that the top players play in all the top-tier tournaments, the presence of stiff sanctions to maximize this participation, the existence of possible substantial bonus payoffs for full participation, and the rule that no other ATP tournament can be played during the same week as a Masters' tournament.

Generally, if the nearest candidate for product substitution is found to be in a different market, then more remote candidates are *a fortiori* also considered to be in a different market. One such candidate might be considered to be the Tier 1 tournaments of the WTA. As my statistical work to be presented below will indicate, the WTA Tour's Tier 1 is more likely a candidate as a complementary product to the Masters' tier, than as a substitute product.[12] This evidence shows that, controlling for other relevant factors, having a combined tournament between the ATP and WTA raises the average daily attendance by over 2,000 in some tests and

---

[11] Deposition of Mr. Franulovic, pp. 274-279.
[12] A complementary product is a good that is consumed together with the original good. A substitute product is consumed instead of the original good.

13

by over 4,000 in other tests.[13]  In addition to the statistical evidence, it appears that the two tours have made a special effort to coordinate their activities, rather than to compete.  Of the nine Masters' tournaments and the ten Tier 1 WTA tournaments, two are currently combined.  In 2008, three others take place in different venues during the same week.  The remaining tournaments are scheduled during different weeks.[14]  This has also been the pattern for earlier years.  The statistical evidence also shows that when the ATP and WTA have separate tournaments on the same week in different venues that it does not have a statistically significant impact on the attendance of the ATP event.

Moreover, the year after the ATP plans to introduce its Brave New World reforms, the WTA intends to introduce its own program of restructuring.  In the latter (known as "Roadmap 2010"), the WTA will have four top-tier tournaments, each of which will be a combined event with an ATP 1000 tournament.  The WTA CEO since early 2004, Larry Scott, had previously spent nine years as COO of the ATP.

In antitrust cases in the sports industry, the defendant frequently claims that its sport must compete with other sports (and sometimes other forms of amusement) in the broader entertainment market.  Of course, at some level, most products have some relationship to each other.  Thus, if the price of gasoline goes up from $2 to $3 a gallon, consumers will have less disposable income to buy a new pair of shoes.  The price hike for gas, in consequence, may lead a consumer to postpone a shoe purchase.  On this basis, it could be asserted that gasoline and men's shoes are in the same market.  This, of course, would make little sense.  The economic analysis of relevant markets as well as the U.S. Department of Justice demand a much more careful and meaningful test.  The question asked is whether a small, but significant, change in the

---

[13] The dummy variable representing a combined tournament is statistically significant at either the .01 or .05 level in most specifications.

[14] Unlike the ATP Masters, the WTA Tier 1 tournaments are not protected from competition from lower tier WTA tournaments. In 2008, six lower tier tournaments take place during the same week as WTA Tier 1 tournaments.

14

price of one product occasions an appreciable change in the quantity demanded of the second

product. As a result of applying this more discerning criterion, antitrust decisions in the sports

industry have uniformly found that different sports are in different markets.[15] I am unaware of

any antitrust litigation in which two of the more popular sports have been found to compete with

each other in the same relevant market.[16]

The production of top-tier men's professional tennis also involves input markets. One

such market is the contracting of player services. As will be discussed below, it is from ATP's

control over this market, that ATP's market power derives. Another is the quasi-market for

hosting top-tier men's professional tennis tournaments. The latter refers to the process by which

it is decided which venues receive a sanction to be able to host a top-tier event and what the

terms of that sanction are. I call this a quasi-market for two reasons. First, it is not clear how

this "market" was established. It appears to be the case that many top-tier tournaments believe

that they had membership rights that were established within the ATP in 1989 and that these

rights denoted the tier at which each member's tournament would take place. In this view, the

membership right illegitimately has been converted to a ten-year sanction by the ATP.[17] Second,

whether or not this conversion was legitimate, the present arrangement for the granting of

---

[15] A corroboratory view is provided by Annette Koring, GTF marketing director, in her deposition on November 9, 2007, where she states (p. 88): Q: "What events would you regard as competition to the Hamburg Men's Tournament?" A: "We do not have any other tennis tournament here in Hamburg. Of course we have soccer clubs here and some spilling playing into the Federal league, but these are different customers and therefore, I do not consider them to be direct competitors to us…. In this and this context I do not see any competitor."

[16] See, for instance: Los Angeles Memorial Coliseum Commission v. National Football League, 726 F.2d 1381 (9th Cir.1984); McNeil v. National Football League, 777 F. Supp 1475 (Minn. 1991); NCAA v. Board of Regents of University of Oklahoma, 468 U.S. 85, 132-133 (U.S.1984); Chicago Professional Sports Limited Partnership v. NCAA, 961 F.2d 667, 673-74 (7th Cir.1992); American Needle, Inc. v. New Orleans Louisiana Saints, 385 F.Supp.2d 687, 696 (N.D.Ill.2005); Metropolitan Intercollegiate Basketball Ass'n v. National Collegiate Athletic Ass'n, 339 F.Supp.2d 545, 549 (S.D.N.Y. 2004).

[17] A March 16, 2007 email from TPL lawyer Richard Barrat at Morgan, Lewis & Bockius in London appears to agree that there are legal issues with the conversion of memberships into sanctions. He writes: "Clearly the sanction application is removing a right from the tournaments that they currently have, i.e., the right to decide how to exploit their TV and related rights. It is for them to determine whether this is acceptable to them." Exhibit 380, at EML0779835.

15

sanctions is clearly not founded in market principles; rather, there is an administrative process that appears to be stilted to favor certain groups or individuals within the ATP.[18]

The production of top-tier men's professional tennis also has a number of joint outputs. In particular, as an outgrowth of the production of top-tier men's professional tennis and its live competition, there is also the production of broadcasting rights to tournaments, the production of sponsorship rights to tournaments, the production of merchandising rights and the production of concessions rights. These joint products differ in some of their characteristics, but they do not alter the fundamental conclusion already derived. The joint products are sold because of their unique connection to the market for the production of top-tier men's professional tennis and they are sold within the United States and globally.

The geographical market for the production of men's professional tennis is the world. As Mark Miles states in his transition memorandum to Etienne de Villiers: "This is a world wide sport and a world wide circuit."[19] Unlike MLB, the NFL, the NBA or the NHL, which are produced and marketed overwhelmingly in North America, or the PGA and LGPA which sponsor tours in North America, or the national European soccer leagues, which play within a given country, the ATP Masters' and the Grand Slam tournaments are conceived of as a worldwide product, with tournaments spanning four continents.[20] Accordingly, the product is produced and sold in the United States and around the world.

---

[18] I will discuss aspects of this stilted process below in the text. One striking example of the favoritism occurred during the bid process for an ATP 500 tournament and can be cited here. While the bidding instructions stated that the sanction would go to the highest bidder, according to ATP0617911, Doha bid twice the prize money and 17 times the premium ($10 million versus $573,500) as Dubai, yet the ATP awarded the sanction to the Tiriac-owned Dubai membership.
[19] In his deposition (p. 79), Perry Rogers also states that the market exists globally and in the United States.
[20] Other sporting competitions, such as the pan-European Champions League, cover a group of countries, but are still not worldwide in scope.

16

In contrast to the sharp distinction in performance measures across the tiers of the ATP tours, the performance differences across regions of the world are more muted, as shown in Table Three below.

**Table Three**
**Masters Tournament Averages Across Regions**
**2004-2007**

| Masters Tier | Regions | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Tournament days | Americas | 9.00 | 9.00 | 9.25 | 9.50 |
| | Europe | 7.00 | 7.00 | 7.00 | 7.40 |
| Ticket revenue per spectator | Americas | $20.6 | $22.2 | $23.2 | n/a |
| | Europe | $18.8 | $18.1 | $15.7 | n/a |
| Sponsorship revenue per day | Americas | $639,193 | $729,009 | $740,096 | $739,987 |
| | Europe | $497,682 | $534,895 | $577,517 | $560,123 |
| Financial commitment per day | Americas | $470,458 | $476,114 | $482,269 | $472,593 |
| | Europe | $406,249 | $348,158 | $336,093 | $325,933 |
| ATP fee per day | Americas | $20,842 | $20,774 | $20,470 | $19,932 |
| | Europe | $33,851 | $29,138 | $27,707 | $22,677 |
| Number of tournaments reporting | Americas | 4 | 4 | 4 | 4 |
| | Europe | 4 | 4 | 4 | 3 |

Sources:
ATP0082512-541;
http://www.tennis-data.co.uk/alldata.php.

Naturally, joint products are also sold primarily to national or regional markets with varying characteristics, but in the aggregate top-tier men's professional tennis is conceived of, produced as and marketed as an international product.

Another element of market definition is supply substitutability. That is, with an attractive change in relative prices, can new companies enter the market in question, such that the original company would not be able to profitably sustain a small, but significant non-transitory increase in price? Stated differently, is entry into the market easy or is the market contestable? The answer in the market for the production of top-tier men's professional tennis is that entry into the market is effectively blocked because of the collusion between the ATP cartel and the ITF. This point will be elaborated in the section below on market power.

18

## V. Market Power

Without market power, anticompetitive acts are not likely to have anticompetitive outcomes. With market power and significant barriers to entry, anticompetitive acts are likely to lead to anticompetitive outcomes that lower market efficiency and consumer welfare. This has been the case in top-tier men's professional tennis.

One important indicator of market power is the market share possessed by a producer. In this case, the ATP cartel and the ITF (with the Grand Slam committee) are the only producers of top-tier men's professional tennis tournaments.[21] The two organizations work together to support each other's events. The four corresponding national tennis federations run the four Grand Slam tournaments (Australian Open, French Open, Wimbledon and the U.S. Open) and accept the ranking points that a player earns in the ATP circuits as the basis for both the selection and seeding of players in these tournaments. Further, the ATP cartel and the ITF coordinate their schedules such that neither the Grand Slams nor the Davis Cup events compete directly with the ATP top-tier events. Also, the ATP creates geographic and court-surface swings that lead up to and promote the Grand Slam tournaments. In addition, many of the top-tier men's tournaments on the ATP's Masters' circuit are very valuable assets, selling sometimes for over $50 million, and are owned by the corresponding country tennis federation. Thus, for example, the French Masters is owned by the French Tennis Federation, the Rome Masters is owned by the Italian Tennis Federation, the Canadian Masters is owned by the Canadian Tennis Federation, and the U.S.T.A. holds the rights to convert a loan to the Indian Wells Masters into ownership equity in that tournament. Consequently, several of the component organizations of the ITF, i.e., the

---

[21] As noted earlier, the national tennis federations of the United States, France, England and Australia form the Grand Slam committee and they also are generally regarded as the most powerful federations within the ITF. Thus, although the ITF and the Grand Slam committee are nominally separate entities, their structures and operating practices ensure a very strong overlap of perspectives.

national tennis federations, have a direct equity stake in the success of the ATP Masters (to be the ATP 1000) series.   Finally, according to parts of the record in this case, the ITF has co-owned the Masters Cup with the ATP.  It is unclear whether the ITF continues to hold an equity stake in the Cup, but it appears that its financial fortune is still linked to the Cup.  At a press conference in London on July 3, 2007, Mr. de Villiers was asked about the four-year Cup commitment to the O2 facility in London commencing in 2009: "Q. Is there any ITF involvement at all? A. The ITF and the Grand Slam Development Fund benefit from the event by way of a grant that is made.  We have the active support of the Grand Slams, as well."[22]  The ATP cartel and the ITF, therefore, have grown co-dependent and the resulting hand-in-glove collaboration between the two entities effectively exercises monopoly control over the industry.

Thus, the ATP cartel is able to control the production of premier men's professional tennis.  It, in turn, wields this control through anticompetitive acts, to be analyzed in the next section, to exclude the entry of potential competitors.  By requiring the top fifty players to participate in at least 16-plus of its top-tier events, by fixing the prize money associated with each event, by unilaterally choosing the host venues for the premier tournaments, by implementing asphyxiating controls over "special" (read: independent) events, and by pooling its broadcasting and sponsorship rights, among other acts, the ATP cartel has made it either prohibitively expensive or impossible for independent tournaments and, hence, independent tours to succeed.  The new regulations that the ATP plans to introduce in 2009, known as the Brave New World, would only extend and make more draconian these controls.  Supply substitution is thereby foreclosed under current arrangements.

Mr. Franulovic also opined on this dynamic in his deposition.

---

[22] ASAP Sports, Fast Scripts, "ATP Tour Announcement," July 3, 2007.

Q: Is it true, sir, that the ATP and certain of its officers and directors, agreed

to implement the services of top tennis players by imposing mandatory

player restrictions and penalties that effectively eliminated players' ability

to participate in tournaments excluded from the Masters 1000 tier?

A: Yes.[23]

If the ATP cartel faced competition or potential competition, it would not have the power

to fix prices in the player services market, which it does by setting the amount and distributional

forms of prize money, resulting in a low player share in revenue as well as a regime of stiff

sanctions. Further, it also would not have the power to extort public subsidies for facility

construction or command tour sanction purchases in excess of $20 million. Lastly, the ATP

cartel would not have the ability to artificially reduce output of top-tier tournaments and to

decide upon their location irrespective of the competitive forces of the marketplace.

## VI. Anticompetitive Acts

### A. Reduction of Output

When the ATP tour was first formed in 1990, there were 11 top-tier tournaments.[24]

Subsequently, the number was reduced to nine championship tournaments and in 1994, the top

tour was named the "Super Nine Series." When the "Super Nine Series" was established,

Section 2.6 of the corresponding Agreement expressly contemplated adding a tenth top-tier

---

[23] Deposition of Mr. Franulovic, p. 275.
[24] This number comes from the transition memorandum that Mark Miles sent to Etienne de Villiers in 2005.
Exhibit 272.

tournament in Asia.[25]  Nonetheless, the ATP's Brave New World plan calls for the number to be further reduced to 8 top-tier tournaments in 2009.[26]

It is the hallmark of monopoly power that output is reduced below what it would be in a competitive industry.  By reducing output, the monopolist gains the ability, given a downward sloping demand curve denoting the inverse relationship between price and quantity demanded of a product, to raise prices.  A monopolist may thereby maximize its profits, but, as economic theory has clearly shown, this behavior lowers economic welfare by creating dead weight loss.

In the current matter, this welfare lowering decision is all the more striking since demand for top-tier tennis has been growing over the past seven years.  Average attendance at Masters' tournaments has increased by over 20,000 from 135,616 in 2000 to 156,385 in 2006.  This represents a compound annual growth rate in tournament attendance of 2.4 percent since 2000.  To be sure, the growth rate has been accelerating; between 2000 and 2002 the compound annual growth rate in attendance was 0.7 percent, while between 2002 and 2006 the compound annual growth rate in attendance was 3.3 percent.  Television and sponsorship revenues are also once again on the rise.  TPL net revenues grew from $4.73 million in 2004 to $6.33 million in 2006, i.e., they grew by an impressive 33.8 percent over this two-year period.[27]

Although the prices that will be charged at Masters' events in 2009 as well as the broadcasting rights fees and sponsorship revenue are not yet known, we do know that Etienne de Villiers has claimed that there will be at least an immediate 20 percent jump in ATP revenues when the Brave New World is implemented.[28]  Since output will be reduced from 9 to 8

---

[25]  Complaint, Monte-Carlo Country Club v. ATP Tour, Inc., April 9, 2007, p. 12.
[26]  The ATP has pursued a policy of reducing the overall number of tournaments at all three levels.  It sponsored a total of 83 tournaments in 1996 and 68 in 2002.  If the Brave New World plan is implemented, the three levels will have a total of 61 tournaments.
[27]  ATP0077281.
[28]  Complaint, The Monte-Carlo Tennis Club v. ATP Tour, Inc., p. 20.

tournaments, or by 11.1 percent, this suggests that Mr. de Villiers is anticipating an average price increase on the order of 30 percent or more.

This strategy by a monopolist of lowering output and raising prices is frequently called "creating artificial scarcity." Tellingly, an ATP strategy document explicitly embraces this strategy of creating "scarcity value and selling for a premium."[29]

## B. Restrictions on the market for player services

The Brave New World plan contemplates several additional restraints on the market for player services. First, it imposes a new and draconian requirement that the top 50 players participate in all eight of the eight Masters or ATP 1000 tournaments.[30] Although players today are expected to participate in all nine Masters tournaments, this expectation is not enforced with any sanctions until after a player has missed three Masters events in a given year. Under the Brave New World, stiff sanctions will be implemented immediately. For failing to participate in one ATP 1000 event, a player will: (a) get zero points for this missed tournament and not be able to make up the missed points; (b) be automatically suspended at the next top-tier (ATP 1000) tournament at which he earned the most points during the preceding twelve months; and, (c) lose a share of his potential prize bonus.

This policy robs a player of free choice and the ability to self-optimize career decisions. A non-injured player cannot exercise his own discretion about participating in an ATP 1000 tournament, without facing a severe penalty. The policy also combines with other participation rules, as we shall see below, to make it both very difficult and very expensive to hold an

---

[29] ATP0065816, pp. 57-61, at 61.
[30] Nominally, players have been "obligated" to play in all nine Masters tournaments since 2001, but this policy was not enforced with any meaningful sanctions.

23

attractive independent tournament, as well as to make it more difficult and expensive for the lower tier ATP 500 and ATP 250 levels to hold a popular event.

The decision to implement this 8 of 8 requirement comes at a peculiar time. The top ten players on the ATP circuit have been increasing their participation levels over the last four years. The average Masters tournament enjoyed the participation of 7.11 of the top ten players in 2004, 7.56 players in 2005, 7.89 players in 2006, and 9.22 players in 2007. This steady and significant increase has occurred without the application of any of the sanctions contemplated in the Brave New World plan for 2009.[31] Indeed, it comes at a time when the average annual bonus pool for the top eight players went from $9.75 million during 2000-02 to zero during 2003-06, and reached only $3 million in 2007,[32] suggesting that with more appealing financial incentives the participation rate of the top ten could have been pushed even higher.[33]

Mark Miles, the ATP CEO for fifteen years between 1990 and 2005, stated in deposition that he did not believe the 8 of 8 requirement was the best way to proceed. He favors three or four mandatory combined tournaments with the WTA, maintaining nine Masters events, and giving the players some choice regarding participation in the remaining top tournaments.

The discussions of the ATP Board of Directors over the years also suggest that the notion of preserving some flexibility for the players was almost always present. For instance, ATP

---

[31] It has been suggested in some of the depositions that the primary need for the 8 of 8 policy is to make sure that the top players participate in the new Shanghai ATP 1000 tournament, lest these stars would not want to travel all the way to Asia. Perhaps, but such a motive would not justify the imposition of such market restraints. If players experience a strong disutility in making the trip to Shanghai, the appropriate market remedy is to raise the financial incentives for participation. In U.S. labor law, if there were arms' length collective bargaining, the union could bargain away some free labor market rights in exchange for other benefits. In this case there is no collective bargaining and there is no arms' length representation of the players' interests. The top players themselves strongly objected to the 8 of 8 requirement, the downgrading of Hamburg and Monte Carlo, and the reworking of the tournament schedule in a March 2007 letter to Mr. de Villiers (Exhibit 161). This letter called the changes "unacceptable," among other things.

[32] ATP0083228. It is also true that the average prize money paid out to the top ten players has actually gone down since the mid-1990s, and, in real terms, this drop has been over 20 percent.

[33] Of course, scheduling and rule accommodations may also contribute here, and the ATP is making some promising reforms along these lines. The potential success of these efforts is yet another reason why it is unnecessary to resort to the new stringent restraints contemplated in the Brave New World plan.

consultants Deloitte & Touche issued a report in July 2006 that contained a proposal that the top 14 to 16 players be required to play in six of eight Masters events in any given year and to play in all eight over a period of two years.[34]   It was not until October of 2006 at the Board of Directors meeting in London that a consensus to move forward with the compulsory 8 of 8 policy was developed.  In his deposition, George Ciz, ATP business development manager, suggested that a crucial element of this decision was market "research" conducted by Comperio that concluded the best way to garner an improved broadcasting contract was by guaranteeing the participation of the top players.[35]  This "research" seems to have consisted of nothing more than Comperio interviewing network executives who stated that they would find it more attractive to televise a tournament if it was guaranteed that the top players would participate.  Such a preference would be obvious to any thoughtful person; the ATP did not need Comperio to speak to network executives to ascertain it.[36]

The operative questions are different: how much additional value is created for a tournament when 8 instead of 6, or 9 instead of 8, or 10 instead of 9, of the top ten players participate? And at what cost does it come to coerce this additional player participation?  Does it, for instance, result in a higher rate of injury, fatigue, resentment, bad will, or half-hearted effort?

The extra value created by having fuller participation from the top players can be estimated with econometrics.  Using data from all ATP tournaments during 2000-06 and also from just Masters tournaments during this period, I tested different models to estimate how higher participation rates of the top 10 players affected the average daily attendance at the

---

[34] ATP0052699.

[35] Ciz deposition, pp. 44-47.

[36] Also bizarre was the explanation that Perry Rogers, a player representative on the board of directors, gave of the decision to accept 8 of 8.  Rogers represented the concession from the player representatives as a quid pro quo for the board's agreement to accept the pooling of television rights (and he later added brand architecture.)  But pooling of television rights had existed for almost a decade and brand architecture did not represent an asymmetric benefit for the players.  TPL consultant Peter Lawler's email to various ATP executives and board members on November 4, 2007 (Exhibit 368) also states that he does not understand why these items would be viewed as exchanges.

tournament. The tests for all three tournament tiers together are more robust because they contain almost seven times as many observations, and, hence, allow for more complete modeling and more reliable coefficients. Nonetheless, the basic results from both sets of tests reinforce each other.

Table Four presents the results from a model where player participation is measured as a linear variable for the first nine of the top ten players who participate in a tournament and a second binary variable is added to measure whether or not all ten of the top ten players participate. The model also includes a separate binary variable that denotes whether the number one ranked player participates, even if not all the other top ten players participate, and another variable reporting the number of top ten players from the country that is hosting the tournament. The results are straightforward. For all three tiers together, on average for each additional top ten player (from one to nine) who participates, daily attendance grows by 787 fans. This relationship is statistically significant at the .01 level. When the tenth top ten player also participates, the result has no statistically significant effect on daily attendance. If the number one player participates but not all the other top ten players do, it raises average daily attendance by 1,112 at a .05 significance level. For each top ten player from the host country, average daily attendance increases by 696 players, also at the .05 significance level. In relation to arguments made earlier, in this modeling, average daily Masters' attendance is 5,119 above International Series' attendance (.05 significance level) and combined tournaments with the WTA adds 2,098 to average daily attendance (.01 significance level). Having a separate WTA Tier 1 tournament the same weekend as a Masters' tournament has no statistically significant impact on attendance at the Masters event.

For present purposes, the key result is that there is no payoff from compelling all ten of the top ten players to participate. The central result for the Masters-only sample is that there is no payoff at all in this model for increased top ten participation.

Given that the Masters tournaments averaged 9.22 out of 10 of the top ten players in the most recent year, this result implies that if the Brave New World 8 of 8 rule were in effect, and if the rule had its intended participation outcome, then there would have been no statistically significant financial gain for the Masters events.

**Table Four**
**Determinants of Match Attendance I**
**(Dependent Variable: Attendance Per Day)**

| | Model 1 A All Tiers | | Model 1 B Masters Only | |
|---|---|---|---|---|
| | Coeff | Std Err | Coeff | Std Err |
| Number of top 10 players participating (max 9) | 787.5*** | 196.9 | 561.2 | 875.0 |
| All top 10 players participate | 1,106.3 | 1,101.4 | 1,070.9 | 2,910.4 |
| No. 1 player participates (all top 10 do not) | 1,112.0** | 513.6 | 1,571.3 | 1,363.0 |
| No. of top 10 players born in country of tournament | 695.9** | 342.4 | 1,761.6 | 1,876.0 |
| Tier: International Gold | 222.7 | 956.5 | | |
| Tier: Masters | 5,118.9** | 2,150.6 | | |
| Combined with WTA | 2,097.9** | 862.1 | 2,930.5 | 4,493.4 |
| WTA Tier 1 event same week as non-combined Masters | -2,409.2 | 1,604.0 | -2,828.8 | 1,879.2 |
| Number of matches per day | 441.7 | 393.5 | | |
| Region: Americas | 1,203.3 | 861.4 | | |
| Region: Europe | 561.0 | 975.9 | | |
| Indoor | 1,627.8 | 1,108.1 | | |
| Surface: Carpet | 299.6 | 1,236.3 | | |
| Surface: Clay | -1,956.5** | 863.7 | | |
| Surface: Grass | -1,590.2 | 2,104.0 | | |
| No. of weeks before Grand Slam (max 4) | 71.7 | 309.0 | | |
| No. of weeks after Grand Slam (max 4) | -326.7 | 240.8 | | |
| Spring in country of tournament | 908.1 | 985.9 | | |
| Fall in country of tournament | -102.3 | 843.7 | | |
| Summer in country of tournament | 2,545.1*** | 919.8 | | |
| Average temperature: Degrees below 60 F (outdoor only) | -0.8 | 126.9 | | |
| Average temperature: Degrees above 80 F (outdoor only) | -187.9 | 178.6 | | |
| 2001 | 131.3 | 293.2 | | |
| 2002 | -141.0 | 399.3 | | |
| 2003 | 211.8 | 399.1 | | |
| 2004 | 810.9* | 443.4 | | |
| 2005 | 985.7** | 405.0 | | |
| 2006 | 1,038.1** | 397.2 | | |
| Constant | 1,648.7 | 2,217.8 | 12,326.8** | 5483.2 |
| Number of observations | 435 | | 63 | |
| Adjusted $R^2$ | 0.746 | | 0.395 | |

Notes:
Significance levels: .01 = ***, .05 = **, .10 = *.

Sources:
See Appendix A.

The models in Table Four impose a constraint that the relationship between daily attendance and top ten player participation is linear. In the models presented in Table Five this constraint is relaxed by treating top ten player participation as pair dummies, i.e., there is a variable that equals one when either one or two of the top ten participate, another when either three or four of the top ten participate, another when either five or six participate, and so on. The results for the auxiliary or control variables are very similar to those in Table Four. In Model 2a, the largest jump in attendance occurs when a tournament increases its participation of top ten players from 5 or 6 up to 7 or 8. At a .01 significance level, this participation jump causes average daily attendance to increase by 2,581.[37] This increase is 3.5 times as large as the increase (745) when 9 or 10 top ten players participate instead of 7 or 8. In Model 2b, which adds the top ten participation levels lagged one year, the ratio of the attendance jump between the two attendance levels increases to 5.0. For the lagged variables, the results are yet stronger. When the number of top ten players participating the previous year increases from 5 or 6 to 7 or 8, the average daily attendance this year jumps by 2,124; when the number of top ten players participating the previous year increases to 9 or 10, the average daily attendance this year actually falls by 457. The upshot of these tests is that the addition of a ninth and tenth or a tenth player from among the top ten either has no statistically significant impact on attendance, or it has a considerably smaller impact than having a 7th or 8th top player. There are separately positive impacts from having the number one player and from having local stars in a tournament. Given these results, there seems to be a financial reason to motivate high top player participation,

---

[37] This result reinforces the earlier market definition of top-tier tennis. That is, when 7 or 8 or the top ten players participate, tennis fans perceive that the tournament has a championship quality. When fewer than 7 top players participate, then the tournament will still have an appeal as fans will be able to see many of the world's best players, but the tournament itself will not generally present the opportunity to see which of the very top players prevail in a competition against each other. That is, when less than a solid majority of the top players competes, the tournament takes on more of the flavor of an exciting exhibition. When seven or more of the top ten play, then becomes a true competition for the highest rankings in men's tennis.

29

but the extra boost from trying to coerce full participation either does not exist or it exists with sharply diminishing returns.

Table Five
Determinants of Match Attendance II
(Dependent Variable: Attendance Per Day)

| | Model 2 A All Tiers | | Model 2 B All Tiers | |
|---|---|---|---|---|
| | Coeff | Std Err | Coeff | Std Err |
| 1 or 2 top 10 players participate | 1,333.2** | 552.9 | 992.7** | 459.9 |
| 3 or 4 top 10 players participate | 3,275.8*** | 817.3 | 2,628.5*** | 756.8 |
| 5 or 6 top 10 players participate | 2,571.8** | 1,055.5 | 2,116.5* | 1,242.8 |
| 7 or 8 top 10 players participate | 5,153.1*** | 1,772.1 | 4,349.0** | 1,768.0 |
| 9 or 10 top 10 players participate | 5,898.0*** | 2,205.7 | 4,793.7*** | 1,510.6 |
| No. 1 or no. 2 players participate (9 or 10 top 10 do not) | 696.7* | 358.4 | 633.3* | 345.5 |
| No. of top 10 players born in country of tournament | 787.0** | 344.8 | 746.2** | 307.4 |
| Tier: International Gold | 475.4 | 943.7 | 195.7 | 959.8 |
| Tier: Masters | 7,073.0*** | 2,232.2 | 5,566.9** | 2,698.2 |
| Combined with WTA | 2,087.5** | 912.4 | 2,522.5** | 953.4 |
| WTA Tier 1 event same week as non-combined Masters | -2,598.0 | 1,571.0 | -2,853.3 | 1,986.8 |
| Number of matches per day | 413.7 | 401.3 | 119.2 | 420.4 |
| Region: Americas | 1,342.5 | 871.3 | 1,582.9* | 821.8 |
| Region: Europe | 681.3 | 1,023.7 | 1,147.6 | 971.6 |
| Indoor | 1,595.9 | 1,191.7 | 1,507.0 | 1,170.1 |
| Surface: Carpet | 191.4 | 1,249.7 | -244.2 | 1,156.7 |
| Surface: Clay | -2,102.3** | 874.6 | -1,976.3** | 823.2 |
| Surface: Grass | -1,566.1 | 2,130.3 | -1,754.0 | 1,919.3 |
| No. of weeks before Grand Slam (max 4) | 2.2 | 303.3 | -31.7 | 288.9 |
| No. of weeks after Grand Slam (max 4) | -358.5 | 249.4 | -334.8 | 249.4 |
| Spring in country of tournament | 1,081.3 | 991.3 | 759.9 | 1,011.7 |
| Fall in country of tournament | -49.1 | 866.3 | 226.3 | 772.0 |
| Summer in country of tournament | 2,615.2*** | 914.5 | 2,487.4*** | 879.9 |
| Average temperature: Degrees below 60 F (outdoor only) | 17.5 | 120.4 | 34.5 | 133.9 |
| Average temperature: Degrees above 80 F (outdoor only) | -195.7 | 174.1 | -138.3 | 201.4 |
| 2001 | 364.3 | 302.5 | omitted | |
| 2002 | -33.6 | 433.6 | -426.9 | 322.6 |
| 2003 | 399.7 | 424.6 | -241.6 | 338.7 |
| 2004 | 758.9 | 459.5 | 81.8 | 410.1 |
| 2005 | 1,149.6*** | 433.7 | 646.8 | 444.2 |
| 2006 | 1,121.6*** | 422.8 | 940.3* | 477.2 |
| Lag of 1 or 2 top 10 players participate | | | 584.9 | 414.9 |
| Lag of 3 or 4 top 10 players participate | | | 2,247.7*** | 614.2 |
| Lag of 5 or 6 top 10 players participate | | | 2,022.7** | 862.5 |
| Lag of 7 or 8 top 10 players participate | | | 4,147.0** | 1,795.0 |
| Lag of 9 or 10 top 10 players participate | | | 3,690.2* | 2,201.1 |
| Lag of no. 1 or no. 2 players participate (9 or 10 top 10 do not) | | | 301.2 | 447.6 |
| Lag of no. of top 10 players born in country of tournament | | | 435.9 | 278.8 |
| Constant | 1,673.1 | 2,246.7 | 2,731.1 | 2,234.1 |
| Number of observations | 435 | | 346 | |
| Adjusted $R^2$ | 0.742 | | 0.754 | |

Notes:
Significance levels: .01 = ***, .05 = **, .10 = *.
Sources:
See Appendix A.

In addition to the 8 of 8 regulation, the Brave New World also requires the top fifty players to play in each of the four Grand Slam tournaments and in four of the eleven ATP 500 tournaments. Players also may earn ranking points by participating in up to two ATP 250 tournaments. Overall, the plan requires the top fifty players to participate in sixteen tournaments and provides incentives for them to participate in eighteen tournaments.

The four Grand Slams and two of the Masters tournaments last for approximately two weeks. So, if a top player plays in, say, 20 tournaments a year, then he is potentially involved in tournament play for 26 weeks a year. Given the frequent and often distant travel, the necessary training and recuperation period, and the other demands on the time of the leading players, there is a reasonable limit to the number of tournaments a player can enter. As travel has become more onerous and the demands for endorsement and promotional efforts have multiplied, the reasonable limit on the number of tournaments seems only to have grown shorter over time. Moreover, the Brave New World plan contemplates creating an additional two to four combined tournaments with the WTA, which is likely to add an additional two to four weeks to a top player's schedule as he attempts to complete the full ranking point circuit of eighteen tournaments.

**Table Six**
**No. 1 Player, Average Number of Events by Series and Year**

| Series | 2004 | 2005 | 2006 | 2007 | Average |
|---|---|---|---|---|---|
| Grand Slam | 4 | 4 | 4 | 4 | 4.00 |
| International Gold | 2 | 2 | 2 | 1 | 1.75 |
| International | 3 | 3 | 3 | 1 | 2.50 |
| Masters | 6 | 5 | 7 | 9 | 6.75 |
| Masters Cup | 1 | 1 | 1 | 1 | 1.00 |
| Challenger | 0 | 0 | 0 | 0 | 0.00 |
| Olympics | 1 | 0 | 0 | 0 | 0.25 |
| Davis Cup | 2 | 1 | 1 | 1 | 1.25 |
| World Team Cup | 0 | 0 | 0 | 0 | 0.00 |
| TOTAL | 19 | 16 | 18 | 17 | 17.50 |

**Top 2 Players, Average Number of Events by Series and Year**

| Series | 2004 | 2005 | 2006 | 2007 | Average |
|---|---|---|---|---|---|
| Grand Slam | 4.0 | 4.0 | 3.5 | 4.0 | 3.88 |
| International Gold | 1.5 | 2.5 | 2.0 | 1.5 | 1.88 |
| International | 5.0 | 5.5 | 3.0 | 2.5 | 4.00 |
| Masters | 6.0 | 5.5 | 7.0 | 9.0 | 6.88 |
| Masters Cup | 1.0 | 0.5 | 1.0 | 1.0 | 0.88 |
| Challenger | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 |
| Olympics | 1.0 | 0.0 | 0.0 | 0.0 | 0.25 |
| Davis Cup | 3.0 | 1.5 | 1.0 | 0.5 | 1.50 |
| World Team Cup | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 |
| TOTAL | 21.5 | 19.5 | 17.5 | 18.5 | 19.25 |

**Top 5 Players, Average Number of Events by Series and Year**

| Series | 2004 | 2005 | 2006 | 2007 | Average |
|---|---|---|---|---|---|
| Grand Slam | 3.8 | 3.8 | 3.8 | 4.0 | 3.85 |
| International Gold | 1.6 | 2.6 | 2.6 | 3.0 | 2.45 |
| International | 5.6 | 6.0 | 7.0 | 5.8 | 6.10 |
| Masters | 7.2 | 6.2 | 7.8 | 8.8 | 7.50 |
| Masters Cup | 1.0 | 0.4 | 1.0 | 1.0 | 0.85 |
| Challenger | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 |
| Olympics | 0.8 | 0.0 | 0.0 | 0.0 | 0.20 |
| Davis Cup | 2.6 | 2.0 | 2.0 | 1.4 | 2.00 |
| World Team Cup | 0.2 | 0.0 | 0.4 | 0.2 | 0.20 |
| TOTAL | 22.8 | 21.0 | 24.6 | 24.2 | 23.15 |

**Top 10 Players, Average Number of Events by Series and Year**

| Series | 2004 | 2005 | 2006 | 2007 | Average |
|---|---|---|---|---|---|
| Grand Slam | 3.5 | 3.7 | 3.8 | 4.0 | 3.75 |
| International Gold | 1.9 | 2.6 | 2.3 | 2.6 | 2.35 |
| International | 5.1 | 5.8 | 6.6 | 6.3 | 5.95 |
| Masters | 6.8 | 7.1 | 7.5 | 8.3 | 7.43 |
| Masters Cup | 0.8 | 0.7 | 0.8 | 0.8 | 0.78 |
| Challenger | 0.0 | 0.1 | 0.0 | 0.1 | 0.05 |
| Olympics | 0.5 | 0.0 | 0.0 | 0.0 | 0.13 |
| Davis Cup | 1.7 | 2.0 | 2.2 | 1.7 | 1.90 |
| World Team Cup | 0.2 | 0.2 | 0.6 | 0.2 | 0.30 |
| TOTAL | 20.5 | 22.2 | 23.8 | 24.0 | 22.63 |

During 2004-07, as shown in Table Six, the top ten players played in an average of 22.6

tournaments[38], the top five in 23.15, the top two players in 19.25 and the top player (Roger

Federer in each of the four years) in 17.5.[39]  With the Brave New World participation

requirements and sanctions, there would be a minimum of 16 required tournaments (4 Grand

Slam, 8 ATP 1000, 4 ATP 500 events).   The top eight players would also be obligated to play in

the Masters Cup.  At their actual average participation rates during 2004-07, this would leave 0.5

"free" tournaments for the number one player (17.5-16-1), 2.25 "free" tournaments for the top

two players (19.25-16-1), 6.15 for the top five (23.15-16-1), and 6.63 for the top ten (22.63-16).

Of the six free tournaments, the top ten players play in an average of 2.98 events from among the

Davis Cup, the Masters Cup and the World Team Cup, and the top five play in 2.2 from the

Davis Cup and the World Team Cup, thereby reducing the number of "free" tournaments for the

top ten and top five groups to 3.65 (6.63-2.98) and 3.95 (6.15-2.2) tournaments, respectively.

Two of these "free" tournaments are ranking points tournaments at the ATP 250 level, further

reducing the "free" tournaments for the top ten and top five players to 1.65 and 1.95 "free"

tournaments, respectively.  The top player and the top two players on average would be left with

no "free" tournaments.[40]

The 11 ATP 500s and the 39 ATP 250s would be left to compete for these few

availabilities of the top five or ten players, but the top two players would be unavailable given

---

[38]  In Exhibit 370, an email from Mr. de Villiers to Mr. Silva and the ATP Board, Mr. de Villiers presents a chart on
the participation rates of the top ten players from 2002 through 2006.  His data suggests lower overall tournament
participation by the top players than the data in Table Six.  Thus, for instance, Mr. de Villiers' chart reports that in
2006 the top ten players participated in only 19.6 tournaments (in contrast to Table Six which reports 23.8
tournaments) and in 2005 Mr. de Villiers reports 20.2 tournaments (in contrast to Table Six which reports 22.2).  Mr.
de Villiers provides no information on the methodology he employed to make these computations, so I do not use
his chart.  If his participation numbers are more accurate than those appearing in Table Six, then the conclusions in
the text would apply with even greater force and the extremely thin possibilities for designated ATP 500 and ATP
250 tournaments to compete for top players would become still more exiguous.
[39]  The number two ranked player was Andy Roddick in 2004 and Rafael Nadal during 2005-07.
[40]  The top two players have 2.25 "free" tournaments after playing in the Masters Cup, 0.25 "free" tournaments after
playing in the two ATP 250 ranking points tournaments and negative "free" tournaments after participating in the
Davis Cup.

34

historical patterns. The chances of an ATP 500 or ATP 250 of actually landing one of the top

five players would be exceedingly thin. For instance, the average top five player would have

1.95 "free" slots to spread among the 50 tournaments (11 ATP 500 and 39 ATP 250 events) in

the second and third tiers. Of these, six tournaments would already be accounted for[41], so there

would be a total of 9.75 (1.95 x 5) slots for the top five players together to accommodate 44

tournaments; therefore, each tournament on average would receive 0.22 of a top five player

(9.75/44). Again, the biggest draws -- the number one or number two player -- are not available

to any of these tournaments given past participation patterns and the Brave New World

requirements. Needless to say, under these conditions independent tournaments are pretty

effectively shut out of mounting a competitive event, or, much less, a competitive tour. Through

its intended Brave New World policies, then, the ATP forecloses any feasible competition.

This is an express, anticompetitive intent of the Brave New World as evidenced by ATP

documents and testimony. Traditionally, ATP tournaments have been able to compete with one

another for players. In fact, until approximately 2000, the ATP intentionally downplayed the

differences among its tournament categories which helped to encourage player participation at

every level.[42]   Even since 2000, when the Masters Series was renamed as such and players were

encouraged to play those tournaments via ranking and other incentives, players have traditionally

accepted "zero points" at Masters Series tournaments so as to play tournaments at lower levels

that were more appealing to them. Andy Roddick in 2004, for instance, played an International

Series event in Houston rather than the Monte Carlo Masters Series event, resulting in Mr. Tiriac

"cursing" at the players and a member of the ATP Board of Directors suggesting that players be

---

[41]  Each of the top fifty players are required to play in 4 ATP 500s and strongly incentivized to participate in two
ATP 250s, accounting for these six tournaments.
[42]  Exhibit 78 at ATP0054917-18; Exhibit 79 at ATP0054914.

sanctioned.[43]   Further, from 2002 to 2006, top 10 players averaged 1.8 "zero pointers" a year, illustrating that, traditionally lower-tier tournaments have had some success in competing for player services, as players have been willing to take zero pointers while still playing approximately 20 events a year.[44]

The anticompetitive thrust of these policies is laid bare in the Mark Miles' transition memorandum, where he tells Etienne de Villiers that if the ATP Tour were reorganized "to create more down time for players to rest, recover and refresh, the Tour would only be creating its own competition and would not achieve the desired result."

Yet another restraint of trade imposed by the ATP is that it fixes the prize money that tournaments at each level can pay out.  This price fixing not only restricts the tournaments' ability to compete with each other to attract the best players to their events, but it lowers the money paid out and prize money share in total revenue below what it would be absent this restraint of trade.  At the participation levels of the top players in recent years, as shown above, the ATP 500 and ATP 250 tournaments have little, if any, chance of attracting the best players. The fact that the ATP fixes the prize money that these tournaments can award makes it still more difficult to allure these players to their tournaments.  The lower two tiers of tournaments, however, are allowed to offer the top stars appearance guarantees in addition to prize money. These guarantees can run as high as $500,000 or more per tournament for the very top players, such as Roger Federer or Rafael Nadal.  With more of the top players' schedules taken up by the compulsory ATP 1000 events, their availability for the lower tier tournaments will grow ever more scarce, and, hence, the price of appearance fees will likely increase.  Not only does this challenge the economic viability of these lower tier tournaments, but it engenders a perverse incentive, because the appearance fees can well exceed (and do so substantially) the prize money

---

[43] See Ex. 359, ATP 136994-95.
[44] See Ex. 355, ATP 546662.

for finishing first. Under such circumstances, it is less likely that the star player will play at the top of his game during the tournament, thereby, undermining part of the value of bringing him in the first place.

The other outcome of the price fixing of prize money is that players are paid less than they otherwise would be, thereby raising the profitability of the top-tier tournaments and the ATP. One telling statistic is the low player compensation share in total Masters revenue. Table Seven reveals that the share of player compensation in total revenue from Masters tournaments was 22.2 percent in 2007 and that it averaged 24.3 percent during the last five years. These shares are less than half of the lowest levels prevalent in the other major U.S. sports, such as the NFL, NBA, NHL and MLB, where the player salary share in total league revenue varies between 50 and 65 percent.[45]

---

[45] This sharp disparity is explicitly recognized in Deloitte & Touche's November 2006 consulting report to the ATP wherein they refer to the low share of player salary in ATP revenues as a "relatively small proportion of overall revenues compared to team sports." Exhibit 24, at 9.

**Table Seven**
**ATP Tournaments**
**Financial Commitment and Revenue**
**2003-2007**

|  | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| **Masters Tier** |  |  |  |  |  |
| Number of Tournaments Reporting | 9 | 8 | 8 | 8 | 7 |
| Financial Commitment | $29,192,404 | $28,311,472 | $26,888,520 | $27,254,562 | $25,194,231 |
| Total Revenue | $93,787,470 | $95,097,142 | $103,913,418 | $106,484,872 | $100,250,065 |
| *Financial Commitment (% of Revenue)* | 31.1% | 29.8% | 25.9% | 25.6% | 25.1% |
| Adjusted Financial Commitment | $25,835,278 | $25,055,653 | $23,796,340 | $24,120,287 | $22,296,894 |
| *Player Compensation (% of Revenue)* | 27.5% | 26.3% | 22.9% | 22.7% | 22.2% |

Notes:
* According to the applications for an ATP 1000 sanction, of the total financial commitment, 6.5 % goes
  the tour fee, 5.0% goes to the marketing fee, 7.5% goes to the bonus pool and 81% goes to prize money.
  Hence, player compensation is equal to 88.5 percent of the financial commitment.
* Total revenue includes sponsorship, government & other organization support, tickets, hospitality, parking, television, & other revenue.
  Source document does not include financial data for all tournaments played in a given year.

Source: ATP0082512-541.

Still another anticompetitive restraint in the player services market comes in the form of
the ATP's "special events" rule. Special events are events that are not organized by the ATP, the
Grand Slams or the ITF; that is, they are independent or potentially competitive events. The rule,
for instance, precludes players from participating in a special event that is scheduled during the
same week as an ATP Masters or International Gold Series tournament, or within thirty days of
such an ATP tournament if the "special event" takes place within a hundred miles of the ATP
event.

The special events rule is complemented by another anticompetitive rule which grants
date exclusivity to the ATP's Masters series and Masters Cup. As discussed above, the ATP

cartel also coordinates its scheduling with the ITF, the Grand Slams and the WTA to avoid any meaningful competition.

### C. Eliminate Competition in the Hosting Market

The ATP cartel has also sharply restrained competition in the hosting market. It has done this by, first, setting a limit on the number of top-tier tournaments and then dividing up the market horizontally to control which venues receive top-tier sanctions, as well as which dates they receive. The ATP cartel set up a false competition for the awarding of sanctions for the new ATP 1000 series that it intends to establish as part of the Brave New World. In this "competition" three of the eight winners had already been explicitly chosen: Shanghai, Indian Wells and Miami. These tournaments did not have to enter the "competition." The remaining five winners had already been implicitly selected, as existing ATP documents made clear that the Hamburg and Monte Carlo tournaments had been designated for a downgrade.[46] There was no process in place for either an independent and objective process to be undertaken or for there to be a market-driven process that would identify the top tournaments.

Again, ATP board member Mr. Franulovic recognized this anticompetitive practice in his deposition.

---

[46] See, e.g., Exhibit 298 at ATP0348026 (ATP Board PowerPoint presentation dated January 11, 2006 stating: "Too many clay court events in sub optimal conditions (Hamburg, for example)?"); Exhibit 300 at ATP00276023 (E-mail dated March 3, 2006 from Mr. Ciz to Mr. de Villiers "reflecting move of Hamburg" on each proposed draft calendars); Exhibit 307 at ATP0344212 (E-mail dated May 20, 2006 from Mr. Bimes to Mr. de Villiers stating: "100% for Hamburg to move in July"); Exhibit 7 at ATP0008883 (ATP Board PowerPoint presentation dated May 24-25, 2006 stating: "Develop compensation strategy for 'downgrading' Monte-Carlo & Hamburg"); Exhibit 17 at ATP0008381 (ATP Board PowerPoint presentation dated August 26, 2006 stating: "Hamburg moves to summer [in 2009] as Open"); Exhibit 17 at ATP0008388 (ATP Board PowerPoint presentation dated August 26, 2006 stating: "Board agreed to move Hamburg to Summer to create a Masters Combined event on Clay in Europe with 2 leading alternatives: Rome or Madrid?") Exhibit 283 at ATP0549580-81 (Mr. de Villiers manuscript dated January 9, 2007 showing "best guess estimates" of costs of downgrading Monte-Carlo and Hamburg; no other tournaments are mentioned as potential downgrades); Exhibit 161 at ATP0053144 (e-mail from players to Mr. de Villiers dated March 19, 2007 stating that "Unacceptable Issues" include the "Monte-Carlo & Hamburg downgrade").

Q: Is it true that the ATP board members other than yourself and certain

officers have now, as of September 4, September 5, 2007, awarded top-tier

sanctions in the masters 1000 category without regard to competitive merit?

A: Yes.[47]


The actual market restraints, however, are yet more insidious and more disruptive to a

rational production and allocation of tournaments. The forthcoming Shanghai ATP 1000

tournament was awarded its ten-year sanction prior to the "competition." Instead of competing,

Shanghai agreed to pay the ATP approximately $29 million over a period of years.[48] As

Shanghai was vacating its status as host of the Masters Cup, the ATP was also able to make a

deal with London to take over hosting this event. It is projected that the deal with London will

bring the ATP roughly an additional $30 million over the first three years. As these deals

increase ATP revenues, so too do they increase the bonuses, according to the ATP's bonus

structure, received by Etienne de Villiers and other top ATP executives.[49]

Also benefiting from the sanctioning decisions is Indian Wells, the tournament that is 24

percent owned by ATP director since 1990 Charles Pasarell. Not only did Indian Wells not have

to enter the "competition" to be selected as an ATP 1000 host, but it received a Masters' sanction

that runs for 51 years. Thus, despite the fact that there have been numerous complaints about the

Indian Wells grounds and the longer length of its tournament, which, together with its

---

[47] Deposition of Mr. Franulovic, pp. 275-76.

[48] Four ATP 1000 sanctions were made available for the four North American Masters Series events, *i.e.*, Indian Wells, Miami, Canada and Cincinnati tournaments (who were the only ATP members permitted to bid for their "sanction" weeks). In fact, Miami refused to submit an application, on the grounds that it did not accept the application process, but was awarded an ATP 1000 sanction regardless. *See* GTF 00001254. Further, the European Masters Series tournaments were the only tournaments permitted to "bid" for ATP 1000 sanctions in Europe. *See* ATP 0355360. As set forth previously, however, the ATP had decided, long before the receipt of any applications, that Monte Carlo and Hamburg would be downgraded. *See* Fn. 46. In short, there was no open competition or competitive process involved in the assignment of ATP 1000 sanctions.

[49] *See* Exhibit 81 at ATP0342025 (the bonuses directly relate to the three year growth of commercial income - the higher the growth, the higher management bonuses); Exhibit 137 at ATP0205133-139.

combination with a WTA Tier One event, generates higher revenues for Mr. Pasarell, and despite the fact that is over 120 miles from a substantial metropolitan area (Los Angeles) which would assist in the tournament's branding, Indian Wells will face no competitive pressures from other potential ATP 1000 venues for at least until 2053!

Mr. Pasarell has received other favors from the ATP cartel in recent years. For instance, when 50 percent of the Indian Wells tournament was sold in 2005, the tournament was assessed the traditional 10 percent transfer fee by the ATP cartel. The transfer fee is charged on the basis of the asset value of the transfer. Asset value is generally either estimated using one of three standard methodologies or it is taken directly from market offers for the asset in question. Direct market information is more reliable. In this case, Indian Wells had been offered $62 million for its Masters' sanction.[50] Yet Mr. Pasarell told the ATP cartel that his tournament was worth only $20 million and, hence, the assessed transfer fee was 10 percent of $10 million (since half the assets were transferred), or $1 million. When 50 percent of the Miami Masters was sold roughly at the same time, the transfer fee was assessed based on full market value ($40 million). In his deposition, Mr. Pasarell stated that he did not remember whether the ATP had an independent assessment made of the market value of the Indian Wells tournament.

### D. Pooling of Television Rights

When independent producers join together to sell their product as one producer, they gain the ability to exercise monopoly power by lowering output and/or raising prices. Under most circumstances, such behavior is deemed to reduce welfare and is proscribed by antitrust law.

In the 1950s and up until 1961, sports leagues in the United States encountered a twofold problem with the burgeoning television industry. First, some teams in the leagues came from

---

[50] Letter from IMG Vice Chairman, Robert Kain, to Shiekh Mohamed of the Qatar Tennis Federation on January 25, 2006. QTF0047.

very large cities, while other teams came from small cities. The teams from the larger cities were able to earn much higher revenues from their local television contracts, and this engendered a prospective problem with the balanced allocation of player talent across teams. Second, according to existing copyright law at the time, the home team in any contest held the broadcast rights to that game.[51] Thus, if the New York Giants football team was playing the Chicago Bears in Chicago, the Bears would hold the broadcast rights and the Giants would be limited in its ability to telecast the game back in the New York market. The NFL commissioner at the time, Pete Rozelle, followed the lead of the NFL's new rival, the AFL, and sought to establish a television cartel among NFL teams. To do so, he believed that his league would need an antitrust exemption for pooling television rights from the U.S. Congress.

Rozelle effectively lobbied for the same and a bill, known as the Sports Broadcasting Act (SBA), was eventually written and then passed into law at the end of 1961. By allowing the NFL, NBA, NHL and MLB to cartelize their television rights agreements, the expressed purposes of the SBA were: 1) to enable the teams in the four leagues to broadcast games via "sponsored telecasting" back to their home markets, thereby increasing television output, and 2) to enable the leagues to pool their broadcast revenue and divide it equally among the teams, thereby promoting competitive balance in the leagues. The increase of output was an explicit rationale of the SBA.

The SBA, however, seemed to leave one area in doubt. Did the phrase "sponsored telecasting" include cable or pay television? In 1961, cable television had already been introduced, primarily in rural areas. It did not have advertising. In recent decades, of course, cable television has also included commercial advertising. What, then, was the intention of Congress back in 1961, when they used this phrase?

---

[51] *Liberty Broadcasting Systems v. National League Baseball Club of Boston, Inc.* (N.D. Ill., 1952).

42

Since a primary purpose of the act was to promote viewership (increase output), it would be inconsistent with the act's purpose to extend the SBA's coverage to include pay television, which limited viewership in comparison to free, terrestrial television.    Further, during congressional hearings on the bill, then NFL Commissioner Pete Rozelle unequivocally asserted that the legislation was not intended to apply to cable or pay television.  The counsel of the House Antitrust Subcommittee asked the commissioner whether he understood "that this bill covers only the free telecasting of professional sports contests, and does not cover pay TV." Rozelle directly replied: "Absolutely."[52]  In 1982, then NFL Counsel Paul Tagliabue responded to a query from Senator Arlen Specter before the Senate Judiciary Committee as follows: "the words 'sponsored telecasting' in [the SBA] were intended to exclude pay and cable.  This is clear from the legislative history and from the committee reports.  So, that statute does not authorize us to pool and sell to pay and cable."[53] This interpretation was affirmed in two subsequent court cases.[54]

Thus, the ATP cartel's pooling of television rights appears to be vulnerable on two counts. First, the SBA only exempted the NFL, NBA, NHL and MLB from the antitrust law with regard to league-wide national television packages.[55]  It did not exempt all sports.  Second, the SBA did not provide an exemption to any sport for national cable packages.

The limits of the antitrust exemption for sports broadcasting were further clarified in the Supreme Court's 1984 decision in *National Collegiate Athletic Association v. Board of Regents*

---

[52] Stephen Ross, "An Antitrust Analysis of Sports League Contracts with Cable Networks," *Emory Law Journal*, vol. 39, no. 2, spring 1990, p. 470.
[53] Professional Sports Antitrust Immunity Hearings on S.2784 and S2821 Before the Senate Committee on the Judiciary, 97th Congress, 2d Session 41 (1982).
[54] Chicago Pro. Sports Ltd. Partnership v. NBA, 808 F.Supp. 646, 649-50 (N.D. Ill. 1992), and Shaw et al. v. NFL (ED Pa., 2000).  Also see the letter from Charles Rule, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, to Hon. Howard Metzenbaum, Chair, Senate Subcommittee on Antitrust, March 30, 1988.
[55] Indicative of the ATP's apparent disregard and misunderstanding of antitrust law, in his deposition ATP board member Perry Rogers stated that he believed the ATP's television pooling actions were legal because the NFL, NBA and NHL pool their television rights without any antitrust exemption (p. 82).

*of the University of Oklahoma et al.* The University of Oklahoma brought suit against the NCAA because the NCAA's national television contract restricted the number of annual appearances to three that a school could make on national television, fixed the payout to be identical to each school regardless of the team's strength or popularity, and precluded schools from making their own contracts with other networks. The Supreme Court ruled that the NCAA contract was a violation of the antitrust laws because it reduced output, fixed prices and lowered consumer welfare.

In the instant case, there is no pro-competitive reason why the different top-tier tournaments should be prevented from signing their own television contracts, nor is there a pro-competitive reason for them to share broadcasting revenue.[56] If PNB Paribus receives revenue from Key Biscayne, it does not make a match between Roger Federer and Andy Roddick any more exciting. If, for some reason, it became important for the top-tier tournaments to share revenue with each other, this could be accomplished without the restraint of trade engendered by the pooling of television rights.

To be sure, it appears that the pooled ATP contract with ISL had the predictable impact, as least in some markets. In Hamburg, for instance, a flourishing terrestrial television deal was terminated and replaced with a cable deal, at a time when only approximately 1.5 million German households received cable television. The outcome proved to be very harmful financially for the Hamburg tournament, and given the powerful promotional value of televising live sporting events, it also proved to be deleterious to the ATP's following among German tennis fans.

As it came to pass, the ISL deal was also disastrous for all of the ATP Masters tournaments. But the fact that the pooling was poorly conceived and implemented does not

---

[56] TPL lawyer Richard Barrat appears to concur with this view. See Exhibit 380, at EML0779835.

44

make the pooling itself any less anticompetitive. The ATP cartel continues to pool its television rights to this day, along with its internet, sponsorship and licensing rights.

### VII. Anticompetitive Harm

The preceding anticompetitive acts have engendered significant anticompetitive harm. The reduced output of premier tournaments results in fewer tennis fans around the world being able to watch the world's best players compete against each other in live matches. These fans are directly harmed by ATP's anticompetitive behavior. Similarly, sponsors, broadcasters and potential host cities are harmed because they must compete against other sponsors, broadcasters and host cities for a more limited set of opportunities. In each case, there is less output, less consumption and higher prices. As cited above, Etienne de Villiers' bold prediction that with the Brave New World there immediately will be at least a 20 percent boost in revenues, in the face of an 11.1 percent reduction in the output of Masters (or ATP 1000) events, is directly suggestive of a weighted price increase of around 30 percent.

The administrative process for horizontally allocating this artificially limited output of top-tier tournaments causes further anticompetitive harm. Rather than allowing tournaments to compete for the top players by offering different amounts and/or structures of prize money and by making their own media and commercial arrangements, the ATP cartel assigns ten-year to fifty-one-year sanctions through a non-competitive process. One result of this policy is that Germany, the European country with the largest population, the highest number of television households and the greatest number of members in its national tennis federation in the world, has

45

been excluded from hosting a tournament in the men's premier tennis tour.[57]  Because of the
ATP cartel's increasingly restrictive policies, Hamburg, Stuttgart, Berlin or other German cities
cannot feasibly attempt to sponsor a top-tier independent tournament.  Thus, German tennis fans,
foreign tennis fans who travel to Germany in May or the summer months, including many such
fans from the United States, and German companies are excluded from consuming top-tier men's
professional tennis.

      The Hamburg tournament has a long history of successfully providing men's premier
professional tennis.  Until just a few years ago, there was also a second top-tier men's tournament
in Stuttgart, Germany.  The Stuttgart tournament had been purchased by Ion Tiriac in the mid-
1990s.  Mr. Tiriac approached the German government, seeking tens of millions of dollars in
public subsidies to expand the Stuttgart site under the threat that without such a subvention he
would move the tournament to another city.  Mr. Tiriac's gambit is a typical one played by
owners of sports teams in monopoly sporting leagues in the United States, where public spending
has contributed over $20 billion for the construction of new sports facilities since 1990.  The
income streams from these facilities flow primarily to the team owners and players.  In Europe,
however, where team sports leagues are organized as open, promotion/relegation systems,
private team sport owners have little or no power to extort public subsidies for facility
construction or renovation.  Accordingly, the German government was not willing to meet Mr.
Tiriac's demands and Mr. Tiriac moved the Stuttgart tournament with its Masters sanction to
Madrid in 2002.[58]  The Spanish government, however, hopes to conduct a successful bid to host

---

[57]  The German Tennis Federation has 1.66 million members, 2.3 times the number of members of the USTA at
720,000, and far greater than the membership in the tennis federations of France (1.10 million), Australia (225,000),
Spain (105,729), and Great Britain (80,000).  According to the 2006 Comperio report commissioned by the ATP,
Germany has 34 million television households, the UK has 25 million, France has 22 million, Italy has 21 million,
and Spain has 14 million.  Thus, Germany has at least 50 percent more television households than any other
European country.
[58]  According to the Brave New World plans, it is the Madrid tournament that will take the May dates of the
Hamburg tournament.  The Spanish Tennis Federation is less than one-fifteenth the size of the German Tennis

the summer Olympic games and was willing to spend tens of millions of Euros to build a new tennis facility. Thus, the ATP cartel's manipulation of the market has resulted in a higher price to cities that hope to host top-tier men's professional tennis.

Meanwhile, Germany, which hosted two Masters events annually just six years ago, will find itself, if the Brave New World plan is implemented, without any top-tier events in 2009. Ironically, France, with a considerably smaller population and media market, and lesser membership in its tennis federation, will host two ATP 1000 events and the French Open, according to current plans.

It is true that the Hamburg tournament has experienced financial difficulties since 2002. It is also true that the entire Masters tour was dealt a severe blow by the 2001 bankruptcy of ISL, and the consequent collapse of the ATP's ten-year broadcasting and sponsorship deal. Many top-tier tournaments took several years to recover. In his deposition, Charles Pasarell testified that the Indian Wells tournament did not return to profitability until 2006 or possibly even 2007.[59] But the ISL situation hurt Hamburg more than other tournaments. This is because Hamburg had a very successful and growing local, terrestrial television contract prior to 2000, the first year of the ISL deal. The Hamburg tournament's television revenue had grown from $3.1 million in 1995 to $4.1 million in 1999, and its local sponsorship deals had grown to $1.8 million in 1999. As a result of the ISL contract and the mandatory pooling of television and sponsorship rights, at the threat of expulsion from the top-tier of tournaments by the ATP cartel, Hamburg had to buy its way out of its local contracts, costing the tournament $4.7 million in

---

Federation. In a June 1, 2006 letter to Mr. de Villiers, Raymond Moore, longtime co-owner of the Indian Wells tournament, opines about Madrid's qualifications to host a major top-tier tournament as follows: "Madrid is subsidized and, frankly, is a contender only through the personality and negotiating skills of Tiriac. It is not a tournament steeped in history and even the Spanish players prefer Barcelona." ATP0344789.
[59] Pasarell deposition, pp. 124-125.

2000 and $5.7 million in 2001.[60]  By 2003, Hamburg had been forced to rupture its relationship

with its former local partners and it had lost the revenue stream from the ISL contract.

Hamburg's total television revenue in 2003 had fallen to $277,000 and its total sponsorship

revenue decreased to $510,500.   Complicating matters further is the fact that Hamburg's

tournament went from being broadcast on free, terrestrial television to being telecast on pay

cable at a time when only 1.5 million German households received cable television.

It is also well known that Hamburg was suffering from the absence of German players

among the world's best.  In the 1980s and 1990s, Boris Becker and Steffi Graf were German

stars who consistently ranked among the world's top three male and female players.  As

demonstrated in the regression analysis presented above, having local stars plays a statistically

significant and substantial role in generating fan interest.  Although no German player has risen

to a top five ranking since 2000, there is no reason to believe that one will not emerge in the

coming years.  Indeed, with the largest tennis federation membership[61] and the popularity of the

sport in Germany, there is every reason to believe that Germany will supply more than its share

of top stars in the future.

The ATP cartel's leadership itself appears to have been highly uncertain about which

tournament on the Masters tour should be demoted.  Mark Webster, the CEO of Tennis

Properties Limited, wrote to Mark Miles on February 11, 2003: "The ATP has over the last five

years threatened to downgrade Rome, Paris, Cincinnati, Monte Carlo and Canada."[62]  To be sure,

ATP research suggests that, despite its cyclical difficulties, the Hamburg tournament still ranked

above several other Masters events according to various indicators.  For instance, an ATP

---

[60] Curiously, while the Hamburg tournament was not allowed to honor existing contracts, the Miami tournament
was permitted to retain its existing title sponsorship. Further, each Masters event in North America is allowed to sell
network terrestrial coverage to its final and one semi-final round in its domestic territory, and to keep all the revenue
from this sale.
[61] Interestingly, Perry Rogers, a so-called player representative on the ATP's Board of Directors, stated in his
deposition that he was unaware that the German Tennis Federation was the largest in the world (p. 143).
[62] Exhibit 258. ATP0074112-115, at 114.

48

"Comprehensive Update" in May 2006 found that in a survey of tennis fans more respondents recognized the Hamburg tournament (48 percent), than the Monte Carlo Masters (42 percent) or the BNP Paribas Masters in Paris (38 percent).[63]  ATP Research from March 2006 found that in gross media value the Hamburg Masters ranked above the Masters events in Monte Carlo, Miami and Indian Wells.[64]

Hence, it makes little sense for the ATP to arbitrarily downgrade the Hamburg tournament, especially just a few years after it eliminated the other German Masters event. Moreover, this proposed downgrade comes at a time when Hamburg is just beginning to sustain a recovery from the ISL disaster: Hamburg tournament revenues have grown by 29.7 percent since their low point in 2004 and the tournament is projected to have its first profitable year since 2001 in 2008.[65] Giving up on the German market because of accidental and cyclical factors, and other factors caused by the ATP cartel's own misguided policy, while, for instance, holding two-plus top tournaments in France, which has a smaller television market and fewer tennis players, constitutes a misallocation of resources that can only lower economic welfare.

Finally, the ATP cartel's suppression of competition for players among its tournaments and effective foreclosure of competitive tournaments engenders anticompetitive harm to players. Players experience below market compensation and less choice about where and when to play.

## VIII.  Business Justifications

There are no apparent business justifications for the Brave New World plan, or many of the restraints of trade that preceded it.  To the extent that the Brave New World seeks to

---

[63]  ATP0443814.
[64]  ATP0053654.
[65]  GTF00027244-260; GTF00025158; ATP0326121-130; ATP0008335-8340; GTF00073583-629.

49

strengthen the men's top-tier professional tennis product, there are more effective and less restrictive ways to accomplish this end. The goal of increasing profit is acceptable when attained through superior competitive practices, but it is not acceptable when it pursued through output restriction or any anticompetitive means.

Increasing the participation of tennis' top stars is a procompetitive goal, but it was already being achieved *without* the coercive measures of the Brave New World. In any event, the procompetitive way to promote greater participation is through financial incentives, and/or perhaps through converting the putative and failed partnership between the ATP and the players into a true partnership. The latter would entail sincere efforts to elicit, rather than manipulate, player opinions and to incorporate their opinions more effectively into the decision-making process. Further, as demonstrated above, the econometric evidence shows either a zero or a rather modest incremental payoff to a tournament when all of the top ten players participate as opposed to seven or eight of the top ten. On the negative side, coercive measures applied in the player services market can cause bad will, uninspired play, more injuries and negative publicity for the tour, while simultaneously reducing or eliminating the ability of non-ATP 1000 tournaments to meaningfully compete in the player services market..

A decision to bring top-tier tennis to new markets over time as world markets and income levels grow is procompetitive. If done properly, introducing a regular tournament in Shanghai can be procompetitive. But lowering the number of top-tier tournaments and abandoning Europe's largest country in order to include a Chinese tournament is not procompetitive. Just as it would not be procompetitive if in 2012, the ATP cartel decided to move into the world's second largest country by placing an ATP 1000 event in New Delhi, but did so by downgrading the tournaments in Rome and Madrid.

Similarly, a plan to move tournaments over time from less productive to more productive venues may be procompetitive.[66] However, it would be more prudent to allow market forces, rather than administrative fiat, to play a greater role in this process. Further, any procompetitive policy would need to operate on consistent principles. The ATP cartel is awarding ten-year sanctions to most of the ATP 1000 tournaments. By doing so, they are recognizing, on the one hand, the importance of making a long enough commitment to a venue to induce the necessary capital expenditures on renovating or constructing the grounds, and, on the other hand, giving the tournament a long enough period to develop itself before a reallocation is made. It was, for instance, precisely based on the long history and continued expectation of hosting a top-tier tournament that Hamburg invested tens of millions of dollars in its facilities, including the addition of a retractable roof over its stadium court. Yet, although the ATP appears to recognize the need for a ten-year evaluation period to avoid whimsical decisions based on short-run factors, Hamburg's financial difficulties did not begin until the 2000-02 period. Hamburg is already recuperating nicely and the cyclical and short-term causes of its downturn are well understood. It was premature, to say the least, to apply the reallocation stick to the Hamburg tournament. Further, if the reallocation decisions are to be made periodically in order to maximize the marketing potential and popularity of the top-tier men's professional tennis, then it makes no sense to grant a 51-year sanction to any single tournament. The fact that such a lengthy sanction was granted to a tournament that is partly owned by one of the seven members of the ATP Board of Directors elucidates the anticompetitive dangers of a cartel making administrative decisions about the production and allocation of output.

---

[66] Historically this is exactly what has occurred. (*See* Deposition Exhibit 328, identifying 45 ATP membership transfers made from 1991 to 2006, many of which involved the movement of tournaments from one geographic venue to another).

51

The largest problem the ATP has encountered in growing its tours is poor decision-making. The decision to curtail local initiative and undermine local business relationships by forcing the pooling of broadcasting and sponsorship rights had deleterious consequences. At the same time that the ATP cartel was squelching local initiative and good business practices, it was doing next to nothing at a central level to market its sport. In his transition memorandum to Etienne de Villiers, Mark Miles starkly stated (p. 16): "Another crucial and related problem is the lack of marketing of the Tour and the sport.... The fact is the Tour has never had internal marketing competence within the administration .... We have always lacked a true marketing professional on the staff." Similarly, the Clusters consulting firm began its proposal to the ATP by observing that: "In the past, the ATP overall has done little or no centralized marketing."[67] The ATP budgets over the past five years reveal that the cartel has spent only between $930,000 million and $1.3 million annually on central public relations and marketing efforts.[68]

Finally, after several years of decline and stagnation, ATP attendance and revenue are now on an upswing. There is a need to invest prudently and aggressively in the marketing of the sport, but there is no need for draconian measures. Other new approaches, such as developing regional swings in the tour schedule, perhaps combined with more decentralized initiatives around the promotion of these swings, appear to make sense. In the face of growing demand, there is no business justification for a reduction in output, no justification for tighter and more coercive controls over the player services market, and no justification for arbitrary and poorly-conceived horizontal reallocations away from the larger and historically successful markets.

---

[67] ATP0352153.
[68] ATP0100933-49; ATP0079790-806; ATP0079771-89; ATP0079746-69; ATP0079730-45; ATP0079716-29; ATP0079700-14; ATP0079685-99. These expenditures on public relations and marketing represent around two percent of the ATP's budget. This is a very low percent for a sport that purports to be making an aggressive effort to develop new markets and expand its fan base. It is typical for teams in an established sport such as Major League Baseball to spend five or six percent of its budgeting on these promotional functions.

*I declare that the foregoing is true and correct to the best of my knowledge and belief*

Andrew Zimbalist
January 14, 2008
Northampton, Ma.

54

# APPENDIX A

## DATA SOURCES AND USES

### TABLE 1

Data on the number of top ten players participating in each tournament were taken from Tennis-Data.[69] Player rankings were those in effect at the time the tournament was played. The reported values are averages across the tournaments in each tier.

### TABLES 2, 3, 7

As I have noted previously in my report, the defendants in this matter have not provided financial data for all individual ATP tournaments. As a result, I have relied on the financial data that were produced in this matter for comparisons of financial performance across ATP tournament tiers and regions (specifically, for Tables 2, 3 and 7 of my report). Specifically, the only document I have identified which describes the financial performance of all ATP tiers and regions over a range of years is entitled "ATP Tour Inc., Tournament Financial Disclosure" (ATP0082512-541). I understand that this document was created by the ATP in the course of its business and produced through the discovery process in this litigation. I have requested through counsel that ATP clarify this document, and I note that ATP CEO Mr. de Villiers was unable to provide additional clarification at his deposition.

This document has several limitations. First, for categories where a financial figure is reported, the document does not identify which currency is used to report the data. Second, the document reports averages for categories of tournaments; no further information about the methodology used to calculate these averages is provided. Third, combined ATP/WTA events (with the exception of the Masters tournaments at Indian Wells and Miami) are not broken down by tier or region. Fourth, the averages reported in the document appear in some years to be calculated from less than the complete set of the tournaments in that category. For example, the 2007 "Count of Total Revenues" includes only two of the five Masters tournaments that took place in Europe in 2007 (ATP 0082513). The document does not indicate which two tournaments are included, or why certain tournaments were excluded. Fifth, the attendance data reported on ATP0082527 include "...all 60 current tournaments regardless of whether they submitted revenue and expenses." However, it appears that this note applies to the 60 current tournaments as of 2006-2007, but that these averages may not include all tournaments played in prior years (2003-2005).

Table 2 summarizes financial information across tiers for 2006 and 2007, assuming the reported revenue and expense figures are all in U.S. dollars. The data are aggregated at the tier level by multiplying the individual averages for tier/region for non-combined tournaments by the number of observations included in the average, arriving at a total for tournaments in a particular tier and region. Combined tournaments were excluded because they all cannot be allocated to specific tiers or regions. Regional totals are then summed by tier to arrive at a total for the tier; finally, this total is divided by the number of observations for the tier to produce an average for the entire tier. Attendance data are calculated as the simple average of attendance for tournaments in those tiers, based on the document "ATP Worldwide Attendance" (ATP0008335-340). Table 3 includes statistics calculated in a similar fashion to Table 2, but aggregated by region instead of by tier. Table 7 uses the totals calculated for the Masters tier.

---

[69] http://www.tennis-data.co.uk/alldata.php, visited on December 12, 2007.

**TABLES 4 AND 5**

*Dependent Variable*

**Attendance Per Day:** Total attendance for each ATP tournament from 2000 to 2006 was obtained from the ATP's report on worldwide attendance.[70] Tournament length in days was calculated using date information from the Tennis-Data website.[71] Tennis-Data contains information on the date that each round of each tournament was played from 2003 to 2006, thus allowing for direct calculation of tournament length in these years. For 2000 to 2002, tournament length was assumed to equal the tournament length in 2003 (or the earliest year in which tournament length is available).[72] Attendance per day was calculated as total tournament attendance divided by tournament length.

*Independent Variables*

**Participation by Top Ranked Players:** Tennis-Data contains information on each match played in each tournament, including the rank of each competitor at the start of the tournament.

These data were used to calculate the following dummy variables that reflect participation by top ranked players: 1 or 2 of the top 10 players participated; 3 or 4 of the top 10 players participated; 5 or 6 of the top 10 players participated; 7 or 8 of the top 10 players participated; 9 or 10 of the top 10 players participated; and all of the top 10 players participated. The omitted category for the dummy variables in the regression analysis using all tournament tiers is none of the top 10 players participated. Dummy variables were also created for situations in which (a) the top player participated (but not all top 10 players participated); and (b) the no. 1 or no. 2 ranked players participated (but 9 or 10 of the top 10 players did not).

In addition, a variable was created counting the number of top 10 players participating in each tournament (up to a maximum value of 9).

**Number of Top 10 Players Born in the Country of the Tournament:** Country of birth for the top players was compiled from player profiles available on the ATP's website.[73]

**Tier Dummy Variables:** Tier determination (i.e., Masters, International Gold, or International Series) was obtained from historic ATP calendars available on the ATP website.[74] The omitted category in the regression analysis is the International Series tier.

**Combined ATP/WTA Event Dummy Variable:** ATP tournaments were designated as combined if a WTA tournament occurred in the same city in the same week as an ATP event. Calendar dates of WTA events were obtained from the WTA website.[75]

**WTA Tier 1 Dummy Variable:** This variable is an indicator for Masters tier ATP tournaments that are not combined events, but occur on the same week as a WTA Tier 1 event.

---

[70] ATP Worldwide Attendance, ATP0008335-ATP0008340.

[71] http://www.tennis-data.co.uk/alldata.php, visited on December 12, 2007.

[72] In five cases a tournament was held only between 2000-2002. In these cases, the tournament length was assumed to be the average for its tier and region in 2003.

[73] http://www.atptennis.com/en/players, visited on December 19, 2007.

[74] http://www.atptennis.com/5/en/vault/, visited on December 13, 2007.

[75] http://www.sonyericssonwtatour.com/tournaments/finalresults/, visited on December 17, 2007.

**Number of Matches Per Day:** The Tennis-Data website provides data on each match played in a tournament. The number of matches per day was calculated as the total number of matches in the tournament divided by the tournament length in days.

**Region Dummy Variables:** The ATP categorizes tournaments as being played in the Americas (North and South America), Europe (EUR), or the rest of the world. Dummy variables were created for each region, with the "rest of the world" treated as the omitted category in the regression analysis. Regions for each tournament city were determined based on the categories contained in the ATP's report on worldwide attendance.[76]

**Indoor Dummy Variable:** Data on whether the tournament was held indoors or outdoors was obtained from the ATP website.[77]

**Surface Dummy Variables:** Data on tournament surface (i.e., hard court, grass, clay, or carpet) was obtained from the ATP website.[78] In the regression analysis, the omitted surface is hard court.

**Number of Weeks Before a Grand Slam:** A variable that indicates the calendar position of a given tournament in relation to the next Grand Slam event was calculated. This variable is capped at four weeks, so any tournament occurring more than four weeks before the next Grand Slam event is coded as occurring four weeks before the next Grand Slam event. Tournament dates are obtained from historic ATP calendars available on the ATP website.

**Number of Weeks After a Grand Slam:** A variable that indicates the calendar position of a given tournament in relation to the nearest previous Grand Slam event was calculated. This variable is capped at four weeks, so any tournament occurring more than four weeks after the nearest previous Grand Slam event is coded as occurring four weeks after the nearest previous Grand Slam event. Tournament dates are obtained from historic ATP calendars available on the ATP website.

**Seasonal Dummy Variables:** A series of dummy variables identifying the season in which each tournament took place was constructed. The seasonal dummy variables are constructed to account for the hemisphere of each tournament. In the northern hemisphere, winter begins December 1, spring begins March 1, summer begins June 1, and fall begins September 1. In the southern hemisphere, winter begins June 1, spring begins September 1, summer begins December 1, and fall begins March 1. In the regression analysis, the omitted season is winter.

**Temperature Variables:** Data on average daily temperature were obtained from CustomWeather Inc. and Meteorlogix LLC via Bloomberg. For each tournament, a tournament average temperature was calculated across the values reported for each day. In the few cases in which tournament city data were not available, data from a nearby city was used.

In the regression analysis, a variable for the number of degrees below 60F was created, as well as a variable for the number of degrees above 80F. Both variables apply only to outdoor tournaments.

**Year Dummy Variables:** Dummy variables were constructed for the year in which a tournament was played. In the regression analysis without lagged player participation variables, the omitted year is 2000. For the specification with lagged player participation variables, the omitted year is 2001.

---

[76] ATP Worldwide Attendance, ATP0008335-ATP0008340.
[77] http://www.atptennis.com/5/en/vault/, visited on December 13, 2007.
[78] http://www.atptennis.com/5/en/vault/, visited on December 13, 2007.

**TABLE 6**

Player rankings for this analysis are the end of year rankings for each year (ATP rank as of the Monday following the last tournament of the year). Participation data for 2004 were obtained from the document "Tournaments Played by Top 20, by Category and Surface."[79] End of year player rankings for 2005-2007 were obtained from the ATP website,[80] and player participation data for each ATP and Grand Slam tournament were obtained from Tennis-Data.[81] Data on player participation in the Davis Cup and the World Team Cup for 2005-2007 were obtained from respective event website.[82,83]

---

[79] Tournaments Played by Top 20, by Category and Surface (ATP0067769-ATP0067788)
[80] http://www.atptennis.com/3/en/rankings/entrysystem/default.asp, visited on December 31, 2007.
[81] http://www.tennis-data.co.uk/alldata.php, visited on December 12, 2007.
[82] http://www.daviscup.com/teams/playersearch.asp, visited on January 1, 2008.
[83] http://www.arag-world-team-cup.com/1/en/results/, visited on January 1, 2008.

**APPENDIX B**

**DOCUMENTS CONSIDERED**

**Appendix B**
**Bates-Numbered Documents Considered**
**German Tennis Federation**
**v. ATP Tour, Inc., et al.**

| Bates No. | Title | Date(s) |
|---|---|---|
| ATP0000268 – ATP0000368 | The ATP Tour Official Rulebook | 1997 |
| ATP0001233 – ATP0001235 | 2000 ATP Tour Television Distribution | 2000 |
| ATP0001657 – ATP0001660 | Letter Re: Transfer Agreement | September 25, 1998 |
| ATP0001784 – ATP0001786 | ATP Supervisor's Tournament Evaluation - Tournament City: Kitzbuhel - ATP Supervisor: Thomas Karlberg - Tournament Number: 04-319 | January 1, 2004 |
| ATP0007527 – ATP0007552 | Brave New World - Management Retreat #3: Drummers Yard | April 24 - 25, 2006 |
| ATP0007753 – ATP0007804 | ATP Board of Directors Meeting - Meeting Agenda & Discussion Guide | November 12, 2006 |
| ATP0007805 – ATP0007826 | ATP Board of Directors Meeting - Consumer Research Highlights Related to Calendar & Structure' | November 12, 2006 |
| ATP0007827 – ATP0007895 | Melbourne ATP Board Meeting 2009 Format | January 9, 2007 |
| ATP0008066 – ATP0008209 | ATP Brand Positioning Consumer Research - online Survey - Quantitative Findings | October 30, 2006 |
| ATP0008210 – ATP0008257 | ATP Brand Positioning Consumer Research - Focus Group Findings | October 30, 2006 |
| ATP0008335 – ATP0008340 | ATP Worldwide Attendance | April 6, 2007 |
| ATP0008341 – ATP0008364 | What a Wonderful World - Progress Update - (following Wimbledon Board meetings) | July 13, 2006 |
| ATP0008365 – ATP0008375 | WWW - Outstanding Calendar Issues - (Board Call Update) | August 14, 2006 |
| ATP0008376 – ATP0008409 | What a Wonderful World - Progress Update - (for US Open Board meetings) | August 26, 2006 |
| ATP0008591 – ATP0008602 | Tournament Valuations | January 10, 2007 |
| ATP0008754 – ATP0008763 | 2008 Calendar Brainstorming | January 31, 2006 |
| ATP0008850 – ATP0008900 | Brave New World - Comprehensive Update - (Management Retreat #4: Drummers Yard) | May 24 - 25, 2006 |
| ATP0008959 – ATP0008982 | What a Wonderful World - Progress Update - (following Wimbledon Board meetings) | July 5, 2006 |
| ATP0009059 – ATP0009113 | Tournament Categories Comparisons - ATP Premium Events 2006 vs. 2009 | September 26, 2006 |
| ATP0009116 – ATP0009171 | ATP 'Masters 1000' Europe Mens Only (Outdoor Clay) Tournament Application - February 2, 2007 - Monte Carlo | September 3, 2007 |
| ATP0009264 – ATP0009312 | ATP 'Masters 1000' Europe Mens Only (Indoor Hard) Tournament Application - February 2, 2007 - Hamburg | March 19, 2007 |
| ATP0009340 – ATP0009341 | Letter from Philip B. Galloway to Walter Knapper (German Tennis Federation) Re: application for an ATP 1,000 level tournament beginning in 2009 | March 29, 2007 |
| ATP0009397 – ATP0009443 | ATP 'Masters 1000' Combined Tournament Application | February 2, 2007 |
| ATP0009452 – ATP0009496 | ATP 'Masters 1000' Europe Mens Only (Outdoor Clay) Tournament Application - February 2, 2007 - Rome | March 6, 2007 |
| ATP0009507 – ATP0009570 | ATP 'Masters 1000' Europe Mens Only (Indoor Hard) Tournament Application | September 26, 2006 |
| ATP0009577 – ATP0009626 | ATP 'Masters 1000' Combined Tournament Application | September 26, 2006 |
| ATP0009629 – ATP0009691 | ATP 'Masters 1000' NTH America Mens Only (Outdoor Hard) Tournament Application | February 2, 2007 |
| ATP0010345 – ATP0010379 | Serving up the figures - ATP tournament financial review - Update for tournaments - Presentation to ATP Board | February 2, 2007 |
| ATP0010743 – ATP0010814 | ATP Calendar Strategy Research - Prepared for Etienne De Villiers and the ATP Management Team | March 29, 2007 |

60

| | | |
|---|---|---|
| ATP0010815 - ATP0010880 | Calendar Strategy Testing - Research findings | July 5, 2006 |
| ATP0010881 - ATP0010891 | ATP Game Plan by Etienne de Villiers | January 2006 |
| ATP0010983 - ATP0011012 | ATP Additional Research | March 2006 |
| ATP0011013 - ATP0011069 | ATP Media Research - Market Coverage and Audience Comparison, August 2005 - August 2006 | December 2006 |
| ATP0011124 - ATP0011175 | Road to Roland Garros - Television Market Analysis | |
| ATP0011305 - ATP0011335 | ATP TV Strategy 2008 following A Potential Brave New World | May 2006 |
| ATP0011443 - ATP0011446 | Brave New World: Project Timeline | March 16, 2006 |
| ATP0011538 | Re: FW: Strategy Board - Television Distribution Strategy Paper | August 5, 1999 |
| ATP0011991 - ATP0011996 | Letter to Chris Renner from Larry Scott Re: ATP Tour Tournament Television Rights | October 19, 1999 |
| ATP0012688 - ATP0012697 | Due Diligence Report - Newsweek Champions Cup and State Farm Evert Cup - Indian Wells, CA U.S.A. | December 28, 1998 |
| ATP0012921 | Tournaments considered for purchase by Tour | July 27, 1998 |
| ATP0012921 - ATP0012922 | Tournaments considered for purchase by Tour | July 27, 1998 |
| ATP0012922 | Membership Transfers - Cumulative Since 1991 | 1991 - 1998 |
| ATP0013514 - ATP0013522 | Re: Draft 1998 Calendar, Version #9 | October 15, 1996 |
| ATP0015148 | Memorandum Re: Prisma - Tiriac Meeting | May 18, 1998 |
| ATP0015263 - ATP0015264 | Fax Re: Indian Wells Two-Week Event | August 10, 2001 |
| ATP0021578 - ATP0021581 | ATP Supervisor's Tournament Evaluation - Tournament City: Indian Wells - ATP Supervisor: G. Bradshaw/G. Armstrong - Tournament Number: 404 | |
| ATP0021617 - ATP0021621 | Attachments to the Supervisor's Report - Tournament City: Kitzbuhel - ATP Supervisor: Thomas Karlberg - Tournament Number: 319 | |
| ATP0022061 - ATP0022064 | ATP Supervisor's Tournament Evaluation - Tournament City: Monte Carlo - ATP Supervisor: G. Bradshaw/T. Karlberg - Tournament Number: 410 | |
| ATP0035170 - ATP0035176 | EVP Notes - 1994 Hamburg Panasonic German Open | 5/2/94 - 5/8/94 |
| ATP0041024 - ATP0041027 | ATP Supervisor's Tournament Evaluation - Tournament City: Hamburg - ATP Supervisor: Gayle Bradshaw/Tom Barnes - Tournament Number: 414 | |
| ATP0052460 - ATP0052462 | Letter from Bill Babcock (Grand Slam Committee Administrator) to Mark Miles Re: McKinsey Report - January 25, 2003 | January 27, 2003 |
| ATP0052696 - ATP0052718 | Proposal to the ATP - Tournament Financial Review | July 2006 |
| ATP0052993 | Re: Tiriac meeting | December 2, 2006 |
| ATP0052998 - ATP0052999 | Re: ATP Media | July 9, 2006 |
| ATP0053144 - ATP0053150 | Letter from Players to Etienne de Villiers Re: Outcome of a 20-player meeting on March 9 | March 19, 2007 |
| ATP0053396 | Memorandum from Charlie Pasarell to Etienne de Villiers Re: initial comments to the latest WWW | July 14, 2006 |
| ATP0053466 - ATP0053467 | Top 500 - Average Events Played, Points Earned and % of Points Total by Ranking (DRAFT) | September 18, 2006 |
| ATP0053466 - ATP0053469 | Top 500 - Average Events Played, Points Earned and % of Points Total by Ranking (DRAFT) | September 18, 2006 |
| ATP0053630 - ATP0053641 | Indian Wells/Miami compared to non combined AMS events | December 31, 2005 |
| ATP0053643 - ATP0053672 | ATP Additional Research | March 2006 |
| ATP0053647 - ATP0053648 | 2.1 Tournaments Ranked by Hours of Coverage and 2.2 Tournaments Ranked by Cumulative Audience ('000s) | |
| ATP0053653 - ATP0053655 | 2.7 Tournaments Ranked by Brand Exposure, 2.8 Tournaments Ranked by Gross Media Value ($), and 2.9 Tournaments Ranked by Gross Media Value ($) per Hour of Exposure | |
| ATP0053673 - ATP0053698 | WTA/TPL Television Analysis of Pooled rights | |
| ATP0053751 - ATP0053761 | DRAFT - Tennis Properties LTD Business Plan 2007 - 2012 | June 29, 1905 |
| ATP0053793 - ATP0053809 | ATP Monthly Broadcast and Distribution Report | January 2006 |

| ATP0053811 - ATP0053837 | ATP Tournament Valuation Approach - private and confidential - report to the ATP | December 2006 |
| ATP0053838 - ATP0053839 | ATP Tournament Financial Review 'kick-off' meeting - suggested agenda | August 4, 2006 |
| ATP0053840 - ATP0053862 | Proposal to the ATP - Tournament Financial Review | July 20, 2006 |
| ATP0053863 - ATP0053875 | Player Communication | April 16, 2007 |
| ATP0053895 - ATP0053897 | Minutes of the Meeting of Tennis Properties LTD Held in Miami on 29th March 2005 at the Nasdaq-100 Open Tournament Offices | March 29, 2005 |
| ATP0053905 - ATP0053914 | Addressing Player Concerns - Meeting with Top Players | March 18, 2007 |
| ATP0054048 - ATP0054051 | Letter from Etienne de Villiers to Zeljko Franulovic Re: letter dated 1/11/07 | January 19, 2007 |
| ATP0054052 - ATP0054056 | Email from Zeljko Franulovic to Etienne de Villiers - Attach: Letter Re: ATP's Proposed Restructuring Plan; Issues Relating to the Restructuring Proposed by the ATP | January 11, 2007 |
| ATP0054130 - ATP0054136 | Projection of 1999 TV and Marketing Rights | February 19, 1998 |
| ATP0054130 - ATP0054138 | Projection of 1999 TV and Marketing Rights | February 19, 1998 |
| ATP0054281 - ATP0054282 | Letter from Mark D. Miles to Jan Kohne (Managing Director - Deutscher Tennis Bund) Re: DTB's request for relief from a number of financial obligations related to the Tennis Masters Series Hamburg Tournament | June 20, 2002 |
| ATP0054297 - ATP0054300 | DTB President Georg von Waldenfels Interview | April 26, 2002 |
| ATP0054656 - ATP0054662 | Asian Strategy | October 2004 |
| ATP0054875 | Letter from Joseph M. Leccese to Dr. Claus Stauder | October 16, 1998 |
| ATP0054876 - ATP0054877 | Letter from Mark Miles to Dr. Claus Stauder Re: critical issues raised by Prisma and Boris Becker's recent discussions | October 15, 1998 |
| ATP0054878 - ATP0054879 | Fax from Mark Miles to Gunter Sanders Re: courtesy update | October 16, 1998 |
| ATP0054900 - ATP0054913 | ATP Tour 2000: The Future is Now | May 7, 1999 |
| ATP0054914 | ATP Tour 2000: The Future is Now | |
| ATP0054914 - ATP0054922 | ATP Tour 2000: The Future is Now | May 5, 1999 |
| ATP0054915 - ATP0054922 | Fax from Mark Miles to Daniel Beauvois Re: DTB presentation | May 5, 1999 |
| ATP0055514 - ATP0055516 | Re: Fernando Vicente | February 23, 2004 |
| ATP0059885 | Re: FW: KAGAN: Top Sports Marketer, ISL, Up for Sale | February 8, 2001 |
| ATP0060149 - ATP0060157 | 2001 Tennis Masters Series - Message Points for Indian Wells, Ericsson Open | 2001 |
| ATP0060711 - ATP0060713 | DRAFT - ATP Board of Directors - March 26, 2001 - Miami Florida - Minutes | March 26, 2001 |
| ATP0060816 - ATP0060817 | Letter from Angelo Binaghi, Christian Bimes, & Robert Moffatt to Mark Miles | July 2, 2001 |
| ATP0061972 - ATP0061975 | DRAFT - ATP Board of Directors - August 28, 2001 - New York, New York - Minutes | November 5, 2001 |
| ATP0065425 - ATP0065427 | Letter, 'To All' Re: Update on a number of issues | February 14, 2003 |
| ATP0065428 - ATP0065444 | ATP Strategic Planning Process - Update to ATP Staff on Board Decisions and Key Next Steps | February 2003 |
| ATP0065761 - ATP0065876 | ATP Tour, Inc. Board Meeting PDF Demo | February 24, 2003 |
| ATP0067484 - ATP0067503 | Tournaments Played per Level | 2003 - 2004 |
| ATP0067525 - ATP0067627 | Tournaments Played By Top 20 per Tournament Category | 1985 - 2005 |
| ATP0067760 - ATP0067864 | Tournaments Played By Top 20 per Tournament Category | 1985 - 2005 |
| ATP0067924 - ATP0067940 | AMS Player Participation: Top 10 Data Analysis | November 14, 2005 |
| ATP0067990 - ATP0068030 | Top 5 and Top 10 | 1990 - 2005 |
| ATP0068093 - ATP0068106 | Re: TR: Research Request | November 21, 2005 |
| ATP0068150 - ATP0068175 | Top 500 - Average Events Played, Points Earned and % of Points Total by Ranking (DRAFT) | September 18, 2006 |
| ATP0068564 - ATP0068576 | Prize Money and Financial Commitment Progression 2006-2009 | July 5, 2007 |
| ATP0069570 - ATP0069571 | Letter Re: Tournament condition letter 2005 | August 12, 2005 |

| ATP0069612 - ATP0069613 | Re: Media May 15, 2005 - Hamburg, Nadal and more | May 15, 2005 |
| ATP0069988 - ATP0069989 | There was just too much money' - President Georg von Waldenfels about the affair within the DTB | January 22, 2001 |
| ATP0071756 - ATP0071767 | Fax copy of TWI Agreement | November 2, 2003 |
| ATP0071768 - ATP0071771 | Memorandum to TPL Executive Board from Mark Miles, Mark Webster & TPL Marketing Committee Re: Summary of ISL Television and Sponsorship Agreements & Recommendation Regarding Assignment | February 12, 2001 |
| ATP0071772 - ATP0071781 | Summary of ISL Television Agreements - 2001 & Beyond | July 25, 2001 |
| ATP0071772 - ATP0072822 | Summary of ISL Television Agreements - 2001 & Beyond | July 25, 2001 |
| ATP0072016 - ATP0072027 | Shareholders' Agreement | February 9, 2004 |
| ATP0072265 | Fax to Mark Miles from Ion Tiriac Re: Press Releases | July 26, 2001 |
| ATP0072273 - ATP0072274 | Letter from Mark Miles to Italian, French, & Canadian Tennis Association/Federations Re: 7/2/01 Letter | July 18, 2001 |
| ATP0072443 - ATP0072450 | Minutes of the Meeting of Tennis Properties LTD Held in Miami on 29th March 2005 at the Nasdaq-100 Open Tournament Offices | March 29, 2005 |
| ATP0072682 - ATP0072685 | Letter from Mark Young (Exec. VP - ATP Tour, Inc.) to Qatar Tennis Federation & Deutscher Tennis Bund e.V. Re: Transfer Agreement | June 15, 2005 |
| ATP0072820 - ATP0072822 | 2002 Television Revenue Projections | July 24, 2001 |
| ATP0072833 - ATP0072844 | Fax from Dr. Georg von Waldenfels (President - Deutscher Tennis Bund e.V.) to Mark Miles (CEO - ATP Tour, Inc.) & ATP Office Europe Re: DTB's wish to sell 25% of its rights in the ATP Master Series Tournament held in Hamburg to Qatar Tennis Federation | May 17, 2005 |
| ATP0072945 - ATP0072946 | Letter from Mark Miles to Gunter Sanders Re: ATP Tour Calendar for 2000 | September 11, 1998 |
| ATP0073726 - ATP0073735 | Letter from ATP Masters Series Tournament Directors to Mark Miles (CEO - ATP) Re: concern over the marked decrease in player participation at ATP Masters Series events in 2004. | November 5, 2004 |
| ATP0074058 - ATP0074061 | Fax from Mark D. Miles to Christian Bimes, Geoff Pollard, Alan G. Schwartz, Tim Phillips, Francesco Ricci-Bitti Re: response to letter dated 1/25/03 | February 10, 2003 |
| ATP0074062 - ATP0074102 | Premium Tennis': An Opportunity to Grow the Tennis Pie | January 23, 2003 |
| ATP0074112 - ATP0074115 | Letter Re: ATP Reform | February 11, 2003 |
| ATP0074175 - ATP0074181 | Mark Miles Presentation - DTB Board of Directors | May 7, 1999 |
| ATP0074219 | Sanders prevents DTB Bankruptcy | April 26, 1999 |
| ATP0074945 - ATP0074951 | Fax: Letter Re: Outstanding Tournament Issues - 7/19/02 | August 5, 2002 |
| ATP0075057 - ATP0075058 | Letter form Mark Miles to Mark Webster Re: dismay over Webster's actions | July 20, 2001 |
| ATP0075853 - ATP0075855 | ATP Board of Directors - March 21, 2003 - Miami, Florida - Minutes | March 21, 2003 |
| ATP0076018 - ATP0076020 | ATP Board of Directors - June 22, 2004 - London, United Kingdom - Minutes | June 22, 2004 |
| ATP0076100 - ATP0076101 | ATP Board of Directors - November 20, 2004 - Houston, Texas - Minutes | November 20, 2007 |
| ATP0076316 - ATP0076320 | ATP Board of Directors - March 24, 2006 - Miami, Florida - Minutes | March 24, 2006 |
| ATP0076454 - ATP0076455 | ATP Board of Directors - Shanghai, China - November 14, 2006 - Minutes | November 12, 2006 |
| ATP0076456 - ATP0076460 | ATP Board of Directors - Shanghai, China - November 14, 2006 - Minutes | November 14, 2006 |
| ATP0076720 - ATP0076840 | 2006 US Open Series Planning Manual | March 21, 2006 |
| ATP0077281 | Tennis Properties Limited Draft Distribution Progression | December 31, 2006 |
| ATP0077499 - ATP0077509 | Tennis Properties LTD TPL Board Meeting | February 1, 2007 |
| ATP0077510 - ATP0077565 | ATP Masters Series /Tennis Masters Cup 2006 | December 2006 |
| ATP0078485 - ATP0079064 | Strategic Planning Process | October 2002 |
| ATP0079207 - ATP0079209 | Re: senior executive compensation | March 2, 2006 |
| ATP0079685 - ATP0079699 | ATP Tour, Inc. and subsidiaries Consolidated Financial Statements | March 19, 2007 |

| | December 31, 2006 and 2005 | |
| ATP0079700 – ATP0079714 | ATP Tour, Inc. and Subsidiaries Consolidated Financial Statements December 31, 2005 and 2004 | March 20, 2006 |
| ATP0079715 – ATP0079729 | ATP Tour, Inc. and Subsidiaries Consolidated Financial Statements December 31, 2004 and 2003 | March 18, 2005 |
| ATP0079716 – ATP0079729 | ATP Tour, Inc. and Subsidiaries Consolidated Financial Statements December 31, 2004 and 2003 | March 18, 2005 |
| ATP0079730 – ATP0079745 | ATP Tour, Inc. and Subsidiaries Consolidated Financial Statements December 31, 2003 and 2002 | March 19, 2004 |
| ATP0079746 – ATP0079769 | Consolidated Financial Statements ATP Tour, Inc. Years ended December 31, 2002 and 2001 with Report of Independent Certified Public Accountants | June 14, 2003 |
| ATP0079771 – ATP0079789 | Consolidated Financial Statements ATP Tour, Inc. Years ended December 31, 2001 and 2000 with Report of Independent Certified Public Accountants | February 22, 2002 |
| ATP0079790 – ATP0079806 | Consolidated Financial Statements ATP Tour, Inc. - Years ended December 31, 2000 and 1999 with Report of Independent Certified Public Accountants | February 23, 2001 |
| ATP0081584 – ATP0081585 | Re: Fw: Shanghai TMS agreement | February 16, 2007 |
| ATP0081584 – ATP0081587 | Re: Fw: Shanghai TMS agreement | February 16, 2007 |
| ATP0081985 – ATP0081988 | Re: Drummers Retreat Follow-up | June 2, 2006 |
| ATP0082023 – ATP0082034 | Memo Re: TMC Review Document | August 9, 2006 |
| ATP0082512 – ATP0082541 | ATP Tour, Inc. - Tournament Financial Disclosure | 2003 - 2007 |
| ATP0082646 – ATP0082648 | Letter from Et to ATP Member | January 19, 2007 |
| ATP0083227 – ATP0083238 | AMS Player Participation: Top 10 Data Analysis | November 14, 2005 |
| ATP0083239 – ATP0083240 | Re: Confidential | December 9, 2005 |
| ATP0083293 – ATP0083298 | Masters Cup Valuation | |
| ATP0083644 – ATP0083647 | Re: Thursday's Call | December 13, 2006 |
| ATP0083645 – ATP0083647 | Re: Thursday's Call | December 13, 2006 |
| ATP0083757 – ATP0083890 | 2005 Business Planning | May 24, 2005 |
| ATP0084166 – ATP0084173 | Re: London Format Discussions | July 10, 1997 |
| ATP0084368 – ATP0084378 | DRAFT - Masters 1000 Agreement Between New Sports Entertainment [Shanghai] Ltd. And ATP Tour, Inc. | 2007 |
| ATP0084400 | Re: Kitzbuhel | July 9, 2007 |
| ATP0084401 | Letter from Gerard Tsobanian to Andy | June 15, 2007 |
| ATP0084402 | Fax from Alfred Steinbrugger (European Management Establishment) to Dr. Jurgen Hoffmann | May 21, 2007 |
| ATP0084405 – ATP0084425 | Agreement | June 2007 |
| ATP0084426 – ATP0084485 | ATP 'Masters 1000' Combined Tournament Application | February 2, 2007 |
| ATP0084486 – ATP0084489 | Memorandum of Understanding By & Between New Sports & Entertainment [Shanghai] Ltd. And ATP Tour, Inc. | February 15, 2007 |
| ATP0094190 – ATP0094239 | Board Orientation - Understanding the ATP | June 2005 |
| ATP0097044 – ATP0097047 | Chairman's Report to ATP Player and Tournament Members | September 5, 2006 |
| ATP0100933 – ATP0100949 | Consolidated Financial Statements ATP Tour, Inc. - Years ended December 31, 1999 and 1998 with Report of Independent Auditors | March 3, 2000 |
| ATP0107242 | Re: Miles's 2002 Bonus | January 2, 2002 |
| ATP0107242 – ATP0078855 | Re: Miles's 2002 Bonus | January 2, 2002 |
| ATP0115963 – ATP0115964 | An Open Letter from CEO Mark Miles | May 21, 2001 |
| ATP0120751 – ATP0120753 | DTB/TMS Hamburg - Planning meeting - Minutes | March 13, 2002 |
| ATP0134400 – ATP0134402 | Re: FW: For Player Council | December 30, 2003 |
| ATP0136994 – ATP0136995 | Re: Monte carlo | April 19, 2004 |
| ATP0137808 – ATP0137809 | German Tennis Tournaments for Sale?' | |
| ATP0145807 – ATP0145815 | 2005 Business Plan Approach | June 27, 2005 |
| ATP0163617 – ATP0163628 | Addendum to ATP Masters 1000 Application Submitted by Cincinnati | April 19, 2007 |

64

| | | |
|---|---|---|
| ATP0163630 - ATP0163637 | 2007 Masters 1000 Application Addendum - Cincinnati | |
| ATP0165870 - ATP0165871 | Re: Message for Mr. Wang | October 14, 2001 |
| ATP0165894 - ATP0165895 | ATP CEO Courts Booming Asian Tennis Market | September 30, 2004 |
| ATP0166732 - ATP0166735 | Re: Proposal for Enhancing the Value of Doubles | March 31, 2005 |
| ATP0167900 | Email from Jeff Chapman to Graham | November 28, 2001 |
| ATP0170878 - ATP0170881 | Mark Miles address to General Tournament Director Meeting | November 23, 1999 |
| ATP0171390 - ATP0171409 | ATP Licensing Strategy | April 2001 |
| ATP0171953 - ATP0171959 | DRAFT - Phase 2 - Potential Actions/Solutions | September 12, 2002 |
| ATP0172568 - ATP0172577 | DRAFT - Player Services Strategic Planning Worksheet - 5 Year Plan | March 12, 2003 |
| ATP0172678 - ATP0172680 | Email from Iggy Jovanovic to All ATP Board Re: FW: 500's feedback | March 13, 2007 |
| ATP0174669 | Re: Shanghai | February 1, 2001 |
| ATP0180367 - ATP0180368 | Re: TMC BID Terms | March 27, 2004 |
| ATP0189516 - ATP0189520 | Average Number of events played, points earned and % of points total by type of event (trailing 52 weeks) | September 18, 2006 |
| ATP0189960 - ATP0189969 | ATP Analysis - Playing Trends | 2003 - 2005 |
| ATP0196605 - ATP0196868 | The 2001 ATP Official Rulebook | 2001 |
| ATP0198922 - ATP0198928 | ATP Tour/ISL Deal Summary | |
| ATP0198923 - ATP0198928 | ATP Tour/ISL Deal Summary | |
| ATP0201401 - ATP0201414 | Summary of One on One Meetings with Players during Indian Wells 2006 - by Iggy Jovanovic | March 15, 2006 |
| ATP0201452 - ATP0201457 | Summary of One on One Meetings with players during Rome 2006 - By Iggy Jovanovic | May 15, 2006 |
| ATP0202400 - ATP0202410 | ATP Organization Performance Survey | February 23, 2006 |
| ATP0203040 - ATP0203053 | Summary of One on One Meetings with Players during Indian Wells 2006 - by Iggy Jovanovic | March 15, 2006 |
| ATP0205133 - ATP0205139 | Salary and Incentive Analysis | January 2007 - March 2007 |
| ATP0206301 - ATP0206308 | Player Communication - Clay Court 2009 | |
| ATP0206837 - ATP0206838 | Internazionali D'Italia - Discussion Points for Meeting with Etienne de Villiers - Tournament Office - On Site at Foro Italico, Viale Dei Gladiatori, Rome | May 11, 2006 |
| ATP0207211 - ATP0207218 | 2007-08 Withdrawal Rule | |
| ATP0208188 - ATP0208193 | Sponsorship revenues - contract details | 2009 |
| ATP0208526 | Tournament Compensation Plan | |
| ATP0208527 - ATP0208529 | ATP Tour, Inc. - Tournament Transfer Fee Revenue | 1991 - 2006 |
| ATP0208692 - ATP0208714 | ATP Business Plan Status 2003 - 2004 | June 2004 |
| ATP0210105 - ATP0210182 | DRAFT Phase 3: Strategic Planning Process | November 2002 |
| ATP0214526 - ATP0214557 | ATP Restructuring Plan 2001-2004 | June 2001 |
| ATP0214799 - ATP0214809 | ATP Restructuring Plan 2001-2004 - Meeting of TPL - New York, New York | August 31, 2001 |
| ATP0214829 - ATP0214832 | Television Only Guarantee | June 25, 1905 |
| ATP0214829 - ATP0215263 | Television Only Guarantee | |
| ATP0215124 - ATP0215128 | Eurosport Television Sales Update | 1996 |
| ATP0215129 - ATP0215131 | 1997 Eurosport Television Sales Update | January 23, 1998 |
| ATP0215132 - ATP0215134 | 1996 -1999 Television rights Budget and Projection | |
| ATP0215135 - ATP0215139 | 1997 Eurosport television Sales Update | June 19, 1905 |
| ATP0215140 - ATP0215143 | Eurosport Television Sales Update | June 20, 1905 |
| ATP0215140 - ATP0215144 | 1998 Eurosport Television Sales Update | January 1, 1999 |
| ATP0215145 - ATP0215146 | Television Distribution Formula & Television Pro Forma | |
| ATP0215147 - ATP0215151 | Eurosport Television Sales Update | June 21, 1905 |
| ATP0215152 | ESPN Television Sales Summary | |
| ATP0215156 - ATP0215160 | Eurosport Television Sales Update | March 1997 |
| ATP0215161 - ATP0215165 | Eurosport Television Sales Update | March 1997 |

65

| | | |
|---|---|---|
| ATP0215166 - ATP0215167 | Television Sales Update | |
| ATP0215168 - ATP0215170 | Television Sales Update | |
| ATP0215239 - ATP0215263 | Summary of marketing and Television Costs | November 12, 1999 |
| ATP0216634 | Letter from Etienne de Villiers to Philip Galloway Re: ATP's agreement | December 2, 2005 |
| ATP0216640 - ATP0216649 | 2006 Bonus Projection | March 30, 2006 |
| ATP0216919 - ATP0216924 | Television Projection TPL | June 23, 1905 |
| ATP0217551 - ATP0217620 | 2007-09 atp marketing plan | November 2006 |
| ATP0218947 - ATP0218972 | DRAFT WTA/TPL Television Analysis of Pooled rights | June 28, 1905 |
| ATP0220539 - ATP0220542 | Re: Mail failure | October 5, 1995 |
| ATP0221666 - ATP0221667 | Fax from Mark Miles to Ivan Blumberg | February 20, 1998 |
| ATP0221671 - ATP0221672 | Letter from Larry Scott to Ivan Blumberg | April 2, 1998 |
| ATP0221810 - ATP0221826 | Consolidated Financial Statements - ATP Tour, Inc. - Years ended December 31, 1995 and 1994 with Report of Independent Auditors | March 14, 1996 |
| ATP0222327 - ATP0222351 | List of events played (All) | November 3, 1997 |
| ATP0222450 - ATP0222451 | Memorandum from Charlie Pasarell to: Super 9 Tournament Directors, Mark Miles, Larry Scott, Daniel Beauvois, Stephan Brubacher, Sergio Zyman, Scott Miller, Mark Webster, & Richard Barratt | April 9, 1999 |
| ATP0223811 - ATP0223829 | Fax from Mark Miles to Butch Buchholz, Patrice Clerc, Charlie Pasarell, Ion Tiriac, & Mark Webster Re: conference call arrangement | November 9, 1998 |
| ATP0224057 - ATP0224075 | ATP Tour Partners Meeting | 10/14/98 - 10/15/-98 |
| ATP0224369 - ATP0224371 | Re: FW: Miami Herald - 12/10/99 | December 10, 1999 |
| ATP0225314 - ATP0225327 | Due Diligence Report - Newsweek Champions Cup and State Farm Evert Cup - Indian Wells, CA U.S.A. | January 15, 1999 |
| ATP0226172 - ATP0226179 | Discussion Outline for TPL Meeting | January 10, 2001 |
| ATP02266437 - ATP0266451 | Excerpt From ATP/Super 9 Repositioning and Strategic Marketing Plan | May 6, 1999 |
| ATP0226912 - ATP0226914 | Re: FW: Kitzbuhel Tournament Director - Attach: jp-business-cv13.04.07 | April 16, 2007 |
| ATP0250380 | Re: FW: Compensation | May 15, 2007 |
| ATP0250385 - ATP0250386 | Re: Shanghai board meeting update | November 20, 2006 |
| ATP0250411 - ATP0250413 | Re: Stuttgart | October 31, 2006 |
| ATP0250487 - ATP0250489 | Re: ATP Board Meeting Pre Wimbledon | June 3, 2006 |
| ATP0250506 - ATP0250509 | Re: my meeting with the FFT | February 26, 2006 |
| ATP0250572 | Re: Ljubicic | March 26, 2007 |
| ATP0250575 - ATP0250577 | Re: report from Miami | March 30, 2007 |
| ATP0251383 - ATP0251384 | Re: FW: Blake & Roddick | May 7, 2007 |
| ATP0251529 - ATP0251532 | Re: Answers | January 31, 2007 |
| ATP0252059 - ATP0252060 | Re: FW: Roberdo article translated | May 15, 2007 |
| ATP0252217 - ATP0252219 | Re: Confidential - 500's | February 18, 2007 |
| ATP0252924 - ATP0252928 | Letter from: Indian Wells, Miami, Monte Carlo, Madrid, & Paris Tournament Representatives to Etienne de Villiers Re: Masters Series Tournaments and ongoing efforts at reforming the ATP Tour. - 9/29/06 | October 9, 2006 |
| ATP0253882 - ATP0253899 | Restructuring ATP Player Services Department | November 14, 2003 |
| ATP0254635 - ATP0254638 | DRAFT - ATP Board of Directors - June 5, 2002 - Paris, France - Minutes | June 17, 2002 |
| ATP0254689 - ATP0254700 | Memorandum from Charlie Pasarell to: Mark Webster, Gavin Forbes, Stephanie Tolleson, Steve Simon, Butch Buchholz, Bob Kain, Adam Barrett | September 18, 2001 |
| ATP0255050 - ATP0255051 | ATP Board of Directors - New York, New York - August 26, 2006 - Minutes | August 26, 2006 |
| ATP0255403 - ATP0255405 | Confidential - Meeting of the ATP Board of Directors - Via Telephone Conference Call | March 8, 2006 |
| ATP0256176 - ATP0256187 | 2004 Budget Projection - ATP Tour, Inc. - London | June 20, 2004 |
| ATP0259884 - ATP0259887 | TPL Budget/Actual Progression | December 31, 2006 |
| ATP0262265 - ATP0262275 | Letter from Charles M. Pasarell, Jr. to Rob | September 30, 2005 |

66

| ATP0262305 - ATP0262322 | Fax: Sanction Agreement - 9/26/02 | October 21, 2002 |
| ATP0262337 - ATP0262393 | The TMS Members (as referred to herein) - ATP Tour, Inc. And Tennis Properties Limited - Pooling Agreement | February 9, 2004 |
| ATP0264696 - ATP0264697 | Faxed Memorandum from Charlie Pasarell to Etienne de Villiers | May 12, 2006 |
| ATP0265132 - ATP0265136 | Memorandum from Mark Miles to Charlie Pasarell Re: Discussion Points for Ten Day Format | March 18, 2002 |
| ATP0265163 - ATP0265160 | Fax from Ariene Thornhill to Charlie Pasarell | March 21, 2002 |
| ATP0268968 - ATP0268969 | Re: report from Miami | March 30, 2007 |
| ATP0268978 - ATP0268991 | European Group General Meeting - Summary | January 9, 2007 |
| ATP0268992 | Re: EG Tournament Div. Meetings in Zurich (Board and General) | January 9, 2007 |
| ATP0269141 - ATP0269142 | Letter from: Barcelona, Monte Carlo, Rome, & Hamburg Tournament Representatives to Patrice Dominguez (ATP Europe) Re: ATP reforms project, 'Bravo Real World' | June 23, 2006 |
| ATP0269144 - ATP0269149 | Open Letter From European Tournament Directors - To ATP CEO Etienne de Villiers | June 18, 2006 |
| ATP0269150 - ATP0269154 | Open Letter From European Tournament Directors - To ATP CEO Etienne de Villiers | June 18, 2006 |
| ATP0269219 - ATP0269221 | Re: Please read - 3 set final matches at all ATP Tournaments in 2007 | |
| ATP0269510 - ATP0269581 | Letter from Philip B. Galloway to Sergio Palmieri (Federazione Italiana Tennis) Re: reviewed application | March 29, 2007 |
| ATP0270040 - ATP0270041 | Re: you've probably heard things… | June 9, 2006 |
| ATP0270148 - ATP0270150 | Re: FW: our meeting in Paris - Attachments: Letter to Christian Bimes.pdf | September 29, 2006 |
| ATP0276025 - ATP0276026 | Re: calendars - Attach: 2008 Calendars for London Meeting ver. 2  03-03-06.xls | March 3, 2006 |
| ATP0276236 - ATP0276238 | Re: Fw: conversation with alain riou and stephane simian this morning. | March 14, 2006 |
| ATP0277248 - ATP0277252 | ATP Doubles: Revolution or Retrogression? | June 28, 1905 |
| ATP0277864 - ATP0277865 | Re: After Elections | November 20, 2006 |
| ATP0278696 | Re: all euro TDs | January 24, 2007 |
| ATP0279651 - ATP0279652 | Re: FW: AMS data | April 18, 2007 |
| ATP0279655 - ATP0279734 | Re: Paris response | April 4, 2007 |
| ATP0279994 - ATP0279996 | Re: FW: For TPL Meeting: Preliminary BrandDriver Results - Attach: BRANDDRIVER ATP Calendar Strategy research - Event awareness & attitudes 9 May 06.ppt | May 11, 2006 |
| ATP0281401 - ATP0281402 | Letter from Mark V. Young (ATP Tour, Inc.) to Deutscher Tennis Bund Holding GmbH | February 28, 2003 |
| ATP0283627 - ATP0283628 | Letter Re: 'Open Letter from European Tournament Directors' ATP-Letter from July 11th, 2006 | July 29, 2006 |
| ATP0283964 - ATP0283966 | Re: FW: Calendar issues for Thursday's call | October 3, 2006 |
| ATP0288451 - ATP0288452 | LD Meeting Notes - Re: German 5 Series | September 21, 2004 |
| ATP0295869 - ATP0295871 | Letter to Mr. Etienne de Villiers Re: support for the comments made by Gerard Tsobanian in connection with reform of the doubles competition. | October 6, 2005 |
| ATP0301879 - ATP0301880 | Re: latest status of our thinking. - Attach: Appendix 2 World series and fees.xls | April 13, 2006 |
| ATP0305952 - ATP0305954 | Re: Frankfurt Tournament | December 13, 2006 |
| ATP0310978 - ATP0310979 | Re: Action Steps from Drummers and MC - Attach: EG Tournament GAME Presentation - Monte-Carlo 03-09-2006.ppt | March 13, 2006 |
| ATP0316960 - ATP0316970 | Re: FW: - Attach: TPL Business Plan Draft; ATP.doc; TPL Business Plan Annex 1.xls | June 14, 2006 |
| ATP0321824 - ATP0321844 | 2007 Masters 1000 Application Addendum - Madrid - v2 | |
| ATP0322013 - ATP0322023 | 2007 Masters 1000 Application Addendum - Monte Carlo | |
| ATP0322384 - ATP0322397 | 2007 Masters 1000 Application Addendum - Cincinnati | |
| ATP0322399 - ATP0322401 | Letter from Gerard Tsobanian to Flip [Galloway] Re: additional information requested in [Flip's] letter dated March 29, 2007 | April 13, 2007 |
| ATP0322729 - ATP0322733 | Re: Tennis Canada ATP tournament application - Attach: ATP master | April 20, 2007 |

67

| | | |
|---|---|---|
| | application p&L.xls | |
| ATP0322734 - ATP0322737 | ATP Master 1000 Application - Tennis Canada - 4.1 Profit and Loss Account (US$) | 2005 - 2006 |
| ATP0326121 - ATP0326130 | Tournament Name: Masters Series Hamburg - Year Ended: 5/20/07 - P&L, Sponsorship, Ticketing, Broadcasting, F&B and Souvenir/Merchandise, Staff costs, & Definitions | May 20, 2007 |
| ATP0329097 - ATP0329106 | Agreement - among ATP Tour, Inc., Monte-Carlo Country Club and Societe Monegasque pour L'Exploitation du Tournoi de Tennis | July 18, 2007 |
| ATP0331485 - ATP0331487 | ATP Announces New Marketing Strategy, Structure - Governing Body Launches ATP Properties, Names Scott as President Sir Martin Sorrell, Bob Mansfield named to ATP Marketing Advisory Board | July 23, 2001 |
| ATP0332255 - ATP0332275 | 2003 Player Meeting - Miles CEO Report (Final) | |
| ATP0332940 - ATP0332957 | ATP/Star Alliance Partnership Presentation | |
| ATP0333514 - ATP0333521 | Re: FW: Indian Wells position | October 29, 2003 |
| ATP0333585 - ATP0333596 | DRAFT Strategic Planning | July 30, 2002 |
| ATP0335310 - ATP0335313 | Re: report from Miami | March 30, 2007 |
| ATP0335501 | Re: New Plan | March 27, 2006 |
| ATP0335604 - ATP0335619 | ATP Player Relations Business Plan | |
| ATP0341498 | Re: SLIDE - Attach: worldwide 2006.xls; Tournament Valuation Methodology 01-15-07.ppt | February 27, 2007 |
| ATP0341499 - ATP0341504 | Tournament [Attendance?] | 2000 - 2006 |
| ATP0342025 - ATP0342026 | Re: Executive bonuses and compensation - Attach: 2007 Incentive bonus et.xls | March 15, 2007 |
| ATP0342097 - ATP0342098 | Re: Fw: SUN-SENTINEL (USA): Proposed Changes Don't Suit Everyone | April 6, 2007 |
| ATP0342147 | Re: Fw: THE AGE (AUS): Grand Slam Points to Be Reduced by Governing Body | April 10, 2007 |
| ATP0342349 | Re: Board Meeting - Conf. Call | March 3, 2006 |
| ATP0342488 - ATP0342491 | Re: Ref. : Re: ATP Workshop, Monte-Carlo | March 21, 2006 |
| ATP0342967 | Re: Update | April 11, 2006 |
| ATP0343632 | Re: Retail Merchandise | May 9, 2006 |
| ATP0343669 - ATP0343670 | Re: Various | May 10, 2006 |
| ATP0344061 | Re: Withdrawals | May 15, 2006 |
| ATP0344212 - ATP0344214 | Re: Paris 'combined' | May 20, 2006 |
| ATP0344682 - ATP0344690 | Memorandum Re: Response to Sergio Palmieri Questions from May 11, 2006 | May 31, 2006 |
| ATP0344788 - ATP0344791 | Letter from Ray Moore | June 4, 2006 |
| ATP0345297 | Re: BRW Outstanding Issues - Attach: BRW Revised Progress Update 06-19-06.ppt | June 20, 2006 |
| ATP0345353 | Re: Queens summary | June 20, 2006 |
| ATP0345981 - ATP0345987 | Re: My memo - Attach: Jerry Maguire.doc | April 3, 2006 |
| ATP0346162 - ATP0346163 | Anderton Appointed ATP Chief Marketing Officer | March 22, 2006 |
| ATP0346561 - ATP0346562 | Re: ATP Briefing Materials - Attach: ATP Calendar Strategy 03-17-06.ppt | March 17, 2006 |
| ATP0346758 - ATP0346780 | ATP Organization Performance Survey 2006 | June 28, 1905 |
| ATP0347695 - ATP0347696 | Re: senior executive compensation - Attach: Dear Graham and Perry.doc; Executive Compensation Structure Feb 26 et.xls | March 1, 2006 |
| ATP0347838 | Re: Indian Wells Tennis | March 10, 2006 |
| ATP0347867 - ATP0347872 | Resume of Phil Anderton | |
| ATP0347879 - ATP0347880 | Re: Indian Wells Tennis | March 15, 2006 |
| ATP0348016 - ATP0348032 | The Thoughts of Chairman "Brian" - With apologies to Monty Python... - Should we have more combined events? | January 17, 2006 |
| ATP0348793 | Re: Paris 'combined' | May 16, 2006 |
| ATP0348843 - ATP0348844 | Things...... | May 21, 2006 |

| | | |
|---|---|---|
| ATP0349593 - ATP0349650 | Re: One more report - Attach: 2006 16 TV Markets Comparative Study 04-20-07.ppt | April 25, 2007 |
| ATP0349891 | Re: Vegas Follow-up | April 30, 2007 |
| ATP0350494 - ATP0350495 | Re: Indian Wells | March 2, 2006 |
| ATP0351654 - ATP0351661 | Re: ATP Corporate Communications | September 20, 2006 |
| ATP0352098 - ATP0352104 | Clusters - Segmentation of Tennis Consumers, Implementation Proposal | February 15, 2007 |
| ATP0352153 - ATP0352161 | Email to Phil Anderton and George Ciz from Chris Cowan, Clusters Attachments: Clusters ATP Segmentation Proposal.doc | September 21, 2006 |
| ATP0352922 - ATP0352930 | ATP Programming Development 2007 Initiatives | May 10, 2007 |
| ATP0355364 - ATP0355428 | Re: Note from Etienne and Draft Application Document - Attachments: Open 500 Application draft Dec 21.doc | December 22, 2006 |
| ATP0356698 - ATP0356701 | Re: Thursday's Calendar Call | October 4, 2006 |
| ATP0357188 - ATP0357259 | ATP Calendar Strategy Research | May 25, 2006 |
| ATP0358491 - ATP0358499 | Old Heavy Users/Old Light Users/Young Heavy Users/Young Light Users' | |
| ATP0359625 - ATP0359816 | ATP - Board of Directors Meeting - London - Jacco Eltingh | 6/25/06 - 6/28/06 |
| ATP0360309 - ATP0360435 | Jacco Eltingh - N.Y. - board '06 | |
| ATP0366243 - ATP0366246 | ATP Board of Directors - London, England - June 27, 2006 - Minutes | June 17, 2006 |
| ATP0367917 - ATP0367949 | Re: Special Board Meeting | May 19, 2003 |
| ATP0368223 - ATP0368224 | Fax of Letter Re: Request for Prize Money Freeze 2003 | April 22, 2002 |
| ATP0369960 - ATP0369995 | Doubles Promotion: from A to Z | May 5, 2005 |
| ATP0375870 - ATP0375872 | RE my meeting with the FFT | February 23, 2006 |
| ATP0377914 - ATP0378191 | ATP Official Rulebook for 2003 | 2003 |
| ATP0378295 | Re: management reports due on Monday 17th april - Attach: Brave New World Status Report April 5.xls | April 5, 2006 |
| ATP0378576 - ATP0378577 | Marketing Strategy Development | |
| ATP0378841 - ATP0378844 | Email from Andre Silva to: David Higdon, Etienne de Villiers, Brad Drewett, Gayle David Bradshaw, George Ciz, Horst Klosterkemper, Mark Young, Phil Anderton, Flip Galloway, & Richard Davies | May 9, 2006 |
| ATP0379126 - ATP0379127 | Re: Stat | July 18, 2006 |
| ATP0379240 - ATP0379242 | Re: Withdrawal Proposal - Final - Attach: 2007-08 Withdrawal Proposal.doc | August 2, 2006 |
| ATP0380327 | Re: Consumer Research - Full Report - Attach: BRANDDRIVER US-France for Shanghai Board - 11-11-06.ppt | November 22, 2006 |
| ATP0381154 - ATP0381156 | Re: 5 Year Strategic Planning Documents - Officiating & Rulemaking | March 13, 2003 |
| ATP0381487 | Re: FW: Urgent-Request from ATP Players and Coaches - Attach: VINA Qualies Request.doc | January 25, 2007 |
| ATP0381818 - ATP0381823 | Summary of Rule Changes for 2007 | November 21, 2006 |
| ATP0387573 | Special Events Rule Reminder - 2006 | 2006 |
| ATP0387900 | Re: STARS Program | February 5, 1998 |
| ATP0390799 - ATP0391062 | ATP Official Rulebook for 2005 | 2005 |
| ATP0392116 - ATP0392349 | ATP Official Rulebook for 2006 | 2006 |
| ATP0397480 - ATP0397774 | ATP Official Rulebook for 2004 | 2004 |
| ATP0401423 - ATP0401670 | ATP Official Rulebook for 2007 | 2007 |
| ATP0443769- ATP0443822 | Brave Real World Comprehensive Update | May 30, 2006 |
| ATP0444057 - ATP0444058 | Re: 2008 calendar-food for thought | October 30, 2006 |
| ATP0444661 - ATP0444662 | Re: Brace New World | May 11, 2006 |
| ATP0444663 - ATP0444664 | Email from Etienne de Villiers to Andre Silva | May 11, 2006 |
| ATP0444667 - ATP0444669 | Memorandum from Charlie Pasarell to Etienne de Villiers | May 12, 2006 |
| ATP0444720 - ATP0444721 | Re: ATP Los Angeles | July 19, 2006 |
| ATP0444798 - ATP0444800 | When you are stuck in London….and there's no where else to run… | |
| ATP0449155 - ATP0449157 | Email to J.J. Carter from Andre Silva Re: FW: For Player Council | December 30, 2003 |
| ATP0460195 - ATP0460198 | ATP Supervisor's Tournament Evaluation - Tournament City: Hamburg - ATP Supervisor: Bradshaw/Barnes - Tournament Number: 414 | |

| | | |
|---|---|---|
| ATP0464594 – ATP0464862 | ATP 2002 Official Rulebook | 2002 |
| ATP0464863 – ATP0464884 | Letter Re: 2002 Rule Summary | |
| ATP0480896 – ATP0480901 | ATP Consumer Research Agreement | September 2006 |
| ATP0537677 – ATP0537815 | The 1999 ATP Tour Official Rulebook | 1999 |
| ATP0540692 – ATP0540720 | ATP Board of Directors - Melbourne, Australia - January 16, 2007 - Minutes | January 16, 2007 |
| ATP0540697 – ATP0540720 | ATP Board of Directors - Melbourne, Australia - January 18, 2007 - Minutes | January 18, 2007 |
| ATP0543545 – ATP0543596 | ATP '500' Tournament Application | July 25, 2007 |
| ATP0546559 | Re: 500 and 4/11 | August 12, 2007 |
| ATP0546652 | Re: 250's | July 18, 2007 |
| ATP0546662 | Re: Matches & Tournaments Played Top 20 2002-2006 | July 16, 2007 |
| ATP0546668 – ATP0546669 | Re: 4 of 11 versus 4 of 13. | July 16, 2007 |
| ATP0546883 – ATP0546884 | Re: Matrix - Attachments: Strategy vs. Likelihood Matrix - 06-27-07.ppt | June 27, 2007 |
| ATP0546948 – ATP0546951 | Tennis Properties LTD Business Plan Projections | 2006 |
| ATP0547273 – ATP0547274 | Re: FW: James Blake summary | May 15, 2007 |
| ATP0549571 – ATP0549591 | Re: FW: Valuation Pages Scan - Attachments: Valuation 01-09-07.pdf | January 9, 2007 |
| ATP0549665 – ATP0549691 | ATP Tournament Valuation Approach - private and confidential - report to the ATP | December 2006 |
| ATP0549696 – ATP0549701 | Re: Documents as promised - Attachments: FG letter131206final.doc | December 14, 2006 |
| ATP0553527 – ATP0553537 | ATP - Calendar Strategy Research | March 21, 2006 |
| ATP0556369 – ATP0556374 | Clusters - Segmentation of Tennis Consumers, Phase 2: Implementation Proposal | May 16, 2007 |
| ATP0576404 – ATP0576415 | Re: Rankings Comparison - Attach: 2009 Rankings Research - 2006 Top 10 Rankings Comparison.xls | June 21, 2007 |
| ATP0582215 – ATP0582232 | 2007 Masters 1000 Application Addendum - Madrid | |
| ATP0588487 | Re: 2009 prize money breakdowns.xls | September 14, 2007 |
| ATP0588488 – ATP0588513 | Key Components of proposed 2009 round by round proposal | 2006 - 2007 |
| ATP0589493 – ATP0589502 | Ratings Analysis - AMS | 2002 - 2007 |
| ATP0590625 – ATP0590627 | Letter from Andy Anson (ATP Tour, Inc.) to Evington Finance Corp. Re: Purchase/Transfer Agreement | August 30, 2007 |
| ATP0591040 – ATP0591063 | ATP '250' Tournament Application | October 2007 |
| ATP0591396 – ATP0591397 | Re: ATP 500 Application | September 21, 2007 |
| ATP0591399 – ATP0591400 | Re: FW: ATP '500' Tournament Application | September 21, 2007 |
| ATP0591401 | Re: FW: Washington application | September 21, 2007 |
| ATP0617980 – ATP0617995 | "500" Category Business Plan & Reasoning | May 24, 2007 |
| Bates number cut off | Re: calendars | March 3, 2006 |
| GTF00000269 - GTF00000347 | ATP 'Masters 1000' Europe Mens Only (Outdoor Clay) Tournament Application | February 2, 2007 |
| GTF00000359 - GTF00000362 | ATP Supervisor's Tournament Evaluation - Tournament City: Hamburg - ATP Supervisor: Darby/Karlberg - Tournament Number: 04-414 | January 1, 2004 |
| GTF00000365 - GTF00000367 | ATP Supervisor's Tournament Evaluation - Tournament City: Hamburg - ATP Supervisor: Mark Darby/Tom Barnes - Tournament Number: 06-414 | January 1, 2005 |
| GTF00000596 - GTF00000597 | Members in Clubs of DTB e.V. - 1948-2006 | 1948 - 2006 |
| GTF00000600 - GTF00000601 | Investments | Before 1988 - 1997 |
| GTF00000725 - GTF00000727 | Statement of Items | February 16, 2007 |
| GTF00000816 - GTF00000842 | Restated Certificate of Incorporation of ATP Tour, Inc. | October 22, 1997 |
| GTF00001076 | Letter from Christian Bimes to Dr. Georg Frhr von Waldenfels Re: letter dated 11/27 | December 11, 2006 |
| GTF00001077 - GTF00001078 | Re: answer to your letter (to Mr Von Waldenfels) | January 12, 2007 |
| GTF00001260 | Re: Info | March 29, 2007 |
| GTF00001261 | Re: Info | March 29, 2007 |

| | | |
|---|---|---|
| GTF0000261 - GTF00000263 | Letter to Philip (Flip) Galloway Re: Your letter dated March 29, 2007 | April 12, 2007 |
| GTF000043363 - GTF000043374 | Minutes of the last meeting held in Hamburg on 7th November 2006 - Dr. Georg von Waldenfels | March 12, 2007 |
| GTF00004945 - GTF00004950 | Final Press Conference | May 18, 2003 |
| GTF00005298 - GTF00005302 | Closing Press Conference with Boris Becker, Toralf Bitzer, Walter Knapper, Robert Lubenoff & Dr. Georg Freiherr von Waldenfels | May 16, 2004 |
| GTF00006463 | Das Ende des Rothenbaums? | May 5, 2004 |
| GTF00007325 - GTF00007326 | Audience Reach | |
| GTF00007960 - GTF00007999 | Hamburg Masters Series - Television Broadcast and Sponsor Report | 4/11/05 - 4/17/05 |
| GTF00008138 - GTF00008139 | ATP Masters Series 2005 - Broadcasters | February 14, 2005 |
| GTF00008195 - GTF00008202 | Tennis Masters Hamburg Broadcast & Audience Report | June 25, 1905 |
| GTF00008557 - BLANK | DRAFT - Herr Knapper, was wird die Fans 2005 am Rothenbaum erwarten (Mr. Knapper, what can fans expect at Rothenbaum in 2005?) | |
| GTF00008708 - GTF00008709 | Order of events of Press conference on 10. August 2004 | August 10, 2004 |
| GTF00008966 - GTF00009005 | Masters Series Hamburg - Television Broadcast and Sponsor Report | 5/15/06 - 5/21/06 |
| GTF00010833 | Fax from Thomas Kastner (German Tennis Federation) to Gilles Jourdan | July 11, 2007 |
| GTF00013914 | Scheich Mohammed: 'Notfalls machen wir eine eigene Serie' | May 18, 2007 |
| GTF00014004 | Tennis Der Neue Turnierdirektor Carl-Uwe Steeb Hat Ein Grosses Ziel - 'Der Rothenbaum braucht einen Titelsponsor' | May 22, 2007 |
| GTF00022514 | Knapper kontert Kritik: 'Kuhnen hat keine Ahnung' | May 19, 2006 |
| GTF00022814 - GTF00022853 | Masters Series Hamburg - Television Broadcast and Sponsor Report | 5/15/06 - 5/21/06 |
| GTF00023634 - GTF00023636 | Press Conference with Roger Federer | May 15, 2007 |
| GTF00023697 - GTF00023699 | Press Conference with Lleyton Hewitt | May 16, 2007 |
| GTF00024783 - GTF00024798 | ATP Tournament Financial Review - tournament Consultation Questionnaire | September 2006 |
| GTF00025158 | Tournament Name: Tennis Masters - Tournament City: Hamburg - Financial Summary 1995-2002 | February 19, 2007 |
| GTF00027244 - GTF00027260 | Tournament Name: Masters Series Hamburg - Tournament City: Hamburg | 2003 - 2006 |
| GTF00027511 | Re: WG: saa at the masters in HAM | March 28, 2007 |
| GTF00027993 | Tag - Anzahl - Einnahmen (Day - Number of/Count - Take/Receipt) | 2006 - 2007 |
| GTF00035558 - GTF00035559 | Fax from Mark Webster to Walter Knapper Re: Premiere, NDR | April 23, 2003 |
| GTF00036262 - GTF00036270 | [A]quisitionlist per 7.3.2003 | July 3, 2003 |
| GTF00037811 | Presse: (Anlage 1) - Toralf Bitzer | |
| GTF00037812 | Marketing/Kartenvertrieb: Anlage 2 - Annette Eichler | |
| GTF00037813 | Organisationsleiter: (Anlage 3) - Thomas Kastner | |
| GTF00037814 | Turnierdirektor: (Anlage 4) - Walter Knapper | |
| GTF00042863 - GTF00042875 | Verhandlungsstand - QTF - DTB | May 13, 2005 |
| GTF00043165 - GTF00043167 | Re: PR Arbeit/Diverses | September 29, 2006 |
| GTF00043190 | Re: Kurzinfo meetings New York - 8/30/06 | September 3, 2006 |
| GTF00043321 | Letter from Ulrich Kroeker to Lieber Walter & Karl-Uwe Steeb | December 13, 2006 |
| GTF00043338 - GTF00043343 | Agenda for the Meeting of Shareholders of Rothenbaum Sport GmbH | November 7, 2006 |
| GTF00043344 - GTF00043362 | Rothenbaum Sport GmbH - Budget 2006/Budget 2007 | 2006 - 2007 |
| GTF00045436 | Masters Series Hamburg - Besucherzahlen - 2004 - 2007 | March 27, 2007 |
| GTF00049265 | Letter from Wolfgang Wiebe to Annette Koring Re: Masters Series Hamburg 2005 | |
| GTF00054536 - GTF00054537 | Letter from Holger Bartl to Frau Koring | |
| GTF00057263 - GTF00057305 | The Super 9 Members - ATP Tour, Inc. and Tennis Properties Limited - Shareholders' Agreement relating to Tennis Properties Limited | June 21, 1905 |
| GTF00067762 - GTF00067763 | Minutes - Annual Shareholder Meeting of Rothenbaum Sport GmbH Held at the DTB Office in Hamburg | November 7, 2006 |
| GTF00067764 - GTF00067766 | Minutes - Supervisory Board Meeting of Rothenbaum Sport GmbH Held at the DTB Office in Hamburg on 7th March 2006, 15:00 Hours | March 7, 2006 |

| | | |
|---|---|---|
| GTF00067767 - GTF00067768 | Minutes - Board Meeting of Rothenbaum Sport GmbH - Held at the Hotel Intercontinental in Berlin | May 11, 2006 |
| GTF00068154 - GTF00068173 | Deed Register No. 613/2005P | May 12, 2005 |
| GTF00068174 - GTF00068183 | Deed Register No. 1434/2005P | September 29, 2005 |
| GTF00068184 - GTF00068197 | Deed Register No. 612/2005P | May 12, 2005 |
| GTF00068198 - GTF00068234 | Deed Register No. 1434/2005P | September 29, 2005 |
| GTF00068619 - GTF00068624 | Letter from Frank Schrotter to Finanzamt Hamburg-Nord | January 30, 2006 |
| GTF00068925 - GTF00068938 | siehe Anwesenheitsliste | 1/26/07 - 1/28/07 |
| GTF00068939 - GTF00068947 | siehe Anwesenheitsliste (Anlage 1) | May 1, 2007 |
| GTF00068959 - GTF00068964 | siehe Anwesenheitsliste (Anlage 1) | February 11, 2006 |
| GTF00068965 - GTF00068967 | DRAFT - Zukunft Master Series Turnier in Hamburg | November 7, 2006 |
| GTF00068968 - GTF00068972 | siehe Anwesenheitsliste (Anlage 1) | September 21, 2006 |
| GTF00069023 - GTF00069028 | Lease Agreement between Qatar Tennis Federation, & Deutscher Tennis Bund e.V. | June 20, 2004 |
| GTF00069049 - GTF00069056 | Letter Re: Sale of WTA Full Tournament Class Membership and Sanction Tier II A - Betty Barclay Cup Tennis Tournament, Hamburg, Germany | October 16, 2002 |
| GTF00069057 - GTF00069062 | Sale Agreement between Deutscher Tennis Bund e.V., & Qatar Tennis Federation | June 20, 2004 |
| GTF00069063 - GTF00069067 | DTB e.V., Leistungssport, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2001 | January 10, 2007 |
| GTF00069068 - GTF00069073 | DTB e.V., Leistungssport, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2002 | January 10, 2007 |
| GTF00069074 - GTF00069078 | DTB e.V., Leistungssport, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2003 | January 10, 2007 |
| GTF00069079 - GTF00069083 | DTB e.V., Leistungssport, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2004 | January 10, 2007 |
| GTF00069084 - GTF00069092 | DTB e.V., Leistungssport, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2005 | January 10, 2007 |
| GTF00069093 - GTF00069104 | Deutscher Tennis Bund e.V., Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2001 | January 10, 2007 |
| GTF00069105 - GTF00069116 | Deutscher Tennis Bund e.V., Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2002 | January 10, 2007 |
| GTF00069117 - GTF00069128 | Deutscher Tennis Bund e.V., Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2003 | January 10, 2007 |
| GTF00069129 - GTF00069140 | Deutscher Tennis Bund e.V., Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2004 | January 10, 2007 |
| GTF00069141 - GTF00069152 | Deutscher Tennis Bund e.V., Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2005 | January 10, 2007 |
| GTF00069153 - GTF00069170 | Deutscher Tennis Bund, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) September 1999 | January 10, 2007 |
| GTF00069171 - GTF00069186 | DTB Holding GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) September 2000 | January 10, 2007 |
| GTF00069187 - GTF00069198 | DTB Holding GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2000 | January 10, 2007 |
| GTF00069199 - GTF00069213 | DTB Holding GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2001 | January 10, 2007 |
| GTF00069214 - GTF00069227 | DTB Holding GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2002 | January 10, 2007 |
| GTF00069228 - GTF00069240 | DTB Holding GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2003 | January 10, 2007 |
| GTF00069241 - GTF00069254 | DTB Holding GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2004 | January 10, 2007 |
| GTF00069255 - GTF00069262 | DTB Holding GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und | January 10, 2007 |

|  | Salden (pro Monat) Dezember 2005 |  |
| --- | --- | --- |
| GTF00069263 – GTF00069276 | DTB Rothenbaum Turnier GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) September 2000 | January 10, 2007 |
| GTF00069277 – GTF00069284 | DTB Rothenbaum Turnier GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2000 | January 10, 2007 |
| GTF00069285 – GTF00069298 | DTB Rothenbaum Turnier GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2001 | January 10, 2007 |
| GTF00069299 – GTF00069312 | DTB Rothenbaum Turnier GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2002 | January 10, 2007 |
| GTF00069313 – GTF00069326 | DTB Rothenbaum Turnier GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2003 | January 10, 2007 |
| GTF00069327 – GTF00069340 | DTB Rothenbaum Turnier GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Dezember 2004 | January 10, 2007 |
| GTF00069341 – GTF00069354 | DTB Rothenbaum Turnier GmbH, Kanzlei-Rechnungswesen V.5.34, Summen und Salden (pro Monat) Juni 2005 | January 10, 2007 |
| GTF00069355 – GTF00069369 | Rothenbaum Sport Gumbo, Kanzlei-Rechnungswesen V.5.34 Summen und Salden (pro Monat) Juni 2006 | January 10, 2007 |
| GTF00069453 | Re: 'new Project' | June 26, 2007 |
| GTF00069694 – GTF00069737 | Rothenbaum Sport GmbH | June 30, 2006 |
| GTF00069738 – GTF00069779 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | June 30, 2005 |
| GTF00069780 – GTF00069824 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2004 |
| GTF00069825 – GTF00069871 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2003 |
| GTF00069872 – GTF00069919 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2002 |
| GTF00069920 – GTF00069963 | Rothenbaum Sport Gumbo (vormals Deutscher Tennis Bund Holding GmbH) | December 31, 2005 |
| GTF00069964 – GTF00070017 | Deutscher Tennis Bund Holding GmbH | December 31, 2004 |
| GTF00070018 – GTF00070070 | Deutscher Tennis Bund Holding GmbH | December 31, 2003 |
| GTF00070071 – GTF00070125 | Deutscher Tennis Bund Holding GmbH | December 31, 2002 |
| GTF00070126 – GTF00070179 | Deutscher Tennis Bund Holding GmbH | December 31, 2001 |
| GTF00070180 – GTF00070234 | Deutscher Tennis Bund Holding GmbH | December 31, 2000 |
| GTF00070235 – GTF00070289 | Deutscher Tennis Bund Holding GmbH | December 31, 2000 |
| GTF00070290 – GTF00070346 | Deutscher Tennis Bund Holding GmbH | December 31, 1999 |
| GTF00070347 – GTF00070402 | Deutscher Tennis Bund Holding GmbH Hamburg | December 31, 1998 |
| GTF00070403 – GTF00070458 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 2007 |
| GTF00070459 – GTF00070513 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 2006 |
| GTF00070514 – GTF00070568 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1995 |
| GTF00070569 – GTF00070619 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 2004 |
| GTF00070620 – GTF00070667 | Deutscher Tennis Bund Holding GmbH | December 31, 2004 |
| GTF00070668 – GTF00070715 | Deutscher Tennis Bund Holding GmbH | December 31, 2003 |
| GTF00070716 – GTF00070766 | Deutscher Tennis Bund Holding GmbH | December 31, 2002 |
| GTF00070767 – GTF00070817 | Deutscher Tennis Bund Holding GmbH | December 31, 2001 |
| GTF00070818 – GTF00070867 | Deutscher Tennis Bund Holding GmbH | December 31, 2000 |
| GTF00070868 – GTF00070915 | Deutscher Tennis Bund Holding GmbH | September 30, 2000 |
| GTF00070916 – GTF00070954 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1995 |
| GTF00070955 – GTF00070970 | Anlagen |  |
| GTF00070971 – GTF00071007 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1996 |
| GTF00071008 – GTF00071023 | Anlagen |  |
| GTF00071024 – GTF00071057 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1997 |
| GTF00071058 – GTF00071074 | Anlagen |  |
| GTF00071075 – GTF00071110 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1998 |
| GTF00071111 – GTF00071157 | Deutscher Tennis Bund Holding GmbH | September 30, 1999 |
| GTF00071158 – GTF00071172 | Anlagen |  |
| GTF00071173 – GTF00071224 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1994 |

| | | |
|---|---|---|
| GTF00071225 - GTF00071268 | Rothenbaum Sport Gumbo | June 30, 2006 |
| GTF00071269 - GTF00071310 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | June 30, 2005 |
| GTF00071311 - GTF00071355 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2004 |
| GTF00071356 - GTF00071402 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2003 |
| GTF00071403 - GTF00071450 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2002 |
| GTF00071451 - GTF00071494 | Rothenbaum Stadion Gumbo (vormals Deutscher Tennis Bund Holding GmbH) | December 31, 2005 |
| GTF00071495 - GTF00071548 | Deutscher Tennis Bund Holding GmbH | December 31, 2004 |
| GTF00071549 - GTF00071601 | Deutscher Tennis Bund Holding GmbH | December 31, 2003 |
| GTF00071602 - GTF00071656 | Deutscher Tennis Bund Holding GmbH | December 31, 2002 |
| GTF00071657 - GTF00071710 | Deutscher Tennis Bund Holding GmbH | December 31, 2001 |
| GTF00071711 - GTF00071765 | Deutscher Tennis Bund Holding GmbH | December 31, 2000 |
| GTF00071766 - GTF00071820 | Deutscher Tennis Bund Holding GmbH | September 30, 2000 |
| GTF00071821 - GTF00071877 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1998 |
| GTF00071878 - GTF00071935 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1997 |
| GTF00071936 - GTF00071992 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1997 |
| GTF00071993 - GTF00072048 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1996 |
| GTF00072049 - GTF00072104 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1995 |
| GTF00072105 - GTF00072156 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1994 |
| GTF00072157 - GTF00072204 | Deutscher Tennis Bund Holding GmbH | December 31, 2004 |
| GTF00072205 - GTF00072252 | Deutscher Tennis Bund Holding GmbH | December 31, 2003 |
| GTF00072253 - GTF00072303 | Deutscher Tennis Bund Holding GmbH | December 31, 2002 |
| GTF00072304 - GTF00072354 | Deutscher Tennis Bund Holding GmbH | December 31, 2001 |
| GTF00072355 - GTF00072404 | Deutscher Tennis Bund Holding GmbH | December 31, 2000 |
| GTF00072405 - GTF00072452 | Deutscher Tennis Bund Holding GmbH | September 30, 2000 |
| GTF00072453 - GTF00072491 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1995 |
| GTF00072492 - GTF00072507 | Anlagen | |
| GTF00072508 - GTF00072544 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1996 |
| GTF00072545 - GTF00072560 | Anlagen | |
| GTF00072561 - GTF00072594 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1997 |
| GTF00072561 - GTF00072611 | Anlagen | |
| GTF00072612 - GTF00072647 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1998 |
| GTF00072648 - GTF00072683 | Deutscher Tennis Bund Holding GmbH | September 30, 1999 |
| GTF00072684 - GTF00072709 | Anlagen | |
| GTF00072710 - GTF00072761 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1994 |
| GTF00072762 - GTF00072813 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1994 |
| GTF00072814 - GTF00072861 | Deutscher Tennis Bund Holding GmbH | 2004 |
| GTF00072862 - GTF00072909 | Deutscher Tennis Bund Holding GmbH | 2003 |
| GTF00072910 - GTF00072960 | Deutscher Tennis Bund Holding GmbH | 2002 |
| GTF00072961 - GTF00073011 | Deutscher Tennis Bund Holding GmbH | 2001 |
| GTF00073012 - GTF00073066 | Deutscher Tennis Bund Holding GmbH | 2000 |
| GTF00073067 - GTF00073121 | Deutscher Tennis Bund Holding GmbH | September 30, 2000 |
| GTF00073122 - GTF00073171 | Deutscher Tennis Bund Holding GmbH | December 31, 2000 |
| GTF00073172 - GTF00073228 | Deutscher Tennis Bund Holding GmbH | September 30, 1999 |
| GTF00073229 - GTF00073285 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1998 |
| GTF00073286 - GTF00073341 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1997 |
| GTF00073342 - GTF00073396 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1996 |
| GTF00073397 - GTF00073451 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1995 |
| GTF00073452 - GTF00073495 | Rothenbaum Sport GmbH | 2006 |
| GTF00073496 - GTF00073537 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | 2005 |
| GTF00073538 - GTF00073582 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | 2004 |
| GTF00073583 - GTF00073629 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | 2003 |

74

| | | |
|---|---|---|
| GTF00073630 - GTF00073677 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | 2002 |
| GTF00073678 - GTF00073721 | Rothenbaum Sport GmbH - (vormals Deutscher Tennis Bund Holding GmbH) | 2005 |
| GTF00073722 - GTF00073775 | Deutscher Tennis Bund Holding GmbH | December 31, 2004 |
| GTF00073776 - GTF00073828 | Deutscher Tennis Bund Holding GmbH | December 31, 2003 |
| GTF00073829 - GTF00073883 | Deutscher Tennis Bund Holding GmbH | December 31, 2002 |
| GTF00073884 - GTF00073937 | Deutscher Tennis Bund Holding GmbH | December 31, 2001 |
| GTF00073938 - GTF00073985 | Deutscher Tennis Bund Holding GmbH | September 30, 2000 |
| GTF00073986 - GTF00074032 | Deutscher Tennis Bund Holding GmbH | September 30, 1999 |
| GTF00074033 - GTF00074047 | Anlagen | |
| GTF00074048 - GTF00074083 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1998 |
| GTF00074084 - GTF00074117 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1997 |
| GTF00074118 - GTF00074134 | Anlagen | |
| GTF00074135 - GTF00074187 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1996 |
| GTF00074188 - GTF00074242 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1995 |
| GTF00074243 - GTF00074294 | Deutscher Tennis Bund Holding GmbH Hamburg | September 30, 1994 |
| GTF00074295 - GTF00074407 | Berichtsheft - 58. Mitgliederversammlung - 4. November 2006 - Wernigerode | November 4, 2006 |
| GTF00076887 - GTF00076935 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2001 |
| GTF00076936 - GTF00076985 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | December 31, 2000 |
| GTF00076986 - GTF00077038 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | September 30, 2000 |
| GTF00077039 - GTF00077087 | Deutscher Tennis Bund Rothenbaum Turnier GmbH | September 30, 1999 |
| GTF00077088 - GTF00077135 | Deutscher Tennis Bund Pool GmbH Hamburg | September 30, 1994 |
| GTF00077136 - GTF00077182 | Deutscher Tennis Bund Pool GmbH Hamburg | September 30, 1995 |
| GTF00077183 - GTF00077225 | Deutscher Tennis Bund Pool GmbH Hamburg | September 30, 1996 |
| GTF00077226 - GTF00077236 | Anlagen | |
| GTF00077237 - GTF00077267 | Deutscher Tennis Bund Pool GmbH Hamburg | September 30, 1997 |
| GTF00077268 - GTF00077298 | Deutscher Tennis Bund Pool GmbH Hamburg | September 30, 1998 |
| GTF00077299 - GTF00077309 | Anlagen | |
| GTF00077310 - GTF00077364 | Deutscher Tennis Bund Rothenbaum Turnier GmbH Hamburg | September 30, 1998 |
| GTF00077365 - GTF00077418 | Deutscher Tennis Bund Rothenbaum Turnier GmbH Hamburg | September 30, 1997 |
| GTF00077419 - GTF00077469 | Deutscher Tennis Bund Rothenbaum Turnier GmbH Hamburg | September 30, 1996 |
| GTF00077470 - GTF00077523 | Deutscher Tennis Bund Rothenbaum Turnier GmbH Hamburg | September 30, 1995 |
| GTF00077524 - GTF00077575 | Deutscher Tennis Bund Rothenbaum Turnier GmbH Hamburg | September 30, 1994 |
| GTF00077960 - GTF00077962 | Re: FW: WG: Potential financial sponsor | November 15, 2007 |
| GTF00078166 - GTF00078214 | Re: FW: WG: Preliminary Observations & Recommendations | November 15, 2007 |
| GTF00078331 - GTF00078341 | Besprechungsergebnis - Meeting am 23.10.2007 / Frankfurt - Teilnehmer: Ulrich Kroeker, Carl-Uwe Steeb, Annette Koring | October 23, 2007 |
| GTF00078426 - GTF00078429 | Re: FW: WG: Sitzung des Sportausschusses am 15.11.2007 | November 15, 2007 |
| GTF00090527 - GTF00090545 | Deutscher Tennis Bund Holding GmbH | December 31, 2002 |
| GTF00090575 - GTF00090595 | Deutscher Tennis Bund Holding GmbH | December 31, 2002 |
| GTF00090628 - GTF00090629 | Deutscher Tennis Bund Holding GmbH, Hamburg | |
| MC 0001723 - MC 0001724 | Letter from Patrice Dominguez to Sixte Cambra, Sergio Palmieri, & Walter Knapper Re: Follow-up of meeting in Barcelona | September 23, 2006 |
| MC 0001731 - MC 0001734 | Letter from Georg von Waldenfels, Mme Elizabeth de Massy, & Angelo Binaghi to Christian Bimes Re: 11/1/06 Paris meeting | November 27, 2006 |
| MC 0002504 - MC 0002547 | Memorandum to Tournament members from Mark Miles Re: ATP Board Strategic Planning | January 9, 2003 |
| MC 0002566 - MC 0002575 | ATP Business Plan 2003 - 2004 | November 2003 |
| MC 0008538 - MC 0008540 | Re: Fw: Mercedes verabschiedet sich von ATP Tour | December 7, 2006 |
| MC 0008654 - MC 0008656 | Re: Thursday's Call | December 13, 2006 |
| MC 0010045 - MC 0010056 | Aligning Management and ATP Performance: Incentive Compensation Plan Design | June 22, 2004 |

| | | |
|---|---|---|
| MC 0010045 - MC 0010057 | Aligning Management and ATP Performance: Incentive Compensation Plan Design - Presentation to ATP Board of Directors | June 22, 2004 |
| MC 0035643 - MC 0035651 | Supersport - South Africa - 30 March 2007 - Hamburg Masters, ATP in lawsuit | March 30, 2007 |
| MC 0036668 | Re: Letter to Etienne de Villiers | October 6, 2006 |
| MC 0038004 - MC 0038006 | Re: report from Las Vegas - Attachments: report from LV.doc | May 3, 2007 |
| MC 0038603 | Re: timing sponsor | September 14, 2004 |
| MC 0049874 - MC 0049875 | Notes of ITF President's Meeting with Selected National Association-owned Tournaments | |
| MC 0049893 - MC 0049894 | Re: FW: Draft | June 16, 2006 |
| MC0010057 | Sponsorship/Licensing and TV Units Revenue Projections | June 22, 2004 |
| MILES 0037 - MILES 0041 | Re: Fw: ATP - Attachments: lettertoEtiennedeVilliers.zip | July 31, 2007 |
| MILES 0038 - MILES 0041 | Letter Re: ATP's Proposed Restructuring Plan | January 11, 2007 |
| MILES 0045 | Re: Greece - 2/20/07 | July 31, 2007 |
| MILES 0048 - MILES 0049 | Re: Wimbledon Equal Prize Money Announcement | July 31, 2007 |
| MILES 0052 - MILES 0069 | Memorandum Re: FW: Etienne reports - Attachments: MDM Transition Document to ET.doc | March 19, 2007 |
| MILES 0153 - MILES 0158 | Re: TR: ATP Chairman's Report from Miami - 4/12/06 | August 2, 2007 |
| MILES 0197 - MILES 0198 | Re: battle of the surfaces | January 24, 2006 |
| MILES 0519 - MILES 0523 | Re: FW: TR: ATP Chairman's Report from Miami - 4/8/06 | August 2, 2007 |
| MILES 0587 - MILES 0588 | Re: ATP Chairman's Report Melbourne | January 25, 2006 |
| MILES 0682 - MILES 0709 | Mercedes-Benz/ATP Meeting - Las Vegas, USA | September 30, 2001 |
| MILES 0737 - MILES 0747 | Letter from CEO of ATP Tour, Inc. to Mark D. Miles Re: Agreement | April 13, 1990 |
| MILES 0749 - MILES0758 | Letter from Franco Bartoni & Tim Mayotte (ATP Tour, Inc.) to Mark D. Miles Re: 1991 Agreement | October 9, 1995 |
| MILES 0759 - MILES 0772 | Letter from ATP Tour, Inc. to Mark D. Miles Re: 1995 Agreement | November 3, 1998 |
| MILES 1289 - MILES1290 | Re: Conversation with Brian Tobin | July 6, 1995 |
| NR0034259 - NR0034259_0008 | Memorandum Re: Indian Wells | March 8, 2006 |
| NR0035179 - NR0035179_0002 | Decision of the Strategy Board regarding Grand Slam/ATP Tour Year-End Tournament | November 1999 |
| NR0104493 - NR0104493_0030 | ATP 'Game' Plan - Americas and IG Tournament Meeting - Miami 2006 | March 10, 2006 |
| PD-ROP0003842 - PD-ROP0003843 | Handwritten Notes | December 1, 2002 |
| PD-YOM0002278 - PD-YOM0001773 | Handwritten Notes | January 16, 2007 |
| PD-YOM0002528 - PD-YOM0002530 | Handwritten Notes | October 22, 2006 |
| PD-YOM0003557 - PD-YOM0003029 | Handwritten Notes | March 8, 2006 |
| PD-YOM0004163 - PD-YOM0004164 | Handwritten Notes - Call of Charlie & Ray | |
| PD-YOM0004931 - PD-YOM0004003 | Handwritten Notes | January 18, 2005 |
| PD-YOM0006835 - PD-YOM0006840 | Outline of TPL History | |
| QTF00000047 - QTF00000048 | Letter from Robert Kain | January 25, 2006 |

**Deposition Exhibits Considered**
**German Tennis Federation**
**v. ATP Tour, Inc., et al.**

| Exhibit No. | Exhibit Date | Title |
|---|---|---|
| Ex. 1 | July 11, 2007 | Notice of 30(b)(6) Deposition for ATP Tour, Inc., Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware & Monte-Carlo Country Club, et al. v. ATP Tour, Inc., et al., C.A. No. 07-198 (GMS), U.S. Distr. Ct., Distr. of Delaware, May 25, 2007. |
| Ex. 16 | July 11, 2007 | DRAFT - ATP Board of Directors - New York, NY - August 26, 2006 - Minutes |
| Ex. 17 | July 11, 2007 | What a Wonderful World Progress Update |
| Ex. 24 | July 11, 2007 | Deloitte - Presentation - Serving up the figures - ATP tournament financial review |
| Ex. 3 | July 11, 2007 | The Official Site of the ATP - Full Calendar - 2007,' ATPtennis.com, <http://www.atptennis.com/5/en/vault/archive.asp?year=2007&caltype=full>. |
| Ex. 7 | July 11, 2007 | Brave New World |
| Ex. 1 & Ex. 27 | August 3, 2007 | Defendants' Rule 26(A)(1) Disclosures, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware & Monte-Carlo Country Club, et al. v. ATP Tour, Inc., et al., C.A. No. 07-198 (GMS), U.S. Distr. Ct., Distr. of Delaware, May 4, 2007. |
| Ex. 2 & 28 | August 3, 2007 | Subpoena in a Civil Case (No. 07-178 GMS) to: Mark Miles |
| Ex. 3 & Ex. 29 | August 3, 2007 | Plaintiffs' Subpoena Decus Tecum and Notice of Deposition of Mark Miles, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware & Monte-Carlo Country Club, et al. v. ATP Tour, Inc., et al., C.A. No. 07-198 (GMS), U.S. Distr. Ct., Distr. of Delaware, July 24, 2007. |
| Ex. 4 & Ex. 30 | August 3, 2007 | Complaint and Jury Demand, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware, March 28, 2007. |
| Ex. 36 | August 7, 2007 | ATP Supervisor's Tournament Evaluation - Tournament City: Kitzbuhel - ATP Supervisor: Ed Hardisty - Tournament Number: 07-319 |
| Ex. 42 | August 7, 2007 | The 2007 ATP Official Rulebook |
| Ex. 70 | August 20, 2007 | Amended and Restated Bylaws of ATP Tour, Inc. |
| Ex. 74 | August 20, 2007 | Memorandum Re: ISL Agreements |
| Ex. 78 | August 20, 2007 | Fax from Mark Miles to Daniel Beauvois re: the DTB presentation |
| Ex. 79 | August 20, 2007 | ATP Tour 2000: The Future is Now |
| Ex. 93 | August 24, 2007 | Mercedes Benz ATP Meeting |
| Ex. 98 | August 24, 2007 | McKinsey Report |

| | | |
|---|---|---|
| Ex. 125 | August 30, 2007 | The 2007 ATP Official Rulebook |
| Ex. 131 | August 30, 2007 | Original Complaint, Michael Bryan, et al. v. ATP Tour, Inc., et al., C.A. No. H-05-3082, U.S. Distr. Ct., Southern Distr. of Texas Houston Div., September 1, 2005. |
| Ex. 155 | September 5, 2007 | DRAFT - ATP Board of Directors - Melbourne, Australia - January 16, 2007 - Minutes |
| Ex. 156 | September 5, 2007 | DRAFT - ATP Board of Directors - Melbourne, Australia - January 17, 2007 - Minutes |
| Ex. 157 | September 5, 2007 | DRAFT - ATP Board of Directors - Melbourne, Australia - January 18, 2007 - Minutes |
| Ex. 158 | September 5, 2007 | DRAFT - ATP Board of Directors - Melbourne, Australia - January 19, 2007 - Minutes |
| Ex. 161 | September 5, 2007 | Letter from the Players to Etienne de Villiers |
| Ex. 163 | September 5, 2007 | Complaint, Monte-Carlo Country Club, et al. v. ATP Tour, Inc., et al., C.A. No. 07-198, U.S. Distr. Ct., Distr. of Delaware, April 9, 2007. |
| Ex. 165 | September 5, 2007 | Letter from Thomas Wallen (Swedish Open Bastad) to ATP Board of Directors Re: Brave New World |
| Ex. 166 | September 5, 2007 | Re: Fw: Branding |
| Ex. 167 | September 5, 2007 | ATP to begin suspending players who skip mandatory events,' ESPN.com, <http://sports.espn.go.com/sports/tennis/news/story?id=2999435>. |
| D-2 | September 18, 2007 | Find a Lawyer - Lawyer Details - Georg von Waldenfels |
| D-38 | October 11, 2007 | Complaint and Jury Demand, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware, March 28, 2007. |
| D-49 | October 23, 2007 | ATP Tour, Inc.'s Amended Notice of Deposition of Ayman Azmy, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware, October 21, 2007. |
| D-58 | October 23, 2007 | Sony Ericsson Championships Awarded to Doha, Qatar for 2008-2010,' Qatar Tennis Federation, <http://www.qatartennis.org/news.htm>, visited on October 21, 2007. |
| D-62 | October 23, 2007 | Amended and Restated Bylaws of ATP Tour, Inc. |
| D-62 | October 23, 2007 | Amended and Restated Bylaws of ATP Tour, Inc. |
| D63 | October 23, 2007 | Defendants' First Set of Document Requests to Plaintiff Deutscher Tennis Bund, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware & Monte-Carlo Country Club, et al. v. ATP Tour, Inc., et al., C.A. No. 07-198 (GMS), U.S. Distr. Ct., Distr. of Delaware, May 2, 2007. |
| D-64 | October 24, 2007 | ATP Tour, Inc.'s Amended Notice of Deposition of Tariq Al Siddiqi, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware, March 28, 2007. |

78

| D-65 | October 24, 2007 | ATP Tour, Inc.'s Amended Notice of Deposition of Sheikh Mohammed Bin Faleh-Al Thani, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware, March 28, 2007. |
| D-66 | October 24, 2007 | Letter Re: Deutscher Tennis Bund, et al. v. ATP Tour, Inc. et al. & Civil Action No. 07-178 (GMS) |
| D-69 | November 1, 2007 | Steeb, Carl-Uwe,' Client Management Group, <http://clientmanagementgroup.de/en/index.php>, visited on October 26, 2007. |
| D-70 | November 1, 2007 | Nord-LB Open 2007 a great success,' Client Management Group, <http://clientmanagementgroup.de/en/index.php>, visited on October 26, 2007. |
| D-74 | November 1, 2007 | Interview mit Carl-Uwe Steeb - 'Ich hoffe, dass Becker eine Chance bekommt', RP Online, <http://www.rp-online.de/public/article/aktuelles/sport/mehr/tennis/399609>. |
| Ex. 244 | November 7, 2007 | Player Activity - Andre Agassi,' ATPtennis.com, <http://www.atptennis.com/5/en/players/playerprofiles/playeractivity.asp?query=Singles&year=2000&player=A092&selTournament=0&prevtrnnum=0>. |
| D-99 | November 16, 2007 | 2008 Sony Ericsson Open: An Interview with Adam Barrett and Butch Buchholz,' sonyericssonopen.com, <http://www.sonyericssonopen.com/content/20070406135207.html>. |
| Ex. 258 | November 20, 2007 | Letter from Mark Webster to Mark Miles re: ATP Reform |
| Ex. 272 | November 20, 2007 | Memorandum Re: FW: Etienne reports - Attachments: MDM Transition Document to ET.doc |
| Ex. 283 | November 21, 2007 | Email from Flip Galloway to Dan Jones re: Valuation Pages |
| D-114 | November 27, 2007 | First Amended Complaint, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware, October 15, 2007. |
| D-115 | November 27, 2007 | DRAFT - First Amended Complaint, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware, October 15, 2007. |
| Ex. 298 | November 27, 2007 | The Thoughts of Chairman Brian |
| Ex. 300 | November 27, 2007 | Email from Etienne de Villiers to George Ciz and Horst Klosterkemper re: calendars |
| Ex. 307 | November 27, 2007 | Email to Etienne de Villiers from Jean-Francois Cajoulle re:Paris combined |
| Ex. 325 | November 29, 2007 | Letter Re: Transfer Agreement |
| Ex. 328 | December 6, 2007 | ATP Tour, Inc. - Tournament Transfer Fee Revenue 1991- 2006 |
| Ex. 344 | December 7, 2007 | Subpoena in a Civil Case (No. 07-178 GMS) to: Phil Anderton - Executed on 6 December 2007 |
| Ex. 355 | December 12, 2007 | Email from Etienne de Villiers to Andre Silva; All ATP Board; All Management Committee re: Matches & Tournaments Played Top 20 2002-2006 |
| Ex. 359 | December 12, 2007 | Email from Andre Silva to J.J. Carter re: Monte Carlo |
| Ex. 368 | January 8-9, 2007 | E-mail dated November 4, 2007 from TPL consultant Peter Lawler to various ATP executives and Board members. |
| Ex. 370 | January 8-9, 2007 | E-mail from Etienne de Villiers to Andre Silva and ATP Board. |

Ex. 380    January 8-9,    E-mail dated March 16, 2007 from TPL lawyer Richard Barratt at Morgan Lewis & Bockius in London.
2007

**Other Documents and Data Sources Considered**
**German Tennis Federation**
**v. ATP Tour, Inc., et al.**

**Title**

*American Needle, Inc. v. New Orleans Louisiana Saints*, 385 F.Supp.2d 687, 696 (N.D.Ill.2005)

ASAP Sports, 'ATP Tennis Media Conference,' August 31, 2007

ASAP Sports, 'ATP Tour Announcement,' July 3, 2007

ASAP Sports, 'Pacific Life Media Conference,' March 1, 2006

ASAP Sports, 'Pacific Life Open,' March 18, 2007

ASAP Sports, 'Pacific Life Open,' March 19, 2006

ASAP Sports, 'Pacific Life Open,' March 20, 2004

ASAP Sports, 'TMS - Madrid,' October 19, 2003

ATP Official Rulebook for 2008, http://www.atptennis.com

ATP Tour Tournament Information for the 2007 Calend[ar]

Case summary: Volvo North America Corporation, et al. v. Men's International Professional Tennis Council, et al., 857 F.2d 55 (2nd Cir. 1988)

Charles Rule, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, to Hon. Howard Metzenbaum, Chair, Senate Subcommittee on Antitrust

*Chicago Pro. Sports Ltd. Partnership v. NBA*, 808 F.Supp. 646, 649-50 (N.D. Ill. 1992)

*Chicago Professional Sports Limited Partnership v. NCAA*, 961 F.2d 667, 673-74 (7th Cir.1992)

Comperio Research, 'Masters Series Hamburg - Television Broadcast and Sponsor Report,' May 14-20, 2007

Complaint, *Monte-Carlo Country Club v. ATP Tour, Inc*, April 9, 2007

Complaint, Monte-Carlo Country Club, et al. v. ATP Tour, Inc., et al., C.A. No. 07-198, U.S. Distr. Ct., Distr. of Delaware, April 9, 2007
Fax copy: Amended and Restated Bylaws of ATP Tour, Inc

Fax copy: Tennis Properties Limited & Tennis Properties BV - Budgeted Distributions - 31st December 2007

Fax copy: Tennis Properties Limited & Tennis Properties BV - Budgeted Distributions - 31st December 2007

German 2. Bundesliga Attendance - 2006/07,' ESPNsoccernet, <http://soccernet.espn.go.com>

81

German Bundesliga Attendance - 2003/04,' ESPNsoccernet, <http://soccernet.espn.go.com>

German Bundesliga Attendance - 2004/05,' ESPNsoccernet, <http://soccernet.espn.go.com>

German Bundesliga Attendance - 2005/06,' ESPNsoccernet, <http://soccernet.espn.go.com>

German Bundesliga Attendance - 2006/07,' ESPNsoccernet, <http://soccernet.espn.go.com>

History of ATP Tour World Championship, http://www.masters-cup.com/3/history

History of Career Watch, http://www.masters-cup.com/3/history

History of Grand Slam Cup, http://www.masters-cup.com/3/history

History of Honor Roll, http://www.masters-cup.com/3/history

History of Records, http://www.masters-cup.com/3/history

http://www.arag-world-team-cup.com/1/en/results

http://www.atptennis.com/3/en/rankings/entrysystem/default.asp

http://www.atptennis.com/5/en/vault/

http://www.atptennis.com/en/players

http://www.daviscup.com/teams/playersearch.asp

http://www.ftc.gov/bc/docs/horimer.htm (revised April 8, 1997)

http://www.sonyericssonwtatour.com/1/

http://www.tennis-data.co.uk/alldata.php

Letter from Brooks & Co to Walter Knapper Re: Confirmation of share of royalty payment for year ended 12/31/05

*Liberty Broadcasting Systems v. National League Baseball Club of Boston, Inc.* (N.D. Ill. 1952)

*Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir.1984)

*McNeil v. National Football League*, 777 F. Supp 1475 (Minn. 1991)

*Metropolitan Intercollegiate Basketball Ass'n v. National Collegiate Athletic Ass'n*, 339 F.Supp.2d 545, 549 (S.D.N.Y. 2004)

*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 132-133 (U.S.1984)

Press Release for 2009 ATP Tour "500" Events, http://www.atptennis.com

Professional Sports Antitrust Immunity Hearings on S.2784 and S2821 Before the Senate Committee on the Judiciary, *97th Congress, 2d Session 41 (1982)*

Ross, Stephen F., "An Antitrust Analysis of Sports League Contracts with Cable Networks," *Emory Law Journal*, vol. 39, no. 2, spring 1990

82

Schaerr, Gene, "The Cellophane Fallacy and the Justice Department's Guidelines for Horizontal Mergers," *Yale Law Journal* 94 (1985), pp. 671-93.

Schmalensee, Richard, "Horizontal Merger Policy: Problems and Changes," *Journal of Economic Perspectives* 1 (1987), pp. 41-54

Shareholders' Agreement

*Shaw et al. v. NFL* (ED Pa., 2000)

United Stated Department of Justice and the Federal Trade Commission, *1992 Horizontal Merger Guidelines*, available at http://www.ftc.gov/bc/docs/horimer.htm.

Weather Conditions During Hamburg Tournament (Source: www.weather.org)

**Deposition Testimony Considered**
**German Tennis Federation**
**v. ATP Tour, Inc., et al.**

| Title | Date(s) |
|---|---|
| Deposition of Mark Young, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | July 11, 2007 |
| Deposition of Mark Miles, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | August 20, 2007 |
| Deposition of Gayle David Bradshaw, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | August 30, 2007 |
| Deposition of Iggy Jovanovic, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | August 31, 2007 |
| Deposition of Zeljko Franulovic, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | September 5, 2007 |
| Deposition of Jacco Eltingh, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | October 30, 2007 |
| Deposition of Perry Rogers, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | November 7, 2007 |
| Deposition of Annette Koring, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | November 9, 2007 |
| Deposition of Mark Miles, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | November 20, 2007 |
| Deposition of Charles Pasarell, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | December 6, 2007 |
| Deposition of Juraj Ciz, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | December 21, 2007 |
| Deposition of Etienne de Villiers, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | January 8-9, 2008 |
| Deposition of Walter Knapper, Deutscher Tennis Bund (German Tennis Federation), et al. v. ATP Tour, Inc., et al., C.A. No. 07-178 (GMS), U.S. Distr. Ct., Distr. of Delaware | October 10-11, 2007 |

**APPENDIX C**


**CURRICULUM VITAE**

January 2008

# CURRICULUM VITAE

**ANDREW ZIMBALIST**  Office: Department of Economics
65 Ward Ave.  Smith College
Northampton, MA 01060  Northampton, MA 01063
(413) 586-7636  (413) 585-3622, 585-3503
 FAX (413) 585-3389/3339
 Email: azimbali@smith.edu

## Current Status:

Robert A. Woods Professor, Department of Economics, Smith College
Five College Graduate Faculty

## Education:

B.A.,  University of Wisconsin, 1969
M.A.,  in Economics, Harvard University, 1971
Ph.D., in Economics, Harvard University, 1974

## Memberships:

American Economics Association
Society for American Baseball Research
Drake Group for College Athletic Reform

## Fellowships, Grants, Awards and Positions:

National Science Foundation Traineeship, 9/69-8/72
Doherty Latin American Fellowship, 9/72-8/73
Harvard Institute for International Development Research Grant, 6/73-9/74
Research Fellow, Department of Economics, Harvard University 1/79-7/79
Picker Fellowship in International Studies, 6/82-7/83
Visiting Scholar, Doshisha University, Kyoto, Japan, 1/85-5/85.
Picker Fellowship in International Studies, 6/85-9/86.
Chair, Department of Economics, Smith College, 1982-1987
Writer and Director, Household International Grant on markets and the world
    economy, 1989-1993
MacArthur Foundation Grant for the study of reform of socialist management,
    1990
Ford Foundation Grant for research and academic exchange, 1990-91
Director, LASA Cuba Task Force study group on transition and reform, 1990-91
MacArthur Foundation Grant for research and academic exchange, 1992-96

86

Chair, LASA Task Force on Scholarly Relations with Cuba, 1993-94

Member, The Atlantic Council of the United States, Working Group on Cuba, 1994-95

*Baseball and Billions* selected as one of the 8 best business books of 1992 by *Business Week*, as the best sports book of 1992 by the *Sporting News*, as the best business book of 1992 by *USA Today Baseball Weekly*, and selected as Breakthrough Book in *Lingua Franca*

*Sports, Jobs and Taxes* selected as Breakthrough Book in *Lingua Franca*

Selected as the sports journalist of the year in 1998 by the *Village Voice*

*Unpaid Professionals* selected as a Breakthrough Book in *Lingua Franca*

Danziger Fellowship, Smith College, 1999-2002

Listed in *Who's Who in America*

Listed in *Who's Who in American Educators*

Chair, Smith College Committee on Athletics and NCAA Faculty Rep, 1998-present

Bi-weekly commentator on the business of sports on NPR's Marketplace, 2002-present

Visiting Professor, University of Geneva, 2003

*May the Best Team Win* given "Silver Award" by *ForeWord Magazine* in their Book of the Year Award in Business and Economics

*National Pastime: How Americans Play Baseball and the Rest of the World Plays Soccer* awarded prize for "Outstanding Academic Title" by *Choice*, the major review journal of the American Library Association

National Advisory Council, Campaign for Alcohol-Free Sports TV

Advisory Board, Israeli Baseball League

National Policy Advisory Board, Women's Sports Foundation

Advisory Board, Pennsylvania State Institute for Sports Law, Policy and Research

Selected as one of America's Top 100 Most Influential Sport Educators (Institute for International Sport)

Visiting Professor, American Studies Program, Doshisha University, Kyoto, Japan, June 2007.

Selected as one of top 100 sports educators by the Institute for International Sport, October 2007.

## Other Activities (partial listing)

Member, Editorial Board of journal *Journal of Sports Economics*, 1999 - present.

Member, Editorial Board of journal *Base Ball*, 2006 – present

Member, Editorial Board of journal *Journal of Issues in Intercollegiate Sport*, 2007 – present

Member, Editorial Board, *Sports Technology*, 2007 - present

Academic Affiliate, Analysis Group/Economics, 1999-present

Series Editor of Latin American Economic Development Book Series, Westview Press, 1987-1994.

Member, Editorial Board of journal *Comparative Economic Studies*, Association for Comparative Economic Studies, 1987-1990.

Member, Editorial Board of journal *Latin American Perspectives*, 1988-1998.

Member, Advisory Board, Western Massachusetts Civil Liberties Union, 1988-1994.

87



Member, Board of Directors, Network on East-West-South Research Cooperation on Technology Transfer, 1988-1994.

Member, Cable Advisory Board, Northampton, Ma., 1990-1994.

Member, Washington Office on Latin America Op-ed Writers' Network, 1995-1998.

Chair, Cable Advisory Board, Northampton, Ma., 1993-1994.

Member, Advisory Board, EcoConsult, 1992-1996.

Development Consultant, SRI project on non-traditional export promotion in Central America and the Caribbean basin, 1987-1988.

Development/Management Consultant, United Nations' Development Project, assessment of management training programs and needs in Cuban economy, 1990- 1993.

Project consultant, Ford Foundation, 1990

Project consultant, MacArthur Foundation, 1992

Consultant, for Attorney Robert Pearl in litigation brought by Mrs. Billy Martin, involving estimation of managerial contribution to revenue of baseball franchises, 1992.

Consultant, for Weil, Gotshal & Manges, in litigation brought by NFL Players' Association, involving an analysis of the effect of free agency on league competitive balance, 1992.

Consultant, for Williams & Youle, in arbitration case for compensation for territorial rights to the Denver Zephyrs of the American Association from the Colorado Rockies. (testimony)

Consultant, for Cunningham Law Group, in litigation against Major League Baseball for tortious interference in effort to procure a franchise for Tampa Bay.

Consultant, for Grippo & Elden, in litigation brought by WGN and the Chicago Bulls against the National Basketball Association over league rules restricting the number of superstation broadcasts.

Consultant, for Williams, Youle & Koenigs, Attorneys at Law, for arbitration case of The Denver Zephyrs Baseball Club v. Colorado Baseball Management, et al. (testimony)

Consultant, for Campbell, Maack & Sessions, in arbitration case for territorial compensation rights regarding Salt Lake City Buzz and Trappers. (testimony)

Consultant, for Wendell, Chritton & Parks, in arbitration case for territorial compensation to Fort Lauderdale Yankees from Florida Marlins. (testimony)

Consultant, for ABRY Communications in litigation between KSMO-TV and the Kansas City Royals. (testimony)

Consultant, for the Major League Baseball Players' Association concerning analysis and design of revenue sharing system for Major League Baseball.

Consultant, for Atlantic Council of the United States, project on U.S./Cuba relations.

Consultant, for IRELA (Instituto de Relaciones Europeo-Latino-americans), Madrid, of the European Parliament.

Co-founder of the United Baseball League, with Rep. Robert Mrazek, Rep. John Bryant and Richard Moss.

Consultant, for Attorney Robert Bell in litigation between Marianne Stanley and USC.

Consultant, for ING Bank

Consultant, for Holderbank

Consultant, for Coca-Cola

Consultant, for Euromoney

Consultant, for Mayor's Office, Portland, Oregon

Consultant, for Krendl, Horowitz & Krendl in litigation between Steven Ehrhardt
and the Colorado Rockies Baseball Team. (testimony)

Consultant, for Brown, Hart, Reed & Kaplan in Burt v. Hampshire College.
(testimony)

Consultant, for Wolff Companies

Consultant, for Connecticut Senate Democrats

Consultant, for Husch & Eppenberger, in St. Louis CVC Authority v. NFL
(testimony)

Consultant, for Rose, Sundstrom & Bentley, in W. Poe v. Hillsborough County &
City of Tampa. (testimony)

Consultant, for U.S. House Judiciary Committee in drafting bill for partially lifting
baseball's antitrust exemption as it applies to labor relations

Consultant, for IRS in franchise asset evaluations

Consultant, for Davis, Scott, Weber & Edwards in Miami sports facility case

Consultant, for Los Angeles Mayor's Office in arena financing matter

Consultant, for Cincinnati *Business Courier*, in stadium lease evaluation

Contributing columnist, *Sports Business Journal*

Consultant, for Analysis Group/Economics in U.S. Department of Justice
case against a Major League Baseball franchise. (testimony)

Consultant, for ENIC in European soccer case

Consultant, for National Basketball Players' Association in collective bargaining

Consultant, for Rabinowitz, Boudin et al. in copyright case

Consultant, for National Hockey Players' Association in franchise analysis

Consultant, expert on behalf of Fraser class in antitrust litigation against Major
League Soccer (testimony)

Consultant, for Leboeuf, Lamb, Greene & MacRae in baseball franchise valuation
case

Consultant, for Kohrman, Jackson & Krantz in NFL/consumer protection case.
(testimony)

Consultant, for Greenbaum, Doll & McDonald in sports antitrust case

Consultant, for Menard, Murphy and Walsh in sports facility/eminent domain case

Consultant, for Levin, Fishbein, Sedran & Berman in NFL antitrust case

Consultant, for Wisconsin Governor's office in stadium matter

Consultant, for Sills, Cummis, et al. in tax case involving the New Jersey Nets

Consultant, U.S. Department of Justice, in tax case involving several baseball teams.
(testimony)

Consultant, for Shughart, Thomson & Kilroy in NFL franchise valuation case

Lecturer, Aspen Institute Congressional Program on Cuba

Consultant, for Boies, Schiller & Flexner in NFL ownership/franchise valuation
case. (testimony)

Consultant, Ways and Means Committee, Boston City Council

Consultant, for Henry Klein in NFL/consumer rights case

Consultant, for Thorsnes, Bartolotta & McGuire in sports broadcasting antitrust case

89

Consultant, for Schulman & Kaufman, in sports licensing case

Consultant, for Blecher & Collins in sports licensing case

Consultant, "The Power of Ideas" Program, American Public Television

Consultant, for Modern Continental in stadium construction plan

Consultant, for Boies, Schiller & Flexner in Broadcasting case (testimony)

Consultant, for National Cable Telecommunications Association, Board of Directors

Consultant, Minneapolis Metropolitan Sports Facilities Corporation against MLB's contraction efforts

Consultant, to the Shubert Organization in economic development matter

Consultant, to the IRS in NFL franchise valuation case

Consultant, to Boyle, Morrisey et al. in damages case

Consultant, to the Antitrust Division of the U.S. Justice Department

Consultant, to First Watch Investment Advisors, LLC

Consultant, to McLaughlin, Gouldborne & Cohen in minor league baseball facilities matter

Consultant, to Furnier & Thomas in a sports stadium matter

Consultant, to NCAA in financial analysis of intercollegiate athletics

Consultant, to Brascher Law in sports damages case

Consultant, to Marcus Katz in sports league matter

Consultant, to Bruce Ratner/Forest City in development matter

Consultant, to Wisconsin State Legislature in team and stadium matter

Consultant, to Dewey Ballantine in intercollegiate sports antitrust case

Consultant, to new team boxing league

Consultant to Boies, Schiller and Flexner in NFL ownership matter

Consultant to WUSA, relaunch effort

Consultant to McDonald & Hayden in NHL financial matter

Consultant to District of Columbia's Controller's Office in stadium matter

Consultant to Waite, Schneider, Bayless and Chesley in stadium matter

Consultant to San Francisco Giants in stadium matter (testimony)

Consultant to City of Anaheim in stadium matter (testimony)

Consultant to Waite, Schneider, Bayless and Chesley in NASCAR antitrust matter (testimony)

Consultant to Jackson County, Mo. in stadium negotiations with the Chiefs and Royals

Consultant to Rainey Kaiser, in stadium matter in Jackson, Tennessee (testimony)

Consultant to Magna Entertainment in horse racing matter

Consultant to Harrah's in sports development matter

Consultant to ML in sports franchise purchase matter

Consultant to NJSEA in stadium matter

Consultant to the San Francisco Board of Supervisors in assessing the economic impact of an Olympics bid

Consultant to various MLB teams

Consultant to MLB in collective bargaining

Consultant to Citigroup clients on franchise purchase

Consultant to Weil, Gotshal & Manges in matter involving NBA team

Consultant to Geraghty, O'Laughlin & Kenney in matter involving professional basketball player

90

Consultant to Melick, Porter & Shea in matter involving professional golf

Consultant to New Jersey Sports and Exhibition Authority in arena matter

Member, National Advisory Council, Campaign for Alcohol-Free Sports TV, Center for Science in the Public Interest

Member, Advisory Board, Museum of the City of New York, exhibit on baseball in New York, 1947-1957

Member, Board of Advisers, Israeli Baseball League

Member, Board of Directors, Vintage Baseball

Member, Advisory Board, Penn State Institute for Sports Law, Policy and Research

Member, National Expert Advisory Panel, Women's Sports Foundation

Member, Antitrust Public Policy Group, Women's Sports Foundation

Consultant to Michael Best Law Group in minor league baseball matter

Member, Knight Commission Committee on financial reform in college sports

Consultant to city of Seattle in sports facility matter

Consultant to Barnes & Thornburg in tennis antitrust matter

Consultant to Ken Burns/Florentine Films on baseball documentary

Referee for Social Science Research Council of Canada, American Economic Review, World Development, Latin American Research Review, Southern Economic Journal, Regional Science and Urban Economics, Problems of Post-Communism, Industrial and Labor Relations Review, Journal of Inter-American Studies and World Affairs, Latin American Politics and Society, Cuban Studies, Social Science Quarterly, Journal of Comparative Economics, Studies in Comparative International Development, Journal of Industrial Economics, National Science Foundation, Fullbright, Latin American Perspectives, Journal of Sports Economics, Eastern Economics Journal, Southern Economic Journal, Quarterly Review of Economics and Finance, Economic Inquiry, Regional Studies, Journal of Business, B.E. Journals in Economic Analysis and Policy, Journal of Planning, Education and Research, Growth and Change, Journal of Public Economics, Urban Affairs Review, Sociological Forum, State and Local Government Review, Thompson/South-Western publishing, and various university presses and other journals.

## Testimony before Political Bodies:

House Ways and Means Committee on the economic effects of U.S. policy toward Cuba in March 1994

U.S. Senate Judiciary Committee in December 1992 in hearings on baseball's antitrust exemption

N.Y. State Senate on public policy toward minor league baseball in February 1993

U.S. House Judiciary Committee in its consideration of the Bunnings/Synar bill to limit MLB's anti-trust exemption in September 1994

U.S. Senate Judiciary Committee in January 1996 at hearings on the future of professional sports leagues

U.S. House Judiciary Committee in February 1996 at hearings on antitrust implications of professional sports franchise relocation

91

New York State Senate on the economic impact of sports franchises and stadiums on cities in
    April 1996
U.S. House Commerce Committee in May 1996 at hearings on the "Fan Freedom
    and Community Protection Act of 1996"
Connecticut State Legislature in December 1998 on the proposal to bring the New
    England Patriots to Hartford (written only)
U.S. Senate Judiciary Committee in June 1999 at hearings on sports antitrust policy
    and stadium financing
Springfield City Council in July 1999 on public subsidies for the construction of a
    minor league stadium
Philadelphia City Council in June 2000 on pubic subsidies for stadium construction.
U.S. Senate Judiciary Committee in November 2000 on competitive balance in
    Major League Baseball (written only)
Ways and Means Committee, Boston City Council, December 11, 2000 (written only)
U.S. Department of Education Commission of Gender Equity in College Athletics, November 20,
    2002
San Francisco City Council, March 2005

## Publications:

## Books:

*Economic Democracy: Workers' Participation in Chilean Industry, 1970-73,* Academic    Press,
February 1978. Updated, student paperback edition, Fall 1981. Revised Spanish language edition,
*Democracia Económica,* Fondo de Cultura Económica, Mexico, 1984. (with Juan Espinosa).

*Case Studies on the Labor Process* (editor). Monthly Review Press, December 1979 (paperback
edition, April 1981).

*Comparative Economic Systems: An Assessment of Knowledge, Theory and Method* (editor). In
series on history of economic thought edited by Warren Samuels, Kluwer-Nijhoff, November 1983.

*Comparing Economic Systems: A Political Economic Approach,* Academic Press, July 1984.
Second printing, December 1985. Second edition, Harcourt, Brace and Javonovitch, Fall 1988
(with H. Sherman and S. Brown).

*Cuba's Socialist Economy Toward the 1990s* (editor). Special issue of *World Development,* vol.
15, no. 1, January 1987.Pergamon Press. Book version with new introductory essay, (paper and
hardback editions) October 1987, Lynne Rienner Publishers.

*Cuban Political Economy: Controversies in Cubanology* (editor). Westview Press, January 1988.

*The Cuban Economy: Measurement and Analysis of Socialist Performance.* Johns Hopkins
University Press, October 1989. (with Claes Brundenius).

*Panama at the Crossroads: Economic Development and Political Change in the Twentieth Century.* University of California Press, Summer 1991. (with John Weeks).

*Cuba in Transition: Crisis and Transformation* (joint editor). Westview Press, Spring 1992.

*Baseball and Billions: A Probing Look Inside the Big Business of Our National Pastime.* Basic Books, Fall 1992.  (Japanese edition published in July 1993 by Dobunshoin, Tokyo.) Updated paperback edition with new preface and postscript, March 1994.  Audio cassette, High Sport Productions, 1994.

*Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums.* (jointly      written and edited with Roger Noll, Stanford University).  Brookings Institution, October 1997 (hard and soft back editions).

*Unpaid Professionals: Commercialism and Conflict in Big-Time College Sports.*  Princeton University Press, September 1999 (hardback).  Expanded and updated paperback edition, February 2001.

*The Economics of Sport I & II* (editor). Two volumes. Edward Elgar's series on *The International Library of Critical Writings in Economics,* edited by Mark Blaug, September 2001.

*Symposium on Competitive Balance in Professional Sports* (editor). Special Issue of the *Journal of Sports Economics,* May 2002.

*May the Best Team Win: Baseball Economics and Public Policy*.  Washington, D.C.: Brookings Institution Press, March 2003. Expanded and updated paperback edition, April 2004.  Japanese Edition (Baseball Magazine), forthcoming October 2006.

*National Pastime: How Americans Play Baseball and the Rest of the World Plays Soccer.* Washington, D.C.: Brookings Institution Press, April 2005, (with Stefan Szymanski).  Japanese Edition (Diamond, Inc.), 2006.  Korean Edition (Editor Publishing), 2006.  Expanded paperback edition, June 2006.

*In the Best Interests of Baseball? The Revolutionary Reign of Bud Selig.*  New York: Wiley, March 2006.  Paperback edition, June 2007.

*The Bottom Line: Observations and Arguments on the Sports Business* (editor). Temple University Press, September 2006. ·

*Equal Play: Title IX and Social Change* (joint editor and author). Philadelphia: Temple University Press, Fall 2007, forthcoming (with Nancy Hogshead-Makar).

## Professional Articles:

"Income Distribution in the United States," in *The Review of Radical Political Economics*, Summer, 1971. Reprinted in Edwards, Reich and Weisskopf, *The Capitalist System*, Prentice-Hall, 1972; MacEwan and Weisskopf, *Perspectives on the Economic Problem*, Prentice-Hall, 1972; Carson, Ingles and McLaud, *Government in the American Economy*, Heath, 1973; Mermelstein, *Economics: Mainstream Readings and Radical Critiques* (second edition), Random House, 1973. (with F. Ackerman, H, Birnbaum and J. Wetzler)

"Sweezy on Chile," *Monthly Review*, March 1972, and a response in May 1972 issue; also in Sweezy and Magdoff, Sweezy and Magdoff (eds.), Revolution and Counter-Revolution in Chile. (with B. Stallings).

"La Expansión de la Educación Primaria y el Desarrollo Capitalista: el Caso de Chile," *Revista del Centro de Estudios Educativos*, (Mexico, D.F.), no. 2, 1973.

"Workers' Participation in Chilean Industry Under Allende," *Science for the People*, Oct./Nov. 1973 and *Monthly Review*, (March 1974).

"Showdown in Chile," *Monthly Review*, October 1974, and in Sweezy and Magdoff (eds.), *Revolution and Counter-Revolution in Chile*. (with B. Stallings).

"The Dynamic of Worker Participation: An Interpretive Essay on the Chilean and Other Experiences," *Administration and Society*, (May 1975); also in Garson and Smith (eds.), *Organizational Democracy*, Sage, 1976.

"The Political Economy of the *Unidad Popular*," *Latin American Perspectives*, (Spring 1975). (with Barbara Stallings).

"The Limits of Work Humanization," *Review of Radical Political Economics*, (Summer 1975).

"Worker Participation in Cuba," *Challenge: The Magazine of Economics Affairs*, (Nov-Dec. 1975).

"Workers' Control in Allende's Chile," Institute for Workers' Control, Pamphlet No. 47 (England); also, revised version in *Comparative Urban Studies*, (Spring 1976). (with James Petras).

"Class and Income Distribution in the United States," in Althauser and Snyder (eds.), *Selected Contemporary Social Problems*, 1975. (with Frank Ackerman).

"Worker Management of Chilean Industry, 1970-1973: An Empirical Investigation," *Journal of Economic Issues*, (June 1976).

"La disparité des salaires et des profits," *Le Monde Diplomatique*, (July 1976).

"Capitalism and Inequality in the United States," in Edwards, et. al., *The Capitalist System*, (2nd edition), Prentice-Hall, 1978. Revised for 3rd edition, 1984. (with F. Ackerman).

"The Prospects for U.S.-Cuba Trade," *Challenge: The Magazine of Economic Affairs*, (January/February 1978).

"The Economics of Workers' Management: The Chilean Experience," *Economic Analysis and Workers' Management*, vol. 12, nos. 3-4, (1978). (with J. Espinosa).

"Introduction: Case Studies on the Labor Process," in *Case Studies on the Labor Process*, edited by Andrew Zimbalist, Monthly Review Press, 1979.

"Technology and the Labor Process in the Printing Industry," *Ibid*.

"Economic Democracy: Solution or New Challenge," *Journal of Social Economics*, Vol. 38, No. 3 (Dec. 1980).

"On the Role of Management in Socialist Development," *World Development*, Vol. 9, Nos. 9/L0 (Fall 1981). Reprinted in Wilber and Jamison (eds.), Socialist Models of Development, Pergamon, 1982.

"Response to de Vylder," *Economic and Industrial Democracy*, Vol. 3 (1982).

"Soviet Aid, U.S. Blockade and the Cuban Economy," *Comparative Economic Studies (formerly ACES Bulletin)*, Vol. 24, No. 4 (Winter 1982).

"Introduction: Reflections on the State of the Art of Comparative Economics," in *Comparative Economic Systems: An Assessment of Knowledge, Theory and Method*, edited by A. Zimbalist, Kluwer-Nijhoff, 1983.

"Incentives and Elicitation Schemes: A Critique and An Extension," in *Comparative Economic Systems: An Assessment of Knowledge, Theory and Method*, edited by A. Zimbalist, Kluwer-Nijhoff, 1983. (with S. Koont).

"Cuban Economic Planning: Organization and Performance," in Halebsky and Kirk (eds.), *Cuba: Twenty-Five Years of Revolution*, Praeger, 1985.

"Recent Studies on Cuban Economic Growth: A Review," *Comparative Economic Studies*, Vol. 27, no. 1 (spring 1985). (with C. Brundenius).

"Japan-U.S. Trade: Reason and Fury," Part 1, *Japan Economic Journal* (April 30, 1985).

"Japan-U.S. Trade: Reason and Fury," Part 2, *Japan Economic Journal* (May 7, 1985).

"Cuban Economic Growth One More Time: A Response to `Imbroglios'," *Comparative Economic Studies* (Fall 1985). (with C. Brundenius).

95

"Cuban Growth: A Final Word," *Comparative Economic Studies* (Winter 1985). (with C. Brundenius).

"An Annotated Bibliography of Economics and Business," in *Sources of Information in the Social Sciences*, American Library Association, 1986. (with B. Hoselitz and R. Kaufman).

"Patterns of Cuban Development: The First Twenty-Five Years," *World Development*, vol 15, no. 1 (January 1987). (with S.Eckstein).

"Cuban Industrial Growth, 1965-1985," *World Development*, vol. 15, no. 1 (January 1987). Translated and reprinted, "El Crecimiento Industrial de Cuba, 1965-85," *Temas de Economía Mundial*, no. 20 (1987) and in *Empresas Públicas: Problemas y Desarrollo*, vol. 2, nos. 6-7 (1988).

"Introduction: Cuba's Socialist Economy Toward the 1990s," *World Development*, vol. 15, no. 1 (January 1987). Revised and expanded as introductory essay in Zimbalist (ed.), *Cuba's Socialist Economy Toward the 1990s*, L. Rienner Publishers, 1987.

"The Economics of Socialism" in J. Eatwell et. al. (eds.), *The New Palgrave: A Dictionary of Economic Thought and Doctrine*. London: The Macmillan Press Ltd., 1987. (with D. Milenkovitch).

"Analyzing Cuban Planning: A Response to Roca," *Cuban Studies/Estudios Cubanos*, vol. 17, 1987.

"Cuban Political Economy and Cubanology: An Overview," in Zimbalist (ed.), *Cuban Political Economy*, op. cit.

"Interpreting Cuban Planning: Between a Rock and a Hard Place," *Ibid*.

"Cubanology and Cuban Economic Performance," *Ibid*. (with C. Brundenius).

"Cuban Planning: A Rejoinder to Roca," *Cuban Studies/Estudios Cubanos*, vol. 18, 1988.

"Cuba's Statistical and Price Systems: Interpretation and Reliability," *Latin American Perspectives*, vol. 14, no. 1, 1988. Revised spanish version in *El Trimestre Económico*, vol. 57, no. 227, 1990.

"Incentives and Planning in Cuba," *Latin American Research Review*, vol. 24, no. 1 (January 1989).

"Cuba's External Economy: Reflections on Export Dependence, Soviet Aid and Foreign Debt," *Comparative Economic Studies*, vol. 30, no. 2, 1988.

"Quinquennial Growth Rates in the CMEA: A Note on Eurocentrism," *Comparative Economic Studies*, vol. 30, no. 3, 1988.

96

"Using Physical Indicators to Estimate GDP Per Capita in Cuba: An Estimate and a Critique," *Journal of Comparative Economics*, March 1989.

"What Is Comparative Economic Systems, Normatively Speaking," *Comparative Economic Studies*, vol. 31, no. 3, Fall 1989.

"Problems and Prospects of Export Diversification: The Case of Costa Rica," in E. Paus (ed.) *Struggle Against Dependence: Non-traditional Export Promotion in Central America and the Caribbean.* Westview Press, 1988.

"Problems and Prospects of Export Diversification: The Case of Panama," in *Ibid*.

"Development Strategy and the Growth of Non-traditional Exports in Socialist Cuba," in *Ibid*.

"La Economía Cubana Al Comienzo del Cuarto Decenio," *El Trimestre Económico*, vol. 56, no. 224 (Octubre-Diciembre 1989).

"The Failure of U.S. Intervention in Panama: Humiliated in Its Backyard," *Third World Quarterly*, vol 11, no. 1, January 1989 (with John Weeks).

"Cuba's Socialist Economy After Three Decades," *Multinational Monitor* (April 1989).

"Cuba's Economic Diversification: Progress and Shortcomings," in S. Halebsky and J. Kirk (eds.) *Transformation and Struggle: Cuba Faces the 1990s*, Praeger Publishers, January 1990.

"Reform in Cuba," in I. Kim (ed.) *Reform in Communist Systems: Comparative Perspectives.*    Washingt

"El Desarrollo Económico de Cuba en Perspectiva Comparada," *Cuadernos de Nuestra América*, vol. 4, no. 4 (December 1989) (with Claes Brundenius).

"Desarrollo Económico y Crisis en Panamá desde 1970," *Temas de Economía Mundial*, 1992.

"Cuba in the Age of Perestroika: A Review Essay," *Latin American Perspectives*, 1992.

"Perspectives on Cuban Development and Prospects for the 1990s," in A. Hennessy and G. Lambie (eds.), *Cuba and Western Europe: Breaking the Blockade*. London: MacMillan, 1994.

"The Organization and Performance of Cuban Agriculture," in Twomey & Helwege (eds.) *Modernization and Stagnation: Latin American Agriculture in the 1990s*. New York: Greenwood Press, 1991. (with Claes Brundenius)

"Does the Cuban Economy Work?" *NACLA Report on the Americas*, October 1990.

"Whither the Cuban Economy," in Kirk et. al. (eds.) *Cuba Faces the 1990s*. Boulder: Westview Press, 1992.

"Industrial Management Reform in Cuba," in Ian Jeffries (ed.) *Industrial Reform in Socialist Countries*. England: E. Elgar Publishers, 1992.

97

"Cuba, 1990," in E. Gamarra and J. Malloy (ed.) *Latin America and Caribbean Contemporary Record*. 1992.

"Salaries and Performance in Major League Baseball," in P. Sommers (ed.) *Diamonds Are Forever: The Business of Baseball*. Washington, D.C.: Brookings Institution, 1992.

"Recent Trends in Latin American Economic Development," in *Proceedings of Symposium on Latin American Studies in theUnited States and the Soviet Union*. Moscow: Institute of Latin America, Academy of Sciences, October 1991.

"Teetering on the Brink: Cuba's Post-CMEA Economic and Political Crisis," *Journal of Latin American Studies*, vol. 24, no. 2, (May, 1992).

"The Cost of the U.S. Embargo and Its Extraterritorial Application to the Cuban Economy," in          M. Krinsl

"U.S. Subsidiary Trade with Cuba: Competing Tendencies," *Business Tips on Cuba*, vol. 1, no. 2 (November 1992).

"Cuba," in *Economist Intelligence Unit World Outlook*, 1993. London: EIU, 1993.

"Baseball's Economic Dilemmas and Public Policy," Katherine Asher Engel Lecture, Smith College, November 17, 1992.

"Quarterly Situation Report: Cuba, 1st Quarter - 4th Quarter, 1993," *Economist Intelligence* Unit. London: EIU, 1993.

"Institutions of the Service Economy in Panama: Free Zone and Banking Center," in R. Roberts (ed.) *International Financial Centres*. London: Edward Elgar Pubs., 1994.

"Public Policy Toward Minor League Baseball," *Oversight Hearings: The Well-Being of Minor League Baseball in New York State*. Trancript of Hearing Before the Committee on Tourism, Recreation and Sports Development, New York State Senate, February 9, 1993: New York, Roy Allen & Associates, 1993.

"Baseball's Economics and the Antitrust Exemption," *Baseball's Antitrust Immunity*. Written Testimony. Hearing before the Subcommittee on Antitrust, Monopolies and Business Rights of the Committee on the Judiciary. U.S. Senate, 102nd Congress, December 10, 1992. Washington D.C.: USGPO, 1993.

"Hanging on in Havana," *Foreign Policy*, No. 92, Fall 1993.

"Cuba," in *Economist Intelligence Unit World Outlook, 1994*. London: EIU, 1994.

"Quarterly Situation Report: Cuba, 1st Quarter, 1994," *Economist Intelligence Unit*. London: EIU, 1994.

98

"Baseball Economics and Antitrust Immunity," *Seton Hall Journal of Sport Law*, vol. 4, no. 1 (1994).

"Cuba: Reforming the Economic System from Within," in J. Pérez-López (ed.), *Cuba at a Crossroads*. Gainesville: University of Florida Press, 1994.

"El Impacto del Embargo de Estados Unidos para Cuba y Terceros Paises," in W. Grabendorff (ed.), *Cuba: Apertura Económica y Relaciones con Europa*. Madrid: IRELA, 1994.

"Cuba: compás de espera en La Habana," *Estudios Internacionales*, XXVII, 107/108, 1994.

"Baseball's Antitrust Exemption," *The Antitrust Bulletin*, vol. 39, no. 2 (summer 1994).

"La organización y el desempeño de la agricultura cubana," in Twomey & Helweg (eds.) *Modernización y estancamiento: La agricultura latinoamericana en los años noventa*. Mexico: Fondo de la Cultura Económica, 1994 (translated and updated version, with Claes Brundenius)

Written Testimony for the House Judiciary Committee's Consideration of the Synar/Bunning Bill on Baseball's Antitrust Exemption. September 1994.

"Waiting for Change: Adjustment and Reform in Cuba," *World Development*, May 1995. (with Manuel Pastor)

"Facing the Future: External Shocks, Economic Crisis, and the Dynamics of Transition in Cuba," *NACLA Report on the Americas*, Fall 1995. (with Manuel Pastor)

"Are Professional Team Sports Striking Out?" *World Book Year Book*, (yearly supplement to the *World Book Encyclopedia*), 1996.

"Cuba, Castro, Clinton and Canosa," in A. Ritter & J. Kirk (eds.), *Cuba in the International System: Normalization and Integration*. London: MacMillan, 1996.

Chapter on comparative economic systems in economics textbook published in Russia. (With Tom Weisskopf and Robert McIntyre)

"The Economics of Major U.S. Professional Sports Leagues," in A. Wise, *International Sport Law and Business*. Cambridge: Kluwer, 1997.

"Professional Sports Franchise Relocations," written testimony before the U.S. Senate, Committee on the Judiciary, January 23, 1996, published in *Hearing on the Future of Professional Team Sports*. Washington, D.C.: USGPO, 1966. Modified version also presented to hearings of the House Judiciary Committee, February 6, 1.

"The Economic Impact of Sports Teams on Cities," *Tennessee's Business*, vol. 7, nos. 1-2, 1996.

"Baseball in the 21st Century," in D. Marburger (ed.) *Stee-rike Four! What's Wrong with the National Pastime*, Greenwood Press, 1996.

99

"The Cuban Economy in the Era of Helms-Burton," in *Cuba ante Helms-Burton*, IRELA, Madrid, Spain, 1996.

"Public Policy and the Economic Impact of Sports Teams and Facilities on Metropolitan Area Development," written testimony before the U.S. House of Representatives, Committee on Commerce, Subcommittee on Commerce on Commerce, Trade and Hazardous Materials, on H.R. 2740, *Hearings on the Fan Freedom and Community Protection Act of 1995*, Serial No. 104-104, May 16, 1996. Washington, D.C.: U.S. Government Printing Office, 1996.

"Has Cuba Turned the Corner?" *Cuban Studies*, vol. 27, 1997 forthcoming. (with Manuel Pastor)

"Gender Equity and the Economics of College Sports," *JAI's Advances in the Economics of Sports*, edited by W. Hendricks, 1997.

"Sports, Jobs and Taxes: Are New Stadiums Worth the Costs?" *Brookings Review*, Summer 1997. (with Roger Noll)

"Build the Stadium: Create the Jobs, *Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums* edited by Roger Noll and Andrew Zimbalist, Brookings Institution, October 1997. (with Roger Noll)

"The Economic Impact of Sports Teams and Facilities," *Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums* edited by Roger Noll and Andrew Zimbalist , Brookings Institution, October 1997. (with Roger Noll)

"Sports, Jobs and Taxes: The Real Connection," *Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums* edited by Roger Noll and Andrew Zimbalist , Brookings Institution, October 1997. (with Roger Noll)

"The Economics of Stadiums, Teams and Cities," *Policy Studies Review*, Vol 15, No. 1, Spring 1998.

"El enigma economico de Cuba," in D. Dirmoser and J. Estay, *Economia y reforma economica en Cuba*. Mexico City: Nueva Sociedad, 1998.

"College Sports: The Bottom Line," *College Football: Nonprofit – Yes or No*. American Bar Association, 1999.

"A Miami Fish Story," *The New York Times Magazine*, October 18, 1998. Reproduced in Peter Donnelly (ed.) *Taking Sports Seriously*. Toronto: Thompson, 2000.

"The Economics of Sports Facilities and Their Communities," *Journal of Economic Perspectives*, Spring 2000, vol. 14, no. 3. (with John Siegfried).

"The Y2K Problem in Professional Sports," in W. Kern (ed.), *Current Issues in Sports Economics*, Upjohn Institute, 2000.

100

"Whither the Cuban Economy," in S. Kaufman and D. Rothkopf (eds.), *Cuba: Preparing for the Future,* America's Society, 2000.

"The Economics of Stadiums, Teams, and Cities," in Wibur Rich (ed.) *The Economics of Politics and Sports Facilities.* Westport, Conn.: Quorum Books, 2000.

"The Cuban Economy at the Millenium," in Dick Clark (ed.) *U.S. Policy Toward Cuba.* Washington, D.C.: The Aspen Institute, 2000.

"The State of Competition in Major League Baseball," *Hearing before the Subcmte. On Antitrust, Business Rights, and Competition of the Senate Committee on the Judiciary,* 106th Cong., 2000.

"Postscript," chapter in paperback edition of *Unpaid Professionals,* forthcoming, February 2001.

"Competitive Balance and Labor Relations in Major League Baseball," *Milken Institute Review,* Volume 3, Number 1, (February, 2001).

"Escalating Ticket Prices in Professional Sports," *2001 Americana Annual/ Encyclopedia Year Book.* Grolier, 2001.

"Foreword," to the second edition of *Fair Ball: A Fan's Case for Baseball* by Bob Costas. Broadway Books, 2001.

"Introduction," in A.Zimbalist (ed.) *The Economics of Sport.* London: Edward Elgar, summer 2001.

"The Peculiar Economics of Baseball," in *Baseball As America.* Washington, D.C.: National Geographic & National Baseball Hall of Fame, March 2002.

"Competitive Balance in Sports Leagues: An Introduction," *The Journal of Sports Economics,* vol. 3, no. 2 (May 2002).

"Testing Causality Between Team Performance and Payroll: The Cases of Major League Baseball and English Soccer," *The Journal of Sports Economics,* vol. 3, no. 2 (May 2002). Reprinted in Bill Gerrard (ed.) *The Economics of Association Football.* London: Edward Elgar, 2006. (with Stephen Hall & Stefan Szymanski)

"A Note on the Local Impact of Sports Expenditures," *The Journal of Sports Economics,* vol. 3, no. 4 (December 2002), with John Siegfried.

"The Cuban Economy Toward the 21st Century: Performance and Prospects," in Max Azicri and Elsie Deal (ed.), *Cuban Socialism in a New Century: Adversity, Survival and Renewal.* Gainesville: University Press of Florida, 2004.

"Competitive Balance Conundrums: Reply to Fort and Maxcy," *The Journal of Sports Economics,* May 2003, vol. 4, no. 2.

"Sports and Economics," *U.S. Society & Values: Sports in America.* (Journal of the U.S. Department of State), December 2003, vol. 8, no. 2.

"May the Best Team Win: Making Baseball Competitive," *The Brookings Review*, Fall 2004.

"Labor Relations in Major League Baseball," *The Journal of Sports Economics*, Winter 2004.

"Sport as Business," *Oxford Review of Economic Policy*, Winter 2004, vol. 19, no. 4.

"Cable Television and Monopoly Power in Sports Programming," *Milken Institute Review*, vol. 5, no. 4, Winter 2004.

"The Practical Significance of Baseball's Antitrust Exemption," *Entertainment and Sports Lawyer*, Vol. 22, No. 1, Spring 2004.

"Reforming Intercollegiate Athletics," in Bruce Svare (ed.) *Sports Reform in America*, forthcoming.

"Whither Baseball Economics," *Nine: A Journal of Baseball History and Culture*, Vol 13 Number 1, September 2004.

"What to Do About Title IX," *Gender Issues*, vol. 21., no. 2, Spring 2003. Reprinted in R. Simon (ed.) *Sporting Equality: Title IX Thirty Years Later.* New Brunswick: Transaction Books, 2005.

"Unionism in Team Sports," in *Berkshire Encyclopedia of World Sport*, 2005.

"Organizational Models in Professional Team Sports Leagues," in S. Szymanski & W. Andreff (eds.), *Handbook of Sports Economics*, Edward Elgar, 2006.

"The Economics of Sport," in S. Durlaf et al., *The New Palgrave*, Macmillan, 2005. (with Stefan Szymanski)

"Preface" for second edition of *National Pastime*, June 2006. (with Stefan Szymanski)

"'Compensating differentials and the social benefits of the NFL' – A Comment," *Journal of Urban Economics*, Vol. 60, No. 1 (July 2006): 124-131. (with Dennis Coates and Brad Humphreys)

"Economic Perspectives on Market Power in the Telecasting of US Team Sports," in C. Jeanrenaud and S. Kesenne (eds.), *The Economics of Sport and the Media*, Edward Elgar Pubs., 2006.

"Facility Finance: Measurement, Trends, and Analysis," *International Journal of Sport Finance,* vol. 1, no. 4, November 2006. To be reprinted in B. Humphreys and D. Howard (eds.) *The Business of Sport.* Praeger, 2008. (with Judith Grant Long)

"The Economic Impact of Sports Facilities, Teams and Mega-Events" *Australian Economic Review*, December 2006.  (with John Siegfried)

"A Wink and a Smile: Getting a Leg Up on the Competition through Real Estate during the Glory Years," in J. Thorn (ed.), *Baseball in New York, 1947-57*, Harper Collins, 2007.

"Unionism in U.S. Sports," **Encyclopedia of U.S. History**, 2007.

"Governance of Sports Leagues: Experiences and Lessons," to appear in volume edited by Placido Rodriguez, forthcoming 2008.

"What to Do About Title IX," *Legal Issues in College Sports*, November 2007.

"The Financing and Economic Impact of the Olympic Games," in B. Humphreys and D. Howard (eds.) *The Business of Sport.* Praeger, 2008.  (with Brad Humphreys)


## Journalistic Articles:


"Allende's Chile:  A Post-Mortem," *Boston Real Paper*, (September 26, 1973).

"Worker Control Over Technology: Labor Issues for the Eighties," *The Nation*, Vol. 229, No. 16 (November 17, 1979).

"Impressions of Cuba:  The Olympics,  The Economy and Politics," *Cubatimes*, (Sept./Oct. 1984). (with A. MacEwan).

"Twisting Statistics on Cuban Health," *Cubatimes*, (Jan./Feb. 1985).

"Cuban Labor Markets Reconsidered," *Cuba Business*, vol. 2, no. 2 (April 1988).

"Sugar Dependence: Has Cuba's Diversification Strategy Worked?" *Cuba Business*, vol. 2, no. 4 (August 1988).

"Non-traditional Exports," *Cuba Business*, vol. 2, no. 5 (October 1988).

"Sugar Diversification," *Cuba Business*, vol. 2, no. 5 (December 1988).

"The Impact of the U.S. Blockade on the Cuban Economy," *Cuba Update*, April 1990.

"Has the U.S. Blockade Helped Cuba?" *Cuba Business*, vol. 3, no. 3 (June 1989).

"Cuban-Soviet Relations: The Gorbachev Visit and After," *Cuba Business*, vol. 3, no. 4 (August 1989).

"In Search of Efficiency," *Cuba Business*, vol. 5, nos. 2&3 (April & June, 1991).

"Take Me Out to the Cleaners," *New York Times*, op-ed piece, 14 July 1992.

"Baseball's Antitrust Exemption," *Legal Times*, vol. xv, no. 27 November 1992. Reprinted in The Connecticut Law Tribune, vol. 18, no. 47 (November 1992).

"Impact of the Blockade," *Cuba Business*, vol. 6, no. 6 (November/December 1992).

"Give Castro a Carrot," *The New York Times*, op-ed piece, February 17, 1994.

"Field of Schemes: The Case for a Baseball Strike," *The New Republic*, August 15, 1994.

"Is Baseball Whiffing in the Cash Column?" *Newsday*, op-ed piece, August 14, 1994.

"Batter Up, Already," *The New York Times*, February 14, 1995.

"Not Suitable for Families," essay published in *U.S. News & World Report*, January 20, 1997.

"Fewer Families Own Sports Teams: It's Okay" op-ed published in *USAToday*, May 21, 1997.

"Municipalities in the '90s Don't Seem to Know When to Say When," *Sports Business Journal*, Vol. 1, No. 6, June 1-7, 1998.

"So You Want to Own a Big-League Ball Team?" *Sports Business Journal*, Vol. 1, No. 7, June 8-14, 1998.

"Capital Needs, Political Realities Fuel New Interest in Sports Offerings," *Sports Business Journal*, Vol. 1, No. 10, June 29-July 5, 1998.

"Team Profitability and Labor Peace," *New York Times*, op-ed, July 5, 1998.

"This Bud's for a Salary Cap," *Sports Business Journal*, Vol. 1, No. 14, July 27 - August 2, 1998.

"Dollar Signs Tell the Story Behind NBA Lockout," *Sports Business Journal*, Vol. 1, No. 16, August 16, 1998.

"A Scary Thought: Jones May Be Right About Browns," *Sports Business Journal*, Vol. 1, No. 20, September 7-13, 1998.

"Without Subsidies, Few Athletic Programs Are Turning a Profit," *Sports Business Journal*, Vol. 1, No. 20, September 7-13, 1998.

"What's BOB Really Worth to Phoenix?" *Sports Business Journal*, Vol. 1, No. 20, September 7-13, 1998.

"Taking Stock in the Indians," *Sports Business Journal*, Vol. 1, No. 26, October 19-26, 1998.

"Fair is Fair, Even If You're a Superstar" *Newsday*, op-ed, November 3, 1998.

"Let the Market Rule the Basketball Court," *The Wall Street Journal*, op-ed, November 10, 1998.

"NBA Lockout: Which Side Is Dropping the Ball?" *The New York Times*, op-ed, November 29, 1998.

"Football Stadium Folly," *The New York Times*, op-ed, December 5, 1998.

"The Patriots Deal: Giving Everything and Getting Nothing," *The Hartford Courant*, op-ed, December 13, 1998.

"Stadium for Patriots in Hartford Will Fail as Economic Development, Just Like Others," *Journal Inquirer*, op-ed, December 14, 1998.

"Thanks to Kraft and Governor, Connecticut Gains a Team and Loses Its Shirt," *Sports Business Journal*, op-ed, December 21-27, 1998.

"If Competitive Balance Spoils the Show, Congress Waits in the Wings," *Sports Business Journal*, January 11-17, 1999.

"Has Milstein Lost His Mind? Not Hardly," *Sports Business Journal*, January 25-31, 1999.

"The NBA Lockout: A Post-Mortem," *Sports Business Journal*, February 15-21, 1999.

"When Teams Move, Protecting Both Fans and Owners Is Tricky," *Sports Business Journal*, February 22-28, 1999.

"Hail Mary Economics," *The Dismal Scientist* (economics magazine on the web, www.dismal.com); March 18, 1999.

"Selig, Players Both Err Early Regarding Competitive Balance," *Sports Business Journal*, March 22-28, 1999.

"Baseball Si, Embargo No," *Sports Business Journal*, April 5-11, 1999.

"Spreading the Wealth While Also Spreading the Sacrifice," *Sports Business Journal*, April 19-25, 1999.

"Four Reasons the Patriots Returned, and Loyalty Isn't One of Them," *Sports Business Journal*, May 16-23, 1999.

"There's No Accounting for College Sports," *University Business*, vol. 2, no. 5 (June 1999).

"If the Redskins Are Worth $800 Million ...," *Texas Monthly*, September 1999.

105

"Flawed Specter Bill Still a Worthy Start for Stadium Finance Reform," *Sports Business Journal*, June 14-20, 1999.

"Arguments Against Making Freshmen Ineligible Fail Examination," *Sports Business Journal*, July 12-18, 1999.

"Thinly Spread Talent Creates Challenge to Records But Also to Baseball," *Sports Business Journal*, August 9-15, 1999.

"NCAA Needs a Real Game Plan to Emerge from Dark Season," *Sports Business Journal*, September 6-12, 1999.

"Deep Contradictions at the NCAA," *NewsSmith*, Fall 1999.

"College Sports Crisis," *The Washington Times*, October 1, 1999.

"Despite Questions, Minor League Basketball Is the Answer," *Sports Business Journal*, October 4-10, 1999.

"The NFL's New Math," *The Wall Street Journal*, October 13, 1999.

"College Athletics System Practically Guarantees Academic Fraud," *Sports Business Journal*, November 1-7, 1999.

"Baseball Needs Millennial Remedies After Its Comeback Stumbles," *Sports Business Journal*, November 29 – December 5, 1999.

"CBS' Big NCAA Deal Is No Cure for What's Ailing College Sports," *Sports Business Journal*, December 27, 1999 – January 2, 2000.

"Irish 'Win One for the Gipper', Get Off With Mild Rebuke," *Sports Business Journal*, January 10-16, 2000.

"Don't Cry for Woody," *Sports Business Journal*, January 24-30, 2000.

"Jordan Effect Won't Rescue NBA," *Wall Street Journal*, January 24, 2000.

"The Commissioner's New Clothes," *Sports Business Journal*, February 21-27, 2000.

"Backlash Against Title IX: an End Rund Around Female Athletes," *Chronicle of Higher Education*, March 3, 2000.  Reprinted in Lynn Messina (ed.) *Sports in America.*  New York: H.W. Wilson, 2001.

"Overinflated," *Brill's Content*, April 2000.

"NCAA's Definition of 'Amateur' Evolves, But Hypocrisy Remains," *Sports Business Journal*, March 20-26, 2000.

106

"MLB, Players Should Get to the Point," *Sports Business Journal*, April 17-23, 2000.

"Reforms Offer Bigger Payoff Than Salaries," *Sports Business Journal*, May 15-21, 2000.

"Fair's Fair for New Fenway – But Is It?" *Sports Business Journal*, June 12-18, 2000.

"Economics 100: Higher Ticket Prices Not Caused By Payroll," *Sports Business Journal*, July 10-16, 2000.

"Blue Ribbon in Review: Good News and Bad," *Sports Business Journal*, August 7-13, 2000.

"Rob Manfred, What Planet Are You On?" *Sports Business Journal*, August 28 – September 3, 2000.

"Academics Get No Boost from Boosters," *Sports Business Journal*, September 4 – September 10, 2000.

"XFL Is No Match for NFL's Firepower," *Sports Business Journal*, October 2 – 8, 2000.

"NCAA's New Financial Report: Good News?" *Sports Business Journal*, November 6-12, 2000.

"Yes, It's About Money," *New York Times*, December 13, 2000.

"MLB Imbalance Shows Up in the Numbers," *Sports Business Journal*, December 18-24, 2000.

"Let Those Interested in Basketball Go to the Pros," *Sports Business Journal*, January 22-28, 2001.

"NBA Players Doing Just Fine at the Pay Window, Thank You," *Sports Business Journal*, January 29-February 4, 2001.

"NFL's Revenue Structure Saps Will to Win," *Sports Business Journal*, February 26 – March 4, 2001.

"History – and Leading Economic Indicators – Best Guides to Future," *Sports Business Journal*, March 12-18, 2001.

"The Price of Athletic Success," www.sportsjones.com, March 2001.

"Selig Wrong to Get That Shrinking Feeling," *Sports Business Journal*, April 2-8, 2001.

"Share of Ball Park: $16 a Year," op-ed, *Miami Herald*, April 30, 2001.

"MLB's Balance Debate Deserts Middle Ground," *Sports Business Journal*, May 7-13, 2001.

"A New Ballpark: The Catch," *St. Louis Post-Dispatch*, May 6, 2001.

"Twins Shouldn't Be Exhibit A for Contraction," *Sports Business Journal*, June 11-17, 2001.

"Cards Offer Is in the Ballpark," *St. Louis Post-Dispatch*, June 20, 2001.

"Does Baseball's Antitrust Exemption Still Matter? More Than You Think," ***Sports Business Journal***, July 9-15, 2001.

"Knight Report Yields Little New, Much Worthy," ***Sports Business Journal***, July 16-22, 2001.

"Teams Riding High, Despite NFL Protest," ***Sports Business Journal***, August 20-26, 2001.

"Should College Athletes Be Paid?" ***American Teacher***, September 2001.

"Boston Bidders, Here's How to Figure Out What Sox Are Worth," ***Sports Business Journal***, September 10-16, 2001.

"Sports and Their Fans – Kudos," ***Sports Business Journal***, October 1-7, 2001.

"New Economic System for NHL Has Both Promise, Problems," ***Sports Business Journal***, October 29 – November 4, 2001.

"Why 'Yer Out' Is A Bad Call for Baseball," ***Business Week***, November 12, 2001.

"Baseball's Addition Through Subtraction Just Doesn't Add Up," ***Sports Business Journal***, November 19-25, 2001.

"Contraction Might Not Fly, But Talk Will Help Hold Salaries Down," ***Sports Business Journal***, December 3-9, 2001.

"MLB By the Numbers: But Who's Buying?" ***Sports Business Journal***, December 24-30, 2001.

"New York City Can Do Better," ***New York Post***, January 17, 2002.

"Baseball and D.C., for All the Wrong Reasons," ***The Washington Post Outlook***, January 27, 2002.

"Zimbalist to Manfred: You Made Point for Me," ***Sports Business Journal***, February 11-17, 2002.

"Baseball by the Numbers," ***New York Times Sunday Magazine***, March 31, 2002.

"That's Not the Sky Falling on TV Rights Landscape, Just a Little Rain," ***Sports Business Journal***, April 1-7, 2002.

"All Right All You Lawyers, Play Ball!," ***Business Week***, April 15, 2002.

"The Exemption Is As Bad Today As When It Began," ***Sports Business Journal***, April 29 - May 5, 2002.

"Making the (Up)grade Is Tougher Than It Looks," ***Sports Business Journal***, May 27 – June 2, 2002.

"Los Angeles and the NFL: Here We Go Again," *Sports Business Journal*, June 24-30, 2002.

"MLS May Not Reap Benefits It Expects From World Cup Fever," *Sports Business Journal*, July 22-28, 2002.

"Middle Ground Not Yet Lost for Baseball Bargainers," *Sports Business Journal*, July 29-August 4, 2002.

"Another Bowl Game Not What NCAA Needs," *Sports Business Journal*, July 29-August 4, 2002.

"The Mets Are Worth More Than $391 Million," *Sports Business Journal*, August 19-25, 2002.

"Numbers, Facts Don't Back Title IX Critics," *Sports Business Journal*, September 16-22, 2002.

"Beantown's New Brain Trust Touches All the Fan Bases," *Sports Business Journal*, October 14-20, 2002.

"Labor Relations Heating Up in the NBA," *Sports Business Journal*, November 11-17, 2002.

"Live from New York City: Inflation, Traffic – and the Olympics!" *Wall Street Journal*, November 14, 2002.

"Time to End the Big Colleges' Scam," *Sports Business Journal*, December 9-15, 2002.

"MLB's Salary Restraints Working – For Some," *Sports Business Journal*, January 6-12, 2003.

"Stadium Renovations: The Real Economic Story," *Kansas City Star*, January 29, 2003.

"The NFL's Report Card," *Sports Business Journal*, February 3-9, 2003.

"MLB's New CBA Already At Work," *Sports Business Journal*, March 3-9, 2003.

"Boom Is Over? Don't Believe Everything You Read," *Sports Business Journal*, March 31-April 5, 2003.

"Flawed Financial Analysis of NHL Skates on Thin Ice," *Sports Business Journal*, April 28-May 4, 2003.

"Gloom and Doom in MLB Stats – or Maybe Not," *Sports Business Journal*, May 26 – June 1, 2003.

"Concentration of Media Ownership Carries Big Price," *Sports Business Journal*, June 23 – June 29, 2003.

"A's New Management Model a Work in Progress," *Sports Business Journal*, July 21 – July 27, 2003.

"Trading on Baseball's Competitive Integrity," *Sports Business Journal*, August 18-24, 2003.

"Imperfect, Prejudicial BCS System Ripe for Reform," *Sports Business Journal*, September 15-21, 2003.

"The Gold in Baseball's Diamond," *The New York Times*, op-ed, September 30, 2003.

"What Went Wrong With WUSA?" *Sports Business Journal*, October 13-19, 2003.

"Money Game: Baseball's Short-Lived Rally," *Forbes*, November 10, 2003.

"NHL Labor Relations: Sorting Through the Rhetoric," *Sports Business Journal*, November 10 – 16, 2003.

"NHL Labor Relations: Crafting a New Agreement," *Sports Business Journal*, November 17 - 23, 2003.

"A Fan's Delight Pays Off for Stadium Owner, Too," *Sports Business Journal*, December 8 - 14, 2003.

"Baseball Makes a Mess in Milwaukee," *The New York Times*, op-ed, December 21, 2003.

"Clarett Has a Compelling Case for NFL Eligibility," *Sports Business Journal*, January 12-18, 2004.

"Jeremy Bloom Can Guide NCAA to Logical Reform," *Sports Business Journal*, February 9-15, 2004.

"A-Rod Should Boost Yanks' 2004 Revenues by $20M," *New York Sun*, February 20, 2004.

"Break Up the Yankees?" *Sports Business Journal*, April 5-11, 2004.

"MLB's Debt Rule Reveals More Smoke and Mirrors," *Sports Business Journal*, May 3-9, 2004.

"Bush Panders for Votes While Hurting Cubans," *Newsday*, May 20, 2004.

"The Bush Economy: Living on Borrowed Time," *Newsday*, June 21, 2004.

"MLB's Internet Arm Gets a Leg Up," *Sports Business Journal*, June 28-July 4, 2004.

"MLB Still Has Work to Do," *Sports Business Journal*, July 26-August 1, 2004.

"Enough Already: Put Baseball Back in DC," *Sports Business Journal*, September 13-September 19, 2004.

"Tweaking the NFL Juggernaut," *Sports Business Journal*, October 4-10, 2004.

110

"Solving the NHL's Stalemate, *Sports Business Journal*, October 18-24, 2004.

"Games People Play," *New York Times*, November 14, 2004.

"Straight Talk on Stadiums," *Sports Business Journal*, November 15-21, 2004.

"No Easy Answers for MLB's Steroid Scandal," *Sports Business Journal*, December 13-19, 2004.

"$53 Million for Pedro? How Do You Figure?" *New York Times*, December 19, 2004.

"Hockey Owners Give Their Sport a Slap Shot," *Newsday*, January 5, 2005.

"Union Proposal Shows Way Out of NHL Hockey Mess," *Sports Business Journal*, January 10-16, 2005.

"NFL, Krafts Make the Super Bowl Math Add Up," *Sports Business Journal*, February 14-20, 2005.

"Single-Entity Ownership Too Simple to Solve NHL's Complex Problems, *Sports Business Journal*, March 14-20, 2005.

"In Steroids Hearings, Congress Has Its Eye on the Wrong Ball," *Sports Business Journal*, April 4-10, 2005.

"Curb Coaches' Salaries and Preserve Title IX Gains," *Sports Business Journal*, May 2-8, 2005.

"British Soccer Fans, Kicked Again," *Washington Post*, May 22, 2005. (with Stefan Szymanski)

"More Benevolence in Stadium Games," *Sports Business Journal*, May 30 – June 5, 2005.

"Does a Stadium Help the Economy," *Washington Examiner*, May 26, 2005.

"New York Facility Triad Is Good News," *Sports Business Journal*, June 27 – July 3, 2005.

"Economic Impact of the Olympic Games Rarely Adds Up to Much Gold," *Sports Business Journal*, August 1-7, 2005.

"With Steroids, Settle In for the Long Haul," *Sports Business Journal*, August 29-September 3, 2005.

"McClatchy's Pirates Demonstrate the Art of Doing Less with More," *Sports Business Journal*, September 19 - 25, 2005.

"Its Owners Divided, the NFL Reaches a Revenue-Sharing Crossroads," *Sports Business Journal*, October 24-30, 2005.

"How Much Is Theo Worth?" *Boston Globe*, Novemeber 2, 2005.

"Monopoly's Money: Nascar's Real Reason for Breaking Up Big Teams Is to Protect Its Cartel," *New York Times*, November 6, 2005.

"How to Confront MLB's Shrinking TV Audience," *Sports Business Journal*, November 28 – December 3, 2005.

"The NHL's Wage Conspiracy Won't Survive Legal Scrutiny," *Sports Business Journal*, December 19-25, 2005.

"Solution to Salary Inflation Among College Coaches Is Clear, But Unlikely," *Sports Business Journal*, January 16 – 23, 2006.

"Fair Ball," *New York Times*, January 22, 2006.

"Financing a New Yankee Stadium: The Devil Is In The Details," *Baseball Prospectus*, January 30, 2006.

"Myth and Reality: The Economic Impact of the Super Bowl," *Sports Business Journal*, February 20 – 26, 2006.

"Over and Out," *Baseball Prospectus*, February 22, 2006.

"Baseball Can Learn from Hockey," *Sports Business Journal*, March 27 – April 2, 2006.

"Fans, critics should keep expectations of steroid investigation realistic," *Sports Business Journal*, April 24 – April 30, 2006.

"Administration's stealth tactics could undermine progress of Title IX," *Sports Business Journal*, May 15 – May 21, 2006.

"Professional Soccer in U.S. Prepared for Take Off," *Sports Business Journal*, June 19 – June 25, 2006.

"Unsettling issues will test strength of MLB's first-half success stories," *Sports Business Journal*, July 24 – July 30, 2006.

"It's Time to Enforce Title IX Again," *Sports Business Journal*, August 21 – August 27, 2006.

"A New Trend in Facility Financing," *Sports Business Journal*, September 18 – September 24, 2006.

"Clutch Play" *Boston Globe*, October 8, 2006.

"The Cardinals' Owners Deserve Our Praise," *Sports Business Journal*, October 16 – October 22, 2006.

"The Cardinals Deliver Winning Teams, And More," *St. Louis Post Dispatch*, October 30, 2006.

"MLB's New CBA Augurs Well for Future Growth," *Sports Business Journal*, November 6 – November 12, 2006.

"Congress Is Right to Investigate the NCAA's Tax Privileges," *Sports Business Journal*, December 18 – 24, 2006.

"College Athletics Turns Pro," *New York Times*, January 7, 2007.

"Baseball's Posting Paradox," *Sports Business Journal*, January 15 – January 21, 2007.

"Player Disability Insurance Challenges Sports Leagues," *Sports Business Journal*, February 19- 25, 2007

"A Dose of Capitalism Wouldn't Hurt the NFL," *Sports Business Journal*, March 19-25, 2007.

"Value of Student-Athlete is Often Forgotten Amid Catastrophic Injury," *Sports Business Journal*, April 24-30, 2007.

"Prejudiced NBA Referees? Think Again," *Sports Business Journal*, May 21-27, 2007.

"College Sports May Be Fun, But They Are Not Money Makers," *Sports Business Journal*, June 18-24, 2007.

"An Exchange of Strategies Could Benefit MLB, Japanese Leagues Alike," *Sports Business Journal*, July 16-23, 2007.

"New GAO Report Belies Critics of Title IX," *Sports Business Journal*, August 20-26, 2007.

"Why the PGA's Fedex Cup Faced Trouble from the Start," *Sports Business Journal*, September 17-23. 2006.

"Baseball's Fortunes Are Soaring in More Ways Than One," *Sports Business Journal*, October 15, 2007.

"Boras is Playing Poker with his Clients' Money (and Reputation)," *Sports Business*

113

*Journal*, November 19-25, 2007.

"Rays' Owners Offer Worthy Stadium Plan for St. Petersburg," *Sports Business Journal*, December 17-23, 2007.

"More Financial Challenges in Store for College Athletics — There's a Reasonable Remedy," *Sports Business Journal*, January 21-27, 2008.

## Book Reviews:

*Conversations with Allende*, by R. Debray, *University Review*, February 1972.

*Generating Inequality* by Lester Thurow, *Review of Radical Political Economics*, Fall 1978.

"The Management of Factories in China:  A Review of Two Books by Stephen Andors," *Challenge*, Sept/Oct 1978.

*Nigerian Capitalism*, by S. Schatz, in *Social Science Quarterly*, Dec. 1979.

*Critical Perspectives on Imperialism and Social Class in the Third World*, by James Petras, *Monthly Review*, Vol. 31, No. 1 (May 1980).

*In the Name of Efficiency:  Management Theory and Shopfloor Practice in Data-Processing Work*, by Joan Greenbaum, *Monthly Review*, Vol. 31, No.5 (October 1980).

*The Cruel Dilemmas of Development: 20th Century Brazil*, by Silvia Ann Hewlett, *Eastern Economic Journal*, Fall 1981.

*Workers' Control Under Plan and Market*, by E. Comisso, *Insurgent Sociologist*, Vol. 11, No. 3 (Fall 1982).

*In Defense of the Mixed Economy*, by Andrew Shonfield, *Journal of Economic Literature*, Vol. 23, No. 2, (June 1985):625-626.

"Cuban Economic Performance:  A Review of *Revolutionary Cuba:  Economic Growth with Equity*," *Monthly Review* (Nov. 1985).

*A Theory of Economic Systems*, by Manuel Gottlieb, *Journal of Comparative Economics*, Vol. 10, No. 2 (June 1986):188-190.

*Rural Development in the Caribbean*, by P. I. Gomes, *Comparative Economic Studies*, vol 28, no. 2 (Summer 1986): 119-123.

*Technological Change, Collective Bargaining, and Industrial Efficiency*, by Paul Willman, *Journal of Economic Literature*, vol. 26 (June 1988): 56-57.

*Power and Poverty: Development and Development Projects in the Third World*, edited by D. Attwood et. al., *Economic Development and Cultural Change*, vol. 38, no. 1 (Oct. 1989).

Review essay: "Recent Scholarship on Cuban Development: A review of J. Dominguez's *To Make a World Safe for Revolution* and J. Perez-Lopez's *Measuring Cuban Economic Performance," Economic Development and Cultural Change* (January 1991).

*Paying the Costs of Austerity in Latin America*, edited by H. Handelman and W. Baer, *Inter-American Review of Bibliography* (winter 1990).

*Poverty Theory and Policy: A Study of Panama*, by Gian Singh Sahota, *Journal of Latin American Studies*, vol. 24 (February 1992).

*Conditions Not of Their Choosing: The Guaymí Indians and Mining Multinationals in Panama*, by Chris N. Gjording, *Journal of Latin American Studies*, vol. 25 (May 1992).

*Cuba: The Revolution in Peril*, by Janette Habel, *Journal of Latin American Studies*, vol. 25 (May 1992).

Review essay, "Baseball and Society in the Caribbean: a Review of *The Tropic of Baseball* and *Trading with the Enemy," New West Indian Guide*, vol. 68, nos. 1-2 (1994).

*Pay Dirt: The Business of Professional Team Sports*, by James Quirk & Rodney Fort, *Journal of Economic Literature*, vol. 32, no. 1 (March 1994).

Review essay, "Cuba and the U.S.: During and After the Cold War," a Review of *Cuba on the Brink* and *The Cuban Revolution, Book World: The Washington Post*, January 23, 1994.

*Hardball: A Season in the Projects*, by Daniel Coyle, *Book World: The Washington Post*, March 21, 1994.

*Lords of the Realm: The Real History of Baseball*, by John Helyar, *Book World: The Washington Post*, May 29, 1994.

*Cuba in Transition*, by the Association for the Study of the Cuban Economy, *The Economics of Transition*, vol. 3, no. 3 (1995).

*Back to the Future: Cuba Under Castro*, by Susan Eckstein, *Economic Development and Cultural Change*, October 1996 (vol. 45, no. 1).

*Cuba's Second Economy: From Behind the Scenes to Center Stage*, by Jorge Pérez-López, *Cuban Studies*, forthcoming.

*A Good Walk Spoiled: Days and Nights on the PGA Tour* by John Feinstein, and *My Usual Game: Adventures in Golf* by David Owen, *The Washington Post Book World*, July 27, 1995.

115

*Making the Majors: The Transformation of Team Sports in America* by Eric M. Leifer, *Journal of Economic Literature*, March 1997.

*Mad as Hell: How Sports Got Away from the Fans and How We Get It Back* by Mike Lupica, *The Washington Post Book World*, December 17, 1996.

*A March to Madness: The View from the Floor in the Atlantic Coast Conference* by John Feinstein, *The Washington Post Book World*, January 18, 1998.

*Cuba: Restructuring the Economy* by Julio Carranza, Luis Gutierrez and Pedro Monreal, *Journal of Interamerican Studies and World Affairs*, Summer 1998.

*Legal Bases: Baseball and the Law* by Roger Abrams, *The Washington Post Book World*, June 18, 1998.

*Anatomy of a Failed Embargo: US Sanctions Against Cuba* by Donna R. Kaplowitz, *The International History Review*, June 1999.

*Onward to Victory: The Crises that Shaped College Sports* by Murray Sperber, *The Washington Post Book World*, October 25, 1998.

*The Agent* by George Higgins, *The Washington Post Book World*, January 26, 1999.

*Castro's Curveball* by Tim Wendell, *The Washington Post Book World*, March 14, 1999.

*Glory for Sale: Fans, Dollars and the New NFL* by Jon Morgan, *Lingua Franca*, Breakthrough Books, February 2000.

*Hard Ball: The Abuse of Power in Pro Team Sports* by James Quirk and Rodney Fort, *Journal of Economic Literature*, June 2000.

*Sole Influence: Basketball, Corporate Greed, and the Corruption of America's Youth* by Dan Wetzel and Don Yaeger, *Washington Post Book World*, April 11, 2000.

*Beer and Circus: How Big-Time College Sports Is Crippling Undergraduate Education* by Murray Sperber, *University Business*, September 2000.

*Leveling the Playing Field: How the Law Can Make Sports Better for Fans* by Paul Weiler, *Washington Post Book World*, August 21, 2000.

*Market, Socialist and Mixed Economies: Comparative Policy and Performance in Chile, Cuba and Costa Rica* by Carmelo Mesa-Lago, *Cuban Studies*, vol. 32, 2001.

*The End of Baseball As We Knew It: The Players Union, 1960-81* by Charles Korr, *Business History Review*, Spring 2003.

*Development Prospects in Cuba: An Agenda in the Making* edited by Pedro Monreal, *Journal of Latin American Studies*, vol. 35, 2003.

"An Evaluation of Phase Two of Cuba's Management Development Program," prepared for the UNDP, January 1993.

"Public Policy Toward Minor League Baseball," Testimony before before the Committe on Tourism, Recreation and Sports Development, New York State Senate, Oversight Hearings, February 9, 1993.

"Opportunity Cost Approach to Estimating 'Just and Reasonable Compensation' for Denver Territorial Rights," prepared for  Williams, Youle & Koenigs, Attorneys at Law, for arbitration case of The Denver Zephyrs Baseball Club v. Colorado Baseball Management, et al., March 5, 1993.

"Critique of the Doctrine of Single Entity As It Applies to the National Basketball Association," report prepared for Grippo & Elden in WGN v. NBA, May 1993.

"Profitability of NBA Franchises," report prepared for Grippo & Elden in WGN v. NBA, May 1993.

"Appropriate Fee Payments for Superstation Broadcasts," report prepared in WGN v. NBA, June 1993.

"Estimating the Value of the Territory of Salt Lake City to the Salt Lake City Trappers and the Pioneer League," report prepared for Campbell, Maack & Sessions in Salt Lake City Buzz/Pacific Coast League v. Salt Lake City Trappers/Pioneer League, February 1994.

"Cash Flow Multiple and Comparable Sales Approach to Estimating Compensation for Denver Territorial Rights," prepared for Williams, Youle & Koenigs, Attorneys at Law, for arbitration case of The Denver Zephyrs Baseball Club v. Colorado Baseball Management, et al., April 1994.

Documents on the design and structure of the United Baseball League, including league prospectus and plan for cities.  July through November 1994.

"An Approach to Estimating Territorial Compensation for Ft. Lauderdale to the Florida State League," prepared for Wendell, Chritton & Parks in arbitration case of the Florida Marlins v. NY Yankees and Florida State League, May 1994.

"A Draft Plan for Revenue Sharing With and Without a Salary Cap for Major League Baseball," prepared for the Major League Baseball Players' Association, May 1994.

"Fact and Value of Damages to KSMO TV-62 from The Baseball Network," prepared for ABRY Communications in litigation against the Kansas City Royals, September 1994.

Issue Brief on the Cuban Economy, Trade and the Embargo for the Atlantic Council of the United States, October 1994.

118

"Report on Territorial Compensation due the Florida State League of the National Association in the Taking of Ft. Lauderdale by the Florida Marlins," prepared for Wendell, Chritton & Parks in arbitration case of the Florida Marlin v. NY Yankees and Florida State League, December 1994.

"Memorandum on the value of the Colorado Rockies' franchise," prepared for Jay Horowitz in Erhardt v. Colorado Rockies, January 1996.

"Memorandum on damages in Burt v. Hampshire College," prepared for attorney David Kaplan, March 1996.

"Memorandum on the economic impact of the Tampa Bay Buccaneers on the Tampa MSA,"prepared for Bentley, Rose & Sundstrom, January 1997.

"Report on damages suffered by the St. Louis CVC as a result of restrictive practices by the NFL," prepared for Husch & Eppenberger, February 1997.

"Expert Rebuttal Report in CVC v. NFL," Husch & Eppenberger, June 1997.

"Second Rebuttal Report in CVC v. NFL," Husch & Eppenberger, September 1997.

"Affidavit on Antitrust Implication of Facility Non-compete Clause," Davis, Scott, Weber & Edwards, September 1997.

"Memorandum on Los Angeles Arena Financing," Mayor's Office, Los Angeles, September 1997.

"Report on Cincinnati Bengals/Hamilton County Lease for New Stadium," Cincinnati *Business Courier*, November 1997.

"Evaluation of Team Report on the FMV of Assets Acquired by the XXX Limited Partnership on October 4, 1993," with GML Associates for the Internal Revenue Service, January 1998.

"Appraisal of the FMV of Major and Minor League Contracts Acquired by [a major league baseball team]," with GML Associates for the Internal Revenue Service, September 1998.

"Memorandum on Luxury Taxes and Player Markets," for the National Basketball Players' Association, October 1998.

"Report on the Purchasing Power Parity of the Spanish Peseta in Various Years," for Rabinowitz, Boudin et. al., October 1998.

"Economic Development in Hartford and the New England Patriots," written testimony before the Connecticut State Legislature, December 9. 1998.

"Expert Report on the Value of the Kansas City Royals," for U.S. Department of Justice, February 1999.

"Declaration," on bankruptcy and franchise stability in Major League Baseball for U.S. Department of Justice, April 1999.

"Expert Report on Monetary Damages Resulting from Restraints on Competition in the Labor Market for Players Implemented by Major League Soccer, L.L.C. and Its Member Teams," for Weil, Gotshal & Manges, June 1999.

"The Cuban Economy at the Millennium," report presented to the Aspen Institute Congressional Symposium, Cayman Islands, April 2000.

"Expert Report on Monetary Damages Resulting from the Violation of the Right of First Refusal Offered to Purchasers of Cleveland Browns' Season Tickets Prior to the 1995 NFL Season," report presented to Kohrman, Jackson & Krantz, April 2000.

"Expert Report on Franchise Valuation of the Washington Redskins on January 1, 2000 and Damages Suffered by WSV," report presented to Boies, Schiller & Flexner, June 2000.

"Affidavit in Rebuttal to Defendants' Motion," in MLS monopsony case, for Weil, Gotshal & Manges, August 2000.

"Supplemental Expert Report on Liability," in MLS monopsony case, for Weil, Gotshal & Manges, August 2000.  (with Roger Noll)

"Supplemental Expert Report on Monetary Damages" in MLS monopsony case, for Weil, Gotshal & Manges, August 2000.

"Financial Integrity and College Athletic Reform," testimony before the Knight Commission on College Athletic Reform, Willard Hotel, Washington, D.C., October 18, 2000.

"Competitive Balance in Baseball," written testimony before the U.S. Senate Judiciary Committee Hearings, November 21, 2000.

"Economic Impact of a New Fenway Park," written testimony to Ways and Means Committee, Boston City Council, December 11, 2000.

"Affidavit on the Intrinsic Value of Season's Tickets," report to Henry Klein in NFL/consumer rights case, January 2001.

"Damages Report," in PCC v. NBC, March 11, 2002.

"Written Testimony" and "Oral Testimony" before the U.S. Department of Education's Commission on Gender Equity in College Athletics, November 20, 2002.

"Expert Report on the Economic Impact of a Proposed Minor League Ballpark and Retail Project in Yonkers, New York," December 17, 2002.

"Report on NBA Team Financials," for National Basketball Players Association, April 20, 2003.

120

"Pro Formas for AAFL," for Marcus Katz.

"Report on the Commercialization of College Basketball and March Madness," for
   Dewey Ballantine in antitrust suit against the NCAA, March 2004.

"Report on the Fiscal Impact on the Treasuries of New York City and New York State from the
   Atlantic Yards Project in Brooklyn," for the Forest City/Ratner Company, April 2004.

"Report on the NBA's Combined Financial Statement for 2002-03," April 2004.

"Report for New Team Boxing League on Its Organizational Structure and Incentives," May 2004.

"Rebuttal Report" in Minogue et al. v. Modell for Boies, Schiller and Flexner, June 2004.

"Supplementary Report on the Fiscal Impact of the Atlantic Yards Project," July 2004.

"Report on NHL finances and labor market," September 2004.

"Updated Report on the Atlantic Yards Project," January 2005.

"Updated Report II on the Atlantic Yards Project," June 2005.

"Liability Declaration in Hamilton County v. NFL," May 2005.

"Comparison of May 2004 and June 2005 FCRC Reports," June 2005.

"Report on Damages from the Angels' 2005 Name Change," November 2005.

"Updated Report III on the Atlantic Yards Project," May 2006.

"Report on revenue sharing modeling exercise for Major League Baseball," July 2006.

"Updated Report IV on the Atlantic Yards Project," November 2006.

"Affidavit on Financials in Kentucky Speedway v. NASCAR," November 2006.

"Report on Prospective Fiscal Damages to Portland from Trail Blazer Relocation," November 2006.

"Liability Report in Kentucky Speedway v. NASCAR," March 2007.

"Report on Damages" in golfer injury case, April 2007.

"Supplemental Liability Report in Kentucky Speedway v. NASCAR," July 2007.

"Declaration on Defendants' Motion in Kentucky Speedway v. NASCAR," August 2007.

"Notes on Minor League Stadium Operations," for the Vintage Base Ball Federation, October 2007.

"Preliminary Opinion of Value for the Eau Claire Express, NWL," for Michael Best Ltd., October 2007.

# EXHIBIT 2

**2/22/2008  Zimbalist, Andrew**

```
1                           VOLUME I
                           PAGES:    1 - 227
2                          EXHIBITS:  161 - 162
3              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
4
                           C.A. NO.  07-178-GMS
5
6
7      *   *   *   *   *   *   *   *   *   *   *    *
                                                   *
8      DEUTSCHER TENNIS BUND (GERMAN              *
       TENNIS FEDERATION) and                    *
9      ROTHENBAUM SPORTS GMBH TENNIS             *
       and QATAR TENNIS FEDERATION,              *
10                       Plaintiffs,             *
                                                 *
11     vs.                                       *
                                                 *
12     ATP TOUR, INC., ETIENNE DE                *
       VILLIERS, CHARLES PASARELL                *
13     GRAHAM PEARCE, JACCO ELTINGH,             *
       PERRY ROGERS, and IGGY JOVANOVIC,         *
14                       Defendants.             *
                                                 *
15     *   *   *   *   *   *   *   *   *   *   *    *
16
17
18              DEPOSITION OF ANDREW ZIMBALIST, taken on
19     behalf of the Defendant, pursuant to the Massachusetts
20     Rules of Civil Procedure, before Karen Borreson, RPR,
21     Notary Public within and for the Commonwealth of
22     Massachusetts, at the Clarion Hotel & Conference
23     Center, 1 Atwood Drive, Northampton, Massachusetts, on
24     Friday, February 22, 2008, commencing at 9:00 a.m.
25
```

1    did -- did do directly industrial organization

2    antitrust economics.

3        Q.    The first conclusion you report in that

4    paragraph is, "The relevant product market is the

5    production of top-tier men's professional tennis."

6        A.    Yes.

7        Q.    Can you tell me how you reached that

8    conclusion?

9        A.    I examined the documents in the case.  I

10    concluded that what the case was about was the

11    production of top-tier men's professional tennis.  I

12    then proceeded to attempt to identify the relevant

13    antitrust market connected to the production of

14    top-tier men's professional tennis.

15        Q.    So the first step was you examined the

16    documents to conclude the case was about the

17    production of men's top-tier tennis?

18        A.    Top-tier professional tennis.

19        Q.    Top-tier professional tennis.  What do you

20    mean by the term "top-tier professional tennis"?

21        A.    I mean, it's -- it's that tier at which the

22    top players compete to establish a champion and a

23    ranking amongst them.

24        Q.    Is there anything more specific that

25    characterizes top-tier professional tennis?

1      A.   You asked me what I meant by it, so that's

2   what I meant by it.

3           If you're asking me to be more specific

4   about how one decides that a particular event is

5   top-tier or not, is that what you're asking me?

6      Q.   I'm asking is there any more specific

7   definition that you can give for the term you used in

8   your report, "men's top-tier professional tennis"?

9      A.   Well, again -- yes, I think I could be more

10  specific.  I looked at the evidence in the case and I

11  concluded that it's only at the Masters level --

12  that's currently the Masters level and at the Grand

13  Slams and the Davis Cup, that you get a majority of

14  the top players, the top ten players, who are

15  competing against each other.

16          And it's -- it seems to be quite clear from

17  the record that those tournaments have a different

18  economic status and are in a different product market

19  than the next closest substitute that I could

20  identify, which was not top tier, the next tier down,

21  the second tier, which is the Gold tournaments.

22     Q.   How do you determine that the Gold tournaments

23  status of the next closest substitute?

24     A.   Gold tournaments are tournaments, as I believe

25  you know, have some of the top players playing in

1    them, that are structured very similarly to -- in

2    terms of the production of the event to the -- to the

3    Masters series.  It's tennis, it's men's.  I think

4    that it's apparent that that would -- that's -- of the

5    products that are out there, that's the closest

6    possible substitute to the top-tier of men's

7    professional tennis.

8       Q.   Aside from it being apparent, was there any

9    testing or analysis you conducted to conclude that

10   that was the next closest substitute?

11      A.   I considered also whether the -- the top-tier

12   of the WTA, women's tennis tour, was a substitute.

13   And I concluded that it -- it didn't bear those

14   characteristics of being a close substitute.

15            I don't -- I don't adhere for a moment to

16   the contention that -- that the ATP tour, the Masters

17   tour, competes with other professional sports in other

18   forms of live entertainment, so I did not do any tests

19   to that effect.  And I didn't particularly have access

20   to enough data in this case to conduct such tests, if

21   even if I wanted to.

22      Q.   You say you don't adhere to the idea that ATP

23   or the men's professional tennis competes against

24   other sports.  What's the basis for saying that you

25   adhere to that view?

1       A.   I've done a good deal of work in -- in the

2   sports area independently and also in -- in the

3   context of consulting agreements, consulting

4   arrangements that I've had.  And the evidence that

5   I've seen -- the evidence I've seen says to me this --

6   that the major professional sports are in separate

7   product markets from the other professional sports.

8       Q.   So that was a view you had prior to your

9   retention in this case?

10      A.   Yes.

11      Q.   And you say you didn't do anything to test

12  whether the other sports were in the same product

13  market in this case, because it was already your view

14  that other sports are not in the same product market?

15      A.   That and I didn't have enough data to -- to

16  run the kind of empirical tests that I would have

17  liked to run.  And some of the -- some of the

18  documentary record in this case is supportive of that

19  view, as well.

20      Q.   Are there any of the documents or the evidence

21  that you've reviewed that would support the idea that

22  tennis does compete against other sports?

23      A.   Not that I can think of.  As -- as I sit here,

24  I'm -- I remember there being a comment or two in

25  definition -- excuse me, in deposition that asserted

2/22/2008 Zimbalist, Andrew

1    that, but I -- I didn't find those comments to be in a

2    context or -- or support it in a way that was at all

3    persuasive.

4        Q.   So did you disregard the deposition testimony

5    that suggested that?

6        A.   Essentially I did.

7        Q.   So you concluded that the case was about the

8    production of men's top-tier professional tennis and

9    then you tried to define the relevant product market

10   that included the production of men's top-tier tennis?

11           MR. MacGILL:   Object to the form of the

12   question.   The testimony speaks for itself.

13       A.   The second part of your question, I wasn't

14   sure.  Did you say that included?

15       Q.   Yes.

16       A.   Maybe you can say it again?

17       Q.   Earlier you said first you looked at documents

18   to conclude that this case was about the production of

19   top-tier men's professional tennis?

20       A.   Right.

21       Q.   And then you said you reached a conclusion

22   about what the relevant product market was?

23           MR. MacGILL:   Let me just object to the

24   restatement of the testimony.   The testimony speaks

25   for itself.

**2/22/2008  Zimbalist, Andrew**

1            You may answer the question.

2      Q.   What was the second step after you concluded

3  that this case involved the production of men's

4  top-tier professional tennis?

5      A.   I looked at the -- the joint products that

6  comprised that market.

7      Q.   What were the joint products that comprised

8  that market?

9            Wait, wait.  I'm sorry.  What you said

10  earlier, what I wrote down, was that you examined the

11  documents and concluded the case was about the

12  production of men's top-tier professional tennis?

13      A.   Okay.

14      Q.   Okay.  At some point you made a conclusion

15  about a market, correct?

16      A.   Yes.

17      Q.   When did you make a conclusion about a market?

18      A.   Are you asking me for a date?

19      Q.   No.  At what point in this analysis?  So first

20  you read the complaint, whatever other documents, and

21  you concluded that the case was about, in your view,

22  the production of top-tier men's professional tennis?

23      A.   Correct.

24            MR. MacGILL:  Object to the form of the

25  question.  The testimony --

1    identified the market, the ATP and the ITF together

2    are the other purchasers of the men's professional

3    tennis services, player services.

4        Q.    How did you delineate the production of the

5    top-tier men's professional tennis as relevant market?

6        A.    My comparing it to the next closest

7    substitute.

8        Q.    You've identified what seemed apparent to you

9    that the next closest substitute was the Gold level

10   tournaments?

11       A.    That's correct.

12       Q.    And you determined that the Gold level

13   tournaments were not a close enough substitute to be a

14   part of a relevant market?

15       A.    That's correct.

16       Q.    What methodology did you use to conclude the

17   Gold level tournaments were not a part of that market?

18       A.    I looked at practical indicia, qualitative and

19   quantitative.

20       Q.    And what practical indicia?

21       A.    It's laid out in my report.  Generally what I

22   did was I looked at the revenue -- average revenue per

23   tournament at each of those tiers, each of those

24   levels.  I looked at the profitability of the

25   tournaments.  I looked at television revenue.  I

1    looked at ticket prices.  I looked at attendance.  All

2    of those quantitative indicia suggested to me that

3    they were in very different markets.

4              And then the qualitative evidence involved

5    deposition testimony from various -- various

6    individuals as well as -- as well as some of the

7    reports that I -- I'd seen that were done for -- for

8    ATP.

9        Q.   In reaching the conclusion that you just

10   described, you've used the term the "Gold level

11   tournaments."  Did you consider the Brave New World

12   second tier tournaments, the ATP 500 level

13   tournaments?

14       A.   There is no existing data for that.  It seems

15   to me that given the proposed reorganization and the

16   proposed destruction of the new rules, that the

17   separation between the gold level and the -- the --

18   well, excuse me.  What would be 500 level and the 1000

19   level, that that separation will be even sharper than

20   it has been.

21       Q.   What factors do you look at to reach that

22   conclusion?

23       A.   Well, I -- the -- the eight of eight rule, for

24   instance, is geared towards reorganizing or

25   restructuring the venues where the top players

1       A.    Using my logic.  I reached a conclusion that

2    men from -- throughout the world participate in player

3    services market, that there are countries throughout

4    the world that operate in the hosting market.  There

5    is a sponsorship agreement with Mercedes-Benz that's a

6    worldwide sponsorship agreement.

7              So that I think that this market -- and I

8    agree with most of the ATP literature on this -- this

9    is a worldwide market.  It promotes itself -- it

10   promotes its uniqueness on the basis that it's -- it's

11   a worldwide market.  And when it sells sponsorships it

12   says that they're a worldwide market with a unique set

13   of customers and consumers.

14      Q.    And as an antitrust economist, do you believe

15   that ATP's statements about worldwide markets are

16   intended to be understood as statements of relevant

17   antitrust markets?

18      A.    Well, I'm -- as I just said to you, the

19   relevant antitrust markets are more specific markets

20   that I delineated as joint products that come out of

21   this -- the general antitrust market here, which is

22   the production of top-tier men's professional tennis.

23      Q.    Do you have an opinion that the relevant

24   geographic market is the world?

25      A.    Well, I -- you have to ask me that for the

2/22/2008 Zimbalist, Andrew

```
1    specific antitrust markets, not the general market.

2    This case is about the men's professional top-tier

3    tennis, that's what I'm saying here.  And then the

4    production of that has several joint productions and

5    each of these joint productions is potentially

6    relevant and specific antitrust markets.

7              So as I just said, the player services

8    market, I believe, is a worldwide market.  The hosting

9    market, I believe, is a worldwide market.  The live

10   market, I believe, is a regional market.  And the

11   sponsorship market has both characteristics.  The

12   television market is largely a regional market.  The

13   merchandising and the concessions market are largely

14   local and regional markets.  So they each have -- each

15   of the specific markets has a different geographical

16   delineation.

17      Q.   So as I understand you, you're changing your

18   opinion, the opinion expressed here as a relevant

19   geographic market is the world and now you're saying

20   it's not that clear?

21      A.   For -- for the characterization of -- I say

22   it -- the relevant market is the production of men's

23   top-tier professional tennis.  That has a variety of

24   the joint products.

25              If I look at the whole ball of wax, it
```

57

1    markets in this case?

2        A.    Generally it does, yes.

3        Q.    On Page 6 you refer to "Quantitative evidence

4    can consist" -- in the last paragraph on Page 6.

5    "Quantitative evidence can consist of practical

6    indicia such as disparity in prices, sales levels or

7    profitability, or efforts of cross elasticity of

8    demand, or conducting a SSNIP ('a small but

9    significant non-transitory increase in price') test."

10           Did you use any of those techniques in

11   determining the relevant antitrust markets in this

12   case?

13       A.    Yes.

14       Q.    And which one did you use?

15       A.    Practical indicia.

16       Q.    The disparity in prices?

17       A.    Among other things that we've gone over, yes.

18       Q.    Is it your opinion as an antitrust economist

19   that two products that sell for different prices are

20   necessarily in different antitrust markets?

21       A.    No, it's not my opinion.

22       Q.    Did you make any attempt here to estimate

23   cross elasticity of demand between the different

24   products that might be in the same level of an

25   antitrust market?

2/22/2008 Zimbalist, Andrew

1       A.   I could not estimate cross elasticity demands.

2   I was not given the price data.

3       Q.   Did you make any estimate to conduct a SSNIP

4   test?

5       A.   I could not do that for the same reason.

6       Q.   Moving over to Page 7, you refer to the

7   cellophane fallacy.  Did you conduct any analysis to

8   determine whether the cellophane fallacy would affect

9   any analysis in this case?

10      A.   I could not do that, again, because I was not

11  given a price data.

12      Q.   Did you discuss with counsel trying to obtain

13  the price data that would be necessary to create to

14  estimate cross elasticity demand or demand a SSNIP

15  test?

16      A.   Yes.

17      Q.   Did you ever discuss whether the data -- in

18  Footnote 7, you refer to the data was produced to

19  Pricewaterhouse and Deliotte, Footnote 7?

20      A.   Yes.

21      Q.   Did you ever discuss with counsel whether they

22  might subpoena that data from Pricewaterhouse or

23  Deliotte?

24      A.   I -- I wouldn't -- I would never suggest to

25  them that they subpoena anything.  That's their

1      A.   As I sit here, I can't -- I can't identify --

2    I can't recall any specific cases where I've done

3    that.

4      Q.   Have you served as an expert in other cases in

5    which you have offered an opinion on the relevant

6    antitrust market?

7      A.   Yes.

8      Q.   How many cases have you rendered such an

9    opinion?

10     A.   I don't know offhand.  I -- recently I did one

11   this -- this past year, but I'd have to -- if you want

12   an actual number, I'd have to go back and look at my

13   CV.

14          It's very hot in this room, excuse me.

15     Q.   What was the case within the last year in

16   which you offered an opinion on the definition of a

17   relevant antitrust market?

18     A.   It was a case brought the Kentucky Speedway

19   against NASCAR and ISC, International Speedway

20   Corporation.

21     Q.   How did you go about identifying the relevant

22   market in that case?

23          MR. MacGILL:  Now, I would caution the

24   witness, my understanding is there is a protective

25   order that's been issued in that case.  And I have not

1  seen a protective order, but if you're aware of any

2  such protective order in terms, I would just caution

3  you to be cognizant of whatever the courts ordered in

4  relation to those proceedings.

5        Can I hear the question back, please.

6        (The pending question was read.)

7    A.    I -- I wrote my report about a year ago, so

8  I'm not sure that I can recollect in great detail.  I

9  was able to do an econometric test because I would

10 have price data.  It had a variety of limitations to

11 it.  I was also able to do what I referred to as a

12 modified SSNIP test and I also used practical indicia.

13   Q.    When you say you "also used practical indicia,

14 is that referring to the methodology you used in this

15 case?

16   A.    Yes.

17        The question you asked me before I thought

18 was had I rendered an opinion using only practical

19 indicia before.  And I had not done that, as far as I

20 can recall.

21   Q.    I just want to clarify for the record, you're

22 comfortable using review of practical indicia as a way

23 to defer to the methodology you used here?

24   A.    I am.

25   Q.    On the bottom of Page 7 at the end of the

1    they might instead take their family out to dinner.

2        Q.   And that's a verbal description of what the

3    SSNIP test is, correct?

4        A.   Which sentence are you referring to?

5        Q.   The -- the carryover sentence from 14 to 15.

6        A.   The question asked is whether a small -- yes.

7    That's -- that's right.

8        Q.   And you didn't do a SSNIP test here?

9        A.   That's correct.

10        Q.   Are you relying for your opinion in this case

11    on your reading of antitrust decisions in the sports

12    industry?

13        A.   Well, I -- but -- it -- it's unvoidable that I

14    have a certain amount of experience firsthand and --

15    and through study that informs the way I look at any

16    case that I approach.  We're all a product of our

17    histories.  And part of the way that I analyze cases

18    has to do with -- with the experience that I've had.

19             And part of that experience has been either

20    being directly involved in some of these cases or

21    having read about them or talked to other experts who

22    have been in those cases or other people involved in

23    those cases.  So at some level I'm relying upon my

24    history.  I'm not sure if I'm answering your question.

25        Q.   Are you relying on your reading of antitrust

1    decisions in the sports industry as a basis for the

2    opinion you've rendered in this case?

3         A.   Oh, yes.  So I think that -- one necessarily

4    when -- when you try to define a market, you

5    necessarily have certain predispositions, certain

6    ideas about what products they might be competing

7    with.  And my -- my experience in the sports industry

8    does give me certain predispositions.  And one of

9    those predispositions is that the major professional

10   sports are not in the same market with each other.

11        Q.   When you say "major professional sports are

12   not in the same market with each other," is that a

13   market for live audiences or television broadcasts,

14   for sponsorship or for all purposes?

15        A.   The evidence that I've looked at does not --

16   as I can recall as I sit here, does not include an

17   analysis of sponsorship market.  I've seen analysis

18   related to live attendance and television and I think

19   that they are in different markets from each other for

20   those two areas.

21             I also think that the history of

22   legislation in the United States suggests that the

23   U.S. Government thinks that they are in different

24   markets from each other, different television markets.

25   If -- if the sports were in the same television market

**2/22/2008  Zimbalist, Andrew**

1    the production of top-tier men's professional tennis.

2              Do you see that paragraph?

3              MR. MacGILL:  Again, which paragraph are

4    you referring to?

5        A.   Right here.

6              MR. MacGILL:  Okay.

7        Q.   And in that paragraph you refer to the

8    production of broadcasting rights to tournaments, the

9    production of sponsorship rights to tournaments, the

10   production of merchandising rights and the production

11   of concession rights.  Those are the four derivative

12   markets you spoke of earlier; is that correct?

13       A.   Yes.

14       Q.   You say, "These joint products differ in some

15   of their characteristics, but they do not alter the

16   fundamental conclusion already derived."

17             What is your basis for saying they differ

18   in some of their characteristics?

19       A.   Well, the merchandising rights, for instance,

20   and the concessions rights are local -- local

21   geographically or regional geographically.  The

22   sponsorship rights to a large exptent are regional.

23   Broadcasting rights to a large extent are regional.

24   The input markets, as I said before, are worldwide.

25   The geographical delineation of the live market is

84

1     regional and local.  So one of the ways in which they

2     differ is the -- the geographical delineation of the

3     market.

4         Q.    You say regional and local.  Do you deliver a

5     distinction between regional and local?

6         A.    Yes.

7         Q.    What's the distinction?

8         A.    Generally -- I don't think that there is a

9     specific radius in miles or kilometers that will --

10    will distinguish between region and local, but --

11    But when you think about local in professional sports,

12    you think about the television territory that the

13    league would grant to a team.

14              It certainly includes the -- what's known

15    as the ADI, the area of designated influence, and the

16    media market.  Sometimes it will include further

17    surrounding countries.  But you're talking basically

18    about a 30 or 40 or 50 miles of radius around a

19    facility for a local market.

20              A regional market is a market that would go

21    out beyond that and might include other states.  And

22    if you're talking about Europe, it might very well

23    include more than one country.

24        Q.    Is it relevant to your analysis here to

25    determine what regional or local markets for live

1    markets are local and regional.  But whether I explain

2    that and try to offer empirical evidence, I think

3    you're right.  I think I probably don't do an

4    explanation of that.  But, again, that's because it's

5    not relevant to the conclusion I'm drawing.

6        Q.   What was the methodology you used for

7    determining the geographical market?

8        A.   Of what?

9        Q.   That you identified in this sentence right

10   here, "The geographical market for the production of

11   men's professional tennis is the world."

12            How did you do that?

13       A.   I'm talking about the production of it, so

14   it's two main input markets, which the inputs are used

15   for production.  And I -- I think that it's apparent

16   in considering those markets that they function on a

17   worldwide basis.  You -- they draw tennis players from

18   around the world and they stage their tournaments

19   around the world.

20       Q.   Was there any more detailed analysis you used,

21   other than determining that it was apparent that

22   players come from around the world and that

23   tournaments are played around the world?

24       A.   Well, as I said earlier, there is -- there is

25   all sorts of ATP documents, including the one that's

1    in front of me that stresses that.  When they sell

2    sponsorship rights and other -- other products, they

3    stress that this is a world -- there is a worldwide

4    market out there that -- that you will bring your

5    product before.

6        Q.   And is there any economic or econometric

7    analysis that you performed to support your conclusion

8    about the geographical market in this case?

9        A.   I did not perform econometric analysis to

10   define a geographic market.

11       Q.   Did you perform any economic analysis, other

12   than saying what you believe was apparent?

13       A.   No.

14       Q.   With respect to the market for live audience

15   members at top-tier men's professional tennis, you

16   agree that that's not a global market, correct?

17       A.   I agree that it's probably not a global

18   market.  I didn't study that empirically.  I don't

19   know the answer to the question how many -- how many

20   Europeans go to Indian Wells and how much -- how much

21   sensitivity, therefore, there might be to Indian Wells

22   revenue by altering prices as a result of -- of

23   international consumers' decisions.  But I don't

24   suspect that it's -- it's an international market.

25              As I said a couple of times already, I did

1    that's the case, that there would be people in between

2    Montreal and Cincinnati who would be making that

3    choice.

4            But I think more significantly it's quite

5    possible that somebody would choose to -- I'm not

6    going to go to Montreal to watch the women because I

7    can watch the men on TV.  So that would -- I could

8    watch the men who are playing in Cincinnati on

9    television.  Or I'm not going to go to Cincinnati to

10   watch the men, because I can watch the women on TV.

11           And so the -- the concurrents of the

12   tournaments themselves in the same broader television

13   market can have the -- the affect that you were

14   talking about.

15       Q.   You've offered an opinion about what the

16   geographic market is for live attendance at top-tier

17   men's professional tennis, correct?

18       A.   I've said that it appears to be local or

19   regional.

20       Q.   And you can't tell any more specifically

21   whether it's local or regional?

22       A.   Again, as I said earlier, I don't think that

23   it's pertinent to the argument that I am making.  I

24   didn't find the need to -- to make a clear distinction

25   there.

# EXHIBIT 3

# Horizontal Merger Guidelines




U.S. Department of Justice
and the
Federal Trade Commission

**Issued: April 2, 1992**
Revised: April 8, 1997

# 0. Purpose, Underlying Policy Assumptions and Overview

These Guidelines outline the present enforcement policy of the Department of Justice and the Federal Trade Commission (the "Agency") concerning horizontal acquisitions and mergers ("mergers") subject to section 7 of the Clayton Act,[1] to section 1 of the Sherman Act,[2] or to section 5 of the FTC Act.[3] They describe the analytical framework and specific standards normally used by the Agency in analyzing mergers.[4] By stating its policy as simply and clearly as possible, the Agency hopes to reduce the uncertainty associated with enforcement of the antitrust laws in this area.

Although the Guidelines should improve the predictability of the Agency's merger enforcement policy, it is not possible to remove the exercise of judgment from the evaluation of mergers under the antitrust laws. Because the specific standards set forth in the Guidelines must be applied to a broad range of possible factual circumstances, mechanical application of those standards may provide misleading answers to the economic questions raised under the antitrust laws. Moreover, information is often incomplete and the picture of competitive conditions that develops from historical evidence may provide an incomplete answer to the forward-looking inquiry of the Guidelines. Therefore, the Agency will apply the standards of the Guidelines reasonably and flexibly to the particular facts and circumstances of each proposed merger.

## 0.1 Purpose and Underlying Policy Assumptions of the Guidelines

The Guidelines are designed primarily to articulate the analytical framework the Agency applies in determining whether a merger is likely substan-

---

[1] 15 U.S.C. § 18 (1988). Mergers subject to section 7 are prohibited if their effect "may be substantially to lessen competition, or to tend to create a monopoly."

[2] 15 U.S.C. § 1 (1988). Mergers subject to section 1 are prohibited if they constitute a "contract, combination . . ., or conspiracy in restraint of trade."

[3] 15 U.S.C. § 45 (1988). Mergers subject to section 5 are prohibited if they constitute an "unfair method of competition."

[4] These Guidelines update the Merger Guidelines issued by the U.S. Department of Justice in 1984 and the Statement of Federal Trade Commission Concerning Horizontal Mergers issued in 1982. The Merger Guidelines may be revised from time to time as necessary to reflect any significant changes in enforcement policy or to clarify aspects of existing policy.

---

1

tially to lessen competition, not to describe how the Agency will conduct the litigation of cases that it decides to bring. Although relevant in the latter context, the factors contemplated in the Guidelines neither dictate nor exhaust the range of evidence that the Agency must or may introduce in litigation. Consistent with their objective, the Guidelines do not attempt to assign the burden of proof, or the burden of coming forward with evidence, on any particular issue. Nor do the Guidelines attempt to adjust or reapportion burdens of proof or burdens of coming forward as those standards have been established by the courts.[5] Instead, the Guidelines set forth a methodology for analyzing issues once the necessary facts are available. The necessary facts may be derived from the documents and statements of both the merging firms and other sources.

Throughout the Guidelines, the analysis is focused on whether consumers or producers "likely would" take certain actions, that is, whether the action is in the actor's economic interest. References to the profitability of certain actions focus on economic profits rather than accounting profits. Economic profits may be defined as the excess of revenues over costs where costs include the opportunity cost of invested capital.

Mergers are motivated by the prospect of financial gains. The possible sources of the financial gains from mergers are many, and the Guidelines do not attempt to identify all possible sources of gain in every merger. Instead, the Guidelines focus on the one potential source of gain that is of concern under the antitrust laws: market power.

The unifying theme of the Guidelines is that mergers should not be permitted to create or enhance market power or to facilitate its exercise. Market power to a seller is the ability profitably to maintain prices above competitive levels for a significant period of time.[6] In some circumstances, a sole seller (a "monopolist") of a product with no good substitutes can maintain a selling price that is above the level that would prevail if the market were competitive. Similarly, in some circumstances, where only a few firms account for most of the sales of a product, those firms can exercise market power, perhaps even approximating the performance of a monopolist, by either explicitly or implicitly coordinating their actions. Circumstances also may permit a single firm, not a monopolist, to exercise market

---

[5]  For example, the burden with respect to efficiency and failure continues to reside with the proponents of the merger.

[6]  Sellers with market power also may lessen competition on dimensions other than price, such as product quality, service, or innovation.

power through unilateral or non-coordinated conduct -- conduct the success of which does not rely on the concurrence of other firms in the market or on coordinated responses by those firms. In any case, the result of the exercise of market power is a transfer of wealth from buyers to sellers or a misallocation of resources.

Market power also encompasses the ability of a single buyer (a "monopsonist"), a coordinating group of buyers, or a single buyer, not a monopsonist, to depress the price paid for a product to a level that is below the competitive price and thereby depress output. The exercise of market power by buyers ("monopsony power") has adverse effects comparable to those associated with the exercise of market power by sellers. In order to assess potential monopsony concerns, the Agency will apply an analytical framework analogous to the framework of these Guidelines.

While challenging competitively harmful mergers, the Agency seeks to avoid unnecessary interference with the larger universe of mergers that are either competitively beneficial or neutral. In implementing this objective, however, the Guidelines reflect the congressional intent that merger enforcement should interdict competitive problems in their incipiency.

## 0.2 Overview

The Guidelines describe the analytical process that the Agency will employ in determining whether to challenge a horizontal merger. First, the Agency assesses whether the merger would significantly increase concentration and result in a concentrated market, properly defined and measured. Second, the Agency assesses whether the merger, in light of market concentration and other factors that characterize the market, raises concern about potential adverse competitive effects. Third, the Agency assesses whether entry would be timely, likely and sufficient either to deter or to counteract the competitive effects of concern. Fourth, the Agency assesses any efficiency gains that reasonably cannot be achieved by the parties through other means. Finally the Agency assesses whether, but for the merger, either party to the transaction would be likely to fail, causing its assets to exit the market. The process of assessing market concentration, potential adverse competitive effects, entry, efficiency and failure is a tool that allows the Agency to answer the ultimate inquiry in merger analysis: whether the merger is likely to create or enhance market power or to facilitate its exercise.

# 1.  Market Definition, Measurement and Concentration

## 1.0  Overview

A merger is unlikely to create or enhance market power or to facilitate its exercise unless it significantly increases concentration and results in a concentrated market, properly defined and measured.  Mergers that either do not significantly increase concentration or do not result in a concentrated market ordinarily require no further analysis.

The analytic process described in this section ensures that the Agency evaluates the likely competitive impact of a merger within the context of economically meaningful markets -- i.e., markets that could be subject to the exercise of market power.  Accordingly, for each product or service (hereafter "product") of each merging firm, the Agency seeks to define a market in which firms could effectively exercise market power if they were able to coordinate their actions.

Market definition focuses solely on demand substitution factors -- i.e., possible consumer responses.  Supply substitution factors -- i.e., possible production responses -- are considered elsewhere in the Guidelines in the identification of firms that participate in the relevant market and the analysis of entry.  See Sections 1.3 and 3.  A market is defined as a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a "small but significant and nontransitory" increase in price, assuming the terms of sale of all other products are held constant.  A relevant market is a group of products and a geographic area that is no bigger than necessary to satisfy this test.  The "small but significant and nontransitory" increase in price is employed solely as a methodological tool for the analysis of mergers: it is not a tolerance level for price increases.

Absent price discrimination, a relevant market is described by a product or group of products and a geographic area.  In determining whether a hypothetical monopolist would be in a position to exercise market power, it is necessary to evaluate the likely demand responses of consumers to a price increase.  A price increase could be made unprofitable by consumers either switching to other products or switching to the same product produced by firms at other locations.  The nature and magnitude of these two

4

types of demand responses respectively determine the scope of the product market and the geographic market.

In contrast, where a hypothetical monopolist likely would discriminate in prices charged to different groups of buyers, distinguished, for example, by their uses or locations, the Agency may delineate different relevant markets corresponding to each such buyer group. Competition for sales to each such group may be affected differently by a particular merger and markets are delineated by evaluating the demand response of each such buyer group. A relevant market of this kind is described by a collection of products for sale to a given group of buyers.

Once defined, a relevant market must be measured in terms of its participants and concentration. Participants include firms currently producing or selling the market's products in the market's geographic area. In addition, participants may include other firms depending on their likely supply responses to a "small but significant and nontransitory" price increase. A firm is viewed as a participant if, in response to a "small but significant and nontransitory" price increase, it likely would enter rapidly into production or sale of a market product in the market's area, without incurring significant sunk costs of entry and exit. Firms likely to make any of these supply responses are considered to be "uncommitted" entrants because their supply response would create new production or sale in the relevant market and because that production or sale could be quickly terminated without significant loss.[7] Uncommitted entrants are capable of making such quick and uncommitted supply responses that they likely influenced the market premerger, would influence it post-merger, and accordingly are considered as market participants at both times. This analysis of market definition and market measurement applies equally to foreign and domestic firms.

If the process of market definition and market measurement identifies one or more relevant markets in which the merging firms are both participants, then the merger is considered to be horizontal. Sections 1.1 through 1.5 describe in greater detail how product and geographic markets will be defined, how market shares will be calculated and how market concentration will be assessed.

---

[7] Probable supply responses that require the entrant to incur significant sunk costs of entry and exit are not part of market measurement, but are included in the analysis of the significance of entry. See Section 3. Entrants that must commit substantial sunk costs are regarded as "committed" entrants because those sunk costs make entry irreversible in the short term without foregoing that investment; thus the likelihood of their entry must be evaluated with regard to their long-term profitability.

## 1.1  Product Market Definition

The Agency will first define the relevant product market with respect to each of the products of each of the merging firms. [8]

### *1.11  General Standards*

Absent price discrimination, the Agency will delineate the product market to be a product or group of products such that a hypothetical profit-maximizing firm that was the only present and future seller of those products ("monopolist") likely would impose at least a "small but significant and nontransitory" increase in price. That is, assuming that buyers likely would respond to an increase in price for a tentatively identified product group only by shifting to other products, what would happen? If the alternatives were, in the aggregate, sufficiently attractive at their existing terms of sale, an attempt to raise prices would result in a reduction of sales large enough that the price increase would not prove profitable, and the tentatively identified product group would prove to be too narrow.

Specifically, the Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a "small but significant and nontransitory" increase in price, but the terms of sale of all other products remained constant. If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next-best substitute for the merging firm's product.[9]

In considering the likely reaction of buyers to a price increase, the Agency will take into account all relevant evidence, including, but not limited to, the following:

(1) evidence that buyers have shifted or have considered shifting purchases between products in response to relative changes in price or other competitive variables;

---

[8]  Although discussed separately, product market definition and geographic market definition are interrelated. In particular, the extent to which buyers of a particular product would shift to other products in the event of a "small but significant and nontransitory" increase in price must be evaluated in the context of the relevant geographic market.

[9]  Throughout the Guidelines, the term "next best substitute" refers to the alternative which, if available in unlimited quantities at constant prices, would account for the greatest value of diversion of demand in response to a "small but significant and nontransitory" price increase.

(2) evidence that sellers base business decisions on the prospect of buyer substitution between products in response to relative changes in price or other competitive variables;

(3) the influence of downstream competition faced by buyers in their output markets; and

(4) the timing and costs of switching products.

The price increase question is then asked for a hypothetical monopolist controlling the expanded product group. In performing successive iterations of the price increase test, the hypothetical monopolist will be assumed to pursue maximum profits in deciding whether to raise the prices of any or all of the additional products under its control. This process will continue until a group of products is identified such that a hypothetical monopolist over that group of products would profitably impose at least a "small but significant and nontransitory" increase, including the price of a product of one of the merging firms. The Agency generally will consider the relevant product market to be the smallest group of products that satisfies this test.

In the above analysis, the Agency will use prevailing prices of the products of the merging firms and possible substitutes for such products, unless premerger circumstances are strongly suggestive of coordinated interaction, in which case the Agency will use a price more reflective of the competitive price.[10] However, the Agency may use likely future prices, absent the merger, when changes in the prevailing prices can be predicted with reasonable reliability. Changes in price may be predicted on the basis of, for example, changes in regulation which affect price either directly or indirectly by affecting costs or demand.

In general, the price for which an increase will be postulated will be whatever is considered to be the price of the product at the stage of the industry being examined.[11] In attempting to determine objectively the effect of a "small but significant and nontransitory" increase in price, the Agency, in most contexts, will use a price increase of five percent lasting for the foreseeable future. However, what constitutes a "small but significant and nontransitory" increase in price will depend on the nature of the

---

[10] The terms of sale of all other products are held constant in order to focus market definition on the behavior of consumers. Movements in the terms of sale for other products, as may result from the behavior of producers of those products, are accounted for in the analysis of competitive effects and entry. See Sections 2 and 3.

[11] For example, in a merger between retailers, the relevant price would be the retail price of a product to consumers. In the case of a merger among oil pipelines, the relevant price would be the tariff -- the price of the transportation service.

7

industry, and the Agency at times may use a price increase that is larger or smaller than five percent.

## 1.12  Product Market Definition in the Presence of Price Discrimination

The analysis of product market definition to this point has assumed that price discrimination -- charging different buyers different prices for the same product, for example -- would not be profitable for a hypothetical monopolist. A different analysis applies where price discrimination would be profitable for a hypothetical monopolist.

Existing buyers sometimes will differ significantly in their likelihood of switching to other products in response to a "small but significant and non-transitory" price increase. If a hypothetical monopolist can identify and price differently to those buyers ("targeted buyers") who would not defeat the targeted price increase by substituting to other products in response to a "small but significant and nontransitory" price increase for the relevant product, and if other buyers likely would not purchase the relevant product and resell to targeted buyers, then a hypothetical monopolist would profitably impose a discriminatory price increase on sales to targeted buyers. This is true regardless of whether a general increase in price would cause such significant substitution that the price increase would not be profitable. The Agency will consider additional relevant product markets consisting of a particular use or uses by groups of buyers of the product for which a hypothetical monopolist would profitably and separately impose at least a "small but significant and nontransitory" increase in price.

# 1.2  Geographic Market Definition

For each product market in which both merging firms participate, the Agency will determine the geographic market or markets in which the firms produce or sell. A single firm may operate in a number of different geographic markets.

## 1.21  General Standards

Absent price discrimination, the Agency will delineate the geographic market to be a region such that a hypothetical monopolist that was the only present or future producer of the relevant product at locations in that

region would profitably impose at least a "small but significant and nontran-
sitory" increase in price, holding constant the terms of sale for all products
produced elsewhere.  That is, assuming that buyers likely would respond to
a price increase on products produced within the tentatively identified
region only by shifting to products produced at locations of production out-
side the region, what would happen?  If those locations of production out-
side the region were, in the aggregate, sufficiently attractive at their existing
terms of sale, an attempt to raise price would result in a reduction in sales
large enough that the price increase would not prove profitable, and the
tentatively identified geographic area would prove to be too narrow.

In defining the geographic market or markets affected by a merger, the
Agency will begin with the location of each merging firm (or each plant of
a multiplant firm) and ask what would happen if a hypothetical monopolist
of the relevant product at that point imposed at least a "small but signifi-
cant and nontransitory" increase in price, but the terms of sale at all other
locations remained constant.  If, in response to the price increase, the
reduction in sales of the product at that location would be large enough
that a hypothetical monopolist producing or selling the relevant product at
the merging firm's location would not find it profitable to impose such an
increase in price, then the Agency will add the location from which produc-
tion is the next-best substitute for production at the merging firm's location.

In considering the likely reaction of buyers to a price increase, the
Agency will take into account all relevant evidence, including, but not limit-
ed to, the following:

(1) evidence that buyers have shifted or have considered shifting pur-
chases between different geographic locations in response to relative
changes in price or other  competitive variables;

(2) evidence that sellers base business decisions on the prospect of
buyer substitution between geographic locations in response to relative
changes in price or other competitive variables;

(3) the influence of downstream competition faced by buyers in their
output markets; and

(4) the timing and costs of switching suppliers.

The price increase question is then asked for a hypothetical monopolist
controlling the expanded group of locations.  In performing successive iter-
ations of the price increase test, the hypothetical monopolist will be
assumed to pursue maximum profits in deciding whether to raise the price

9

at any or all of the additional locations under its control. This process will continue until a group of locations is identified such that a hypothetical monopolist over that group of locations would profitably impose at least a "small but significant and nontransitory" increase, including the price charged at a location of one of the merging firms.

The "smallest market" principle will be applied as it is in product market definition. The price for which an increase will be postulated, what constitutes a "small but significant and nontransitory" increase in price, and the substitution decisions of consumers all will be determined in the same way in which they are determined in product market definition.

## 1.22 Geographic Market Definition in the Presence of Price Discrimination

The analysis of geographic market definition to this point has assumed that geographic price discrimination -- charging different prices net of transportation costs for the same product to buyers in different areas, for example -- would not be profitable for a hypothetical monopolist. However, if a hypothetical monopolist can identify and price differently to buyers in certain areas ("targeted buyers") who would not defeat the targeted price increase by substituting to more distant sellers in response to a "small but significant and nontransitory" price increase for the relevant product, and if other buyers likely would not purchase the relevant product and resell to targeted buyers,[12] then a hypothetical monopolist would profitably impose a discriminatory price increase. This is true even where a general price increase would cause such significant substitution that the price increase would not be profitable. The Agency will consider additional geographic markets consisting of particular locations of buyers for which a hypothetical monopolist would profitably and separately impose at least a "small but significant and nontransitory" increase in price.

---

[12] This arbitrage is inherently impossible for many services and is particularly difficult where the product is sold on a delivered basis and where transportation costs are a significant percentage of the final cost.

---

10

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEUTSCHER TENNIS BUND
(GERMAN TENNIS FEDERATION),
ROTHENBAUM SPORT GMBH,
AND QATAR TENNIS
FEDERATION,

                Plaintiffs,

    v.

ATP TOUR, INC., ETIENNE DE
VILLIERS, CHARLES PASARELL,
GRAHAM PEARCE, JACCO
ELTINGH, PERRY ROGERS, and
IGGY JOVANOVIC,

                Defendants.

Reply to Mr. Walker by Andrew Zimbalist

February 1, 2008

What follows is a brief reply to the work of Jonathan Walker. I will attempt to concentrate on the key points of difference between Walker and myself. It should be understood that many of the points I discuss herein are elaborated upon in greater detail in my original report, so I will not continually refer back to that report. Walker's second report reiterates and relies upon many of the same mistaken arguments that appear in his first report. Accordingly, I will first address conceptual issues in the first report to the extent necessary to formulate this reply.

Conceptual Issues Incorporated from Walker's Original Report

I cannot identify a place in this report where Mr. Walker defines any of the relevant product or geographical markets that he believes are operative in this case. If there is no market power and there is no attempt to monopolize, as he argues, then these and other conclusions must apply to specific market characteristics.

Walker claims that the ATP functions as a single economic enterprise. As such, it is not possible for the ATP to be a cartel or to arrange for collusion among its member tournaments. As a matter of economics, I think this claim is unsustainable. A principal and defining characteristic of capitalist production is private ownership. The individual ATP Masters tournaments are separately owned. Subject to ITF and ATP rules, these tournaments manage their tournaments with regard to pricing,

1

concessions, memorabilia, local sponsorships and advertising, groundskeeping, catering, parking, consumer services, and so on. Absent the anticompetitive acts of the ATP, each of these tournaments could produce its event on its own. Each tournament attempts to maximize its objective function, most likely long-run profit maximization. Thus, each tournament is a separate economic enterprise. It is no coincidence that U.S. courts that have examined the claims of the various team sports leagues, including the NFL, the NBA and MLB, have concluded that the league itself is not a single economic entity.[1] It also bears emphasis that there is much more revenue sharing across the teams in the three major U.S. sports leagues than there is across the top-tier tournaments in the ATP.[2]

Although he does not appear to affirmatively define a relevant market or many relevant markets, Walker asserts that the "relevant

---

[1] The 9th Circuit Court of Appeals in *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (1984) wrote as follows: "The NFL clubs are, in the words of the district court, 'separate business entities whose products have an independent value.' The member clubs are all independently owned. Most are corporations, some are partnerships, and apparently a few are sole proprietorships. Although a large portion of League revenue, approximately 90%, is divided equally among the teams, profits and losses are not shared, a feature common to partnerships or other 'single entities.'"

[2] The only exception that I am aware of when the courts have accepted the status of a sports league as a single entity in the United States is the case of Major League Soccer. In that case, the league is jointly owned by all the investors. Investors are then given management control over a specific team. This is a much different organizational and ownership structure than that which prevails in the other major team sports leagues or in the ATP.

2

markets include markets for live entertainment." In this view, tennis at all levels competes with all forms of live entertainment (e.g., football, soccer, basketball, bowling, golf, swimming, concerts, opera, theater), because every time someone spends a dollar at a tennis match, it is a dollar that they do not have to spend on some other form of live entertainment. This conclusion flies in the face of what court after court has decided in professional sports cases. It also contradicts the intent of several congressional initiatives, such as the Sports Broadcasting Act or the act that allowed the National and American Football Leagues to merge in 1966. Mr. Walker might argue that these are legal or political decisions, which is so, but at least in the case of the legal decisions, they reflect economic analysis performed by experts on either side of the issue.

Walker writes that (p.3): "Other challenged conduct, such as ATP's historical and continued use of player commitment rules, special event rules, and its pooling of television rights address externalities and free-riding, both of which can diminish consumer welfare if ignored." Yet he never elaborates this point with any evidence to sustain its applicability in this case.

Walker's presentation of the history of the ATP fails to mention a rather crucial development; namely, the antitrust suit by Volvo against the MIPTC. The ATP did not create the product of a top-tier men's tennis tour, as Walker asserts. The product was created by the MIPTC, in collaboration with the ITF. The ATP came into power to fill a void left

3

when the prior governing body, the MIPTC, disintegrated as a result of an antitrust lawsuit resulting from the channeling of players into certain events; the preclusion of player participation in certain events; and the pooling of television rights.

Walker asserts, again without presenting any evidence or explanation (p. 17): "No individual tennis tournament could possibly produce this product on its own." Why could not the Madrid Masters produce a top-tier professional tennis tournament on its own? Why could not the entire top-tier men's professional tennis market be structured in an open, competitive way, whereby any venue could announce a tournament, its rules and its prize money? The ITF, in turn, could stipulate that any such tournament that had at least 50 percent of the top ten players (or some other criterion, with an algorithm and sliding point system) would yield a certain amount of qualifying points for an invitation to a Grand Slam event? Each tournament would be obliged to offer competitive prize money in its effort to attract the top players and the players would be free to respond to the incentives provided as they wished.

Fans find competitive markets to be interesting and such an open arrangement may bring extra attention and cachet to these events. Prior to 1976, Major League Baseball argued that it needed the artificial control of the player reserve system to preserve competitive balance and financial stability. Yet when an arbitrator opened the doors of free agency and players became free to negotiate their own contracts after six years in the

4

majors, fans became enthralled with the rapidly rising salaries and the opportunities for teams to better themselves with free agent signings. Baseball's popularity, after years of dormancy, soared.

Walker's comment is typical of the overstatement that characterizes each of his reports. He doesn't write that "it would be difficult for an individual tournament" to produce the product on its own. He writes that each tournament "could [not] possibly" produce the product. But using hyperbole or strong language does not make an assertion true.

In this case, Walker appears to be attempting an analogy with professional team sports. In team sport industries, it is true that an individual team cannot produce a valid game or a championship season on its own. The analogy, however, breaks down on a moment's reflection. In team sports, the competition is between teams; in tennis tournaments, the competition is between players. A team can't produce a valid game by itself, and a tennis player cannot produce a valid match by himself.

Walker mocks the notion that the ATP top-tier tour might be reducing output with the introduction of the Brave New World. He argues that the tour is an "economically integrated product" wherein the number of tournaments played defines the characteristic of the tour, just as a red shirt defines the color characteristic of a garment. Walker reasons that it makes no more sense to judge the number of tournaments than it does to judge a company that produces red instead of blue shirts. He offers the analogy that (p. 19) "requiring the NFL to include all 32 of its teams into

5

the playoffs or having Major League Baseball promote all minor league teams to major league status cannot be viewed as improving the leagues' output simply because additional games would be played under these circumstances." This is a straw man. The NFL cannot have an unlimited number of teams in its playoffs or they wouldn't be playoffs. Regarding the promotion of minor league teams in baseball, the proper analogy in the ATP context would be promoting all ISG and IS tournaments to the top tier, not expanding the top-tier by introducing a new tournament in Shanghai or in Delhi.

But, of course, the complaint in the instant case does not call for this remedy. Rather, the central point regarding output quantity is that the ATP directly controls one aspect of the quantity produced: the number of top-tier tournaments. It does not have direct control over the attendance at the events or the viewership on television.

Walker also misconstrues my allegation on the artificial restriction of output, both in his initial report and his response. First, I agree that if Monte Carlo is included in the top tier, then there is no nominal reduction in output quantity. This point is obvious. What is not known now, however, is whether Monte Carlo will be successful in attracting regularly five or more of the top ten players. It is my understanding that the ATP settlement with Monte Carlo includes a provision that if Monte Carlo does not succeed in attracting an average of six of the top ten players during the first four years of the Brave New World, then Monte Carlo will lose its

ATP 1000 status. Since the Brave New World would not commence until 2009, neither Walker nor I know if Monte Carlo will continue to be a top-tier event. That is, viewed narrowly, we do not know at this time if there will be a nominal reduction in the quantity of output in top-tier tennis or not.

Second, if demand for top-tier men's tennis grows (if the demand curve shifts out to the right) as it has been doing (and should be expected to continue to do as world population and income grows), and the ATP maintains the number of tournaments at the same level, then this too is an artificial restriction of output. It is a typical exercise of monopoly power. To the extent that the artificial restriction of output leads to higher profits, it strengthens the monopoly and potentially further raises barriers to entry.

It is, of course, true, as Walker states, that attendance may increase, that television viewership may expand, that sponsorship dollars may grow, and it is also true, as I acknowledge in my report, that there are other investments and policies being pursued which may lead to growth in these areas. The issue at hand, though, is not whether other factors will cause revenue growth. The issue is the impact of the restrictive policies of the Brave New World.

Walker attempts to find other reasons why the ATP and its heavy-handed interventions are a necessary part of the top-tier men's tennis tour. He writes (p. 21): "Consumers apparently prefer additional features that require more central oversight – e.g., assurance that the athletic contests

7

are legitimate, assurance about the quality of officiating …." But these and other pro-competitive functions are not components of the Brave New World and they are being or can be effectively dealt with by the ITF. The ATP is not needed to perform these functions. Walker goes on (p. 21): "Public reaction in other sports contexts, such as reaction to the Major League Baseball steroid scandal, suggests that consumers may prefer strong league oversight rather than minimal league oversight. Decisions about how much authority and rule-making will reside at the league/tour level, rather than at the team tournament level, affect how consumers perceive and value league/tour performances. They are potentially important product attributes to consumers." Here again, policy regarding performance-enhancing drugs has been set by the ITF instead of the ATP. Even so, Walker is misinformed. The World Anti-Doping Agency (WADA) recommends that drug testing and enforcement be conducted by an independent body, not the league. Walker seems to search in vain for justifications for heavy-handed intervention by the ATP.

Walker also devotes many pages in each of his reports to argue that the market for live top-tier tennis tournaments is local in nature. It is not clear with whom he thinks he is arguing on this point. It is apparent that the market to attend live tournaments is largely local or regional in nature. Still he misses some important points. He cites a variety of my publications where I stipulate that the market for a home sports team is primarily local. However, local sports teams have city identity. Such is

8

not always the case in other sporting contests. Thus, the Super Bowl does not, except by rare coincidence, have a local team playing, and it attracts visitors from all over the United States to watch it in person. Similarly, the Olympics attract visitors from all over the world. The NCAA men's and women's Final Four falls in the same category. Top-tier tennis matches fall somewhere in between these extremes. When a top-tier tournament is held in Hamburg, the fans who attend are not rooting for a local team or even necessarily a local player and the event happens once a year, not 81 times a year as is the case with a major league baseball game at the home field. Such a tennis event, therefore, is likely to have more of a regional appeal.

Walker seeks to drive home his point about the local nature of the geographical markets by citing a 1994 academic study (p. 27) in the *Sport Marketing Quarterly* about two low-level tennis tournaments in Vermont and South Carolina. The study finds that "the majority of tournament spectators resided either in the host state or one in proximity to the host state." First, this evidence is suggestive of a regional, not a local, market. Second, there is no reason to believe that top-tier tennis tournaments in 2008 would have similar market characteristics to low-level tennis tournaments in the early 1990s. It is an established fact, for instance, that the live market for minor league baseball games is much more local than that for major league games. Hundreds or thousands of tennis fans may

travel long distances to watch Federer play Nadal or Djokovic, but they won't travel far to watch two unknowns play each other.

Walker also enters into a long discussion of television and sponsorship markets during which he insists that broadcasters and companies have many alternative forms of programming and advertising platforms. As a general proposition, the latter is correct. The question is whether or not there is ready substitution at the margin among these alternatives. Various requests notwithstanding, I was not provided with sufficiently detailed data to empirically test the extent of this substitution behavior. A reasonable alternative is to seek information on whether the ATP garnered a super-competitive return from selling television and sponsorship rights. A competitive firm would sell where price equals marginal cost. The marginal cost to the ATP to sell television rights is small and it is hard to imagine that the rapidly increasing prices that the ATP has received for its rights in recent years (discussed in my original report) do not represent margins substantially above the marginal cost. Nonetheless, there was so much mismanagement of television rights by the ATP since 2000 that it is likely these rights have not been efficiently exploited. To the extent that this is still true, super-competitive returns may not be in effect today, but may be in the near future. The fact that the ATP did not receive an upfront rights fee on some of its contracts, but instead entered revenue sharing deals where it assumed some production

costs, does not mean that the ultimate return from the contract did not exceed marginal costs.

On page 30 Walker offers an array of statistics to show that tennis is less popular in the United States as a television sport than many other sports. This data, however, does not mean that the ATP does not earn a super-competitive return on its television contracts in the United States. It does, though, raise the question about why the ATP is reducing output of top-tier tennis in Europe where tennis is one of the most popular spectator sports.

Curiously, as evidence of the low returns that the ATP garners from its television deals, Walker cites data from 2002 and compares the ATP's TV revenues that year with the Grand Slams. This is cooking the data. The ISL contract was paid through 2001. The ATP did not have adequate substitute contracts in place for 2002 and that year was the low point this decade in television revenues. To be sure, the ATP has been recovering from the ISL collapse and the destruction of local broadcasting relationships since the beginning of the present decade. Therefore, even more recent data would likely underrepresent ATP's steady state television revenues. In any event, it is clear that 2002 is not a representative year.

It is also clear that there is no reason to expect the ATP Masters tier to generate revenues similar to those generated by the Grand Slams. The Grand Slams are to the ATP Masters what the World Series is to a

regular season MLB game or the Super Bowl is to a regular season NFL game. A team or a player competes all year to be able to qualify for the culminating events. The culminating events always command much larger audiences and account for a disproportionate share of television revenues.

Walker's discussion of the relative prices of spot ads and ad costs per viewer for the Hamburg Masters tournament versus other television shows does not establish what he claims. He argues that since the tournament's ad prices are lower than those for other shows that the tournament must be in competition with these other shows for the sale of advertising time. While this is true in some broad sense, Walker does not present evidence that it is true in the narrow sense of the DOJ merger guidelines which seeks to identify close substitutes. The demographic characteristics (age, income, gender, preferences) of tennis spectators may be quite different than those of the other shows. The companies that buy ads on the broadcasts of tennis shows may simply be evaluating the expected return from advertising on the tennis show. Indeed, the fact that the implied CPMs from Walker's data differ substantially from tennis to the other shows is suggestive of the products being in different markets.

Walker posits (p. 38): "the lack of entry barriers confronting potential new tournaments and tours further diminish the economic significance of the little share that ATP has." This seems to go to the heart of the disagreement between the parties in this case. I argue in my original report that there are very significant entry barriers; principally,

and especially with the Brave New World, the ATP's stiff rule regarding player service commitments makes it very difficult for a top player to participate in an independent tournament, let alone an entire rival tour. The ATP's "little share" would be important if the ATP events were not tied to the Grand Slams,[3] via the ITF/ATP accord regarding ranking points.[4]   To deflate the importance of this accord and ongoing collaboration, Walker notes that "the ITF has historically had contentious relations with ATP" (p. 39).   Walker is correct here – there were historical frictions; nonetheless, the two bodies have collaborated in the 21st Century and together dominate top-tier men's professional tennis.

Toward the end of his first report, Walker cites examples from other sport industries where there was a recent restructuring to create a heightened competition.   These experiences are characterized by Walker as pro-consumer and pro-competitive and are evidenced to justify the Brave New World efforts to also build a tour with, what Walker believes is, heightened competition.   His interpretation of the impact of the recent changes in the PGA Tour and NASCAR, however, is questionable.   With regard to NASCAR's new point system and "Chase for the Cup," Walker writes (p. 57): "This change in the competition's structure has been

---

[3] Walker states that ranking points are not the only way a player can get into a Grand Slam.   It is my understanding that each Grand Slam generally awards 16 first-round positions to players from qualifying tournaments and has up to 8 wild card entries, so that a total of up to 24 out of a total draw of 128 may enter a Grand Slam without accruing sufficient ranking points in ATP tournaments.

[4] As I point out in my original report, the ATP and ITF are also linked by common ownership interests, overlapping membership and strategic considerations.

13

viewed positively in helping NASCAR compete for advertising,

attendance, and television ratings with other sports." It turns out that

Walker offers one citation for this assertion and it is to NASCAR's

website. That is, NASCAR itself is touting its new policy. This is not

proper use of evidence in an expert report and it is not an acceptable use of

evidence in the economics discipline. The fact of the matter is that since

the "Chase for the Cup" was introduced two years ago both live

attendance and television ratings for NASCAR's Nextel Cup events have

gone down. If the "Chase for the Cup" is to be successful, it certainly is

too early to tell.

Walker has a special section entitled "Strengthening Player

Commitment is Pro-Competitive." His point here seems to be that

guaranteeing the participation of all the top players in the top events will

increase consumer, television and sponsor interest in the events. As a

general matter, this is probably correct. It would also likely increase

consumer, television and sponsor interest if the players were obligated to

have a bathing suit contest before each tennis match. Indeed, there are

probably a host of requirements that would spark the interest of the tennis

world. The question is whether or not the measures under consideration

are the least restrictive way to accomplish the desired ends. In the case of

the player service requirements of the Brave New World, the answer is

that they are not. Players are being stripped of their choice over which

tournaments in which to participate. Inevitably, this abridges their labor

14

market rights and it impacts the prize money that would otherwise have to be offered to entice their participation. Walker talks about how basketball, football or baseball players sign contracts to play in all games (unless they are disabled) during a season and implies that since it is okay in those industries, it should be okay in tennis. There are many problems with this reasoning; chief among them is that these players receive guaranteed salaries and benefits for an entire year (the average NBA salary is in excess of $5 million annually), and, indeed, they often sign contracts which are guaranteed for multiple years (Alex Rodriguez recently signed a contract with the New York Yankees that will guarantee him to be paid at least $275 million over ten years). Tennis stars, of course, work on a piece rate basis, where they are compensated tournament by tournament, according to their success. The labor markets are structured in entirely different ways. The statistical evidence from my regression analysis is ambiguous about the extent of increased attendance occurring by requiring participation by all the top ten players. On balance, it does suggest that there may be some small attendance gains, though not nearly as large as the gains when a tournament moves from having 5 or 6 stars to 7 or 8 stars. But the likelihood that there will be some small attendance gains does not make the new restrictions on the player services market pro-competitive, any more than it would be pro-competitive to declare slavery and force the stars to play in 10 of 10 or 9 of 9, rather than 8 of 8 top-tier tournaments.

15

Walker argues that there are economies of scale in pooling television rights. It is not at all clear that this is so. It is also unclear that there is an advantage in "consistency in programming." The same could be argued for any monopoly. What is the evidence besides ATP claims to this effect? The counterargument is that variety in programming is preferable. Listeners get to hear different styles of announcing, to see different camera angles, to experience different color commentary, and so on. Why wouldn't competition be deemed preferable, as it is in other sectors of the economy? This argument, of course, receives more force if the "consistency of programming" is performed at an inferior level; yet, even if the programming level is good, it can probably benefit from competition and new ideas. Pooling is also likely to compel broadcasters to sign package deals which would obligate them to cover some matches or tournaments that they do not want to cover. This raises the cost of programming for them and potentially raises the price to consumers (via higher channel subscription fees.) Certainly, the ATP's disastrous experience with ISL highlights the danger of pooling and signing a single television rights deal. Among other things, it is akin to putting all one's eggs in one basket, rather than diversifying risk. It is also true that the ISL deal was insensitive to the local conditions in the German market and this resulted in a drastically reduced television exposure for top-tier men's professional tennis. It is not uncommon for centralized decision making to yield outcomes that are not responsive to local market conditions.

16

On page 63 Walker writes that the Hamburg tournament has voluntarily pooled its television rights with the APT for years. He does not cite a source. My information is different. The Hamburg tournament has pooled television rights since 1999, but they did so only after receiving a threat that their sanction would be revoked if they did not enter the pooling arrangement. More recently, the application for an ATP 1000 sanction required applicants to accept a condition that they agree to pool their television rights.

<u>Walker's Responsive Report</u>

Based in part on these incorporated errors, Walker's second report makes additional mistaken arguments. On page 7, Walker sets out his basic position: "It goes without saying that it is <u>not</u> anticompetitive for a tour to decide what its product shall be, so there is no antitrust injury here." I agree that, as long as the ATP exists, it is able to define the attributes of the tour, provided that it does not engage in anticompetitive acts in doing so. In the instant case, I have argued that the ATP cartel has engaged in several anticompetitive acts, including: imposing restrictive player service rules; fixing prize money; special events rules; pooling television rights and artificially restricting output. Further, the ATP derives market power by its alliance with the ITF, which together with its imposition of restrictive player service rules, effectively forecloses the

17

development of meaningful competition. I will attempt to elucidate some of these points in the commentary that follows.

Walker complains (p. 8) that I did not offer any alternatives for the ATP's organization. This would have been beyond the scope of my engagement, and is, in any event, unnecessary to a complete analysis of the flaws inherent in the present and proposed structures of the ATP. Nevertheless, I think that my initial report, as well as some of the commentary above, suggests alternative and more competitive policies and structures for top-tier men's professional tennis.

Walker continues on p. 8: "There is no other explanation for the Plaintiffs or any other tournament to seek an ATP sanction rather than operate outside of the ATP." The problem is that it is either impossible or prohibitively expensive to attempt to operate a top-tier men's tennis tournament outside of the ATP. As elaborated in my initial report, this is because the playing commitments and special event rules enforced by the ATP leave no effective room for an independent top-tier tournament to be organized. Even if a tournament could offer a sufficient financial inducement to a top ten player or two, it would be exceedingly difficult to entice a majority of the top ten players to participate. Further, because the Brave New World leaves little, if any, open time for a top player to take on a commitment to a new, independent tournament, the financial incentive to attract a top player must be very large. And even if a single independent tournament were able to exist, it would be unlikely in the

extreme that an independent competitive tour, comprised of several independent tournaments, could be established.

Walker has identified a variety of what he calls "flaws" in my argument. One such "flaw" is that there is no reduction in output of top-tier events, because Monte Carlo will remain a top-tier event since, under the Brave New World, it would be able to offer top-tier prize money and also 1000 points. Yet, as I argued above, we do not know *a priori* whether Monte Carlo will be able to attract over 50 percent of the top ten players. That is, there might be an absolute output reduction in top-tier tournaments and there might not be. Neither Walker nor I know at this time what will come to pass.

The more crucial point is that, as the world population and income grows, we can expect the demand for top-tier men's tennis to also grow. Such growth has been occurring since 2000. If the ATP maintains the same number of top-tier tournaments in the face of growing demand, this constitutes an artificial restriction of output.

Walker also writes that when a monopolist restricts output and increases profits, this is the exercise of monopoly power; it is not the creation or maintenance of monopoly power. I agree that the exercise of monopoly power by itself is not anticompetitive or exclusionary. However, in this case and others, when the monopolist artificially limits output, it is strengthening itself and raising barriers to entry. One way in which these entry barriers are raised is what happened with Mr. Tiriac and

19

the former Masters tournament in Stuttgart. Because the German government was unwilling to provide a large enough subsidy for renovating the Stuttgart grounds to satisfy Mr. Tiriac, Mr. Tiriac made a deal with the government in Madrid to construct a new tennis facility with a public investment of tens of millions of Euros. By so doing, the ATP has raised the bar for hosting a top-tier tournament and made it yet more difficult and more expensive for any prospective competitive tournament or tour.

Walker writes on page 11 that the ATP has "too low [a market share] to infer that [market] power exists." It is true that the ATP's quantitative share of total revenue generated by top-tier men's professional tennis by itself does not suggest that the ATP would have market power. The reason that the ATP does have market power, however, is because it works together with the entity that has most of the market share, the ITF. The fact that the ATP and the ITF had frictions in the last century is irrelevant.

Walker also complains about my methodology for defining the relevant market, despite not having defined a relevant market himself. After a lengthy preamble that repeats elements of the prescribed DOJ methodology, Walker writes (p. 16): "This approach would require consideration of specific products sold at specific events as a starting point at least." This is baffling. Walker apparently wants me to start my market product definition by considering the sale of specific products (e.g., beer,

20

programs, popcorn, etc.) at specific events (e.g., Masters tournaments). If the sale of these products could not be profitably monopolized, the methodology would then have me build up to include other products, presumably including the sale of tickets to the event, and finally including all the products of live entertainment available. Other than the utter impracticality of such a procedure, Walker misses on his first step. Concessionaires are typically sold monopoly rights at sporting events, so that they do indeed have a monopoly over the sale of the products at the event. Thus, Walker would have me stop analysis before it began.

Next, Walker states that my product market is based on a "vaguely defined attribute." I define top-tier men's tennis as including tournaments at which well over 50 percent of the top ten players regularly participate. While I confess that well over 50 percent is not precise, the meaning of the criterion is quite clear in general and in its application to the instant case. When a minority of the top ten players participates in a tournament, it is not apparent that the winner of that tournament represents the best tennis player at that time. The tournament takes on more of the character of an exhibition, similar to when a major league baseball team during spring training travels to play a college team. Some of the individuals involved may be stars and fun to watch, but the typical fan could not conclude that the outcome of the game denotes anything about the best baseball team playing the game. Thus, the top-tier tournaments are the ones to which a healthy majority of the top players go to compete against each other.

21

These tournaments are viewed differently than others by the fans.  It is manifest from all the minutes of ATP meetings and ATP studies over the last six years and from the final adoption of the proposed Brave New World plan that the ATP also views having a healthy majority of the top ten players at a tournament as a defining characteristic of the product. Even Walker, in his first report, writes (p. 55): "The degree of homogeneity of play among tournaments within a tier, and the degree of heterogeneity of play between tiers, are likely to be relevant to consumers' demand for a tennis tour."  Finally, the soundest indicator of all is the marketplace where the practical indicia plainly depict a separation between top-tier ATP events and the second-tier (ISG) events.  Similarly, the offers by the Qatar Tennis Federation to buy a top-tier event for over $60 million in contrast to its offer to buy a second-tier event for $10 million also confirms that there is a sharp distinction between these levels.

It is also true that the Grand Slam tournaments have a greater reputation and economic clout than the ATP Masters events.  As I stated above, the relationship here is akin to that between a regular season MLB game and the World Series.  The World Series has greater prestige and financial muscle, but a team has to perform in the regular season (and first two rounds of the postseason) to get to the World Series.  Both regular season games and World Series games belong to the same product market, which is Major League Baseball.

Walker repeatedly calls upon me to do a SSNIP or cross elasticity test. Despite repeated requests for ticket price and more detailed television contract data, none was forthcoming. Without such data, those tests were not possible. I also explained that there would be a number of other serious impediments to performing valid empirical tests. I won't repeat that discussion here other than to note that the cellophane fallacy presents a formidable challenge. Walker never mentions this. It is convenient for defendants in antitrust cases to demand rigorous statistical tests that, once executed, are subject to abundant objections. In this case, I could not even begin to undertake the challenge because the ATP did not provide the requested data.[5]

Walker also complains about the practical indicia I present. He says it means nothing that Masters events have both substantially higher ticket prices and attendance than ISG events and purports to prove this by citing the example of US Airways, America West and Southwest flights on the route between Philadelphia and Phoenix. Walker notes that in early 2007, US Airways had the highest prices yet it carried the most people.

---

[5] Walker cites the deposition of Walter Knapper, where Knapper states that ticket prices at Hamburg Masters tournaments are affected by the prices of other sporting events in Hamburg. At the end of his comment, Knapper states that he is not really an expert in this area and the questions would be better directed at the tournament's marketing director, Annette Koring. In her deposition, Ms. Koring is unequivocal (p. 88): Q: "What events would you regard as competition to the Hamburg Men's Tournament?" A: "We do not have any other tennis tournament here in Hamburg. Of course we have soccer clubs here and some spilling playing into the Federal league, but these are different customers and therefore, I do not consider them to be direct competitors to us.... In this and this context I do not see any competitor."

23

The problem here is that airline routes are regulated.  The times of the flights and the quantity of flights flown by each airline are subject to administrative decision.   He also appears to present average prices which are affected by a host of factors, such as the type of plane, size of its various classes of service, when tickets are bought, etc.  His analogy suffers fatally.[6]

Walker proceeds to argue that the Hamburg tournament does not belong in the same tier with some of the other events that fall into my top-tier category.  He cites, for instance, the fact that the Hamburg Tournament only drew five of the top ten male players in 2006.  He fails

---

[6]  Sports leagues and tours produce joint products, each with potentially distinct geographic markets.  It is never a straightforward matter to define a relevant market in sports.  The Ninth Circuit Court of Appeals decision in one of the landmark cases in the sports industry (the Raiders' case) reflects this complexity: "Here the exceptional nature of the industry makes precise market definition especially difficult…. In fact, because of the exceptional structure of the League, it was not necessary for the jury to accept absolutely either the NFL's or the plaintiff's market definitions. Instead the critical question is whether the jury could have determined that Rule 4.3 reasonably served the NFL's interest in producing and promoting its product (i.e., competing in the entertainment market) or whether Rule 4.3 harmed competition among the 28 teams to such an extent that any benefits to the League as a whole were outweighed.  As we find below, there was ample evidence for the jury to reach the latter conclusion." *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (1984).

to mention, however, that the Hamburg tournament drew an average of 7.75 top ten players between 2000 and 2007, and, notably, he fails to mention that the 2006 tournament was impacted by the fact that Federer and Nadal played a five-set final the week before Hamburg at the Rome Masters.[7]  For this reason, neither Federer nor Nadal were able to participate in the 2006 Hamburg tournament.   Further, the fact, cited by Walker, that there are some years when ISG events drew more fans than the Hamburg event (which would also be true for other Masters tournaments) has little to do with whether Hamburg is a top-tier event or not.  First, one would want to look at the tournament's performance over an extended period, not just one year.  Second, sport leagues commonly show a wide variety of attendance experiences among its teams or venues. The Kansas City Royals are in the same product market as the New York Yankees, yet they not only draw tens of thousands fewer fans per game than the Yankees, but they occasionally are outdrawn by popular Triple A minor league teams.

Walker cites several articles that I published on sports stadiums and economic development.  In these articles I point out that when a sports fan does not spend money at a local arena or stadium, he or she often spends that money on a different form of entertainment.   Walker suggests that I am thereby admitting that professional team sports are all in the

---

[7]  The actual number of top ten players participating at the Hamburg tournament each year is as follows: 2000 = 8; 2001 = 9; 2002 = 9; 2003 = 7; 2004 = 7; 2005 = 8; 2006 = 5; 2007 = 9.  Here, as throughout his reports, Walkers plays fast and loose with his numbers.

25

same product market as all forms of entertainment. But this is nonsensical. It is also true that Baltimore fans who are fed up with the Orioles and don't renew their season's tickets at Camden Yards may spend the "saved" money on a family trip to Cancun, on a new car, or on renovating the bathroom. Does Walker believe that bathroom renovations are in the same market as Mr. Angelos' team? The point is that the economist's concept of substitutability is narrowly defined and the Justice Department's test concentrates on consumers making substantial substitutions between two goods when the price of one of the two goods rises as little as five percent.

      Walker misrepresents my description of the results from my regression work. He also questions the regression models that I test, though he freely cites some of the results when they are convenient for him. Walker appears to question my use of ordinary least squares regressions (p. 22). Since attendance at tennis tournaments may be constrained by the stadium and grounds capacity on some days at some tournaments, it may be prudent to use a truncated regression model. The difficulty here is that a truncated model requires information about the capacity of a facility. The ATP did not produce any such information. Similarly, I thought about a location fixed effects approach that would have controlled for demand-related variables. Among the problems here are that I am already using several dummy variables to capture other elements that are of more direct interest, such as tier, surface, season,

WTA, etc. These dummies already capture some of the location effects and the problem is I would have to omit many location dummies due to overlaps among the dummies if I added location dummies. Further, to the extent that demand for live attendance is regional, rather than local, and I believe it to be a significant extent for many tournaments, using local demographic data will be inaccurate. In any event, local per capita income data has not tended to be a significant determinant of attendance at other sporting events in the United States. The reality is that controlling for demographic factors is far from straightforward.

Walker also suggests that my regressions may have an endogeneity problem; that is, my dependent variable (attendance) may be affecting my independent variables (such as my player participation dummy variables), rather than vice versa. Walker argues that a prestigious tournament will have high attendance and a player's sponsoring company may lean heavily on a player to participate in such a tournament. In this way, Walker reasons that high attendance can cause high player participation (whereas the regressions were exploring whether higher top-player participation caused higher attendance). While Walker's concern is reasonable, I don't believe it applies here because I am using year to year fluctuations in attendance and testing how they are related to year to year fluctuations in top player participation. A prestigious tournament, especially one that the player's sponsor would have strong feelings about, would be one that had consistently high attendance over time. The coefficient that my regression

27

estimates shows how the increase in top player participation changes the average daily attendance at the tournament.

Furthermore, Walker's concern seems misplaced in this case for other reasons. First, Walker never demonstrates bias. Second, even if it were present, endogeneity will tend to bias the coefficient downward. I am not looking at the size of the coefficient, but the difference between coefficients. It is not clear how the difference in the coefficients will be affected by the endogeneity bias. Third, I also include a regression model where participation levels are lagged. To the extent that there were a confusion in causal direction and an endogeneity problem as Walker posits, the lagged specification should mitigate it. Fourth, the effect of prestige is at least somewhat controlled for already by the use of tier dummies in my model.

Walker criticizes my interpretation of the relationship between the WTA and the ATP. He notes that my estimated coefficients may have different interpretations. I agree that they may and I believe that I suggest as much in my original report. I only maintained that the regression analysis results were consistent with the interpretation that the men's and women's top-tier tours were not substitutes for one another, and that they might instead be seen as complements. The growing cooperation and personnel connections between the two tours reinforces this view. On the top of page 26, Walker dismisses a variable I included "to measure the effect of distant WTA events occurring in other parts of the world on

attendance at local ATP events." He suggests that it is silly to suspect that a tennis fan would substitute a women's event in one part of the world for a men's event in another part of the world. Perhaps, but the events are not on "the other side of the world" from each other. For instance, in 2006 the four overlapping WTA and ATP tournaments took place in the following concurrent pairs: Berlin and Rome; Rome and Hamburg; Montreal and Cincinnati; and, Zurich and Madrid. More importantly, the substitution does not have to be between two live events – it could be between going to a live men's event and watching the women's event on television. Walker ends this section by criticizing me for not using ticket prices in my analysis. Again, the ATP did not provide price data.

Finally, Walker states that my regression results are incomplete because I only looked at the top ten players and did not look at the top twenty. Most of the ATP analysis that I read focused on the top ten players. Further, I suspect that if I included the results from the top twenty, Walker would have complained that I did not include the top thirty, and so on.

Walker apparently objects to my use of the term "quasi-market" to describe the hosting market. He observes that he does not remember ever hearing the term before. It seems that this is to be taken as a criticism that I am not doing formal economics. Quasi-market might not be "a term of art in competition economics" and it is not meant to be. It is meant to be as clear a use of the English language as I can muster to describe what I

29

meant. Perhaps it was inartful. I meant that the hosting market is really a potential market that has been suppressed by the ATP and not allowed to function as an open market. As I understand it, sanctions were initially issued to tournaments when the ATP began to function as a tour organizer. There was no market for hosting at this time, i.e., the right to host a top-tier tournament was not bought and sold, it was simply conferred. However, as the ATP and its tour became increasingly commercialized and as the market power of the ATP was augmented by its alliance with the ITF, the ATP has begun to buy and sell the sanction rights to tournaments at different levels. It is still not an open market.

Walker says that I do not "identify who the customers are in this so-called quasi-market" or what their alternatives are to buying a sanction. Perhaps I am at fault for not detailing what I thought would be apparent. The customers in this market are those who would like to and have the means to host a top-tier men's professional tennis tournament. They include private individuals, companies, city organizations and national tennis federations. Investing in being a host of a top-tier tennis tournament is a unique investment opportunity. The types of financial and human capital resources that are required for such an undertaking do not translate easily into alternative investments. The notion that there is such an alternative to which a tennis investment group would turn if the price of hosting the tennis tournament increased by five percent is far-fetched. Indeed, it is because of the unique character of hosting a top-tier

tournament, the availability of which has been artificially limited, that the ATP is able to extract a value of nearly $30 million from Shanghai to host an event and or an offer of over $60 million to buy another event. The scarce resource here is tennis playing talent. By controlling the market for this talent via its alliance with the ITF, and controlling the burgeoning market for tennis sanctions, the ATP is able to capture a significant part of the value produced by this scarce resource.

Walker writes in each of his reports that the ATP does not price fix, i.e., that it does not set limits on the prize money that can be paid out to players (p. 35):

> "Zimbalist does argue that the ATP would not be able to control the prices for player services if it did not have market power, but he presupposes facts about the Brave New World that are not true and his analysis of wage setting is incomplete. Zimbalist says that ATP caps prize money at ATP events and that this is evidence of control in a player market. Zimbalist's factual assumption is wrong. The ATP does not limit the prize money tournaments may pay athletes. The ATP sets a floor on the prize money that member tournaments must pay. This is consistent with fact that the tour has an interest in eliciting greater output from players in order to make men's professional tennis a more compelling entertainment alternative relative to other sports and non-sport alternatives."

31

My understanding is different. Top-tier tournaments have a prize level set by the ATP. These levels vary slightly, depending on the length of the tournament, the size of the draw and the currency conversion. An individual tournament may petition the ATP for the right to change this prize level, but the ATP still retains control, and to my knowledge, no tournament has ever petitioned to do so. The data in the chart below for the Masters' tour in 2008 is consistent with this interpretation and the assertion that prize money is fixed by the ATP.[8]

| Tournament | Total Prize Money | First Place |
|---|---|---|
| Indian Wells | $3,589,000 | $500,000 |
| Miami | $3,770,000 | $533,350 |
| Monte Carlo | €2,270,000 | €340,000 |
| Rome | €2,270,000 | €340,000 |
| Hamburg | €2,270,000 | €340,000 |
| Canada | $2,615,000 | $400,000 |
| Cincinnati | $2,615,000 | $400,000 |
| Madrid | €2,270,000 | €340,000 |
| Paris | €2,270,000 | €340,000 |

Following Walker's logic, then, the ATP is *not* acting in a manner that is consistent with an "interest in eliciting greater output from players in order to make men's professional tennis a more compelling entertainment alternative...."

---

[8] Data taken from the ATP website on January 31, 2008.

32

Walker next maintains that the high and growing fees paid for sanction rights does not represent market power on the part of the ATP. When Shanghai pays nearly $30 million for a sanction that used to be given away or when Doha offers over $60 million to buy a tournament sanction, Walker avers that these prices represent nothing more than the net present value of the future cash flow to be derived from operating the tournament plus the net present value of any consumption benefit. I believe that this interpretation is mistaken for several reasons. First, part of the future cash flow derives from the exercise of monopoly power by the ATP. Thus, for instance, the ATP's ability to extract stadium subsidies because of its artificial scarcity policy will raise the profitability of the Tiriac-owned Madrid tournament. The net present value of his cash flow grows and so does the value of Tiriac's sanction. Similarly, the ATP's control over prize money, and its artificial deflation of the same, raises cash flow for the top-tier tournaments and raises the value of their sanctions. Second, the ability of the ATP to insert itself and capture all or part of the value of the top-tier sanction represents market power. These values are produced overwhelmingly by the players. As Walker himself admits (p. 35): "Indeed, discovery documents indicate that top players have greater name recognition than ATP itself." Third, a significant share of the value of sporting events and franchises derives from the synergies and opportunities that they engender. Walker leaves this important factor out of his formulation of sanction value.

33

Walker misconstrues the mechanism by which the ATP's special events rule is anticompetitive.[9] He states that the rule's provision prohibiting two tournaments in the same week cannot be anticompetitive in my market definition, because there could not be two simultaneous tournaments, each with a majority of the top ten players. This is correct. The anticompetitive mechanism in this instance is the rule that prohibits top fifty players from participating in an independent within 30 days of a Masters tournament and within 100 miles of a Masters tournament. This is simply another mechanism to shut down access to top players for prospectively rival tournaments, as well as another artificial constraint on the players' labor market freedom.

On page 42 Walker writes in reference to the mandatory 8 of 8 participation rule: "The explicit purpose for the rule is to increase player participation ... and the most reasonable expectation is that the number of ATP tournaments with well over 50 percent of the top-ten players will be greater in the future because of it." Here Walker is making a convoluted claim that output will increase in the future as a result of the restrictive and anticompetitive 8 of 8 mandatory participation rule. Walker also argues that because there are only ten top ten players and they can play in a limited number of tournaments, that there are physical limits on the number of top-tier tournaments that can be produced. In the end, Walker tries to make the case that the ATP's Brave New World restraints are

---

[9] See p. 44.

output increasing and pro-competitive. But the clear reality is otherwise. Consider the following.

Under the Brave New World the top ten players must participate in 8 of 8, the top eight must participate in the Masters Cup, all ten must participate in 4 ATP 500 events and all ten are strongly incentivized to participate in 2 ATP 250 events. For the top ten players together, this amounts to 148 ATP events. If the ATP structured incentives such that seven of the top ten players were to play in each tournament, they would be able to hold 21.1 top-tier tournaments, as opposed to the 8 or 9 top-tier tournaments envisioned in the Brave New World. If the ATP structured incentives such that eight of the top ten players were to play in each tournament, they would be able to hold 18.5 top-tier tournaments. In either case, the ATP would have more than doubled the current number of top-tier tournaments that exist under the artificially-imposed limits of the Brave New World. The Brave New World instead obliges the top players to participate in lower tier matches and fixes the prize money. Further, with higher compensation levels and more freedom of choice, it is possible that the top players will choose to participate in more tournaments during the course of a season. Over time, market-driven compensation levels for top players would encourage more talented youth to develop their tennis skills and possibly pursue a professional tennis career. This will only improve the quality of professional tennis and make it more attractive as a sport. Dynamically, this outcome would be pro-competitive, but it is

thwarted by the ATP's price fixing. Walker's contention, then, that the ATP has no control over the player services market is implausible.

Walker applauds the ATP's move into Shanghai as a market expansion. I do not criticize the ATP's desire to embrace the Chinese market. But the Shanghai market was already activated with the Masters Cup tournament. What has been added is not the Chinese market, but another tournament in the English market, by moving the Masters Cup to London. In essence, the ATP has chosen to have two top-tier tournaments in England, two or three in France (depending on the future status of Monte Carlo) and to eliminate two top-tier tournaments in Germany, Europe's largest country and the home of the world's largest tennis federation. It is difficult to imagine that a competitive process would have produced such a result.

Walker's discussion of television pooling in his second report retreads ground already covered. He restates his view that pooling is pro-competitive because it will expand output. This view seems to be at odds with that of ATP board member Perry Rogers who states in his deposition that the strategy behind pooling television rights is to able to raise prices and increase profits (pp. 76-81). In this connection, however, I acknowledge a point of Walker's that one sentence in my original report would have been clearer had I added the word "potentially." That is, it would have been more precise had I written that "pooling television rights among independent producers is *potentially* anticompetitive."

36

Walker takes issue with my inference from a quote by Mr. de Villiers about revenues increasing by 20 percent with the Brave New World.  First, he gratuitously reminds me that monopolists produce on the elastic portion of their demand curves.  Next, he points out that there are other reasons besides the restrictive policies of the Brave New World why revenues might be rising.  My interpretation of Mr. de Villiers' comment is consistent with the recommendation of the ATP commissioned McKinsey Report that the ATP should "create product scarcity to drive up demand" and with Perry Rogers' statement during his deposition cited above.[10]

On page 54 Walker states that "the Hamburg Tournament did not submit an application to become a combined event." Here Walker overlooks a basic reality of the manipulated sanctioning process.  Hamburg was not allowed to submit an application for a combined event.  Those tournaments which were allowed to submit such an application were informed beforehand by the ATP.

Walker also claims that the sanctioning process for the Brave New World was competitive.  In actuality, the process was a sham.  Indian Wells received an unprecedented 51-year ATP 1000 sanction and a non-compete agreement precluding the ATP from scheduling events during its week without having to so much as apply.  Defendants awarded an ATP 500 sanction to a Dubai tournament, owned in part by Ion Tiriac, the

---

[10] Exhibit 98 at ATP0078922 for McKinsey Report recommendation.

37

owner of the Madrid tournament and a member of the Defendants' cartel. Dubai bid $573,500 for the sanction. For the same sanction, Qatar Tennis Federation's Doha tournament offered a bid premium of $10 million and, according to Mr. de Villiers in his deposition (pp. 484-89), the Doha application appears to have been substantially the same in all other material aspects. The ATP awarded the sanction to Dubai and Mr. Tiriac.

It would not be helpful to enumerate all the places where Walker misrepresents my words or my arguments, but a few illustrative examples are in order. On page 45, Walker writes: "Zimbalist asserts that 'many tournaments' believe that they had rights that specified their tier, and that ATP has illegitimately converted these permanent membership rights into ten-year sanctions. Like many of Zimbalist's other conclusions, this one is not alleged in the FAC and Zimbalist provides no evidence that it is true." First, what I assert is that many tournaments believe this to be the case. I do not draw the "conclusion" that what the tournaments believe is actually true. Hence, Walker is simply wrong to assert that it is my conclusion. Second, although it is not my conclusion, I do think that the belief of many tournaments draws some *prima facie* credibility from the fact that on March 16, 2007 TPL lawyer Richard Barrat wrote an email in which he stated: "Clearly the sanction application is removing a right from the tournaments that they currently have, i.e., the right to decide how to exploit their TV and related rights. It is for them to determine whether

this is acceptable to them."[11]  This email might not be definitive proof, but for Walker to say that I "present no evidence" appears to be an overstatement.

Another example of Walker's misrepresentation of my report comes when he discusses my regression results.  Walker repeatedly refers to what he calls my conclusion that adding a ninth and/or tenth top player to a tournament produces a "modest" gain in attendance.  Here is what I wrote.  First, in connection to the first of two basic models that I estimate (p. 26): "When the tenth top ten player also participates, the result has no statistically significant effect on daily attendance."  Second, in connection to the second of the models (p. 29): "The upshot of these tests is that the addition of a ninth and tenth or a tenth player from among the top ten either has no statistically significant impact on attendance, or it has a considerably smaller impact than having a 7th or 8th top player."  In fact, as shown in my regression results in the Model 2B (p. 31), when the current year and the lagged year effects of adding a 9th or 10th player are added together in the second model, the net effect on average daily attendance is -12.  In contrast, adding the current and lagged effects of adding a 7th and/or 8th player (rather than a 5th or 6th top ten player), the effect on attendance is +4,357.[12]  Hence, I conclude the discussion conservatively

---

[11]  Exhibit 380, at EML0779835.

[12]  In the second model without lags, the effect of adding a ninth and/or tenth top-ten player is +745, while the effect of adding a seventh and/or eighth top-ten player is +2582, or roughly 3.5 times as great.

by stating (p. 30): "… the extra boost from trying to coerce full

participation either does not exist or it exists with sharply diminishing

returns." This is a far cry from Walker's description that I find the effect

to be "modest."

February 1, 2008

*/s/ Andrew Zimbalist*

Andrew Zimbalist

40