## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEUTSCHER TENNIS BUND (GERMAN   :
TENNIS FEDERATION), ROTHENBAUM   :   C.A. No.   07-0178 (GMS)
SPORT GMBH, and QATAR TENNIS   :
FEDERATION,   :
  :
              Plaintiffs,   :   **REDACTED**
  :   **PUBLIC VERSION**
  :
     against   :
  :
ATP TOUR, INC., ETIENNE DE VILLIERS,   :
CHARLES PASARELL, GRAHAM PEARCE,   :
JACCO ELTINGH, PERRY ROGERS, and IGGY  :
JOVANOVIC,   :
  :
              Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## MOTION TO BIFURCATE TRIAL INTO
## SEPARATE LIABILITY AND DAMAGES PHASES

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
Phone: (212) 969-3000

Dated:  May 9, 2008

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Carolyn Hake (I.D. #3839)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com

*Attorneys for Defendants*

{00215830;v1}

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.  Separate Trials on Liability and Damages Will Serve the Interests of Judicial Economy and Efficiency ........................................................................................... 4

II. Bifurcation Will Reduce Confusion and Increase Juror Comprehension of the Issues .......................................................................................................................... 8

III. Plaintiffs Will Not be Prejudiced by a Bifurcated Trial .......................................... 9

CONCLUSION ...................................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Barr Labs., Inc. v. Abbot Labs.*, 978 F.2d 98 (3d. Cir. 1992)..........................................8

*Cantor v. Perelman*, 2006 WL 318666 (D. Del. 2006)...................................................4

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558 (1990) .........................5

*Ciena Corp. v. Corvis Corp.*, 210 F.R.D. 519 (D. Del. 2002)....................................3, 9

*Dardovitch v. Haltzman*, 190 F.3d 125 (3d Cir. 1999) ..............................................5

*Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209 (Fed. Cir. 1987) .....................3

*In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444 (3d Cir. 1997) ................................3, 7

*Stoutmire v. Strickland*, 599 F. Supp. 314 (N.D. Ill. 1984)..........................................4

*Union Carbide Corp. v. Montell N.V.*, 28 F. Supp.2d 833 (S.D.N.Y. 1998) ...........................3, 10

**Rules**

Fed. R. Civ. P 42.........................................................................................1, 2, 3

**Other Authorities**

9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2388
     (2d ed. 2002)...........................................................................................3

Defendants respectfully submit this memorandum in support of their motion pursuant to Federal Rule of Civil Procedure 42(b) to bifurcate the trial of this action into separate liability and damages phases.

## PRELIMINARY STATEMENT

This action arises out of plaintiffs' dissatisfaction with defendants' plans to restructure the ATP men's professional tennis tour starting in 2009 (generally known as the "Brave New World" plans). The new tour structure is designed to create a more coherent tournament calendar and ranking system, to expand ATP's reach into the growing sports market in Asia, to increase player prize money, to enhance player commitments to tour events, and to encourage investment by ATP members in tournament facilities. Plaintiffs are members of ATP who currently operate a tennis tournament in Hamburg, Germany as part of the highest tier of tournaments on ATP's annual tour. Under the Brave New World restructuring plans, ATP intends to place the Hamburg tournament into the tour's second tier beginning in 2009.[1]

Plaintiffs have asserted a variety of claims challenging the restructuring plans under the federal antitrust laws and various state tort laws, and seek a permanent injunction barring defendants from implementing the plans, as well as compensatory damages on their antitrust and tortious interference claims. Notably, plaintiffs' First Amended Complaint (the "Complaint") seeks no damages at all in connection with the claims that defendants have breached their fiduciary duties or have converted plaintiffs' rights. In addition, the damages identified by plaintiffs during discovery are entirely *prospective* in nature, in that they are based upon plaintiffs' expert's projections of loss in the value of the Hamburg tournament (and related

---

[1] The first tier will have 9 tournaments, in which the winning player will receive 1000 ranking points; the second tier will have 11 tournaments, in which the winner will received 500 ranking points; and the third tier will have 41 tournaments, in which the winner will receive 250 ranking points.

assets) that will occur as of 2009 *if* the defendants' Brave New World plans are implemented. Significantly, plaintiffs' expert did not identify any damages that plaintiffs had already suffered arising out any of the conduct challenged in the Complaint. Moreover, even plaintiffs' witnesses have acknowledged that an award of injunctive relief requiring defendants to preserve the status quo — *i.e.*, preserving the Hamburg tournament's current status as part of the highest tier of the ATP Tour — would likely prevent any of the damages plaintiffs have identified. Plaintiffs' expert also failed to show how the damages could be attributed to the different specific claims alleged in the Complaint — *i.e.*, how the damages should be calculated in the event the jury finds liability on some but not all of plaintiffs' claims.

As a result, this case is an ideal candidate for bifurcation into separate liability and damages phases under Fed. R. Civ. P. 42(b). Bifurcation would very likely reduce the length of the trial and would certainly simplify the issues to be presented to the jury. Even if liability were found, damages might be largely or totally mooted depending on the injunctive relief granted to plaintiffs. Neither party can meaningfully articulate its position on damages unless and until liability has been found (on specific, identified claims) and the nature and extent of any permanent injunctive relief is determined by the Court. Moreover, if the parties were required to present their damage theories in advance of a liability finding, the evidence would be confusing and the instructions to the jury would be so complex as to make it difficult, if not impossible, for the jury to properly assess any damages. If, notwithstanding a grant of permanent injunctive relief, plaintiffs were to claim (contrary to the record) that compensable damages exist, evidence concerning damages arising out of the specific claims as to which liability has been found could then be presented to the jury (so long as consistent with plaintiffs' existing testimony and expert

reports), without interruption, delay, or prejudice, given that evidence relating to damages is almost completely separate from evidence pertaining to liability.

Accordingly, the Court should exercise its broad discretion and bifurcate the trial of this action into separate liability and damages phases.

## ARGUMENT

Fed. R. Civ. P. 42(b) governs the bifurcation of trials, and in relevant part provides:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues...preserv[ing] any federal right to a jury trial.

Under this rule, the district court has broad discretion to separate issues for trial as part of its wide discretion in trial management. *Ciena Corp. v. Corvis Corp.*, 210 F.R.D. 519, 520 (D. Del. 2002) (*citing Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1212 (Fed. Cir. 1987); 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2388 (2d ed. 2002)). In exercising their discretion to bifurcate issues for trial, courts should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of issues presented in the case. *Id.* (*citing Union Carbide Corp. v. Montell N.V.*, 28 F. Supp.2d 833, 837 (S.D.N.Y. 1998)). These considerations should ultimately be guided by whether one trial or separate trials will most likely result in a just final disposition of the litigation. *Id.* (citations omitted).

In employing these standards, the Third Circuit has recognized that "[s]everance of the question of liability from other issues can 'reduce the length of trial, particularly if the severed issues are dispositive of the case, and can also improve comprehension of the issues and evidence.'" *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 n.5 (3d Cir. 1997) (citation omitted). The bifurcation of liability and damages here would have a high likelihood of

reducing the length of trial and would certainly improve the jury's comprehension of the issues and evidence.

## I.    Separate Trials on Liability and Damages Will Serve the Interests of Judicial Economy and Efficiency

Here, severing liability issues from the presentation of plaintiffs' purported damages case and allowing the jury to make an initial determination limited to liability will almost certainly conserve judicial resources, while also simplifying the presentation of evidence to the jury. Obviously, if defendants succeed on the liability phase of the trial, there will be no need to try plaintiffs' damages claims, thereby saving the Court and the parties substantial time and resources. Likewise, should plaintiffs prevail only on claims as to which they have not sought monetary damages, it is clear that no damages phase would be required.

More importantly, even if plaintiffs succeed on any of the claims as to which they have sought damages, the Court would be in a position to consider issuing permanent injunctive relief that would reduce or entirely eliminate plaintiffs' damage claims, thereby obviating the need for a damages case.[2] As described above, plaintiffs have requested permanent injunctive relief barring defendants from:

---

[2] In cases such as this, where plaintiffs are seeking legal and equitable remedies arising out of the same claims, the Seventh Amendment requires the Court to empanel a jury to make liability determinations, while reserving for the court the power to issue equitable relief that may resolve the case based upon the jury's findings. *See Moore v. Sun Oil Co.*, 636 F.2d 154, 157 (6th Cir. 1980) (holding that, where plaintiff sought both legal and equitable relief, jury should determine whether plaintiff had suffered discrimination, and if the jury so found, the court would then determine whether plaintiff was entitled to equitable relief); *McMillan v. Lincoln Fed. Sav. & Loan Assoc.*, 678 F. Supp. 89, 92 (D.N.J. 1988) (same); *Stoutmire v. Strickland*, 599 F. Supp. 314, 316-17 (N.D. Ill. 1984) (in action seeking legal and equitable relief arising out of same claims under Civil Rights Act, jury would make liability findings, while determination of injunctive relief was reserved to court).

With respect to plaintiffs' claims for breach of fiduciary duty, those are equitable claims as to which plaintiffs seek no damages and accordingly should be tried solely by the Court. *See Cantor v. Perelman*, 2006 WL 318666 (D. Del. 2006) (denying jury trial for fiduciary duty

> [I]mplementing, directly or indirectly, the Brave New World plan and from
> engaging in any of the unlawful and anticompetitive conduct alleged [in the
> Complaint.]

(D.I. 50, Ex. A, at Prayer for Relief, ¶ F).  Although the issuance and scope of injunctive relief

lies in the discretion of the Court, any relief that addressed defendants' ability to implement the

Brave New World plans (and/or preserved the Hamburg tournament's current status in ATP's

highest tier) would affect — and likely eliminate — any of the damages plaintiffs have identified

and claimed in this action, all of which arise prospectively out of the future implementation of

the restructuring plans in 2009.[3]

To begin with, plaintiffs have failed to adduce any testimony or documentary evidence

demonstrating current damages arising out of ATP's announcement of the Brave New World

plans, and/or any of the other conduct challenged in their complaint.  Indeed, Georg von

Waldenfels, the president of plaintiff German Tennis Federation, agreed that if plaintiffs were to

receive a "positive decision" — *i.e.*, a decision preserving the Hamburg tournament's current

status and calendar spot on the ATP Tour — by the end of 2008, such a decision would eliminate

or mitigate any damages that may be at issue in this case.  (Ex. A, at pp. 558-59).[4]

---

claim); *see also Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 567
(1990) (finding actions against trustee for breach of fiduciary duty "were within the exclusive
jurisdiction of courts of equity"); *Dardovitch v. Haltzman*, 190 F.3d 125, 134 n.1 (3d Cir. 1999)
(affirming denial of jury trial for breach of fiduciary duty claim against trustee for self-dealing).

[3] In their draft of materials for the Final Pretrial Order provided to defendants on April 23, 2007,
plaintiffs included a draft "Itemized Statement of Special Damages" that includes one additional
component of damages — approximately $3.5 million in damages to "plaintiffs' current and
prospective sponsorship and broadcasting contracts for 2009."  These alleged damages were
never identified by plaintiffs' damages expert, and were never disclosed or described by
plaintiffs in their initial Rule 26(a) disclosures, nor in responses to defendants' interrogatories
concerning damages.  Regardless of whether these purported "new" damages would be entirely
prevented by an injunction, it is clear that plaintiffs should not be allowed to augment their
damages claims at this point, and thus have no basis to present evidence of these damages at
trial.  Fed. R. Civ. P. 37(c)(1).

[4] Citations to "Ex.__" refer to exhibits attached to and submitted with this memorandum of law.

Q.    Just to go back to my question, if you are able to operate a 1000 event starting in 2009 by, your words, repair any insecurity or damage, you think you would be able to eliminate or mitigate any monetary damage?

MS. ADAMS: Object to form. Object to the extent it mischaracterizes the testimony.

A.    Yeah, I mean the sooner the better. I mean that's why we already tried in early summer to obtain a settlement. But, be that as it may, we are still working towards a positive decision; and *if we do get a positive decision next year at the latest, we will then be able to curtail and contain that financial damage, yes.*

(*Id.*) (emphasis added); (*see also* Ex. B, at ¶ 42).

Similarly, plaintiffs' damages expert, Gary G. Kleinrichert — whose expert report sets forth two purportedly distinct categories of damages that form the entirety of plaintiffs' damages case — acknowledged that his damages assessments would not apply if the Hamburg tournament were to go forward as a top-tier ATP tournament in 2009 in its current calendar spot. Specifically, Kleinrichert testified that no portion of his "membership devaluation" damages calculation (Kleinrichert's first category of damages, estimated at $39.7 to 46.5 million) constitute present damages arising out of defendants' announcement of the Brave New World plans. (Ex. C, at p. 206). In fact, Kleinrichert acknowledged that he was not even asked to consider whether plaintiffs would suffer any portion of the "membership devaluation" damages under a scenario in which the Hamburg tournament were to go forward in 2009 in its current tier and/or calendar position. (*Id.*) Instead, this damages figure serves as Kleinrichert's estimate of the difference between (a) the value of plaintiffs' tournament rights as a 1000 event "for the period 2009 forward," and (b) the value of the tournament rights plaintiffs "expect to obtain beginning in 2009" under the Brave New World as a 500 event. (Ex. D, at p. 4).[5] Kleinrichert

---

[5] Aside from the difficulties discussed in this motion, there are fundamental problems with the propriety and suitability of Kleinrichert's damages methodology that will be addressed by defendants in a motion in limine to exclude his testimony under *Daubert*.

also acknowledged that no portion of his "asset impairment" damages assessment (Kleinrichert's second category of damages, estimated at $31.1 million) would apply if the Hamburg tournament were to go forward as part of ATP's highest tier, in its current calendar spot. (Ex. C, at pp. 19-20, 180-81).[6]

Accordingly, even if plaintiffs were able to establish liability under any of the claims as to which they have sought damages, the Court's determination as to the appropriate injunctive relief will affect — and likely obviate — the need for plaintiffs to present a damages case at all. In the event that plaintiffs still believe that compensable damages exist notwithstanding injunctive relief, evidence of those damages could be presented immediately following a liability trial without inconvenience or prejudice to the parties. As described below, there will be little if any overlapping evidence pertaining to the liability and damages issues in this case.

Under these circumstances — *i.e.*, a case in which damages evidence may well be unnecessary regardless of whether liability is established — it plainly serves the interests of convenience, judicial economy, and simplification of the issues to bifurcate trial into separate liability and damages phases. *See In re Paoli R.R. Yard PCB Litig.*, 113 F.3d at 452 n.5 (upholding bifurcation of trial, where resolution of Phase I issues concerning plaintiffs' exposure to chemicals obviated need for trial of additional issues).

---

[6] After the close of the period set by the Court's Coordinated Scheduling Order for expert disclosures, plaintiffs served additional charts purporting to present an alternative assessment by Kleinrichert of damages under a hypothetical "discounted cash-flow" analysis. Putting aside the issue of whether these charts were timely and otherwise proper (and/or whether they are admissible under the rules of evidence), Kleinrichert acknowledged that this approach also seeks to estimate damages (at most) for the period 2009 forward, under the assumption that Brave New World is implemented as planned. (Ex. C, at p.194). Accordingly, this damages assessment also would not apply if Brave New World is enjoined, and the Hamburg tournament's current tier and calendar position are preserved.

## II.    Bifurcation Will Reduce Confusion and Increase Juror Comprehension of the Issues

Plaintiffs' Complaint includes ten separate counts asserted against some or all of the defendants. As noted above, plaintiffs seek compensatory damages only with respect to their claims under the antitrust laws and their claims for tortious interference. (D.I. 50, Ex. A, at Prayer for Relief, ¶¶ A-C.) Their damages expert Kleinrichert has made no attempt to identify which categories of damages he has estimated relate to the different antitrust or tortious interference claims. (Ex. C, at pp. 26, 43). Not only are Kleinrichert's opinions concerning damages irrelevant to the jury's consideration of liability issues, much of his testimony may end up being unnecessary with respect to damages as well.

Even more importantly, the jury cannot possibly determine how the damages may be reduced or eliminated by the Court's determination of injunctive relief until after the Court has addressed that issue. In fact, it certainly appears impossible to devise comprehensible instructions for the jury to apply in assessing any damages:

> *First*, the jury would need to determine the claim or claims as to which the defendants should be held liable.

> *Second*, the jury would need to figure out — in the absence of any evidence or guidance from plaintiffs — which portion of the different categories of damages asserted by plaintiffs relate to that claim or claims.

> *Third*, the jury would need to determine how any of those damages might be reduced (if not eliminated) by the injunctive relief that the Court *might* thereafter decide to impose.

It is obvious that the only way for a jury in this case to have a reasonable chance of understanding the issues and making a proper determination is for the parties' damages presentations to be deferred until after the determination of the claim(s) as to which damages are to be assessed and the Court's determination concerning injunctive relief. *See, e.g., Barr Labs., Inc. v. Abbot Labs.*, 978 F.2d 98, 115 (3d. Cir. 1992) (upholding bifurcation of antitrust claims, where resolution of initial issue of product market definition would serve judicial economy and

juror comprehension of the issues by excluding presentation of evidence that would ultimately become irrelevant); *cf Ciena Corp.*, 210 F.R.D. at 520 (courts are typically bifurcating patent trials into liability and damages phases to assist the jury's understanding of the issues).

**III.    Plaintiffs Will Not be Prejudiced by a Bifurcated Trial**

Finally, plaintiffs will not face any prejudice resulting from trial being bifurcated into separate liability and damages phases.  Because the issues and evidence pertaining to damages in this case are clearly divisible from issues and evidence relating to liability, bifurcation will be straightforward and economical.

Here, plaintiffs' damages case is based upon purported valuations of the Hamburg tournament membership and tennis-facility assets before and after the Brave New World plans are implemented.  The underlying issues will principally concern: whether plaintiffs' expert's valuation methodology is reliable; whether appropriate benchmarks (or proxies) were used to evaluate the relevant assets; and whether the value of these benchmarks (or proxies) was properly measured.  As discussed above, plaintiffs' specific evidence supporting their damages case comes exclusively from Kleinrichert and documents purportedly bearing on the value of the Hamburg membership and assets before and after the Brave New World plans are implemented. None of this evidence is relevant to liability issues.[7]  Moreover, given that none of plaintiffs' fact

---

[7] Principal issues pertaining to liability on these claims include: whether ATP and its members function as a single-entity in conducting and producing a yearly tennis tour product; whether defendants entered into any agreements unreasonably restraining trade; whether ATP willfully acquired or preserved monopoly power in any properly-defined relevant antitrust markets; whether ATP's plans are procompetitive; whether the type of injury claimed by plaintiffs constitutes antitrust injury; whether the director defendants breached any fiduciary duties owed to ATP members; whether defendants tortiously interfered with any contacts or prospective business relationships existing between plaintiffs and third-parties; and whether defendants wrongfully converted any of plaintiffs' property.

witnesses have been able to offer evidence of any form of damages, it seems unlikely that there would be much, if any, overlap in witnesses between the liability and damages phases.

On the other hand, defendants' evidence relating to damages will come primarily from their own damages expert, Peter R. Greenhalgh, and through cross-examination of Kleinrichert. Again, none of this evidence pertains to any liability issues. To the extent any of defendants' fact witnesses may testify concerning facts relating to Kleinrichert's valuation of benchmark assets (*i.e.*, assets used to approximate the purported value of plaintiffs' supposed tournament rights and related assets), such testimony would be limited and clearly severable from evidence pertaining to liability issues. Where evidence pertaining to liability and damages is clearly divisible, bifurcation is warranted. *See e.g., Union Carbide Corp.*, 28 F. Supp. 2d at 837 (bifurcating liability and damages, finding "little likelihood of repetition or waste of resources" where plaintiff intended "to rely primarily on its damages expert" and the damages issues did not appear to "require repetition of the evidence presented during the liability phase").

Thus, even if both liability and damages phases are required, the trial should take no longer overall if the phases are separated. Few if any witnesses would need to appear during both phases of the trial, and there is virtually no overlap of evidence. Moreover, the damages trial, if necessary, could occur immediately following the liability phase, with the same jury that would have found defendants liable.[8]

---

[8] The Coordinated Scheduling Order entered by the Court on July 13, 2007, provided that trial would be scheduled for 10 days, subject potentially to being extended to 15 days. (Ex. E, at ¶ 15). If bifurcation is granted, the liability issues could be tried in less than 10 days (given the more limited evidence necessary for liability), leaving time for the Court to determine injunctive relief (if required) before trying any surviving damages issues.

## CONCLUSION

For all the foregoing reasons, defendants respectfully request that the Court bifurcate the trial of this action into separate liability and damages phases.

Dated: May 9, 2008

ASHBY & GEDDES

*/s/ Carolyn S. Hake*

Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com

PROSKAUER ROSE LLP
Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
(*admitted pro hac vice*)
1585 Broadway
New York, NY 10036-8299
Phone: (212) 969-3000

*Attorneys for Defendants*

# EXHIBIT A

**11/27/2007  Waldenfels, Von George**

```
 1

 2

                    UNITED STATES DISTRICT COURT
 3                  FOR THE DISTRICT OF DELAWARE

 4

      ------------------------------
 5                                        Civil Action No.
      DEUTSCHER TENNIS BUND                 07-178(GMS)
 6    (GERMAN TENNIS FEDERATION)
      and ROTHENBAUM SPORTS GMBH
 7    TENNIS,
 8                  Plaintiffs,
 9         -against-
10    ATP TOUR, INC.,
11                  Defendant.
12    ------------------------------
13    MONTE-CARLO COUNTRY CLUB and    Civil Action No.
      SOCIETE MONEGASQUE POUR           07-198(GMS)
14    L'EXPLOITATION DU TOURNOS
      DE TENNIS,
15
                    Plaintiffs,
16
           -against-
17
      ATP TOUR, INC., ETIENNE DE
18    VILLIERS, and CHARLES PASARELL,
19                  Defendants.
20    --------------------------------
                    DATE:  November 27, 2007
21                  TIME:  8:37 a.m.
22                      VOLUME IV
23                  Videotape deposition of GEORG von
      WALDENFELS, taken by and before JOYCE SILVER, a
24    Certified Shorthand Reporter and Notary Public of the
      State of New York, and STEVEN RIVERA, Videographer,
25    held at the office of PROSKAUER ROSE, LLP, 1585
      Broadway, New York, New York.
```

```
1                 GEGORG von WALDENFELS
2    suffered any monetary damage?
3                 MS. ADAMS:  Object to form.
4         A.    I mean I believed that we would have
5    nevertheless incurred certain financial damage simply
6    because of the insecurity created and the situation,
7    but I believe that if a decision were made in favor
8    of us continuing a 1000 event in May, we could very
9    quickly repair the situation and go on.
10        Q.    And with respect to the -- and by "repair
11   the situation," you mean mitigate any damage that you
12   may have suffered?
13                MS. ADAMS:  Object to form.
14        A.    I mean, for example, you take sponsors.
15   You can't just talk about the sponsors that we have
16   right now.  We also want to attract new sponsors and
17   you can only go to new sponsors if you know the
18   situation, if you can tell them we are going to
19   continue the way we were forever and ever.
20        Q.    Just to go back to my question, if you
21   are able to operate a 1000 event starting in 2009 by,
22   your words, repair any insecurity or damage, you
23   think you would be able to eliminate or mitigate any
24   monetary damage?
25                MS. ADAMS:  Object to form.  Object to
```

**11/27/2007  Waldenfels, Von George**

```
1                    GEGORG von WALDENFELS
2     the extent it mischaracterizes the testimony.
3          A.      Yeah, I mean the sooner the better.  I
4     mean that's why we already tried in early summer to
5     obtain a settlement.  But, be that as it may, we are
6     still working towards a positive decision; and if we
7     do get a positive decision next year at the latest,
8     we will then be able to curtail and contain that
9     financial damage, yes.
10         Q.      Did you have any discussions with any
11    representative of the QTF at the time you decided to
12    file the initial complaint as to whether or not they
13    would be a party to the action?
14                 MS. ADAMS:  Object to the extent it calls
15    for the disclosure of anything that's attorney/client
16    privileged.
17                 If you had any discussion with counsel in
18    that regard, don't respond to that.
19         Q.      In this context when I'm using the term
20    "representative of QTF," representative can
21    sometimes, I guess, be a word that can go beyond the
22    party to include counsel.  I don't mean to include
23    counsel in that question at all.  I just mean to
24    include officers and directors of the QTF.
25         A.      I mean of course as good partners, and we
```

# EXHIBIT B

# REDACTED

# EXHIBIT C

**2/12/2008  Kleinrichert, Gary**

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF DELAWARE
2

3

    DEUTSCHER TENNIS BUND            )
4   (GERMAN TENNIS FEDERATION),      )
    ROTHENBAUM SPORTS GMBH           )
5   TENNIS, AND QATAR TENNIS         )
    FEDERATION,                      )
6                                    )
                     Plaintiffs,     )
7                                    )
                  -v-                ) CAUSE NO.
8                                    ) 07-178 (GMS)
                                     )
9   ATP TOUR, INC.,                  )
    ETIENNE de VILLIERS,             )
10  CHARLES PASARELL,                )
    GRAHAM PEARCE, JACCO ELTINGH,)
11  PERRY ROGERS, AND                )
    IGGY JANOVIC,                    )
12                                   )
                     Defendants.     )
13

14

15

16          The deposition upon oral examination of
    GARY G. KLEINRICHERT, a witness produced and sworn
17  before me, Michele K. Dew, CRR-RPR, Notary Public in and
    for the County of Marion, State of Indiana, taken on
18  behalf of the Defendants at the offices of Ice Miller,
    One American Square, 35th Floor, Indianapolis, Indiana,
19  on February 12, 2008, at 8:20 a.m., pursuant to the
    Federal Rules of Civil Procedure.
20

21

22

23

24

25

1    you.

2        MR. UNDERWOOD:  Then confine your objections to

3    proper objections.

4        MR. MacGILL:  Ask your questions, all right, and

5    we're going to give you answers.

6        MR. UNDERWOOD:  And you confine your objections

7    to proper.

8        MR. MacGILL:  None of this colloquy.  Now, I

9    want to hear the question back.

10        MR. UNDERWOOD:  Please stop coaching the

11    witness.

12  Q  Can you answer the question?

13        MR. MacGILL:  Read the question back.

14        (The requested material was read back by the

15    reporter.)

16        MR. MacGILL:  Object to the form of the

17    question.

18  A  I don't know if the plaintiffs would have sold those

19    rights or they would not have sold those rights.

20  Q  You're using the value received from Shanghai as some

21    sort of measure of the value of the rights that

22    Plaintiffs held; is that correct?

23  A  That is correct, yes.

24  Q  Okay.  Now, let's take the second part of your damage

25    calculation relating to, as I believe you said

**2/12/2008 Kleinrichert, Gary**

1     earlier, the invested assets.  You have an opinion

2     about how those assets will be impaired if the

3     Hamburg tournament is moved to a different spot in

4     the calendar and classified as an ATP 500 tournament;

5     correct?

6  A  If those things occur, yes, that the cash flows will

7     not be adequate to support the facility.

8  Q  Yes.  And if the Hamburg tournament were not moved --

9  A  Well, actually, let me reverse that.  There will be

10    negative cash flows.  When I say they won't be

11    adequate, I understand that the cash flows from

12    operating such a tournament will be negative.

13  Q  And if the Hamburg tournament is not moved to July

14    and were granted the status of a Masters 1000 series

15    tournament, that negative effect on the value of the

16    invested assets would not occur; correct?

17  A  Well, if the Hamburg tournament were to retain its

18    status as a Tier I-type tournament and if the Hamburg

19    tournament were to retain its time slot period in the

20    European clay season, I understand that the Hamburg

21    tournament would be able to generate cash flows and

22    in such case believe those cash flows to be adequate

23    to support the invested assets in the facility.

24  Q  And what's the basis for that opinion?

25  A  Well, a couple of things.  One is how the Hamburg

**2/12/2008 Kleinrichert, Gary**

```
 1        Complaint alleges became, I believe, more and more
 2        restrictive throughout the 2000s and through the
 3        Brave New World are even increasingly restrictive and
 4        at some point during that period, including the
 5        implementation of the Brave New World, if not
 6        earlier, constitute antitrust claims.  That's my
 7        understanding.
 8    Q   In the but for world which you used to determine
 9        damages in this case, would there be player
10        commitment rules for tournaments?
11             THE WITNESS:  Can you read back the question,
12        the first element?
13             (The requested material was read back by the
14        reporter.)
15    A   Ultimately, the determination of whether or not there
16        would or would not be player commitment rules for
17        tournaments, of course, is a matter for the Court.
18        As it relates to the but for world, I generally had
19        understood that the tournaments would be able to
20        compete more openly for players and sponsors.  So I
21        didn't allocate a specific damage amount to a
22        particular element but considered the fact that the
23        tournaments would be able to compete in an
24        increasingly competitive environment.
25    Q   I understand it's for the Court to decide, but you
```

```
 1              (The requested material was read back by the
 2         reporter.)
 3              MR. MacGILL:  Did you say sane or same?
 4              MR. UNDERWOOD:  Same.
 5              MR. MacGILL:  Is that what you got, same?
 6              THE REPORTER:  To use the same but for world,
 7         same.
 8              THE WITNESS:  You're going to have to read back
 9         the rest of the question.
10    Q    Do you think it's appropriate to use the same but for
11         world with respect to each of the plaintiffs'
12         individual claims in this action?
13    A    I think it's appropriate to use similar but for
14         worlds in the various claims, yes.
15    Q    Do you think it's appropriate to use the same but for
16         world with respect to each of those claims?
17    A    I think in order to change the but for world, you'd
18         have to understand the conclusion with respect to
19         each of the various allegations.  For example, the
20         Court could determine that however many allegations
21         there are -- say there are five -- that four of the
22         five are held to be ruled in favor of the
23         GTF Plaintiffs.  It just depends on how the Court
24         will determine each of those.
25              In general, I believe that the but for world
```

43

1      course, have projections as well.

2   Q  Were they historic with respect to 2007?

3   A  My recollection is that they were projected but for a

4      period of time they may have been actual and

5      projected, meaning that during the year there were

6      some actual results with then projected amounts for

7      the remaining months is my recollection.

8   Q  At the bottom of page 29, you write that, "According

9      to the guidance provided by FAS 144, the undiscounted

10     cash flows through the end of the asset's useful life

11     and disposal must be more than the carrying value

12     ($31.1 million for the Hamburg facility) of the asset

13     to be considered recoverable."

14         Do you see that?

15  A  Yes.

16  Q  Did you prepare an analysis that showed the

17     undiscounted cash flows through the end of the

18     asset's useful life and disposal were more than the

19     carrying value?

20  A  No.

21  Q  Is it your opinion that those assets can be

22     considered recoverable?

23  A  It's my opinion that with respect to scenario 2 that

24     because of projected future cash flows that an

25     impairment test would not need to be performed under

**2/12/2008  Kleinrichert, Gary**

```
1         the scenario of continuing to be granted a Tier I
2         event with holding the rights previously were held.
3    Q    Scenarios 1 and 2 were examples of how to apply
4         FAS 144; is that correct?
5    A    Scenario 1 and 2 are examples of two scenarios within
6         FAS 144 of when an impairment test should be
7         considered.
8    Q    And your articulation of the guidance provided by
9         FAS 144 in the bottom of page 29 says, "the
10        undiscounted cash flows through the end of the
11        asset's useful life and disposal must be more than
12        the carrying value of the asset to be considered
13        recoverable."
14            Do you see that?
15   A    Yes.
16   Q    Have you ever done a test in your but for world to
17        see whether the undiscounted cash flows through the
18        end of the asset's useful life are more than the
19        carrying value of those assets?
20   A    You've asked me that question already, and I said no
21        and I said why.
22   Q    Because it didn't fit in one of the examples that was
23        given in FAS 144; correct?
24   A    There are criteria that are put forth in 144 of when
25        you do an impairment test.  In the but for world, the
```

**2/12/2008  Kleinrichert, Gary**

1          share of such marketplace in a manner in which they

2          did from '95 through '99.

3     Q   So you're saying in a market in which they could have

4          competed since the year 2000 as they did prior to

5          2000; is that correct?

6              MR. COHEN:  Objection to form.  Misstates prior

7          testimony.

8              You may answer.

9     A   Well, the damage calculation is for the period from

10         '09 to '13 and then for the period from 2013 and

11         beyond.  But I do show what the actual results would

12         have been like from 2000 through 2006 and then 2007

13         and 2008 on a projected basis, or at least partially

14         projected for 2007 and fully projected for '08, as

15         though they can compete as though they did from '95

16         to '99 in the marketplace for those sponsorship

17         dollars and for the television rights and to pay

18         costs similar to what they paid for television

19         production in a manner and similar to the way they

20         did from '95 through '99.

21    Q   So yes, you're calculating projected cash flows from

22         2009 to 2013.  The projections that you're basing

23         that on are based on your projection as to what would

24         have happened from the year 2000 on if the ISL

25         transaction had not occurred; is that correct?

**2/12/2008  Kleinrichert, Gary**

```
 1    Q   If Plaintiffs were to go forward from 2009 as a
 2        Masters 1000 tournament in the week that they had
 3        previously held in the calendar, would they have
 4        suffered the $45.6 million loss that you identify in
 5        that paragraph?
 6            MR. COHEN:  Objection to form and that's an
 7        incomplete hypothetical.
 8            You may answer.
 9    A   I've not been asked to make a calculation under that
10        assumption.  I understand they still could have
11        incurred some damages as it relates to the
12        announcement, as I've said.
13    Q   Yes.
14    A   And this is based on --
15    Q   I could short-circuit my question here.  Is there any
16        place in this report where you've calculated the
17        damages that you say they might have suffered based
18        on the announcement?
19    A   No.
20            MR. UNDERWOOD:  I think I have nothing further.
21            MR. MacGILL:  Okay.  Thank you.
22            MR. UNDERWOOD:  Drive carefully.
23            THE WITNESS:  Thank you.  Travel safely.
24            THE REPORTER:  What kind of copies of the
25        transcript would you all like?
```

# EXHIBIT D

# REDACTED

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) and ROTHENBAUM SPORTS GMBH, | : : : | Civil Action No. 07-178 (GMS) |
| Plaintiffs, | : : | |
| - against - | : : : | |
| ATP TOUR, INC., JOHN DOE 1, JOHN DOE 2 JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, and JOHN DOE 9, | : : : : | |
| Defendants. | : | |

---

| | | |
|---|---|---|
| MONTE-CARLO COUNTRY CLUB and SOCIÉTÉ MONÉGASQUE POUR L'EXPLOITATION DU TOURNOI DE TENNIS, | : : : : | Civil Action No. 07-198 (GMS) |
| Plaintiffs, | : : | |
| - against - | : : : | |
| ATP TOUR, INC., ETIENNE DE VILLIERS, and CHARLES PASARELL, | : : : | |
| Defendants. | : | |

---

## COORDINATED SCHEDULING ORDER

This _____ day of _____, 2007, the Court having conducted a Rule 16

Scheduling Conference pursuant to Local Rule 16.2(b) on June 25, 2007, and the parties

Plaintiffs Deutscher Tennis Bund and Rothenbaum Sports GMBH (collectively, the "GTF") and

defendant ATP Tour, Inc. in *Deutscher Tennis Bund et al. v. ATP Tour, Inc., et al.*, 07cv178

(GMS) (the "Hamburg Litigation"); and the parties Plaintiffs Monte-Carlo Country Club and

Société Monégasque pour L'Exploitation du Tournoi de Tennis (collectively, "Monte-Carlo")

and defendants ATP Tour, Inc., Etienne de Villiers, and Charles Pasarell (collectively "ATP") in

*Monte-Carlo Country Club et al. v. ATP Tour, Inc. et al.*, 07cv198 (GMS) (the "Monte-Carlo

Litigation"), having determined after discussion that this matter cannot be resolved at this

juncture by settlement, voluntary mediation, or binding arbitration:

IT IS SO ORDERED that:

1.　　**Consolidation of Actions**: The Hamburg Litigation and the Monte-Carlo

Litigation shall be consolidated for all pretrial purposes and trial.  Should any Party believe that,

after conducting discovery, consolidation for trial is inappropriate, that Party must advise all

other Parties of that position no later than **February 18, 2008**.  Upon such advice, the parties

shall meet and confer by no later than **February 25, 2008**.  Following such meet and confer,

should any Party believe that consolidation for trial is inappropriate, said Party shall notify the

Court no later than **February 29, 2008**; the remaining parties may file a response by **March 14,**

**2008**.  There shall be no reply.  All papers submitted in this consolidated litigation shall bear the

dual caption set forth above but shall be filed and docketed solely in C.A. No. No. 07-178

(GMS).

2.　　**Rule 26(a) Initial Disclosures**: The Parties shall make their initial

disclosures pursuant to Federal Rules of Civil Procedure 26(a) on or before **May 4, 2007**,

provided, however, that the requirements of Rule 26(a)(1)((B) are waived.

3.　　**Litigation Hold**: To the extent they have not done so already, the Parties

shall promptly suspend their routine document retention/destruction policies and put in place a

"litigation hold" to ensure the preservation of relevant documents within their possession,

custody, or control, including, without limitation, any relevant e-mail accounts (both work-

2

related and personal), computer hard drives, accessible computer back-up tapes, and electronic storage devices, whether readily accessible or otherwise, upon which documents within the possession, custody, or control of the Parties, or the Parties' "key players," are stored or likely to be found. For purposes of this Scheduling Order:

      (a)    The GTF's "key player(s)" are (i) tournament director Walter Knapper; (ii) Dr. Georg von Waldenfels; (iii) the officers and the members of the board of directors or supervisory board, if any, of each of the GTF Plaintiffs; (iv) the immediate predecessors of anyone in categories (i) thru (iii); and (v) any individual(s) that anyone in categories (i) thru (iv) have supervised or currently supervise directly, including their assistant(s), if any;

      (b)    Monte-Carlo's "key player(s)" are (i) tournament director Zeljko Franulovic; (ii) Elizabeth Ann de Massy; (iii) the officers and the members of the board of directors or supervisory board, if any, of each of the Monte Carlo Plaintiffs; (iv) the immediate predecessors of anyone in categories (i) thru (iii); and (v) any individual(s) that anyone in categories (i) thru (iv) have supervised or currently supervise directly, including their assistant(s), if any; and

      (c)    The ATP's "key players(s)" are (i) Etienne de Villiers; (ii) Charlie Pasarell; (iii) Graham Pearce; (iv) Jacco Eltingh; (v) Perry Rogers; (vi) Iggy Jovanovic; (vii) Flip Galloway; (viii) Phil Anderton; (ix) Horst Klosterkemper; (x) Brad Drewett; (xi) Mark Young; and (xii) Richard Davies; (xiii) the immediate predecessors of anyone in categories (i) thru (xii); and (xiv) any individual(s) that anyone in categories (i) thru (xiii) have supervised or currently supervise directly, including their assistant(s), if any. For the avoidance of doubt, the "litigation hold" shall apply to any "ATP Properties" documents within ATP.

3

(d)    Notwithstanding the above, any individuals who are not currently officers, directors, supervisory board members, or employees of the GTF Plaintiffs, the Monte Carlo Plaintiffs, or ATP shall be excluded from the respective definition of "key players" above, although each Party's duty to issue a Litigation Hold and preserve relevant documents under this paragraph shall apply to any relevant documents created or obtained by their former officers, directors, supervisory board members, or employees to the extent that such documents were in the Party's possession, custody, or control when the duty to preserve relevant documents for purposes of these Litigations came into effect, or thereafter.

(e)    The foregoing designation of "key players" is made solely for purposes of this Scheduling Order and shall not be used for any other purposes, including for any evidentiary purpose.

4.    ATP shall respond to the Complaint in each of the Hamburg Litigation and the Monte Carlo Litigation on or before **May 4, 2007**.

5.    **Joinder of Other Parties and Amendment of Pleadings**:  All motions to join other parties shall be filed on or before **July 27, 2007** and all motions to amend the pleadings shall be filed on or before **July 27, 2007**.

6.    **Discovery**:

(a)    **Fact Discovery:**  All fact discovery in this case shall be initiated so that it will be completed on or before **November 2, 2007**.  Said discovery shall proceed notwithstanding the filing or pendency of any Rule 12 or Rule 56 Motion by any Party.  The Parties may serve their initial document requests, interrogatories, and deposition notices by **May 2, 2007**; service of all discovery requests shall be by e-mail (in Microsoft Word format for ease of preparing responses and objections).

4

(i) To ensure the orderly and expeditious conduct of fact discovery under this Scheduling Order, the parties shall produce all documents, electronic or otherwise, responsive to any document request served by **May 2, 2007**, except to the extent that request is objected to, beginning **May 25, 2007** and continuing on a rolling basis through **August 1, 2007**; the parties agree to make reasonable efforts to complete such production by **August 1, 2007** and to meet and confer on **July 20, 2007** to discuss the status and expected completion of such production. The Parties shall produce all documents, electronic or otherwise, responsive to any subsequent document request, except to the extent that request is objected to, within the 30 days of service of the request. The Parties agree that all electronic documents shall be produced in a format sufficient to allow the receiving party to conduct full text searches (including searches of the body of such documents and attachments, as well as searches for the author, recipient, copy recipient, date, or the subject of all email or instant message communications) without further conversion or coding by the receiving party, and that the producing party shall preserve the native format of such electronic documents so that the native file may be produced upon a showing of good cause by the requesting party. Accordingly, the Parties agree to produce electronic documents subject to the following protocol:

(1)    Where the original document is not in color, the producing party shall produce single-image TIFF files for each page of electronic documents (in 300 DPI, Group IV TIFF Images);

(2)    Where the original document is in color, the producing party shall produce a JPEG file;

(3)    The producing party shall produce a corresponding LFP File that permits the receiving party to determine which TIFF Images constitute a single electronic document;

(4)    The producing party shall also produce an accompanying document level OCR Text File ("txt file") that shall be named and shall

5

correspond to the Bates Numbers or TIFF Image Key Numbers of the
associated electronic document; and

(5)     All txt files shall capture and include all text-based data (or OCR-
readable text on any image file) reflected on the corresponding TIFF
Image file.

Should any technical problems arise in the production or receipt of electronic documents, upon

notice from the receiving party, the producing party shall promptly communicate with its

Information Technology or Litigation Support Staff or, if applicable, its respective vendor, to

assist the receiving party in attempting to resolve any such problem.  To the extent that a Party

produces responsive documents in any language other than English, the producing party shall

also produce any existing English translation that the producing party (or its counsel) has of such

document at the time of production (including any translation created for purposes of the

litigation); such production of translations shall not be deemed a waiver of any work-product

protection or attorney-client privilege.

(ii)  Each side (GTF and Monte Carlo together constituting one side and

ATP constituting the other side) shall be allowed to serve fifty (50) interrogatories, including

discrete subparts.  This limit may be altered upon a showing of good cause.

(iii)  Unless otherwise agreed or ordered by the Court, each side also shall

have a total of one hundred and seventy-five (175) hours to depose fact witnesses, including Rule

30(b)(6) witnesses.  This figure is premised on the assumption that each side will seek to take

between fifteen and twenty fact-witness depositions and that, for the depositions of up to four (4)

"key players," on each side, the time limits in Rule 30(d)(2) may be extended to two days or

fourteen hours.  To the extent that any Party believes it has a need to extend the deposition time

limit for any other witness, the Parties shall meet and confer and attempt to reach an agreement

regarding such request.  The Parties shall reasonably accommodate witness and lawyer schedules

6

and shall endeavor to hold the majority of "key player" and expert depositions in Wilmington or

New York. The calculation of "hours" shall include only actual testimony and shall exclude

breaks, lengthy attorney colloquy, and translations.

(b) **Expert Discovery:** Expert discovery in this case shall be initiated

so that it will be completed on or before **December 19, 2007.** Opening expert reports shall be

served no later than **November 2, 2007.** Answering expert reports shall be served no later than

**November 27, 2007.** Rebuttal expert reports, if any, shall be served no later than **December 7,**

**2007.** Expert witnesses may be noticed to be deposed for up to one (1) seven-hour day, subject

to an extension of up to one (1) additional seven-hour day upon agreement of the Parties or for

good cause shown.

(c) **Discovery Disputes:** Should counsel find they are unable to

resolve a discovery or scheduling matter, a representative from each party in the matter shall be

on the line when contacting Chambers at (302) 573-6470 to schedule a teleconference. Not less

than forty-eight hours prior to the teleconference, the parties shall file with the Court, via

electronic means (CM/ECF), a **joint, non-argumentative** letter agenda not to exceed two (2)

pages in length, exclusive of exhibits, outlining the issue(s) in contention. A sample letter can be

located on this Court's website at www.ded.uscourts.gov. After the parties have had three (3)

discovery teleconferences, they will be required to file a joint letter showing good cause why the

Court should permit any subsequent discovery teleconference.

7. **Confidential Information and Papers Filed Under Seal:** Should

counsel find that it will be necessary to apply to the Court for a protective order specifying terms

and conditions for the disclosure of confidential information, they should confer and attempt to

reach an agreement on a proposed form of order and submit it to the Court within ten (10) days

7

from the date of this Order. When filing papers under seal, counsel should deliver to the Clerk

an original and two copies of the papers.

**If, after making a diligent effort, the parties are unable to agree on the**

**contents of the joint proposed protective order, then they shall follow the dispute resolution**

**process outlined in paragraph 6(c).**

8.    <u>Settlement Conference</u>:  Pursuant to 28 U.S.C. § 636, this matter is

referred to United States Magistrate Judge Mary Pat Thynge for the possibility of exploring a

settlement. The parties agree that the possibility of settlement may be enhanced by such referral.

The parties shall contact Magistrate Judge Thynge to schedule a settlement conference with

counsel and clients, subject to the availability of the Court and counsel.

9.    <u>Summary Judgment Motions:</u>  Prior to filing any summary judgment

motion, the parties must submit letter briefs seeking permission to file the motion. The opening

letter brief shall be no longer than five (5) pages and shall be filed with the Court no later than

**December 21, 2007**. Answering letter briefs shall be no longer than five (5) pages and filed with

the court no later than **January 21, 2008**. Reply letter briefs shall be no longer than three (3)

pages and filed with the Court on or before **February 4, 2008**. The Court shall hold a Status

Conference to hear argument and to determine whether the filing of any motion will be permitted

on **February 11, 2008** at 10:00 a.m. **Unless the Court directs otherwise, no letter requests to**

**file a motion for summary judgment may be filed at a time before the dates set forth in**

**paragraph 9.**

10.    <u>Dispositive Motions</u>.  All case dispositive motions and an opening brief

and affidavits, if any, in support of the motion shall be served and filed on or before the later of

**February 25, 2008**, or two weeks after the Court renders its decision regarding whether to

8

permit summary judgment motion practice.  Briefing will be presented pursuant to the Court's

Local Rules, unless the parties agree to an alternative briefing schedule.  Any such agreement

shall be in writing and filed with the Court for the Court's approval.  Any request for extensions

of time as set forth in this Scheduling Order **must** be accompanied by an explanation or your

request will be denied.

      11.    **Applications by Motion**:  Except as provided in this Scheduling Order or

for matters related to scheduling, any application to the Court shall be by written motion, filed,

via electronic means (CM/ECF).  Unless otherwise requested by the Court, counsel shall **not**

deliver copies of papers or correspondence to Chambers.  Any non-dispositive motion should

contain the statement required by Local Rule 7.1.1.

      12.    **Oral Argument**:  If it believes that oral argument is necessary, the Court

will schedule a hearing pursuant to Local Rule 7.1.4.

      13.    **Pretrial Conference**:  On **June 30, 2008**, beginning at 9:30 a.m., the

Court will hold a Pretrial Conference in Chambers with counsel.  Unless otherwise ordered by

the Court, the parties should assume that filing the Joint Pretrial Order satisfies the pretrial

disclosure requirement in Federal Rule of Civil Procedure 26(a)(3).  A sample form of Pretrial

Order can be located on this court's website at www.ded.uscourts.gov.  On **April 23, 2008**,

plaintiffs' counsel shall forward to defendants' counsel a draft of the Pretrial Order containing

the information plaintiffs propose to include in the Pretrial Order.  By **May 12, 2008**, defendants'

counsel shall, in turn, provide to plaintiffs' counsel any comments on plaintiffs' draft(s), as well

as the information that defendants propose to include in the proposed Pretrial Order.  The Parties

shall file with the Court the **joint** proposed Final Pretrial Order with the information required by

9

the form of the Final Pretrial Order which can be located on this Court's website at www.ded.uscourts.gov on or before **June 2, 2008**.

14.     **Motions _in limine_**:  No party shall file more than five (5) motions _in limine_.  Opening briefs on all motions _in limine_ shall be served by **May 5, 2008**.  Answering briefs in opposition to any motions _in limine_ shall be served on or before **May 26, 2008**.  Reply briefs in further support of any motions _in limine_ shall be served on or before **June 2, 2008**.  All briefs (opening, answering, and reply) on all motions _in limine_ shall be filed on **June 2, 2008**.  Opening and answering briefs shall not exceed five (5) pages and reply briefs shall not exceed three (3) pages.

15.     **Trial.**  This mater is scheduled for a ten (10) day jury trial beginning on **July 21, 2008**.  (If agreed to and ordered by the Court, the trial date may be subject to a potential extension to fifteen (15) days upon application by one or more parties.)

16.     **Scheduling**:  The parties shall contact Chambers, at (302) 573-6470, only in situations where scheduling relief is sought and only then when ALL participating counsel are on the line for purposes of selecting a new date.

_____
The Honorable Gregory M. Sleet
United States District Judge

805058