# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEUTSCHER TENNIS BUND (GERMAN
TENNIS FEDERATION), ROTHENBAUM
SPORT GMBH, and QATAR TENNIS
FEDERATION,

               Plaintiffs,

  against

ATP TOUR, INC., ETIENNE DE VILLIERS,
CHARLES PASARELL, GRAHAM PEARCE,
JACCO ELTINGH, PERRY ROGERS, and IGGY
JOVANOVIC,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

:    **REDACTED**
:    **PUBLIC VERSION**
:
:    C.A. No. 07-178-GMS

## DEFENDANTS' MOTION *IN LIMINE* NO. 3 TO EXCLUDE EXPERT OPINIONS PROFFERED BY GARY G. KLEINRICHERT

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

Dated: May 13, 2008

{00216369;v1}

Pursuant to Federal Rule of Evidence 702 and the *Daubert* standard, defendants respectfully move to exclude the opinion testimony proffered by plaintiffs' damages expert, Gary G. Kleinrichert ("Kleinrichert"), under *Daubert* and Fed. R. Evid. 702.

## PRELIMINARY STATEMENT

ATP Tour, Inc. ("ATP") operates a worldwide men's professional tennis tour. Plaintiffs are members of ATP and currently operate a tennis tournament in Hamburg, Germany. ATP decided to restructure the tour beginning in 2009 in order to make it more attractive to consumers, and to better compete with other tennis, sports, and entertainment products. As part of the new tour structure, ATP is refining its tournament calendar and ranking system, which will result in the Hamburg tournament being categorized in the tour's second tier (rather than its first tier) beginning in 2009. (The top two tiers will comprise approximately the top third of the tour.)

Plaintiffs allege that defendants' restructuring plans are anticompetitive and injurious to the Hamburg tournament and consumers of ATP tennis. They seek to enjoin the restructuring plans, and also request damages under their antitrust and tortious interference claims,[1] offering Kleinrichert's opinions to establish the amount of their damages. (Ex. 1, p. 2.)[2]

Kleinrichert's opinions, however, are completely disconnected from plaintiffs' allegations concerning ATP's restructuring plans. In fact, Kleinrichert utterly fails to connect the damages he calculates to the specific acts of defendants that plaintiffs challenge. His testimony thus provides no guidance as to which purported damages arise from which of defendants' acts.

In addition, Kleinrichert's "but for" world — the basis for his damages calculation — involves giving plaintiffs the benefit of the very acts and conduct they condemn as

---

[1] Plaintiffs also have claims for breach of fiduciary duty and conversion, but have not requested monetary damages under these claims. (D.I. 50, Ex. A, at Prayer for Relief.)

[2] Citations to "Ex._" refer to exhibits attached to and submitted with this memorandum of law.

anticompetitive. As such, his opinions cannot be squared with plaintiffs' legal claims and liability theory, and therefore cannot assist the jury in making any damages determination (assuming one ever becomes necessary).

Finally, Kleinrichert's choice of a "benchmark" transaction as the basis for his analysis of the value of the Hamburg tournament is entirely unsupported, given the nature of that transaction and the significant differences between the tournament at issue there and the Hamburg tournament. It provides no reliable basis for a jury to assess any damages at issue.

## ARGUMENT

To be admissible, expert testimony must assist the trier of fact in understanding the evidence or determining a fact at issue in the case. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993); Fed. R. Evid. 402. Under this standard, the District Court has discretion to exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Kleinrichert's first error is that he calculates a single damages figure, which he claims is the total damage that plaintiffs will suffer, without any analysis of how those supposed damages arise out of the specific conduct plaintiffs challenge. This failure to tie the purported damages to the plaintiffs' allegations is fatal under *Daubert*.[3] Indeed, in an article warning other experts of the pitfalls of *Daubert*, Klenrichert himself has warned:

> [I]f the approach utilized by the financial expert *does not measure the damage caused by the specific allegations at issue*, it may, at the court's discretion, be subject to exclusion. For example, we have seen many instances where, as part of testimony related to

---

[3] *See, e.g., Storage Tech. Corp. v. Cisco Sys., Inc.*, 395 F.3d 921, 926-28 (8th Cir. 2005) (expert improperly attributed entire value of acquisition price — used as proxy for plaintiffs' damages — to wrongfully appropriated employees and trade secrets); *Microstrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1354-55 (Fed. Cir. 2006) (expert testimony excluded for ignoring plaintiffs' obvious financial instability pre-dating challenged conduct, and attributing all losses to alleged tortious conduct).

damages, *an expert will put forth a valuation of plaintiff's entire business both before and after the defendant's alleged misconduct. The reduced value is then put forth as damages, even though it was clear from the evidence that the diminished value was due (in whole or in part) to a number of factors unrelated to the alleged misconduct.*

(Ex. 2, p. 2 (emphasis added).)  This is exactly what Kleinrichert has done here.

To illustrate, plaintiffs have asserted that the following, among other things, constitute separate antitrust violations: (a) player commitment rules, (b) the centralized creation of a tour calendar (including when each tournament is scheduled and how many tournaments are in each week), and (c) pooling of broadcast rights.  (D.I. 50, Ex. A, at ¶¶ 83-87, 91-94, 99-104.) However, Kleinrichert offers nothing that would permit a jury to attribute any portion of the damages he calculates to any one or more of these alleged violations.  Kleinrichert falls prey to his own warnings: he "put forth a valuation of plaintiff's entire business both before and after the defendant's alleged misconduct" without measuring the effect of any specific misconduct upon plaintiffs.  He flatly admitted that "I didn't allocate a specific damage amount to a particular element" of ATP's restructuring plans.  (Ex. 3, p. 26.)[4]

Kleinrichert's second error is that he calculated damages based on a but-for world that includes the very same anticompetitive features that plaintiffs challenge.  As a basis for damages, Kleinrichert looked to a transaction entered into between ATP and a new tournament member in Shanghai, China ("Shanghai")                **REDACTED**

. to serve as a proxy for the value of the Hamburg tournament if the

---

[4] Kleinrichert suggested that he thought it would be appropriate to use "similar but for worlds" to analyze damages under plaintiffs' different legal theories, but acknowledged that the "but for" world might need to change, depending upon the ultimate findings on each of plaintiffs' claims. (Ex. 3, p. 43.)  Thus, while recognizing that there could be different damages assessments under plaintiffs' separate legal theories, Kleinrichert set forth only a single "entire business devaluation" analysis, which, if anything, relates to plaintiffs' conversion claim, for which no damages are even sought.  Kleinrichert was unable to identify and set forth a damages calculation — beyond noting that there "could be some damages" — if plaintiffs were unable to show a wrongful misappropriation of their claimed rights.  (*Id.* at 71-72.)

tournament were to retain its top-tier status going forward. (Ex. 3, pp. 91, 107-08.)  Crucially, by

utilizing the ATP/Shanghai transaction as the benchmark to value the Hamburg tournament,

Kleinrichert created a but-for world that assumed that the Hamburg tournament would "retain its

status as a Tier I-type tournament" and enjoy the benefits of, for example, the player

commitment rules for top-tier tournaments, a centrally-designed tour calendar, calendar

exclusivity for top-tier tournaments, and pooling of broadcast rights.  (*Id.* at 20, 30-31, 46-48,

62-67, 148-50.)[5]  In other words, Kleinrichert's analysis of damages that plaintiffs are entitled to

is based upon the notion of reinstating plaintiffs into the alleged "cartel," and giving them the

benefits of the specific anticompetitive conduct they complain of.  Courts have often refused to

admit expert damages opinions that are at odds with the parties' legal claims and liability

theories, as Kleinrichert's analysis plainly is here.[6]

Finally, even if Kleinrichert's damages assessment could properly be based upon valuing

the Hamburg tournament as a top-tier ATP tournament going forward, Kleinrichert's use of the

ATP/Shanghai transaction to provide a benchmark for that value is completely unsupported by

the record. \

## REDACTED

---

[5] Indeed, ATP's current tour structure currently incorporates versions of each of these challenged acts, and Kleinrichert's "but for" world constructs a scenario that is "similar to the way it had been prior to the calendar changes in the [restructuring]."  (Ex. 3, p. 49.)

[6] *See, e.g., Kemper Mobile Elec., Inc. v. Southwestern Bell Mobile Sys.,* 428 F.3d 706, 713 (7th Cir. 2006) (court excluded expert damages testimony regarding total lost profits for failure to coalesce with plaintiffs' theory of fraud concerning a specific lost business relationship); *Group Health Plan, Inc. v. Phillip Morris USA, Inc.,* 344 F.3d 753, 760-61 (8th Cir. 2003) (expert opinion — that absent conspiratorial conduct, smoking would have become safer because low-tar cigarette consumption would have increased — directly conflicted with plaintiffs' theory that defendants fraudulently marketed low-tar cigarettes as safer alternatives, and was thus excluded).

**REDACTED**

Moreover, the Shanghai tournament will be played in a different place, during a different season, and on a different court surface than the Hamburg tournament is currently played. Although Kleinrichert admitted that it is "intuitive" that each of these factors affects the value of a given tournament, (Ex. 3, p. 129), he failed to account for any of them in opining that the value of the Hamburg tournament is comparable to the total value of the ATP/Shanghai transaction.[7] Basing a valuation assessment upon a demonstrably unsuitable benchmark — as opposed to plainly relevant record evidence — is grounds for preclusion of an expert under the relevance or "fit" prong of *Daubert*.[8]

## CONCLUSION

For all the foregoing reasons, defendants respectfully request that the Court grant their motion to exclude the expert opinions proffered by Gary G. Kleinrichert.

---

[7] Indeed, the record evidence demonstrates that the Shanghai tournament is likely to be significantly more valuable than the Hamburg tournament, reflecting the rapidly expanding demand for sports in China. Furthermore, Kleinrichert simply ignored the record evidence pertaining to the actual value of the Hamburg tournament, including (a) the Qatar Tennis Federation plaintiff's acquisition of 25% of the Hamburg tournament membership (in addition to 49% of Rothenbaum Sport, GmBH, the operating company for the tournament) for €3 million in 2005, and (b) the fact that the Hamburg tournament has sustained operating losses every year since 2002. (Ex. 1, pp. 7-8, Exhibit T; Ex. 3, pp. 54-57, 140.)

Even if it were appropriate to base plaintiffs' damages upon the ATP/Shanghai deal, Kleinrichert made a host of improper assumptions and errors in valuing the rights under this methodology.

[8] *See Player v. Motiva Enter., LLC*, 2007 WL 2020086, at *6 (3d Cir. July 13, 2007) (expert's property contamination damages analysis — based upon valuation of comparison site that had experienced contamination — excluded as unreliable, where expert failed to present evidence indicating that the comparison site was similar to plaintiffs' property); *Chemipal, Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 593-94 (D. Del. 2004) (expert failed to connect his use of market growth rate figures for other products to estimate damages for plaintiff's loss of sales for its specific diet product); *El Aguila Food Prod., Inc. v. Gruma Corp.*, 2005 WL 1156090, at *2 (5th Cir. May 17, 2005) (expert excluded for failure to make any effort to demonstrate reasonable similarity of plaintiffs' firms and the businesses whose earnings data he utilized as a benchmark).

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

PROSKAUER ROSE LLP
Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

*Attorneys for Defendants*

Dated: May 13, 2008

EXHIBIT 1

# REDACTED

# EXHIBIT 2

1 of 2 DOCUMENTS

Copyright 2000 IBJ Corporation
The Indiana Lawyer

April 12, 2000

SECTION: FOCUS; Pg. 8

LENGTH: 1352 words

**HEADLINE:** Determining lost revenues and Daubert considerations admissibility issues

**BYLINE:** By Vincent A. Thomas CPA, CVA and Gary G. Kleinrichert CPA, CVA

**BODY:**

The following provides a general overview of commonly used methods for determining lost revenues in a damage calculation, as well as a discussion of Daubert considerations. Again, this is meant to be a general overview and applications may differ from case to case. However, our experience tells us that these concepts are fairly universal and can be helpful in assessing and preparing damage calculations.

Commonly used methods

There are many generally accepted approaches to determining lost revenues. These range from a straightforward predetermined calculation spelled out in a contract to a detailed market study or statistical analysis. The following are some of the most commonly used.

Pre-determined Calculation In some instances there exists a predetermined calculation of the revenues the plaintiff would have generated, "but for" the allegations against the defendant. What the plaintiff was expecting to generate in the way of revenue may exist. For example, assume ABC Inc. entered into a contract with XYZ Ltd. to deliver 1,000 widgets at $ 10 per widget, and ABC alleges XYZ refused to take delivery and thus breached the contract. Lost revenues to ABC in this matter may be a simple calculation of the $ 10 times 1,000 widgets times $ 10 per widget, or $ 10,000.

Before and After This approach simply utilizes the results prior to the alleged misconduct to estimate what revenues would have been after the alleged misconduct. A simple example might be that average revenues prior to the alleged breach were $ 10,000; therefore, one might conclude that expected revenues after the alleged misconduct were also expected to be $ 10,000.

Market Share This method utilizes the market share the company maintained prior to the alleged misconduct. Estimated "but for" revenues are computed based applying this historical percentage to actual or projected industry (or relevant market segment) revenues during the damage period. Such a method may require additional work in the form of a market study and is often utilized in patent infringement matters under a "Mor-Flo" analysis.

Comparable Companies/ Yard-stick Approach This method utilizes revenues earned by competitors or comparable companies in the industry to determine what expected revenues may have been for the subject company. Finding a truly comparable company can, however, prove difficult.

Management Projections Management of the plaintiff may have, prior to the alleged breach, prepared projections of revenues for future periods. These projections may be an adequate estimate what revenues would have been. Alternatively, projections may later be constructed by management or through a marketing study.

Regression This is a statistical approach that both measures the historical relationship between certain defined variables (e.g. time, competitor revenues, industry revenues) and revenues generated. It also provides an equation to predict the level of revenues based on this relationship.

Daubert considerations

The application of a particular methodology is often not sufficient for a thorough and credible analysis; and, in practice, more than one or a combination of the above may be utilized. Furthermore, projection of lost revenues must be performed on a case-by-case basis. Using a before and after approach to determine lost revenues for a well-established company may be an appropriate method; however, utilizing such an approach for a start-up enterprise with few years of history may not.

It is also extremely important for an expert to consider all relevant factors such as market conditions, customer retention, capacity and so on. This is especially important in today's environment, as not only could your expert's credibility be in question, but the testimony may not even be admitted.

The U.S. Supreme Court's highly publicized ruling in Daubert v. Merrill Dow concluded that the testimony of a scientific expert is admissible only if it is both "relevant and reliable" and outlines specific factors the trial judge may consider in making such a determination. Since the aforementioned methodologies for determining lost revenues have been commonly used by financial experts, one might conclude that they should meet the Daubert requirements. Not necessarily.

Application of reliability

The issue of reliability goes beyond just whether the methodology is one that is generally accepted. It may also extend to the underlying data or information upon which the expert's testimony was based. For example, assume a financial expert relies on management's internally generated projections to determine total revenues that a company would have generated "but for" an alleged breach. We have seen financial experts do just this, even when the evidence overwhelmingly indicated that the projections were unrealistic and unreliable.

When cross-examined, the financial expert reiterates their reliance on management for the projections. Is this acceptable under Daubert? It may not be. In Andrew J. Whelan, et al. v. Tyler Abell, et al a financial expert relied on speculative financial projections to perform a business valuation. Applying the Daubert factors, the judge concluded, "The undue prejudice that would be caused to defendants by allowing the highly speculative testimony is clear. Accordingly, the court has excluded his testimony."

Relevant to issue at hand?

While the "reliability" aspect of Daubert has garnered much attention, one must keep in mind that the testimony must also be "relevant" to the specific issue at hand. In Daubert, the court stated that, "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, not helpful." In Kuhmo Tire Co. Ltd., et al v. Carmichael, et al, the court stated, " the specific issue before the court was not the reasonableness in general of a tire expert's use of a visual and tactile inspection. Rather, it was the reasonableness of using such an approach to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant. The relevant issue was whether the expert could reliably determine the cause of this tire's separation."

How could this affect admissibility of testimony from financial experts testifying on damages? Well, if the approach utilized by the financial expert does not measure the damage caused by the specific allegations at issue, it may, at the court's discretion, be subject to exclusion. For example, we have seen many instances where, as part of testimony related to damages, an expert will put forth a valuation of the plaintiff's entire business both before and after the defendant's alleged misconduct. The reduced value is then put forth as damages, even though it was clear from the evidence that the diminished value was due (in whole or in part) to a number of factors unrelated to the alleged misconduct. If such testimony is not assisting the trier of fact in assessing the issue at hand (e.g. "the damage" caused by the alleged misconduct in that particular case), opposing counsel may argue that it should be excluded under Daubert's relevance requirement.

Know the facts

In closing, although the Supreme Court's Daubert ruling is now a few years old and its application to expert testimony is still being developed through new cases and interpretations, the message is clear to financial experts. A credible analysis includes not just the use of an accepted methodology, but also must be based upon sound underlying data and be relevant to the specific issue of the case. A careful understanding of the facts and circumstances is always a must for a thorough and credible analysis and can assist in determining whether it will withstand admissibility tests, let alone cross-examination.

Determining lost revenues and Daubert considerations admissibility issues The Indiana Lawyer April 12, 2000

Vincent Thomas is senior manager and Gary Kleinrichert is a partner with Arthur Andersen's complex claims and events practice. Both are resident in Indianapolis and are in charge of litigation consulting services for the Indiana, Ohio and Kentucky markets. The views expressed in this column are those of the authors.

**LOAD-DATE:** April 11, 2000

EXHIBIT 3

1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF DELAWARE
2

3

    DEUTSCHER TENNIS BUND            )
4   (GERMAN TENNIS FEDERATION),      )
    ROTHENBAUM SPORTS GMBH           )
5   TENNIS, AND QATAR TENNIS         )
    FEDERATION,                      )
6                                    )
                    Plaintiffs,      )
7                                    )
                    -v-              ) CAUSE NO.
8                                    ) 07-178 (GMS)
                                     )
9   ATP TOUR, INC.,                  )
    ETIENNE de VILLIERS,             )
10  CHARLES PASARELL,                )
    GRAHAM PEARCE, JACCO ELTINGH,    )
11  PERRY ROGERS, AND                )
    IGGY JANOVIC,                    )
12                                   )
                    Defendants.      )
13

14

15

16          The deposition upon oral examination of
    GARY G. KLEINRICHERT, a witness produced and sworn
17  before me, Michele K. Dew, CRR-RPR, Notary Public in and
    for the County of Marion, State of Indiana, taken on
18  behalf of the Defendants at the offices of Ice Miller,
    One American Square, 35th Floor, Indianapolis, Indiana,
19  on February 12, 2008, at 8:20 a.m., pursuant to the
    Federal Rules of Civil Procedure.
20

21

22

23

24

25

**2/12/2008  Kleinrichert, Gary**

1      Complaint alleges became, I believe, more and more

2      restrictive throughout the 2000s and through the

3      Brave New World are even increasingly restrictive and

4      at some point during that period, including the

5      implementation of the Brave New World, if not

6      earlier, constitute antitrust claims.  That's my

7      understanding.

8  Q  In the but for world which you used to determine

9      damages in this case, would there be player

10     commitment rules for tournaments?

11       THE WITNESS:  Can you read back the question,

12     the first element?

13       (The requested material was read back by the

14     reporter.)

15  A  Ultimately, the determination of whether or not there

16     would or would not be player commitment rules for

17     tournaments, of course, is a matter for the Court.

18     As it relates to the but for world, I generally had

19     understood that the tournaments would be able to

20     compete more openly for players and sponsors.  So I

21     didn't allocate a specific damage amount to a

22     particular element but considered the fact that the

23     tournaments would be able to compete in an

24     increasingly competitive environment.

25  Q  I understand it's for the Court to decide, but you

26

```
 1              (The requested material was read back by the
 2         reporter.)
 3              MR. MacGILL:  Did you say sane or same?
 4              MR. UNDERWOOD:  Same.
 5              MR. MacGILL:  Is that what you got, same?
 6              THE REPORTER:  To use the same but for world,
 7         same.
 8              THE WITNESS:  You're going to have to read back
 9         the rest of the question.
10    Q    Do you think it's appropriate to use the same but for
11         world with respect to each of the plaintiffs'
12         individual claims in this action?
13    A    I think it's appropriate to use similar but for
14         worlds in the various claims, yes.
15    Q    Do you think it's appropriate to use the same but for
16         world with respect to each of those claims?
17    A    I think in order to change the but for world, you'd
18         have to understand the conclusion with respect to
19         each of the various allegations.  For example, the
20         Court could determine that however many allegations
21         there are -- say there are five -- that four of the
22         five are held to be ruled in favor of the
23         GTF Plaintiffs.  It just depends on how the Court
24         will determine each of those.
25              In general, I believe that the but for world
```

```
 1    A  That's correct.

 2    Q  So in your but for world, tournaments are entitled to

 3       retain their spot in the calendar indefinitely; is

 4       that correct?

 5    A  Well, this tournament had the right to retain its

 6       status.

 7    Q  What about other tournaments?

 8    A  My understanding is there are some separate

 9       arrangements with various other tournaments.  I mean,

10       the ATP may have some agreements with tournaments

11       that are specific, so...

12    Q  In general, do other tournaments in your but for

13       world have the right to retain their spot in the

14       calendar?

15    A  In general, the but for world would be similar to the

16       way it had been prior to the calendar changes in the

17       Brave New World.  So a tournament would have a right

18       to a calendar week of the same week or a similar

19       week, an equal value.

20    Q  So in your but for world, would Plaintiffs have the

21       right to move their tournament to a different week in

22       the calendar?

23    A  Again, this but for world, as we've said, is similar

24       to the way it was prior to the Brave New World.  So

25       to the extent they had that right previously, they
```

1       the French Open?

2    A  I assume a but for world similar to when the

3       tournament was being held between '95 and '99.

4    Q  And in that but for world, was the tournament held

5       two weeks before the French Open?

6    A  I just don't recall.

7    Q  Was it relevant to your analysis to determine whether

8       it was being held two weeks before the French Open at

9       that time?

10   A  It was relevant as it relates to it would retain its

11      rights that existed at that time.  It would retain

12      its value as it existed from '95 to '99.

13   Q  Page 7, you have a discussion of QTF.  The bottom of

14      that page you write that, "Based on the relatively

15      informal nature of the transaction between the GTF

16      and QTF, the GTF's motivation for this transaction,

17      the testimony in this case that the 'price' was not

18      based on the value of the Hamburg Membership, the

19      ATP's subsequent sales of components of the

20      Hamburg Membership, the QTF's offer to purchase the

21      Indian Wells membership for approximately $60 million

22      and the actual $68-$70 million re-financing

23      transaction involving the Indian Wells tournament, I

24      have not considered the QTF's purchase of 25% of the

25      Hamburg Membership as part of the basis for

```
 1        determining the market value of a Masters Series
 2        membership."
 3             Do you see that?
 4    A   I do, yes.
 5    Q   What do you mean by "the relatively informal nature
 6        of the transaction?"
 7    A   Well, the testimony from the transcripts of the
 8        various players involved.  "Players" being
 9        representatives with respect to the transaction.
10    Q   What do you mean by "the relatively informal nature?"
11        I understand where you're getting your view that it
12        was a relatively informal transaction.  What do you
13        mean when you say it was a relatively informal
14        transaction?
15    A   My recollection is I wouldn't describe what occurred
16        with respect to the transaction as being a formal
17        negotiation.  I believe one of the QTF
18        representatives described it as helping a friend, or
19        something of that nature.  My recollection also is
20        that there weren't so much formal agreements that
21        were being exchanged, which would be typical of a
22        transaction of this type.
23    Q   Do you mean there weren't formal agreements signed by
24        the parties?
25    A   There ultimately were some agreements signed, but the
```

```
 1        negotiations, or at least the discussions with

 2        respect to leading up to the transaction, appeared

 3        clearly to be much more discussions about how to

 4        assist a friend than they did a formal negotiation

 5        for a stake in the tournament.  I think the

 6        deposition testimony there speaks for itself.

 7   Q    Your description of the transaction involved the QTF

 8        paying to the GTF 3 million Euros?

 9   A    That's my recollection, yes.  There were other

10        elements of it as well.

11   Q    I'm just reading from the last bullet point you have.

12        The final bullet point says, the QTF agreeing to pay

13        to the GTF 3 million Euros.

14   A    That's the last of the bullet points as it relates to

15        the transaction.

16   Q    Okay.  So you think that 3 million can't be used as a

17        basis for valuing the Hamburg membership at that

18        time?

19   A    Well, I didn't use it as a basis, because all the

20        people involved in the transaction indicated that it

21        wasn't a price that was believed to be indicative of

22        the value.

23   Q    Do you have an opinion as to whether the price paid

24        by QTF was higher or lower than a price that would be

25        indicative of the value at that time?
```

```
 1    A   Well, based on other transactions that occurred with

 2        respect to tournaments, it appears to be clearly

 3        lower.

 4    Q   Now, you say in your second bullet, "the QTF

 5        obtaining a right of first refusal in the event that

 6        the GTF decides to sell the Hamburg Membership."

 7            In your opinion, would that right of first

 8        refusal have had any value to QTF?

 9    A   I suspect that it would, yes.

10    Q   So is it your opinion as you sit here today that in

11        paying 3 million for the rights they obtained in

12        2005, the QTF underpaid for those rights?

13            THE WITNESS:  Can you read the question back,

14        please.

15            (The requested material was read back by the

16        reporter.)

17            THE WITNESS:  Read it back one more time.

18    Q   Do you think the QTF underpaid for the rights it

19        obtained in 2005?

20    A   The transaction appears, as I described, the informal

21        nature of the transaction and the comparison of that

22        transaction to other transactions, the fact that the

23        QTF did not obtain control of the tournament because

24        they obtained less than 50 percent.  They did receive

25        a right of first refusal, of course, which only
```

57

**2/12/2008 Kleinrichert, Gary**

1    A    They received a right to host a Masters Series event.

2         I guess I don't understand your question.  Can you be

3         more specific?

4    Q    Okay.  You've offered the opinion that that's an

5         appropriate transaction to you as to value the rights

6         that Plaintiffs held at that time; correct?

7    A    I've used the transaction between the ATP and

8         Shanghai as a estimate of the value or a proxy for

9         the value of what the GTF Plaintiffs could have

10        agreed to themselves, of course, as to in this case

11        Shanghai to value those rights held by the GTF.

12   Q    That's as a proxy for the actual value of the rights

13        as they were held by GTF; correct?

14   A    Sure.

15   Q    Do you believe that the GTF Plaintiffs could have

16        transferred to Shanghai all of the rights that

17        Shanghai acquired from ATP?

18   A    Based on my understanding of the rights that were

19        transferred, I believe they could have transferred

20        their rights that they held for similar value as to

21        what ATP transferred the rights to Shanghai.  My

22        understanding based on the fact that I understand the

23        plaintiffs allege that the rights held by GTF could

24        have been transferred to Shanghai.

25   Q    And do you believe that the rights that GTF held that

```
 1    Q  You didn't suggest it in your report, did you?  Yes
 2       or no.
 3    A  I'll have to reread the report.
 4    Q  Do you recall whether you mentioned it in your
 5       report?
 6    A  I don't recall if I did or did not.
 7    Q  Okay.  Are you offering an opinion that the
 8       Shanghai/ATP transaction is comparable to a supposed
 9       Shanghai/GTF transaction?  Are you or are you not
10       offering an opinion?
11    A  I'm sorry.  I'm going back and looking at my report.
12    Q  I've withdrawn the question.  I asked if you
13       remembered if you had and you said no, you didn't
14       remember.  That's the only question that was pending.
15    A  I don't recall if I did or didn't.  I recalled that
16       fact, and I thought that I'd footnoted it either in
17       the narrative or in a schedule.  I just don't know,
18       so...
19    Q  We don't need to take the time.  Whatever's in your
20       report is in your report.
21    A  Okay.
22    Q  Are you offering an opinion that the Shanghai/ATP
23       transaction is an appropriate benchmark transaction
24       to use to value the rights GTF held?
25    A  Sure, yes.
```

**2/12/2008 Kleinrichert, Gary**

1    Q  And in order to do that, do you have to opine that

2        the transaction between ATP and Shanghai was

3        comparable to a supposed transaction between GTF and

4        Shanghai?

5    A  Certainly, yes.

6    Q  Are you offering that opinion; that those are

7        comparable transactions?

8    A  Well, I'm offering the opinion that the transaction

9        between ATP and Shanghai, which transferred the right

10       to hold an ATP Masters Series event, transferred a

11       right which had been very similar, if not the same,

12       right held by GTF.  So as such, it's an appropriate

13       measure of the value of the right held by GTF.

14   Q  In order to say it's an appropriate measure, you have

15       to conclude that those transactions are comparable;

16       correct?

17   A  Well, that the right being transferred is analogous,

18       of course.

19   Q  And if you conclude that the right being transferred

20       is analogous, do you have to also then use the actual

21       amount paid by Shanghai as the appropriate value?

22   A  Well, you consider the financial terms of that

23       transaction as the basis for determining the value

24       that exchanged in the transaction.

25   Q  In the but for world, would other tournaments have

**2/12/2008 Kleinrichert, Gary**

```
1        transaction that I was aware of and the information
2        presented provided, you know, valuations for the
3        precise week in which the Hamburg tournament was
4        being moved and it was on clay in Europe outside of
5        the European clay court season.  Now, I presume that
6        the GTF Plaintiffs may believe this is an
7        overvaluation of such right because of vacation
8        habits of Germans and perhaps other facts, but I used
9        this as a basis for determining the value of the week
10       which was being transferred.
11   Q   Is it your opinion that a tournament has value
12       depending on when it is and where and what type of
13       surface?  Do those factors affect the value of the
14       tournament?
15   A   I think there's testimony from many that would say
16       the desirability of a tournament is impacted by those
17       factors, and that's pretty intuitive.
18   Q   The next page, Paragraph No. 2, at the end you say,
19       "If the market concludes that the new membership and
20       sanction has no value and as a result there are no
21       potential buyers of the new membership and sanction
22       then the new membership and sanction will have $0
23       value to the GTF Plaintiffs."
24           Do you see that?
25   A   I do.
```

**2/12/2008 Kleinrichert, Gary**

```
 1    A   Yes, I considered it.  I believe I described it
 2        elsewhere in the report.
 3    Q   The GTF tournament has a current-period operating
 4        cash flow loss; is that correct?
 5    A   Yes.
 6    Q   And does it have a history of operating under cash
 7        flow losses?
 8    A   Yes, it does.  In the current environment it does, in
 9        recent history.
10    Q   Did you consider whether that current-period
11        operating under cash flow loss combined with a
12        history of operating under cash flow losses was
13        sufficient to invoke scenario 2?
14    A   Yes.
15    Q   And your conclusion was?
16    A   My conclusion is as is described in the rest of my
17        report.
18    Q   And it was?
19    A   Well, I can read what it says here.
20    Q   Can you tell me without reading what it says?  Was
21        your conclusion that scenario 2 applied or not?
22    A   My conclusion was that if you did an impairment
23        analysis under No. 2 or not that the result would be,
24        based upon projections and forecasts of cash flows,
25        that there would not be an impairment charge.  I
```

EXHIBIT 4

**REDACTED**