IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEUTSCHER TENNIS BUND (GERMAN
TENNIS FEDERATION), ROTHENBAUM
SPORT GMBH, and QATAR TENNIS
FEDERATION,

                       Plaintiffs,

    against

ATP TOUR, INC., ETIENNE DE VILLIERS,
CHARLES PASARELL, GRAHAM PEARCE,
JACCO ELTINGH, PERRY ROGERS, and IGGY
JOVANOVIC,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**REDACTED
PUBLIC VERSION**

C.A. No. 07-178-GMS

## DEFENDANTS' MOTION *IN LIMINE* NO. 4 TO EXCLUDE EVIDENCE OF DAMAGES NOT PROPERLY DISCLOSED DURING DISCOVERY

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*
Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

Dated: May 16, 2008

Defendants move pursuant to Fed. R. Civ. P. 37(c)(1) to preclude Plaintiffs from offering at trial any evidence concerning damages not properly disclosed during discovery. Specifically, Defendants seek to preclude: (1) damages not identified at all during discovery, including but not limited to purported "[d]amages to Plaintiffs' contractual relationships"; and (2) damages identified in the untimely and defective "response" expert submission served by Plaintiffs after the deadline for expert disclosures.

## BACKGROUND

This action concerns Plaintiffs' challenge to Defendants' restructuring of the ATP men's professional tennis tour (generally known as the "Brave New World"), and the ATP's decision to place the tournament operated by Plaintiffs — the Hamburg tournament — into the tour's second tier starting in 2009. Plaintiffs seek to enjoin the Brave New World, and also seek damages on their antitrust and tortious interference claims.[1]

Plaintiffs' initial Rule 26(a) disclosures failed to identify any present damages arising out of actions challenged in their Complaint, stating only that the amount of any such damages "is not yet known." (Ex. 1 at 8.)[2] During fact discovery, Defendants requested information concerning Plaintiffs' damages claims through depositions and interrogatories. None of Plaintiffs' fact witnesses could identify any components of Plaintiffs' purported damages. In fact, Plaintiffs' witnesses repeatedly stated that they were unaware of any sponsorships or other contracts that had been lost in connection with the anticipated 2009 restructuring. (Ex. 2 at 282-84; Ex. 3 at 88, 99-100, 105-107; Ex. 4 at 280-86; Ex. 5 at 343; Ex. 6 at 151; Ex. 7 at 107; Ex. 8 at 242-44; Ex. 9 at 107-08.) When Defendants sought the details of their damages claims,

---

[1] Plaintiffs also have claims for breach of fiduciary duty and conversion, but have not requested monetary damages under these claims. (D.I. 50, Ex. A, at Prayer for Relief.)

[2] Citations to "Ex._" refer to exhibits attached to and submitted with this memorandum of law.

Plaintiffs deferred the issue to expert discovery. Specifically, when asked to identify "all losses that any Plaintiff claims to have suffered", Plaintiffs responded that the request was

**REDACTED**

On January 7, 2008, Plaintiffs served an expert report on damages from Gary Kleinrichert.[3] He opined that Plaintiffs would suffer two forms of damage if Defendants were permitted to proceed with their restructuring plans: (1) a devaluation of Plaintiffs' membership rights; and (2) an impairment of the book value of Plaintiffs' capital assets. (Ex. 11 at 4-5.) Thus, the only damages Kleinrichert asserted Plaintiffs would suffer were prospective damages that they would suffer if ATP were permitted to proceed with the Brave New World and solely related to an expected decrease in the value of the Hamburg tournament.

On April 23, however, Plaintiffs provided their draft "Itemized Statement of Damages" (hereinafter, "ISD"),[4] which identifies alleged damages never disclosed during discovery, namely, supposed damages "to Plaintiffs' contractual relationships" in the amount of $3,511,615.93. Not only had this type of damages not been disclosed earlier, Plaintiffs' fact witnesses, in response to direct questioning, consistently and repeatedly disavowed knowledge of any such damages. (Ex. 3 at 99-100; Ex. 6 at 151; Ex. 8 at 242-44; Ex. 9 at 107-08.)

In addition, the ISD also identifies certain damages that were only described in a "discounted cash flow analysis" that Plaintiffs delivered to Defendants as a purported "response" to Defendants' damages expert Peter Greenhalgh. Not only was this "response" delivered well

---

[3] Defendants have separately moved to exclude Kleinrichert's opinions in their entirety pursuant to the *Daubert* standard. (D.I. 124.)

[4] The ISD was provided to Defendants as part of Plaintiffs' draft Pretrial Order submissions.

after the Court-ordered deadline for any such expert disclosure, it is facially defective as an expert report and therefore cannot serve as the basis for Kleinrichert to offer opinions at trial.

The Court's scheduling order dated December 3, 2007, established a specific schedule for the exchange of expert reports, response reports and reply reports. Pursuant to that order, Defendants served their responsive damages report on January 28; Plaintiffs' reply to that report (if any) was due February 1. Plaintiffs served nothing at that time, but instead waited until the evening of February 11 — approximately 12 hours before the commencement of their expert's deposition — before faxing to Defendants the purported "response" report, claiming that it responded to issues that had been raised five days earlier in their deposition of Greenhalgh. (Ex. 12.) This unsigned "response" consisted of four pages of financial figures, with no explanation or indication of who had prepared it or for what purpose. Defendants promptly objected to this "response" as untimely and incomplete. (Ex. 13.)

In his deposition, Kleinrichert testified that he had prepared the "response," but that he had not actually reviewed Greenhalgh's deposition testimony — meaning that it could not possibly constitute a "response" to that testimony. (Ex. 14 at 35.) Rather, Kleinrichert conceded that the "response" was in fact nothing more than a "rebuttal" to concepts addressed in Greenhalgh's January 28 report. (*Id.* at 34-35.) Kleinrichert offered no excuse for failing to serve this rebuttal report on February 1 as the Court's schedule required.

## ARGUMENT

Plaintiffs cannot be permitted to introduce at trial evidence concerning any damages that were not properly disclosed during discovery. Based on their responses during discovery and their own fact witnesses' testimony, they should be limited to the damages properly disclosed by their expert in his opening expert report. Plaintiffs have no right to introduce entirely new

categories of damages that were never even raised during discovery, nor can Kleinrichert supplement his damages testimony based on the untimely and facially defective "response".

The general purpose of pretrial discovery is to permit parties to obtain information about their opponents' positions and to avoid "trial by ambush". *Ierardi v. Lorillard, Inc.*, 1991 U.S. Dist. LEXIS 11887, at *8 (E.D. Pa. Aug. 23, 1991). A party that refuses to disclose information during discovery cannot thereafter make use of that information at trial. Fed. R. Civ. P. 37(c)(1); *Bridgestone Sports Co. v. Acushnet Co.*, 2007 U.S. Dist. LEXIS 11370, at *11 (D. Del. Feb. 15, 2007); *Frederick v. Hanna*, 2007 U.S. Dist. LEXIS 18626, at *14 (W.D. Pa. March 16, 2007) (excluding evidence not disclosed prior to Pretrial Statement or Motions in Limine); *Philips Elec. N. Am. Corp. v. Contec Corp.*, 2004 U.S. Dist. LEXIS 5839, at *4-5 (D. Del. April 5, 2004) (excluding documents produced after discovery). Rule 37(c)(1) specifically provides that where "a party fails to provide information [as required in discovery] . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial".

Plaintiffs failed to provide during discovery any information concerning the supposed $3.5 million damages to their contractual relationships now suggested by their ISD. That failure is anything but "harmless," because Defendants have been deprived of any opportunity to investigate the particulars of the alleged damages or to challenge the basis for the claims. Indeed, to this date, Defendants have no way to know the specifics of the contractual relationships at issue; the nature of the purported interference with those contracts; whether any of those contracts were actually breached; whether or not these alleged damages are contingent on future events; the extent of any specific damages arising out of any breach; and whether Plaintiffs made any effort to salvage or mitigate the purported damages. Plaintiffs plainly cannot offer evidence relating to these damages through Kleinrichert, as he has never disclosed any

opinions relating to these damages; nor should they be permitted to offer such evidence in any other fashion. Likewise, Plaintiffs should be precluded from offering any evidence concerning any other possible, as-yet-undisclosed forms of damages that they may yet conjure up.

A similar analysis should apply to Plaintiffs' attempt to use the February 11 "response" to augment the opinions Kleinrichert may offer at trial. Rule 26(a)(2)(C) requires a party to "make [expert] disclosures at the times and in the sequence that the court orders". Aside from their claim that the "response" was an answer to Greenhalgh's deposition testimony — a claim contradicted by Kleinrichert's own testimony — Plaintiffs offered no excuse for the untimely service of the document. In addition, the document fails on its face to comply with the Rule 26 requirements for expert disclosures: (1) it is not "signed by the witness" (Rule 26(a)(2)(B)); (2) it contains no "complete statement of all opinions the witness will express" (Rule 26(a)(2)(B)(i)); (3) it fails to set forth "the basis and reasons for" the testimony (*id.*); and (4) it does not identify "the data or other information considered by the witness in forming" his opinions (Rule 26(a)(2)(B)(ii)). Plaintiffs cannot carry their burden of showing substantial justification for their failure to comply with Rule 26 and that such failure was harmless to Defendants. *See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 2007 WL 979854, *12 (D.N.J. March 30, 2007), *citing Yetti by Molly v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Accordingly, the "response" should be disregarded and Kleinrichert's testimony should be limited to (at most) the opinions set forth in his initial report.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant their motion to exclude any evidence of damages not specifically included in the original expert report proffered by Gary G. Kleinrichert.

5

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

PROSKAUER ROSE LLP
Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: May 16, 2008

6

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) and ROTHENBAUM SPORT GMBH, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 07-178-GMS |
| ATP TOUR, INC., JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8 and JOHN DOE 9, | ) ) ) ) ) | |
| Defendants. | ) | |

## DEUTSCHER TENNIS BUND AND ROTHENBAUM SPORTS GMBH'S
## FED. R. CIV. P. 26(a)(1) INITIAL DISCLOSURE STATEMENT

Plaintiffs Deutscher Tennis Bund (German Tennis Federation) and Rothenbaum Sport GMBH (collectively, "Hamburg"), by and through their undersigned attorneys, make the following initial disclosures to the defendant ATP Tour, Inc. ("ATP").

### GENERAL LIMITATIONS AND EXCEPTIONS

1.     These initial disclosures are made upon a good faith review of information reasonably available to Hamburg at this time.  Hamburg has exercised due and reasonable diligence in making these initial disclosures, and reserves the right to amend or supplement these disclosures when and if additional requested information and/or additional documents are located

by, or their contents become known to, Hamburg. Hamburg further reserves the right to assert any applicable objection to the disclosure of such additional information or documents.

2.    Hamburg will not provide information protected from disclosure by the attorney-client privilege or work-product doctrine, including, without limitation, information prepared by or at the direction of its attorneys, or by or for its attorneys' representatives or agents in anticipation of litigation or for trial, and any materials containing or reflecting mental impressions, conclusions, opinions, and/or legal theories, or the basis thereof, of any attorneys for Hamburg, or any other applicable privileges.

3.    Hamburg, in making these initial disclosures, does not waive any objections based on relevance, materiality, privilege, immunity from disclosure, or other grounds as specified above.

4.    Hamburg reserves objections to provision of information as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome.

5.    This matter is in its preliminary stages and discovery and investigation are ongoing, Hamburg is not aware at this time of all of the persons who may possess discoverable information that the ATP may use to support its defenses, or the subjects on which such persons may possess discoverable information. Hamburg reserves the right to modify, amend, or supplement this list as additional information becomes known through further investigation and discovery.

DB02:5959214.1                                                      066145.1001

## INITIAL DISCLOSURES

**A.     Fed. R. Civ. P. 26(a)(1)(A) – Name, Address, and Telephone Number Of Individuals Likely To Have Discoverable Information That Hamburg May Use To Support Its Claims, And The Subjects Of The Information.**

<u>PLAINTIFF'S RESPONSE:</u>     Based on the information known at the time of these disclosures, Hamburg identifies the following persons:

1.     **Persons Affiliated With Hamburg.**

i.     Walter Knapper
       Rothenbaum Sport GMBH
       c/o Robert D. MacGill, Esq.
       BARNES & THORNBURG LLP
       11 South Meridian Street
       Indianapolis, Indiana 46204

Mr. Knapper may have discoverable information concerning the historical and present performance of the Hamburg tennis tournament, the Hamburg tennis tournament's relationship with the ATP, the ATP's plan for restructuring the ATP's men's professional tennis tournament circuit and calendar for 2009 (the "ATP Plan"), the ATP Plan's potential impact on the Hamburg tournament, and communications between Hamburg and the ATP.  Mr. Knapper is to be contacted only through undersigned counsel.

ii.  ·  Dr. Georg Von Waldenfelds
        Deutscher Tennis Bund
        c/o Robert D. MacGill, Esq.
        BARNES & THORNBURG LLP
        11 South Meridian Street
        Indianapolis, Indiana 46204

Dr. Von Waldenfels may have discoverable information concerning the historical and present performance and activities of the German Tennis Federation, the historical and present performance of the Hamburg tennis tournament, the ATP's Restructuring Plan and its potential

3

impact on the Hamburg tennis tournament and on the German Tennis Federation, and the potential impact of the ATP's plan to downgrade the status of the Hamburg tennis tournament. Dr. Von Waldenfelds is to be contacted only through undersigned counsel.

> iii.    Mr. Frank Schroetter
> Rothenbaum Sport GMBH
> c/o Robert D. MacGill, Esq.
> BARNES & THORNBURG LLP
> 11 South Meridian Street
> Indianapolis, Indiana 46204

Mr. Schroetter may have discoverable information concerning the historical and present performance of the Hamburg tennis tournament, capital investments made by Hamburg relating to the Hamburg tennis tournament, and the potential effects of the ATP's Restructuring Plan on the Hamburg tennis tournament.  Mr. Schroetter is to be contacted only through undersigned counsel.

### 2.    Persons Affiliated With The ATP.

The following persons are defendants and/or affiliated with Defendant ATP who, upon information and belief, may have discoverable information supporting Hamburg's claims or defenses in this action.

> iv.    Etienne de Villiers
> c/o ATP Tour, Inc.
> 201 ATP Tour Blvd
> Ponte Vedra Beach, FL 32082-3211

> v.    Charles Pasarell
> c/o ATP Tour, Inc.
> 201 ATP Tour Blvd
> Ponte Vedra Beach, FL 32082-3211

> vi.    Graham Pearce
> c/o ATP Tour, Inc.
> 201 ATP Tour Blvd
> Ponte Vedra Beach, FL 32082-3211

> vii.    Jacco Eltingh

4

        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

viii.   Perry Rogers
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

ix.   Iggy Jovanovic
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

x.   Flip Galloway
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

xi.   Phil Anderton
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

xii.   Horst Klosterkemper
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

xiii.   Brad Drewett
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

xiv.   Mark Young
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

xv.   Richard Davies
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

xvi.   Chistopher Clouser
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

xvii.   Andy Anson
        c/o ATP Tour, Inc.
        201 ATP Tour Blvd
        Ponte Vedra Beach, FL 32082-3211

In addition, Hamburg believes that many, if not all, of the current Masters Series tournaments, not yet named as parties in this action, may have discoverable information supporting Hamburg's claims or defenses in this action. This information may include the past, present, and future operations of the ATP, the ATP Scheme and its potential impact on the Hamburg tennis tournament, the ATP's plan to downgrade the status of the Hamburg tennis tournament; the operation of the ATP's Board of Directors, and the status of competition in the relevant market(s).

**3.    Persons Affiliated With "Monte Carlo."**

Upon information and belief, the following person, affiliated with the Plaintiffs, Monte-Carlo Country Club and Société Monégasque pour L'Exploitation du Tournoi de Tennis ("SMETT") (collectively, "Monte Carlo") in the matter captioned *Monte-Carlo Country Club, et al. v. ATP Tour, Inc. et. al.*, Civil Action No. 07-198 (D.Del.) (the "Monte-Carlo Litigation"):

xviii.  Zeljko Franulovic
        SMETT
        c/o Alan M. Unger, Esq.
        SIDLEY AUSTIN LLP
        787 Seventh Avenue
        New York, NY 10019

In addition, Hamburg believes that many, if not all, of the persons identified in the initial disclosures exchanged by the parties in the Monte Carlo Litigation may have discoverable information supporting Hamburg's claims or defenses in this action.

**4.    Persons Currently Affiliated With Non-Parties.**

Upon information and belief, the following persons, not affiliated with any current party in this litigation, may have discoverable information supporting Hamburg's claims or defenses in

6

this action.

    xix.    Ion Tiriac
             Mutua Madrileña Madrid
             Address Unknown

    xx.    Gerard Tsabanian
             President, Masters Series Madrid
             Address Unknown

    xxi.    Mr. Yu Chen
             Shanghai Administration of Sport
             Address Unknown

    xxii.    Mr. Wang Liqun
             Shanghai Ba-shi Company
             Address Unknown

    **B.**    **Fed. R. Civ. P. 26(a)(1)(B) – Documents, Electronically Stored Information, And Tangible Things In The Possession, Custody, Or Control Of Hamburg That Hamburg May Use To Support Its Claims Or Defenses.**

    <u>**PLAINTIFF'S RESPONSE:**</u>    Based on the information known at the time of these disclosures, Hamburg states the following:

    Pursuant to the parties' agreement embodied in the Joint Proposed Pre-trial Order submitted on May 4, 2007, this requirement has been waived. Hamburg reserves the right to supplement these disclosures if the Court requires identification of the information contemplated by Fed. R. Civ. P. 26(a)(1)(B).

    **C.**    **Fed. R. Civ. P. 26(a)(1)(C) - Computation Of Damages**

    <u>**PLAINTIFF'S RESPONSE:**</u>    Based on the information known at the time of these disclosures, Hamburg states the following:

    Hamburg has, or will, suffer multiple forms of damage as a result of the actions of the defendants.

    First, in the absence of injunctive relief, Hamburg will suffer irreparable, incalculable,

7

                    

and permanent harm. The categories of Hamburg's irreparable harm would include the loss of a century's worth of accumulated goodwill, prestige, and reputation as one of the world's top-tier tennis tournaments, the loss of the participation and services of top-tier tennis players, and the destruction of Hamburg's continued viability as a top-tier tennis tournament.

Second, even if injunctive relief is granted, Hamburg will have suffered a substantial amount of incidental damages proximately caused by the ATP's attempt to implement a restructuring plan under which Hamburg would no longer be a top-tier Masters tournament. Among other things, Hamburg has incurred substantial costs and fees in its efforts to oppose defendants unlawful scheme, and has been injured in its ability to attract premium sponsors and secure revenue income from television and media broadcasting and other commercial activities associated with its tournament. The exact amount of these incidental damages is not yet known. Hamburg will supply a computation of its incidental damages, along with accompanying documents or other evidentiary material supporting such amount, after discovery in this matter.

Third, in the absence of injunctive relief, Hamburg will suffer substantial direct damages and lost profits if the ATP Scheme is implemented in an amount to be determined at trial. These damages are in addition to, and separate from, the irreparable harm and incalculable loss of goodwill, prestige, and reputation described above. Among other things, Hamburg will suffer direct damages and lost profits from the loss of revenues derived from sponsorships, ticket sales, tourism, licensing, promotional packages, merchandising, branding, advertising, and the sale of television and other media rights, and other commercial future economic opportunities associated with its tournament. Hamburg will lose the value of substantial investments made over many years to develop, improve, and promote the tournament's reputation, facilities, and brand equity. The exact amount of these damages is not yet known but Hamburg believes the figure will

DB02:5959214.1                                                         066145.1001

constitute many millions of dollars. Hamburg will supply a computation of its damages and lost profits, along with accompanying documents or other evidentiary material supporting such amount, after discovery in this matter.

Discovery in this matter has just begun, and Hamburg expressly reserves its right to supplement these responses to provide additional information concerning the harm suffered by Hamburg as a result of the defendants' unlawful actions.

**D.    Insurance Agreements (Fed. R. Civ. P. 26(a)(1)(D)):**

This requirement does not apply to plaintiffs in this action.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
Chad S.C. Stover (No. 4919)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6692
bflinn@ycst.com
cstover@ycst.com
*Attorneys for Deutscher Tennis Bund (the German Tennis Federation) and the Rothenbaum Sports GMBH*

Robert D. MacGill, Esq. (Admitted *Pro Hac Vice*)
Hamish S. Cohen, Esq. (Admitted *Pro Hac Vice*)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn, Esq. (Admitted *Pro Hac Vice*)
300 Ottawa Avenue N.W.
Suite 500
Grand Rapids, Michigan 49503
(616) 742-3930

Dated: May 4, 2007

9

## CERTIFICATE OF SERVICE

I, Chad S.C. Stover, hereby certify that on May 4, 2007, copies of the foregoing

document were served on the following counsel of record in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Lawrence C. Ashby, Esquire
Philip Trainer, Jr., Esquire
Carolyn Hake, Esquire
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

### BY E-MAIL

Bradley I. Ruskin, Esquire
Jennifer R. Scullion, Esquire
PROSKAUER ROSE
1585 Broadway
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
Chad S.C. Stover (No. 4919)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6692
bflinn@ycst.com
cstover@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis
Federation) and the Rothenbaum Sports GMBH*

# EXHIBIT 2

1

2                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE

3

4      -------------------------------

                                    Civil Action No.
5      DEUTSCHER TENNIS BUND            07-178(GMS)
       (GERMAN TENNIS FEDERATION)
6      and ROTHENBAUM SPORTS GMBH
       TENNIS,
7
                    Plaintiffs,
8
           -against-
9
       ATP TOUR, INC.,
10
                    Defendant.
11
       -------------------------------
12
       MONTE-CARLO COUNTRY CLUB and    Civil Action No.
13     SOCIETE MONEGASQUE POUR           07-198(GMS)
       L'EXPLOITATION DU TOURNOS
14     DE TENNIS,
15
16                  Plaintiffs,
17         -against-
18     ATP TOUR, INC., ETIENNE DE
       VILLIERS, and CHARLES PASARELL,
19                  Defendants.
20     -------------------------------
21                   DATE:  September 19, 2007
                     TIME:  8:20 a.m.
22
                         VOLUME II
23
                    Videotape deposition of GEORG von
24     WALDENFELS, taken by and before JOYCE SILVER, a
       Certified Shorthand Reporter and Notary Public of the
25     State of New York, held at the office of PROSKAUER
       ROSE LLP, 1585 Broadway, New York, New York.

```
1                    GEORG von WALDERFELS
2    the way it is.  And I always expressed my conviction
3    that a U.S. court would decide in our favor and
4    represent our interests.  I, also, said that it could
5    be that ATP may regain its senses.
6         Q.    Have any sponsors refused to sponsor any
7    of the 2007 or 2008 because of the ATP restructuring
8    plans designed to commence in 2009?
9         A.    I wouldn't know of any such person who
10   expressed that.  Again, 2007 and 2008 in particular
11   is still secure, and this is how I expressed it to
12   people and how they knew it anyway.  And I always
13   expressed my intention to fight for 2009.
14              The problem for our sponsors was, indeed,
15   the press conference held by ATP here at the US Open
16   in New York when they said these are the eight sites
17   but Hamburg is not decided yet, and Hamburg is no
18   longer part of the Masters series.  That became a
19   problem.
20              And I'm convinced that if ATP's plans
21   were to be realized, that is if we were downgraded
22   and moved into July, we would lose considerable
23   sponsorship.
24        Q.    Did the press conference -- I take it the
25   press conference you think has had some effect on
```

282

1                    GEORG von WALDERFELS

2      whether or not people will be willing to sponsor in

3      2009 and thereafter?

4           A.     Many media reported Hamburg is no longer

5      the site for the Masters.  And of course many people

6      don't read, you know, the entire press release issued

7      by ATP, but they may read an AP release or, know,

8      just another sound byte type of release.  And in that

9      kind of press release it said Hamburg is no longer a

10     site for a Masters tournament and that, of course, is

11     a loss of confidence and a loss of standing for

12     Hamburg.

13          Q.     All of your sponsors are aware that

14     Hamburg will be a Masters event in 2008.  Yes?

15          A.     Well, we made sure to emphasize again and

16     again that 2008 was still guaranteed because there

17     were, of course, you know, uncertainties and what

18     will happen even in 2008, but we made sure that

19     sponsors would know that 2008 there is no change.

20          Q.     And no sponsors have refused to go

21     forward in 2008 because of the possible plan

22     beginning in 2009.  Correct?

23          A.     No, I mean I don't know of any such

24     persons or any such decision, but that is why it is

25     so very important for me to reestablish that trust

1                GEORG von WALDERFELS

2    into the Hamburg event as a Masters venue and that is

3    why I'm making sure that everyone knows that and

4    that's why I'm also interested in a decision that, I

5    suppose a legal decision, that will tell us that we

6    can go ahead.

7        Q.     Do you believe that the -- strike that.

8                When the 2007 event was played this past

9    spring, do you believe there was some public

10   uncertainty about whether or not the Hamburg event

11   would be a 1000 or Masters event after 2009?

12       A.     I mean I'm sure it was a topic of

13   discussion on center court, but we were also very

14   gratified to note that both the winner of the meet,

15   Roger Federer, and his opponent Nadal said into the

16   microphones, the press microphones, that Hamburg has

17   to remain a site for the Masters.

18       Q.     Do you believe that the announcement by

19   ATP of a restructuring plan for 2009 and thereafter

20   had any effect on ticket sales in Hamburg during

21   2007?

22                THE INTERPRETER:  Okay.

23       A.     I mean of course all these issues were

24   discussed in the newspapers and in the media.

25   However, we had record visitors in 2007 in Hamburg

# EXHIBIT 3

# REDACTED

# EXHIBIT 4

**12/10/2007  Steeb, Carl Uwe**

```
1

2              IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF DELAWARE

4         --------------------------------X

5    DEUTSCHER TENNIS BUND (GERMAN

6    TENNIS FEDERATION) and

7    ROTHENBAUM SPORTS GMBH TENNIS,

8    and QATAR TENNIS FEDERATION,

9                     Plaintiffs,

10         VS.                    Case No. 07-178-GMS

11   ATP TOUR, INC., ETIENNE DE

12   VILLIERS, CHARLES PASAELL,

13   GRAHAM PEARCE, JACCO ELTINGH,

14   PERRY ROGERS and IGGY JOVANOVIC,

15                     Defendants.

16        --------------------------------X

17

18   CONTINUED VIDEOTAPED DEPOSITION OF CARL UWE-STEEB

19                  New York, New York

20                  December 10, 2007

21

22

23   Reported by:

     Bonnie Pruszynski, RMR

24

25
```

1                 CARL UWE-STEEB

2       A       Not that I remember.

3       Q       In your last deposition session you

4    testified that you were in negotiations with Black

5    Rock, Nintendo, Air Berlin and South African

6    Airlines for the 2008 tournament, for them to be

7    sponsors.

8                 Are those negotiations still going

9    on?

10               MS. ADAMS:  Object to form.

11      A       Some of them.

12      Q       Have you concluded any agreements

13   with any of those companies?

14      A       We are in the stage of preparing

15   contracts with Black Rock.  They want to continue.

16               Air Berlin is pulling out because of

17   South African Airlines, because now they are

18   flying in the same -- last year, last year they

19   didn't mind because they didn't fly the same

20   routes or directions.  And now Air Berlin bought

21   LTU and now they are flying the same destinations

22   as South African Airlines.  So, therefore, Air

23   Berlin is not a sponsor anymore, because it's a

24   competition between them.  So, we decided to

25   continue with South African Airlines because it's

280

1                 CARL UWE-STEEB

2    a bigger sponsor, and they had a -- I spoke with

3    them on Saturday, and they will -- they are --

4    will continue in 2008.

5                 Nintendo is changing their strategy

6    about sponsoring, and they will attend on-site

7    with their games but not be a -- not be a sponsor

8    at, within the stadium, because they concentrate

9    on classic advertising.

10                Eon is basically agreed, not signed.

11   We are in the -- preparing the contracts.

12                And we are, I am discussing with

13   Andalusia tourism.  They want to be part of the

14   tournament.  It's ongoing right now.

15      Q      Ongoing discussions with Andalusia

16   Tourism Company?

17      A      Yeah.  We made an offer and trying to

18   get back to us.

19                We are speaking to potential sponsors

20   for linesmen and for --

21                (Interpreter and witness conferring.)

22      A      Equipment for linesmen and ball boys,

23   different companies.

24                Like all the, all the presentations

25   and all the proposals, they are -- most of them

**12/10/2007  Steeb, Carl Uwe**

1                    CARL UWE-STEEB

2    are done now, and we waiting for -- we are waiting

3    for -- to come back to us.  But, as I said, Black

4    Rock, which is a big sponsor and Eon is basically

5    agreed but not signed.

6         Q       For the Black Rock sponsorship, how

7    many years is that agreement going to be?

8         A       It's for 2008.

9         Q       Is it the same, more or less money

10   than they gave for the 2007 tournament?

11        A       The same.

12        Q       And for South African Airlines, is

13   it, how many -- strike that.

14                For South African Airlines, how many

15   years is the agreement going to be?

16        A       For 2008.

17        Q       And is it more?

18        A       A little more.

19        Q       How much more it going to be?

20        A       10,000 euros, more approximately.

21        Q       For the 2007 tournament, Nintendo

22   became the sponsor for the clock and the radar

23   gun; is that correct?

24        A       Yes.

25        Q       Have you had discussions with another

**12/10/2007  Steeb, Carl Uwe**

                        CARL UWE-STEEB

1                       CARL UWE-STEEB

2    company to replace Nintendo for those

3    sponsorships?

4         A     We are making offers right now and

5    thinking of other watch companies.  I had

6    approached towards Longines, but the answer from

7    Nintendo was two weeks ago.  So, we are -- so

8    this, sponsoring spaces are available since two

9    weeks, and now we are starting to approach

10   sponsors.

11        Q     Did they explain to you, the Nintendo

12   people explain to you what changes in their

13   sponsorship strategy they were making?

14             MS. ADAMS:  Objection to form.

15        A     They are coming out with a new game

16   in April, and so they don't know if the timing is

17   right with the tournament, and how they can

18   promote this particular game and, therefore,

19   therefore, they are not sure if -- or they are not

20   sure about the timing; therefore, they cannot do

21   it.

22        Q     And for Eon Hanse, you said you have

23   got a basic agreement, but it's just not signed;

24   is that correct?

25        A     Yes.

1               CARL UWE-STEEB

2       Q       How years is that agreement?

3       A       Two years.

4       Q       For the 2008 and 2009 tournaments?

5       A       Yes.

6       Q       And what amount of money will Eon be

7    paying to sponsor for the 2008 year?

8       A       Similar amount than last year.  But I

9    have to say, two-year contract, but option to

10   cancel the contract if we are not a Masters Series

11   in 2009 anymore.

12      Q       They have the option to get out of

13   the 2009 sponsorship --

14      A       Yes.

15      Q       -- if you are not a 1000 level

16   tournament?

17      A       Yes.

18      Q       But for 2008, they don't have that

19   option; correct?

20      A       No.  2008 they -- they are committed

21   with this contract, when it's signed.

22      Q       Mr. Kroeker testified at his

23   deposition that the tournament was also having

24   discussions with Eon about becoming a title

25   sponsor.

```
 1                     CARL UWE-STEEB
 2          A      Yes.
 3          Q      Are those negotiations still going
 4     on?
 5          A      We are approaching them now, yeah.
 6     Because we got only, only like three weeks ago the
 7     permission from Hamburg to speak to the mother
 8     company.
 9          Q      Permission from the Hamburg division
10     of Eon Hanse?
11          A      Yes.
12          Q      To speak to the paren company.
13          A      Yes, because you have to follow the,
14     you know, what you say, the --
15                 (Interpreter and witness conferring.)
16                 THE INTERPRETER:  The hierarchy.
17          Q      And has Eon Hanse, in the parent
18     company, expressed whether or not they are willing
19     to become a title sponsor for the 2008 tournament?
20          A      No.  It's -- I'm still waiting for
21     the meeting to be set, and then we can present
22     what we -- what our idea is.  Like the Eon Hanse,
23     they would --
24                 (Interpreter and witness conferring.)
25                 THE INTERPRETER:  Welcome.
```

285

1                    CARL UWE-STEEB

2        A      They would welcome if they could

3    increase their sponsorship, but with their budget

4    they cannot do it.  So they would need the mother

5    company for it.

6                    THE INTERPRETER:   The parent company.

7        A      The parent company.

8        Q      If the parent company became a title

9    sponsor, would that affect the sponsorship

10   agreement that you are about to sign with the

11   Hamburg Eon Hanse company?

12       A      No.  They would just be an increase.

13       Q      Has the Hamburg Tournament taken any

14   steps to prepare for the 2009 season as a 500

15   level event in July?

16       A      No.

17       Q      Has the Hamburg Tournament taken any

18   steps to determine what -- what steps it could

19   take so that it could be a viable tournament in

20   July for the 2009 season?

21       A      No.  We assume that we are going to

22   stay a 1000 tournament.

23       Q      You assume you are going to be a 1000

24   tournament in May for the 2009 season?

25       A      Yes.

# EXHIBIT 5

1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF DELAWARE
2

3       ---------------------------------
        DEUTSCHER TENNIS BUND              : Civil Action No.
        (GERMAN TENNIS FEDERATION)          07-178 (GMS)
4       and ROTHENBAUM SPORTS GMBH        :
        TENNIS,
5                                         : VIDEOTAPE
                        Plaintiffs,         DEPOSITION OF:
6                                         : WALTER KNAPPER
               -against-
7                                         :
        ATP TOUR, INC.,
8                                         :

                        Defendant.
9       ---------------------------------
        MONTE-CARLO COUNTRY CLUB and      : Civil Action No.
10      SOCIETE MONEGASQUE POUR             07-198 (GMS)
        L'EXPLOITATION DU TOURNOS         :
11      DE TENNIS,
                                          :
12                      Plaintiffs,
                                          :
13             -against-
                                          :
14      ATP TOUR, INC., ETIENNE DE
        VILLIERS, and CHARLES PASARELL,:
15
                        Defendants.       :
16      ---------------------------------
17                    TRANSCRIPT of the stenographic notes
18      of the proceedings in the above-entitled matter,
19      as taken by and before TERESA M. CATULLO, a
20      Certified Court Reporter, Registered Professional
21      Reporter and Notary Public, held at the office of
22      ASHBY & GEDDES, LLP, 500 Delaware Avenue,
23      Wilmington, Delaware, on Wednesday, October 10,
24      2007, commencing at 8:14 in the forenoon.
25

1  changed.  You cannot say, okay, that's a issue

2  of Becker.  It's a different issue.  It's a

3  different issue of the development on the

4  markets.

5          If you are a company and you

6  employee 100,000 people, you can go to the

7  same in America or somewhere else and then you

8  say, okay, I have to reduce my head count by

9  20,000 people, and parallel, you explain to

10  the world that you are spending a lot of money

11  for sponsorship, what's the thinking of -- of

12  most of the companies?

13      Q.   Was 2007 an improvement in your

14  relations -- in your ability to attract

15  sponsors relative to 2006?

16      A.   It improved year by year, because

17  what's also written in here where you not put

18  the question that it's very tough after the

19  terrible situation with ISL where we were

20  forced to fire sponsors and pay sponsors money

21  back that we could run this Super 9

22  tournament.

23          It's very important that you

24  gain trust from those guys again.  I was

25  personally talking to a lot of local companies

# EXHIBIT 6

**REDACTED**

# EXHIBIT 7

11/29/2007 Kroeker, Ulrich

```
 1
 2                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF DELAWARE
 3
 4        -------------------------------
                                            Civil Action No.
 5    DEUTSCHER TENNIS BUND                    07-178(GMS)
      (GERMAN TENNIS FEDERATION)
 6    and ROTHENBAUM SPORTS GMBH
      TENNIS,
 7
                    Plaintiffs,
 8
           -against-
 9
      ATP TOUR, INC.,
10
                    Defendant.
11
          -------------------------------
12
      MONTE-CARLO COUNTRY CLUB and       Civil Action No.
13    SOCIETE MONEGASQUE POUR              07-198(GMS)
      L'EXPLOITATION DU TOURNOS
14    DE TENNIS,
15                    Plaintiffs,
16         -against-
17    ATP TOUR, INC., ETIENNE DE
      VILLIERS, and CHARLES PASARELL,
18
                    Defendants.
19
          ---------------------------------
20
                         DATE:  November 29, 2007
21                       TIME:  9:00 a.m.
22
                         Videotape deposition of ULRICH KROEKER,
23    taken by and before JOYCE SILVER, a Certified
      Shorthand Reporter and Notary Public of the State of
24    New York, and STEVEN RIVERA, Videographer, held at
      the office of PROSKAUER ROSE, LLP, 1585 Broadway, New
25    York, New York.
```

1    Kroeker - direct

2    for 2008 at the same level as 2007, or did you make

3    individual decisions with respect to each sponsor

4    that you would project the same income?  That's the

5    question.

6              I'll rephrase it.

7              So in making the projection for

8    sponsorship income for 2008, you indicated that Eon

9    Hanse, there's a question about what direction it

10   might go and you said earlier that you just continued

11   the same numbers from 2007 for the other sponsors.

12             Did you actually consider each of those

13   sponsors and make a determination that you think it

14   will be the same, or is that -- did you just leave it

15   alone because you don't have any reasons to change

16   it?

17.            MS. ADAMS:  Objection to form.

18        A.    It was based on existing agreements.

19        Q.    Okay.  Okay.  So it is your affirmative

20   belief that the sponsorship income from those

21   sponsors will be the same in 2008 as it was in 2007?

22        A.    So the budget reflects what is actually

23   definitely going to be the case.  If anything, it can

24   improve.

25        Q.    Did you have projections for

# EXHIBIT 8

1
2                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE
3
4       ------------------------------
                                      Civil Action No.
5    DEUTSCHER TENNIS BUND               07-178(GMS)
     (GERMAN TENNIS FEDERATION)
6    and ROTHENBAUM SPORTS GMBH
     TENNIS,
7
               Plaintiffs,
8
          -against-
9
     ATP TOUR, INC.,
10
               Defendant.
11
        ------------------------------
12
     MONTE-CARLO COUNTRY CLUB and     Civil Action No.
13   SOCIETE MONEGASQUE POUR            07-198(GMS)
     L'EXPLOITATION DU TOURNOS
14   DE TENNIS,
15             Plaintiffs,
16        -against-
17   ATP TOUR, INC., ETIENNE DE
     VILLIERS, and CHARLES PASARELL,
18
               Defendants.
19
        ------------------------------
20             DATE:  November 30, 2007
               TIME:  8:00 a.m.
21
                    VOLUME II
22
               Videotape deposition of ULRICH KROEKER,
23   taken by and before JOYCE SILVER, a Certified
     Shorthand Reporter and Notary Public of the State of
24   New York, and STEVEN RIVERA, Videographer, held at
     the office of PROSKAUER ROSE, LLP, 1585 Broadway, New
25   York, New York.

```
1                    ULRICH KROEKER

2         Q.      Had any sponsors exercised their right to

3    terminate their sponsorship agreements?

4         A.      No, not yet.

5         Q.      Have any sponsors reduced their

6    commitment to support the Hamburg tennis tournament

7    in 2007 or 2008 as a result of the announced plan to

8    downgrade the tournament in 2008?

9         A.      The sponsor Eon Hanse has reduced its

10   commitment from 333,000 to 300,000 Euro and shortened

11   its commitment from three years to two years with the

12   possibility of dropping out.  Other sponsors have

13   extended their commitment through 2008 but not

14   further.

15        Q.      And you said yesterday that you are still

16   in negotiations with Eon in Dusseldorf, or Eon Hanse?

17        A.      Yes, of course, because of their

18   sponsorship and the extended commitment.

19        Q.      Do you have Defendant's Exhibit 45 in

20   front of you?

21                THE INTERPRETER:  Which one is that?

22        Q.      It looks like this (indicating).  It's in

23   the pile there, yes.  That's it.  That's the page,

24   exactly.

25                MS. ADAMS:  Just a moment, Counsel.
```

```
1                    ULRICH KROEKER
2        Q.      That page right there (indicating).  Turn
3   to the page marked 124.  Yes, do you have it?
4                MS. ADAMS:  Got it.  Thank you.
5        Q.      This document shows Eon Hanse with a
6   start date of 2005, a finish date of 2007.  And that
7   Eon Hanse paid 400,000 Euros for 2005 and 2006.
8   Correct?
9        A.      Yes, the agreement established an amount
10  of one million and they paid 400, 400, 200,000.
11       Q.      So in 2007 they paid 200,000 Euros?
12       A.      According to the agreement, a total of
13  one million.
14       Q.      Okay.  And you said -- so for 2008, they
15  have agreed to 300,000 Euros?
16       A.      Yes.  But we are still negotiating
17  whether they can -- whether there will be an increase
18  by title sponsoring.
19       Q.      In your earlier answer when you said they
20  had been supporting at a level of 333,000, that was
21  just the million dollars divided by the three years
22  of that contract?
23       A.      Yes, a third of a three-year commitment.
24       Q.      Okay.  And as of -- as of the time this
25  table was prepared, there weren't any agreements
```

```
 1                    ULRICH KROEKER

 2       other than the agreement referred to in the second

 3       line which you said it was an ATP sponsor Head/Penn.

 4       All of the other agreements terminated in 2007 or

 5       2008.  Correct?

 6            A.     The contracts are almost limited, and

 7       some of them have been extended by one year and two

 8       years.

 9            Q.     Has the DTB or RSG undertaken any

10       analysis of the effect of the change in

11       classification and the change in schedule on the

12       value of the Hamburg tournament after 2009?

13                  MS. ADAMS:  Object to form.

14            A.     No, no analysis has been made but just

15       estimates.

16            Q.     Who has made estimates of that?

17            A.     Well, those who deal with -- who have

18       experience in the German or Hamburg tennis

19       environment which means the tournament director, the

20       president, the event manager and people who deal with

21       these tennis issues on a daily basis.  And that

22       includes estimates by journalists, sports journalists

23       and political leaders of the City of Hamburg.

24            Q.     How would the proposed restructuring

25       effect sponsorship monies?
```

244

# EXHIBIT 9

# REDACTED

# EXHIBIT 10

# REDACTED

# EXHIBIT 11

# REDACTED

# EXHIBIT 12

# BARNES & THORNBURG LLP

11 South Meridian Street
Indianapolis, IN 46204-3535 U.S.A.
(317) 236-1313
Fax (317) 231-7433

www.btlaw.com

Hamish S. Cohen
(317) 261-7956
Email: hamish.cohen@btlaw.com

February 11, 2008

**Via E-Mail**

Colin A. Underwood, Esquire
Evan Greene, Esquire
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299

Re:     Deutscher Tennis Bund, et al v. ATP Tour, Inc. et al. &
Civil Action No. 07-178 (GMS)

Dear Counsel:

Mr. Peter R. Greenhalgh testified at his deposition that Paragraphs 33 and 34 of his Responsive Expert Report (the "Report") are not conjecture but instead constitute affirmative opinions. He further, through testimony, set forth "opinions" relating to Paragraphs 33 and 34 that exceed the scope of the statements set forth in those paragraphs of the Report.

As a result, we have prepared a response relating to these newly-disclosed opinions, identified for the first time in Mr. Greenhalgh's testimony, which is attached hereto. This response was completed this evening and is being produced at this time pursuant to Fed.R.Civ.P. 26(e)(1).

Nothing in this letter constitutes a waiver of the Plaintiffs substantive or procedural rights relating to Mr. Greenhalgh's report or testimony or this matter generally.

Very truly yours,

Hamish S. Cohen

HSC/xb
cc:     All Counsel of Record

INDS02 HCOHEN 954067v1

Index

**German Tennis Federation, et al. v. ATP Tour, Inc., et al.**
**Index of Schedules**

| Schedule | Description |
| --- | --- |
| 1 | Summary of EBITDA Analysis |
| 2 | Calculation of the Present Value of EBITDA |
| 3 | Actual and Projected Financial Statements |
| 4 | Historical Financial Statements |

Schedule 1

**German Tennis Federation, et al. v. ATP Tour, Inc., et al.**
**Summary of EBITDA Analysis**

Note: All amounts are in thousands of the currency indicated

| | Reference | Amount (EURO's) | Exchange Rate (1) | Amount (US $'s) |
|---|---|---|---|---|
| Present Value (2009-2013) | Schedule 2 | € 10,607.4 | 1.4752 | $15,648.0 |
| Present Value (2013-forward) | Schedule 2 | 10,554.9 | 1.4752 | 15,570.6 |
| Present Value of EBITDA | | € 21,162.3 | | $31,218.6 |

Notes

(1) As of January 4, 2008 per the Wall Street Journal (at www.wsj.com).

Schedule 2

**German Tennis Federation, et al. v. ATP Tour, Inc., et al.**
**Calculation of the Present Value of EBITDA**

Note: All amounts are in thousands of EURO

| | Reference | 2009 | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|---|---|
| **Present Value of Projected EBITDA through 2013** | | | | | | | |
| Projected EBITDA | Schedule 3 | €3,356.2 | €3,388.7 | €3,422.6 | €3,456.8 | €3,491.4 | |
| Discount Factor (to 1/1/2008) | | 0.8087 | 0.7019 | 0.6092 | 0.5288 | 0.4590 | |
| Present Value of EBITDA | | €2,713.3 | €2,378.5 | €2,085.0 | €1,828.0 | €1,602.5 | €10,607.4 |

**Capitalization of Future Projected EBITDA**

| | | |
|---|---|---|
| 2013 EBITDA plus LTG | €3,526.3 | |
| Terminal Year Multiple | 7.0 | = 1 / (Discount Rate – Long Term Growth Rate) |
| Capitalized Value | 24,684 | |
| Present Value Factor (6 years) | 0.4276 | |
| Present Value (2013-forward) | €10,554.9 | |

| | | |
|---|---|---|
| Discount Rate = | 15.21% | (1) |
| Long Term Growth Rate = | 1.00% | |

**Notes**

(1) Source: Morningstar, "International Cost of Capital Report 2007."

| | |
|---|---|
| "Country Risk Rating" model | 11.91% |
| "International CAPM" model | 18.51% |
| Mid-point | 15.21% |

Schedule 3

German Tennis Federation, et al. v. ATP Tour, Inc., et al.
Actual and Projected Financial Statements

Note: All amounts are in thousands of EURO

Schedule 4

German Tennis Federation, et al. v. ATP Tour, Inc., et al.
Historical Financial Statements

Note: All amounts are in thousands of EURO

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Projected 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | | | |
| Sponsorship | €1,618.2 | €1,618.2 | €1,965.4 | €2,824.0 | €1,768.0 | €1,768.0 | €1,978.7 | €1,653.6 | €510.6 | €860.1 | €1,439.0 | €1,637.7 | €1,848.0 |
| Ticketing/Hospitality/Parking | 144.7 | 163.8 | 251.0 | 200.7 | 149.0 | 162.0 | 176.5 | 3.1 | 520.0 | 541.0 | 480.1 | 428.7 | 440.0 |
| Tickets | 2,945.7 | 3,316.1 | 2,851.1 | 2,422.3 | 1,922.0 | 2,118.0 | 2,163.6 | 1,737.9 | 1,543.0 | 1,604.0 | 1,472.6 | 1,408.9 | 1,600.0 |
| Television (2002 TPL) | 3,007.8 | 3,323.4 | 3,579.0 | 3,834.7 | 4,114.0 | 0.0 | 0.0 | 525.6 | 277.0 | 382.0 | 284.0 | 383.7 | 383.7 |
| Food and Beverage | 187.8 | 273.1 | 286.1 | 261.7 | 243.0 | 306.0 | 324.2 | 288.4 | 327.0 | 380.0 | 384.0 | 341.9 | 380.0 |
| Souvenir/Merchandise | 0.0 | 0.0 | 0.0 | 2.8 | 0.0 | 0.0 | 0.0 | 8.0 | 0.0 | 8.3 | 19.0 | 17.8 | 18.0 |
| ISL Marketing/Marketing | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7,398.0 | 8,595.2 | 2,461.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other | 34.8 | 121.0 | 160.0 | 87.2 | 100.0 | 232.0 | 603.5 | 44.3 | 140.0 | 131.0 | 100.0 | 91.7 | 100.0 |
| Government/Other Organization Support | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2,280.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Revenues** | 7,976.6 | 8,847.6 | 9,090.6 | 9,463.4 | 8,314.0 | 11,973.0 | 13,814.7 | 9,699.2 | 5,575.5 | 3,656.4 | 4,172.7 | 4,352.4 | 4,736.7 |
| **Expenses** | | | | | | | | | | | | | |
| Prize Money incl. ATP fee | 1,266.9 | 1,743.0 | 1,896.6 | 2,228.8 | 2,136.0 | 2,776.0 | 3,321.4 | 3,001.0 | 2,476.0 | 2,467.4 | 2,112.2 | 2,113.1 | 2,112.6 |
| Player Hospitality/Services | 384.1 | 404.4 | 155.8 | 214.3 | 159.0 | 185.0 | 203.1 | 180.5 | 112.6 | 117.6 | 112.4 | 122.1 | 141.9 |
| Marketing/Media | 71.6 | 182.4 | 500.9 | 277.0 | 206.0 | 185.0 | 314.4 | 249.0 | 450.4 | 422.2 | 398.5 | 454.8 | 488.7 |
| Television | 152.1 | 39.4 | 211.7 | 384.2 | 380.0 | 636.0 | 629.7 | 374.8 | 70.7 | 9.8 | 61.2 | 21.8 | 8.0 |
| Site costs | 0.0 | 0.0 | 0.0 | 0.0 | 3.0 | 2.0 | 328.0 | 282.8 | 646.2 | 655.1 | 740.2 | 773.3 | 623.8 |
| Facility expenses | 113.8 | 250.8 | 160.4 | 124.1 | 728.0 | 619.0 | 644.6 | 544.6 | 116.1 | 113.2 | 115.4 | 113.8 | 118.5 |
| Tournament operations | 415.7 | 687.3 | 430.2 | 440.3 | 183.0 | 123.0 | 334.4 | 315.0 | 501.1 | 495.2 | 434.2 | 498.9 | 570.2 |
| Food and beverage | 0.0 | 0.0 | 182.2 | 188.8 | 160.0 | 185.0 | 315.6 | 254.9 | 314.9 | 296.4 | 278.3 | 298.4 | 333.1 |
| Souvenir/Merchandise | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.0 | 5.0 | 11.0 | 26.9 | 0.0 |
| General and administrative | 766.5 | 664.4 | 628.6 | 468.8 | 413.0 | 424.0 | 383.3 | 378.3 | 714.4 | 805.5 | 735.8 | 737.2 | 834.9 |
| ISL/Agency Costs | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4,703.0 | 5,065.7 | 1,361.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Capital Costs / Interest | 132.2 | 482.2 | 968.1 | 1,180.3 | 1,128.9 | 834.5 | 466.1 | 447.1 | 0.0 | 0.0 | 0.0 | 0.0 | 32.1 |
| Depreciation | 516.1 | 585.6 | 728.6 | 1,160.3 | 1,343.1 | 634.5 | 693.9 | 679.9 | 678.7 | 630.2 | 668.0 | 32.1 | 32.1 |
| Other | 10.1 | 13.8 | 23.2 | 5.8 | 107.0 | 16.0 | 49.4 | 30.5 | 80.5 | 62.6 | 68.7 | 18.2 | 60.0 |
| **Total Expenses and Outflows** | 3,862.1 | 5,202.7 | 6,786.1 | 7,204.0 | 6,923.0 | 11,589.8 | 13,516.4 | 8,520.3 | 5,163.6 | 6,004.9 | 5,729.9 | 5,198.6 | 5,491.6 |
| **Revenues over Expenses and Outflows** | 4,116.5 | 3,644.9 | 3,281.5 | 2,249.4 | 1,391.0 | 403.1 | 298.3 | (1,821.1) | (668.1) | (2,408.5) | (1,557.2) | (837.2) | (754.9) |
| Plus: Depreciation | 516.1 | 585.6 | 728.6 | 1,731.0 | 1,243.1 | 969.4 | 669.5 | 679.9 | 678.7 | 630.2 | 668.0 | 32.1 | 32.1 |
| Plus: Capital Costs/Interest | 132.2 | 482.2 | 968.1 | 1,180.3 | 1,128.9 | 634.5 | 496.1 | 447.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **EBITDA** | €4,763.8 | €4,712.6 | €4,978.2 | €5,160.7 | €3,861.0 | €1,807.0 | €1,463.9 | (694.1) | €10.6 | (1,778.3) | (881.2) | (805.1) | (722.6) |

# EXHIBIT 13

BOCA RATON
BOSTON
LONDON
LOS ANGELES
1585 Broadway                    NEW ORLEANS
New York, NY  10036-8299         NEWARK
Telephone 212.969.3000           PARIS
Fax 212.969.2900                 SÃO PAULO
                                 WASHINGTON

# PROSKAUER ROSE LLP

Colin A. Underwood
Partner

Direct Dial 212.969.3350
cunderwood@proskauer.com

February 11, 2008

**BY EMAIL**

Hamish Cohen, Esq.
Barnes & Thornburg LLP
1313 Merchants Bank Building
11 South Meridian Street, 13th Floor
Indianapolis, IN 46024

Re:    Deutscher Tennis Bund v. ATP Tour, Inc., 07-178

Dear Hamish:

At approximately 7:22 this evening, you emailed a purported "response" to certain of Mr. Greenhalgh's opinions concerning damages in this action.  As you know, we are taking the deposition of Plaintiffs' proffered damages expert, Mr. Kleinrichert, tomorrow in Indianapolis beginning at 8 a.m. and, as I explained to you earlier today, we have had to travel to Indiana today.  This meant that I was not even in my office when you sent the "response" after hours tonight.

The supposed "response" consists of multiple, new financial "schedules," with absolutely no explanation or accompanying text of any kind.  Your letter states that your law firm prepared the "response."  There is no supporting expert report nor any other proffer of foundation.  Nor is there any statement of the data or other information considered in preparing the "response."  Indeed, the "schedules" do not cite any record evidence nor even specify the organization or circumstances that they purport to analyze.

Moreover, your explanation for serving this untimely "response," namely, that it relates to "newly-disclosed opinions, identified for the first time in Mr. Greenhalgh's testimony," is specious.  First, I note that Mr. Greenhalgh's deposition was last Wednesday, meaning that you have had more than five days to raise any response to his testimony.  Waiting until the eve of your expert's deposition is neither justified nor reasonable.  (I note that when we spoke twice earlier today, you did not even mention that you planned to serve a "response" this evening.)  More importantly, Mr. Greenhalgh's opinions were clearly identified in the very paragraphs of his report that you cite, and he added nothing to those opinions when he explained them in his deposition.

**PROSKAUER ROSE LLP**

Hamish S. Cohen
February 11, 2008
Page 2

We object to the "response" in its entirety, including because, to the extent Plaintiffs purport to offer the "response" as "expert" opinion (whether through Mr. Kleinrichert or otherwise): (a) it is served in violation of the So Ordered expert discovery schedule; (b) it is in violation of FRCP 26; (c) there is no cause, let alone good cause, for its untimely service; (d) any such "opinions" could have and should have been proffered in Mr. Kleinrichert's January 7, 2008 report or at the very least in a properly served reply report on February 1; and (e) the untimely service and the lack of explanation, citations, foundation, and compliance with FRCP 26 is prejudicial, not least because it was provided on the eve of Mr. Kleinrichert's deposition.

Defendants reserve all rights with respect to the "response," including the right (a) to move to strike the "response," (b) to preclude any testimony concerning the analyses stated therein, and (c) to respond to the "response" if Plaintiffs are permitted to offer it or testimony concerning it in these proceedings.

Defendants' deposition of Mr. Kleinrichert tomorrow is without waiver of and fully preserving all rights, including those stated above.

Sincerely,

Colin A. Underwood

Index

German Tennis Federation, et al. v. ATP Tour, Inc., et al.
Index of Schedules

| Schedule | Description |
| --- | --- |
| 1 | Summary of EBITDA Analysis |
| 2 | Calculation of the Present Value of EBITDA |
| 3 | Actual and Projected Financial Statements |
| 4 | Historical Financial Statements |

Schedule 1

German Tennis Federation, et al. v. ATP Tour, Inc., et al.
Summary of EBITDA Analysis

Note: All amounts are in thousands of the currency indicated

| | Reference | Amount (EURO's) | Exchange Rate (1) | Amount (US $'s) |
|---|---|---|---|---|
| Present Value (2009-2013) | Schedule 2 | € 10,607.4 | 1.4752 | $15,648.0 |
| Present Value (2013-forward) | Schedule 2 | 10,554.9 | 1.4752 | 15,570.6 |
| Present Value of EBITDA | | € 21,162.3 | | $31,218.6 |

Notes

(1)  As of January 4, 2008 per the Wall Street Journal (at www.wsj.com).

Schedule 2

**German Tennis Federation, et al. v. ATP Tour, Inc., et al.**
**Calculation of the Present Value of EBITDA**

Note: All amounts are in thousands of EURO

| | Reference | 2009 | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|---|---|
| **Present Value of Projected EBITDA through 2013** | | | | | | | |
| Projected EBITDA | Schedule 3 | €3,355.2 | €3,388.7 | €3,422.6 | €3,456.8 | €3,491.4 | |
| Discount Factor (to 1/1/2008) | | 0.8087 | 0.7019 | 0.6092 | 0.5288 | 0.4590 | |
| Present Value of EBITDA | | €2,713.3 | €2,378.5 | €2,085.0 | €1,828.0 | €1,602.5 | €10,607.4 |
| | | | | | | | |
| **Capitalization of Future Projected EBITDA** | | | | | | | |
| 2013 EBITDA plus LTG | | €3,526.3 | | | | | |
| Terminal Year Multiple | | 7.0 | | | | | |
| Capitalized Value | | 24,684 | | | | | |
| Present Value Factor (6 years) | | 0.4276 | | | | | |
| Present Value (2013-forward) | | €10,554.9 | | | | | |

Discount Rate = 15.21% (1)

Long Term Growth Rate = 1.00%

= 1 / (Discount Rate – Long Term Growth Rate)

**Notes**

(1) Source: Morningstar, "International Cost of Capital Report 2007."

| | |
|---|---|
| "Country Risk Rating" model | 11.91% |
| "International CAPM" model | 18.51% |
| Mid-point | 15.21% |

Page 1 of 1

Schedule 4

German Tennis Federation, et al. v. ATP Tour, Inc., et al.
Historical Financial Statements

Note: All amounts are in thousands of EURO

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Projected 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | | | |
| Sponsorship | €1,618.2 | €1,618.2 | €1,963.4 | €2,824.0 | €1,766.0 | €1,759.0 | €1,976.7 | €1,853.6 | €610.5 | €660.1 | €1,439.0 | €1,637.7 | €1,848.0 |
| Tele/Hospitality/Parking | 144.7 | 192.9 | 251.0 | 200.7 | 149.0 | 162.0 | 178.5 | 3.1 | 520.0 | 541.0 | 480.1 | 420.7 | 440.0 |
| Tickets | 2,945.7 | 3,316.1 | 2,851.1 | 2,422.3 | 1,922.0 | 2,118.0 | 2,183.6 | 626.6 | 1,643.0 | 1,804.0 | 1,472.6 | 1,488.5 | 1,500.0 |
| Television (2002 TPL) | 3,067.9 | 3,322.4 | 3,578.0 | 3,834.7 | 4,114.0 | 0.0 | 0.0 | 625.6 | 277.0 | 382.0 | 294.0 | 383.7 | 383.7 |
| Food and Beverage | 167.6 | 273.1 | 286.1 | 281.7 | 243.0 | 305.0 | 374.2 | 283.4 | 327.0 | 360.0 | 386.0 | 341.9 | 350.0 |
| Souvenir/Merchandise | 0.0 | 0.0 | 0.0 | 2.8 | 0.0 | 0.0 | 0.0 | 0.0 | 8.0 | 8.3 | 19.0 | 17.6 | 15.0 |
| ISL Matching/Shortfall/right | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7,398.0 | 6,995.2 | 2,451.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other | 34.8 | 131.0 | 160.0 | 87.2 | 100.0 | 232.0 | 503.5 | 44.3 | 140.0 | 131.0 | 100.0 | 91.7 | 100.0 |
| Government/Other Organization Support | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2,250.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Revenues** | 7,978.6 | 8,847.6 | 9,080.6 | 9,453.4 | 8,314.0 | 11,973.0 | 13,814.7 | 8,699.2 | 6,576.5 | 3,956.4 | 4,172.7 | 4,382.4 | 4,736.7 |
| **Expenses** | | | | | | | | | | | | | |
| Prize Money incl. ATP fee | 1,295.9 | 1,743.0 | 1,896.8 | 2,228.6 | 2,158.0 | 2,776.0 | 3,321.4 | 3,001.0 | 2,476.0 | 2,457.4 | 2,112.2 | 2,113.1 | 2,112.8 |
| Player Hospitality/Services | 354.1 | 404.4 | 153.8 | 214.3 | 189.0 | 165.0 | 203.1 | 180.5 | 112.8 | 117.6 | 112.4 | 122.1 | 141.9 |
| Marketing/Media | 71.6 | 192.4 | 500.9 | 277.0 | 206.0 | 185.0 | 314.4 | 243.0 | 450.4 | 422.2 | 398.6 | 454.6 | 488.7 |
| Television | 182.1 | 38.4 | 211.7 | 364.2 | 360.0 | 936.0 | 928.7 | 374.8 | 70.7 | 9.8 | 61.2 | 21.8 | 8.0 |
| Site costs | 0.0 | 0.0 | 0.0 | 0.0 | 3.0 | 2.0 | 329.0 | 262.8 | 648.2 | 835.1 | 740.2 | 773.3 | 823.8 |
| Facility expenses | 113.8 | 250.8 | 160.4 | 124.1 | 728.0 | 618.0 | 544.6 | 544.6 | 114.1 | 113.2 | 113.4 | 113.8 | 116.5 |
| Tournament operations | 416.7 | 687.3 | 430.0 | 440.3 | 143.0 | 153.0 | 324.4 | 315.0 | 501.1 | 480.7 | 434.2 | 438.5 | 670.2 |
| Food and beverage | 0.0 | 0.0 | 196.2 | 188.8 | 180.0 | 180.0 | 316.8 | 268.9 | 314.9 | 289.4 | 276.3 | 296.4 | 333.1 |
| Souvenir/Merchandise | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.0 | 6.0 | 11.0 | 28.9 | 0.0 |
| General and administrative | 786.6 | 864.4 | 828.6 | 468.6 | 413.0 | 424.0 | 353.5 | 378.3 | 714.4 | 805.5 | 735.8 | 737.2 | 834.9 |
| ISU/Agency Costs | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4,703.0 | 5,065.7 | 1,801.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Capital Costs / Interest | 132.2 | 482.2 | 0.0 | 1,160.3 | 1,126.9 | 534.5 | 486.1 | 447.1 | 678.7 | 630.2 | 686.0 | 32.1 | 32.1 |
| Depreciation | 516.1 | 685.5 | 726.8 | 1,731.0 | 1,343.1 | 684.4 | 688.5 | 679.8 | 447.1 | 447.1 | 0.0 | 0.0 | 0.0 |
| Other | 10.1 | 13.5 | 23.2 | 5.8 | 107.0 | 18.0 | 48.4 | 30.5 | 60.5 | 62.6 | 66.7 | 18.2 | 50.0 |
| **Total Expenses and Outflow** | 3,882.1 | 5,202.7 | 5,798.1 | 7,204.0 | 6,923.0 | 11,569.9 | 13,516.4 | 8,520.3 | 6,143.6 | 6,064.9 | 5,729.9 | 5,199.6 | 5,491.6 |
| **Revenues over Expenses and Outflow** | 4,115.5 | 3,644.9 | 3,281.5 | 2,249.4 | 1,391.0 | 403.1 | 298.3 | (1,821.1) | (568.1) | (2,408.6) | (1,557.2) | (837.2) | (754.9) |
| Plus: Depreciation | 516.1 | 685.5 | 726.8 | 1,731.0 | 1,343.1 | 684.4 | 688.5 | 679.9 | 678.7 | 630.2 | 686.0 | 32.1 | 32.1 |
| Plus: Capital Costs/Interest | 132.2 | 482.2 | 969.1 | 1,160.3 | 1,126.9 | 534.5 | 447.1 | 447.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **EBITDA** | 4,763.8 | 4,712.6 | 4,977.2 | 5,140.7 | 3,861.0 | 1,607.0 | 1,463.9 | (694.1) | 110.6 | (1,778.3) | (891.2) | (805.1) | (722.8) |

# EXHIBIT 14

1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF DELAWARE
2

3

        DEUTSCHER TENNIS BUND          )
4       (GERMAN TENNIS FEDERATION),    )
        ROTHENBAUM SPORTS GMBH         )
5       TENNIS, AND QATAR TENNIS       )
        FEDERATION,                    )
6                                      )
                    Plaintiffs,        )
7                                      )
                  -v-                  ) CAUSE NO.
8                                      ) 07-178 (GMS)
                                       )
9       ATP TOUR, INC.,                )
        ETIENNE de VILLIERS,           )
10      CHARLES PASARELL,              )
        GRAHAM PEARCE, JACCO ELTINGH,  )
11      PERRY ROGERS, AND              )
        IGGY JANOVIC,                  )
12                                     )
                    Defendants.        )
13

14

15

16          The deposition upon oral examination of
        GARY G. KLEINRICHERT, a witness produced and sworn
17      before me, Michele K. Dew, CRR-RPR, Notary Public in and
        for the County of Marion, State of Indiana, taken on
18      behalf of the Defendants at the offices of Ice Miller,
        One American Square, 35th Floor, Indianapolis, Indiana,
19      on February 12, 2008, at 8:20 a.m., pursuant to the
        Federal Rules of Civil Procedure.
20

21

22

23

24

25

```
 1        Court were to determine that they are or are not

 2        entitled to damages for a period which that I've

 3        calculated a damage calculation is the Court's and

 4        jury's determination, not mine.

 5     Q  Have you calculated any damages arising out of any

 6        activity between 1999 and 2005?

 7     A  No.

 8     Q  Okay.  Where did you use the but for world that goes

 9        back to pre-2000?

10     A  In response to what I understood was offered as

11        opinions by Mr. Greenhall, I looked at what the cash

12        flows could have been realized by the GTF in the

13        absence of the alleged anticompetitive behavior,

14        including that that occurred back from 2000 forward.

15     Q  So in that calculation you took a but for world that

16        was but for the anticompetitive behavior that you

17        believe Plaintiffs alleged going back to the year

18        1999 or 2000?

19     A  The allegations made by the plaintiffs in the

20        Complaint speak for itself.  It's just my

21        recollection of what they say.  My recollection is

22        that the Complaint speaks to allegations of

23        anticompetitive behavior, including that in the

24        Brave New World and other anticompetitive behavior.

25             Mr. Greenhall describes in his report that
```

```
 1         refers to alleged anticompetitive behavior all the
 2         way back to 2000.  So in rebutting what I understand
 3         it now to be an opinion of Mr. Greenhall, I've as
 4         well done that to rebut his opinion.
 5    Q    Did you review Mr. Greenhall's testimony?
 6    A    No.
 7    Q    So what's your basis for testifying as to what
 8         Mr. Greenhall's opinions are or aren't?
 9    A    I have read his report, and I understand from Counsel
10         that what I didn't understand to be an opinion in his
11         report based on the way it's written that
12         Mr. Greenhall testified that it was his affirmative
13         opinion.  So I have gained that understanding from
14         Counsel.
15    Q    And did Mr. Greenhall reference conduct going back to
16         2000 in his report?
17    A    I'd have to reread his report, but my recollection is
18         yes.
19    Q    Okay.  Now, in order to determine damages, you have
20         to determine what the but for world is and calculate
21         the value of whatever Plaintiff holds in that but for
22         world; correct?
23    A    Sure, yes.
24    Q    I understand that it's up to the Court to decide what
25         the but for world should be, but in order to do your
```