IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 07-178-GMS |
| ATP TOUR, INC. et al., | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE OPINIONS OF DR. ANDREW ZIMBALIST**

Defendants' Motion in Limine No. 1 ("Motion") misrepresents Dr. Zimbalist's opinions, ignores the applicable legal framework, and disregards the generally accepted economic methodologies which were utilized properly by Dr. Zimbalist.

The Motion makes but one substantive argument: Dr. Zimbalist should be excluded because he "admits" that he lacked sufficient tournament-related pricing data to conduct a particular form of econometric cross-elasticity testing commonly referred to as "SSNIP tests."[1] This argument ignores the reality -- widely recognized by economists, antitrust regulators and Courts -- that such pricing data are typically unavailable. Generally accepted practice for economists identifying relevant markets does not require use of such an econometric test. Instead, economists using generally accepted practice identify relevant antitrust markets by identifying the narrowest possible market; broadening this market by adding the next-best

---

[1] Defendants did not produce this data, claiming it was not within their possession, custody, or control. Further, Defendants do not (and cannot) attack Dr. Zimbalist's qualifications - he is

1

substitutes; and then analyzing whether these next-best substitutes actually serve as substitutes for consumers using quantitative and qualitative indicia. This is exactly the methodology utilized by Dr. Zimbalist and Defendants' expert, Dr. Jonathan Walker.[2]

## I.    Economists Do Not Require Price Data To Define Relevant Markets.

Defendants claim Dr. Zimbalist should be excluded because he admits lacking sufficient price data to conduct an econometric SSNIP or cross-elasticity test. As set forth below, however, Dr. Walker also lacked pricing data and did no such analysis himself. This is not surprising. The necessary pricing data often, if not generally, does not exist and, in any case, is not required by antitrust economists.[3] "The procedure for defining a market in a merger case or Section 2 case can be rigorously described, *but the information required to implement the procedure is typically unavailable.* Few analysts (or courts) follow the rigorous procedure in either merger or Section 2 cases. Instead, most markets are defined with some guidance from theory and some qualitative knowledge." Market Definition, Use and Abuse, Dennis W. Carlton, April 2007[4] (hereinafter "Market Definition") (emphasis added); *see also* Federal Trade Commission, U.S. Department of Justice, Commentary on the Horizontal Merger Guidelines, 2006 ("Commentary"), 9 ("In the

---

frequently cited as one of the country's preeminent sports economists - or the fact that his opinions would be helpful to the jury.

[2] The Motion also argues that Dr. Zimbalist's opinions should be excluded in this matter as he was excluded by the *Kentucky Speedway* Court. Dr. Zimbalist's report in *Kentucky Speedway* is sealed and it cannot be reviewed by Plaintiffs, Defendants or this Court. Regardless, this argument is irrelevant, as is the fact that Dr. Zimbalist has, appropriately, been permitted to submit opinions to juries in numerous cases. Further, this decision is the subject of an appeal.

[3] In the unusual circumstances where sufficient price data is available, an econometric SSNIP test is still complicated, perhaps fatally so, by what has come to be known as the "cellophane fallacy." *See* Report, 6-7 and authorities cited therein.

[4] Copies of this document and of Dr. Carlton's biography are attached hereto as Ex. 1 & 2, respectively. Dr. Carlton, an MIT trained economist and a professor of Economics as the University of Chicago, drafted this DOJ Economic Analysis Group Discussion Paper in his role as Deputy Assistant Attorney General.

2

vast majority of cases, the Agencies largely rely on non-econometric evidence obtained primarily from customers and from business documents.").[5]

## II.     Dr. Zimbalist Utilized Generally Accepted and Validated Methodologies.

Dr. Zimbalist determined that there are six relevant markets: top-tier men's professional tennis; the input markets for men's professional player services and tournament "sanctions"; and the output markets for broadcasters, sponsors, and fans.[6] In doing so, Dr. Zimbalist properly utilized "the notion of product substitutability to delineate" the relevant markets by identifying the narrowest possible market(s) and then broadening them by examining the apparent nearest substitute product to examine whether these products are, in fact, substitutes for one another. *See* Dr. Zimbalist's Liability Report ("Report"), 6.[7]   He did so by utilizing two, independent methodologies: he analyzed (1) quantitative and qualitative indicia; and (2) barriers to entry and anticompetitive conduct.   These methodologies are generally accepted in the relevant scientific community and have been independently validated. Further, they comport precisely with the Merger Guidelines and established practices of economists. Commentary, 5-6; Market Definition, 1, 31-32.

*First*, Dr. Zimbalist analyzed both qualitative and quantitative indicia.  This analysis is generally accepted and utilized by antitrust economists.  Commentary, 5-6, 9, Market Definition, 1, 31-32.  In fact, Defendants' expert utilized this methodology exclusively.  *See* Walker Dep.,[8]

---

[5] The relevant pages of the Commentary are attached hereto as Ex. 3.
[6] Defendants erroneously state that Dr. Zimbalist found but one market, but as set forth below, his report and testimony set forth that there are numerous, relevant input and output antitrust markets.  Additionally, the copy of Dr. Zimbalist's deposition transcript does not reflect timely changes made by Dr. Zimbalist by errata sheet or during Dr. Zimbalist's cross-examination.  The errata sheet and the cross-examination are attached hereto as Ex. 4 and 5.
[7] Defendants' expert, Dr. Walker, did not do this.  Instead, he began his analysis with the broadest possible market: the market of all entertainment options.
[8] The relevant pages of Walker's deposition are attached hereto as Ex. 6.

45-48, 61-62 (Walker determined substitutability based upon indicia in record deposition and documentary evidence); 49, 61-62, 65, 67-69, 79-81 (he did not distinguish between qualitative and quantitative evidence). Further, while Dr. Zimbalist conducted econometric analyses relating to player participation, Walker conducted no econometric analysis whether as part of a SSNIP or cross-elasticity test or otherwise. *Id.* at 62-63, 67-69.[9]

Further, this type of analysis is generally accepted under the applicable legal framework outlined by the United States Supreme Court. *See Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1964). Pursuant to this analysis, a finder of fact analyzes "practical indicia" which operate as "evidentiary proxies for direct proof of substitutability. *Brown Shoe* said as much." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986); *JamSports & Entertainment LLC v. Paradama Productions, Inc.*, 336 F. Supp. 2d 824, 840-41 (N.D. Ill. 2004). The Guidelines themselves call for the consideration of practical indicia factors. *See* Guidelines, § 1.11 (setting forth four *Brown Shoe* factors); *Ansell Inc. v. Schmid Lab. Inc.*, 757 F. Supp. 467, 475 (D.N.J. 1991), *aff'd.*, 941 F.2d 1200 (3d Cir. 1991). Though it is not necessary to satisfy each of these indicia to determine whether there is "reasonable interchangeability of use or the cross-elasticity of demand between the products itself and substitutes for it," Dr. Zimbalist considered each of the practical indicia identified in *Brown Shoe* in ascertaining and examining the relevant markets.[10] *Brown Shoe*, 370 U.S. at 325; *L.A. Mem'l Coliseum Com'n v. NFL*, 726

---

[9] Walker states that his entire report is a SSNIP test because "he reviewed various sources of information indicating that [consumers] have multiple alternatives . . . ." *Id.* at 70-71. Walker never conducted an econometric analysis, however, of the effect of a 5% price increase (or decrease in input markets), nor could he. If, however, one accepts Walker at his word, then it is beyond dispute that Dr. Zimbalist's report is also a full SSNIP test, because he employed the same, and additional, methodologies.

[10] For example: Industry or public recognition of the submarket as a separate economic entity: Report at 8-10, 15-16, 21, 23, 34, 39-40; the products' peculiar characteristics and uses: *id.* at 8-11; 15-16, 23, 25-27, 40; unique production facilities: *id.* at 23, 25-27, 39-40; distinct customers:

F.2d 1381, 1392-93 (9th Cir. 1984).

*Second*, Dr. Zimbalist considered barriers to entry and anticompetitive conduct. Such evidence reinforces market definitions. *See, e.g.*, Commentary, 3; 10 & 12 ("The process of defining a relevant market is directly linked to competitive effects analysis."); *Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998). Dr. Zimbalist properly utilized this separate, generally accepted and appropriate methodology.[11] Dr. Walker did not do so. He admitted, however, that barriers to entry and anticompetitive conduct exist.[12]

Dr. Zimbalist's methodologies are generally accepted in the relevant scientific community and are independently validated. As he utilized appropriate methodologies and data, his opinions are admissible.

DATED: May 27, 2008

YOUNG CONAWAY STARGATT
& TAYLOR, LLP


*/s/ Karen E. Keller*
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6692
bflinn@ycst.com
kkeller@ycst.com

*Attorneys for Plaintiffs*

*Of Counsel:*

Robert D. MacGill
Daniel Gravelyn
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

---

*id.* at 15-16, 23, 25-27, 34-35; distinct prices: *id.* at 11, 22-23, 36-37; sensitivity to price changes: *id.* at 11, 22-23, 34-36; and specialized vendors: *id.* at 11-13, 15, 23, 25-27.
[11] Dr. Zimbalist analyzed a wide variety of anticompetitive activity and found that this analysis supports his conclusions. *See, e.g.*, Report, 21-45.
[12] *See, e.g.,* Walker Dep. 104-111 (Brave New World legislated to dictate player fields, which in turn affects tournament's ability to compete in sponsorship, broadcast and attendance marketplaces); 204-206 (special events rule, bonus pools and ranking points effect ability of a tournament to compete in the player services marketplace).

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, hereby certify that on May 27, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Lawrence C. Ashby, Esquire
> Philip Trainer, Jr., Esquire
> Carolyn Hake, Esquire
> Ashby & Geddes
> 500 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on May 27, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Bradley I. Ruskin, Esquire
> Jennifer R. Scullion, Esquire
> PROSKAUER ROSE
> 1585 Broadway
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
C. Barr Flinn  (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
jhiggins@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*

# EXHIBIT
# 1

ECONOMIC ANALYSIS GROUP
DISCUSSION PAPER

Market Definition:  Use and Abuse

by

Dennis W. Carlton*

EAG 07-6          April 2007

EAG Discussion Papers are the primary vehicle used to disseminate research from economists in the Economic Analysis Group (EAG) of the Antitrust Division. These papers are intended to inform interested individuals and institutions and of EAG's research program and to stimulate comment and criticism on economic issues related to antitrust policy and regulation. The analysis and conclusions expressed herein are solely those of the authors and do not represent the views of the United States Department of Justice.

Information on the EAG research program and discussion paper series may be obtained from Russell Pittman, Director of Economic Research, Economic Analysis Group, Antitrust Division, U.S. Department of Justice, BICN 10-000, Washington, DC 20530, or by e-mail at russell.pittman@usdoj.gov. Comments on specific papers may be addressed directly to the authors at the same mailing address or at their e-mail address.

Recent EAG Discussion Paper titles are listed at the end of this paper. To obtain a complete list of titles or to request single copies of individual papers, please write to Janet Ficco at the above mailing address or at janet.ficco@usdoj.gov or call (202) 307-3779. Beginning with papers issued in 1999, copies of individual papers are also available from the Social Science Research Network at www.ssrn.com.

---

* University of Chicago, NBER, U.S. Department of Justice. I thank Thomas Barnett, David Evans, Kenneth Heyer, James O'Connell, Hill Wellford and Gregory Werden for helpful discussions. The views expressed in this paper do not necessarily represent those of the Department of Justice where I serve as Deputy Assistant Attorney General.

**Abstract**

A "market" can be rigorously and precisely defined quantitatively, but the information to do so is typically not available.  Instead, markets are often defined based on qualitative information, leading to the possibility of errors.  I make some practical suggestions to mitigate such errors.  When markets are correctly defined, it is the change in market shares that is central to the antitrust analysis, though this is not how courts typically use market definition and shares to analyze Section 2 cases.  Unfortunately, there is only a weak link between change in market share and change in competitive performance, and that is why market definition and the use of market shares are very crude tools of analysis.  That is why their best use is as safe harbors to quickly screen out frivolous cases from those where the economic forces governing industry behavior need to be carefully studied.  But, I explain why even this use of market definition and market shares can be problematic in Section 2 cases.

Market definition and the market shares based on it continue to be a central focus of many antitrust cases. This is so despite the well understood limitations of such a methodology in providing an accurate guide to the competitiveness of an industry. The simplicity of the methodology is both its strength and weakness. Its strength is that it is easy to understand and seems intuitively correct – high market shares indicate that competition is weak, while low ones indicate the reverse. The weakness of the methodology is its failure to identify when high market shares may in fact not convey accurate information about an industry's competitiveness, or conversely when low market shares can mask a lack of competition. Although some may call for the elimination of the methodology as an analytic tool because of its limitations, its great strength is that it may prevent decision-makers from making egregious errors. I think its best use is to provide safe harbors so that firms in relatively competitive industries are not harassed with senseless antitrust suits and, if they are, such suits can be dispensed with at summary judgment.

A "market" can be rigorously and precisely defined quantitatively, but the information to do so is typically not available. Instead, markets are often defined based on qualitative information, leading to the possibility of errors. I make some practical suggestions to mitigate such errors. When markets are correctly defined, it is the change in market shares that is central to the antitrust analysis, though this is not how courts typically use market definition and shares to analyze Section 2 cases. Unfortunately, there is only a weak link between change in market share and change in competitive performance, and that is why market definition and the use of market shares are very crude tools of analysis. That is why their best use is as safe harbors to quickly screen out frivolous cases from those where the economic forces governing industry behavior need to be carefully studied. But, I explain why even this use of market definition and market shares can be problematic in Section 2 cases.

Although market definition, together with the calculation of market shares, is a crude methodology, if it is to be used, there are certain logical principles that one should follow. Otherwise, this methodology will become even cruder or, worse yet, misleading.  Once one has defined a market, one must understand why market shares are a very imprecise way of characterizing competition, and are, at most, the beginning point for an analysis, not the end point. The government agencies responsible for antitrust, the Federal Trade Commission and Department of Justice, recognize this limitation – it is explicit in the Merger Guidelines, for example – but courts often have less experience in antitrust matters and that can create problems with the use of market shares.

This paper is organized as follows.  Section II explains the purpose of market definition, namely the identification of "market power", a term whose meaning is often ambiguous.  The section explains that it is the change, not the level, of market power that is relevant in most antitrust cases.  Despite this, most single firm conduct (henceforth, Section 2) cases focus on the level of market power, a calculation for which market definition surprisingly turns out to be particularly problematic.[1]  Section III explains how economic theory combined with applicable assumptions tells us precisely what we want to know about the economic effect of mergers, cartels and various types of Section 2 behavior.   Using Section III as a framework, Section IV explains the economic principles underlying market definition and market share analysis, emphasizing the sometimes extreme information requirements one must have to define markets, or lacking that information the arbitrariness of market definition.  This analysis naturally leads to a discussion of the limitations of market definition and market shares as tools to use to arrive at the correct answer. It pays special attention to feasibility of implementation, and discusses merger and Section 2 cases

---

[1] Some of what I label single firm conduct cases (e.g., tying, vertical restraints) are covered by Section 1 of the Sherman Act.  I mean to include those cases when I refer to "Section 2" cases.

separately.  Section V explains how market definition can be a useful research tool, while Section VI discusses some common mistakes made in applying market definition.  Section VII describes how one would apply market definition in two complicated settings:  one where R & D is central and the other where goods are interrelated as complements, such as in "two-sided" markets where different market participants exert strong effects on each other.  Section VIII concludes with a discussion of how the best use of market definition and market shares is as a safe harbor.

## II.    What is the Purpose of Market Definition?

This section makes four points.  First, it answers what the goal of market definition is, namely to measure "market power."  Second, it explains an ambiguity in the definition of market power.  Third, it explains why it is the change in market power, not the level of market power, that is relevant to most antitrust analyses.  Finally, it explains the limitations of using predicted changes in market shares to estimate the change in market power.

Markets are defined so that when one calculates the share that a firm (or group of firms) comprise, one can assess whether that firm has significant "market power".  Roughly speaking, "market power" means that the industry's behavior deviates from perfect competition.  One standard definition of market power is the ability to set price profitability above the competitive level, which is usually taken to mean marginal cost.  For this definition to make sense there must be a possibility that competition could establish the "competitive level."  Let's suppose that is so – for example consider an industry where there are constant returns to scale (it costs $C$ to produce each unit) and many firms.  We can contrast price in that industry to an industry with only one (or a few firms) and ask whether the price in the latter case is above the competitive price, $C$.  If it is, we can then ask whether the deviation is big enough to be considered a "significant" enough deviation from the competitive level to justify an antitrust concern that could trigger an antitrust

3

intervention as, for example, when the market power is created by merger or some other action. Of course, any such intervention carries the risk that the decision will be in error and will do more harm than good.

As far as I know, there are no judicial standards to determine how large a deviation of price from $C$ constitutes "significant." The consequence of declaring a specific deviation level as "significant" is that antitrust decisions based on market shares will be made and therefore a decision theoretic framework in which one trades off the expected costs of type I and type II errors is the only one capable of answering the question of what constitutes a "significant" level. I have never seen any quantitative attempt to use such a framework to answer the question of how large a deviation of price from $C$ should be considered "significant." Furthermore, there is a time dimension that must also be analyzed. For how long should a price elevated above marginal cost persist before we attach the label "significant"? Answers to these questions can be specified based not on any such quantitative assessment but based on what "seems" reasonable. So, for example, Areeda and Turner (1978, vol. 2 P. 347) suggest using a 5% threshold in a discussion about what might constitute a significant price increase.[2]

Before readily accepting this 5% threshold, I note that numerous attempts to measure the gap between price and marginal cost estimate gaps in excess of 5% for industries that many would consider to be relatively competitive in that there is free entry and several firms. Roughly speaking, a monopolist facing a demand elasticity of 20 would price at about 5% above constant marginal

---

[2] Notice that if one uses a 5% price deviation (or any specified percent) as a criterion for "significant" deviation, then there can be a logical problem. Consider the following. Firm A and Firm B merge in New York causing prices to rise there from $100 to $105, or a 5% increase. The product is also shipped for $100 to Chicago and therefore, the Chicago price rises from $200 to $205, a 2-1/2% price increase. Is it sensible to say that a New York consumer has suffered a significant loss, but not the Chicago one, if each consumes one unit of the product? The problem arises because a percent criterion does not measure the deadweight loss to society, nor does it measure the harm to consumers.

cost, but many (most?) firms face much lower elasticities. Perhaps, in light of this, 5% may be ok to use to determine whether the change in market power is "significant" but a higher number may be appropriate to determine whether the level of market power is "significant". [3]

Suppose that unlike the previous example in which a competitive price could be defined, the industry is one in which there cannot be an equilibrium where price equals marginal cost. A good example is an industry in which there is a fixed cost of entry and then Cournot competition. Suppose further that there is free entry. The free entry condition guarantees that (economic) profits are zero (i.e., a competitive rate of return is earned on capital), but price will exceed $C$, marginal cost. There is often confusion between pricing at marginal cost and earning zero profits. In most industries, there is a deviation from perfect competition in that price exceeds marginal cost, yet free entry can still guarantee zero (expected) economic profit. Suppose profits are zero yet price exceeds marginal cost. Should we attached the label "market power" to describe this circumstance, or should we reserve that label for the case in which price exceeds marginal cost and profits are positive? Alternatively, as my textbook (Carlton and Perloff (2005), P. 93) suggests, should we label the first situation as "market power" and the second as "monopoly power"? Courts and analysts often fail to specify what definition they are using.

The fact that it is difficult to calculate either marginal cost or economic profits foreshadows that the direct determination of the level of market power is going to be hard no matter what definition is used. That is one reason why analysts use market share as a proxy for market power, but, as we will soon see, it may be no easier to define markets to calculate market share than it is to measure market power directly.

---

[3] Marginal cost can be difficult to estimate. It one approximates it as average variable cost, then one may erroneously measure that there is a gap between price and marginal cost when there is none as, for example, when price equals marginal and average cost and the marginal cost is upward sloping. In this situation, average variable cost underestimates marginal cost.

Although we have been discussing the <u>level</u> of market power, it is the <u>change</u> in market power that is (or should be) the focal point of most antitrust analysis. (This is not quite right. It is the change in welfare that should be the ultimate focus. But changes in market power can be informative about changes in welfare.) In a merger setting[4], it is a comparison between the market power in two different industry structures that one must analyze in order to predict whether price will rise post-merger. For example, all else equal, is a market where there are five firms with shares 15, 15, 20, 25, 25 significantly less competitive than a market in which the first two firms merge so that there are only four firms with shares 30, 20, 25 and 25? This strikes me as a well-posed question. Notice that the pre-merger <u>level</u> of market power is irrelevant for answering the question. It is only the <u>change</u> in market power that matters. One can answer a question about the change even through one does not know the initial level. Indeed, one can see why a market power definition based on price ($P$) in excess of marginal cost is particularly convenient to use here. Let $P_2$ be the post merger price and $P_1$ be the pre-merger price. The change in market power equals $(P_2 - C)$ minus $(P_1 - C)$ or $P_2 - P_1$. As long as C is unchanged as a result of the merger, the change in market power is measured as the change in prices. Notice how this approach focuses on the change in price (in the absence of other changes). To the extent that the merger creates efficiencies, so that the marginal cost of the merging parties will fall, this will make an analysis that focuses only on price in a hypothetical where costs do not change a conservative one in the sense that if a merger does not significantly raise price under the assumption of unchanged costs, one would reach the same conclusion if one took further account of any cost efficiencies.[5]

---

[4] Cartels and mergers involve similar considerations. For simplicity, I focus on mergers throughout the paper.

[5] Suppose price rose but quality improved. Although the next section shows how to handle this case precisely, for purposes here one should focus on the quality-adjusted price. Suppose price falls, but not as much as marginal cost. Consumers and society gain, so there should be no

Consider now a Section 2 case in which the issue is whether some alleged bad act (e.g., exclusive dealing) harmed competition. How should one measure whether there is significant market power? Should one measure it before or after the alleged bad act? Following the same logic as in the merger case, one should focus on the change in market power as a result of the alleged bad act and ask how much market power exists absent the alleged bad act and compare it to the market power that exists with the alleged bad act, keeping all else constant. The conceptual difficulty is that the alleged bad act may have has some efficiency justification, but price must typically rise in order to create the incentives to generate the efficiency. Indeed, an increase in market power may be desirable if it enables the firm to provide a higher quality product.[6]

For example, exclusive territories can provide incentives for firms to engage in the provision of services by giving them the ability to raise price as a result of the elimination of competition. Therefore, the product characteristics (including service) are not being held constant when one compares the price with and without the alleged bad act. This means that even if the alleged bad act is desirable in that it creates incentives for the provision of valued services to at least some consumers, and even if there are perfect substitutes to the product both with and without services, the analyst who looks at only price will mistakenly conclude that market power is created even though none is. The analyst concludes this because the analyst observes a lower price in the absence of the alleged bad act and, therefore, incorrectly reasons that the bad act created additional market power. This is why Section 2 cases can be much more complicated than a typical merger

---

antitrust concern even though market power has increased. Suppose price rose, but some costs (e.g., fixed costs) fell. Then one would have to do a more complicated analysis to determine whether total welfare rose if one believes that total welfare, not just consumer surplus, should be the proper objective of antitrust. These examples illustrate that it is the change in welfare, not market power, that is the ultimate focus of analysis. See Carlton (2007) and Heyer (2006).

[6] I use "product quality" broadly to include not just the physical characteristic of the product, but also the way it is sold.

case. <u>One expects a price increase as a result of the alleged bad act if the alleged bad act harms competition, but one could also expect a price increase even when the alleged bad act does not harm competition but improves product quality</u>. Therefore, looking only at the behavior of price before and after the alleged bad act does not answer whether the "bad" act really is harmful. One must dig further and examine, for example, in the case of exclusive distribution, whether some consumers are served better and whether rival manufacturers can still obtain efficient distribution. It is typically hard to trade off the benefit to some consumers from the improved service against the harm to others as a result of the elevated price. Moreover, especially when the services have been provided for many years, it would be wrong to postulate that a reduction in price from elimination of the special services associated with exclusive territories will not harm consumers. For the short term, that may be so, but eventually as the failure to educate consumers mounts over time, the long run impact on demand could be substantial.

Despite the logic of looking at the change in market power, courts in Section 2 cases often inquire about only the level of market power. In doing so, they are trying to create a safe harbor and shortcut the need to investigate whether market power increased and harmed competition. I discuss this point more fully in Section IV.

Because it is change in market power that is (or should be) the focus of an antitrust analysis, when one is using market shares as a proxy for market power one must focus on the change in shares that results from some particular antitrust decision. But it may be hard to predict the change in share. For example, if Firm A merges with Firm B, the industry will be more concentrated as a result and the analysis measures how that concentration changes as a result of the merger. The concentration measure is based on the pre-merger market shares of the individual firms as in, for example, the HHI index of concentration which equals the sum of the squared market shares of firms. So, if there are five firms, each with a market share of 20, and two merge so that the new

8

firm has a share of 40, the HHI rises from 2000 to 2800. We then ask whether that increase warrants concern that price might rise.[7] Notice that I have assumed that the post-merger share of the merged firm equals the sum of the pre-merger shares. That may be so the day after the merger, but need not remain so in the new equilibrium post-merger. When it is not so, then this method will be inaccurate as a guide to predicting how price will change based on how industry concentration (which depends on market shares) will change.[8] And, of course, this analysis presumes that a change in concentration will cause a change in price, a relationship that may not be true. Similarly, in a Section 2 context, one should be interested in answering how the alleged bad act alters the market share of the firm engaged in the action. If there are not observations on market share both before and after the alleged bad act began, this could be a source of difficulty.

## III.    Getting it Exactly Right

As a theoretical matter, if one knows the structure of demand for a product and all its substitutes, knows the cost curves of firms that currently produce (or could produce) the product, and knows the game that describes the competitive environment (e.g., static Cournot, static Bertrand, dynamic trigger strategies), then one can write down a model whose equilibrium reflects the outcome of all these economic forces. This is of course a tall order, but it is critical to know what one would want to measure before turning to proxies, such as market share.

Consider the case in which a merger is to occur. Suppose that Firm A is a dominant firm facing a competitive fringe with supply curve $S^*$ $(p)$. Firm 1 wishes to merge with a large segment of the competitive fringe so that after merger the competitive fringe will have supply of only

---

[7] In answering that question, the linkage between a change in HHI and a change in price could also depend on the level of HHI.

[8] This method can be adapted as long as one can use pre-merger shares to predict post-merger shares. We show how this can be done in the next section.

$S**(p)$ where $S** < S*$ for all $p$. If industry demand is $D (p)$, then the demand pre-merger facing

the dominant firm is $D (p) - S* (p)$ and the profit maximization yields that the pre-merger price p*

is determined by:

$$(1) \quad \frac{p*-mc}{p*} = \frac{-1}{E*}, \text{ where}$$

       $mc$ = marginal cost of Firm 1,

       $E*$ = elasticity of demand facing Firm 1 which equals $\frac{1}{s}E^D - E^S \left(\frac{1-s}{s}\right)$, where

       $E^{D=}$ demand elasticity of $D(p)$,

       $E^{S=}$ supply elasticity of $S(p)$, and

       $s$ = share of sales of dominant firm.

Landes and Posner (1981) use *(1)* to develop insights about how to define markets in their

seminal 1981 paper. It is of course easy to see that the deviation of price from marginal cost

depends not only on share $s$ (in of course the way intuition suggests: the firm has more market

power when $s$ is larger), but also on $E^D$ and $E^S$, elasticity concepts that depend on how demand or

supply changes as price changes. A share will not necessarily reflect either of these elasticities

accurately.

If Firm 1 merges, then the exact calculation of how price changes is the difference between

the pre-merger price $p*$ and the post-merger price $p**$ which is calculated exactly as in *(1)* but

with $S**(p)$ replacing $S* (p)$. We see that $p**$ will depend on not just how the merger affects the

shares of the dominant firm but also on supply and demand elasticities. We could enhance the

model and recognize that the merger could lower Firm 1's marginal cost, and that could easily be

reflected in the calculation of $p**$.

10

We can expand the analysis to include market structures other than a homogeneous product with a dominant firm and competitive fringe. Suppose, for example, that each firm $i$ faces demand $d_i(p_1, p_2 \ldots)$ where $i=1\ldots n$ is a listing of all products. If we know each firm's costs, and know the competitive game (e.g. Bertrand), we can solve for equilibrium prices pre-merger and post-merger. One does not necessarily need to know the cost curves if one is willing to specify the game. For example, if the game is Bertrand, then one can use profit maximization to derive an equation like (1), and calculate $mc$ from $p$ and the elasticity. This is a now standard type of merger simulation used to estimate so-called "unilateral" effects.

There is no reason to limit these simulations to cases where Bertrand is the competitive game, where the competitive game remains unchanged pre and post merger, where product quality is unchanged, or to static situations. If one allows for dynamic (repeated) games, one can address what the Guidelines call "coordinated effects". All of these complications are difficult to implement, but at least theoretically, these models allow the analyst to focus on what are the underlying forces that matter in influencing how the price will change as a result of the merger. These models show exactly why in the case of merger, market shares or changes in them, however measured, cannot possibly be anything but a crude guide to market power or its change, or to the change in price resulting from a merger.

Now consider Section 2 cases. In Section 2 cases, again the theoretically correct model can be described, though it may be difficult to implement in practice. Let $a$ be the alleged bad acts(s) and let $a^*$ be the act(s) that would occur if $a$ were not allowed. Then, the analyst needs to compare $p(a)$ to $p(a^*)$ where $p$ is the vector of all prices of the relevant products and $a$ and $a^*$ are actions that influence demand (e.g., selling effort) and costs. (The acts could also influence the types of competitive game.) A full analysis of the competitive consequences of act $a$ as compared to act $a^*$ requires an analysis of not just prices, but also how the different acts affect the quality of the

11

product to (some) consumers.  For example, if *a* represents vertical restrictions designed to increase sales information to the consumer, then the demand curve for a firm will be affected by whether *a* or *a*\* occurs.  Similarly, the supply capabilities of the firm and its rivals could depend on Firm 1's actions.  Taking these effects into account one can then calculate, at least theoretically, whether banning *a* and replacing it with *a*\* leads to an increase in welfare.

Let me summarize this section.  Although perhaps difficult to implement empirically, theoretical models produce clear results about how to calculate the effect of mergers or alleged bad acts under Section 2 on prices and consumer plus producer welfare.  I do not mean to suggest that the assumptions underlying the models are not contentious, or that these models can easily be implemented.[9]  I do mean that theory tells us how price and welfare will be determined and therefore theory tells us how to calculate the effect of either mergers or Section 2 behavior.

There is no model that I am aware of where market share (or more precisely its change) is the only variable that matters in predicting the change in either price or welfare.  Moreover, it is clear from most models, especially those involving differentiated products, that there is no theoretical need even to define a "market" to get to the correct answer.  At best, market definition and market shares can be used as a shortcut to start the analysis, especially when the correct analysis is hard to do.

Merger cases are typically much easier to analyze than Section 2 cases.  Merger cases will usually be handled by answering whether price will rise as a result of the merger.  Section 2 cases will usually be handled by asking whether the price increase is offset by some beneficial product change.  A focus on the level of market power (rather than its change) can allow a court to provide a safe harbor for either merger or Section 2 behavior if the level of market power after the merger

---

[9] See Carlton (2003, 2004) for a critique of how these models have been used.

or alleged bad act is low. Courts often use market share to decide that market power is low and we now turn to an examination of whether they can do that in a rigorous way.

### IV.     Market Definition

We have seen that the theoretically correct analysis may be difficult to implement empirically. In such cases, it is reasonable to resort to a simpler analysis as a first step and that is exactly what market definition and the use of market shares is designed to do. I will discuss merger cases separately from Section 2 cases because, as I have already explained, merger cases are logically easier to analyze.

### A.     Market Definition in Merger Cases

#### 1. Mergers -   Theory of Market Definition

In a merger case, one uses market shares to calculate industry concentration so as to determine the level of industry concentration and the change in industry concentration as a result of the merger. The implicit assumption is that increases in industry concentration lead to increases in price. (The effect of any particular change in concentration could depend on the level of concentration.) A typical starting assumption is that the post-merger share of the merged firm equals the sum of the pre-merger shares of the merging firms. This of course may not be so as, for example, when entry is easy. In such a case, the use of pre-merger market shares in this way may be inappropriate. But let's suppose that we are in an industry where post-merger the share of the merged firm is well predicted by the sum of the pre-merger shares of the merging firms, so that the use of pre-merger market shares is sensible. There are two virtually equivalent ways to define markets.

One is to rely on demand substitution to identify products and the geographic areas where they are sold and then separately to consider as market participants all those who would supply the product at the current price plus, say, 5%. This is roughly the approach of the Merger Guidelines. A second and virtually equivalent approach is to combine this procedure into one step and define the market to include all those products and areas that constrain prices of the product under analysis from either the demand or supply side. Product A is a demand substitute for Product B if a price increase in B causes consumers to substitute to A. Product A is a supply substitute for Product B, if a price increase in B causes firms that produce A to shift their capacity to the production of B.

To see the difference between the two alternative ways of defining a market, consider the following example. There are two products, nails and screws. Consumers do not substitute between them, so there is no substitution on the demand side. A monopolist of nails could profitably raise price by 5% above current levels as a result of a merger of all current and potential nail producers. Firm A makes screws, but could and would switch to producing nails if the price of nails rose by 5%, holding constant the price of screws, so there is supply substitution. Under the Merger Guidelines' approach, the market is nails, but when calculating shares, one considers all those nails that would be produced by Firm A and other firms if nail prices rose 5%.[10] Under the second approach, the market would consist of nails plus screws (somehow appropriately weighted, perhaps by value), and shares would be calculated accordingly. I will follow the first approach, but

---

[10] Typically, one uses the likely "capacity" of the firm to produce nails as a measure of its market participation. Needless to say, capacity can be hard to measure or even define. As a technical matter, this artifice of holding constant all prices of products outside the market need not be a correct description of what would happen if price of the product under analysis rose. For example, in the example in the text, the price of screws could rise as screw producers start producing nails, causing less switching to nails than in the text. This strikes me as one of many details that should not matter to the analysis and if they do, the analyst must think hard about the underlying economics using the theory of the previous section.

recognize that the second approach can also be a sensible way to proceed. Since market shares are only crude proxies for market power, these roughly equivalent approaches for calculating shares should not differ and, if they do, one should delve deeper into the underlying economics.[11]

The Merger Guidelines recognize the need to define a time dimension, a magnitude of increase and a benchmark price to approach the question of whether a merger raises an antitrust concern by increasing market power. For example, one could ask whether after the merger prices could be profitably increased above current levels[12] by a significant amount (e.g., 5%) for a significant time (e.g., 2 years). The Guidelines define a market to be consistent with this phrasing of the issue. A market is defined by thinking about a hypothetical monopolist. A monopolist of all of the products in a market would raise price profitability above current levels by, say 5%, for some time, say two years, on the assumption that the prices of all the products excluded from the market remain unchanged. In this thought experiment of using a hypothetical monopolist, there is not necessarily a unique set of products that determines the market, nor is there an unambiguous methodology of how to raise the price of each product in the market (should each go up by 5% or just on average rise by 5%?)[13]. These strike me as details that again, if they matter, would cause

---

[11] Proxies obviously can lead to erroneous conclusions under certain hypotheticals. I am not saying that these two approaches always yield the same result, but if they don't one should re-examine the underlying economics to make sure it is not a peculiarity of the proxy that is generating a strange result. See Baker (2006).

[12] The Guidelines use the expected future price if that can be predicted to be different from the current price. They also indicate they may use the competitive price if the current price exceeds it. The logic for the latter approach presumably is that the competitiveness of the industry is expected to increase in the future.

[13] One could add the condition, as the Guidelines do, that one use the smallest market and when it is necessary to add products to the candidate market one adds products to the market sequentially with the "closest" substitute product to the candidate market being added. Regarding which "price" to focus on, one could focus on the price of the products of the firms involved in the transaction when asking whether price will rise and one could assume that the hypothetical

me to pause about the usefulness of the proxy of market shares and to delve more deeply into the underlying economics as described in the previous section.

Aside from determining which products belong in the market, one must determine the geographic scope of the market. I would handle this in the same ways as product market definition is handled: by treating location as a product characteristic and asking the same type of questions as one does for inclusion of a product in the market. For example, apples in Chicago are in the same market as apples in Milwaukee, if an increase in the price of apples in Chicago would induce buyers to switch to buying apples in Milwaukee in such quantities as to defeat a price increase. Suppose no buyer would literally go to Milwaukee to buy these apples, but instead that DC Transport would pick them up and bring them to sell in Chicago. Technically, DC Transport has become a market participant in the market for apples in Chicago. Alternatively stated, there is supply substitution between apples in Milwaukee and those in Chicago. I would treat these two cases -- one involving the buyer traveling, the other involving DC Transport traveling -- in the same way. One could define the market to be apples in Milwaukee and Chicago, or one could define it using the other approach, in which the market is only Chicago, but DC Transport is a participant in that market. Again, this seems like a detail.[14]

---

monopolist sets the price of each product in the market optimally. I return to these points in the next section.

[14]The Guidelines define the geographic area based on the location of production, not consumption. Although this initially may seem odd, it really is not. Because there is an assumption of no geographic price discrimination in this part of the Guidelines, they come to the same result as I do above. Notice that the prices in Chicago and Milwaukee become linked in my example.

2. **Merger -- Practical Implementation of Market Definition**

The theory underlying market definition for mergers is logically coherent. A separate issue is whether it is implementable. It is possible to describe an econometric procedure to define markets (See, e.g., Werden (2002)). For any set of products $(a_1, a_2 \ldots \ldots a_n)$, estimate econometrically a demand system in which the demand for product $a_i$ depends on its own price and that of all other products. Suppose that product 1 is the product under analysis, such as when two producers of product 1 want to merge, and that we have ordered the products so that product 2 is the closest substitute for (product 1) and so on.[15] Now, assuming costs are known, calculate the price that a monopolist of just $a_1$ would charge. If that price exceeds the current average price for $a_1$ by, say, a 5%, stop. If not, add $a_2$, and calculate the optimal prices for $a_1$ and $a_2$. If (by some measure) the average price of $a_1$ and $a_2$ rises above current levels by, say, a 5%, stop. If not, continue. In this way, a market can be defined.

This econometric approach requires a tremendous amount of information about a demand system, information that is typically not available. Moreover, if it were available it seems odd to use it only in this way. The reason is that with such a detailed demand system available, it might well make sense to calculate directly the effect of the proposed merger. This can be done by a merger simulation, as described in the previous section, where one uses the demand system combined with various assumptions of the competitive game (e.g., Cournot or Bertrand) and

---

[15] It is a bit tricky to define exactly what one means by closest substitute to $a_1$. One could say it is the product $a_2$ such that the joint pricing of $a_1$ and $a_2$ allows the price of $a_1$ to be the highest. When the market consists of more than one product, it is less clear what a unique sensible definition is and differences in this definition can lead to differences in the products included in the market. Moreover, the procedure of adding the closest substitute does not necessarily lead to the smallest market in which a hypothetical monopolist would raise the price of $a_1$ by 5%. Again, these strike me as details that if they mattered to the analysis then one should examine more deeply the underlying economics.

perhaps cost, to predict what the new pricing will be if there is a merger.[16] This direct approach requires no market definition, but utilizes all the same information required to define a market. It is a much more refined way of making predictions on pricing than one based solely on market share. Indeed, this methodology can also account for the fact that products outside "the market" can affect the price under analysis and the prices of those products may themselves change in response to the merger, in contrast to the procedures for market definition under the Guidelines.[17] Market definition, with its dichotomous "in" or "out" classification, is a crude simplification and a merger simulation can be a more accurate approach that automatically takes account of demand and supply substitutability.

The drawback of merger simulation is that it requires not only extensive demand estimation, but assumptions about how firms will compete. Even if one has information on the former, many are uncomfortable about assumptions on the latter. (See, Carlton (2004)).

There are really two responses to this reluctance to use merger simulation. The merger simulation, when done under different assumptions, is really a way of revealing to the analyst the constraints on pricing that the demand system imposes and makes transparent all the underlying assumptions. The different merger simulations allow the analyst to see whether these constraints hold under a variety of assumptions. Second, if instead of doing a merger simulation, one defines a market and uses pre-merger market shares to calculate the change in the HHI, one is assuming that these market shares allow one to predict the price effect of a merger. That is, the price is assumed post-merger to depend on (pre-merger) market shares in a simple way (e.g., price is assumed to

---

[16] As discussed in the previous section, one could at least theoretically assume a repeated game (and so deal with a "coordinated effects" analysis). Although possible in theory, such simulations are not commonly used in antitrust matters, unlike merger simulations based on static games (e.g, Bertrand).

[17] The Guidelines would look at price changes in other products, entry responses, and other supply responses, but after the market is defined.

depend on just the HHI).  There is no such model that I am aware of that has this property.  There are models in which price depends on current concentration and other things such as elasticities, but not only are those models premised on assumptions that may not be relevant to the industry under analysis, worse yet, in such models there may not be a profit incentive to merge.[18]  (See, Salant et al. (1983), Farrell and Shapiro (1990)).  This is all a very long way of saying that the use of changes in market shares to calculate the change in the HHI is a very crude methodology for predicting whether a merger will increase price.  The use of market shares is at best viewed as a crude merger simulation, but lacks the logical consistency underlying merger simulation.  Its main attractiveness is its simplicity.

But there is a further problem.  I had assumed that a detailed econometric demand system together with knowledge of costs was available.  When it is not, then it is not possible to delineate a market with the precision that its definition demands.[19]  Instead, one attempts to use various types of evidence to do one's best to see whether the price constraining effect of one product upon another will be sufficient to prevent a significant price rise.  Although the clear theoretical construct of market definition can guide one, the absence of estimates of the demand (or cost) system subject this exercise to possible error and arbitrary judgments.  These errors can be mitigated by some of the types of econometric studies that I describe in the next section.

One alternative path to market definition in the absence of detailed econometric estimates of a demand system is simply to ask consumers to which products they would turn if price of the

---

[18] For example, in a Cournot model with constant returns to scale, one can show that
$(P-C)/P = HHI/E$ where $P$ is price, $C$ is cost, $E$ is the absolute value of the industry demand elasticity and $HHI$ is the sum of squared market shares.

[19] To define a market using the hypothetical monopolist test, one must specify marginal cost.  To do a merger simulation, one could also use cost information, or alternatively infer cost from the profit maximizing conditions that emerge from equilibrium of the assumed competitive game.

product under analysis rose by, say, 5%.  Notice that this set of products does not satisfy the market definition under the Guidelines because it may include products that attract so few switches that those products would not prevent a price increase.  Therefore, although this method is simple, markets defined in this way will tend to be overbroad unless one includes only those products for which there is "significant substitution" (how much is "significant"? – well if I define it precisely then I am back to an approach like that of the Merger Guidelines).  However, consumer responses as to their switching possibilities can give one a rough estimate of demand price elasticities and cross elasticities, and those can assist in defining a market.  (See Heyer (2007) for a more skeptical view of the value of relying on consumer responses.) [20]

I have not discussed "critical loss analysis" (see, Harris and Simons (1989)), because it is not an alternative method for defining markets.  When done correctly (as Harris and Simons recognize), it is simply a rephrasing of the hypothetical monopolist test.  It asks what is the critical amount of demand that has to be lost in response to a price rise before the price rise is unprofitable.  That is a question about how big the demand elasticity has to be to make a price increase unprofitable.  Critical loss can help one describe this critical demand elasticity, but it is not a new analytic tool and has been misused.  See Carlton (2004).

The methodology of market definition and market shares is an extremely crude way of assessing a merger's competitive effect, especially since market definition is usually not based on the extensive quantitative information required to define it rigorously.  The methodology can certainly be informative in many cases, but it is only the first step in an analysis that must delve into the economic facts of the industry.  It can be a useful guide, but only if subsequent analysis

---

[20] One implementable procedure to define markets is to identify products whose prices are highly correlated.  Stigler and Sherwin (1985) recommend this procedure.  Although it has quite serious drawbacks (see, Carlton and Perloff (2005), Chapter 20 and Werden and Froeb (1993)), the procedure can sometimes be a useful way to start an analysis.

confirms its message. The methodology's 0 or 1 nature (is a product in or out of the market?) together with the arbitrariness of certain decisions (e.g., why hold the price of products outside the market constant?), emphasizes its crudeness. Still, the use of market shares (or changes in them) is simple, and it can be thought of as the first step in a merger analysis. Its best use is likely to provide a safe harbor when industry concentration and shares of merging firms are low.

B.     **Market Definition in Section 2 Cases**

We have already discussed how the central issue in a Section 2 case is whether some alleged bad act enables additional market power to be exercised, and, if so, whether any exercise of additional market power is offset by the additional provision of valuable services made profitable as a result of the price increase. Estimating market power while adjusting for services provided can be difficult and it is even more difficult to figure out if an increase in market power is offset by improved services – the traditional pro-competitive explanation for many alleged bad acts.

Instead of focusing on whether the alleged bad act increases market power, the courts typically focus on whether there is market power and, if so, whether the alleged bad act is justified on pro-competitive grounds. One reason, I think, for this current emphasis on the level of market power (whether it is measured before or after the bad act often seems not to be a focus of attention) is because at the summary judgment stage, a case can be thrown out  if there is no market power, while it is thought to be more difficult to get the case thrown out at summary judgment if one concedes market power but defends by claiming that the action is pro-competitive. Because the courts focus on existing levels of market power, this has required markets to be defined in Section 2 cases to see whether market power exists (presumably, after the alleged bad act has occurred). My experience is that courts ask whether market power exists in

21

the presence of the alleged bad act, a question with the potential to be answered in a misleading way if one ignores the efficiency justification for the alleged bad act, as I explained in a previous section. Moreover, such an analysis fails to consider whether the "bad" act creates any additional market power. Still, the procedure does have a logic because if there is no market power after the alleged bad act, then the antitrust inquiry ends.

To answer the question of whether the firm has market power, some have tried to adapt the procedure of the Merger Guidelines to define a market in a Section 2 context. As a logical matter, this initially seems fine with the benchmark price now no longer being the current price but rather the competitive price. So the hypothetical monopolist test to define a market is as follows: consider all those products such that a hypothetical monopolist of those products would raise price above the competitive level by, say, 5%. One then calculates the market share of the firm in this market and if it is high one concludes that there is market power. But what sense does this make? Suppose the current price is $10. If one <u>knows</u> that the competitive price is $5, the market definition exercise is <u>useless!</u> One can observe whether the current price($10) exceeds the competitive price($5) and the deviation is the measure of market power. There is no need to define a market and calculate market share in order to see whether the market share is so high that one can safely conclude that $10 is higher than $5. Alternatively, if, one does not know the competitive price, there is <u>no</u> way to implement this market definition test.[21]

But a bit more analysis shows that the logic of using the competitive price as the benchmark price is not necessarily correct. In a merger case, we use the current price as the benchmark, not the competitive price. That is sensible because the relevant question is whether the merger will raise price from current levels. By similar logic, in a Section 2 case we should use the price that

---

[21] It is also correct to say that in the absence of cost information, one cannot define a market in a merger case using the Guidelines in the rigorous way I described earlier.

would prevail in the absence of the "bad" act as the benchmark price in order to define a market and calculate market shares in an effort to determine whether the firm has enough market power so that it could possibly use (or have used) the "bad" act to elevate price.[22]    The hypothetical monopolist test for market definition in a Section 2 case should be:  include all those products such that the hypothetical monopolist would raise price by 5% above the benchmark price defined as the price that would prevail absent the "bad" act.  If the firm's market share is low, the inquiry should end.[23]    It may sometimes be difficult to figure out that benchmark price, though not always.  For example, if the "bad" act has not yet taken effect, the current price can be used as the benchmark price.[24]  But when, as will commonly occur, this is not the case, the analyst could have difficulty.

In this situation, one is in the uncomfortable position of realizing how arbitrary market definition can be in Section 2 cases and how this arbitrariness can lead to errors.  Perhaps the best one can say is that one might look at "similar" firms and throw out the antitrust case if there are enough of them-but that is a cop out unless one can define what "similar" means.  If one is able to establish a benchmark price because there is a consensus that in some areas (or time periods) there are no bad acts, one can then use econometric techniques to try to use those benchmark areas and their characteristics to calculate the benchmark price in any area.  This can be a useful approach, and one I describe in the next section.

---

[22]If possible, the expected post bad act market share of the firm should be used.

[23] If one concludes that there is market power, then as described previously, one should compare the price effect of the "bad" act to any efficiency effects associated with the "bad" act.  The change in market share pre and post "bad" act may give insight into the likely price effect.

[24] If the benchmark price is known and the price after the "bad" act is known, then, as already explained, there is no need to go to the effort to define a market.  If the benchmark price is not known, one cannot define the correct market.  If the benchmark price is known, but the price after the "bad" act is not known, then one may benefit from defining a market and asking whether the "bad" act is likely to allow the firm to achieve a sufficiently high market share that market power concerns arise.  If not, the inquiry ends.

## V. **Is Market Definition a Useful Tool for Understanding Market Behavior?**

So far I have discussed market definition only in the context of antitrust cases, but what about as a research tool to understand economic behavior? Should economists study market definition and market shares in their academic research and if so wouldn't such studies be relevant in antitrust cases? It is undeniable that most of the current interest in market definition stems from its use in antitrust cases. But, although it is no longer as popular as it once was, there was a flourishing literature in relating market performance to market structure measured by market shares. This literature has been heavily criticized (See, e.g., Chapter 8 of Carlton and Perloff (2005)) because, among other reasons, a market share does not have the same economic effect across industries, which differ enormously, and because market share is an <u>outcome</u> of industry fundamentals, not a basic <u>characteristic</u> of them. Such studies are sometimes still used in academic studies and can be done properly. They are used in antitrust studies and, under appropriate circumtstances, can be a powerful tool not just for checking market definition, but for understanding the economic behavior of the industry. (See, e.g., Carlton and Sider (1999) and Carlton (2003, 2004)).

Consider a proposed merger between two firms. One may well be able to use the past historical relationship between price and concentration to predict the effect of the merger. One could use regression analysis to estimate this relationship, though caution is needed to deal with the determination on concentration.[25] Simply analyzing the relation between price and concentration over time may tell one nothing about the relation of competitiveness to concentration absent a theory explaining why concentration might be changing over time. However, it is sometimes

---

[25] The statistical issue is whether concentration should be treated as an exogenous or endogenous variable.

possible to construct such theories and to use the estimated relationship between price and concentration as a predictor of a merger's effects. For example, in the railroad industry where tracks were laid many years ago, it seems sensible to predict the effect of a merger of two railroads that will reduce the number of railroads serving a route from 3 to 2 by comparing pricing on routes with 3 railroads to those with 2, after adjusting for other route characteristics. In fact, a recent paper (Peters (2007)) analyzing the airline industry shows that such predictions based on the historical relationship of price to concentration are often as or more accurate than those based on merger simulation.

Such econometric studies can also shed light on the appropriate market definition. For example, suppose there is a question whether Product B is in the same market with Product A. A regression reveals that there is a relation between the price of Product A and market concentration based on a market definition excluding Product B, but no relation based on a market definition including Product B. Under appropriate statistical circumstances, that can be quite informative as to the correct market definition and can indicate that Product B is not in the same market as Product A. I have often found these types of econometric analyses helpful in understanding both market definition and predicting the consequence of mergers. (See, Carlton (2003) and the similar views of Coleman and Scheffman (2003)).

Similarly, in the context of Section 2 cases, one can use econometric techniques to explore the direct effect of a "bad" act if one is fortunate enough to have data on periods when the "bad" act was in use and not in use. Again, one has to make sure that one can deal with the statistical issue of exogeneity properly, but if so these studies can be valuable. One can also use the same type of studies as just described in the merger context to test which definitions of market make sense and are useful for prediction.

## VI.   Common Mistakes in Defining Markets

Although I have stressed the limitations of the methodology of using market definition and market share, I have also explained that the methodology still can sometimes be useful if done in a way that captures the underlying economics, especially in the context of merger cases. In this section, I list a few of what I have found to be common mistakes:

1. Firm 2 is producing at capacity. Hence, it cannot increase supply to offset a hypothetical price increase by Firm 1, and accordingly should be excluded as a participant from the market.

This logic correctly recognizes that Firm 2's zero supply elasticity means that increases in Firm 2's output cannot constrain Firm 1's price. But it fails to recognize that Firm 2's existing production constrains Firm 1's ability to raise price. Suppose it costs $1 to make one unit of wheat. In equilibrium, 1000 units are sold at $1 each. Imagine 1000 wheat farmers including Firms 1 and 2 each of whom produces one (and only one) unit. Each wheat farmer likely faces a highly elastic demand precisely because of the output of the others, and would on its own be unable to increase the price of wheat. Excluding capacity constrained wheat farmers would incorrectly indicate that Firm 1 has market power.[26]

2. Firm 1 produces steel. It has several long-term customers. The capacity to serve those customers should not be considered in calculating the market for steel in evaluating a merger involving other firms.

If the customers have signed long term fixed price contracts with Firm 1, but the steel can be resold, then the capacity to produce that steel should be in the market, but should not be attributed to Firm 1. If the steel cannot be resold, the contract will not be breached, and the output

---

[26] The elasticity of the residual demand curve facing a single farmer equals $E/s$ where $E$ is the aggregate demand elasticity and $s$ is the market share of our single farmer. This elasticity facing a farmer will be large for small $s$.

produced by these customers does not affect other customers of steel, then the steel sold to these customers should be excluded from the market. However, if the output of these customers does constrain the prices of the products of other steel customers, then the steel output to these customers should be included in the market, but should not be attributed to Firm 1. The presence of these customers constrains the price that these other steel customers can pay for steel. If there is no fixed price contract, then the capacity is attributable to Firm 1. The price to long term customers will be set in the marketplace where the price reflects competition amongst many other steel producers.

3. <u>Used goods sell for a lower price than new goods and therefore are not part of the same market as new goods.</u>

Used goods sell for a lower price than new goods for many reasons ,including the fact that they have fewer years of service to provide. Whether they are in the same market as new goods depends on how good a substitute they are for various demanders. For example, if used goods have greater reliability problems than new goods, there may be a class of consumers willing to pay a (length adjusted) price that reflects a premium for the reliability. That could mean that used and new goods do not tightly constrain each other's prices, but that is an empirical question. See, Carlton and Gertner (1989).

## VII.   **Market Definition in Complicated Settings**

I now discuss two somewhat complicated settings and see how useful market definition can be. Since we have already seen its limitations in even relatively simple settings, we should not be surprised that its limitations are even more severe as the circumstances become more complicated. We discuss two settings. One is where R & D is important. In such settings, I ask whether it is sensible to think of an "R & D innovation market", a concept that was used by the

Department of Justice in the 1990s. The second setting is one involving what are called "two-sided markets". (See, Evans and Schmalensee (2005) and Rochet and Tirole (2004)). These are markets where multiple inputs and outputs require coordination in order to produce desirable products. One example is a mall in which the mall owner must account for the fact that some stores attract customers to the mall, yet those customers buy at other stores in the mall. Another example is an operating system for computers, where the owner of the operating system wishes to induce application programmers to write applications programs for its operating system so as to make its operating system attractive to users. In such cases, there are interactions between different "sides" of the market that should be internalized. So, for example, the mall owner subsidizes the rent of the bookstore, but charges a high rent to the restaurant. Or, the owner of the operating system subsidizes application programmers, but charges users a high price for the operating system. Other common examples of two-sided markets include dating clubs, game stations and games, and card payment systems. As far as I know, there has been no recognition yet by courts of market definition in two-sided markets.

### A.    <u>Innovation Markets</u>

An innovation market consists of the future innovations in some area, presumably measured by the resources devoted to R & D in the particular area. (Gilbert and Sunshine (1995)). Shares are calculated for each firm in the obvious way. Notice that this analysis is focused on an input (R & D) not the output of the R & D (new products). It is a departure from the usual procedures of basing market definition on products. It would be a justifiable procedure if it were easy to predict which R & D will lead to which new product, but in many (most?) cases it is not possible to do this. The success of R & D is highly uncertain and predicting from where R & D breakthroughs will come from is very hard. Perhaps pharmaceuticals are an exception because one can see

exactly how far along a drug development is in its FDA trials. Yet a market for particular drugs in development really is not an R & D market, instead it is a market for a future product (uncertain as it may be). This is different from a market based on R & D for a particular general type of product. Moreover, we lack a theoretical framework for defining markets for R & D innovation markets. What is the analogue to a 5% price increase?. What price is being measured if the product cannot be defined? Furthermore, the link between R & D concentration and new product output is quite weak (see, Gilbert (2005)). For all these reasons, I am skeptical that the already crude theoretical construct of "market" can be of much use in analyzing industries where R & D is key. (See, Carlton and Gertner (2003) for a more detailed critique.)

### B.    <u>Two-Sided Markets</u>

In two-sided markets, one party (e.g, mall developer, owner of a computer operating system) internalizes the externalities across agents by effectively taxing and subsidizing different groups so that a "total package" is produced. There has been a literature questioning the empirical relevance of these two-sided markets (or the related concept of industries with network economies). In such markets, without the coordinating ability of a third party, markets cannot produce the efficient result. The lack of a third party could then indicate either no need for one or the existence of a market failure. (See, Liebowitz and Margolis (1994)).[27] For purposes of this discussion, I assume that a third party is needed and does exist in order to coordinate activity among different groups. What is a sensible procedure to define a market in such a case?

---

[27] For example, when cars were being developed, the car manufacturers could have perhaps benefited from subsidizing location of gas stations and standardization of fuel standards if there were scale economies initially in such activities. The fact that no such subsidization occurred shows either the market was inefficient, or alternatively, that whatever inefficiency existed, it was too small to cause it to be corrected.

To take a concrete example, suppose two shopping malls want to merge.[28]  To simplify, assume that there are no surrounding competing retail stores that are not in malls.  We start out by recognizing that a mall owner puts together a portfolio of stores that complement each other and whose existence he coordinates by lowing the rent of one type of store to stimulate demand (and elevate rent) at another.   Suppose that the mall owner charges each store a rent based on its retail sales.  Following an approach similar to the Guidelines, we ask which nearby malls must a hypothetical monopolist control in order for it to be profitable for the merged firm to raise the "price" by, say 5%.  But just as in the earlier discussion of market definition when multiple substitutes were in the market, one must define what "price means.  Is it the rent of one particular retail store, average rent or total rent that has to rise?  In the earlier discussion of market definition when the market contained multiple products, I recognized the ambiguity in the definition of "price" but said that I doubted that it should matter much, though I indicated a preference to focus on the products of the merging firms, rather than all products in the market.  But here, there is no one type of retail store to focus on.[29]  Therefore, one should focus on an aggregate measure of rent.  Moreover, we know that because of the two-sided nature of the market it is unlikely that it is optimal for the hypothetical monopolist to raise rents to all stores by 5%.  Indeed, the whole point

---

[28] For an application of market definition to credit cards, see Emch and Thompson (2006).

[29] Notice that the product is "malls", not individual retail stores.  If one does mistakenly focus on rent to only a particular type of retail store, one must recognize the two-sided nature of the market in which feedback effects occur in other retail stores in the mall.  An increase in the percent of sales charged as rent to the bookstore could lead to higher book prices and fewer customers to the bookstore and, thereby, to all other stores in the mall.  The fall in mall customers leads to a decline in sales in other retail stores and a decline in rents from these stores.  Failure to understand this feedback effect could lead one to overestimate the profitability to the mall owner of raising rents to the bookstore and, thereby, lead one to define markets too narrowly and overestimate market power.

Notice that this type of feedback effect can also arise in one-sided markets, when a firm sells complementary products.  The price increase in one product will adversely affect sales of the other, and that effect will temper the profitability of a price increase in the initial product.

of having a mall is to charge different rents to different types of stores. Failure to allow the hypothetical monopolist to set rents optimally could lead one to a misleading market definition. For example, one might conclude that post-merger there is no market power (i.e., a very broad market in which the post-merger mall owner has a small share) when with optimal pricing the market is narrower and the mall owner has a large market share reflecting market power created by the merger. My sense is that this problem of using the right "price" will make market definition in two-sided markets more difficult than in the typical case and will therefore further limit reliability of market definition and market shares.

## VIII.  Conclusion

Market definition is a crude though sometimes useful tool for identifying market power. The ambiguity in what analysts mean by market power (price above marginal cost, or excess profits) cannot be resolved by market share. When being used to analyze a merger or Section 2 case, it is not just the level of market share, but the changes in market shares that are relevant to calculate whether any increase in market power occurs. Despite this, in Section 2 cases courts often use market definition to figure out whether market power exists, a question that we have shown can be especially problematic to answer by using market definition. In Section 2 cases, the full antitrust analysis is difficult because any increase in market power typically has to be weighed against any benefits of the alleged bad act. The procedure for defining a market in a merger case or Section 2 case can be rigorously described, but the information required to implement the procedure is typically unavailable. Few analysts (or courts) follow the rigorous procedure in either merger or Section 2 cases. Instead, most markets are defined with some guidance from theory and some qualitative knowledge. Econometric studies using market definition may be helpful both in

testing various definitions and in understanding the economic consequences of either the merger or "bad" act.

My own view is that the definition of a market and the use of market shares and changes in market shares are at best crude first steps to begin an analysis. I would use them to eliminate frivolous antitrust cases when shares are low, but would use them cautiously for anything else. Their usefulness in Section 2 cases is especially weak. Despite their limitations, when they can be used to eliminate frivolous antitrust cases, that use can contribute enormous value to society.

References

PHILIP E. AREEDA & DONALD F. TURNER, 2 ANTITRUST LAW (1978).

Jonathan B. Baker, *Market Definition: An Analytical Overview* (November 2006)
(working paper, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id
=854025)

Dennis W. Carlton, *Does Antitrust Need to be Modernized?* (Economic Analysis Group
Discussion Paper, No. 07 -3, 2007).

DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION (4th
ed. 2005).

Dennis W. Carlton, *Using Economics to Improve Antitrust Policy*, 2004 COLUM. BUS. L.
REV. 283 (2004).

Dennis W. Carlton, *The Relevance for Antitrust Policy of Theoretical and Empirical
Advances in Industrial Organization*, 12 GEO. MASON L. REV. 47 (2003).

Dennis W. Carlton & Hal Sider, *Market Power and Vertical Restraints in Retailing:
An Analysis of FTC v. Toys 'R' Us*, *in* THE ROLE OF THE ACADEMIC ECONOMIST IN
LITIGATION SUPPORT (Daniel Slottje ed., 1999).

Dennis W. Carlton & Robert Gertner, *Market Power and Mergers in Durable-Good
Industries*, 32 J. L. & ECON. 203 (1989).

Dennis W. Carlton & Robert Gertner, *Intellectual Property, Antitrust and Strategic Behavior,
in eds.* Adam Jaffee and Joshua Lerner, INNOVATION POLICY AND THE ECONOMY, MIT
PRESS. (2003)

Eric Emch and Scott Thompson, *Market Definition and Market Power in Payment Card Networks*,
5 REVIEW OF NETWORK ECONOMICS (2006)

Joseph Farrell & Carl Shapiro, *Horizontal Mergers: An Equilibrium Analysis*, 80
AM. ECON. REV. 107 (1990).

David Evans and Richard Schmalensee, *The Industrial Organization of Markets with Two-Sided
Platforms, mineo,* (2005).

Richard J. Gilbert & Stephen C. Sunshine, *Incorporating Dynamic Efficiency Concerns
in Merger Analysis: The Use of Innovation Markets*, 63 ANTITRUST L. J. 569 (1995).

Ken Heyer, *Welfare Standards and Merger Analysis: Why Not the Best?*, 2 COMPETITION POLICY
INTERNATIONAL 2006.

Ken Heyer, *Predicting the Competition Effects of Mergers by Listening to Customers* (Economic Analysis Group Discussion Paper, No. 06-11, 2006), *forthcoming in* 74 ANTITRUST LAW JOURNAL 1 (2007).

William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 HARV. L. REV. 937 (1981).

S. J. Liebowitz and Stephen E. Margolis, *Network Externality: An Uncommon Tragedy*, J. ECON. PERSP., Spring 1994, at 133.

Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report* (Institut d'Economie Industrielle Working Paper, No. 275, 2005), *forthcoming in* RAND J. E., *available at* http://idei.fr/doc/wp/2005/2sided_markets.pdf

Stephen W. Salant et. al., *The Length of Optimal Extraction Programs When Depletion Affects Extraction Costs*, 31 J. ECON. THEORY 364 (1983)

David T. Scheffman & Mary Coleman, *Quantitative Analyses of Potential Competitive Effects from a Merger*, 12 GEO. MASON L. REV. 319 (2003).

Gregory J. Werden, *The History of Antitrust Market Delineation*, 76 MARQ. L. REV. 123 (1992)

Gregory J. Werden, *Market Delineation Algorithms Based on the Hypothetical Monopolist Paradigm* (Economic Analysis Group Discussion Paper No. 02-8, 2002), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=327282

Gregory J. Werden and Liske M. Froeb, *Correlation, Casualty, and All that Jazz: The Inherent Shortcomings of Price Tests for Antitrust Market Delineation, 8 Review of Indusrtial Organization, 329* (1993)

# EXHIBIT
# 2

# Curriculum Vitae

**DENNIS WILLIAM CARLTON**

**February 2008**

Academic Address:

University of Chicago
Graduate School of Business    (773) 702-6694
Hyde Park Center
Room 505
5807 South Woodlawn Avenue
Chicago, IL 60637

## EDUCATION

Ph.D., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts:  Economics, 1975.

M.S., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts:  Operations Research, 1974.

A.B., HARVARD UNIVERSITY (Summa cum laude):  Applied Math and Economics, 1972.

## ACADEMIC EMPLOYMENT

UNIVERSITY OF CHICAGO, Graduate School of Business (1984 - present):  Professor of Economics.

UNIVERSITY OF CHICAGO, Law School (1980 - 1984):  Professor of Economics.

UNIVERSITY OF CHICAGO, Department of Economics:  Assistant Professor (1976 - 1979); Associate Professor (1979 - 1980).

MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts, Department of Economics (1975 - 1976):  Instructor in Economics.

## OTHER ACADEMIC EXPERIENCE

HARVARD UNIVERSITY, Public Policy Summer Course in Economics (1977): Professor.

BELL TELEPHONE LABORATORIES (Summers 1976, 1977).

JOINT CENTER FOR URBAN STUDIES OF M.I.T. AND HARVARD UNIVERSITY, Cambridge, Massachusetts (1974 - 1975).


## FIELDS OF SPECIALIZATION

Theoretical and Applied Microeconomics
Industrial Organization


## ACADEMIC HONORS AND FELLOWSHIPS

Keynote Address to Israel Antitrust Conference, 2008

Lewis Bernstein Memorial Antitrust Lecture, Washington, D.C., 2006

Distinguished Visitor, University of Melbourne, April 2005

Milton Handler Lecture, New York, 2004

Keynote Address to the International Competition Network, Mexico, 2004

Alexander Brody Distinguished Lecture, Yeshiva University, 2000

Ph.D. Thesis chosen to appear in the Garland Series of Outstanding Dissertations in Economics

Recipient of the 1977 P.W.S. Andrews Memorial Prize Essay, best essay in the field of Industrial Organization by a scholar under the age of thirty

National Science Foundation Grant, 1977 - 1985

Recipient of Post-doctoral Grant from the Lincoln Foundation, 1975

National Science Foundation Fellowship, 1972 - 1975

Phi Beta Kappa, 1971

John Harvard Award, 1970

Detur Book Prize, 1969

Edwards Whitacker Award, 1969

M.I.T., National Scholar Award, 1968

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

Compass Lexecon, 2008 – present; (formerly) Lexecon Inc., 1977 - 2006; President 1997 - 2001

Co-editor, Journal of Law and Economics, 1980 - present

Visiting Committee, MIT, Department of Economics, 1995 - present

Member, Advisory Board, Economics Research Network, 1996 - present

Member, Advisory Board of Antitrust and Regulation Abstracts, Social Science Research Network, 1998 - present

Advisory Board, Massachusetts Institute of Technology, Department of Economics, 1999 - present

Co-Editor, Competition Policy International (CPI), 2004 – present

Advisory Board, Journal of Competition Law and Economics 2004- present

Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice, 2006 - 2008

Presidential Appointment to the Antitrust Modernization Commission, March 17, 2004 - 2007

Invited Panelist at Public Hearing on the Retail Banking Sector Inquiry: Payment Cards, before the European Commission in Brussels, Belgium, July 17, 2006.

Consultant on Merger Guidelines to the FTC, 2003

Professor, George Mason Institute for Judges, October 2001

Chairman, FTC Round Table on Empirical Industrial Organization (September 11, 2001)

Participant in the Round Table on the Economics of Mergers Between Large ILECS before the Federal Communications Commission, February 5, 1999

Member, Steering Committee, Social Science Research Council, Program in Applied Economics, 1997 - 1999

Participant in roundtable discussions on "The Role of Classical Market Power in Joint Venture Analysis," before the Federal Trade Commission, November 19, 1997 and March 17, 1998.

Participant in meetings with Committee of the Federal Reserve on Payment Systems, June 5, 1997

Associate Editor, Regional Science and Urban Economics, 1987 - 1997

Resident Scholar, Board of Governors of the Federal Reserve System, Summer, 1995

Accreditation Committee, Graduate School of Business, Stanford University, 1995

Associate Editor, The International Journal of Industrial Organization, 1991 - 1995

Editorial Board, Intellectual Property Fraud Reporter, 1990 - 1995

Consultant on Merger Guidelines to the U.S. Department of Justice, 1991 - 1992

Member, Advisory Committee to the Bureau of the Census, 1987 - 1990

National Bureau of Economic Research, Research Associate

Member, American Economics Association, Econometrics Society

## BOOKS

Market Behavior Under Uncertainty, Ph.D. Thesis, Massachusetts Institute of Technology (September 1975); Garland Publishing (1984).

Modern Industrial Organization, Scott, Foresman & Co., co-authored with Jeffrey Perloff, first edition (1990), second edition (1994), translated into Chinese, French, Hungarian and Italian; Addison Wesley Longman, third edition (2000), fourth edition (2005).

## RESEARCH PAPERS

"The Equilibrium Analysis of Alternative Housing Allowance Payments," (with Joseph Ferreira) Chapter 6 of Analysis of a Direct Housing Allowance Program, The Joint Center for Urban Studies of M.I.T. and Harvard University, (July 1975).

"Theories of Vertical Integration," presented at Fourth Annual Telecommunications Conference. Appears in a volume of Proceedings of the Fourth Annual Telecommunications Conference, Office of Telecommunications Policy, (April 1976).

"Uncertainty, Production Lags, and Pricing," American Economic Review, (February 1977).

"Selecting Subsidy Strategies for Housing Allowance Programs," (with Joseph Ferreira) Journal of Urban Economics, (July 1977).

"Peak Load Pricing With Stochastic Demand," American Economic Review, (December 1977). (Reprinted in Economic Regulation edited by P.L. Joskow, Edward Elgar Publishing Limited, 1998 and Reprinted in The Economics of Public Utilities edited by Ray Rees, Edward Elgar Publishing, Limited (2006).

"The Distribution of Permanent Income," Income Distribution and Economic Inequality, edited by Zvi Griliches, et al. (Halsted Press, 1978).

"Vertical Integration--An Overview," in Congressional Record Hearings on the Communications Act of 1978. Bill H.R. 13105, (August 3, 1978).

"Market Behavior with Demand Uncertainty and Price Inflexibility," American Economic Review, (September

1978).

"Vertical Integration in Competitive Markets Under Uncertainty," Journal of Industrial Economics, (March 1979). Awarded the P.W.S. Memorial Prize for the best essay in the field of Industrial Organization by a scholar under the age of thirty.

"Valuing Market Benefits and Costs in Related Output and Input Markets," American Economic Review, (September 1979).

"Contracts, Price Rigidity and Market Equilibrium," Journal of Political Economy, (October 1979).

"Why New Firms Locate Where They Do:  An Econometric Model," in Studies in Regional Economics, edited by W. Wheaton, (Urban Institute, 1980).

"Benefits and Costs of Airline Mergers:  A Case Study," (with W. Landes and R. Posner) Bell Journal of Economics, (Spring 1980).  (Reprinted in "Air Transport" in Classics In Transport Analysis series, edited by Kenneth Button and Peter Nijkamp, 2001.)

"The Limitations of Pigouvian Taxes as a Long Run Remedy for Externalities," (with G. Loury) Quarterly Journal of Economics, (November 1980).

"The Law and Economics of Rights in Valuable Information:  A Comment," Journal of Legal Studies, (December 1980).

"Price Discrimination:  Vertical Integration and Divestiture in Natural Resources Markets," (with J. Perloff) Resources and Energy, (March 1981).

"The Spatial Effects of a Tax on Housing and Land," Regional Science and Urban Economics, (November 1981).

"Comments on Weicher," Journal of Law and Economics, (December 1981).

Comment, in Sherwin Rosen ed. Studies in Labor Markets, University of Chicago Press, (1981).

"Planning and Market Structure," in The Economics of Information and Uncertainty, edited by J.J. McCall, University of Chicago Press, (1982).

"The Disruptive Effect of Inflation on the Organization of Markets," in Robert Hall, ed. The Economics of Inflation, University of Chicago Press, (1982).

"The Need for Coordination Among Firms With Special Reference to Network Industries," (with J. M. Klamer) University of Chicago Law Review, (Spring 1983).

"A Reexamination of Delivered Pricing," Journal of Law and Economics, (April 1983).

"Futures Trading, Market Interrelationships, and Industry Structure," American Journal of Agricultural Economics, (May 1983).

"The Regulation of Insider Trading," (with D. Fischel), Stanford Law Review, (May 1983) , reprinted in J. Macey ed., Classics in Corporate Law and Economics, Edward Elgar Publishing (forthcoming).

"The Location and Employment Choices of New Firms:  An Econometric Model with Discrete and Continuous

Endogenous Variables," The Review of Economics and Statistics, (August 1983).

"Economic Goals and Remedies of the AT&T Modified Final Judgment," (with W. Lavey), Georgetown Law Review, (August 1983).

"Equilibrium Fluctuations When Price and Delivery Lags Clear the Market," Bell Journal of Economics, (Autumn 1983).

"Energy and Location," Energy Costs, Urban Development, and Housing, Brookings Institution, (1984).

"Futures Markets: Their Purpose, Their History, Their Growth, Their Successes and Failures," Journal of Futures Markets, (September 1984). (Reprinted in Futures Markets edited by A.G. Malliaris and W.F. Mullady, Edward Elgar Publishing Limited, 1995; and in Classic Futures: Lessons from the Past for the Electronics Age, edited by Lester Telser, Risk Books, 2000.)

"The Economics of Gray-Market Imports," (with C. DeMuth), written for the Coalition to Preserve the Integrity of American Trademarks (COPIAT), (May 1985).

"The Limitation of Pigouvian Taxes As A Long Run Remedy for Externalities: Extension of Results," (with G. Loury) Quarterly Journal of Economics, (August 1986).

"The Rigidity of Prices," American Economic Review, (September 1986).

"The Theory and The Facts of How Markets Clear: Is Industrial Organization Valuable for Understanding Macroeconomics?" in Handbook of Industrial Organization, eds. Schmalensee and Willig, (1989).

"Market Power and Mergers in Durable Good Industries," (with R. Gertner), Journal of Law and Economics, (October 1989).

"Comments on Vertical Integration and Market Foreclosure," Brookings Papers on Economic Activity: Microeconomics, (1990).

Book Review of Tirole's "The Theory of Industrial Organization", Journal of Political Economy, (June 1990).

"The Genesis of Inflation and the Costs of Disinflation: Comment," Journal of Money, Credit & Banking, (August 1991, Part 2).

"The Theory of Allocation and its Implications for Marketing and Industrial Structure: Why Rationing is Efficient," Journal of Law and Economics, (October 1991).

"The Economics of Cooperation and Competition in Electronic Services Network Industries," in Economics of Electronic Service Networks, Wildman Steven ed., Praeger Press, (1992).

"Merger Policy and Market Definition Under the EC Merger Regulation," (with W. D. Bishop). Conference on Antitrust in a Global Economy, Fordham Corporate Law Institute, (1994).

"The Antitrust Economics of Credit Card Networks," (with A. Frankel) Antitrust Law Journal, (Winter 1995).

"Economic Organization and Conflict," Journal of Institutional and Theoretical Economics, (March 1995).

"Antitrust and Higher Education: Was There a Conspiracy to Restrict Financial Aid?" (with G. Bamberger and R. Epstein) The Rand Journal of Economics, (Vol. 26, No. 1, Spring 1995, pp. 131-147).

"The Competitive Effects of Line-of-business Restrictions in Telecommunications," (with K. Arrow and H. Sider), Managerial and Decision Economics, (Vol. 16, pp. 301-321, 1995). (Reprinted in Deregulating Telecommunications - The Baby Bells Case for Competition, edited by Richard S. Higgins and Paul H. Rubin, John Wiley & Sons Ltd., 1995.)

"The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee," (with A. Frankel), Antitrust Law Journal, (Spring 1995).

"Antitrust and Payment Technologies," (with A. Frankel), Review, Federal Reserve Bank of St. Louis (November/December 1995).

"Antitrust Policy Toward Mergers When Firms Innovate: Should Antitrust Recognize the Doctrine of Innovation Markets?" Testimony before the Federal Trade Commission Hearings on Global and Innovation-based Competition (October, 1995).

"You Keep on Knocking But You Can't Come In: Evaluating Restrictions on Access to Input Joint Ventures," (with S. Salop), Harvard Journal of Law & Technology, (Volume 9, Summer, 1996). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"Comments on Causes and Consequences of Airline Fare Wars," Brookings Papers on Economic Activity: Microeconomics, (1996).

"A Critical Assessment of the Role of Imperfect Competition in Macroeconomics," in Market Behavior and Macro Economic Modeling, Brakman, Van Ees, & Kuipers (eds.), MacMillan Press (1997).

"Price Rigidity," Business Cycles and Depressions, David Glasner ed., Garland Publishing, Inc., (1997).

"Communication Among Competitors: Game Theory and Antitrust," (with R. Gertner and A. Rosenfield), George Mason Law Review, (1997). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"Comments on Born and Viscusi," Brookings Papers on Economic Activity: Microeconomics, (1998).

"Antitrust and Higher Education: MIT Financial Aid (1993)" (September 1997) (with G. Bamberger), The Antitrust Revolution, (Oxford University Press, 3rd edition 1999).

"Market Power and Vertical Restraints in Retailing: An Analysis of FTC v. Toys 'R' Us," (with H. Sider), The Role of the Academic Economist in Litigation Support, edited by Daniel Slottje, North Holland, (1999).

"The Economics of Religion, Jewish Survival and Jewish Attitudes Toward Competition on Torah Education," (with A. Weiss), Journal of Legal Studies, (2001). (Reprinted in Essential Readings on Jewish Identities, Lifestyles and Beliefs, edited by Stanford M. Lyman, Gordian Knot Books, 2003).

"A General Analysis of Exclusionary Conduct and Refusal to Deal -- Why Aspen and Kodak are Misguided," Antitrust Law Journal, (2001). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"The Lessons from Microsoft," Business Economics, (January 2001).

"Lessons from Halacha About Competition and Teaching," (with A. Weiss), Center for Business Ethics Social Responsibility, http://besr.org/library/competition.html, (March 2001).

"The Choice of Organizational Form in Gasoline Retailing and The Costs of Laws Limiting that Choice," (with

A. Blass), Journal of Law and Economics, (October 2001). (Reprinted in Franchise Contracting and Organization, edited by Francine Lafontaine, Elgar Publishing, (2005).

"Should The Merger Guidelines Be Scrapped? Introduction to a Debate," in Symposium On The Antitrust Analysis Of Mergers: Merger Guidelines vs. Five Forces, 33 U. WEST L.A. L. REV. (2001).

"Free Riding and Sales Strategies for the Internet," (with J. Chevalier), The Journal of Industrial Economics, (December 2001).

"The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries," (with M. Waldman), The Rand Journal (Vol. 33, No. 2, Summer 2002). (Reprinted in B. Klein and A. Lerner eds. Economics of Antitrust Law, Edward Elgar Publishing Ltd, forthcoming.)

"The Competitive Effects of Fannie Mae," (with D. Gross and R. Stillman) in Housing Matters: Issues in American Housing Policy, Fannie Mae (January 2002, reprinted 2004).

"Intellectual Property, Antitrust and Strategic Behavior," (with R. Gertner), in eds. Adam Jaffee and Joshua Lerner, Innovation Policy and the Economy, Volume 3, MIT Press (2003).

"Airline Networks and Fares," (with G. Bamberger), Handbook of Airline Economics, 2nd ed., Darryl Jenkins, ed., McGraw Hill (2003).

"Contracts that Lessen Competition -- What is Section 27 for, and How Has it Been Used?" (with David Goddard), in Mark N. Berry and Lewis T. Evans eds., Competition Law at the Turn of the Century: A New Zealand Perspective, Victoria University Press (2003).

Interview, Economists' Roundtable, Antitrust Magazine, (Spring 2003).

"The Relevance for Antitrust Policy of Theoretical and Empirical Advances in Industrial Organization," (Fall 2003), George Mason Law Review.

"The Control of Externalities in Sports Leagues: An Analysis of Restrictions in the National Hockey League," (with A. Frankel and E. Landes), Journal of Political Economy, (February 2004).

"An Empirical Investigation of the Competitive Effects of Domestic Airline Alliances," (with G. Bamberger and L. Neumann), Journal of Law and Economics, Vol. 47, No. 1, (April 2004, pp. 195-222).

"Why Barriers to Entry are Barriers to Understanding," American Economic Review, (May 2004).

"Using Economics to Improve Antitrust Policy," Milton Handler Lecture, Columbia Business Law Review, (June 2004).

"The Proper Role for Antitrust in an International Setting," (Keynote address: Second Annual Conference of the International Competition Network (ICN), Merida City, Mexico (June 25, 2003), appears as Appendix to "Using Economics to Improve Antitrust Policy", Columbia Business Law Review (June 2004).

"Econometric Analysis of Telephone Mergers," (with H. Sider) pp. 373-395 in American Bar Association, Econometrics: Legal, Practical, and Technical Issues, (2005).

"How Economics Can Improve Antitrust Doctrine Towards Tie-in Sales," (with M. Waldman), Competition Policy International, (Spring 2005).

Preface to: "Law and Economics of the Mexican Competition Laws," by Francisco Gonzalez de Cossio (2005).

"Transaction Costs, Externalities and "Two-Sided" Payment Markets," (with A. Frankel), Columbia Business Law Review, No. 3, Vol. (2005).

"Predation and the Entry and Exit of Low-Fare Carriers," (with G. Bamberger), in Advances in Airline Economics: Competition Policy and Antitrust, Darin Lee, ed., (2006).

"Why Tie An Essential Good," (with Michael Waldman), in Hahn R. ed., Antitrust Policy and Vertical Restraints, AEI-Brookings, (July 2006).

"Market Definition: Use and Abuse," Competition Policy International (Spring 2007)

Interview with Deputy Assistant Attorney General, The Antitrust Source (February 2007)

Separate Statement of Dennis W. Carlton, in The Report of the Antitrust Modernization Commission, (April 2007)

"Does Antitrust Need to be Modernized?," Journal of Economic Perspectives (Summer 2007)

"Mergers," Palgrave Dictionary, (with J. M. Perloff), (forthcoming).

"Antitrust and Regulation," (with R. Picker) in N. Rose ed., Economics of Deregulation, NBER, (forthcoming).

"Theories of Tying and Implications For Antitrust," (with M. Waldman), in W. Collins ed. Issues in Competition Law and Policy, American Bar Association, (forthcoming).

"Barriers to Entry," in W. Collins ed. Issues in Competition Law and Policy, American Bar Association, (forthcoming).

"Product Variety and Demand Uncertainty: Why Mark-ups Vary with Quality," (with James D. Dana Jr.), Journal of Industrial Economics (forthcoming)

"Regulation, Antitrust, and Trinko," (With H. Sider), in eds. J. Kwoka and L. White, The Antitrust Revolution, (forthcoming).

"The Year in Review: Economics at the Antitrust Division 2006-2007" (with K. Heyer), Review of Industrial Organization, (forthcoming).

"Economic Analysis of Competition Practices in the EU and the U.S.: A View from Chief Economists," (with M. Salinger), Competition Policy International (Autumn 2007).

"Proposal for a Market-Based Solution to Airport Delays," (with W. Whalen, K. Heyer and O. Richard), Regulation (2008).

"Safe Harbors for Quantity Discounts and Bundling," (with M. Waldman),   George Mason Law Review (forthcoming).

**UNPUBLISHED PAPERS**

"Modeling the Housing Allowance Program," M.A. Thesis, Massachusetts Institute of Technology (September 1974).

"The Cost of Eliminating a Futures Market and The Effect of Inflation on Market Interrelationships," (1984).

"The Empirical Importance of Delivery Lags as an Explanation of Demand," (1984).

"Statistical Supplement to The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee Comment, 63 Antitrust Law Journal 903 (1995)," (with Alan Frankel), (May 1997).

"Competition, Monopoly, and Aftermarkets," (with M. Waldman), Working Paper No. 8086, National Bureau of Economic Research, (January 2001, revised March 2002).

"Tying, Upgrades, And Switching Costs In Durable-Goods Markets," (with Michael Waldman),

NBER Working Paper 11407, (2005).

"Antitrust and Not for Profits," (with G. David), mimeo (2005).

"Why Tie a Product Consumers Do Not Use?," (with J. Gans and M. Waldman), NBER Working Paper 13339.

"The Need to Measure the Effect of Merger Policy and How to Do It," Economic Anaylsis Group Paper 07-15, (2007).

"Mergers in Regulated Industries: Electricity," Economic Group Paper, 07-16, (2007).


## WORK IN PROGRESS


Theoretical analysis of firm size, information, price rigidity, and product variety.

Empirical analysis of business cycle effects on firm size distributions.

Analysis of growth of futures markets and the effect of this growth on the industrial organization of related industries.

# EXHIBIT
# 3



# Commentary on the
# Horizontal Merger Guidelines
### 2006

## Federal Trade Commission



## U.S. Department of Justice



# Commentary on the Horizontal Merger Guidelines

 

U.S. Department of Justice    Federal Trade Commission

March 2006

# Table of Contents

Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Governing Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Overview of Guidelines Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        The Agencies' Focus Is on Competitive Effects . . . . . . . . . . . . . . . . . . . . . . . 2

        Investigations Are Intensively Fact-Driven, Iterative Processes . . . . . . . . . . . . . 3

        The Same Evidence Often Is Relevant to Multiple Elements of the Analysis . . . . . . . . . 3

    Commentary Outline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**1. Market Definition and Concentration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Mechanics of Market Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Breadth of Relevant Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Evidentiary Sources for Market Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        The Importance of Evidence from and about Customers . . . . . . . . . . . . . . . . . . . 9

        Evidence of Effects May Be the Analytical Starting Point . . . . . . . . . . . . . . . . . 10

        Industry Usage of the Word "Market" Is Not Controlling . . . . . . . . . . . . . . . . . 11

    Market Definition and Integrated Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        Market Definition Is Linked to Competitive Effects Analysis . . . . . . . . . . . . . . . . 12

        Market Definition and Competitive Effects Analyses May Involve the Same Facts . . . . 14

        Integrated Analysis Takes into Account that Defined

            Market Boundaries Are Not Necessarily Precise or Rigid . . . . . . . . . . . . . . . . 15

    Significance of Concentration and Market Share Statistics . . . . . . . . . . . . . . . . . . . 15

**2. The Potential Adverse Competitive Effects of Mergers** . . . . . . . . . . . . . . . . . . . 17

    Coordinated Interaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        Concentration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        Additional Market Characteristics Relevant to Competitive Analysis . . . . . . . . . . . 20

        Role of Evidence of Past Coordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        Maverick and Capacity Factors in Coordination . . . . . . . . . . . . . . . . . . . . . . . . 24

    Unilateral Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        Unilateral Effects from Merger to Monopoly . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        Unilateral Effects Relating to Capacity and Output for Homogeneous Products . . . . . 27

        Unilateral Effects Relating to Pricing of Differentiated Products . . . . . . . . . . . . . 27

        Unilateral Effects Relating to Auctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        Unilateral Effects Relating to Bargaining . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3. **Entry Analysis** ................................................................. 37
   Likelihood of Entry ............................................................. 38
      Sunk Costs and Risks Associated with Entry ................................... 38
         Consumer Products .................................................... 38
         Industrial Products ................................................... 40
      Other Significant Obstacles to Successful Entry ............................... 42
      Cost Disadvantages of Entrants ............................................. 45
   Timeliness of Entry ............................................................ 45
   Sufficiency of Entry ........................................................... 46
4. **Efficiencies** .................................................................. 49
   Efficiencies the Agencies Consider .............................................. 49
      Merger-Specific Efficiencies ................................................ 49
      Cognizable Efficiencies .................................................... 51
   Verification of Efficiency Claims ................................................ 52
   Sufficiency of Efficiencies ...................................................... 55
   "Out-of-Market" Efficiencies .................................................... 56
   Fixed-Cost Savings ............................................................ 57
   Supporting Documentation ..................................................... 59
Referenced Agency Materials ....................................................... 61
Case Index ....................................................................... 63
   U.S. Department of Justice Cases ................................................ 63
   Federal Trade Commission Cases ................................................ 66

# Foreword

Mergers between competing firms, i.e., "horizontal" mergers, are a significant dynamic force in the American economy. The vast majority of mergers pose no harm to consumers, and many produce efficiencies that benefit consumers in the form of lower prices, higher quality goods or services, or investments in innovation. Efficiencies such as these enable companies to compete more effectively, both domestically and overseas.

Fourteen years ago, to describe their application of the antitrust laws to horizontal mergers, the Federal Trade Commission and the U.S. Department of Justice (collectively, the "Agencies")—the two federal Agencies responsible for U.S. antitrust law enforcement—jointly issued the 1992 Horizontal Merger Guidelines (the "Guidelines"). In 1997, the Agencies jointly issued revisions to the Guidelines' section on Efficiencies. Since these publications were issued, the Agencies have consistently applied the Guidelines' analytical framework to the horizontal mergers under their review.

Today, to provide greater transparency and foster deeper understanding regarding antitrust law enforcement, the Agencies jointly issue this Commentary on the Guidelines.

The Commentary continues the Agencies' ongoing efforts to increase the transparency of their decision-making processes. These efforts include the Agencies' joint publication of Merger Challenges Data, Fiscal Years 1999–2003 (issued December 18, 2003), the Commission's subsequent publication of Horizontal Merger Investigation Data, Fiscal Years 1996–2003 (issued February 2, 2004 and revised August 31, 2004), the Department's Merger Review Process Initiative (issued October 12, 2001 and revised August 4, 2004), the Reforms to the Merger Review Process at the Commission (issued February 16, 2006), and the Department's and Commission's increased use of explanatory closing statements following merger investigations.

The Commentary follows on the Agencies' February 2004 Merger Enforcement Workshop. Over three days, leading antitrust practitioners and economists who have examined merger policy and the Guidelines' analytical framework discussed in detail all sections of the Guidelines. The Workshop focused on whether the analytical framework set forth by the Guidelines adequately serves the dual purposes of leading to appropriate enforcement decisions on proposed horizontal mergers, and providing the antitrust bar and the business community with reasonably clear guidance from which to assess the antitrust enforcement risks of proposed transactions.

Workshop participants generally agreed that the analytical framework set out in the Guidelines is effective in yielding the right results in individual cases and in providing advice to parties considering a merger. Thus, the Agencies concluded that a revamping of the Guidelines is neither needed nor widely desired at this time. Rather, the Guidelines' analytic framework has proved both robust and sufficiently flexible to allow the Agencies properly to account for the particular facts presented in each merger investigation.

The Agencies also have observed that the antitrust bar and business community would find useful and beneficial an explication of how the Agencies apply the Guidelines in particular investigations. This Commentary is intended to respond to this important public interest by enhancing the transparency of the analytical process by which the Agencies apply the antitrust laws to horizontal mergers.

Deborah Platt Majoras
Chairman
Federal Trade Commission

Thomas O. Barnett
Assistant Attorney General for Antitrust
U.S. Department of Justice

March 2006

v

# Introduction

## Governing Legal Principles

The principal federal antitrust laws applicable to mergers are section 7 of the Clayton Act, section 1 of the Sherman Act, and section 5 of the Federal Trade Commission Act. Section 7 proscribes a merger the effects of which "may be substantially to lessen competition." Section 1 prohibits an agreement that constitutes an unreasonable "restraint of trade." Section 5, which the Federal Trade Commission enforces, proscribes "unfair methods of competition." Over many decades, the federal courts have provided an expansive body of case law interpreting these statutes within the factual and economic context of individual cases.

The core concern of the antitrust laws, including as they pertain to mergers between rivals, is the creation or enhancement of market power. In the context of sellers of goods or services, "market power" may be defined as the ability profitably to maintain prices above competitive levels for a significant period of time. Market power may be exercised, however, not only by raising price, but also, for example, by reducing quality or slowing innovation. In addition, mergers also can create market power on the buying side of a market. Most mergers between rivals do not create or enhance market power. Many mergers, moreover, enable the merged firm to reduce its costs and become more efficient, which, in turn, may lead to lower prices, higher quality products, or investments in innovation. However, the Agencies challenge mergers that are likely to create or enhance the merged firm's ability—either unilaterally or through coordination with rivals—to exercise market power.

Following their mandate under the antitrust statutory and case law, the Agencies focus their horizontal merger analysis on whether the transactions under review are likely to create or enhance market power. The Guidelines set forth the analytical framework and standards, consistent with the law and with economic learning, that the Agencies use to assess whether an anticompetitive outcome is likely. The unifying theme of that assessment is "that mergers should not be permitted to create or enhance market power or to facilitate its exercise." Guidelines § 0.1. The Guidelines are flexible, allowing the Agencies' analysis to adapt as business practices and economic learning evolve.

In applying the Guidelines to the transactions that each separately reviews, the Agencies strive to allow transactions unlikely substantially to lessen competition to proceed as expeditiously as possible. The Agencies focus their attention on quickly identifying those transactions that could violate the antitrust laws, subjecting those mergers to greater scrutiny. Most mergers that pose significant risk to competition come to the Agencies' attention before they are consummated under the premerger notification and reporting requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a ("HSR"). HSR requires that the parties to a transaction above a certain size notify the Agencies before consummation and prohibits consummation of the transaction until expiration of one or more waiting periods during which one of the Agencies reviews the transaction. The waiting periods provide the Agencies time to review a transaction before consummation.

For more than 95% of the transactions reported under HSR, the Agencies promptly determine—i.e., within the initial fifteen- or thirty-day waiting period that immediately follows HSR filings—that a substantial lessening of competition is unlikely. The Agencies base such expeditious determinations on material provided as part of the HSR notification, experience from prior investigations, and other market information. For many industries, a wealth of information is available from government reports, trade

directories and publications, and Internet resources. For some transactions, the parties volunteer additional information, and for some, the Agencies obtain information from non-public sources. The most important non-public sources are market participants, especially the parties' customers, who typically provide information voluntarily when the Agencies solicit their cooperation.

Evidence that the merged firm would have a relatively high share of sales (or of capacity, or of units, or of another relevant basis for measurement) or that the market is relatively highly concentrated may be particularly significant to a decision by either of the Agencies to extend a pre-merger investigation pursuant to HSR by issuing a request for additional information (commonly referred to as a "second request"). A decision to issue a second request must be made within the initial HSR thirty-day waiting period (fifteen days for cash tender offers), or the parties will no longer be prevented under HSR from consummating their merger. A second request may be necessary when it is not possible within thirty days to gather and analyze the facts necessary to address appropriately the competitive concerns that may arise at the threshold of the investigation, such as when parties to a merger appear to have relatively high shares in the market or markets in which they compete. Although the ultimate decision of whether a merger likely will be anticompetitive is based heavily on evidence of potential anticompetitive effects, the Agencies find that only in extraordinary circumstances can they conduct an extensive competitive effects analysis within thirty days. That is why market shares and concentration levels, which have some predictive value, frequently are used as at least a starting point during the initial waiting period.

Sometimes the Agencies also investigate consummated mergers, especially when evidence suggests that anticompetitive effects may have resulted from them. The Agencies apply Guidelines analysis to consummated mergers as well as to mergers under review pursuant to HSR.

## Overview of Guidelines Analysis

The Guidelines' five-part organizational structure has become deeply embedded in mainstream merger analysis. These parts are: (1)

market definition and concentration; (2) potential adverse competitive effects; (3) entry analysis; (4) efficiencies; and (5) failing and exiting assets.

Each of the Guidelines' sections identifies a distinct analytical element that the Agencies apply in an integrated approach to merger review. The ordering of these elements in the Guidelines, however, is not itself analytically significant, because the Agencies do not apply the Guidelines as a linear, step-by-step progression that invariably starts with market definition and ends with efficiencies or failing assets. Analysis of efficiencies, for example, does not occur "after" competitive effects or market definition in the Agencies' analysis of proposed mergers, but rather is part of an integrated approach. If the conditions necessary for an anticompetitive effect are not present—for example, because entry would reverse that effect before significant time elapsed—the Agencies terminate their review because it would be unnecessary to address all of the analytical elements.

The chapters that follow, in the context of specific analytical elements such as market definition or entry, describe many principles of Guidelines analysis that the Agencies apply in the course of investigating mergers. Three significant principles are generally applicable throughout.

## The Agencies' Focus Is on Competitive Effects

The Guidelines' integrated process is "a tool that allows the Agency to answer the ultimate inquiry in merger analysis: whether the merger is likely to create or enhance market power or facilitate its exercise." Guidelines § 0.2. At the center of the Agencies' application of the Guidelines, therefore, is competitive effects analysis. That inquiry directly addresses the key question that the Agencies must answer: Is the merger under review likely substantially to lessen competition? To this end, the Agencies examine whether the merger of two particular rivals matters, that is, whether the merger is likely to affect adversely the competitive process, resulting in higher prices, lower quality, or reduced innovation.

The Guidelines identify two broad analytical frameworks for assessing whether a merger between competing firms may substantially lessen competition. These frameworks require that the

2

Agencies ask whether the merger may increase market power by facilitating coordinated interaction among rival firms and whether the merger may enable the merged firm unilaterally to raise price or otherwise exercise market power. Together, these two frameworks are intended to embrace every competitive effect of any form of horizontal merger. The Guidelines were never intended to detail how the Agencies would assess every set of circumstances that a proposed merger may present. As the Guidelines themselves note, the specific standards set forth therein must be applied to a broad range of possible factual circumstances.

## Investigations Are Intensively Fact-Driven, Iterative Processes

Merger analysis depends heavily on the specific facts of each case. At the outset of an investigation, when Agency staff may know relatively little about the merging firms, their products, their rivals, or the applicable relevant markets, staff typically contemplates several broad hypotheses of possible harm.

For example, based on initial information, staff may hypothesize that a merger would reduce the number of competitors from four to three and, in so doing, may foster or enhance coordination by enabling the remaining firms profitably to allocate customers based on prior sales. Staff also might hypothesize that the products of the merging firms are particularly close substitutes with respect to product characteristics or geographic location such that unilateral anticompetitive effects are likely.

Staff evaluates potential competitive factors of this sort by gathering additional information and conducting intensive factual analysis to assess both the applicability of individual analytical frameworks and their implications for the likely competitive effects of the merger. As it learns more about the merging firms and the market environment in which they compete, staff rejects or refines its hypotheses of probable relevant markets and competitive effects, ultimately resulting in a conclusion about likelihood of harm. If the facts do not point to such a likelihood, the merger investigation is closed.

In testing a particular postulated risk of competitive harm arising from a merger, the Agencies take into account pertinent characteristics of the market's competitive process

using data, documents, and other information obtained from the parties, their competitors, their customers, databases of various sorts, and academic literature or private industry studies. The Agencies carefully consider the views of informed customers on market structure, the competitive process, and anticipated effects from the merger. The Agencies further consider any information voluntarily provided by the parties, which may include extensive analyses prepared by economists or in consultation with economists. The Agencies also carefully consider prospects for efficiencies that the proposed transaction may generate and evaluate the effects of any efficiencies on the outcome of the competitive process.

## The Same Evidence Often Is Relevant to Multiple Elements of the Analysis

A single piece of evidence often is relevant to several issues in the assessment of a proposed merger. For example, mergers frequently occur in markets that have experienced prior mergers. Sometimes evidence exists concerning the effects of prior mergers on various attributes of competition. Such evidence may be probative, for example, of the scope of the relevant product and geographic markets, of the likely competitive effects of the proposed merger, and of the likelihood that entry would deter or counteract any attempted exercise of market power following the merger under review. Similarly, evidence of actual or likely anticompetitive effects from a merger could be used in addressing the scope of the market or entry conditions.

An investigation involving potential coordinated effects may uncover evidence of past collusion and sustained supra-competitive prices in the market. This information can be relevant to several elements of the analysis. The product and geographic markets that were subject to collusion in the past may be probative of the relevant product and geographic markets today. That entry failed to undermine collusion in the past may be probative of whether entry is likely today. Of course, during its investigation, the Agency may discover facts that tend to negate these possibilities. For example, since collusion occurred, new production technologies may have emerged that have altered the ability or incentives of firms to coordinate their actions. Similarly, innovation may have led to the introduction of

new products that compete with the incumbent products and constrain the ability of the merging firms and their rivals to coordinate successfully in the future.

# Commentary Outline

In the chapters that follow, the Commentary explains how the Agencies have applied particular Guidelines' provisions relating to market definition and concentration, competitive effects (including coordinated interaction and unilateral effects analysis), entry conditions, and efficiencies. Application of the Guidelines' provisions relating to failure and exiting assets is not discussed in the Commentary because those provisions are very infrequently applied. For convenience, the order of these chapters follows the order of the issues set forth in the Guidelines.

Included throughout the Commentary are short summaries of matters that the Agencies have investigated. They have been included to further understanding of the principles under discussion at that point in the narrative. None of the summaries exhaustively addresses all the pertinent facts or issues that arose in the investigation. No other significance should be attributed to the selection of the matters used as examples. (In some instances in the Efficiencies chapter, names and other key facts of actual matters are changed to protect the confidentiality of business and proprietary information. Each is noted as a "Disguised Example.") An Index at the end of the Commentary lists all of the mergers discussed in these case examples and provides citations to additional public information.

For the reader's convenience, the case examples briefly state how each investigation ended, i.e., whether it was closed because the Agency determined not to challenge the merger or because the parties abandoned the merger in response to imminent Agency challenge, or whether the investigation proceeded to a consent agreement or to litigation. The discussion within each case example pertains solely to the relevant Agency's analysis of the merger, and does not elaborate on any subsequent judicial or administrative proceedings.

# 1. Market Definition and Concentration

The Agencies evaluate a merger's likely competitive effects "within the context of economically significant markets—i.e., markets that could be subject to the exercise of market power." Guidelines § 1.0. The purpose of merger analysis under the Guidelines is to identify those mergers that are likely to create or enhance market power in any market. The Agencies therefore examine all plausible markets to determine whether an adverse competitive effect is likely to occur in any of them. The market definition process is not isolated from the other analytic components in the Guidelines. The Agencies do not settle on a relevant market definition before proceeding to address other issues. Rather, market definition is part of the integrated process by which the Agencies apply Guidelines principles, iterated as new facts are learned, to reach an understanding of the merger's likely effect on competition.

The mechanics of how the Agencies define markets using the Guidelines method has been the subject of extensive discussion in legal and economic literature and appears to be well understood in the antitrust community. This Commentary, accordingly, provides only a brief overview of the mechanics. The remainder of this chapter addresses a number of discrete topics concerning market definition issues that frequently arise in merger investigations.

## Mechanics of Market Definition

The Guidelines define a market as "a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a 'small but significant and nontransitory' increase in price, assuming the terms of sale of all other products are held constant." Guidelines § 1.0.

This approach to market definition is referred to as the "hypothetical monopolist" test. To determine the effects of this "'small but significant and nontransitory' increase in price" (commonly referred to as a "SSNIP"), the Agencies generally use a price increase of five percent. This test identifies which product(s) in which geographic locations significantly constrain the price of the merging firms' products.

The Guidelines' method for implementing the hypothetical monopolist test starts by identifying each product produced or sold by each of the merging firms. Then, for each product, it iteratively broadens the candidate market by adding the next-best substitute. A relevant product market emerges as the smallest group of products that satisfies the hypothetical monopolist test. Product market definition depends critically upon demand-side substitution—i.e., consumers' willingness to switch from one product to another in reaction to price changes. The Guidelines' approach to market definition reflects the separation of demand substitutability from supply substitutability—i.e., the ability and willingness, given existing capacity, of firms to substitute from making one product to producing another in reaction to a price change. Under this approach, demand substitutability is the concern of market delineation, while supply substitutability and entry are concerned with current and future market participants.

Definition of the relevant geographic market is undertaken in much the same way as product market definition—by identifying the narrowest possible market and then broadening it by

iteratively adding the next-best substitutes. Thus, for geographic market definition, the Agencies begin with the area(s) in which the merging firms compete respecting each relevant product, and extend the boundaries of those areas until an area is determined within which a hypothetical monopolist would raise prices by at least a small but significant and non-transitory amount.

**DaVita–Gambro** (FTC 2005)  DaVita Inc., proposed to acquire Gambro Healthcare, Inc. The firms competed across the United States in the provision of outpatient dialysis services for persons with end stage renal disease ("ESRD"). Commission staff found that the relevant geographic markets within which to analyze the transaction's likely competitive effects were local. Most ESRD patients receive treatments about 3 times per week, in sessions lasting 3–5 hours, and in general either are unwilling or unable to travel more than 30 miles or 30 minutes to receive kidney dialysis treatment. In the process of defining the geographic market, staff identified the Metropolitan Statistical Areas ("MSAs") within which both firms had outpatient dialysis clinics, then examined each area to determine if geographic factors such as mountains, rivers, and bays, and travel conditions, were such that the scope of the relevant market differed from the MSA's boundaries.

Within each such MSA, staff isolated the area immediately surrounding each dialysis clinic of both merging parties, and assessed whether a hypothetical monopolist within that area would impose a significant price increase. Staff expanded the boundaries of each area until the evidence showed that such a hypothetical monopolist would impose a significant price increase. From interviews with industry participants and analysis of documents, staff found that, in general, dialysis patients tend to travel greater distances in rural and suburban areas than in dense urban areas, where travel distances as small as 5–10 miles may take significantly more than 30 minutes, due to congestion, road conditions, reliance on public transportation, and other factors. Maps indicating the locations from which each clinic drew its patients were particularly useful. Thus, some MSAs included within their respective

boundaries many distinct areas over which a hypothetical monopolist would exercise market power. The Commission entered into a consent agreement with the parties to resolve the concern that the transaction would likely lead to anticompetitive effects in 35 local markets. In an order issued with the consent agreement, the Commission required, among other things, the divestiture of dialysis clinics in the 35 markets at issue.

## The Breadth of Relevant Markets

Defining markets under the Guidelines' method does not necessarily result in markets that include the full range of functional substitutes from which customers choose. That is because, as the Guidelines provide, a "relevant market is a group of products and a geographic area that is no bigger than necessary to satisfy [the hypothetical monopolist] test." Guidelines § 1.0. This is one of several points at which the Guidelines articulate what is referred to in section 1.21 as the "'smallest market' principle" for determining the relevant market. The Agencies frequently conclude that a relatively narrow range of products or geographic space within a larger group describes the competitive arena within which significant anticompetitive effects are possible.

**Nestle–Dreyer's** (FTC 2003)  Nestle Holdings, Inc., proposed to merge with Dreyer's Grand Ice Cream, Inc.  The firms were rivals in the sale of superpremium ice cream.  Ice cream is differentiated on the basis of the quality of ingredients.  Compared to premium and non-premium ice cream, superpremium ice cream contains more butterfat, less air, and more costly ingredients.  Superpremium ice cream sells at a substantially higher price than premium ice cream.  Using scanner data, Commission staff estimated demand elasticities for the superpremium, premium, and economy ice cream segments.  Staff's analysis showed that a hypothetical monopolist of superpremium ice cream would increase prices significantly.  This, together with other documentary and testimonial evidence, indicated that the relevant market in which to analyze the transaction was superpremium ice cream.  The Commission entered into a consent agreement with the merging firms, requiring divestiture of two

brands and of key distribution assets.

*UPM–MACtac* (DOJ 2003)  UPM-Kymmene Oyj sought to acquire (from Bemis Co.) Morgan Adhesives Co. ("MACtac"). They were two of the three largest producers of paper pressure-sensitive labelstock, from which "converters" make pressure-sensitive labels. End users peel pressure-sensitive labels off a silicon-coated base material and directly apply them to items being labeled.  The Department challenged the acquisition on the basis of likely anticompetitive effects in two relevant product markets.  One was paper labelstock used to make pressure sensitive labels for "variable information printing" ("VIP").  Some or all of the printing on VIP labels is done by end users as the label is applied.  A familiar example is the price labeling of fresh meat sold in supermarkets.  Although paper labelstock for VIP labels competes with plastic film labelstock, the Department found that film labels are of sufficiently higher cost that a hypothetical monopolist of paper labelstock for VIP labels would raise price significantly.  The other relevant product market was paper labelstock used for "prime" labels.  Prime labels are used for product identification and are printed in advance of application.  Paper labelstock for prime labels, competes not just with film labelstock, but also with pre-printed packaging and other means of product identification.  Nevertheless, the Department found that a hypothetical monopolist of paper labelstock for prime labels would raise price significantly because users of pressure-sensitive paper labels find them the least-cost alternative for their particular applications and because they would have to incur significant switching costs if they adopted an alternative means of product identification.  After trial, the court enjoined the consummation of the acquisition.

*Tenet–Slidell* (FTC 2003)  Tenet Health Care Systems owned a hospital in Slidell, Louisiana (near New Orleans), and proposed to acquire Slidell's only other full-service hospital.  There were many other full-service hospitals in the New Orleans area but all were outside of Slidell.  Commission staff found that a significant number of Slidell residents and their employers required access to either of the two Slidell hospitals in their private health insurance plans.  The Slidell hospitals competed against each other for inclusion in health plan networks.  After merging, the combined hospital would have had no rival with "must have" network status among Slidell residents and employers.  A hypothetical monopolist of the Slidell hospitals likely would have imposed a small but significant and non-transitory price increase on health plans selling coverage in Slidell, because neighboring hospitals outside of Slidell were not effective substitutes for network inclusion. The relevant geographic market, therefore, was limited to hospitals located in Slidell.  Under Louisiana law, proposed acquisitions of not-for-profit hospitals must be approved by the Louisiana Attorney General.  By invitation of the state Attorney General, Commission staff, in a public letter authorized by the Commission, advised the Attorney General of the staff's view that, based on the facts gathered in its then-ongoing investigation, the proposed acquisition raised serious competitive concerns.  In a vote authorized by local law, parish residents subsequently rejected the proposed transaction, which never was consummated.

In sections 1.12 and 1.22, the Guidelines explain that the Agencies may define relevant markets on the basis of price discrimination if a hypothetical monopolist likely would exercise market power only, or especially, in sales to particular customers or in particular geographic areas. The Agencies address the same basic issues for any form of discrimination:  Would price discrimination, if feasible, permit a significantly greater exercise of market power?  Could competitors successfully identify the transactions to be discriminated against? Would customers or third parties be able to undermine substantially the discrimination through some form of arbitrage in which a product sold at lower prices to some customer groups is resold to customer groups intended by the firms to pay higher prices? In cases in which a hypothetical monopolist is likely to target only a subset of customers for anticompetitive price increases, the Agencies are likely to identify relevant markets based on the ability of sellers to price discriminate.

*Quest–Unilab* (FTC 2003)  Quest Diagnostics, Inc. and Unilab Corp., the two leading providers of clinical laboratory testing services to physician groups in Northern California, proposed to merge.  Their combined market share would have exceeded 70%; the next largest rival had a market share of 4%. Clinical laboratory testing services are marketed and sold to various groups of customers, including physicians, health insurers, and hospitals. Commission staff determined that purchasers of these services cannot economically resell them to other customers, and that suppliers of the services can potentially identify the competitive alternatives available to physician group customers according to the group's base of physicians and geographic coverage.  This information indicated that a hypothetical monopolist could discriminate on price among customer types.  Suppliers' ability to price discriminate, combined with the fact that some types of customers had few competitive alternatives to contracting with suppliers that had a network of locations, led staff to define markets based on customer categories.  The Commission issued a complaint alleging that the transaction would lessen competition substantially in one of the customer categories: the provision of clinical laboratory testing services to physician groups in Northern California.  An accompanying consent order required divestiture of assets used to provide clinical laboratory testing services to physician groups in Northern California.

*Ingersoll-Dresser-Flowserve* (DOJ 2000) Flowserve Corp. agreed to acquire Ingersoll-Dresser Pump Co.  Both firms produced a broad array of pumps used in industrial processes.  The Department challenged the proposed acquisition on the basis of likely anticompetitive effects in "API 610" pumps, which are used by oil refineries, and pumps used in electric power plants. Both sorts of pumps are customized according to the specifications of the particular buyer and are sold through bidding mechanisms. Customization of the pumps made arbitrage infeasible. The Department concluded that the competition in each procurement was entirely distinct and therefore that each procurement took place in a separate and distinct relevant market.  The Department's challenge to the

merger was resolved by consent decree.

*Interstate Bakeries–Continental* (DOJ 1995) The Department challenged Interstate Bakeries Corp.'s purchase of Continental Baking Co. from Ralston Purina Co.   The challenge focused on white pan bread, and the Department found that the purchase likely would have produced significant price increases in five metropolitan areas—Chicago, Milwaukee, Central Illinois, Los Angeles, and San Diego.    Among the reasons the Department concluded that competition was localized to these metropolitan areas were that bakers charged different prices for the same brands produced in the same bakeries, depending on where the bread was sold, and that arbitrage was infeasible.  Arbitrage was exceptionally costly because the bakers themselves placed their bread on the supermarket shelves, so arbitrage required removing bread from the shelves, reshipping it, and reshelving it.  This process also would consume a significant portion of the brief period during which the bread is fresh.  The Department settled its challenge to the proposed merger by a consent decree requiring divestiture of brands and related assets in the five metropolitan areas.

The Guidelines indicate that the relevant market is the smallest collection of products and geographic areas within which a hypothetical monopolist would raise price significantly.  At times, the Agencies may act conservatively and focus on a market definition that might not be the smallest possible relevant market.  For example, the Agencies may focus initially on a bright line identifying a group of products or areas within which it is clear that a hypothetical monopolist would raise price significantly and seek to determine whether anticompetitive effects are—or are not—likely to result from the transaction in such a candidate market.  If the answer for the broader market is likely to be the same as for any plausible smaller relevant market, there is no need to pinpoint the smallest market as the precise line drawn does not affect the determination of whether a merger is anticompetitive. Also, when the analysis is identical across products or geographic areas that could each be defined as separate relevant markets using the smallest market principle, the Agencies may elect to

employ a broader market definition that encompasses many products or geographic areas to avoid redundancy in presentation. The Guidelines describe this practice of aggregation "as a matter of convenience." Guidelines § 1.321 n.14.

## Evidentiary Sources for Market Definition

### *The Importance of Evidence from and about Customers*

Customers typically are the best source, and in some cases they may be the only source, of critical information on the factors that govern their ability and willingness to substitute in the event of a price increase. The Agencies routinely solicit information from customers regarding their product and supplier selections. In selecting their suppliers, customers typically evaluate the alternatives available to them and can often provide the Agencies with information on their functional needs as well as on the cost and availability of substitutes. Customers also provide relevant information that they uniquely possess on how they choose products and suppliers. In some investigations, customers provide useful information on how they have responded to previous significant changes in circumstances. In some investigations, the Agencies are able to explore consumer preferences with the aid of price and quantity data that allow econometric estimation of the relevant elasticities of demand.

*Dairy Farmers–SODIAAL* (DOJ 2000) The Department challenged the proposed acquisition by Dairy Farmers of America, Inc. of SODIAAL North America Corp. on the basis of likely anticompetitive effects in the sale of "branded stick and whipped butter in the Philadelphia and New York metropolitan areas." DFA sold the Breakstone brand, and SODIAAL sold the Keller's and Hotel Bar brands. The Department concluded that consumers of branded butter in these metropolitan areas so preferred it over private-label butter, as well as margarine and other substitutes, that a hypothetical monopolist over just branded butter in each of those areas would raise price significantly. This conclusion was supported by econometric

evidence, derived from data collected from supermarkets, on the elasticity of demand for branded butter in Philadelphia and New York. The Department's complaint was resolved by a consent decree transferring the SODIAAL assets to a new company not wholly owned by DFA and containing additional injunctive provisions.

In the vast majority of cases, the Agencies largely rely on non-econometric evidence, obtained primarily from customers and from business documents.

*Cemex–RMC* (FTC 2005) The proposed acquisition of RMC Group PLC by Cemex, S.A. de C.V. would have combined two of the three independent ready-mix concrete suppliers in Tucson, Arizona. Ready-mix concrete is a precise mixture of cement, aggregates, and water. It is produced at local plants and delivered as a slurry in trucks with revolving drums to construction sites, where it is poured and formed into its final shape. Commission staff determined from information received from customers that a hypothetical monopolist over ready-mix concrete would raise price significantly in the relevant area. Asphalt and other building materials were found not to be good substitutes for ready-mix concrete, due in significant part to concrete's pliability when freshly mixed and strength and permanence when hardened. Concerned that the transaction likely would result in coordinated interaction in the Tucson area, the Commission, pursuant to a consent agreement, ordered Cemex, among other things, to divest RMC's Tucson-area ready-mix concrete assets.

*Swedish Match–National* (FTC 2000) Swedish Match North America, Inc. proposed to acquire National Tobacco Company, L.P. The acquisition would have combined the first- and third-largest producers of loose leaf chewing tobacco in the United States. Commission staff evaluated whether, as the merging firms contended, moist snuff should be included in the relevant market for loose leaf chewing tobacco. Swedish Match's own market research revealed that consumers would substitute less expensive loose leaf, but not more expensive snuff, if loose leaf prices increased slightly. Additional evidence from

the firms' own business documents, and customer testimony from distributors that purchase and resell the products to retailers, demonstrated that loose leaf chewing tobacco constitutes a distinct product market that does not include moist snuff. The acquisition would therefore have resulted in a merged firm with a high share of the relevant market for loose leaf chewing tobacco. The Commission successfully challenged the merger in federal district court.

In determining whether to challenge a transaction, the Agencies do not simply tally the number of customers that oppose a transaction and the number of customers that support it. The Agencies take into account that all customers in a relevant market are not necessarily situated similarly in terms of their incentives. For example, intermediate resellers' views about a proposed merger between two suppliers may be influenced by the resellers' ability profitably to pass along a price increase. If resellers can profitably pass along a price increase, they may have no objection to the merger. End-users, by contrast, generally lack such an incentive because they must absorb higher prices. In all cases, the Agencies credit customer testimony only to the extent the Agencies conclude that there is a sound foundation for the testimony.

### Evidence of Effects May Be the Analytical Starting Point

In some investigations, before having determined the relevant market boundaries, the Agencies may have evidence that more directly answers the "ultimate inquiry in merger analysis," i.e., "whether the merger is likely to create or enhance market power or facilitate its exercise." Guidelines § 0.2. Evidence pointing directly toward competitive effects may arise from statistical analysis of price and quantity data related to, among other things, incumbent responses to prior events (sometimes called "natural experiments") such as entry or exit by rivals. For example, it may be that one of the merging parties recently entered and that econometric tools applied to pricing data show that the other merging party responded to that entry by reducing price by a significant amount and on a nontransitory basis while the prices of some other sellers that might be in the relevant

market did not.

To be probative, of course, such data analyses must be based on accepted economic principles, valid statistical techniques, and reliable data. Moreover, the Agencies accord weight to such analyses only within the context of the full investigatory record, including information and testimony received from customers and other industry participants and from business documents.

Evidence pertaining more directly to a merger's actual or likely competitive effects also may be useful in determining the relevant market in which effects are likely. Such evidence may identify potential relevant markets and significantly reinforce or undermine other evidence relating to market definition.

***Staples–Office Depot*** (FTC 1997) Staples, Inc. proposed to acquire Office Depot, Inc., a merger that would have combined two of the three national retail chains of office supply superstores. The Commission found that in metropolitan areas where Staples faced no office superstore rival, it charged significantly higher prices than in metropolitan areas where it faced competition from Office Depot or the other office supply superstore chain, OfficeMax. Office Depot data showed a similar pattern: its prices were lowest where Staples and OfficeMax also operated, and highest where they did not. These patterns held regardless of how many non-superstore sellers of office supplies operated in the metropolitan area under review.

The Commission also found that evidence relating to entry showed that local rivalry from office supply superstores acted as the principal competitive constraint on Staples and Office Depot. Each firm regularly dropped prices in areas where they confronted entry by another office supply superstore, but did not do so in response to entry by other sellers of office supplies, such as Wal-Mart. Newspaper advertising and other promotional materials likewise reflected greater price competition in those areas in which Staples and Office Depot faced local rivalry from one another or from OfficeMax. Such evidence provided direct support for the conclusion that the acquisition would cause anticompetitive effects in the relevant product market defined as the sale of

10

consumable office supplies through office supply superstores, in those metropolitan areas where Staples and Office Depot competed prior to the merger. The Commission successfully challenged the merger in federal district court.

In some cases, competitive effects analysis may eliminate the need to identify with specificity the appropriate relevant market definition, because, for example, the analysis shows that anticompetitive effects are unlikely in any plausibly defined market.

*Federated–May* (FTC 2005)    Federated Department Stores, Inc. proposed to acquire The May Department Stores Co., thereby combining the two largest chains in the United States of so-called "traditional" or "conventional" department stores. Conventional department stores typically anchor enclosed shopping malls, feature products in the mid-range of price and quality, and sell a wide range of products. The transaction would create high levels of concentration among conventional department stores in many metropolitan areas of the United States, and the merged firm would become the only conventional department store at certain of the 1,200 malls in the United States.

If the relevant product market included only conventional department stores, then before the merger Federated had a market share greater than 90% in the New York–New Jersey metropolitan area. If the relevant product market also included, for example, specialty stores, then Federated's share in that geographic area was much smaller. The evidence that Commission staff obtained indicated that the relevant product market was broader than conventional department stores. For example, in the New York–New Jersey metropolitan area, Federated charged consumers the same prices that it charged throughout much of the eastern region of the United States, including where Federated faced larger numbers of traditional department store rivals. May and other department store chains, like Federated, also set prices to consumers that were uniform over very broad geographic areas and did not appear to vary local prices based on the number or identity of

conventional department stores in malls or metropolitan areas.

This evidence provided support for the conclusion that the acquisition likely would not create anticompetitive effects. Staff also found no evidence that competitive constraints, e.g., rivalry from retailers other than department stores, in New York–New Jersey were not representative of other markets in which Federated and May competed. Further, evidence pertaining both to which firms the parties monitored for pricing and to consumer purchasing behavior also supported the conclusion that the relevant market was sufficiently broad that the merger was not likely to cause anticompetitive effects. The Commission closed the investigation.

## *Industry Usage of the Word "Market" Is Not Controlling*

Relevant market definition is, in the antitrust context, a technical exercise involving analysis of customer substitution in response to price increases; the "markets" resulting from this definition process are specifically designed to analyze market power issues. References to a "market" in business documents may provide important insights into the identity of firms, products, or regions that key industry participants consider to be sources of rivalry, which in turn may be highly probative evidence upon which to define the "relevant market" for antitrust purposes. The Agencies are careful, however, not to assume that a "market" identified for business purposes is the same as a relevant market defined in the context of a merger analysis. When businesses and their customers use the word "market," they generally are not referring to a product or geographic market in the precise sense used in the Guidelines, although what they term a "market" may be congruent with a Guidelines' market.

*Staples–Office Depot* (FTC 1997)    In the blocked Staples–Office Depot transaction described above in this Chapter, the Commission alleged, and the district court found, that the relevant product market was "the sale of consumable office supplies through office supply superstores," with "consumable" meaning products that

consumers buy recurrently, like pens, paper, and file folders. Industry members in the ordinary course of business did not describe the "market" using this phrase. The facts showed that a hypothetical monopolist office supply superstore would raise price significantly on consumable office supplies. Many retail firms that are not office supply superstores—such as discount and general merchandise stores—sold consumable office supplies in areas near the merging firms. Despite the existence of such other sellers, evidence, including the facts identified above, justified definition of the relevant product market as one limited to the sale of consumable office products solely through office supply superstores.

It is unremarkable that "markets" in common business usage do not always coincide with "markets" in an antitrust context, inasmuch as the terms are used for different purposes. The description of an "antitrust market" sometimes requires several qualifying words and as such does not reflect common business usage of the word "market." Antitrust markets are entirely appropriate to the extent that they realistically describe the range of products and geographic areas within which a hypothetical monopolist would raise price significantly and in which a merger's likely competitive effects would be felt.

*Waste Management–Allied* (DOJ 2003) Waste Management, Inc. agreed to acquire assets from Allied Waste Industries, Inc. that were used in its municipal solid waste collection operations in Broward County, Florida. The Department challenged the proposed acquisition on the basis of anticompetitive effects in "small container commercial hauling." Commercial haulers serve customers such as office buildings, apartment buildings, and retail establishments. Small containers have capacities of 1–10 cubic yards, and waste from them is collected using specialized, front-end loading vehicles. The Department found that this market was separate and distinct from markets for other municipal solid waste collection services. The Department concluded that a hypothetical monopolist in just small container commercial hauling would have raised prices significantly because it was uneconomical for homeowners to use the much

larger containers used by commercial customers and uneconomical for commercial customers using large "roll-off" containers to switch to small commercial containers. The Department's challenge to the merger was resolved by a consent decree requiring divestiture of specified collection routes and the assets used on them.

*Pacific Enterprises–Enova* (DOJ 1998) Pacific Enterprises (which owned Southern California Gas Co.) and Enova Corp. (which owned San Diego Gas & Electric Co.) agreed to combine the companies under a common holding company. The Department challenged the combination on the basis of likely anticompetitive effects arising from the ability of the combined companies to raise electricity prices by restricting the supply of natural gas. The Department concluded that the relevant market was the sale of electricity in California during periods of high demand. In high-demand periods, limitations on transmission capacity cause prices in California to be determined by power plants in California. Inter-temporal arbitrage was infeasible because there is only a very limited opportunity to store electric power. Thus, the Department concluded that a hypothetical electricity monopolist during just periods of high demand would raise prices significantly. The Department's complaint was resolved by a consent decree requiring divestiture of generating facilities and associated assets.

# Market Definition and Integrated Analysis

## Market Definition Is Linked to Competitive Effects Analysis

The process of defining the relevant market is directly linked to competitive effects analysis. In analyzing mergers, the Agencies identify specific risks of potential anticompetitive harm, and delineate the appropriate markets within which to evaluate the likelihood of such potential harm. This process could lead to different conclusions about the relevant markets likely to experience competitive harm for two similar mergers within the same industry.

*Thrifty–PayLess* (FTC 1994) A proposed merger of Thrifty Drug Stores and PayLess Drug Stores would have combined retail drug store chains with store locations near one another in towns in California, Oregon, and Washington. Commission staff identified two potential anticompetitive effects from the merger: (1) that "cash" customers, i.e., individual consumers who pay out of pocket for prescription drugs, likely would pay higher prices; and (2) that third-party payers, such as health plans and pharmacy benefit managers ("PBMs"), likely would pay higher dispensing fees to chain pharmacy firms to obtain their participation in provider networks.

Cash customers tend to shop close to home or place of employment, suggesting small geographic markets for those customers. Third-party payers need network participation from chains having wide territorial coverage. The staff assessed different relevant markets for the two risks of competitive harm. In its complaint accompanying a consent agreement, the Commission alleged that the sale of prescription drugs in retail stores (i.e., sales to cash customers) was a relevant product market and that anticompetitive effects from the merger were likely in this market. The Commission did not allege a diminution in competition regarding the process by which pharmacies negotiate for inclusion in health plan provider networks and sought no relief in that market. The Commission ordered Thrifty, among other things, to divest retail pharmacies in the geographic markets of concern.

*Rite Aid–Revco* (FTC 1996) The nation's two largest retail drug store chains, Rite Aid Corp. and Revco D.S., Inc., proposed to merge. They competed in many local markets, including in 15 metropolitan areas in which the merged firm would have had more than 35% of the retail pharmacies. As in the foregoing *Thrifty–PayLess* matter, Commission staff defined two markets in which harm potentially may have resulted: retail sales made to cash customers, and sales through PBMs, which contract with multiple pharmacy firms to form networks offering pharmacy benefits as part of health insurance coverage. Pharmacy networks often include a high percentage of local pharmacies because access to many participating pharmacies is often important to

plan enrollees.

Rite Aid and Revco constrained one another's pricing leverage with PBMs in bargaining for inclusion in PBM networks. Each merging firm offered rival broad local coverage of pharmacy locations, such that PBMs could assemble marketable networks with just one of the firms included. A high proportion of PBM plan enrollees would have considered the merged entity to be their preferred pharmacy chain, leaving PBMs with less attractive options for assembling networks that did not include the merged firm. This would have empowered the merged firm successfully to charge higher dispensing fees as a condition of participating in a network.

Commission staff determined that the merger was likely substantially to lessen competition in the relevant market of sales to PBMs and similar customers who needed a network of pharmacies. The Commission voted to challenge the merger, stating that "the proposed Rite Aid-Revco merger is the first drug store merger where the focus has been on anticompetitive price increases to the growing numbers of employees covered by these pharmacy benefit plans, rather than exclusively focusing on the cash paying customer." The parties subsequently abandoned the deal.

Many mergers, in a wide variety of industries, potentially have effects in more than one relevant geographic market or product market and require independent competitive assessments for each market.

*Suiza–Broughton* (DOJ 1998) The Department challenged the proposed acquisition of Broughton Foods Co. by Suiza Foods Corp. Suiza was a nationwide operator of milk processing plants with four dairies in Kentucky and Tennessee. Broughton operated two dairies, including the Southern Belle Dairy in Pulaski County, Kentucky. The two companies competed in the sale of milk and other dairy products to grocery stores, convenience stores, schools, and institutions. The Department's investigation focused on schools, many of which require daily, or every-other-day, delivery. School districts procured the milk through annual contracts, each of which the

13

Department found to be an entirely separate competition. Thus, the Department defined 55 relevant markets, each consisting of a school district in south central Kentucky in which the proposed merger threatened competition. The Department's complaint was resolved by a consent decree requiring divestiture of the Southern Belle Dairy.

*NAT, L.C.–D.R. Partners* (DOJ 1995)  The Department and private plaintiffs challenged the consummated acquisition of the *Northwest Arkansas Times* by interests owning the competing *Morning News of Northwest Arkansas.* The Department concluded that the acquisition likely would harm subscribers of these newspapers as well as local advertisers, and defined separate relevant markets for readers and local advertisers. The Department found that both markets included only daily newspapers because of unique characteristics valued by readers and local advertisers, and concluded that the acquisition likely would harm both groups of customers. The courts required rescission of the acquisition.

## Market Definition and Competitive Effects Analyses May Involve the Same Facts

Often the same information is relevant to multiple aspects of the analysis. For example, regarding mergers that raise the concern that the merged firm would be able to exercise unilateral market power, the Agencies often use the same data and information both to define the relevant market and to ascertain whether the merger is likely to have a significant unilateral anticompetitive effect.

*General Mills–Pillsbury* (FTC 2001)  General Mills, Inc. proposed to acquire The Pillsbury Co.  General Mills owned the Betty Crocker brand of pancake mix and the Bisquick brand of all-purpose baking mix, a product that can be used to make pancakes as well as other products.  Pillsbury owned the Hungry Jack pancake mix brand.  An issue was whether the relevant product market for pancake mixes included Bisquick.  General Mills' Betty Crocker pancake mix had a relatively small share of a candidate pancake mix market that excluded Bisquick, suggesting that the merger

likely would not raise significant antitrust concerns in the candidate pancake mix market should the relevant market exclude Bisquick.

In addition to obtaining information from industry documents and interviews with industry participants on the correct contours of the relevant product market, FTC staff analyzed scanner data to address whether Bisquick competed with pancake mixes. Demand estimation revealed significant cross-price elasticities of demand between Bisquick and most of the individual pancake mix brands, suggesting that Bisquick competed in the same relevant market as pancake mixes. Merger simulation based on the elasticities calculated from the scanner data showed that if General Mills acquired Pillsbury it likely would unilaterally raise prices. All of the evidence taken together further confirmed that Pillsbury's Hungry Jack and Bisquick were significant substitutes, and the staff concluded that the relevant market included both pancake mixes and Bisquick. The parties resolved the competitive concerns in this market by selling Pillsbury's baking product line. No Commission action was taken.

*Interstate Bakeries–Continental* (DOJ 1995)  The Department challenged Interstate Bakeries Corp.'s purchase of Continental Baking Co. from Ralston Purina Co. on the basis of likely unilateral effects in the sale of white pan bread. Econometric analysis determined that there were substantial cross-elasticities of demand between the Continental and Interstate brands of white pan bread. The Department used the estimated cross-elasticities in a merger simulation, which predicted that the merger was likely to result in price increases for those brands of 5–10%. The data used to estimate these elasticities also were used to estimate the elasticity of demand for white pan bread in the aggregate and for just "premium" brands of white pan bread. The latter estimation indicated that the relevant market was no broader than all white pan bread, despite some limited competition from other bread products and other sources of carbohydrates. The Department's challenge to the proposed merger was settled by a consent decree requiring divestiture of brands and related assets in the five metropolitan areas.

14

## Integrated Analysis Takes into Account that Defined Market Boundaries Are Not Necessarily Precise or Rigid

For mergers involving relatively homogeneous products and distinct, identifiable geographic areas, with no substitute products or locations just outside the market boundaries, market definition is likely to be relatively easy and uncontroversial. The boundaries of a market are less clear-cut in merger cases that involve products or geographic areas for which substitutes exist along a continuum. The simple dichotomy of "in the market" or "out of the market" may not adequately capture the competitive interaction either of particularly close substitutes or of relatively distant substitutes.

Even when no readily apparent gap exists in the chain of substitutes, drawing a market boundary within the chain may be entirely appropriate when a hypothetical monopolist over just a segment of the chain of substitutes would raise prices significantly. Whenever the Agencies draw such a boundary, they recognize and account for the fact that an increase in prices within just that segment could cause significant sales to be lost to products or geographic areas outside the segment. Although these lost sales may be insufficient to deter a hypothetical monopolist from raising price significantly, combined with other factors, they may be sufficient to make anticompetitive effects an unlikely result of the merger.

## Significance of Concentration and Market Share Statistics

Section 2 of the Guidelines explains that "market share and concentration data provide only the starting point for analyzing the competitive impact of a merger." Indeed, the Agencies do not make enforcement decisions solely on the basis of market shares and concentration, but both measures nevertheless play an important role in the analysis. A merger in an industry in which all participants have low shares—especially low shares in all plausible relevant markets—usually requires no significant investigation, because experience shows that such mergers normally pose no real threat to lessen competition substantially. For example, if the merging parties are small producers of a homogeneous product, operating in a geographic area where many other producers of the same homogeneous product also are located, the Agencies may conclude that the merger likely raises no competition concerns without ever determining the precise contours of the market. By contrast, mergers occurring in industries characterized by high shares in at least one plausible relevant market usually require additional analysis and consideration of factors in addition to market share.

Section 1.51 of the Guidelines sets out the general standards, based on market shares and concentration, that the Agencies use to determine whether a proposed merger ordinarily requires further analysis. The Agencies use the Herfindahl-Hirschman Index ("HHI"), which is the sum of the squares of the market shares of all market participants, as the measure of market concentration. In particular, the Agencies rely on the "change in the HHI," which is twice the product of the market shares of the merging firms, and the "post-merger HHI," which is the HHI before the merger plus the change in the HHI. Section 1.51 sets out zones defined by the HHI and the change in the HHI within which mergers ordinarily will not require additional analysis. Proposed mergers ordinarily require no further analysis if (a) the post-merger HHI is under 1000; (b) the post-merger HHI falls between 1000 and 1800, and the change in the HHI is less than 100; or (c) the post-merger HHI is above 1800, and the change in the HHI is less than 50.

The Agencies' joint publication of Merger Challenges Data, Fiscal Years 1999–2003 (issued December 18, 2003), and the Commission's publication of Horizontal Merger Investigation Data, Fiscal Years 1996–2003 (issued February 2, 2004 and revised August 31, 2004), document that the Agencies have often not challenged mergers involving market shares and concentration that fall outside the zones set forth in Guidelines section 1.51. This does not mean that the zones are not meaningful, but rather that market shares and concentration are but a "starting point" for the analysis, and that many mergers falling outside these three zones nevertheless, upon full consideration of the factual and economic evidence, are found unlikely substantially to lessen competition. Application of the Guidelines as an integrated whole to case-specific facts—not

15

undue emphasis on market share and concentration statistics—determines whether the Agency will challenge a particular merger. As discussed in section 1.521 of the Guidelines, historical market shares may not reflect a firm's future competitive significance.

*Boeing–McDonnell Douglas* (FTC 1997) The Boeing Co., the world's largest producer of large commercial aircraft with 60% of that market, proposed to acquire McDonnell Douglas Corp., which through Douglas Aircraft had a share of nearly 5% in that market. Airbus S.A.S. was the only other significant rival, and obstacles to entry were exceptionally high. Although McDonnell Douglas was not a failing firm, staff determined that McDonnell Douglas' significance as an independent supplier of commercial aircraft had deteriorated to the point that it was no longer a competitive constraint on the pricing of Boeing and Airbus for large commercial aircraft. Many purchasers of aircraft indicated that McDonnell Douglas' prospects for future aircraft sales were close to zero. McDonnell Douglas' decline in competitive significance stemmed from the fact that it had not made the continuing investments in new aircraft technology necessary to compete successfully against Boeing and Airbus. Staff's investigation failed to turn up any evidence that this situation could be expected to be reversed. The Commission closed the investigation without taking any action.

Indeed, market concentration may be unimportant under a unilateral effects theory of competitive harm. As discussed in more detail in Chapter 2's discussion of Unilateral Effects, the question in a unilateral effects analysis is whether the merged firm likely would exercise market power absent any coordinated response from rival market incumbents. The concentration of the remainder of the market often has little impact on the answer to that question.

16

# EXHIBIT
# 4

**Errata in Draft Transcript of Deposition of Andrew Zimbalist in DTB v. ATP et al.,
taken February 22, 2008**

p. 11, line 11, should read: "asked them to input"

p. 23, line 19, should read: "There are some"

p. 27, line 18, should read: "which involves antitrust economics"

p. 50, lines 5 & 6, should read: "because apparently my general description"

p. 53, line 7: should read: "at all representative of the issue"

p. 55, line 9, should read: "the places I would have changed:

p. 55, line 11, should read: "markets of some of the joint products"

p. 57, lines 5 & 6, should read: "is a potentially …. and antitrust market."

p. 57, line 13, should read: "concessions markets"

p. 60, line 3, should read: " Second Circuit held"

p. 62, line 11, should read: "Not sure that cooperation"

p. 62, line 17, should read: "just layout a formula"

p. 66, line 19, should read: "percent of the revenue."

p. 76,  line 13, should read: "unavoidable"

p. 81, line 16, should read: "my response"

p. 81, line 19, should read: "has evolved over time"

p. 83, line 2, should read: "are raging supreme"

p. 91, line 21, should read: "ATP"

p. 92, line 22, should read: "top tier men's"

p. 99, line 7, should read: "top ten"

p. 99, line 23, should read: "relative to demand"

p. 100, line 6, should read: "outside the scope"

p. 101, line 22, should read: "to you right now"

p. 102, line 21, should read: "Meaning, did he talk"

p. 105, line 2, should read: "Dehli, India"

p. 105, line 24, should read: "Hamburg is affected"

p. 106, line 13, should read: "it seems well near impossible"

p. 107, line 7, should read: "clay court swing"

p. 107, line 14, should read: "better than I do"

p. 108, line 1, should read: "prohibitively expensive"

p. 108, line 7, should read:  "could come along and say"

p. 108, lines 10 and 16, should read: "prohibitively expensive"

p. 110, lines 1 and 2, should read: " advantage of in competitive"

p. 110, line 16, should read: "I happen to"

p. 114, line 7, should read: "economist.  I know the sports"

p. 116, line 13, should read: "incentivizing – but strongly"

p. 119, line 10, should read: "the top 15 tournaments"

p. 119, line 13, should read: "have 15 but"

p. 122, line 4, should read: "if you add that tendency"

p. 125, line 3, should read: "to quantitatively add"

p. 126, line 11, should read: "Federer"

p. 133, line 17, should read: "used pair dummies" and "the pair dummies"

p. 134, line 1, should read: "Oh, darn."

p. 144, line 21, should read: "offer an expert"

p. 149, line 7, should read: "it's an opinion as an"

p. 153, line 10, should read: "Marcus Katz"

p. 153, line 19, should read: "up pro formas"

p. 153, line 25, should read: "made about the design"

p. 154, line 21, should read: "some pro formas"

p. 156, line 18, should read: "it has encountered"

p. 157, line 7, should read: "that suggest"

p. 158, line 17, should read: "There are such tests."

p. 159, line 19, should read: "are biased downward"

p. 164, line 3, should read: "tobit regression"

p. 164, line 9, should read: "censored regression"

p. 174, line 18, should read: "there are also"

p. 175, line 14, should read: "that it is simply adding"

p. 175, line 19, should read: "it's a piece of evidence"

p. 177, line 2, should read: "individual teams, and with Major"

p. 179, line 4, should read: "before I wrote that sentence? No."

p. 181, line 19, should read: "enthralled"

p. 184, line 4, should read: "Relative to the demand in the marketplace."

p. 185, line 6, should read: "sell the television rights"

p. 187, line 23, should read: "own-elasticity test"

p. 188, line 5, should read: "establish them as substitutes"

p. 190, line 5, and p. 191, line 3, should read: "Annette Koring"

p. 192, lines 15 and 16, should read: "specious grounds and it is being"

p. 194, line 23, I believe it is "Comperio"

p. 198, lines 14 & 15, should read: "ATP/WTA joint tournament."

p. 199, line 18, should read: "the AFL came along"

p. 201, line 2, should read: "number should be seven"

p. 205, line14, should read: "tacit collusion"

p. 210, line 3, should read: "tracks run open-wheel races"

p. 214, lines 16-17, should read: "to engage in contact sports during"

p. 215, line16, should read: "happens in tennis."

p. 216, line 9, should read: "complementary"

p. 216, line 23, should read: "attendance at men's"

p. 218, line 6, should read: "different continents"

p. 219, line 11, should read: "the concurrence"

p. 219, line 13, should read: "the effect"

p. 224, line 2, should read: "A.  No."

With the foregoing corrections, the transcript will represent an accurate reading of my deposition in this matter.

Andrew Zimbalist

March 13, 2008

# EXHIBIT
# 5

1

```
 1                       VOLUME I
                         PAGES:    1 - 227
 2                       EXHIBITS:  161 - 162

 3          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 4
                         C.A. NO.  07-178-GMS
 5

 6

 7    *   *   *   *   *   *   *   *   *   *       *
                                                 *
 8    DEUTSCHER TENNIS BUND (GERMAN              *
      TENNIS FEDERATION) and                     *
 9    ROTHENBAUM SPORTS GMBH TENNIS              *
      and QATAR TENNIS FEDERATION,               *
10                    Plaintiffs,                *
                                                 *
11    vs.                                         *
                                                 *
12    ATP TOUR, INC., ETIENNE DE                 *
      VILLIERS, CHARLES PASARELL                 *
13    GRAHAM PEARCE, JACCO ELTINGH,              *
      PERRY ROGERS, and IGGY JOVANOVIC,          *
14                    Defendants.                *
                                                 *
15    *   *   *   *   *   *   *   *   *   *       *

16

17

18          DEPOSITION OF ANDREW ZIMBALIST, taken on

19    behalf of the Defendant, pursuant to the Massachusetts

20    Rules of Civil Procedure, before Karen Borreson, RPR,

21    Notary Public within and for the Commonwealth of

22    Massachusetts, at the Clarion Hotel & Conference

23    Center, 1 Atwood Drive, Northampton, Massachusetts, on

24    Friday, February 22, 2008, commencing at 9:00 a.m.

25
```

220

1    Q.   You didn't look at how concurrent events here

2 might have affected ATP tournament television ratings?

3    A.   Not television ratings, no.

4         MR. UNDERWOOD:  I have no other questions.

5 Thank you.

6         MR. MacGILL:  I have just a couple of

7 follow-up questions.

8             EXAMINATION BY MR. MacGILL

9    Q.   Does the ATP now operate in an environment

10 which includes the special events rule?

11    A.   Yes, it does.

12    Q.   And does the ATP now operate in an environment

13 which includes the ranking system, which awards points

14 for Grand Slams, Masters series events and others?

15    A.   Yes.

16         MR. UNDERWOOD:  Object to the form of the

17 question.

18    Q.   Does the ATP now operate in an environment

19 which includes -- a Masters schedule which includes a

20 schedule stipulating Grand Slam events, Masters series

21 events and other tournaments?

22    A.   Can you repeat that?

23    Q.   Does the APT now operate in an environment

24 which includes an overall schedule, which includes

25 Grand Slams events, Masters series events and other

221

1  ATP events?

2      A.    Yes.

3              MR. UNDERWOOD:   Object to the form of the

4  question.

5      Q.    Does the ATP now operate in an environment

6  which includes the ownership interlock, which you

7  identified in your initial report and in your reply

8  report?

9      A.    Yes.

10             MR. UNDERWOOD:   Object to the form of the

11  question.

12     Q.    In this operating context, does the APT itself

13  have the ability to exercise market power in the

14  market for production of top-tier men's professional

15  tennis events?

16             MR. UNDERWOOD:   Object to the form of the

17  question.

18     A.    In this context, yes, it does.

19     Q.    In this operating context, Dr. Zimbalist, does

20  the ATP itself have the ability to exercise market

21  power in the market for player services?

22             MR. UNDERWOOD:   Object to the form of the

23  question.

24     A.    In this operating context, yes, it does.

25     Q.    And finally, Mr. Zimbalist, in this operating

222

1  context, does the ATP itself have the ability to

2  exercise market power in the market for hosting a

3  top-tier event?

4          MR. UNDERWOOD:  Object to the form of the

5  yes.

6      A.   In this operating context, yes, it does.

7          MR. MacGILL:  I have no further questions.

8      FURTHER EXAMINATION BY MR. UNDERWOOD

9      Q.   Turn to Page 20 of Exhibit No. 162.

10     A.   Okay, I'm there.

11     Q.   You write, "It is true that the ATP's

12  quantitative share of total revenue generated by

13  top-tier men's professional tennis by itself does not

14  suggest that the ATP would have market power,"

15  correct?

16     A.   Yes, I do.

17     Q.   Is that a correct statement?

18     A.   Yes, it is.

19     Q.   And you say, "The reason that the ATP does

20  have market power; however, is because it works

21  together with the entity that has most of the market

22  share, the ITF."

23          Do you see that statement?

24     A.   Yes, I do.

25     Q.   Is that a correct statement?

# EXHIBIT
# 6

1

1

2            IN THE UNITED STATES DISTRICT COURT

3               FOR THE DISTRICT OF DELAWARE

4    --------------------------------X

5    DEUTSCHER TENNIS BUND (GERMAN

6    TENNIS FEDERATION) and

7    ROTHENBAUM SPORTS GMBH TENNIS,

8    and QATAR TENNIS FEDERATION,

9               Plaintiffs,

10        VS.                    Case No. 07-178-GMS

11    ATP TOUR, INC., ETIENNE DE

12    VILLIERS, CHARLES PASAELL,

13    GRAHAM PEARCE, JACCO ELTINGH,

14    PERRY ROGERS and IGGY JOVANOVIC,

15               Defendants.

16    --------------------------------X

17

18        DEPOSITION OF JONATHAN WALKER, Ph.D.

19               New York, New York

20               February 14, 2008

21

22    Reported by:
      Bonnie Pruszynski, RMR
23

24

25

45

1              Jonathan Walker, Ph.D.

2  consumers in the output markets and some

3  consideration of the entry conditions that prevail

4  in the input market.

5              MR. UNDERWOOD:  Could I hear the

6       answer again?

7              (Record read.)

8              THE WITNESS:  I had to consider

9       substitution possibilities, that is the word

10       that is missing.

11  BY MR. MAC GILL:

12       Q      Could you summarize again, sir, you

13  just described in your answer, and the court

14  reporter will be able to listen to your tape

15  recording and record your answer properly to the

16  last question.

17              Let's make sure you have your chance

18  to state, again, what you looked at in terms of,

19  in terms of your economic methodology that you

20  utilized in connection with your identifying the

21  relevant markets at issue, what, if anything, did

22  you evaluate relative to this issue of

23  substitutability?

24       A      I think that there is a lot of

25  information that is discussed in here in

46

1              Jonathan Walker, Ph.D.

2    particular.  For live attendance, I considered

3    what the deponents said about how they went about

4    setting their ticket prices, the GTF deponents,

5    what they said about how they went about setting

6    ticket prices, what alternatives were available in

7    Hamburg.

8              I considered articles that had been

9    written about live attendance at tennis events.  I

10   considered my general background in sports

11   economics and an understanding about what a tennis

12   event actually is, and all of those led me to

13   conclude that consumers have other alternatives to

14   ATP tennis, besides ATP tennis, itself.

15             There was also evidence in the record

16   that the market was much narrower than global,

17   local markets for live attendance.  And I

18   recognized that Masters Series events, local

19   markets were not overlapping, and came to the

20   conclusion that there must be some products that

21   are constraining pricing today, and given the

22   prices and circumstances that exist today, there

23   must be substitutes for tennis other than other

24   tennis events.

25             As far as sponsorships go, I

47

1                    Jonathan Walker, Ph.D.

2    considered deposition testimony from, particularly

3    from the GTF witnesses, but also from other

4    witnesses, talking about the alternatives that are

5    available to sponsors.  I considered what the

6    purpose of the sponsorship is and my general

7    understanding of how businesses work to conclude

8    that there were other alternatives available to

9    sponsors besides ATP Tennis.

10                   I also considered evidence in the

11   record, direct evidence of substitution of non-ATP

12   events for ATP events by sponsors to conclude that

13   there were numerous sponsorships opportunities,

14   substitution possibilities available to sponsors.

15                   For television, once again, I

16   considered what the general business model is for

17   television networks, I reviewed evidence that is

18   summarized in my report concerning the sale of

19   programming rights to television networks, and I

20   also considered deposition testimony from GTF

21   witnesses in particular, to conclude that networks

22   had numerous alternatives to ATP tennis.

23                   All of that led me to conclude that

24   ATP tennis, both live audiences, live

25   entertainment, life event attendance-related

48

Jonathan Walker, Ph.D.

1
2  revenues were competing with lots of other
3  alternatives.  It led me to conclude that ATP
4  sponsorships were competing with lots of other
5  alteratives, and it led me to conclude that ATP
6  television programming was competing with lots of
7  other alternative.
8          When I say "competing," I mean in the
9  sense that a monopolist over that would not be
10  able to raise prices above the competitive level.
11      Q     Now, just focusing on your, the
12  actual methodology that you used to -- for market
13  definition, to arrive at these opinions on what
14  the markets at issue are in this case, I
15  understand that you -- there as a part of that
16  methodology, you considered this subject of
17  substitutability as you have described it; right?
18      A     Yes, that's right.
19      Q     Now, as you did this, in connection
20  with this market analysis, is it fair to say that
21  you reviewed various forms or at least some forms
22  of qualitative evidence to make your market
23  definition assessment and conclusion.
24      A     Yes.
25      Q     And you have described, as you best

49

1           Jonathan Walker, Ph.D.

2   remember, the various forms of qualitative

3   evidence that you reviewed in connection with that

4   market definition and conclusion of relevant

5   markets that you have reached here?

6       A       I summarized some of it, yes.

7       Q       And based on the qualitative evidence

8   that you have summarized, at least in part, you

9   were able to come to the conclusion and, again,

10  your words, that the relevant markets as issue are

11  as you describe them in paragraph 2(D)?

12      A       Well, I have never --

13      Q       2(B), I should say.

14      A       I have never tried to distinguish

15  between the qualitative evidence and the

16  quantitative evidence.

17              There is a body of evidence, some of

18  which is clearly qualitative, and some of which is

19  clearly quantitative and it's in totality it leads

20  me to these conclusions.

21      Q       All right.  Now, the quantitive

22  evidence in this context of defining markets and

23  coming to the market definitions that you,

24  yourself, arrived at in connection with this case,

25  the quantitative evidence that you used took what

61

Jonathan Walker, Ph.D.

1

2    events.   The question is:   What's the market in

3    which ATP sponsorships, ATP live entertainment,

4    ATP broadcast rights are sold?

5          It seems to me to be pretty obvious

6    that's what we are talking about in this case.

7    Q      Now, let's go back to what evidence,

8    if any, supports your market definitions that you

9    wrote on your own computer and submitted in the

10   record of this case.

11         You described, in your words,

12   qualitative evidence and, in your words,

13   quantitative evidence, which supports a market

14   definition, one of them as live entertainment.   In

15   relation to that live entertainment conclusion,

16   that is that live entertainment is a market, did

17   you do any cross-elasticity testing.

18   A      Well, first, it wasn't my -- my

19   words.   I did not in anywhere in this report say

20   this is the quantitative and this is the

21   qualitative evidence.   I presented lots of

22   evidence, and if somebody wanted to distinguish

23   between what's quantitative and what's

24   qualitative, they could.   And I gave you my first

25   attempt at trying to do such a thing.

62

1                    Jonathan Walker, Ph.D.

2                    I don't know why one would want to do

3    that.  I don't know if I knew the purposes if I

4    would categorize things differently.

5         Q      Fair enough.  That's fine.

6         A      Second, I did not say that it was a

7    live attendance market.  I said it's a market in

8    which live attendance related revenue earned by

9    ATP tournaments are earned, and it includes more

10   than just ATP tennis.

11                   And as far as what did I look at?  I

12   think that it's summarized pretty well in the

13   report, itself.  I tried to be very clear, and

14   it's why I would distinguish between the one and

15   one third pages of this being my opinion as

16   opposed to the -- or being a disclosure of my

17   opinion, as opposed to the document, itself.

18        Q      Let's go back to the question, if you

19   don't mind, the actual question that I asked you a

20   minute ago.

21                   In relation to your conclusion, using

22   what you described as generally accepted economic

23   principles, when you came to the conclusion that

24   one of the relevant markets at issue was live

25   entertainment, did you do any cross elasticity

63

1                Jonathan Walker, Ph.D.

2   testing?

3        A        Formal econometric estimation of

4   cross elasticities, no; but consideration of

5   substitution possibilities, and cross elasticities

6   meaning tendencies for consumers to switch between

7   products, yes, I considered that.

8        Q        On a qualitative basis?

9             MR. UNDERWOOD:  Object to the form of

10           the question.

11       A    .  I think we have talked before.  There

12  is a lot evidence in this case, of both a

13  quantitative and qualitative nature, that

14  indicates that there are substitutes for

15  attendance at live ATP events.

16       Q        All right.  In connection with the

17  live entertainment market that you identified in

18  connection with the methodology that you utilized

19  in this case to identify live entertainment as one

20  of the relevant markets, you did not do

21  cross-elasticity testing in an econometric

22  modeling sense; agreed?

23       A        Well, there is all that prefatory

24  material that just contradicts what I said before

25  about there being a live entertainment market per

65

1                    Jonathan Walker, Ph.D.

2    consider --

3         Q      I'm' not interested in a lecture

4    right now.

5         A      I'm answering your questions.

6         Q      Did you or did you not --

7         A      I applied the Department of Justice

8    merger guidelines method for determining the

9    markets in which each of these three types of

10   revenue sources are earned.  That methodology

11   involves identifying what it is that you are

12   trying to determine is being affected by

13   competition, and then thinking about and analyzing

14   and considering what are the substitution

15   possibilities available to the buyers of those

16   services.  And I did that for each of those three

17   things.

18        Q      Using qualitative evidence, not

19   cross-elasticity measures; is that right?

20              MR. UNDERWOOD:  Object to the form of

21        the question.

22        A      Using both qualitative and

23   quantitative evidence.

24        Q      Did you or did you not, with respect

25   to any one of the four markets that you have

67

                    Jonathan Walker, Ph.D.

1  know right now what you didn't do.  Then we are

2  going to go to what additional steps you did.

3

4       A       Well, that is actually the problem.

5  That may be why it appears that I am arguing with

6  you, but you keep saying that I didn't do things,

7  and I keep trying to explain to you how and why it

8  is that an economist the answering that question

9  would say that your preface is incorrect.

10      Q       I'm not arguing with you.  Just

11  answer the questions and we will get to the end of

12  this.

13              Now, you didn't to cross-elasticity

14  testing for live entertainment, sponsorships --

15  the live entertainment market, the sponsorship

16  market, the broadcast rights market or the player

17  services market; right?

18      A       No.

19              MR. UNDERWOOD:  Object the form of

20        the question.

21      A       No, that is not right.

22      Q       Let's take them one at a time.

23              What cross-elasticity modeling did

24  you do for the market live entertainment?

25      A       If by cross-elasticity modeling you

68

1                    Jonathan Walker, Ph.D.

2    mean what econometric analysis did I do --

3         Q      Yes.

4         A      -- to estimate specific

5    cross-elasticity parameters, the answer is none.

6         Q      The answer is what?

7         A      None.

8         Q      Now, let's make sure there is no

9    problem with what you are saying under oath and

10   what I am understanding.

11              When you say "econometric modeling,"

12   what do you mean?

13        A      Well, I don't know that I said

14   econometric modeling.  I don't know that it

15   matters that I didn't, but I don't think that I

16   said that.

17        Q      Let's hear the last, if you could,

18   let's find his phrase, Bonnie, if you don't mind,

19   let's read it back and make sure we have this term

20   used.

21              (Record read.)

22        Q      Is it fair to say, sir, using your

23   words, now that the reporter has just read them

24   back, that you did no econometric analysis to

25   estimate cross-elasticity parameters for the

69

1          Jonathan Walker, Ph.D.

2  market of sponsorships that you identified --

3        A      Yes, that is correct.

4        Q      -- is it fair to say, sir, that,

5  again, using your terms, that you did no

6  econometric analysis to estimate cross-elasticity

7  parameters for the broadcast rights market that

8  you identified?

9        A      Yes, that's correct.

10       Q      Is it, again, using your terms, is it

11  correct to say, sir, that you, yourself, in

12  connection with your methodology, did not use any

13  econometric analysis to estimate cross-elasticity

14  parameters in the underlying market you identified

15  for player services?

16       A      Yes, that's correct.

17       Q      All right.  And I believe you already

18  answered that you did no econometric analysis to

19  estimate cross-elasticity parameters for the

20  market live entertainment; correct?

21       A      For the market in which live

22  entertainment revenues were earned, that's

23  correct.

24       Q      Now, looking at each of these four

25  markets, with respect to the live entertainment

70

1                    Jonathan Walker, Ph.D.

2    markets as you have described it, did you do any

3    SSNIP test?

4          A      Yes.

5          Q      What SSNIP test did you do?

6          A      Well, the entire analysis, which is

7    described and summarized in this report, is a

8    SSNIP test.  That is what it means.

9          Q      And did you do what you considered to

10   be a SSNIP test for the sponsorship market?

11         A      Yes.

12         Q      Did you do a SSNIP test for the

13   broadcast rights market?

14         A      Yes.

15         Q      And did you do a SSNIP test for the

16   player services market?

17         A      Yes.

18         Q      What do you consider a SSNIP test --

19   just for the record, SSNIP refers, to what, sir?

20         A      Oh, the -- significant non-transitory

21   increase in price, small but substantial

22   non-transitory increase in price.

23         Q      We will refer to that, sir, as a

24   SSNIP test.

25         A      Sure.

71

Jonathan Walker, Ph.D.

1

2      Q      Now, what did you do in connection

3  with the live entertainment market, what was your

4  SSNIP test.  Describe what you actually did to

5  conduct a SSNIP test relative to that market.

6      A      I reviewed various sources of

7  information indicating that fans have multiple

8  alternatives available to attendance at live

9  tennis events.

10             I considered survey results,

11  deposition testimony, academic studies indicating

12  the same.  And I considered whether, under those

13  circumstances, it was reasonable, as matter of

14  economics, that a local monopolist over ATP tennis

15  tournaments could raise price above both the

16  competitive level and, alternatively, above the

17  existing observed level, over a sustained period

18  of time.

19      Q      And did this work involved

20  calculations?

21      A      There are calculations that are

22  discussed in this report, yes.

23      Q      Did it involve an assessment of this

24  information, the fan information, the survey

25  information, the deposition information, other

79

Jonathan Walker, Ph.D.

1
2  characterize as qualitative evidence to support
3  the conclusion that one of the relevant markets at
4  issue is the market for sponsorships?
5      A      Well, other than you asking me to do
6  it, I wouldn't go through this characterization at
7  all.
8              If are you asking me now to identify
9  evidence that seems like it would be more
10 appropriately a qualitative bucket than a
11 quantitative, I would say the deposition testimony
12 from the GTF talking about the competitive
13 alternatives that are available to people to whom
14 they attempt to market sponsorships.
15             I think the evidence of actual
16 substitution by sponsors of other things, or
17 sponsorship of the ATP and its member tournaments,
18 academic studies tending to indicate that all
19 sorts of sponsorships compete with each other, a
20 general understanding of the purpose for
21 sponsorships, which tends to indicate that
22 businesses have non-sponsorship alternatives
23 available to perform the exact same function as
24 sponsorship.  Those are the things that come to
25 mind.

80

Jonathan Walker, Ph.D.

2    But, once again, I think this is
3  discussed in greater detail in the report, and I
4  don't mean to exclude things by not happening to
5  remember them offhand.

6    Q    All right.  Now, if you do remember
7  during the course of the deposition any
8  qualitative evidence that would support this
9  conclusion that the sponsorship is a relevant
10 market issue, please add at any time in this
11 deposition as you fit.

12    Now, is there quantitive evidence,
13 sir, that supports your conclusion that a relative
14 market at issue is sponsorship -- sponsorships, I
15 should say.

16    MR. UNDERWOOD:  Object to the form of
17    the question.

18    A    There is the same problem.  If it was
19 in your earlier question, I apologize for not
20 having caught it.

21    But the relevant markets at issue
22 include markets for sponsorships, meaning the
23 markets into which ATP sells its sponsorships.  It
24 is not limited to sponsorships.  And, in fact, in
25 my answer I talked about other alternatives that

1                    Jonathan Walker, Ph.D.

2   are available to sponsors to achieve the same

3   results as sponsoring.  Two obvious alternatives

4   would be hiring celebrity tennis athletes as

5   spokespeople, or advertising directly by purchase

6   of slots, ad slots.

7        Q      Sir, I asked you, you may not have

8   heard my question.  I just asked you simply to

9   identify on the record on your oath quantitative

10  evidence that supports the conclusion in your

11  report, your opinion in your report, that one of

12  the relevant markets at issue is the markets for

13  sponsorships.

14             Is there or is there not quantitative

15  evidence that supported your conclusion that is

16  properly used by you, as an economist, in

17  identifying that as a relevant market?

18             MR. UNDERWOOD:  Object to form of the

19       question.

20       A      And the reason that I answered that

21  way is because all of that prefatory material was

22  misleading because the sentence that you are

23  reading talks about the relevant markets at issue,

24  including the markets for live entertainment,

25  markets for sponsorships; meaning, the markets in

104

                    Jonathan Walker, Ph.D.

1

2       A       I don't know that I said input

3   markets.  I don't have any problem talking about

4   input markets.

5               I thought that I answered those are

6   inputs, when you asked me what do I mean by

7   underlying.

8       Q       No, you did.  You did.  You didn't

9   say input markets.  You said, you know, I asked

10  you what you meant by "underlying," and you did

11  say "inputs."

12      A       Yes.

13      Q       You didn't say "input markets."

14              Now, separate from that answer, what

15  is an "input market"?

16      A       If somebody were to ask me, you know,

17  about an input market, I would imagine that they

18  are talking about a market in which inputs,

19  meaning not final outputs, are bought and sold,

20  where inputs are not final consumer goods, but

21  goods that are used in the production of other

22  goods and services.

23              MR. MAC GILL:  Can I hear the answer

24      back.

25              (Record read.)

105

Jonathan Walker, Ph.D.

1

2          A       I guess I should add, inputs are not

3   limited to goods.   Inputs clearly can be services

4   as well.

5          Q       All right.  Now, in moving from the

6   definition you just provided here to the context

7   of this case, is one of the inputs to staging a

8   men's professional tennis event player services?

9          A       Yes.

10          Q       And based on your work in this case,

11   does a mens professional tennis tournament need

12   player services in order to deliver its product;

13   that is, a tennis tournament?

14          A       Yes.

15          Q       And relative to this adjective that

16   you used when you used the word underlying to

17   modify the markets for player services, were you

18   meaning, in a very general sense, that these

19   markets for player services underlie the

20   production of a tennis tournament?

21              MR. UNDERWOOD:  Object to the form of

22        the question.

23          A       I meant that player services underlie

24   the production of a tennis tournament.

25          Q       Okay.

106

1                    Jonathan Walker, Ph.D.

2        A        But, again, going back, this is just

3    saying that player services are necessary, and

4    those player services are bought and sold in some

5    kind of a market, and you need to talk about it

6    and think about what that market is in order to

7    address the issues that were alleged in the

8    complaint.

9        Q        So, player services are bought and

10   sold in some kind of market; right?

11       A        Yes.

12       Q        All right.  Now, in that some kind of

13   market that you have described in the context of

14   this mens professional tennis, included as market

15   participants are tournaments like Hamburg, that

16   has an interest in securing player services;

17   agreed?

18       A        Yes.

19       Q        And other tournaments would also be

20   part of that same player services market in the

21   sense that they would be in the marketplace to

22   obtain the services for use in their tournament;

23   right?

24       A        Yes.

25       Q        All right.  Now, the Brave New World

107

1                    Jonathan Walker, Ph.D.

2    does impose some restrictions relative to player

3    services, do you agree with that?

4         A      No.

5                MR. UNDERWOOD:  Object to the form of

6         the question.

7         A      I am not sure that I would.

8         Q      Let's go back.

9                Let's go more fundamentally.

10               At a fundamental level, if there were

11   no professional tennis players in your tournament,

12   there is no tournament to be staged, right, no

13   competition to be had?

14        A      No tennis tournament, that is

15   correct.

16        Q      And in the event of the relationships

17   that you were able to identify based on your work

18   in this case, I take it you were able to come to

19   the conclusion that the quality of the player

20   field influences the ability to get sponsors.

21   Fair statement?

22        A      Yes, I think that is correct.

23        Q      The quality of the player field also

24   influences the capability to secure broadcasters.

25   Do you agree with that?

108

Jonathan Walker, Ph.D.

1

2      A      Actually, I think that both of those

3  statements are not exactly correct, so, I want to

4  amend the answer that I just gave.

5             The quality of the playing field

6  influences the ability get sponsors.  The expected

7  quality of the playing field influences the

8  ability to get sponsors.  The expected quality of

9  the playing field influences the ability to secure

10  broadcast rights, and to sell.

11      Q      Expected quality in whose mind?

12      A      In the case of the sponsorships, in

13  the mine of the sponsors.  In the case of the sale

14  of programming rights, in the eyes of the

15  networks, or in the case of the payment to have

16  carriage, potential in the eyes of the networks,

17  depending upon the specifics of the deal.

18      Q      In terms of fans, does the quality of

19  the player of the -- strike that.

20             Does the quality of the player field

21  influence the ability to attract live audiences;

22  that is, fans at the event.

23      A      I think it's in all cases, I mean, I

24  guess I should be clear, that the actual player

25  participation affects expectations of

109

                    Jonathan Walker, Ph.D.

1 participation; but when you buy a ticket, you are

2 buying a ticket based on what you expect to see,

3 and what you expect may not be what you get when

4 you walk into the stadium.

5                    Just as with sponsors, when you enter

6 into a sponsorship agreement from the sponsor's

7 perspective, you enter into it based on what you

8 expect is going to be delivered, and what actually

9 is delivered may be different, what actually is

10 delivered will certainly influence expectations in

11 the future.  So, it's always the case in all three

12 of these groups that it's expectations that are

13 driving the show, but that actual outcomes affect

14 future expectations.

15        Q      All right.  Aren't you overstating

16 the case in the case of live audience, when you

17 use the term "always the case"?

18                    MR. UNDERWOOD:  Object to the form of

19        the question.

20        A      I don't think I am.

21        Q      Okay.

22        A      I don't think that when you buy a

23 ticket you know for a fact what is going to be

24 there.

110

Jonathan Walker, Ph.D.

1

2    Q        If you buy --

3    A        I think that your expectations are

4   less likely to be unmet in the case of a fan who

5   is buying a ticket at the gate at the day; but

6   even that fan, I think, can be surprised if

7   somebody decides not to show at the last minute,

8   or somebody gets injured, you may not get to see

9   what you thought you were going to get to see when

10  you walked in the door.

11              In addition, there are fans that buy

12  tickets beforehand, and those fans may be

13  substantially surprised.  And, so, a fan that buys

14  a ticket months beforehand is basing his purchase

15  decision on his expectations or her expectations

16  who is going to be there, and those expectations

17  may not be met.

18    Q        Okay, fair enough.

19              So, the expected quality of the

20  player field influences sponsorship support;

21  agreed?

22    A        Yes.

23    Q        Of a tournament.

24              The expected quality of the player

25  field influences the availability of network and

111

 1                    Jonathan Walker, Ph.D.

 2  cable television coverage; right?

 3        A      I think that's correct.

 4        Q      And the expected quality of the

 5  player field for a tournament also influences the

 6  number of fans that attend the tennis tournament;

 7  agreed?

 8        A      Yes.  I think that is true.

 9        Q      Now, the Brave New World is, as you

10  have ascertained it through all of your work in

11  this case, been legislated by the ATP in an effort

12  to influence the expected quality of the player

13  field at certain select events; right?

14               MR. UNDERWOOD:  Object to the form of

15        the question.

16        A      Could you repeat the question,

17  please?

18        Q      Yes.

19               The Brave New World has been

20  legislated with the aim of affecting the expected

21  quality of the player field at the ATP 1000

22  events, for example; right?

23        A      Among other things, yes.

24               And I would like to take a break as

25  soon as you finish with whatever this string is,

204

Jonathan Walker, Ph.D.

1  reading it.  The rule says what it says.  I

2  haven't memorialized it.  I'm not going to argue

3  with you if you tell me that the rule says this,

4  that or the other because I haven't memorized it.

5

6      Q      Looking at the European clay court

7  swing that we have defined to include three ATP

8  1000s, if you include Monte Carlo as a 1000,

9  Barcelona as well.  Defining the European clay

10  court swing there, do you agree that the Special

11  Event Rule would, by its terms, apply to each of

12  those four tournaments in the European clay court

13  swing?

14          MR. UNDERWOOD:  Object to form of the

15      question.

16      A      Again, I just haven't memorized -- I

17  am not clear sitting here how the Special Events

18  Rule is meant to be applied to ATP 500 events.

19  So, I am not sure about Barcelona.  It is my

20  understanding that it would apply, that --

21  actually, I take that back.

22          My understanding is that there are

23  some elements of the Special Events Rule that

24  would apply to all of those.

25          I don't remember the extent of the

205

                    Jonathan Walker, Ph.D.

1  rules that would apply to Barcelona and whether

2  they are the same as the rules that would apply to

3  the ATP 1000 event.

4      Q    All right.  Relative to a player's

5  decision to play any one of those four events,

6  will you now admit that the Special Events Rule

7  may impair the ability of Hamburg to set up a

8  German Open to compete with -- for player services

9  with any one of those four events?

10     A    Yes, it may.

11     Q    Now, second, the ranking system, will

12 the ranking system in place under the Brave New

13 World affect the ability of the Hamburg event to

14 stage a German Open in any of the weeks in the

15 European clay court swing?

16         MR. UNDERWOOD:  Counsel, it sounds

17     like you are beginning to move off the

18     Special Event Rule and onto an entirely

19     newly topic, and I note for the record it's

20     after 8 o'clock at this point.

21         MR. MAC GILL:  I would like to finish

22     this line, and then we can adjourn if that's

23     your preference.

24         MR. UNDERWOOD:  It sounds like you

206

1          Jonathan Walker, Ph.D.

2      are starting a new line.  Do you have an

3      idea of how long this line is going to take?

4          MR. MAC GILL:  Five to ten minutes.

5          MR. UNDERWOOD:  As long as the

6      witness is okay, we will continue.

7          Would you read the question back

8      please?

9          (Record read.)

10 BY MR. MAC GILL:

11     Q    In any of the weeks in which the

12 European clay court swing occurs?

13     A    Yes.

14     Q    And will the bonus pool affect the

15 ability of Hamburg staging the German Open as a

16 separate event during those same weeks of the

17 European clay court swing influence the ability of

18 Hamburg to compete for player services?

19     A    Yes.

20     Q    Now, separate and apart from the --

21 strike that.

22          On the ranking system, are you aware

23 of the agreement that was made between the Grand

24 Slams and the ATP regarding points awarded for

25 Grand Slam events and ATP events?