**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DEUTSCHER TENNIS BUND (GERMAN          :
TENNIS FEDERATION), ROTHENBAUM         :
SPORT GMBH, and QATAR TENNIS           :
FEDERATION,                            :
                                       :
                    Plaintiffs,        :
                                       :       C.A. No. 07-178-GMS
        against                        :
                                       :
ATP TOUR, INC., ETIENNE DE VILLIERS,   :
CHARLES PASARELL, GRAHAM PEARCE,       :
JACCO ELTINGH, PERRY ROGERS, and IGGY  :
JOVANOVIC,                             :
                                       :
                    Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

**DEFENDANTS' REPLY MEMORANDUM:
MOTION *IN LIMINE* NO. 2 TO EXCLUDE
EXPERT OPINIONS PROFFERED BY CHARLES ELSON**

|  |  |
|---|---|
|  | ASHBY & GEDDES |
|  | Philip Trainer, Jr. (I.D. #2788) |
|  | Carolyn Hake (I.D. #3839) |
|  | Tiffany Geyer Lydon (I.D. #3950) |
|  | 500 Delaware Avenue, 8th Floor |
|  | P.O. Box 1150 |
|  | Wilmington, Delaware 19899 |
|  | (302) 654-1888 |
|  | ptrainer@ashby-geddes.com |
|  | chake@ashby-geddes.com |
|  | tlydon@ashby-geddes.com |

*Of Counsel:*                                *Attorneys for Defendants*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Julie A. Tirella
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: June 2, 2008

Defendants submit this reply on their motion to exclude Charles Elson ("Elson").

**ARGUMENT**

Plaintiffs do not – and cannot – dispute that Elson is not permitted to testify to the law of fiduciary duty. Yet even a cursory examination of Elson's "opinions" confirms that that is exactly what he is doing, often word for word. Ex. A (Comparing Elson statements to Plaintiffs' proposed jury instructions). Merely saying that he is not usurping the Court's role does not change the fact that he is. Nor does it obviate the recognized danger and prejudice that flows from allowing an expert to testify about the law to a jury. *E.g.*, *In re Intel Corp.*, 526 F. Supp. 2d 461, 466 (D. Del. 2007) ("the prohibition against allowing expert witnesses to opine on legal issues is most significant in the context of a jury trial.")

The *Cantor* case on which Plaintiffs rely is not to the contrary. Unlike Elson, the expert in *Cantor*, Longstreth, did not simply relabel the law as "custom and practice." As shown in the attached, and explained in *Cantor*, Longstreth opined on "the process" for handling a transaction with a potentially interested director, including the specific types of investigation, discussions, and vetting. *Cantor v. Perelman*, 2006 WL 3462596, at *5 (D. Del. Nov. 30, 2006); Ex. B (Expert Report of Bevis Longstreth). If properly supported, such specialized knowledge could be useful to a lay jury. What is not helpful, but harmful, is to have an expert such as Elson tell a jury, in words or substance, what the law is before they are charged by the Court. The teaching of *In re Walt Disney Co*, 907 A.2d 693 (Del. Ch. 2005) is that – even in a non-jury trial – it does not matter whether the expert claims that the testimony is only about "custom and practice." What matters is that, in substance, the testimony is about the law and therefore must be excluded.

Plaintiffs also do not dispute that Elson's report discloses <u>zero</u> examination of the facts in this case. Pltfs. Opp. at 4. Elson's testimony should be excluded on this basis alone.

1

Incredibly, Plaintiffs try to blame Defendants for this fatal flaw in Elson's report by arguing that he <u>would have</u> applied his conclusory statements to the actual facts of the case in post-report testimony. *Id.* at n. 2 ("deposition testimony would doubtless have expanded upon the opinions of Professor Elson."). Plaintiffs only confirm their intent to try to sandbag Defendants at trial with new opinions from Elson.[1] Conclusory opinions cannot be remedied after the fact in deposition, let alone at trial. *See Honeywell Int'l v. Universal Avionics Sys.*, 347 F. Supp. 2d 129, 135 (D. Del. 2004) (Rule 26(a)(2) requires "a complete statement of all opinions the witness will express and the basis and reasons for them."). A testifying expert "must prepare a detailed and complete written report, <u>stating the testimony the witness is expected to present during direct examination</u>, together with the reasons therefore" such that "<u>a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed</u>." Fed. R. Civ. P. 26(a)(2), Advisory Comm. Notes, 1993 ("the report, <u>which is intended to set forth the substance of the direct examination</u>, should be written in a manner that <u>reflects the testimony to be given by the witness</u> . . . .") (emphasis added). The sole case Plaintiffs cite, *Kelly v. GAF Corp.*, 115 F.R.D. 257 (E.D. Pa. 1987), pre-dates the 1993 reforms. *See* Advisory Comm. Notes (1993 reforms responded to history of "sketchy and vague" reports).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant their motion to exclude the opinions proffered by Charles Elson.

---

[1] Plaintiffs similarly try to improperly expand their damages claims *post hac* by asserting that they "seek damages for . . . breaches of fiduciary duty." Pltfs. Opp. at 1. As explained in our Motion to Bifurcate and Motions in Limine Nos. 3 and 4, since the outset of the case, Plaintiffs have specifically limited damages being sought to alleged damage to the Hamburg tournament due to Defendants' alleged antitrust and tortious interference claims. D.I. 50 at 48-50 (Prayer for Relief A and B). Plaintiffs cannot, just before trial, expand or change their damages theories.

3

                ASHBY & GEDDES

                */s/ Tiffany Geyer Lydon*

                _____
                Philip Trainer, Jr. (I.D. #2788)
                Carolyn S. Hake (I.D. #3839)
                Tiffany Geyer Lydon (I.D. #3950)
                500 Delaware Avenue, 8th Floor
                P.O. Box 1150
                Wilmington, Delaware 19899
                (302) 654-1888
                ptrainer@ashby-geddes.com
                chake@ashby-geddes.com
                tlydon@ashby-geddes.com

                *Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Julie A. Tirella
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

Dated: June 2, 2008

3

# EXHIBIT A

Case 1:07-cv-00178-GMS   Document 140-2   Filed 06/02/2008   Page 1 of 12

**EXHIBIT A**

| **Elson's Opinion (relevant part)** | **Plaintiffs' Jury Instruction (relevant part)[1]** |
|---|---|
| **Opinion 2:** It is generally accepted custom and practice for the directors of a corporation to <u>act in accordance with the corporation's governing documents, corporate tax status</u> and enumerated purpose. | **Jury Instruction 52:** The duty of loyalty also required that the ATP Director Defendants <u>not violate the laws the ATP is obliged to obey</u>, including <u>tax laws</u>, competition laws, <u>and laws relating to the ATP's corporate status.</u> |
| **Opinion 3:** It is generally accepted custom and practice for the directors of a corporation <u>to not place their personal interests</u>, . . . <u>ahead of those of the non-profit corporation and its members.</u> Stated another way, directors act, as a matter of general custom and practice, in a manner that is unselfish and that is intended <u>to benefit the enterprise and its members</u> . . . . | **Jury Instruction 52:** The duty of loyalty means essentially that . . . the ATP Director Defendants may <u>not put their own personal interests ahead of those of ATP Tour, Inc. or its members</u> . . . . The ATP Director Defendants were required . . . to exercise the utmost good faith <u>in furthering the interests of ATP Tour, Inc. and its members</u> and conserving its property. |
| **Opinion 4:** It is generally accepted custom and practice for the directors of a corporation <u>to be fully informed as to facts that are material</u> to their oversight of the operation and management of the corporation. | **Jury Instruction 53:** This duty includes a duty of the ATP Director Defendants to <u>inform themselves of all material information</u>, . . . reasonably available to them prior to making a business decision. |
| **Opinion 6:** It is generally accepted custom and practice for directors of a corporation to <u>act in accordance with applicable law and to avoid knowing violations of law</u>. | **Jury Instruction 52:** The duty of loyalty also required that the ATP Director Defendants <u>not violate the laws the ATP is obliged to obey</u>, including tax laws, competition laws, and laws relating to the ATP's corporate status.<br><br>**Jury Instruction 54:** Two types of conduct constitute a breach of the duty of good faith: . . . (2) . . . for example, <u>a fiduciary acts with the intent to violate applicable positive law</u>. |
| **Opinion 7:** Where a director has a <u>personal business or financial interest in a decision being contemplated by the Board of Directors,</u> it is generally accepted custom and practice for that director to <u>fully disclose such interest</u> to the Board of Directors . . . | **Jury Instruction 56:** [T]he ATP Director Defendants must not have <u>an undisclosed personal financial interest in the transaction</u> that is the subject of the directors' or officers' business judgment[.] |

---

[1] Defendants cite Plaintiffs' Proposed Jury Instructions only to show that Elson's proffered opinions parallel those instructions. Defendants maintain their objection to charging the jury on any fiduciary duty claims given that (a) they are traditionally equitable in nature and (b) Plaintiffs have not sought any damages with respect to those claims. Defendants also maintain each of their objections to Plaintiffs' Proposed Jury Instructions.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

RONALD CANTOR, IVAN SNYDER and
JAMES A. SCARPONE, as TRUSTEES OF
THE MAFCO LITIGATION TRUST,

          Plaintiffs,

- against -

RONALD O. PERELMAN,
MAFCO HOLDINGS INC.,
MacANDREWS & FORBES HOLDINGS INC.,
ANDREWS GROUP INCORPORATED,
WILLIAM C. BEVINS and
DONALD G. DRAPKIN,

          Defendants.

-----------------------------------------------------------x

No. 97-CIV-586-KAJ

## EXPERT REPORT OF BEVIS LONGSTRETH

January 12, 2006

A 179

I, Bevis Longstreth, submit this report in the above-referenced action.

Qualifications

I received my B.A. from Princeton University in 1956 and my law degree from Harvard University in 1961. I practiced law at Debevoise & Plimpton for approximately 30 years, first as an associate and from 1970 as a partner. I was twice appointed a Commissioner of the Securities and Exchange Commission by President Reagan, serving from 1981 to 1984. I then returned to Debevoise & Plimpton, practicing corporate, finance, banking and securities law until my retirement in 1994. I was an Adjunct Professor at Columbia University School of Law from 1994 to 1999. I am the author of Modern Investment Management and the Prudent Man Rule (Oxford University Press, 1986) and have written and lectured extensively on corporate governance and other issues of corporate and securities law. I served as an advisor to the American Law Institute's Project on Principles of Corporate Governance.

Throughout my career as a lawyer I have served on boards of directors and of trustees in both the profit and not-for-profit world. Since 1996, I have been a member of the Board of Trustees of the College Retirement Equities Fund (CREF), and am Co-Chair of its Committee on Corporate Governance and Social Responsibility. Since 1993, I have served as a member of the Board of Directors of AMVESCAP PLC, one of the world's largest independent global investment managers. I have been Chair of the Audit Committee for 13 years. In 2005, I became a member of the Board of Directors of the privately owned investment management firm of Grantham, Mayo & Van Otterloo, LLC, where I am Chair of its Risk Committee. From 1972 until I was appointed to the SEC, and again after I left the SEC, I have been a member of the Finance Committee of the Rockefeller Family Fund (Chairman, 1987-2004), where I have been responsible for investment strategy, asset allocation, manager selection and monitoring. I have served since 2004 as a member of the Standing Advisory Group to the Public Company Audit Oversight Board, and from 1992 to 1998 I was a Member of the Board of Governors of the American Stock Exchange. Other qualifications may be found in my curriculum vitae, attached as Exhibit A. (It includes a listing of all publications I have authored within the last ten years.)

Rate of Compensation, Materials Considered and Basis for Opinion

My rate of compensation paid for the study and testimony I am providing in this action is $1,000 per hour. A list of the materials I have considered in forming the opinions set forth herein is attached as Exhibit B. The basis for my opinions, as set forth below, is my experience as a board member and trustee of numerous organizations, my experience as a practicing lawyer counseling boards of directors, my service as an SEC Commissioner, and my other professional and academic experience in addressing issues of corporate governance.

I have not testified as an expert at trial or by deposition within the preceding four years.

<u>Opinion</u>

Reference is made to the letter of Edward A. Friedman to Bevis Longstreth, dated December 23, 2005 (the "Letter"), a copy of which is attached hereto as Exhibit C. I set forth below my answers to the numbered questions contained in the Letter. Those answers, taken in their totality, answer the general questions set forth at the bottom of page 4 and top of page 5 of the Letter, which are to the following effect:

> "We wish to obtain your expert opinion with respect to the nature of the arm's-length bargaining that would have been conducted by Marvel with Perelman, if Perelman had presented to the independent directors of Marvel a request that Marvel assist and acquiesce in the Note transactions as it did. In this regard, we are seeking your views as to the considerations that a director of Marvel would have taken into account as part of this process, and the compensation and other benefits, if any, that a Marvel director would have sought to obtain on Marvel's behalf if Marvel were asked to agree to Perelman's request."

<u>Answer to 1.</u>

As an independent director of Marvel (or, for that matter, of any other company, public or private), I would have various responsibilities. The most significant responsibility involves the direction and oversight of the management of the business and affairs of Marvel. In discharging this responsibility, I would owe Marvel the twin duties of loyalty and care generally expected of corporate directors throughout the country.

In my experience, loyalty requires that I must at all times serve Marvel and its stockholders with a loyalty uncompromised by any competing interest, personal or otherwise.

Care requires that in the discharge of my responsibilities as a director, I must exercise reasonable business judgment informed by facts that a reasonable investigation would disclose. In other words, I would have to make such investigation of the facts surrounding a corporate issue to be decided as would, in my reasonable judgment, enable me to reach an informed decision regarding that issue.

<u>Answer to 2.</u>

Given the distribution of Marvel's stock ownership, where 80% is owned directly or indirectly by one controlling shareholder, and the remaining 20% is owned by public shareholders, I would be aware of the conflicts that were likely to arise in decision-making by Marvel's board between what's in the best interests of the controlling shareholder, on the one hand, and what's in the best interests of the public shareholders, on the other hand.

A 181   2

Given the power implied by ownership of 80% of all outstanding stock, I would be aware of the pressure that from time to time could be exerted upon me, as an independent director of Marvel, by the controlling shareholder, who would naturally expect to be able to guide Marvel's board in doing what he wanted Marvel to do. I would be acutely aware of the fact that only the independent directors could be expected to assert, with undivided loyalty, the best interests of Marvel and all the shareholders, and that to do so could be a particularly difficult responsibility. The Chairman of Marvel's Board was Perelman. The CEO of Marvel was Bevins, who was also a member of Marvel's Board. And Drapkin was a member of Marvel's Board. These three individuals comprised the Boards of the various holding companies that were wholly-owned, directly or indirectly, by Perelman and through which he held ownership of 80% of all outstanding stock of Marvel.

Given the potential for difficulty under these circumstances in discharging the duty of an independent director of Marvel, I would only have accepted the director position if I thought I could succeed in standing up to the pressure that could be exerted by the controlling shareholder.

I would probably have had a discussion with the controlling shareholder about the obvious conflicts that could arise in order to make sure he knew of my determination to discharge my duty of care to Marvel with a loyalty to this company and all its shareholders, undiluted by regard for how I got appointed to the board or any friendship that existed between the controlling shareholder and me.

In considering corporate issues, I would be especially watchful for matters in which the controlling shareholder was directly or indirectly interested, other than through his stake in Marvel. Once identified, I would take particular care in assessing the best interests of Marvel and all its shareholders in regard to such matters.

The issuance of the Notes by the wholly-owned holding companies of Perelman was a clear case of conflict between the personal interests of Perelman and the corporate interests of Marvel. As discussed at some length below, the security for the Notes included a range of negative covenants restricting Marvel's freedom of action, and correspondingly, the free play of business judgment by its Board, in pursuit of business opportunities that were attractive for Marvel or in furtherance of measures necessary for the health, or even the survival, of Marvel.

As Marvel began to encounter liquidity problems, these negative covenants impaired its ability to raise much needed capital, leading in the end to a bankruptcy filing. Evidence of impairment is found in the Minutes of the Special Meeting of the Marvel Board held on December 12, 1996, where Perelman indicates that a "proposed financial restructuring" by Andrews Group Incorporated, involving an investment of $350 million for 80.1% of the outstanding common stock of Marvel, could not go forward because the holders of the Notes, whose consent to such a restructuring was required under the negative covenants, could not even be organized into a group capable of being approached for the purpose of negotiation leading, possibly, to consent. Perelman goes on to say that the delay in obtaining this restructuring was having a

negative impact on Marvel's liquidity needs and that, therefore, one option being considered was a bankruptcy filing under Chapter 11. Perelman stated that in Chapter 11, Marvel might be able to achieve the proposed financial restructuring without regard to the rights of the Noteholders under the negative covenants.

These Minutes capture with dramatic effect the actual impairment of Marvel's business and prospects created by the negative covenants. Of course, they are simply a snapshot of Marvel's business at one moment in time. Given the wide scope of the restrictions on Marvel that resulted from the negative covenants, it is highly likely that there were many other instances of impairment over the more than three year period between the issuance of the first tranche of Notes and the Chapter 11 filing.

In fact, the terms of the third tranche of Notes, issued in 1994 and referred to in the Letter as the Marvel III Notes, considered together with Marvel's exploration of financing possibilities for its acquisition of SkyBox International Inc. in 1995, present another concrete example of impairment. In brief, the Marvel III Notes, unlike those issued in 1993 in the previous two tranches, bore interest payable semi-annually. As indicated in the Private Offering Memorandum ("POM") for the Marvel III Notes, the principal source of cash to make interest payments would come from tax sharing payments to be made by Marvel under a consolidated group tax sharing agreement among Marvel and its controlling corporate shareholders, among which was Marvel III.

The POM pointed out that the obligation of Marvel to make tax sharing payments would terminate if less than 80% of Marvel's outstanding common stock were owned by the consolidated group, and that the consolidated group's ownership stood at approximately 80%. Accordingly, Marvel could not issue common stock to third parties (unless the consolidated group correspondingly increased its stake) without causing (a) a loss of the right to consolidate Marvel with Perelman's wholly-owned holding companies, and, importantly, (b) a loss of Marvel's duty to make the tax sharing payments that were being counted on to service interest due on the Marvel III Notes.

In addition, if Perelman's ownership of Marvel, through his wholly-owned holding companies, dropped below 80%, this "deconsolidation event" would trigger a right on the part of the holders of the Marvel III Notes to require Marvel III to repurchase the Marvel III Notes in full at a purchase price of 101% of their face value.

In Marvel's 10K for 1994, its intention to acquire SkyBox is discussed, and Marvel states that it is exploring various alternatives to raise the purchase price of $150 million for this acquisition. In fact, Marvel raised the purchase price through a bank term loan, which didn't violate any of the negative covenants to which it was subject under the terms of the Notes. Although the issuance of Marvel common stock would certainly have been one way of raising $150 million, it is obvious that, given the dire consequences to Marvel III of doing so, Perelman and his colleagues would have had a strong interest in avoiding any exploration of a stock offering, even if it was clearly the best alternative for Marvel and all of its shareholders. The issuance of preferred stock would have been another alternative that, depending on the negative covenants, could have been impossible without the consent of the Noteholders.

    To explore financing alternatives with an eye solely to determining what was in the best interests of Marvel and all its shareholders, it would have been necessary to have a Committee designated, consisting solely of independent Marvel directors, who would be free to explore the alternatives, free of interference or influence from Perelman, Bevins and Drapkin. The Committee would be free to retain independent financial advisers to assist in the exploration. There is no evidence that these sound corporate practices were followed.

<u>Answers to 3 and 4.</u>

    Upon learning of Perelman's intention to cause his wholly-owned holding companies to issue Notes pursuant to Indentures as described in the Letter, I would have asked Perelman to make a complete presentation to the Marvel Board of his planned Note offering. Such a presentation would have disclosed the following important matters, among others.

    First, the security for the Notes would not be limited to a pledge of Perelman's controlling block of Marvel stock.

    Security for the Notes would include negative covenants in the Indentures to which the issuers of the Notes (each a holding company wholly-owned directly or indirectly by Perelman) were parties, wherein those issuers would agree to exercise their power to restrict Marvel in a variety of ways apparently considered necessary by the investment bankers to market the Notes. These restrictions included, among other things, limitations on debt of Marvel and its subsidiaries, on the issuance of preferred stock, and on so-called Restricted Payments, which were defined to include dividends, repurchases of stock and non-scheduled repayments of debt.

    Given the sheer power of Perelman, as owner of 80% of the stock of Marvel, to cause compliance with these restrictions, and the obvious interest of Perelman, personally, as sole recipient (through his wholly-owned holding companies) of the net proceeds of the Note issuances, in doing so, the requested presentation would make clear the deep and serious conflict of interest that Perelman faced. As an independent director, it would be obvious to me that Perelman could not be expected to discharge his fiduciary duty to Marvel as both its controlling shareholder and as a director, while at the same time seeking to restrict Marvel's ability to conduct its affairs in order to sell the Notes and secure the net proceeds therefrom for himself personally, without any benefit to Marvel. I would demand that Perelman, in his capacity as a Marvel director, after completing his presentation and answering questions from the independent Marvel directors, step aside to allow the independent directors to consider, alone, the impact of the proposed restrictions on Marvel's business. I would make the same demand of Messrs. Bevins and Drapkin, the other Marvel board members who held positions with Perelman's holding companies and therefore were not independent.

    In my experience, it is commonplace for conflicted directors to disclose the nature of their conflict to those on the board not so conflicted and then leave the meeting so that the unconflicted directors can consider the matter free from the presence

of the conflicted directors and whatever influence their presence and continued participation in the meeting might create. For a conflicted director, there is both the duty to disclose and the duty to recuse oneself in order to leave the decision-making entirely to those not conflicted. In the case of a public company, like Marvel, where the conflicted director also controls the company through stock ownership, the duties to disclose and recuse become vested with even greater necessity.

<u>Answer to 5.</u>

In thinking about the impact of the restrictions on Marvel's business, I would start with the realization that there was no benefit to Marvel from having such restrictions imposed on it. All the benefits of the Note issuances would accrue to Perelman. This being the case, I would ask how it could conceivably be in Marvel's best interests to allow such restrictions to apply. I would know that the Noteholders and Indenture Trustee, who would possess the legal right to enforce the convenants by which such restrictions would be applied to Marvel, would have the sole power to waive or amend such restrictions and in considering such actions in the future would have solely the best interests of the Noteholders in mind. Those interests could easily differ from the best interests of Marvel. Even if the Noteholders and Indenture Trustee claimed that the best interests of the Noteholders were the same as the best interests of Marvel, the fact would remain that this judgment, which as a matter of corporate law was placed in the hands of Marvel's board of directors, would have been taken away from that board and placed squarely in the hands of the Noteholders and Indenture Trustee, neither of whom owed any fiduciary duty whatsoever to Marvel or its shareholders.

In his presentation, Perelman might have argued that the restrictions needn't bother Marvel because Marvel was not agreeing to be bound by them, and if at some future time they proved disadvantageous to Marvel, it could simply refuse to comply. This argument would not prove persuasive to me or to other independent directors. We would know that Marvel would have to disclose the restrictions in its SEC filings. We would know that, were we to claim in such filings that Perelman, as controlling shareholder, would not allow his wholly-owned holding companies to comply with their covenants to impose restrictions on Marvel in cases where it was not in the best interests of Marvel to do so, that the Note issuances could not be completed. We would also know that, were we, as the independent directors of Marvel, to resist the application of any restriction, we would do so at peril of being sued for tortious interference with the contractual relationships between the Indenture Trustee and Perelman's wholly-owned holding companies. Indeed, Marvel would also be exposed to this risk.

In fact, to meet specific closing conditions, Marvel's counsel delivered to the investment banks involved in each of the three tranches of the Notes, legal opinions that, in my experience, were essentially the same in form and scope, as would be delivered in a financing transaction involving Marvel as the issuer of its own indebtedness. These opinions included so-called 10b-5 opinions with respect to the accuracy and completeness of disclosure about Marvel made to the bankers responsible for placing the Notes and were based upon the participation by such counsel in conferences with the various parties involved in the offerings.

Had Perelman intended to use his power over Marvel to cause it not to comply with the negative covenants, or had Marvel itself intended to not comply with those covenants, when, in either case, compliance was not in Marvel's best interests, Marvel's counsel could not have given the 10b-5 opinions because there was no disclosure suggesting any such possibility.

I would reflect on the fact that, shortly before the first issue of Notes occurred, at a Board meeting of Marvel on March 18, 1993, we amended Marvel's charter to increase its authorized capital stock, both Common and Preferred, by more than 200% in order to, among other things, effect stock splits and have stock available for "acquisitions of other companies and other general corporate purposes." I would realize that the negative covenants would limit the power of the Marvel Board to use the increase in authorized capital stock in what it deemed the best interests of Marvel and its shareholders.

Answers to 6 and 7.

First of all, I would be concerned about the "bet the ranch" nature of accepting restrictions that, depending on future events that I could not reasonably anticipate, might so restrict Marvel as to cause its demise. With hindsight, of course, this is precisely what happened.

Even if I could get past the "bet the ranch" concern, and it is not clear to me, at this point, that I could have been able to do so, as an independent director, I would refuse to allow Marvel to accept the proposed restrictions unless I could conclude that there were benefits to Marvel worth more than the cost, however uncertain, of allowing it to (a) surrender its freedom of action for however long the Notes remained outstanding, (b) cause its officers to conduct road shows and otherwise provide support instrumental in achieving a successful placement of the Notes and (c) have its general counsel and other lawyers acting on its behalf participate actively throughout the process of offer, issuance and sale of the three tranches of the Notes, as indicated by the fact that such counsel delivered financing-type opinions regarding Marvel, which included so-called 10b-5 opinions in respect of disclosures made in the offering materials regarding Marvel and its subsidiaries.

As proposed by Perelman there were no benefits of any kind accruing to Marvel. Before deciding there were no benefits sufficient to convince me to expose Marvel to the uncertain risks of the negative covenants, I would be willing at least to explore what, if any, benefits might be possible. I would, therefore, invite Perelman back into the board room and acquaint him with this proposition. If he were willing to negotiate benefits for Marvel, then I would advise him that the independent directors would retain (a) counsel and (b) bankers, who in each case had no connections to either Perelman or the investment bankers involved in the Note issuances or any of the prospective Note purchasers. These advisers would serve Marvel through its independent directors in determining what kind of benefit, if any, in what size, could constitute a reasonable and, to the independent directors, acceptable quid pro quo for allowing the

restrictions to be imposed. I would ask the advisers to develop as many alternative ways of benefiting Marvel adequately as possible.

If the independent directors could overcome the "bet the ranch" concern, and if they could identify benefits representing an adequate quid pro quo for subjecting Marvel to the negative covenants, then the independent directors would direct their advisers to negotiate with Perelman and the investment bankers with a view to completing the transactions necessary to give Marvel its benefits as a condition to the issuance of the Notes.

<u>Answer to 8.</u>

Of course, the SEC filings by Marvel relating to the Note issuances would have to be accurate and not misleading. Ultimately, it is the Marvel Board's responsibility to assure this result. The descriptions of the restrictions being imposed on Marvel, as actually contained in the SEC filings, would certainly have been materially misleading if it had been the plan of Perelman and the Note issuers only to honor the covenants imposing restrictions on Marvel if such restrictions did not infringe the best interests of Marvel. No such qualification was inserted in the filings, and no reader of the statements filed could have been expected to imagine that such a qualification would apply.

In Marvel's S-3 Registration Statement filed with the SEC on March 14, 1995 to enable Marvel to offer debt securities "off the shelf," the section titled "Investment Considerations" makes abundantly clear that Marvel considered the negative covenants agreed to by the issuers of the Notes to restrict Marvel in regard to its business and to create risks for its business and prospects that investors should carefully evaluate, including the risk of a default under its own debt instruments.

_____
Bevis Longstreth

Dated: January 12, 2006