**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEUTSCHER TENNIS BUND (GERMAN
TENNIS FEDERATION), ROTHENBAUM
SPORT GMBH, and QATAR TENNIS
FEDERATION,

                          Plaintiffs,

    against

ATP TOUR, INC., ETIENNE DE VILLIERS,
CHARLES PASARELL, GRAHAM PEARCE,
JACCO ELTINGH, PERRY ROGERS, and IGGY
JOVANOVIC,

                          Defendants.

:                  C.A. No. 07-178-GMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION *IN LIMINE* NO. 3 TO
EXCLUDE EXPERT OPINIONS PROFFERED BY GARY G. KLEINRICHERT**

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: June 2, 2008

In opposing Defendants' motion to exclude the opinion testimony of Gary G. Kleinrichert, Plaintiffs failed to rebut Defendants' showing that Kleinrichert's damages calculations are totally disconnected from Plaintiffs' legal theories and the facts of the case.

Indeed, Plaintiffs essentially acknowledge that Kleinrichert made no effort to explain how his proposed damages calculations relate to and arise out of any of the challenged conduct at issue in this action. (*See* Opp. Br., p. 2). Nevertheless, Plaintiffs attempt to justify this failure — and sidestep the "fit" component of the *Daubert* inquiry, which requires expert testimony to be connected to the disputed facts at issue in the case — by asserting that Kleinrichert "need not provide strict causational proofs" because Plaintiffs' alleged antitrust injury cannot be "disaggregated" to reflect damages caused by the various challenged acts. (*Id.*, at p. 3).

Plaintiffs miss the point. Kleinrichert's methodological breakdown lies not in his failure to provide a specific damages figure for each purportedly anticompetitive act at issue. Rather, Kleinrichert's critical error is that he provided just one calculation (i.e., an entire business devaluation) to serve as a measure of damages for *each of Plaintiffs' legal claims* — even though he acknowledged that the "but for world" (used to assess damages) might need to change depending upon how the Court resolves each of the different claims. (D.I. 124, Ex. 3, p. 43).

To illustrate just one example of the fallacy of this approach, Kleinrichert stated at his deposition that his "entire business devaluation" — estimating damages at over $70 million — could be used to assess damages for both Plaintiffs' antitrust and tortious interference with contract claims. (Ex. A, p. 44). However, as discussed in detail in Defendants' Motion *In Limine* No. 4, Plaintiffs are now asserting that their tortious interference damages should be measured at approximately $3.5 million — separate from, and in addition to, Kleinrichert's damages calculations. Putting aside Defendants' challenge to the belated disclosure of the $3.5

1

million in damages, Plaintiffs' assertion that their tortious interference claims should now be valued independently at $3.5 million demonstrates that Kleinrichert's calculations cannot be "fit" to measure damages for each of Plaintiffs' legal claims.[1]  Kleinrichert's failure to tie his damages calculations to Plaintiffs' different legal claims is fatal under *Daubert*, since his opinions provide no meaningful basis for the jury to render a damages award under Plaintiffs' various claims.[2]  The cases cited by Plaintiffs concerning the disaggregation of antitrust damages are inapposite.[3]

Furthermore, Plaintiffs do not dispute that Kleinrichert's damages assessment is based upon a "but for world" that assumes that the Hamburg tournament would remain a top-tier ATP tournament and enjoy the benefits of ATP rules that existed prior to the calendar/rule changes that ultimately evolved into the Brave New World plan.  (Opp. Br., p. 5, fn. 7).  As such, the damages analysis is directly at odds with Plaintiffs' allegations that these rules are

---

[1] In fact, Kleinrichert admitted that "the core" of his damages assessment is based on Plaintiffs' ability to show a wrongful misappropriation of their claimed rights (Ex. A, pp. 71-72), which, if anything, relates to Plaintiffs' conversion claim, for which no damages have even been alleged.

[2] *See* D.I. 124, p. 2, fn. 3; *see also Fashion Boutique, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002) (expert's generalized findings regarding the value of plaintiff's business was irrelevant to assessing damages in a product disparagement claim under New York law); *Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 915-17 (S.D. Tex. 2007) (Plaintiff's disclosure of expert witness opinion concerning damages for breach of contract claim was insufficient to permit expert to testify on future damages for misappropriation of trade secrets).

[3] *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 813 (3d Cir. 1985), *In re Lower Lake Erie Iron Ore*, 998 F.2d 1144, 1176 (3d Cir. 1993), and *Lepage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) stand for the proposition that antitrust damages need not be "disaggregated" if based upon a series of anticompetitive actions, which, taken together, had the effect of destroying the plaintiffs' business interests.  In contrast here, Kleinrichert improperly tied one damages calculation to all of Plaintiffs' legal claims (both antitrust and non-antitrust), even though he understood that the "but for" world could change depending upon the Court's findings with respect to the different claims.  Moreover, Plaintiffs' antitrust allegations here are separable, in that the jury might well find that some of the alleged restraints are not in fact anticompetitive, in which case damages might need to be attributed to specific restraints.  For example, if the jury were to find for Plaintiffs only on their claim for "agreeing" on the amount of prize money paid to players, Plaintiffs would need to show how that alleged restraint alone caused them damage.

anticompetitive (D.I. 124, p. 3), and Plaintiffs' liability expert's opinion that Plaintiffs have been operating as part of a cartel for the past decade. (Ex. B, pp. 131-32). Kleinrichert's opinions are thus disconnected from Plaintiffs' legal theory, and cannot serve as a basis to award damages.[4]

Finally, even if Kleinrichert's damages assessment could properly be based upon estimating the value of the Hamburg tournament as a top-tier ATP tournament going forward, the valuation must be based upon a relevant benchmark.[5] Plaintiffs do not dispute this point. (Opp. Br., p. 4). Nevertheless, Plaintiffs fail to address the fact that the ATP/Shanghai transaction — i.e., Kleinrichert's benchmark for measuring the value of Plaintiffs' purportedly damaged rights — involves payments by Shanghai for both a new ATP tournament membership and the right to operate the tournament as part of ATP's top-tier over a ten-year period. Shanghai's payment for its new ATP tournament membership is not a "like" transaction that can be used to benchmark the alleged harm to Plaintiffs' purported rights, as there can be no dispute that Plaintiffs still hold their ATP membership for the Hamburg tournament, and the related right to operate the tournament as part of the ATP Tour (pursuant to ATP's governing documents).[6] In addition, putting aside the fact that the ATP/Shanghai transaction is not "like" Plaintiffs' allegedly harmed rights at issue, Kleinrichert admitted that it is "intuitive" that the value of operating a given tournament is affected by its site, season, and surface (D.I. 124, Ex. 3, p. 129) — but he failed to consider any of these factors.

---

[4] See D.I. 124, p. 4, fn. 6.

[5] D.I. 124, p. 5, fn. 8; *cf. Elcock v. Kmart Corp.*, 233 F.3d 734, 754-56 (3d Cir. 2000) (trial court abused its discretion in admitting estimate of lost future earnings based on assumptions without foundation in trial record); *McMillan v. Weeks Marine, Inc.*, 478 F. Supp.2d 651, 657-58 (D. Del. 2007) (expert's estimate of lost future earnings excluded as based on unrealistic assumptions).

[6] Kleinrichert's use of other tournament membership transactions to provide additional support for his damages assessment (*see e.g.*, Opp. Br., p. 4, fn. 4, p. 5, fn. 8) is similarly misplaced.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Of Counsel:*                          *Attorneys for Defendants*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: June 2, 2008

# EXHIBIT A

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF DELAWARE
2
3
      DEUTSCHER TENNIS BUND          )
4     (GERMAN TENNIS FEDERATION),    )
      ROTHENBAUM SPORTS GMBH         )
5     TENNIS, AND QATAR TENNIS       )
      FEDERATION,                    )
6                                    )
                   Plaintiffs,       )
7                                    )
                 -v-                 ) CAUSE NO.
8                                    ) 07-178 (GMS)
                                     )
9     ATP TOUR, INC.,                )
      ETIENNE de VILLIERS,           )
10    CHARLES PASARELL,              )
      GRAHAM PEARCE, JACCO ELTINGH,  )
11    PERRY ROGERS, AND              )
      IGGY JANOVIC,                  )
12                                   )
                   Defendants.       )
13
14
15
16         The deposition upon oral examination of
      GARY G. KLEINRICHERT, a witness produced and sworn
17    before me, Michele K. Dew, CRR-RPR, Notary Public in and
      for the County of Marion, State of Indiana, taken on
18    behalf of the Defendants at the offices of Ice Miller,
      One American Square, 35th Floor, Indianapolis, Indiana,
19    on February 12, 2008, at 8:20 a.m., pursuant to the
      Federal Rules of Civil Procedure.
20
21
22
23
24
25

1    would result in similar results.  As I've looked at

2    it, I believe it to be similar.

3  Q  For example, do you know the plaintiffs have asserted

4    a cause of action for tortious interference?

5  A  I understand that, yes.

6  Q  And do you believe that the but for world for

7    evaluating damages in a tortious interference claim

8    would be the same as the but for world for evaluating

9    damages on the antitrust claim?

10  A  Well, sure.  From a tortious interference standpoint,

11    the allegations as it relates to interference with

12    players and sponsors would have a similar overall

13    effect, and potential interference with, you know,

14    potential acquirers of the rights held by the GTF.

15        So as it relates to using the market value of

16    those rights, they would still be relevant measure of

17    potential damages to the extent you're looking at the

18    reduction in market value of the rights as a result

19    of tortious interference.

20  Q  Earlier when you were describing your but for world,

21    you said --

22  A  Again -- I don't mean to interrupt you -- that's a

23    damages in accountant's view of why it would be

24    relevant.  Ultimately, that's a decision for the

25    Court.  I do need to make some assessment of the but

44

1       Hamburg membership.

2           MR. MacGILL:  What is the question?

3   Q   You understand that it's Defendants' contention that

4       they didn't appropriate anything at all from Hamburg?

5   A   I understand that, yes.

6   Q   So all I'm asking is if the Court were to conclude

7       there was no appropriation or if there was an

8       appropriation that it was not wrongful, either of

9       those possible scenarios.  If the Court did not agree

10      with Plaintiffs that there was an appropriation that

11      was wrongful, how would that affect your damages?

12  A   It would impact my damages.

13  Q   How would it affect your damages?

14  A   It would reduce the damages.

15  Q   How would it reduce the damages?

16  A   Well, what I need to also understand is what the

17      Court would then determine was wrongful.  The

18      appropriation of the Hamburg membership is kind of at

19      the center and at the core of almost all of the

20      allegations.  So, of course, to do a damage

21      calculation, you must assume some set of liability

22      and then perform a damage calculation as a result of

23      that liability.

24          If the Court were to determine there was no

25      wrongful appropriation of the Hamburg membership,

1        including the week in which the GTF previously had

2        held its tournament, so I'd have to understand

3        whether or not the determination that it was not

4        wrongfully appropriated includes or excludes the

5        rights of the GTF Plaintiffs with respect to their

6        week.  Certainly, the wrongful appropriation of their

7        membership is at the core of many of their

8        allegations.  Of course, if they don't win on

9        liability, damages aren't even relevant.

10   Q    So if there's no wrongful appropriation, are there

11        any damages here?

12   A    There still could be some damages, sure.

13   Q    What damages would there be?

14   A    It would depend what the Court would determine was

15        wrongful.

16   Q    Second bullet you write, "Received from Shanghai the

17        sanction for the 2009 Tennis Masters Cup."

18            Do you have an understanding of whether Shanghai

19        owned the sanction for the 2009 Masters Cup?

20   A    Excuse me.  I'm going to read back an earlier section

21        in my report.  Page 16 of my report refers to

22        received from Shanghai the sanction for the 2009

23        Masters Cup, and when you asked your question

24        "Shanghai," I presume you were not asking generally

25        Shanghai.  You were asking Shanghai as it relates to

# EXHIBIT B

```
1                              VOLUME I
                               PAGES:    1 - 227
2                              EXHIBITS:  161 - 162
3               IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE
4
                               C.A. NO.  07-178-GMS
5
6
7        *  *  *  *  *  *  *  *  *  *  *      *
                                             *
8        DEUTSCHER TENNIS BUND (GERMAN       *
         TENNIS FEDERATION) and             *
9        ROTHENBAUM SPORTS GMBH TENNIS       *
         and QATAR TENNIS FEDERATION,        *
10                        Plaintiffs,        *
                                             *
11       vs.                                 *
                                             *
12       ATP TOUR, INC., ETIENNE DE          *
         VILLIERS, CHARLES PASARELL          *
13       GRAHAM PEARCE, JACCO ELTINGH,       *
         PERRY ROGERS, and IGGY JOVANOVIC,   *
14                        Defendants.        *
                                             *
15       *  *  *  *  *  *  *  *  *  *  *      *
16
17
18              DEPOSITION OF ANDREW ZIMBALIST, taken on
19       behalf of the Defendant, pursuant to the Massachusetts
20       Rules of Civil Procedure, before Karen Borreson, RPR,
21       Notary Public within and for the Commonwealth of
22       Massachusetts, at the Clarion Hotel & Conference
23       Center, 1 Atwood Drive, Northampton, Massachusetts, on
24       Friday, February 22, 2008, commencing at 9:00 a.m.
25
```

**2/22/2008 Zimbalist, Andrew**

1    2002?

2        A.   Yes, it is.

3        Q.   And is it your understanding that the $3

4    million bonus pool in 2007 was also for the top eight

5    players?

6        A.   I think that -- that the plan now is to reduce

7    it to the top five players.  And whether that applies

8    starting in 2009 or it applied in 2007, I'm not

9    certain.

10       Q.   In your view, who was part of the ATP cartel?

11       A.   Who was part of it?

12       Q.   Yes.

13             MR. MacGILL:  Object to the form of the

14   question.

15       A.   The ATP cartel is a cartel of the tournaments

16   that are in the top-tier of the ATP.

17       Q.   Is there anyone else in that cartel or is it

18   just the tournaments?

19       A.   The ATP structure, as you know, for the

20   tournament directors allow there to be representation

21   with some voting rights for the lower tier

22   tournaments.  The -- it was my understanding that the

23   weighting of the voting is such that the top-tier

24   tournaments can control who was elected to represent

25   the tournaments on the ATP governing board.  Normally

1    the players are represented as part of governing

2    board.

3              It's nonetheless my conclusion that the

4    players have been effectively separated from the

5    governance of the ATP and it operates, in essence, as

6    a cartel of the -- the top-tier tournaments.

7         Q.   Has Hamburg been a part of the ATP cartel in

8    your view?

9         A.   Yes.

10        Q.   On Page 25 of the first full paragraph you

11   state "The operative questions are different.  How

12   much additional value is created for a tournament when

13   8 instead of 6, or 9 instead of 8, or 10 instead of 9

14   of the top ten players participate?"

15        A.   Yes.

16        Q.   Do you see that?

17        A.   Yes.

18        Q.   In your analysis, is there a difference if

19   players four through ten play in tournament versus

20   players one through seven?  Would that have a

21   different affect on the tournament?

22        A.   It's an empirical question, so I have to refer

23   to the econometrics, if that's okay.  I can't answer

24   that question on the basis of the first model

25   accurately because it treats each of the first nine