IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEUTSCHER TENNIS BUND (GERMAN TENNIS   :
FEDERATION), ROTHENBAUM SPORT GMBH, and :
QATAR TENNIS FEDERATION,                  :
                                          :
           Plaintiffs,                :
                                          :
   against                     :      C.A. No. 07-178-GMS
                                          :
ATP TOUR, INC., ETIENNE DE VILLIERS,     :
CHARLES PASARELL, GRAHAM PEARCE, JACCO :
ELTINGH, PERRY ROGERS, and IGGY JOVANOVIC,:
                                          :
           Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' TRIAL BRIEF

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Carolyn Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: June 2, 2008

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................ii

I.    Nature of the Case ..................................................................................................1

II.   Contested Issues of Fact to be Established at Trial ................................................3

III.  ATP's Theory of Defense ......................................................................................3

      A.   ATP Has the Express Authority to Control the Tour Structure and Calendar ........3

      B.   Plaintiffs' Antitrust Claims ...........................................................................3

           1.   ATP is a Single Enterprise ...................................................................3

           2.   Plaintiffs Cannot Show Any "Antitrust Injury" ..................................5

           3.   Plaintiffs Cannot Establish a Relevant Product Market, Defendants'
                Market Power, or Anticompetitive Effects ........................................6

      C.   Plaintiffs' Fiduciary Duty Claims .................................................................8

           1.   The Court Should Decide Plaintiffs' Fiduciary Duty Claims ..........8

           2.   The Defendants Have Not Violated Any Fiduciary Duties..............8

      D.   Plaintiffs' Tortious Interference Claims .......................................................9

      E.   Plaintiffs' Conversion Claim.......................................................................10

IV.   Summary and Significance of Outstanding *Daubert* Motions ........................11

      A.   Plaintiffs' Antitrust Expert Andrew Zimbalist ..........................................11

      B.   Plaintiffs' Damages Expert Gary Kleinrichert ..........................................11

      C.   Plaintiffs' Delaware Law Expert Charles Elson.........................................12

V.    Damages Issues and Bifurcation...................................................................12

      A.   The Uncertain Effect of Injunctive Relief in the Event of Finding of Liability......12

VI.   Affirmative Defenses......................................................................................13

      A.   Waiver, Acquiescence, Estoppel & Release...............................................13

VII.  Defendants' Anticipated Motions for Directed Verdict ................................15

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Acierno v. Preit-Rubin, Inc.*, 1999 F.R.D. 157 (D. Del. 2001) ...................................................... 10

*Allen-Myland, Inc. v. IBM, Corp.*, 33 F.3d 194 (3d Cir. 1994) .................................................... 7

*American Needle. v. New Orleans Saints*, 496 F. Supp.2d 941 (N.D. Ill. 2007) ........................... 4

*Arnold v. Soc'y for Savings Bancorp, Inc.*, 678 A.2d 533 (Del. 1996) ...................................... 10

*Aspen Advisors LLC v. UA Theatre Co.*, 861 A.2d 1251 (Del. 2002) ........................................... 9

*Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242 (Del. Ch. 2006) .......................... 14

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150 (Del. Ch. 2005), *aff'd*, 906
    A.2d 114 (Del. 2006) ................................................................................................................. 9

*Brown Shoe Co v. U.S.*, 370 U.S. 294 (1962) ............................................................................... 7

*Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477 (1977) .................................................... 5

*Cantor v. Perelman*, 2006 WL 318666 (D. Del. 2006) ................................................................. 8

*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397 (Del. Ch.
    1995) ....................................................................................................................................... 10

*Chicago Prof'l Sports v. NBA*, 95 F.3d 593 (7th Cir. 1996) ..................................................... 4, 5

*Commerce National Ins. Serv., Inc. v. Buchler*, 120 Fed. Appx. 414 (3d Cir. 2004) ................. 10

*Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219 (Del. Ch. 2000) ................................... 14

*Continental TV, Inc. v. GTE Sylvania*, 433 U.S. 36 (1977) .......................................................... 6

*Copperweld v. Independence Tube*, 467 U.S. 752 (1984) ............................................................. 4

*Dardovitch v. Haltzman*, 190 F.3d 125 (3d Cir. 1999) ................................................................. 8

*Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357 (3d Cir. 1993) ............................. 9

*Forsythe v. ESC Fund Mgt. Co.*, 2007 WL 2982247 (Del. Ch. Oct. 9, 2007) ............................. 13

*Gilbert v. El Paso Co.*, 1988 WL 124325 (Del. Ch. Nov. 21, 1988), *aff'd*, 575 A.2d
    1131 (Del. 1990) ....................................................................................................................... 8

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ............................................................... 8

*In re Hechinger Inv. Co. of Del.*, 327 B.R. 537 (D. Del. 2005)...................................................... 8

*In re Wal-Mart Wage and Hour Employment Practices Litig.*, 490 F. Supp.2d 1091
    (D. Nev. 2007) ...................................................................................................... 10

*Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers Local Union 42 v.*
    *Absolute Environmental Serv., Inc.*, 814 F. Supp. 392 (D. Del. 1993)............................ 10

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983 (Del. Ch. 1987) .............................. 9

*Kentucky Speedway v. NASCAR*, 2008 WL 113987 (E.D. Ky. Jan. 7, 2008)....................... 4, 6, 11

*Kors v. Carey*, 158 A.2d 136 (Del. Ch. 1960) ............................................................................. 8

*Lokomotiv Yaroslavl v. NHL*, 06 CV 9421 (S.D.N.Y. Nov. 15, 2006)........................................... 5

*Madison Square Garden v. NHL*, 2007 WL 3254421 (S.D.N.Y. 2007)......................................... 5

*Mid-South Grizzlies v. NFL*, 720 F.2d 772 (3d Cir. 1983) ........................................................... 6

*Nevins v. Bryan*, 885 A.2d 233 (Del. Ch. 2005) ...................................................................... 14

*Peirson v. Clemens, Inc.*, 2005 U.S. Dist. LEXIS 4587 (D. Del. 2005) ...................................... 10

*Res. Ventures Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp.2d 423 (D. Del. 1999).......................... 10

*Seabury v. PGA*, 878 F. Supp. 771 (D. Md. 1994) ...................................................................... 4

*Telxon Corp. v. Meyerson*, 802 A.2d 257 (Del. 2002).................................................................. 9

*Texaco. v. Dagher*, 547 U.S. 1 (2006) ....................................................................................... 5

*Toscano v. PGA*, 258 F.3d 978 (9th Cir. 2001) ........................................................................... 4

*Werner v. Miller Technology Mgt., L.P.*, 831 A.2d 318 (Del. Ch. 2003) ..................................... 13

## Other Authorities

Restatement (Second) of Torts § 222A (1965) ........................................................................... 10

## I.    Nature of the Case

ATP is a non-profit, Delaware membership organization.  Its members are men's professional tennis players and men's professional tennis tournaments.  ATP operates a worldwide tennis tour (the "Tour") comprised of 63 tournaments in 30 countries.  Players earn prize money and ATP "ranking points" through playing in ATP and non-ATP tournaments culminating in ATP's end-of-season championship tournament.  (The four "Grand Slam" tournaments — the Australian Open, the French Open, Wimbledon, and the U.S. Open — are not part of the Tour, although they do count toward player rankings.)[1]  Plaintiffs operate a tournament in Hamburg, Germany.  Plaintiffs chose to be ATP members and to operate the Hamburg tournament as part of the Tour — and, therefore, to enjoy the benefits of being part of the Tour and to be subject to ATP's rules, Bylaws, and governance.[2]  This case fundamentally challenges what the Tour is and how it is to be governed.

The Tour has three "tiers" of tournaments.  ATP currently places Hamburg in the first tier, the "Masters," which comprises approximately 15% of the tournaments in the Tour.  Beginning in 2009, however, Hamburg will be categorized in its second-highest tier.  The two top tiers, which constitute ATP's "Championship Division," will comprise approximately the top third of the Tour.  The Hamburg event, now scheduled for mid-May, will be scheduled in July.  These changes, undertaken in full accordance with ATP's Bylaws and rules, are part of modifications to the Tour under what is known as ATP's "Brave New World" Plan.  ATP

---

[1] As Plaintiffs have acknowledged, the yearly tennis calendar is for all intents and purposes dominated by the Grand Slams:  ATP and other tennis organizations, such as the WTA, schedule their seasons and events around the dates of the Grand Slams.  Additional non-ATP events that affect ATP's calendar are the annual Davis Cup tournaments and, in Olympic Years (such as 2008), the Olympic Games.  ATP also takes into consideration the dates for other major sporting events in the various countries in which ATP tournaments take place.

[2] Plaintiff QTF also operates an event in the third tier in Doha, Qatar, as well as the year-end championship of the WTA Tour and a WTA event in Berlin.

developed and adopted the Plan based on its experience in the marketplace, the demands of ATP's members, and research showing that ATP's consumers — fans, broadcasters, and sponsors — desired a quality, professional tennis product to compete in the modern sports and entertainment market. The basic features of the Plan are: (1) a more coherent tournament calendar, with logical progression from one event to the next; (2) a defined and recognizable "top tier" of events, featuring all of the top-ranked players; (3) increased prize money for players; (4) increased investment in tournaments and facilities; (5) expansion into the largely-untapped Asian market; (6) enhanced marketing and promotion of Tour events; and (7) improved handling of Tour media rights.

Plaintiffs' case is essentially simple: they seek to retain permanently their preferred "top tier" status and "their" position on ATP's calendar. They make this demand without any regard for whether they merit that status or whether that schedule is sensible, or for the fact that if Plaintiffs get what they want, others by definition will not. And they mount this challenge notwithstanding the clear authority of ATP to determine both status and schedule. Plaintiffs ignore the question of whether their self-interest will harm the greater interests of the ATP members, the Tour, and the sport — the interests that ATP and its Board of Directors must serve.

Stripped of all distractions, Plaintiffs' lawsuit challenges the core right and authority of a professional sports league or circuit to structure and conduct its operations — to determine where, when and what type of events are played, and where its players shall play, and to do so in a manner that responds to the competitive demands of the marketplace. Without such authority, ATP is nothing more — and likely far less — than a roster and a rulebook. Yet at the same time Plaintiffs challenge ATP's implementation of the Plan as anticompetitive and improper, they actively support (as they have since the inception of the ATP in 1990) an integrated circuit which

organizes a system of tiered events, with centralized control over the calendar, and a system of ensuring player attendance. They simply want to get what they want for themselves by fiat, permanently, and have therefore sought injunctive relief restoring their top tier status and place in the calendar. At the same time, they seek damages that their own witnesses concede they have not yet suffered, and will not suffer if they obtain the equitable relief they request.

## II.    Contested Issues of Fact to be Established at Trial

The contested facts to be established by Defendants at trial are set forth in Exhibit 2(a)(2) of the final pretrial order, being filed concurrently herewith.

## III.    ATP's Theory of Defense

Plaintiffs' claims are contrary to fact, law, and common sense. To any objective eye, the Brave New World Plan is procompetitive, reasonable, and good for the Tour and the sport as a whole. Moreover, the Plan is exactly what any person would <u>expect</u> a sports league or circuit to do: organize, promote, brand, and control the season to provide fans, broadcasters, and sponsors with a desired, quality product.

### A.    <u>ATP Has the Express Authority to Control the Tour Structure and Calendar</u>

Under ATP's Bylaws, tournament members are entitled to a slot on the ATP calendar, but ATP has sole discretion over the placement of events on the calendar and over the classification of tournaments within the overall Tour structure. Defendants will show at trial that Plaintiffs have expressly acknowledged ATP's authority in these matters in multiple, written agreements. Accordingly, Plaintiffs have no basis upon which to challenge ATP's exercise of that authority.

### B.    <u>Plaintiffs' Antitrust Claims</u>

#### 1.    <u>ATP is a Single Enterprise</u>

The internal decisions of a unified business interest — a "single entity" — do not give rise to claims under Section 1 of the Sherman Act. *Copperweld v. Independence Tube*, 467 U.S.

752 (1984). As the Seventh Circuit has explained in addressing whether the NBA could be liable

under Section 1:

> [A]ntitrust law permits, indeed encourages, cooperation inside a business organization the better to facilitate competition between that organization and other producers. To say that participants in an organization may cooperate is to say that they may control what they make and how they sell it . . . .

*Chicago Prof'l Sports v. NBA*, 95 F.3d 593, 598 (7th Cir. 1996) (hereafter, "*Bulls II*"). Despite

any superficial independence or "competition," each member is interdependent on the others to

produce a common product — a marketable annual tour or season. Thus, *Bulls II* found that the

NBA acts like a single entity in selling broadcast rights for league games despite internal

"competition" among and "ownership" rights of league members. *Id.* at 600. The NFL and PGA

have likewise been found to be integrated entities in certain instances. *Am. Needle. v. New

Orleans Saints*, 496 F. Supp.2d 941, 944 (N.D. Ill. 2007) (NFL acts as single entity with respect

to branded clothing); *Seabury v. PGA*, 878 F. Supp. 771 (D. Md. 1994) (PGA acts as integrated

entity); s*ee also Ky. Speedway v. NASCAR*, 2008 WL 113987, at *1 (E.D. Ky. Jan. 7, 2008)

(NASCAR is "a producer of a product" free under the antitrust laws to decide which racetracks

will host which races) (attached as Exhibit A).

    The evidence will show that ATP, a non-stock corporation comprised of player and

tournament members that have joined together to produce an annual professional tennis tour, is a

"single entity". Even Plaintiffs' witnesses will concede that ATP tournament members do not

"compete" either among themselves or with ATP itself. Indeed, the allocation of rights and

obligations that may give the sense of limited interventure competition is solely the product of

the organization's internal policy decisions in the first place. Nor does the fact that tournaments

agree to accept and adhere to ATP's policies and rules suffice to establish an agreement for

Section 1 purposes. *Toscano v. PGA*, 258 F.3d 978 (9th Cir. 2001) (dismissing antitrust claims;

acceptance by tournaments and sponsors of PGA rules on player eligibility, scheduling and other issues did not constitute "agreement" for purposes of Section 1).

Even if Defendants cannot show that ATP should be considered a single entity for all purposes, it is nevertheless entitled to be considered a single enterprise with respect to carrying out its internal "core" functions — *e.g.*, how many "tiers" to have, how to define the "tiers," which tournaments to include in which "tier," and when to schedule its tournaments.  *Texaco. v. Dagher*, 547 U.S. 1, 6 (2006) (agreement on price of joint venture's gasoline "not price fixing in the antitrust sense"); *Lokomotiv Yaroslavl v. NHL*, 06 CV 9421, slip op. at 86 (S.D.N.Y. Nov. 15, 2006) (NHL rules on negotiation for transfer of foreign players are "core activities of a joint venture . . . and thus, would not constitute a combination in restraint of trade" under *Dagher*) (attached as Exhibit B); *see also Madison Square Garden v. NHL*, 2007 WL 3254421 (S.D.N.Y. 2007) (NHL requirement for website uniformity "is a key element of the League's new growth strategy to enhance the NHL's 'national brand' and to compete better against other sports and entertainment products and their websites").  Rather, as the *Bulls II* court held, "[c]ourts must respect a league's disposition of these issues, just as they respect contracts and decisions by a corporation's board of directors."  95 F.3d at 597.  And here, unlike most sports leagues, the challenged conduct is in fact the decisions enacted by the corporation's Board of Directors.

2. Plaintiffs Cannot Show Any "Antitrust Injury"

A private antitrust plaintiff must prove "antitrust injury," meaning injury "of the type the antitrust laws were intended to prevent" and that "flows from that which makes defendants' acts unlawful" — *i.e.*, injury that reflects an "anticompetitive effect" or an "anticompetitive act".  *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977).  The antitrust laws "were enacted for the protection of *competition,* not *competitors.*"  *Id.* at 488 (emphasis in original).

The evidence will show that any "injury" to Plaintiffs from Defendants' conduct is not an "antitrust" injury.  First, the changes that ATP is making are permissible changes to "intrabrand" competition within ATP that are intended to and will facilitate ATP's ability to compete on an "interbrand" basis with other tennis, sports, and entertainment products.  Any "injury" to Plaintiffs does not reflect any reduction in "interbrand" competition.  *See Continental TV, Inc. v. GTE Sylvania*, 433 U.S. 36, 52 n.19 (1977) ("primary concern of antitrust law" is "interbrand," not "intrabrand," competition).  If anything, Plaintiffs seek to maintain the benefits of Hamburg's intrabrand position *vis á vis* other ATP tournaments, having been granted these benefits within ATP's structure.  Put most simply, the internal choice by ATP to select one member over another to be in its highest tier is not antitrust injury.  *See Mid-South Grizzlies v. NFL*, 720 F.2d 772, 786-87 (3d Cir. 1983) (dismissing antitrust claims where "the action complained of produced no injury to competition."); *Ky. Speedway*, 2008 WL 113987.

Finally, Plaintiffs cannot show how Defendants' conduct has reduced their own ability to "compete" in any relevant market.  If Plaintiffs are correct that ATP has acted anticompetitively with respect to its member tournaments, that should, if anything, make it ***easier*** for Plaintiffs to compete ***against*** ATP for players, fans, broadcaster and sponsors.  *E.g.*, *Mid-South Grizzlies*, 720 F.2d at 787 ("the Grizzlies' exclusion from the league in no way restrained them from competing for players by forming a competitive league").  But fundamentally, Plaintiffs do not seek to compete with the alleged "cartel"; they just seek the perceived benefits of certain internal decisions of the organization.

3.    Plaintiffs Cannot Establish a Relevant Product Market, Defendants' Market Power, or Anticompetitive Effects

In order to prevail on their antitrust claims, Plaintiffs must prove the existence of a relevant product market and relevant geographic market.  "The outer boundaries of a product

market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co v. U.S.*, 370 U.S. 294, 325 (1962); *Allen-Myland, Inc. v. IBM, Corp.*, 33 F.3d 194, 207 (3d Cir. 1994).

The evidence will show that Plaintiffs' proposed "relevant markets" are each flawed because they do not include all reasonably interchangeable or substitutable products. Plaintiffs' purported expert's methodology for defining the relevant markets is unsound and unreliable and should be rejected because it lacks any scientific basis.[3] Instead, Defendants' expert will show that the relevant product market for antitrust purposes must at the very least include other sports and entertainment events and cannot be as limited as Plaintiffs suggest.

Moreover, even if Plaintiffs were able to prove a proper relevant market, the evidence will show that Defendants do not have market power, nor can they show that anticompetitive effects substantially outweigh the Plan's procompetitive benefits. Assuming the relevant market is men's professional tennis — which the evidence will show is far too narrow — the Grand Slam events, not ATP, dominate the landscape: ATP is forced to schedule events around those tournaments, which draw the greatest attention of fans, broadcasters and sponsors worldwide.

Further, the evidence will show, among other things, that the popularity of tennis in Germany has been declining, and that for multiple reasons the Hamburg tournament was less qualified to be placed in ATP's highest tier two weeks before the French Open. In the face of this reality, Plaintiffs' request that ATP protect their "traditional" event from market forces cannot be seen as procompetitive in any sense. Defendants will show that the ATP's restructuring is the antithesis of anticompetitive behavior. ATP's restructuring will: (a) maintain ATP's top tier at nine events; (b) enlarge the next tier and increase player commitments for that

---

[3] Defendants have moved to exclude the testimony of Plaintiffs' antitrust "expert" under *Daubert*, as discussed below.

tier; (c) expand ATP's top tier events to the growing sports market in Asia; (d) increase the prize

money offered to players at all levels; and (e) increase investments in infrastructure and

marketing expenditures.

C.    Plaintiffs' Fiduciary Duty Claims

1.    The Court Should Decide Plaintiffs' Fiduciary Duty Claims

Plaintiffs assert multiple claims for breach of fiduciary duty, but have requested no

damages with respect to those claims.  Accordingly, those claims should be heard and decided by

the Court rather than the jury, as they are inherently equitable.  *See Granfinanciera, S.A. v.

Nordberg*, 492 U.S. 33, 42 (1989).  "Actions for breach of fiduciary duty, historically speaking,

are almost uniformly actions 'in equity' — carrying with them no right to a trial by jury."  *In re

Hechinger Inv. Co. of Del.*, 327 B.R. 537, 544 (D. Del. 2005); s*ee also Dardovitch v. Haltzman*,

190 F.3d 125, 134 n.1 (3d Cir. 1999) (affirming denial of jury trial for breach of fiduciary duty

claim); *Cantor v. Perelman*, 2006 WL 318666, *9 (D. Del. 2006) (claims seeking both legal and

equitable relief should be "judged equitable").

2.    The Defendants Have Not Violated Any Fiduciary Duties

As officers and/or directors of ATP, the ATP Directors owe fiduciary duties to the

corporation and to its membership.  These duties are not owed to any specific individual

members of the ATP Tour.  *Gilbert v. El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21,

1988), *aff'd*, 575 A.2d 1131 (Del. 1990); *Kors v. Carey*, 158 A.2d 136, 143 (Del. Ch. 1960).  The

ATP Director Defendants had a duty to perform their functions in good faith, in a manner they

reasonably believed to be in the best interest of ATP, and with the care that ordinarily prudent

persons would reasonably be expected to exercise in a like position under similar circumstances.

This duty is met if the directors informed themselves of the material information reasonably

available to them prior to making a business decision.  *Benihana of Tokyo, Inc. v. Benihana, Inc.*,

891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).  Plaintiffs will be unable to

prove a violation of this duty.  Rather, the evidence will show that Defendants approved the

Brave New World Plan after research from at least three outside consultants, input from all ATP

constituencies, and countless meetings and debates.

Although Plaintiffs claim that several ATP directors had improper financial interests in

the implementation of the Brave New World Plan, the evidence will show an absence of self-

dealing; moreover, any other asserted "interest" any director might have had was immaterial

and/or unrelated to the Plan.  *See*, *e.g.*, *Benihana*, 891 A.2d at 174;  (Del. Ch. 2005); *Telxon

Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002).  Likewise, Plaintiffs will be unable to prove

a breach of the duty of loyalty claims based on the Defendants' purported intentional "violations

of positive law."  Such a claim, at a minimum, would require Plaintiffs to show that Defendants

specifically intended that ATP would violate the antitrust laws (the only positive law set forth in

Plaintiffs' proposed jury instructions), and that Plaintiffs were harmed by that violation.  *Exxon

Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 364 (3d Cir. 1993).  Plaintiffs can offer no

evidence of such intent on the part of any of the Defendants.

Accordingly, Defendants are entitled to the presumption that they acted with sound

business judgment.  In all events, the Plan was designed to promote the interest of the Tour, and

Plaintiffs' fiduciary duty claims should be rejected.

D.      Plaintiffs' Tortious Interference Claims

In order to prevail on any of their claims for tortious interference, Plaintiffs must, at a

minimum, prove the existence of a contract or other business relationship with a third party that

was breached or otherwise terminated as a result of Defendants' conduct.  *Aspen Advisors LLC v.

UA Theatre Co.*, 861 A.2d 1251 (Del. 2002); *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532

A.2d 983 (Del. Ch. 1987); *Commerce National Ins. Serv., Inc. v. Buchler*, 120 Fed. Appx. 414,

418 (3d Cir. 2004). Plaintiffs will be unable to carry this burden at trial, as they have not

identified contracts with third parties that were breached or prospective contractual relationships

that were interfered with as a result of Defendants' conduct and have offered no basis for

calculating damages on these claims. In addition, Plaintiffs cannot maintain a tortious

interference claim based on Defendants' purported interference with a contract to which ATP

itself is a party. *Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers Local Union 42

v. Absolute Environmental Serv., Inc.*, 814 F. Supp. 392, 400 (D. Del. 1993).

     E.     <u>Plaintiffs' Conversion Claim</u>

     Conversion is the exercise of dominion over the property of another, in denial of his

rights, or inconsistent with the owner's right to possession or control. *Arnold v. Soc'y for

Savings Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996). Conversion may only apply where the

act of dominion or control so seriously interferes with the owner's right to possession or control

that the defendant has fully extinguished the value of the property. Restatement (Second) of

Torts § 222A (1965). Moreover, a plaintiff cannot maintain a conversion claim for intangible

property — such as the rights Plaintiffs claim were converted here — unless the intangible

property relations are merged into a document. *Peirson v. Clemens, Inc.*, 2005 U.S. Dist. LEXIS

4587, *7-8 (D. Del. 2005); *Acierno v. Preit-Rubin, Inc.*, 1999 F.R.D. 157, 165 (D. Del. 2001);

*Res. Ventures Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp.2d 423, 439 (D. Del. 1999); *Carlton

Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, *16 (Del. Ch. 1995); *see

also In re Wal-Mart Wage and Hour Employment Practices Litig.*, 490 F. Supp.2d 1091, 1101

(D. Nev. 2007). For example, promissory notes, bonds, bills of exchange, stock share

certificates, and insurance policies are all both property in and of themselves and also

representative of a person's interest in other property. *In re Wal-Mart*, 490 F. Supp.2d at 1102-

03. Plaintiffs' conversion claim should be dismissed as a matter of law because they assert that

Defendants converted their rights as an ATP member, which are intangible property rights that are not merged into a document.

In addition, the undisputed evidence will show that Plaintiffs' ATP membership has not been taken or destroyed by Defendants — at most, Plaintiffs contend that their status as an ATP member tournament will be impaired under the Brave New World Plan, because their tournament will be in a different category, one sought by many other members and one higher than that enjoyed by the majority of ATP tournament members.

## IV.     Summary and Significance of Outstanding *Daubert* Motions

Defendants have filed motions to exclude the opinion testimony offered by all three of Plaintiffs' experts.  The exclusion of any of these witnesses will substantially affect the issues to be addressed at trial.

### A.     Plaintiffs' Antitrust Expert Andrew Zimbalist

Defendants have moved to exclude Zimbalist's opinions concerning the relevant antitrust markets because he used an unsound and unscientific methodology to define those markets.  The methodology Zimbalist employed in this case was — as he admitted under oath — even less rigorous and involved less analysis than he used in another case in which his opinions were excluded on *Daubert* grounds.  *Ky. Speedway*, 2008 WL 113987, at *4.  Should the Court grant this motion, Plaintiffs will have no evidence at trial of relevant product or geographic markets, meaning that judgment should be entered dismissing their antitrust claims.

### B.     Plaintiffs' Damages Expert Gary Kleinrichert

Defendants seek to exclude the damages opinions offered by Kleinrichert on the grounds that (1) he failed to connect the damages he believes Plaintiffs will suffer with the particular alleged "bad acts" of Defendants; (2) he calculated damages based on a "but for" world in which Plaintiffs would enjoy the benefits of the very conduct they challenge as anticompetitive; and

(3) his valuation model is unscientific and unreliable in that he used a supposed "benchmark" transaction without any analysis of whether the tournament at issue there was in fact comparable to Plaintiffs' tournament.  Given that Plaintiffs' other witnesses have admitted that they have no knowledge or opinions concerning any damages suffered by Plaintiffs, excluding Kleinrichert's opinions would leave Plaintiffs with no testimony at all on the amount of their damages.

        C.        <u>Plaintiffs' Delaware Law Expert Charles Elson</u>

        Finally, Defendants have moved to exclude the opinion testimony proffered by Elson on the grounds that the witness improperly attempts to usurp the role of the Court in articulating the legal standards applicable to Plaintiffs' fiduciary duty claims, and made absolutely no attempt to apply his view of the law to any of the facts of this case.  Excluding Elson from the trial would properly leave it to the Court to instruct the jury on these issues.

**V.      Damages Issues and Bifurcation**

        A.        <u>The Uncertain Effect of Injunctive Relief in the Event of Finding of Liability</u>

        Plaintiffs in this case have sought both permanent injunctive relief against Defendants' purported misconduct and damages on their antitrust and tortious interference claims.  The only damages identified by Plaintiffs' witnesses have been damages that Plaintiffs claim they will suffer in the event that the Brave New World Plan is implemented as currently anticipated and beginning in 2009 the Hamburg tournament is reclassified and scheduled in July.  Essentially, Plaintiffs' damages theories all stem from the idea that whatever value their tournament has now will be totally eliminated in 2009 under the Brave New World Plan.  If Plaintiffs prevail on liability, and if the Court grants relief enjoining the Brave New World Plan, that relief would preclude any loss of value, and hence eliminate any damage to Plaintiffs.  If Plaintiffs prevail on liability but the Court declines to enjoin the Brave New World Plan in its entirety, further

proceedings would then be necessary to determine Plaintiffs' damages in light of the liability finding and the scope of injunctive relief.

Accordingly, Defendants have moved to bifurcate trial of this action into separate liability and damages phases, with the damages phase to proceed only after a finding of liability and the Court's determination on the proper scope of injunctive relief. Bifurcation would be efficient because even if liability were found, the damages phase might be unnecessary and would at a minimum be affected by the cope of injunctive relief. Indeed, Defendants have affirmatively pressed to ensure that this case could be tried before the 2009 tournament season, specifically for the purpose of obtaining a determination concerning the propriety of the Brave New World Plan *in advance* of its actual implementation.[4]

## VI.    Affirmative Defenses

A.    Waiver, Acquiescence, Estoppel & Release

Delaware courts have defined "waiver," in the context of a fiduciary duty claim, as "the voluntary and intentional relinquishment of a known right." *Forsythe v. ESC Fund Mgt. Co.*, 2007 WL 2982247, at *16 (Del. Ch. Oct. 9, 2007). Claims have been deemed waived where the challenged actions have been fully disclosed to the complaining party. *Id.* ("in some instances, disclosure . . . may preclude a claim for breach of the duty of loyalty"). "It is well established that a stockholder cannot complain of corporate action in which, with full knowledge of all the facts, he or she has concurred." *Werner v. Miller Technology Mgt., L.P.*, 831 A.2d 318, 334 (Del. Ch. 2003). The evidence at trial will show that Defendants at all times sought to apprise ATP member tournaments of decisions affecting the Tour structure, calendar and scheduling, and

---

[4] In fact, given the wholly unsupported nature of Plaintiffs' damage calculations, even if the jury were to find liability and the Court were for some reason to deny Plaintiffs' request for injunctive relief, Defendants would be in position themselves to consider changing their plans to modify or eliminate those things found to be improper, reducing or avoiding all damages.

that Plaintiffs actively encouraged ATP to approve many of the policies and plans at issue in this case. Their claims for breach of fiduciary duty should therefore be deemed to have been waived.

"[A]cquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *17 (Del. Ch. 2006) (internal quotations omitted). "Under this doctrine, one who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he or she thereafter attacks the same transaction." *Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1240 (Del. Ch. 2000). "If the plaintiffs knew of the questionable behavior and did not previously challenge it, while simultaneously accepting a benefit from the now challenged behavior, then a Court will find that the plaintiffs acquiesced to the wrongdoing and will bar a claim against the alleged wrongdoer." *Id.* at 1240-41. The evidence at trial will show that for many years Plaintiffs have accepted the benefits of ATP's policies and practices and of being classified as a highest tier tournament, and should not now be permitted to attack those same policies and practices.

The doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." To establish estoppel it must be shown that the party claiming estoppel (1) lacked knowledge or the means of obtaining knowledge of the facts in question; (2) relied on the conduct of the party against whom estoppel is claimed; and (3) suffered a prejudicial change of position as a result of his reliance. *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005) (director who was removed as member of the board, was estopped from challenging validity of

new director election).  The evidence will show that Defendants relied on Plaintiffs' support of

ATP's policies and practices rules over the years without knowing that Plaintiffs would later

assert that those very acts were unlawful.

Finally, Plaintiffs expressly released Defendants from liability pursuant to enforceable

provisions in ATP's Certificate of Incorporation and its Bylaws.  Those releases should be

enforced and Plaintiffs' claims against the individual director Defendants should be dismissed.

## VII.   Defendants' Anticipated Motions for Directed Verdict

Subject to the evidence presented at trial, Defendants currently anticipate seeking a

directed verdict or judgment as a matter of law on the grounds that no reasonable jury could find:

1. That ATP has violated Section 1 of the Sherman Act because it is a single enterprise.

2. That Plaintiffs have antitrust standing to challenge Defendants' conduct.

3. That Plaintiffs have suffered antitrust injury as a result of Defendants' conduct.

4. That Plaintiffs have proven any relevant product market.

5. That Plaintiffs have proven a relevant geographic market for any relevant product market(s) proven by Plaintiffs.

6. That Defendants have market power in any relevant product and geographic market(s) proven by Plaintiffs.

7. That Defendants are not entitled to the presumption that they acted with sound business judgment.

8. That the Defendants caused ATP to violate the antitrust laws.

9. That Plaintiffs have proven any contracts with third parties that were breached as a result of Defendants' conduct.

10. That Plaintiffs have proven any prospective business relationships that were breached or terminated as a result of Defendants' conduct.

11. That Plaintiffs have proven any recoverable damages arising out of Defendants' conduct.

12. That Plaintiffs' ATP membership rights are properly the subject of a conversion claim.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Julie A. Tirella
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: June 2, 2008

# EXHIBIT A

Westlaw.

Slip Copy                                                                                         Page 1
Slip Copy, 2008 WL 113987 (E.D.Ky.), 2008-1 Trade Cases P 75,995
**(Cite as: 2008 WL 113987 (E.D.Ky.))**

H**KentuckySpeedway**, LLC v. National Ass'n of
Stock Car Auto Racing, Inc.
E.D.Ky.,2008.
      **KENTUCKYSPEEDWAY**, LLC, Plaintiff
                              v.
   NATIONAL ASSOCIATION OF STOCK CAR
     AUTO RACING, INC., a/k/a NASCAR and
   International Speedway Corporation, Defendants.
            **Civil Action No. 05-138 (WOB).**


                        Jan. 7, 2008.

Arthur R. Miller, Harvard Law School, Cambridge,
MA, Daniel J. Walker, Justin A. Nelson, Susman
Godfrey, LLP, Seattle, WA, Fay E. Stilz, James
Rubin Cummins, Paul M. DeMarco, Stanley M.
Chesley, Waite, Schneider, Bayless & Chesley Co.,
LPA, W.B. Markovits, Markovits & Greiwe Co.,
LPA, Cincinnati, OH, Michael P. Fritz, Susman
Godfrey, LLP, Dallas, TX, Stephen D. Susman,
Vineet Bhatia, Susman Godfrey, L.L.P., Houston,
TX, Mark D. Guilfoyle, Deters, Benzinger & Lavelle,
P.S.C., Crestview Hills, KY, for Plaintiff.
David Boies, Helen M. Maher, Jack A. Wilson, Olav
A. Haazen, Boies, Schiller & Flexner LLP, Armonk,
NY, Kate Ruggieri, Timothy A. Karpoff, Boies,
Schiller & Flexner LLP, New York, NY, Kimberly S.
Amrine, Matthew C. Blickensderfer, Frost Brown
Todd LLC, G. Jack Donson, Jr., Taft, Stettinius &
Hollister, LLP, Cincinnati, OH, sheryl G. Snyder,
Frost Brown Todd LLC, Louisville, KY, Stuart H.
Singer, Boies, Schiller & Flexner, LLP, Fort
Lauderdale, FL, Guy I. Wade, III, Kenneth C.
Meixelsperger, Kristin R. Turner, Rodney Acker,
Scott P. Drake, Fulbright & Jaworski L.L.P., Dallas,
TX, Robert B. Craig, Taft, Stettinius & Hollister,
LLP, Covington, KY, for Defendants.

                  ***OPINION AND ORDER***


WILLIAM O. BERTELSMAN, District Judge.


                    **I. INTRODUCTION**


**\*1** This is an antitrust action by the owner of a local
auto-racing track (Plaintiff Kentucky Speedway,
LLC, hereinafter referred to as Speedway) against a

promoter of stock car racing (Defendant National
Association of Stock Car Racing, Inc., hereinafter
referred to as NASCAR) and an affiliated corporation
(Defendant International Speedway Corporation,
hereinafter referred to as ISC). ISC operates certain
stock car race tracks across the United States.
NASCAR promotes ("sanctions") several series of
stock car races: NEXTEL, Busch, the Craftsman
Truck Series, as well as several local series.

This case concerns the sanctioning (licensing) of
NASCAR'S NEXTEL series, which may be thought
of as the World Series or Superbowl of stock car
racing. NEXTEL races are in high demand and are
excellent revenue producers. NASCAR sanctions 36
such races. It offers 19 of these races to its affiliate,
ISC, at its 12 tracks. The remainder are sanctioned at
other tracks. But NASCAR refuses to allow Plaintiff
Speedway to host a NEXTEL race.[FN1] (Doc. # 225,
Defs.' Mem. in Supp. of Summ. J. 10.) Although
there are literally thousands of pages of briefs and
exhibits that have been filed herein, this is all this
case is essentially about. Speedway alleges violations
of the Sherman Act § 1, 15 U.S.C. § 1 (conspiracy in
restraint of trade), and § 2, 15 U.S.C. § 2 (attempt to
monopolize). After an adequate period for discovery,
Defendants filed a Joint Motion for Summary
Judgment. (Doc. # 225.) Responses and replies were
duly filed. (Docs. # 272 & # 277.)


> FN1. The court will assume that Speedway
> is fully qualified to host such a race, as well
> as give Speedway the benefit of all factual
> inferences.


After careful consideration and a thorough review of
the record, and granting Speedway the benefit of the
doubt on all reasonable inferences therefrom, the
court concludes that Speedway has failed to make out
its case. Summary judgment on both claims is
therefore appropriate.


                      **II. ANALYSIS**


The above highly-truncated statement of facts is all
that is necessary to understand this case, because it is
essentially a "jilted distributor" case. As the

following discussion illustrates, a producer of a product is free under current antitrust laws to select its distributors [FN2] and to refuse to deal with would-be distributors, no matter how worthy or deserving they may be. Even more fundamentally, in order to establish both its antitrust claims, Speedway was required to prove relevant markets through qualified expert testimony as part of its prima facie case. This it failed to do, after being given a sufficient opportunity. Thus, summary judgment is appropriate.

> FN2. In this context, the term "distributor" includes both wholesalers and retailers.

### A. The Summary Judgment Standard

Recently, the Sixth Circuit had occasion to discuss the standards for summary judgment in an antitrust case:

> The District Court construed the Supreme Court's trilogy of *Matsushita, Anderson,* and *Celotex* to have "in the aggregate, lowered the movant's burden in seeking summary judgment."(J.A. 44). We respectfully disagree. The Supreme Court observed that summary judgment is appropriate where the antitrust claim "simply makes no economic sense," *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 467, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), or "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party...."*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted)." The Supreme Court "has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.' " *Eastman Kodak Co.,* 504 U.S. at 467, 112 S.Ct. 2072 (quoting *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 579, 45 S.Ct. 578, 69 L.Ed. 1093 (1925)). Moreover, as the Supreme Court explained, *Matsushita* does not increase the non-movant's burden on a motion for summary judgment. "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach a jury...." *Kodak,* 504 U.S. at 468, 112 S.Ct. 2072.

**\*2** *Spirit Airlines, Inc. v. Northwest Airlines, Inc.,* 431 F.3d 917, 930-31 (6th Cir.2005).

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* the Court elaborated on the factual showing that a plaintiff must make to survive summary judgment, emphasizing that "the issue of fact must be 'genuine.' " " 475 U.S. 574, 586 (1986) (citing Fed. R. Civ. Proc. 56(c), (e)). The Court further observed that the party opposing a grant of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Id.* at 587 (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968)).

*Matsushita* instructs that if the plaintiff's claims simply make "no economic sense," it must come forward with "more persuasive evidence." *Id.* As the Sixth Circuit observed in *Spirit Airlines,*"if the [plaintiff's] expert provides a reliable and reasonable opinion with factual support, summary judgment is inappropriate."*Spirit Airlines,* 431 F.3d at 931. As the discussion below illustrates, in this court's view there was a total failure of proof of any relevant market in this case and, thus, of any "reliable and reasonable opinion with factual support," because Plaintiff's expert opinions did not pass *Daubert* analysis. Without proof of relevant markets, Speedway's theories make no economic sense. Thus, summary judgment is appropriate. *Cf. Street v. J.C. Bradford Co.,* 886 F.2d 1472, 1476-81 (6th Cir.1989) (reviewing the progression of Supreme Court decisions marking a return to the original purpose of summary judgments as an effective procedural device in federal court litigation, including complex cases).

### B. Speedway's Expert Testimony Fails the Daubert Test

An essential component of Speedway's theories is the definition of a relevant product market or markets. Speedway postulates two relevant markets: a sanctioning market for the NEXTEL race and a hosting market for the same race.

Speedway relies on the expert report and deposition testimony of Professor Andrew Zimbalist for evidence of the existence of these markets. Zimbalist's theories have been challenged by

Slip Copy                                                                                                Page 3
Slip Copy, 2008 WL 113987 (E.D.Ky.), 2008-1 Trade Cases P 75,995
**(Cite as: 2008 WL 113987 (E.D.Ky.))**

Defendants in *Daubert* motions.[FN3](Docs. # 219 & # 256.)

> FN3. The court will assume for the purpose of this analysis that Zimbalist possesses adequate credentials. The opinions of plaintiff's other expert, Keith Leffler, are based on Zimbalist's market analysis.

In its decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court of the United States placed significant restrictions on the use of a "hired gun" expert. The previous standard had (at least in practice) roughly been: if the expert witness knows more about the subject than the jury, he or she should be permitted to testify. *Daubert* established a far-sweeping new approach.

The standards set by *Daubert* were later incorporated into Federal Rule of Evidence 702, which reads:

**\*3** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The trial court must act as a "gatekeeper" to ensure that unreliable expert testimony is excluded from evidence. *Daubert*, 509 U.S. at 592-94.

*Daubert* enumerated several factors which are relevant to assessing an expert's testimony:

.... (1) whether a "theory or technique ... can be (and has been) tested;" (2) whether the theory "has been subjected to peer review and publication;" (3) whether there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation;" and (4) whether the theory or technique enjoys "general acceptance" within the scientific community. *Daubert*, 509 U.S.

at 592-94;*Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 n. 5 (6th Cir.2001). The Sixth Circuit further examines an expert's opinion by reviewing its context: whether the opinion naturally and directly grows out of research previously conducted independently of the litigation in question, or whether the expert developed the opinion just for the purpose of testifying, which does not offer the same objective proof that the research comports with the dictates of good science. *See Mike's Train House v. Lionel, LLC*, 472 F.3d 398, 408 (6th Cir.2006) ("We have been suspicious of methodologies created for the purpose of litigation"); *Nelson*, 243 F.3d at 252 (magistrate justified in considering fact that expert's study was conducted and opinions were formed merely for purposes of litigation); *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1352 (6th Cir.1992) ( "expert witnesses are not necessarily always unbiased scientists" because "they are paid by one side for their testimony"); *see also Early v. Toyota Motor Corp.*, 486 F.Supp.2d 633, 637 n. 2 (E .D. Ky.2007); *Johnson v. Manitowac Boom Trucks, Inc.*, 406 F.Supp.2d 852, 860 (M.D.Tenn.2005); *aff'd,*484 F.3d 426, 434 (6th Cir.2007). Plaintiff bears the burden of proof as to the admissibility of the opinions of any experts it offers. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999).

(Doc. # 219, Defs.' Jt. Mot. for Order to Limit the Expert Test. of Andrew Zimbalist with Attached Mem. in Supp. 5, 6.)

Definition of the relevant market(s) in this kind of case must be accomplished by expert testimony which meets the *Daubert* /Rule 702 criteria. It is obvious that Zimbalist's analysis fails this test. The critical factor for the analysis is "cross-elasticity of demand" between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

**\*4** All parties agree that the Justice Department's "merger guidelines test" is an accepted means of analyzing the interchangeability of a product and its substitutes. *See Nilavar v. Mercy Health Sys.-Western Ohio*, 244 Fed. Appx. 690, 698 (6th Cir.2007) (unpublished decision) (discussing the merger guidelines test). This test assesses whether the producer or seller of the product can raise its prices

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by a small amount (typically 5% is used) and still make money. That is: if such a price rise were implemented, would the consumers go elsewhere?

Zimbalist did not apply this test, but rather used his own version of it for this litigation. *See* Zimbalist Report, pp. 4, 9 ff. Zimbalist's approach, however, does not meet the *Daubert* criteria. It has not been tested; has not been subjected to peer review and publication; there are no standards controlling it; and there is no showing that it enjoys general acceptance within the scientific community. Further, it was produced solely for this litigation.

Defendants argue that Zimbalist should at least have used other sports, [FN4] and possibly other means of entertainment in general, as possible substitutes for attendance at or television viewing of a NEXTEL race. The court agrees with this argument. The record reflects that the admission price to a NEXTEL race is approximately $85.[FN5] Considering parking and the probable purchase of refreshments, the cost to a family of four would be about $400. Yet, no studies were done to determine whether such a family might patronize a Bengals or Reds game or some other sports event, instead of a NEXTEL race, if that cost were to be raised by $20 (5%).

> FN4. Prof. Zimbalist considered only the Busch NASCAR race as a possible substitution for a NEXTEL race. Even then, his comparison of the markets for the two races was flawed, as pointed out in Defendants' papers.

> FN5. Zimbalist report, p. 25.

Rather, Zimbalist has assumed that this race stands alone as a form of entertainment and has formulated his own hybrid [FN6] test based on this assumption. Where, as here, an expert offers an opinion that is based on a combination of two methodologies, each methodology must meet the *Daubert* criteria, and the combined methodology must meet those criteria also. The remarks of the circuit court in *Elcock v. Kmart Corp.* are pertinent:

> FN6. I.e., partially the Justice Department test and partially his own.

Kmart does not dispute that the Fields and Gamboa approaches are accepted methodologies in the vocational rehabilitation fields; what it does challenge is Copemann's combination method. Each approach, taken in isolation, may very well contain sufficient analytical rigor to be deemed reliable. However, we are inclined to view Copemann's admittedly novel synthesis of the two methodologies as nothing more than a hodgepodge of the Fields and Gamboa approaches, permitting Copemann to offer a subjective judgment about the extent of Elcock's vocational disability in the guise of a reliable expert opinion.

*Elcock,* 233 F.3d 734, 748 (3d Cir.2000).

Therefore, the defense motions to exclude Professor Zimbalist's and Professor Leffler's testimony must be granted. It follows that Plaintiff is left without proof of any relevant product or geographic market. Accordingly, its claims based on both sections of the Sherman Act must fail.

*C. General Discussion*

**1. Proof of Relevant Markets Required**

**\*5** Speedway undertakes to prove relevant market(s) to establish either or both of its Sherman Act claims. (Doc. # 272, Pl.'s Mem. in Resp. to Summ. J. 4, n. 63.) Therefore, its failure to do so, as set out above, is fatal to both claims. However, Speedway also argues that it has adduced "significant evidence of competitive harm" and, therefore, does not need to prove the relevant markets. *See F.T.C. v. Ind. Fed'n of Dentists,* 476 U.S. 447, 458-61 (1986). In the view of this court, Speedway's evidence is not significant enough to trigger this principle. *Indiana Federation of Dentists* itself involved horizontal restraints and appears to have been limited to such and was so characterized by the Court in *California Dental Ass'n v. F.T.C.,* 526 U.S. 756, 770 (1999). Nor is the principle applicable, even if there are some horizontal restraints among ISC and other tracks, where as here the relevant market is not "readily apparent." *Worldwide Basketball & Sport Tours, Inc. v. NCAA,* 388 F.3d 955, 961 (6th Cir.2004), *cert. denied,* 546 U.S. 813 (2005). As in *Worldwide Basketball:*

> .... Far from being a case in which "an observer with even a rudimentary understanding of

economics could conclude that the arrangements in question would have an anticompetitive effect on *customers* and *markets," id.* (emphasis added), *here the relevant market is not readily apparent and the Plaintiffs have failed to adequately define a relevant market, thereby making it impossible to assess the effect of [the challenged NCAA rule] on customers rather than merely on competitors.*While it is true that "the rule of reason can sometimes be applied in the twinkling of an eye,"*Bd. of Regents, 468 U.S. at 109 n. 39, 104 S.Ct. 2948* (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37-38 (Federal Judicial Center, June 1981) (parenthetical omitted)), this abbreviated or "quick-look" analysis may only be done *where the contours of the market and, where relevant, submarket, are sufficiently well-known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition.*Under the "quick-look" approach, extensive market and cross-elasticity analysis is not necessarily required, but *where, as here, the precise product market is neither obvious nor undisputed, the failure to account for market alternatives and to analyze the dynamics of consumer choice simply will not suffice.*The district court therefore erred in applying a quick-look analysis.

*Id.* at 961 (emphasis added).

## 2. Vertical Restraints and "Jilted Distributors"

Further, Speedway cannot show an antitrust injury or any actionable anticompetitive behavior. This is because any preference NASCAR shows for favoring ISC tracks is vertical in nature.

The opinion of the court in *Care Heating & Cooling, Inc. v. American Standard, Inc., 427 F.3d 1008 (6th Cir.2005),*[FN7] is directly in point on Speedway's Sherman Act § 1 claims (anticompetitive conspiracy). This is a "classic 'jilted distributor' "[FN8] case. In the view of this court, Speedway's claims fall squarely within this category.

> FN7. Speedway cites *Care Heating & Cooling* in support of its argument that it should not be required to prove the relevant market(s). That case, however, emphasized

that such proof is, in fact, required in situations such as this one involving vertical restraints of trade. *See Care Heating & Cooling, 427 F.3d at 1012-13.*

> FN8.*See Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 810 (6th Cir.1988).*

**\*6** In *Care Heating & Cooling,* a retail heating and air conditioning company (Care) sued American Standard, d/b/a Trane, because Trane had rejected Care as an approved contractor. *Id.* at 1011.The plaintiff alleged that Trane was conspiring with an approved distributor to prevent plaintiff from competing with the approved distributor. *Id.* This scenario is virtually identical with Speedway's claims here.

The district court granted motions to dismiss on the pleadings, and the Sixth Circuit affirmed. *Id.* First, the appellate court held that the "rule of reason must be applied" because a vertical restraint was involved. *Id.* at 1013-14.In language also applicable to the case at bar, the *Care Heating & Cooling* court observed:

> Here, Care complains that Trane's refusal to add it to the list of approved contractors resulted from a continuing agreement between Trane and Buckeye to prevent Care from expanding its business and competing with Buckeye. *Such an agreement, between the manufacturer, Trane, and one of its distributors, Buckeye, satisfies the test for a vertical restraint on trade. The district court correctly noted that this conduct is per se legal,* because a " 'manufacturer has a right to select its customers and refuse to sell its goods to anyone, for reasons sufficient to itself.' " *Dunn & Mavis, Inc. v. Nu-Car Driveway, Inc., 691 F.2d 241, 243 (6th Cir.1982)* (citations omitted). Trane need not provide justification for its refusal to approve Care. Rather, Care is required to establish the unreasonableness of the alleged trade restraint. *NHL Players' Ass'n,* 325 F.3d at 718.

*Id.* at 1013 (emphasis added).

The *Care Heating & Cooling* court then went on to delineate the elements of a Sherman Act § 1 "rule of reason" claim:

Slip Copy                                                                                                          Page 6
Slip Copy, 2008 WL 113987 (E.D.Ky.), 2008-1 Trade Cases P 75,995
(Cite as: 2008 WL 113987 (E.D.Ky.))

Rule of reason analysis requires the plaintiff to prove (1) that the defendant(s) contracted, combined, or conspired; (2) that such contract produced adverse anticompetitive effects; (3) *within relevant product and geographic markets;* (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of plaintiff's injury. *Int'l Logistics Group, Ltd. v. Chrysler Corp.,* 884 F.2d 904, 907 (6th Cir.1989)(citing *Crane v. Shovel Sales Corp.,* 854 F.2d at 805).

.....

Care, however, does not fare as well with respect to the second, fourth, and fifth prongs of the rule of reason test. Regarding the second prong, because the Sherman Act was intended to protect competition and the market as a whole, not individual competitors, *NHL Players' Ass'n,* 325 F.3d at 720 (citing *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)), the foundation of an antitrust claim is the alleged adverse effect on the market. Care is unable to establish any adverse effect on the market[FN9] as a whole. *Although Care alleges that it was unable to secure a contract with Joshua Homes, and that Trane's agreement with Buckeye prevented Care from expanding its business to compete with Buckeye, these results affected Care alone.*Individual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act. *See Dunn & Mavis,* 691 F.2d at 243-44 (holding that a complaint which fails to allege facts establishing that defendant's conduct had any significant anticompetitive effect on the market fails to state an antitrust claim). Because Care has not sufficiently alleged adverse effects on the market, Care has failed to satisfy the second prong of the rule of reason analysis.

FN9. In the case at bar, no market has been satisfactorily proved.

**\*7**Id. at 1014 (footnote added; emphasis added).

Moreover, the court went on to hold that the fourth prong (illegal object) and the fifth prong (antitrust injury) had not been established.

The fourth prong requires plaintiff to prove that the objects of and conduct pursuant to the defendants' contract were illegal. *Int'l Logistics Group,* 884 F.2d at 907. The analysis set forth above established and underscored that the Sherman Act has been read narrowly to prohibit only *unreasonable* restraints on trade. *Bd. of Regents of Univ. of Okla.,* 468 U.S. at 98, 104 S.Ct. 2948. Whether the agreement between Trane and Buckeye unreasonably restrains trade must be proved by the pleading of sufficient facts by Care, but Care neglected to prove the existence of such illegality with sufficient facts. As a result, it failed to satisfy the fourth prong of the analysis.

The fifth and final prong of the rule of reason test requires Care to prove that it suffered an antitrust injury as a result of defendants' contract or conspiracy. In *In re Cardizem CD Antitrust Litigation,* 332 F.3d 896, 909 (6th Cir.2003), this court defined an "antitrust injury" as one proximately caused by defendants' allegedly illegal conduct and "of the type the antitrust laws were intended to prevent."Because protecting competition is the *sine qua non* of the antitrust laws, a complaint *alleging only adverse effects suffered by an individual competitor cannot establish an antitrust injury. Crane & Shovel Sales Corp.,* 854 F.2d at 807. Care failed to satisfy the fifth prong of the rule of reasons analysis. Therefore, Care failed to state a violation of relevant antitrust law.

*Id.* at 1014-15 (emphasis added).

This court holds that this second quotation exactly fits the situation here.[FN10] This is a classic case of a vertical restraint situation. That is, NASCAR has chosen certain tracks to be the distributors of its NEXTEL race to the exclusion of others. As noted in *Care Heating & Cooling,* quoted above: An agreement between a producer and a distributor to prevent a competitor of the distributor from expanding its business and competing with the preferred distributor is "*per se* legal, because a manufacturer has a right to select its customers and refuse to sell its goods to anyone, for reasons sufficient to itself." *Id.* at 1013 (*citing Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.,* 691 F.2d 241, 248 (6th Cir.1982)).

Slip Copy                                                                                                      Page 7
Slip Copy, 2008 WL 113987 (E.D.Ky.), 2008-1 Trade Cases P 75,995
**(Cite as: 2008 WL 113987 (E.D.Ky.))**

FN10. Other Sixth Circuit exclusive dealing cases are: *Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc.,* 243 F.3d 980 (6th Cir.), *cert. denied,*534 U.S. 993 (2001); *Indeck Energy Serv., Inc. v.. Consumers Energy Co.,* 250 F.3d 972 (6th Cir.2000), *cert. denied,*533 U.S. 964 (2001); *Bailey's, Inc. v. Windsor America, Inc.,* 948 F.2d 1018 (6th Cir.1991); *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.,* 854 F.2d 802 (6th Cir.1988); *Beach v. Viking Sewing Mach. Co., Inc.,* 784 F.2d 746 (6th Cir.1986); and *Sancap Abrasives Corp. v. Swiss Indus. Abrasives,* 19 Fed. Appx. 181 (6th Cir.2001) (unpublished decision).*See also Philadelphia Fast Foods, Inc. v. Popeyes Famous Fried Chicken, Inc.,* 647 F.Supp. 216 (E.D.Pa.1986); *Shayne v. Nat'l Hockey League,* 504 F.Supp. 1023 (E.D.N.Y.1980); and *E.A. Weinel Constr. Co. v. Mueller Co.,* 289 F.Supp. 293 (E.D.Ill.1968). Speedway relies on *Byars v. Bluff City News Co.,* 609 F.2d 843 (6th Cir.1979), but that case is not in point since the producer there physically sabotaged plaintiff's operations. 609 F.2d at 854. That case recognizes that vertical refusals to deal are usually proper. *Id.* The law concerning non-actionability of vertical restraints has grown stronger since *Byars. See* text discussion *supra.*Further, the relevant market was clearly defined in *Byars. Id.* at 849.

In its recent opinion in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 127 S.Ct. 2705 (2007), holding that resale price maintenance was no longer *per se* illegal, the Supreme Court spoke of the increasingly favorable view of vertical restraints in general. *Accord Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884 (1990); *Cont'l T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549 (1977).

### III. CONCLUSION

Therefore, for the reasons stated herein, **IT IS ORDERED** that:

**\*8** (1) Defendants' Joint Motion to Exclude the Expert Report and Testimony of Dr. Keith Leffler

(Doc. # 218) be, and hereby is, **granted;**

(2) Defendants' Joint Motion to Limit the Expert Testimony of Andrew Zimbalist (Doc. # 219) be, and hereby is, **granted;**

(3) Defendants' Joint Motion to Strike the Declarations of Keith Leffler and Andrew Zimbalist (Doc. # 256) be, and hereby is, **granted;**

(4) For the same reasons previously noted by this Court in addressing Defendant's prior similar request, Defendant ISC's Motion for Summary Judgment on Personal Jurisdiction (Doc. # 233) be, and hereby is, **denied;**

(5) Defendants' Joint Motion for Leave to File Supplemental Memorandum (Doc. # 281) be, and hereby is, **granted.**Defendants' tendered Supplemental Memorandum is ordered **filed of record;**

(6) The parties' Motions for Leave to file Errata (Docs.# 293, # 295) be, and hereby are, **granted;**

(7) Defendants' Joint Motion for Summary Judgment on all claims (Doc. # 225) and Defendant ISC's Motion for Summary Judgment on Plaintiff's Sherman Act § 2 claim (Doc. # 228) be, and hereby are, **granted;**

(8) Defendants' Joint Motion to Exclude Certain Exhibits to Plaintiff's Omnibus Response (Doc. # 279) be, and hereby is, **denied as moot;**

(9) For the same reasons noted by the Court in addressing Plaintiff's prior similar requests, Plaintiff's Motion to Unseal the Summary Judgment Record (Doc. # 297) be, and hereby is, **denied;**

(10) The Joint Motion to Modify the Final Pretrial Conference Order (Doc. # 306) be, and hereby is, **denied as moot;**

(11) The January 23, 2008, Final Pretrial Conference date and March 4, 2008, Trial date, as well as all other case deadlines be, and hereby are, **vacated;** and

(12) This matter is hereby **dismissed with prejudice.**A Judgment shall enter concurrently

Slip Copy, 2008 WL 113987 (E.D.Ky.), 2008-1 Trade Cases P 75,995
**(Cite as: 2008 WL 113987 (E.D.Ky.))**

herewith.

**IT IS SO ORDERED.**

E.D.Ky.,2008.
Kentucky Speedway, LLC v. National Ass'n of Stock
Car Auto Racing, Inc.
Slip Copy, 2008 WL 113987 (E.D.Ky.), 2008-1
Trade Cases P 75,995

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

```
6BF3YARH                    Hearing
      1    UNITED STATES DISTRICT COURT
      1    SOUTHERN DISTRICT OF NEW YORK
      2    ----------------------------x
      2
      3    NON-COMMERCIAL PARTNERSHIP
      3    HOCKEY CLUB LOKOMOTIV
      4    YAROSLAVL,
      4
      5                   Plaintiff,
      5
      6            v.                          06 CV 9421 (LAP)
      6
      7    NATIONAL HOCKEY LEAGUE,
      7    CALGARY FLAMES LIMITED
      8    PARTNERSHIP D/B/A CALGARY
      8    FLAMES, AND EDMONTON INVESTORS
      9    GROUP LTD. D/B/A/ EDMONTON
      9    OILERS,
     10
     10                   Defendants.
     11
     11    ----------------------------x
     12          and
     12    ----------------------------x
     13
     13    ANO HOCKEY CLUB METALLURG
     14    MAGNITOGORSK,
     14
     15                   Plaintiff,
     15
     16            v.                          06 CV 9936 (LAP)
     16
     17    NATIONAL HOCKEY LEAGUE AND
     17    LEMIEUX GROUP L.P. D/B/A
     18    PITTSBURGH PENGUINS,
     18
     19                   Defendants.
     19
     20    ----------------------------x
     20                                        New York, N.Y.
     21                                        November 15, 2006
     21                                        2:30 p.m.
     22
     22    Before:
     23
     23                   HON. LORETTA A. PRESKA,
     24
     24                                        District Judge
     25
     25
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

2

```
      6BF3YARH                    Hearing
 1    APPEARANCES
 2
 2    ALEXANDER BERKOVICH
 3         Attorney for Plaintiffs
 3
 4    PROSKAUER ROSE
 4         Attorneys for Defendants
 5    BY:  BRADLEY I. RUSKIN
 5             SCOTT A. EGGERS
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

THE COURT:  All right.  Counsel, thank you for your
2    arguments and papers.  This has been nothing other than a
3    complete treat to have you here.
4          We all at least agree that on a motion for a
5    preliminary injunction, the movant must establish that one,
6    absent such relief it will suffer irreparable injury; and two,
7    either, A, a likelihood of success on the merits, or B,
8    sufficiently serious questions going to the merits and a
9    balance of hardships tipping decidedly toward the moving party.
10          For the moment, I do not address the enhanced standard
11   required when one is interfering with the status quo.
12          With respect to irreparable injury, if an injury can
13   be appropriately compensated by an award of monetary damages,
14   then an adequate remedy at law exists and no irreparable
15   injury may be found to justify the specific relief.
16   Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir.
17   2004).
18          "A showing that the movant will suffer irreparable
19   harm if the preliminary injunction is not granted is the most
20   important prerequisite for the issuance of a preliminary
21   injunction."  Transperfect Translations International, Inc., v.
22   Merill Corp, Number 2004 WL 2725032 at *4 (S.D.N.Y.,
23   November 30, 2004)(Quoting Bell & Howell: Mamiya, Co. v. Masel
24   Supply, Co., 719 F.2d 42, 45 (2d Cir. 1983)) "A party's delay
25   in moving for preliminary injunctive relief undercuts the sense
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

74

6BF3YARH                    Hearing

1  of urgency that typically accompanies such a motion."
2  Transperfect 2004 WL 2725032 at *4  (Citing Tough Traveler Ltd.
3  v. Outbound Products, 660 F.3d 964, 968 (2d Cir. 1995)
4          As the plaintiffs point out here, the contracts
5  between the plaintiffs and the players acknowledge that the
6  players' services are unique, and a loss of those services
7  cannot be compensated by money damages.  Indeed, that is the
8  general rule in personal services contracts, including those
9  involving professional athletes.
10         The unique facts of these cases, however, persuade me
11 that plaintiffs are unlikely to be able to prove that they
12 cannot be compensated by money damages.  Put more plainly,
13 these cases were always about money, the only issue is how
14 much.
15         As the parties have laid out in detail in their
16 papers, particularly in the declaration of William L. Daly,
17 deputy commissioner of the NHL, for many years the NHL and the
18 IIHF had been parties to comprehensive agreements that
19 governed, among other things, the transfer of players to the
20 NHL from the IIHF sanctioned hockey leagues in their home
21 countries, and the member federations of the IIHF.
22         Broadly speaking, the purpose of this NHL IIHF
23 agreement was to create an orderly and efficient time framework
24 to facilitate the transfer of players from the IIHF member
25 federations to the NHL, and to provide monetary assistance to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

6BF3YARH                    Hearing

1  those federations to help support the growth and development of
2  ice hockey in IIHF member countries.
3          For example, the current version of the NHL IIHF
4  agreement provides that the NHL pay a "development fee" of
5  $200,000 for each player from a IIHF league who transferred to
6  an NHL club, requesting "in exchange the NHL receives right to
7  sign the players to play in the NHL, despite their having
8  effective contracts in their home countries."
9          The IIHF and its members determine distribution of the
10  amounts paid by the NHL, but Mr. Daly opines that those funds
11  go primarily to the home teams of the transferred players.
12          As also set out in Daly declaration, the RIHF, a
13  member of the IIHF, declined to join the current NHL IIHF
14  agreement.  In negotiations leading up to the RIHF's decision
15  to opt out of the current agreement, the primary question from
16  the RIHF was how much money it would receive in compensation
17  for each player.  This is of course according to Mr. Daly.
18          Although the NHL indicated that more compensation
19  might be available, the parties were unable to reach an
20  agreement that satisfied the RIHF's monetary demands.
21          As Mr. Daly recounts in his declaration, during the
22  course of these negotiations, including a May 2006 meeting in
23  Riga, Latvia, and a June 2006 meeting in New York, the
24  principal issue was money, and at the June meeting, the issue
25  was specifically the amount of compensation that plaintiff

76

6BF3YARH                    Hearing

1   Metallurg would receive for the transfer of Mr. Malkin.
2            Mr. Daly details that on June 29, 2006, he received an
3   e-mail from Sergey Arutyunyan, general director of the RIHF,
4   demanding the payment of one million dollars as compensation
5   for the transfer of Mr. Malkin to the Pittsburgh Penguins.  In
6   response, Mr. Daly e-mailed Mr. Arutyunyan, noting that under
7   the NHL IIHF agreement, if the transferred player signs an NHL
8   contract, but instead of playing for the NHL, he plays
9   primarily for a minor league team, the NHL pays additional fees
10  referred to as minor league assignment fees to the IIHF.
11           It was Mr. Daly's contention that the pooling of such
12  minor league assignment fees together with the $200,000
13  transfer fee would amount to approximately a million dollars
14  being paid by the NHL for the transfer of Mr. Malkin.
15           In a July 2006 meeting in Chicago, Mr. Tretiak,
16  president of the RIHF, is said by Mr. Daly to have told him
17  that if Mr. Tretiak could secure a million dollars for transfer
18  of Mr. Malkin, Mr. Tretiak was confident that he would receive
19  the approval of the plaintiffs for the transfer.
20           In response, in July, and again in August of 2006,
21  Mr. Daly agreed to structure the transfer fee and the minor
22  league assignment fees so as to total one million dollars for
23  the transfer of Mr. Malkin.
24           During the latter part of July, however, Mr. Daly
25  learned that the RIHF was then demanding a million dollars in

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

6BF3YARH                    Hearing

1   addition to the $800,000 in minor league assignment fees for
2   the transfer of Mr. Malkin.  Mr. Daly refused.
3          Indeed, the plaintiffs' true intent was confirmed as
4   late as October 4, 2006, in Mr. Berkovich's letter to Messrs
5   Ruskin, Daly and Shero, the last the general manager of the
6   Pittsburgh Penguins.  In that letter, Mr. Berkovich concluded
7   by demanding that the NHL and the Pittsburgh Penguins not use
8   Mr. Malkin in the 2006/2007 season, but "to the extent that the
9   Pittsburgh Penguins nevertheless is interested in obtaining the
10  services of Mr. Malkin for the 2006/2007 hockey season, you
11  should contact me with your proposal."
12          At oral argument, as we've heard, I did ask counsel
13  what the latter part of that sentence could possibly mean if it
14  was not money, and did not get a satisfactory response.
15          I also note that plaintiffs have themselves
16  characterized themselves as "sellers" of the services of hockey
17  players.
18          I also note that Ted Saskin, executive director and
19  general counsel of the NHLPA, confirms Mr. Daly's conclusion
20  that the negotiations to persuade the RIHF to sign the current
21  NHL IIHF agreement were unsuccessful "primarily because of the
22  monetary demands that the RIHF made regarding Malkin and his
23  imminent transfer to the Pittsburgh Penguins."  He also
24  confirms Mr. Daly's summary that the principal discussion at
25  the June 2006 New York meeting was the amount of money

78
```
6BF3YARH                    Hearing
```
1   Mr. Malkin's Russian club would receive for his transfer.
2           I note that there are no affidavits in the record
3   specifically refuting or contradicting the focus on money that
4   has been detailed at length by Mr. Daly, Mr. Saskin and others.
5           Thus, despite the general case law, and despite the
6   acknowledgment in the players' contracts, the evidence in the
7   record persuades me that plaintiffs can be adequately
8   compensated by money damages.  The only question is, and always
9   has been, how much.
10          Continuing on the irreparable injury issue, I look to
11  the delay that is evident in plaintiffs proceeding here.  And I
12  find that plaintiffs' delay severely undercuts that sense of
13  urgency that typically accompanies a motion for preliminary
14  injunction.
15          I note in passing that in the year 2000, Mr. Mikhnov
16  participated in and was chosen in that year's NHL draft.
17  Mr. Taratukhin was also selected in the 2001 NHL draft.  And as
18  we know, in 2004, Mr. Malkin came to the United States to
19  participate in the NHL draft and was drafted in the first
20  round, second overall, by the Pittsburgh Penguins.
21          On June 30 of 2006, two of the three players submitted
22  their two week termination notices to their respective teams,
23  Messrs Mikhnov and Taratukhin.  On August -- actually, I think
24  all three did on August 30.  Am I right on that, counsel?
25          MR. RUSKIN:  Yes, your Honor.

79

1           THE COURT:  Thank you, counsel.  On August 7
2    Mr. Malkin signed the new one year contract with plaintiff
3    Metallurg.  On August 13 of this year, Mr. Malkin submitted his
4    two week termination notice as to the August 7 contract.  On
5    September 1, Mr. Taratukhin signed his contract with the
6    Flames.  On September 5, Mr. Malkin signed his contract with
7    the Penguins.  In mid-September the players all reported to
8    their respective team training camps.  On October 3 of this
9    year, Mr. Mikhnov signed his contract with the Oilers.  On
10   October 4, the NHL 2006/2007 season began.  And these actions
11   were commenced on October 18 and 19.
12           Based on these facts, it appears that plaintiffs will
13   be unable to show irreparable injury required to justify the
14   issuing of a preliminary injunction because of their delay in
15   seeking such relief.
16           First, putting aside for a moment the players' earlier
17   expresses of interest in playing in the NHL, and their
18   participation in the NHL draft, plaintiffs slept on their
19   rights for months following the players June 2006 giving of
20   their two week termination notices.
21           At the risk of mixing metaphors, plaintiffs hid in the
22   tall grass while the players terminated their Russian
23   contracts, signed the NHL contracts, joined their NHL teams,
24   began practicing with the teams, and the NHL season began.
25           It was only after the players were engaged in the NHL

6BF3YARH                        Hearing

1   season playing with their respective teams that plaintiffs came
2   forward to seek relief at the time of maximum inconvenience to
3   the defendants.
4           While in some circumstances the delay from the June
5   giving of the notices of termination to the mid-October request
6   for relief might not necessarily constitute fatal delay, here
7   the fact that the players trained with their new teams and
8   actually commenced playing with them during the regular NHL
9   season makes the delay unconscionable.
10          Second, when the facts of the delay are read together
11  with the facts concerning plaintiffs' constant demands for more
12  money for the transfer of players to the NHL, it becomes clear
13  that the delay was in an effort to obtain more money.  Thus,
14  further undercutting any claim of irreparable injury.
15          Accordingly, I find that plaintiffs are unlikely to be
16  able to demonstrate irreparable injury.
17          I also note in passing plaintiffs' apparent
18  concession, at least with respect to the antitrust claim, that
19  the alleged harm is monetary.  Plaintiffs' reply brief at 10,
20  they say "There is a direct causal connection between an
21  antitrust violation here and the alleged harm suffered by
22  plaintiffs.... Indeed, the scheme prohibiting NHL clubs from
23  negotiating with and compensating Russian hockey clubs for the
24  services of Russian hockey players has no legitimate
25  procompetitive justification (and defendants provided none)."

```
       6BF3YARH                    Hearing
 1     Emphasis added.
 2              Moving briefly to the likelihood of success on the
 3     merits.  I will not deal with misappropriation.  Plaintiffs
 4     have cited no case law in support of this cause of action.
 5     Defendants point out that it is a common law doctrine
 6     concerning improper taking of property rights or other
 7     intellectual property rights.  It does not appear to apply
 8     here.  And there doesn't seem to be much argument in the briefs
 9     to the contrary.
10              Also, with respect to unjust enrichment, it doesn't
11     seem anybody talks about this claim much, so I won't either.
12              With respect to tortious interference, I note
13     preliminarily at this stage, without making a final finding,
14     that it does not appear likely that plaintiffs will be able to
15     prove that there were contracts in existence.  This is based
16     first on the Russian law experts.  And again, without making a
17     final finding on this, under Rule 44.1, at this point in time,
18     it appears that Ms. Beliakova's declaration is more persuasive.
19     This is particularly because of not only her explanation, but
20     her attachment of the actual statutes that she relies on.
21              It also appears that the labor law, including the
22     provision for the Article 80 notice prevails over other
23     inconsistent statutes.
24              So preliminarily on the law as stated by the experts,
25     it does not appear plaintiffs will be able to show the
```

```
       6BF3YARH                    Hearing
 1     existence of contracts at the time.
 2               In addition, however, we have the admissions made by
 3     the various individuals negotiating on behalf of plaintiffs,
 4     with respect to the IIHF NHL agreement.  All of those
 5     statements, which I will not reiterate here, are to the effect
 6     that the two week termination provision of Article 80 remains
 7     in effect, particularly Mr. Tretiak, the proposer of the
 8     legislation to close this supposed loop hole, urged others to
 9     work to move now because the loop hole was going to change, and
10     the like.
11               The statements and conduct of those negotiating these
12     agreements, together with the conduct of Metallurg in inducing
13     Mr. Malkin to sign a new contract after he had exercised his
14     termination rights under the prior contract, also appeared to
15     concede the point.
16               Thus, it appears unlikely that plaintiffs will be able
17     to demonstrate the existence of a contract at the relevant
18     time.
19               In addition, on the facts in the record at this time,
20     it does not appear that plaintiffs will be able to satisfy the
21     but for requirement in showing that but for defendants'
22     actions, the players would not have defected.  The players'
23     affidavits make clear that they always wanted to play in the
24     NHL, everyone agrees here that the NHL is the premiere hockey
25     league in the world.  The players had participated in the NHL
```

```
         6BF3YARH                    Hearing
 1   draft, as I mentioned, some years ago.
 2            And thus, it seems unlikely that plaintiffs will be
 3   able to show that but for defendants' conduct, the players
 4   would still be playing for the plaintiffs.
 5            With respect to aiding and abetting a breach of
 6   fiduciary duty, the parties dispute the governing law.
 7   Plaintiffs cite Maryland state law for the proposition that
 8   employment contracts contain an implied duty that an employee
 9   must act solely for the benefit of his or her employer with
10   respect to all matters falling within the scope of his
11   employment.  I am not entirely sure why we would be looking at
12   Delaware law.
13            Defendants contend that there was no aiding and
14   abetting a breach of fiduciary duty because the Russian players
15   did not owe their teams any duty under Russian law.  Plaintiff
16   does not respond to this in the reply papers that I can recall.
17            Aside from why we would rely on Maryland law,
18   defendants' expert persuades me that it is unlikely that
19   plaintiffs will be able to show that the players had any
20   fiduciary duty to the plaintiffs at all.
21            With respect to tortious interference with business
22   relations, of course everyone seems to agree that unlawful or
23   wrongful means are required here.  Defendants contend that
24   there was no tortious interference with business relationships
25   because there are no allegation of any wrongful means to
```

84

6BF3YARH                    Hearing
1   achieve the alleged interference.  Rather, the defendants
2   contend that they were pursuing their legitimate business
3   objectives of securing assets for their respective teams.
4           Plaintiffs respond that signing the Russian players
5   "with full knowledge of plaintiffs' contracts" constitutes
6   theft and was authorized by the NHL's August 2, 2006, memo, as
7   a result of its desire to punish the players for the RIHF's
8   refusal to join the latest NHL IIHF agreement.
9           Again, as I've noted, it does not seem that there was
10  any wrongful means employed by the defendants on this record.
11  On this record, it's clear that the players wanted desperately
12  to play for the NHL, and took all steps to do so.  That
13  defendants had knowledge of the plaintiffs' contracts does not
14  seem to be relevant here.
15          And as was noted during oral argument, the NHL's
16  August 2, 2006, memorandum is virtually the same memorandum,
17  although as counsel points out without the bold typing, but is
18  virtually the same memorandum that had been in effect for some
19  years.
20          Accordingly, it seems that plaintiffs will be unlikely
21  to prevail on the merits of this claim.
22          Plaintiffs also assert a claim for conversion and do
23  not seem to dispute that New York law governs the standard
24  here.  Under New York law, a conversion claim requires "one who
25  owns and has a right to possession of personal property to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
6BF3YARH                    Hearing
```

1 prove that the property is in the unauthorized possession of
2 another, who has acted to exclude the rights of the owner."
3 Key Bank v. Grossi, 227 A.D.2d 841, 843 (3d Dep't 1996).
4           Defendants of course assert that the services of these
5 players are not personal property and thus that plaintiffs
6 cannot prove up a claim for conversion.  Plaintiffs do not
7 respond that I recall in their papers, and accordingly it seems
8 unlikely that they will prevail on this point.
9           Finally, with respect to the alleged Section 1 claim,
10 Section 1 of the Sherman Act prohibits "every contract,
11 combination... or conspiracy in restraint of trade."  Although
12 the plain language of the act would suggest that every contract
13 in restraint of trade violates the antitrust laws, the Supreme
14 Court has long held that the Sherman Act prohibits only
15 unreasonable restraints of trade.
16           Thus, in order to prevail, "a plaintiff claiming a
17 Section 1 violation must first establish a combination or some
18 form of concerted action between at least two legally distinct
19 economic entities unilateral conduct on the part of a single
20 person or enterprise falls outside the purview of this
21 provision in the antitrust law."  Capital Imaging Associates v.
22 Mohawk Valley Medical Associates, 996 F.2d 537, 542, (2d Cir.
23 1993).
24           The Court also recognized that certain conduct is
25 immune from the scrutiny of the antitrust laws.  "It has long

```
         6BF3YARH                    Hearing
 1    been recognized that in order to accommodate the collective
 2    bargaining process, certain concerted activity must be held to
 3    be beyond the reach of the antitrust laws."  Clarett v. NFL,
 4    369 F.3d 124, 142 (2d Cir. 2005).
 5             Here defendants contend that there is no cognizable
 6    claim under Section 1 of the Sherman Act because the NHL policy
 7    on transfer fees and restraint of trade falls within the
 8    purview of the collective bargaining agreement, and is thus
 9    immune from antitrust scrutiny under the non-statutory labor
10    exception.  Clarett 369 F.3d, 140.
11             As counsels pointed out in the papers, it seems likely
12    that defendants will be able to demonstrate that in fact this
13    policy on transfer fees has been a mandatory subject of the
14    collective bargaining agreements.
15             In addition, there seem to be various other problems
16    with the antitrust claim.  First, there does not seem to be any
17    antitrust injury here, thus no injury to competition.  Also it
18    appears, as we noted during oral argument, that plaintiff does
19    not appear to be market participants in the market which they
20    defined.  And finally, the activities here at issue seem to be
21    included within the meaning of the Supreme Court's recent
22    Texaco case as the core activities of a joint venture.  And
23    thus, would not constitute a combination in restraint of trade.
24             For all of these reasons, it appears that plaintiffs
25    are unlikely to prevail on the merits of the claim.  And for
```

87

```
6BF3YARH                    Hearing
 1  all of the reasons stated above, the requests for the
 2  preliminary injunctions are denied.
 3          Counsel, have I forgotten anything first of all at
 4  this moment?  Counsel?  Anybody?
 5          MR. RUSKIN:  No, your Honor.
 6          THE COURT:  Hearing nothing, would you folks confer,
 7  and after you've had a chance to talk with your clients, let me
 8  know in the next day or two how you would like to proceed
 9  please.
10          MR. RUSKIN:  Yes, your Honor.
11          THE COURT:  Anything else?
12          MR. BERKOVICH:  No, your Honor.
13          THE COURT:  Thank you, gentlemen.  Good afternoon.  It
14  was a pleasure having you.
15          MR. RUSKIN:  Thank you, your Honor.
16                              o0o
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300