REDACTED VERSION – PUBLICLY FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), ROTHENBAUM SPORT GMBH, and QATAR TENNIS FEDERATION,

Plaintiffs,

v.

ATP TOUR, INC., ETIENNE DE VILLIERS, CHARLES PASARELL, GRAHAM PEARCE, JACCO ELTINGH, PERRY ROGERS, and IGGY JOVANOVIC,

Defendants.

C.A. No. 07-178-GMS

**CONFIDENTIAL**
**FILED UNDER SEAL**

**PLAINTIFFS' TRIAL BRIEF**

*Of Counsel:*
Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W., Suite 500
Grand Rapids, Michigan 49503
(616) 742 3930

C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Plaintiffs*

Dated: June 2, 2008

REDACTED VERSION – PUBLICLY FILED

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

I. THE NATURE OF THE CASE. ..... 1

II. Evidence Will Demonstrate That Plaintiffs Are Entitled To Judgment On Each Of Their Claims. ..... 2

A. Plaintiffs Will Prove That Defendants Have Violated Act § 1 ..... 2

1. The ATP Is Not A Single Entity. ..... 3

2. Defendants' Actions Are Inherently Suspect. ..... 4

3. Plaintiffs Will Demonstrate Relevant Market Regardless. ..... 7

4. Defendants Cannot Demonstrate Procompetitive Justification. ..... 7

5. Plaintiffs Will Prove Antitrust Injury. ..... 8

B. Plaintiffs Will Prove That Defendants' Violated Sherman Act § 2 ..... 9

1. Defendants Have Monopolized the Relevant Markets. ..... 9

2. Defendants Have Attempted to Monopolize the Relevant Markets. ..... 9

3. Conspiracy to Monopolize. ..... 10

C. Plaintiffs Will Demonstrate That Defendants Violated Fiduciary Duties. ..... 10

1. Plaintiffs Will Prove That Defendants Breached The Duty of Loyalty ..... 10

2. Plaintiffs Will Prove Defendants Breached The Duty of Due Care. ..... 12

3. Plaintiffs Will Prove Defendants Breached the Duty of Good Faith. ..... 14

REDACTED VERSION – PUBLICLY FILED

## TABLE OF AUTHORITIES

Page

**Cases**

*Baring v. Watergate East, Inc.*, C.A. No. 516-N, 2004 Del. Ch. LEXIS 148 (Del. Ch. Oct. 18, 2004) ..... 12

*Gunter Harz Sports, Inc. v. United States Tennis Ass'n.*, 511 F.Supp. 1103 (D. Neb. 1981) ..... 5

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381 (9th Cir. 1984) ..... 4, 7

*Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998) ("*Law II*") ..... 4

*Law v. NCAA*, 902 F. Supp. 1394 (D. Kan. 1995) ("*Law I*") ..... 4

*NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984) ..... 4

*Volvo N. Am., Corp v.Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir. 1988) ..... 5

*Weinberger v. UOP*, 457 A.2d 701 (Del. 1983) ..... 11

**Statutes**

15 U.S.C. § 1 ..... 1, 2

15 U.S.C. § 2 ..... 1

**Other Authorities**

Bruce R. Hopkins, THE LAW OF TAX-EXEMPT ORGANIZATIONS 484 (2003) ..... 13

## I. THE NATURE OF THE CASE.

Evidence at trial will demonstrate that Defendants, ATP officers, and the owners of certain favored ATP tournaments have illegally reduced competition in markets relating to men's professional tennis in order to derive monopolistic proceeds and reduce output in the relevant markets. Defendants have used their market power to: (1) channel players to favored tournaments, thereby damaging all other consumers in the player services market; (2) create an artificial market for the sale of ATP "sanctions," which will subsume tournaments' membership rights; (3) bar entry into the relevant markets so that the ATP can sell its "sanctions" in a monopolistic, artificial marketplace; and (4) control output markets relating, *inter alia*, to sponsorships, broadcasters and fans via input market controls and the pooling of broadcast and sponsorship rights.

Defendants have engaged in these actions with knowledge of their illegality, via fixed bids, price-fixing arrangements and self-dealing transactions, to create monopolistic proceeds for themselves and members of their cartel. They did so believing that their monopoly proceeds would be sufficient to pay off any entity or person who might challenge the legality of these actions. In doing so, Defendants have damaged the relevant markets and consumers in those markets, including Plaintiffs, and have converted Plaintiffs' membership rights.

Defendants conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Act, § 1") which prohibits contracts, conspiracies or combinations in restraint of trade (Count I). It also violates Section 2 of the Act, 15 U.S.C. § 2 ("Act, § 2") which forbids monopolizing, conspiring to monopolize and attempting to monopolize the relevant markets. Plaintiffs seek damages for their injuries to their business and property relating to the Hamburg tournament. On behalf of the Hamburg and Doha tournaments, Plaintiffs also seek to permanently enjoin Defendants'

unlawful acts to the extent that any injury or threatened injury exists that is not or cannot be remedied by an award of damages.

Plaintiffs also contend that Defendants have violated their fiduciary duties to Plaintiffs, interfered with Plaintiffs' business and contractual relationships, and converted Plaintiffs' property. Defendants have breached their fiduciary duties by, *inter alia*, (1) knowingly violating the antitrust laws of the United States; (2) engaging in self-dealing; (3) selectively providing information so as to mislead their members; and (4) inappropriately favoring certain members and classes of members over other members. Defendants have also converted Plaintiffs' membership in the Hamburg tournament and sold it to other entities for approximately $40 million. Finally, because Defendants have improperly downgraded and moved the Hamburg tournament out of the European clay court season, Defendants have unlawfully interfered with Plaintiffs' contractual relationships with sponsors, broadcasters and fans.

Defendants have generally denied Plaintiffs' allegations. Additionally, Defendants claim that the Brave New World Plan (the "BNW") is necessary to improve the competitive position of the ATP in relation to other purported "sports-entertainment" options and is reasonable from a business perspective.

## II. Evidence Will Demonstrate That Plaintiffs Are Entitled To Judgment On Each Of Their Claims.

### A. Plaintiffs Will Prove That Defendants Have Violated Act § 1.

The Sherman Act § 1 forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. As it is undisputed that Defendants' actions occurred in interstate (and international) commerce, Plaintiffs' § 1 claim has three elements: (1) joint action; (2) that unreasonably restrains trade, thereby causing injury to a

relevant market; and (3) an injury to Plaintiffs relating thereto. Plaintiffs will demonstrate all three elements at trial.

**1. The ATP Is Not A Single Entity.**

The evidence at trial will show that the ATP is not a sports league. *See* Merriam Webster Dictionary (defining league, *inter alia*, as "a group of sports teams that regularly play one another.") The ATP has no teams - while NFL teams must, for example, cooperate for NFL football to exist (as it takes two teams to have a football game) - tennis tournaments need not so cooperate. But for the ATP's player controls, market power and anticompetitive actions, Plaintiffs and/or others could organize a tennis tournament independently and compete for the best players, calendar weeks, sponsors, broadcasters, etc. The ATP is less of a unified entity than sports leagues, such as the NFL, all of which have been found in every instance to consist of multiple entities.

Further, the evidence at trial will prove: (1) that the members of the ATP are owned and managed separately from one another and the ATP (by operation of nothing less than the ATP's by-laws); (2) that the ATP and its members do not share expenses, capital expenditures, profits or losses; (3) that each ATP tournament is managed separately and independently from the ATP; (4) that profits vary widely from member to member; (5) that members and the ATP do not exchange or share their accounting books or records; and (6) that tournaments and the ATP compete for the acquisition of management personal, players, sponsors, broadcasters and fans.

Finally, the trial evidence will demonstrate that the ATP is not analogous to a "joint venture." As set forth above, the ATP tournament members operate independently from one another. Further, even if the ATP operated as a "joint venture," there is nothing "core" or essential about the complained-of conduct. Rather, the evidence will demonstrate that the

markets for men's professional tennis functioned well without the BNW player participation requirements and without a reduced top tier of tournaments, and that men's professional tennis is recovering from the ISL deal collapse.[1] This issue will be appropriate for directed verdict. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381 (9th Cir. 1984).

**2. Defendants' Actions Are Inherently Suspect.**

In *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 109 (1984) the Supreme Court adopted a "quick look" rule of reason standard. "This abbreviated inquiry applies in cases where *per se* condemnation of a practice is inappropriate, but where no elaborate industry analysis is necessary to reveal the anticompetitive character of an inherently suspect restraint." *Law v. NCAA*, 902 F. Supp. 1394, 1405 (D. Kan. 1995) ("*Law I*"), *aff'd, Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998) ("*Law II*"). The record evidence will demonstrate that the adverse effects on competition are apparent. Accordingly, the Court need not require proof of market power, and the jury should instead move directly to an analysis of the defendant's proffered competitive justifications for the restraint. *Id.*

Assuming *arguendo* the ATP is a "sports league" (and is not, therefore, arguably subject to a *per se* analysis), then its conduct is illegal where "member institutions may not compete in terms of price and output." *Bd. of Regents*, 468 U.S. at 110 n.40. Where the contested conduct goes to establishing rules of conduct, play and/or eligibility, however, the conduct has been found to be procompetitive and necessary to the function of the sports league or tour. *Id.* at 468-69. Courts have applied this dichotomy to tennis: regulation of tennis rackets used in competition is procompetitive and necessary, *see Gunter Harz Sports, Inc. v. United States*

---

1 The Hamburg tournament, for example, experienced above-normal ticket and sponsorship sales for the 2008 tournament, despite the threat of a 2009 downgrade (which is, however, negatively affecting long-term sponsorship, broadcast and sales possibilities).

*Tennis Ass'n*, 511 F. Supp. 1103 (D. Neb. 1981); but a "special events" rule precluding the participation of tennis players in non-sanctioned events, precluding certain players from participating as wild cards in some sanctioned events; and pooling certain television rights is anticompetitive and illegal. *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 64 (2d Cir. 1988).

The evidence will demonstrate that Defendants' conduct falls into the latter, anticompetitive category for at least four reasons:

*First*, Defendants have created significant barriers to entry into the relevant markets. These barriers include the BNW's player participation requirements (8 of 8 for ATP 1000s, 4 of 11 for ATP 500s, etc.); the BNW ranking system; the BNW bonus system; the ATP Special Event Rule, 1.16; covenants not to compete, including ATP Bylaw 5.16; BNW sanction protections; the BNW "application process"; the BNW pooling of broadcast rights; and the BNW pooling of sponsorship rights.

*Second*, there are anticompetitive effects in the relevant markets. In the player services market, for example, Dr. Walker, as well as ATP witnesses, such as Andre Silva, and non-party witnesses, such as Mr. Buchholtz, will testify that in a pre-BNW environment, tournaments could improve their competitive position vis-à-vis player services by improving tournament prize money, facilities, calendar position, amenities, player benefits and/or player relationships. Under the BNW, however, a tournament's competitive advantages or disadvantages are subsumed by the Defendants' legislative fiat.

The effect of these controls will be increased player participation in a narrow band of favored tournaments; a decrease in player participation in the remaining majority of ATP tournament members; and a decreased availability of player services for "special events."[2]

*Third*, Defendants' barriers to entry and player participation controls have enabled Defendants to create a market for the sale of "ATP sanctions."

*Fourth*, the ATP has damaged competition in output markets relating, *inter alia*, to sponsorships, broadcasting and live attendance. This damage will be demonstrated at trial via evidence of: (1) Input Controls, and the reality that a tournament's player field affects its ability to compete for broadcast contracts, sponsorship contracts and fans; (2) limitations and caps on output levels (Defendants have capped the number of top-tier tournaments at eight (nine if one counts Monte Carlo)) and will pool and sell the broadcast and sponsorship rights relating to these tournaments collectively; (3) horizontal market divisions: calendar, player service and geographic market exclusivity are being sanctioned and sold to certain tournaments; and (4) group boycotts and refusal to deal: the ATP is making players, sponsors and broadcasters available only on specified terms to specified tournaments. These actions would normally be *per se* illegal. At a minimum they warrant the application of the quick look doctrine (and, regardless, represent anticompetitive conduct under a full rule of reason analysis).

---

[2] The anticompetitive effect of these controls is also seen when one compares what favored and non-favored tournaments pay for player services. Under the BNW, for instance, the Paris ATP 1000 event will pay approximately $500,000 to its tournament winner, most likely a top player who will have won five matches. Non-favored ATP events will have to pay that same player an appearance fee that will most likely exceed that amount just to have that player appear for their tournament (presuming that player is making any extra tournament appearances) and non-ATP events, held during the short off season, will pay $1 million for that player to play a single match. This is strong evidence that the player services market is not responsive to consumer demand therein and that, instead, player services are controlled by non-competitive rules and regulations. The cartel members will pay less than market price for input services.

**3. Plaintiffs Will Demonstrate Relevant Market Regardless.**

Like the NFL in *L.A. Memorial Coliseum Commission*, 726 F.2d at 1393, the ATP "has limited substitutes from a consumer standpoint." *Id.* Accordingly, "given the exceptional nature of the industry," a "precise market definition" is "especially difficult." *Id.* at 1394. Regardless, Plaintiffs will prove the existence of at least six relevant markets: the market for (1) top-tier men's professional tennis; (2) men's professional players' services; (3) ATP memberships; (4) sponsors; (5) broadcasters; and (6) fans.

The parties rely on their experts - Dr. Zimbalist and Dr. Walker - for their market definitions. Plaintiffs' market definitions are supported additionally, however, by considerable record evidence, including the testimony of industry insiders and consumers within the relevant markets and documents relating thereto.

Finally, Walker admits that tournaments compete for player services and sanctions and that, regardless of the precise output market definition, player services affect a tournament's ability to compete in that marketplace. This is supported by other record evidence and has been admitted as a matter of law in this matter: "[p]layers are a necessary component of men's professional tennis tournaments." *See, e.g.,* Defendants' Answers, ¶ 83. It is undisputed, therefore, that there is an input market for player services in which tournaments compete and that this market affects a tournament's ability to compete in output markets, regardless of how they are defined.

**4. Defendants Cannot Demonstrate Procompetitive Justification.**

Pursuant to this framework, Defendants contend that the BNW is, in sum, procompetitive. The evidence will show, however, that Defendants have not met their burden to demonstrate procompetitive justifications for several reasons. *First*, the purported

procompetitive justifications simply do not outweigh or justify the anticompetitive effects of the BNW. *Second*, the purported procompetitive justifications all relate to output markets. The ATP has not, however, set forth procompetitive justifications in the market for player services. The procompetitive way to promote player participation is through financial incentives, improved playing conditions, etc., not through a fiat. *Third*, expansion into new markets may be procompetitive, but the number and location of top-tier tournaments should be a function of market forces, not ATP-legislated fiat.

**5. Plaintiffs Will Prove Antitrust Injury.**

The evidence will show, *inter alia*: (1) Defendants have entered into agreements among themselves and, at a minimum, with ATP members and other organizations in Shanghai, Madrid and Dubai to control the player participation market as well as sponsorship markets, broadcast markets and the market for the sale of tournament memberships; (2) Defendants "channel" players into favored tournaments (some of which are cartel members) and away from non-favored tournaments (all of which are ATP members), thereby significantly damaging competition in the player services market; and (3) player services are a necessary input for a tournament to compete in other, related submarkets. Accordingly, the evidence will demonstrate that, by controlling player participation, the Defendants and their co-conspirators have significantly damaged that market in addition to competition in the markets for sponsorships, international fans, broadcasters, etc.

Plaintiffs' injuries from this harm include, *inter alia*: (1) Plaintiffs, and others, will have no access (or will have to pay excess amounts for access) to services of top men's professional players that will effectively preclude them from competing in this marketplace; (2) Plaintiffs' inability to compete for player services will significantly damage their ability to attract fans,

broadcasters, and sponsors; (3) Plaintiffs have been precluded from competing in the marketplace for the sale of memberships and men's professional tennis tournaments, by the Defendants' and their cartel's monopolization of this marketplace; (4) Defendants took Plaintiffs' membership and sold it in the marketplace for approximately [REDACTED] and (5) as a proximate result of Defendants' illegal actions, Plaintiffs will lose approximately [REDACTED] in capital investments that will be rendered valueless by Defendants' illegal, anticompetitive activities. Accordingly, Plaintiffs will prove at trial, that they have suffered [REDACTED] in damage to their business and property directly relating to and caused by Defendants' anticompetitive actions.

**B. Plaintiffs Will Prove That Defendants' Violated Sherman Act § 2.**

**1. Defendants Have Monopolized the Relevant Markets.**

The record evidence will prove that the Defendants have monopoly power in the relevant markets. For example, in the player services' market, the record evidence shows that the top men's professional tennis players are ATP members, are beholden to the ATP and are subject to the ATP's rules and regulations. Accordingly, as specifically intended by the BNW, the Defendants can and have taken monopolistic control over this market. Additionally, they are willfully maintaining their monopoly power by precluding and forbidding any competition by consumers in this relevant market and by suspending and punishing players (rather than by exercising business acumen or superior products) to control where men's professional players play.

**2. Defendants Have Attempted to Monopolize the Relevant Markets.**

As set forth above, the evidence will demonstrate that the Defendants have engaged in anti-competitive or exclusionary conduct. Defendants' own testimony and documentation

demonstrates that they have done so with a specific intent to monopolize the relevant markets by controlling player participation; the sale of memberships; and the availability of top-tier tennis for sponsors, broadcasters and fans. Additionally, specific intent may be inferred by the ATP's anti-competitive activities, especially given that the ATP, in large part, already has considerable market power in the world of men's professional tennis. Further, the evidence will demonstrate that there is a dangerous probability of success. In press releases and marketing materials, Defendants claim to have successfully channeled players and sold "sanctions" for considerable fees. The ATP's actions have had a corresponding and profound negative effect on non-favored tournaments.

**3. Conspiracy to Monopolize.**

Plaintiffs will demonstrate that Defendants have acted in a conspiracy to monopolize the relevant markets. For example, the evidence will demonstrate, and Defendants have specifically admitted, that they are acting to artificially control player participation so as to control the markets for sponsors, broadcasters and fans. In doing so, they have taken overt acts among themselves and with other entities, such as the Madrid and Shanghai tournaments and other non-parties, in furtherance of their conspiracy.

**C. Plaintiffs Will Demonstrate That Defendants Violated Fiduciary Duties.**

**1. Plaintiffs Will Prove That Defendants Breached The Duty of Loyalty.**

Plaintiffs will put forth evidence at trial demonstrating that Defendants violated their duty of loyalty in several ways:

*First*, ATP Board member Charles Pasarell, who is also an owner of the Indian Wells tournament in the ATP 1000 tier, engaged in a number of self-dealing transactions with the ATP over many years. Pasarell's tournament received [REDACTED] a non-compete agreement precluding the ATP from scheduling events during its week; and an

In 2006, approximately was exchanged in the transfer of partial ownership in Pasarell's tournament. *Id.* at 22. Though the ATP normally would assess a 10% transfer fee for all such transactions, *i.e.*, it agreed, as a result of Pasarell's involvement, to assess only a These self-dealing transactions culminated in the BNW, which was designed specifically to create more sponsorship and broadcast revenue for the ATP's "premium tour," defined to include the 1000 and 500 tournaments—including the Indian Wells tournament—but not the other ATP tour tournaments. Pasarell voted for the BNW, placing his interests in his tournament above those of the majority of the ATP's members. The other Board members who voted for the BNW did so with full knowledge of Pasarell's interest.[3]

Similarly Plaintiffs will prove that Mr. Iggy Jovanovic engaged in self-dealing with

The evidence will demonstrate that the BNW was not entirely fair: Defendants downgraded tournaments whose owners were not represented on the ATP Board (Hamburg) while benefiting a tournament whose owner sat on the board and approved the transaction (Indian Wells). Because Defendants, as directors of a non-profit Delaware corporation, owe

[3] The approval of the BNW required the affirmative vote of an interested director: ATP Bylaws § 12.9 state that a minimum of two affirmative votes of the Tournament Board Representatives are required to either (m) increase player commitment requirements or (n) change the number of tournaments in a category. Defendants have admitted both that the BNW could not have been adopted by the ATP had it not been for Pasarell's affirmative vote and that Pasarell had a material, personal interest in approving the BNW. This approval by an interested director precludes the application of the business judgment rule to the BNW and shifts the burden to Defendants to prove that the plan was entirely fair to its members. *Weinberger v. UOP*, 457 A.2d 701, 710 (Del. 1983).

fiduciary duties to all of the ATP's members, they are forbidden to discriminate among members to advance their own personal interests. *See Baring v. Watergate East, Inc.*, C.A. No. 516-N, 2004 Del. Ch. LEXIS 148, at *20-21 (Del. Ch. Oct. 18, 2004).

*Second*, Defendants, with the express purpose of hiding key information from their membership, failed to communicate essential information pertaining to the BNW. *Third*, the ATP is appropriating certain property rights of its members and taking them for itself. These actions are both contrary to Bylaw § 2.1 and injure the majority of the ATP tournament members whose rights are not pooled. *Fourth*, through its BNW, the ATP is attempting to increase the value of its own assets. *Fifth*, the Defendants awarded an ATP 500 sanction to the Dubai tournament, owned in part by Ion Tiriac, the owner of the Madrid tournament and a member of the Defendants' cartel, over the QTF's Doha tournament, which offered a substantially superior application for that sanction. *Sixth*, though the Defendants assert that the increase in revenues generated by the BNW is reinvested in the Tour, evidence indicates that the ATP voted for unprecedented salary and bonus increases to reward the ATP's management team for implementing the BNW. *Seventh*, the members of the ATP Board are violating their duty of loyalty not just to the ATP's members, but to the corporation itself, via their anticompetitive activities which plainly violate the United States antitrust laws and corollary laws in Europe.

**2. Plaintiffs Will Prove Defendants Breached The Duty of Due Care.**

Plaintiffs will demonstrate at trial that Defendants have failed to make a good faith effort to be informed and exercise appropriate business judgment. Certain Defendants testified as to their lack of investigation into the rules and regulations governing the ATP or those regulating the BNW. For example, Pasarell testified that he approved the ATP 1000 application without

reading it. Further, Defendants' pursuit of the BNW, with knowledge of its illegality, is "without the bounds of reason," and therefore violates this duty.

In addition, Mr. de Villiers' and others admitted that the ATP Board members "understood that there was a provision in the TPL agreement that prohibited downgrades of any member prior to December 31, 2009." Specifically, § 28.5 of the TPL agreement established that "the ATP shall not, on or prior to 31 December 2009, downgrade the tournament class status or terminate the Sanction of any [Masters Series] member other than for Cause ..." Defendants voted intentionally to downgrade Hamburg despite their awareness of the TPL's prohibition against such a downgrade. This vote fell outside the scope of their agency and constituted a breach of their duty of "due care," because it was not "entirely fair" to all members of the ATP.

Finally, Plaintiffs will prove that the ATP is a not-for-profit corporation organized under § 501(c)(6) of the tax code, and its Bylaws provide that it may not act in a manner that violates its tax status. *See* Bylaws, § 2.3 (limiting the ATP's powers to activities within the scope of § 501(c)(6)). IRC §501(c)(6) provides that no part of the net earnings of a corporation organized under that section may inure to the benefit of any private shareholder or individual. Under the "private inurement" doctrine, none of the income or assets of a tax-exempt organization may be permitted to directly or indirectly unduly benefit an individual or other person who has a close relationship to the organization, particularly those who are in a position to exercise a significant degree of control over it. *See* Bruce R. Hopkins, THE LAW OF TAX-EXEMPT ORGANIZATIONS 484 (2003). Because the BNW was designed specifically to increase revenues to the "premium tour" tournaments, benefiting in particular Board member Pasarell and his Indian Wells tournament, the plan violates the "private inurement" doctrine and thus exceeds the ATP's powers under its Bylaws. Such actions are inconsistent with the ATP's fiduciary duties.

**3. Plaintiffs Will Prove Defendants Breached the Duty of Good Faith.**

The evidence will demonstrate that the ATP represented to its membership that the application process for the ATP 1000 and ATP 500 sanctions would be subject to an "open and transparent" bidding process. In reality, the application process was a sham.

The ATP did all of these things even though it had explicitly represented to its fiduciaries that the application process would be open, transparent, and based upon objective criteria.

Further, as stated above, Plaintiffs will prove that the ATP's purposeful failures to disclose material interactions to its membership and purposeful attempts to mislead its membership constitute breaches of the duty of good faith. Evidence of such breaches includes:

- Player officer Andre Silva's e-mail to the player members of the Board, de Villers, and Philip Galloway, exhorting them to

- The ATP's failure to disclose to its members in the summary of its January 19, 2007 Board Meeting that the Masters 1000 events would be subject to recategorization on a year-to-year basis; and
- The ATP's assessment of a significantly reduced transfer fee for Director Pasarell's Indian Wells tournament, its waiver of future transfer fees, and its failure to disclose these transactions to its membership.

Finally, the evidence will show that Defendants have knowingly violated the antitrust laws of the United States, on the belief that they could obtain sufficient monopoly proceeds to create a "war chest" to cover any and all liabilities. This tactic was suggested by Ray Moore, Pasarell's business partner, to de Villiers. This is in fact what the ATP has done: the Board has decided to compensate downgraded tournaments with fees generated from tournaments that improve their TPL status.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Plaintiffs*

*Of Counsel:*
Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W., Suite 500
Grand Rapids, Michigan 49503
(616) 742 3930

Dated: June 2, 2008

REDACTED VERSION – PUBLICLY FILED

**CERTIFICATE OF SERVICE**

I, Karen E. Keller, hereby certify that on June 2, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Lawrence C. Ashby, Esquire
Philip Trainer, Jr., Esquire
Carolyn Hake, Esquire
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

I further certify that on June 2, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

Bradley I. Ruskin, Esquire
Jennifer R. Scullion, Esquire
PROSKAUER ROSE
1585 Broadway
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jhiggins@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*

**CERTIFICATE OF SERVICE**

I, Karen E. Keller, hereby certify that on June 9, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Lawrence C. Ashby, Esquire
Philip Trainer, Jr., Esquire
Carolyn Hake, Esquire
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

I further certify that on June 9, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

Bradley I. Ruskin, Esquire
Jennifer R. Scullion, Esquire
PROSKAUER ROSE
1585 Broadway
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jhiggins@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*