

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-178-GMS |
| v. | ) ) ) | **CONFIDENTIAL -- FILED UNDER SEAL** |
| ATP TOUR, INC., et al, | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO BIFURCATE TRIAL INTO SEPARATE LIABILITY AND DAMAGES PHASES**

*Of Counsel:*

Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W., Suite 500
Grand Rapids, Michigan 49503
(616) 742 3930

Dated: May 27, 2008

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
bflinn@ycst.com
kkeller@ycst.com

*Attorneys for Plaintiffs*

REDACTED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-178-GMS |
| v. | ) ) | **CONFIDENTIAL --** |
| ATP TOUR, INC., et al, | ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO BIFURCATE TRIAL INTO SEPARATE LIABILITY AND DAMAGES PHASES**

## I.    Introduction

Plaintiffs' lawsuit challenges the ATP Tour, Inc.'s ("ATP") Brave New World Plan (the "Plan"). Via this Plan, Defendants have, as they intended and conspired to do, taken and exercised monopolistic control in numerous marketplaces relating to men's professional tennis. For example, the Plan (1) monopolizes and eliminates competition for top men's professional tennis players who will have to play in favored events, regardless of their competitive merit, thereby damaging all other consumers in the market for men's player services, including Plaintiffs;[1] (2) creates an artificial market for the sale of ATP "sanctions" and subsumes tournaments' membership rights; (3) bars entry into the relevant markets so that the ATP can sell its "sanctions" in a monopolistic, artificial marketplace; and (4) controls output markets relating, *inter alia*, to sponsorships, broadcasters, and fans, via input market controls and the pooling of broadcast and sponsorship rights.

---

[1] The ATP, in fact, "guarantees" player fields at its favored, top-tier tournaments. *See* ATP Tour, Inc. August 31, 2007 Press Release, ATP Unveils New Top Tier of Events for 2009, attached hereto as Ex. 1.

1

REDACTED

Additionally, attendant to the Plan's development and implementation, Defendants have violated their fiduciary duties of good faith, loyalty and due care by knowingly violating the antitrust laws of the United States; by engaging in a string of self-dealing transactions (which were not disclosed until after the close of discovery);[2] by making improper disbursements inuring to the benefit of certain members and not others; by fraudulently violating their stated business and bidding practices; by selectively hiding information from their membership; by failing to inform themselves of material information relating to their actions; and by repeatedly violating their corporate governance documents.[3] Defendants have also tortiously interfered with Plaintiffs' contractual and business relationships and have converted Plaintiffs' property rights.

Plaintiffs seek an award of damages to their business and property under all counts of the Complaint. If a jury finds liability and awards such damages, in their entirety, Plaintiffs will be made whole. There will be no need, therefore, for injunctive relief. If the jury finds liability on the antitrust claims only, however, and no or partial injury to Plaintiffs' business or property (on account that Plaintiffs' damages are prospective) Plaintiffs may and will also ask the Court to order injunctive relief relating to Defendants' Plan.

Against this backdrop, Defendants have asked this Court to bifurcate the liability and

---

[2] Some of these issues are set forth in the parties' summary judgment letter pleadings. *See* D.I. 109, 112 & 115. Additionally, ATP documents dated July and August 2007, but produced on or about the last day of discovery (December 17, 2007), show that Mr. Iggy Jovanovic engaged in self-dealing with

Ex. 2, 3 & 4, respectively. Mr. Jovanovic did not reveal this in his deposition, even though it took place contemporaneously with these negotiations and transactions. *See* Jovanovic Dep., at 240-42, Ex. 5.

[3] These violations are rapidly leading to a revolt within the world of tennis. *See, e.g.,*
Ex. 6;
Daniel Kaplan, Tournament Sanctions Questioned, Sports Business Journal, May 19, 2008, attached hereto as Ex. 7. The Plan has been finalized and implemented regardless.

2

REDACTED

damages phases of this lawsuit to avoid the impact of the evidence that demonstrates their anticompetitive conduct, breaches of fiduciary duty and tortious activities. Defendants seek bifurcation on the novel grounds that Plaintiffs' damages are only prospective in nature and that, accordingly, this Court might enjoin Defendants illegal conduct, thereby rendering a damages finding by the jury unnecessary. This argument ignores the factual and legal realities. The Plan is no longer prospective - it has been approved, finalized and, in large part, implemented. Plaintiffs have elected to seek damages in this matter and will ask the jury to find that Defendants have, *inter alia*, caused injury to Plaintiffs' business and property. So long and to the full extent as the jury finds such injury, and awards reasonable damages based thereon, this Court may never need to exercise its equitable powers.

Finally, Defendants' request for bifurcation hinges, among other things, on their mischaracterization of Plaintiffs' damages as easily severable from the liability components of their claims. Not only does this ignore the present damages that Plaintiffs have incurred as a result of the ATP's announcement of the Plan, but it also ignores the fact that the issues underlying damages and liability in this matter are inextricably intertwined.

Bifurcation of the trial in this matter would prejudice Plaintiffs in their presentation of their claims; would not promote juror comprehension; and would be the least efficient or economical method for trying this case. Defendants' motion should be denied.

## II.    Argument

"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim . . . ." Fed. R. Civ. P. 42(b); *Synopsys, Inc. v. Magma Design Automation*, C.A. No. 05-701(GMS), 2006 WL 1452803, at *4 (D. Del. May 25, 2006).



"The decision to bifurcate *vel non* is a matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." *Synopsys*, 2006 WL 1452803, at *4 (quoting *Lis v. Robert Packer Hosp.*, 579 F.2d 819, 814 (3d Cir. 1978)). For the reasons cited herein, bifurcation is inappropriate in this case and the Court should deny Defendants' Motion to Bifurcate.[4]

## A.   Judicial Economy and Efficiency Interests Are Served By Plaintiffs Presenting Their Damages Evidence Together With Their Liability Evidence.

Plaintiffs seek an award of damages from the jury for injury to their "business or property" pursuant to the Sherman Act and Section 4 of the Clayton Act and their other claims. Alternatively and secondly, if the jury determines that Defendants are liable, but that the Plaintiffs have not demonstrated this type of injury, Plaintiffs secondarily seek an injunction, pursuant to this Court's distinct equity powers.

Plaintiffs' election of remedies is consistent with the unique standards of proof associated with each request for relief. Plaintiffs' damages claim requires proof of injury to "business or property" in order to recover. *See, e.g.,* 15 U.S.C. § 15(a). Alternatively, Section 16 of the Clayton Act authorizes injunctive relief for any person who demonstrates "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. "A cause of action for injunctive

---

[4] As a threshold matter, Defendants' Motion to Bifurcate should be denied because it violates the express terms of Local Rule 7.1.1 and this Court's Scheduling Order. Local Rule 7.1.1 states that "every nondispositive motion shall be accompanied by an averment of counsel for the moving party that a reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion. Unless otherwise ordered, failure to so aver may result in dismissal of the motion." The Scheduling Order does not order otherwise; rather, it expressly states that all non-dispositive motions must contain the statement mandated by Local Rule 7.1.1. (Scheduling Order at ¶ 11.) Defendants' Motion to Bifurcate contains no such statement, however, nor could it, because Defendants' counsel failed entirely to inform Plaintiffs' counsel that it intended to seek bifurcation, much less make a "reasonable effort to reach agreement" with Plaintiffs' counsel on this issue. Defendants' Motion to Bifurcate may be denied on this basis alone, per the express terms of Local Rule 7.1.1.

REDACTED

relief under [15 U.S.C. § 26] does not require a showing of injury to business or property but imposes a lower threshold requirement – that there be a 'threatened loss or damage' to the plaintiff." *Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206, 214 (3d Cir. 1983); *Bogus v. Am. Speech & Hearing Assoc.*, 582 F.2d 277, 288-89 (3d Cir. 1978) ("The remedy is available even though the plaintiff has not yet suffered actual injury; he need only demonstrate a significant threat of injury from an impending violation of antitrust laws . . ..").  These standards of proof have informed Plaintiffs' election of remedies and counsel a two step sequence for resolution.

*First*, Plaintiffs will seek monetary damages for Defendants' violations of antitrust laws, breaches of fiduciary duty, and tortious behavior.  Plaintiffs now forecast using three to four hours of their allotted trial time to presenting evidence of their damages.  A verdict awarding damages on any theory of recovery should provide an adequate remedy for Plaintiffs relating to damages caused by the announcement and implementation of the Plan.  It should also provide sufficient deterrence against future illegal conduct by the ATP and its Directors. [5]

*Second*, if, for example, the jury does not award Plaintiffs antitrust damages for injury to "business or property" related to the implementation of the Plan, Plaintiffs could then petition the Court to grant injunctive relief which enjoins implementation of the Plan because it violates the antitrust laws of the United States upon a showing, to the Court of threatened (as opposed to actual) loss or damage.  If such an award occurred and an injunction was issued, Plaintiffs could

---

[5] "[T]he purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but to serve as well the high purpose of enforcing antitrust laws." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).  Moreover, Fed. R. Civ. P. 57 expressly confirms the validity of such an approach: "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  The Advisory Committee Notes state that "the fact that declaratory judgment may be granted . . . indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary."

REDACTED

receive damages for past and future income losses resulting solely as a consequence of the Plan announcement by the ATP and its Directors. This approach affords Plaintiffs a full, just and complete remedy if an injunction were also issued.

Sequencing the consideration of legal and declaratory relief in this way allows the Plaintiffs to elect their remedy and promotes judicial economy and efficiency. It permits the Court to preside over all aspects of the trial while appropriately entrusting the jury with the responsibility of resolving liability and damages in the first instance. By contrast, if the Court was to consider only injunctive relief (as Defendants urge it must), it would deprive Plaintiffs of their right to elect remedies and require a later trial on damages under a distinct standard of proof. Injunctive relief – if ordered – may require considerable judicial resources to fashion the contours of an appropriate injunction to deal with all aspects of the Plan that are found to be illegal. Injunctive relief could involve months of post-trial motions and multiple appeals. Notwithstanding Defendants' arguments to the contrary, an un-bifurcated trial of this matter is plainly the most efficient use of the Court's resources and allows a clear prospect for final resolution two weeks after a jury is sworn.

**B.**     **The Premise of Defendants' Arguments Concerning Injunctive Relief Is Incorrect and Fails to Demonstrate that Judicial Economy and Efficiency Are Promoted By Bifurcation.**

Defendants misapprehend the relationship between damages and injunctive relief, and mischaracterize the relief Plaintiffs seek. Plaintiffs, however, have plainly sought damages, and may elect to do so first and foremost as to all counts of their complaint. Accordingly, the underlying premises of Defendants argument - that Plaintiffs primarily seek injunctive relief - is fundamentally flawed. Defendants have not and cannot demonstrate that bifurcation would promote judicial economy and efficiency.

6

First, as set forth above, Plaintiffs seek damages for their injuries caused by the ATP's implementation of the Plan. Under the applicable notice pleading standard, there is no reasonable doubt that Plaintiffs allege damages and seek recompense for their injuries resulting from the Director Defendants' breaches of their fiduciary duties (pursuant to Counts V, VI, and VII of the Amended Complaint for breaches of the fiduciary duties of loyalty, due care, and good faith).[6]

Second, Defendants' assertion that Plaintiffs' fiduciary duty claims can only be tried to the Court is incorrect. Plaintiffs assert their fiduciary duty claims in the same action as legal claims and seek damages therefore. Whether a claim is deemed legal, such that it is tried to a jury, or equitable, such that it is tried only to the court, is subject to a two-part test: First, would the action be deemed legal or equitable in 18th century England? Second, is the remedy sought legal or equitable in nature? *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989). The court balances the two factors, giving greater weight to the latter. *Id.* Following this balancing test in a case involving claims for breach of fiduciary duty under Delaware law, the Second Circuit held that a claim for damages for breach of fiduciary duty other than for restitution was required to be tried to a jury. *Pereira v. Farace*, 413 F.3d 330, 340-41 (2d Cir. 2005); *cf Cantor v. Perelman*, C.A. No. 97-586-KAJ, 2006 WL 318666, at *7 & n.7 (D. Del. Feb. 10, 2006) (construing *Pereira*, and refusing to permit fiduciary duty claims to be tried to a jury because, unlike this matter, no additional legal claims were asserted).

---

[6] Additionally, Plaintiffs are not precluded from seeking monetary damages for their injuries by their prayer for injunctive relief. Even if Defendants had asserted election of remedies as an affirmative defense in this matter, which they did not, Plaintiffs could seek damages and, subsequently, injunctive relief. *See Abdallah v. Abdallah*, 359 F.2d 170, 174 (3d Cir. 1966) (internal quotations omitted) (doctrine only precludes a party from "occupying inconsistent positions in relation to the facts which form the basis of" respective remedies). No such inconsistencies exist.

7

REDACTED

Third, Defendants also argue, incorrectly, that Plaintiffs have presented no evidence of damages and thus that injunctive relief would be the only remedy available to them. (Motion at 5.) The Plan, however, had been approved and, in large part, implemented. Plaintiffs contend, and will put forth evidence to the jury, that damags to the business and property of the Hamburg tournament have already occurred. These damages associated with the implementation of the Plan have been described by Mr. Kleinrichert. He identified, for the Hamburg tournament alone, damages (before trebling) of                    Defendants, for their part, have made no effort to value the damages to the Hamburg tournament, though it is undisputed that they have procured over          in payments relating to the Plan from their own tournament members alone. They will, it appears, argue to the jury that such damages are prospective (which fact is expressly denied). To the extent they are successful in this argument, as part of the jury trial in this matter, then and only then will this Court need to address Plaintiffs' equitable rights to injunctive relief.

Alternatively, even if an injunction were issued as an alternative remedy, Plaintiffs have incurred and will continue to incur damages from the announcement of the Plan. As to these damages, Plaintiffs have complied, and continue to comply, fully with their obligations under the Federal Rules of Civil Procedure, including Rule 26(e), in disclosing all information regarding these damages. Further, Plaintiffs offered to make a 30(b)(6) witness available to testify about the efforts to secure these contracts and the amount of damages relating to these contracts stemming from the Plan announcement alone, but Defendants chose not to avail themselves of such testimony. In light of these facts, Defendants' argument that neither Plaintiffs' initial disclosures nor their interrogatory responses included information about such damages provides an incomplete picture, at best, of the evidence concerning the damages in this matter, and in any

8

REDACTED

event fails to show that Plaintiffs would only be entitled to injunctive relief.

Defendants' arguments about the nature of the claims to be tried and remedy to be sought are incorrect. Bifurcation of this matter would violate protections afforded under the Seventh Amendment and would only complicate and elongate the trial of this matter.[7]

## C.    Prejudgment of Juror Capability Is No Basis For Bifurcation.

Defendants claim that bifurcation is required because Plaintiffs' claims are too complex for a jury to understand. This argument rests on two assumptions: first, that jurors are incapable of understanding the ideas present in this case; and, second, that the lawyers are incapable of conveying the key evidence to the jury. *See* Motion at 8 ("[I]t certainly appears impossible to devise comprehensible instructions for the jury to apply in assessing any damages . . . ."). There is no basis for either assumption. This Court recently resolved similar arguments in denying a motion to bifurcate:

> In this court's experience, jurors are quite adept at comprehending and adhering to the instructions they are given, even in the most complex factual and legal scenarios. Therefore, the court will not pre-judge the yet-unnamed jurors by assuming they are unable to digest the facts and law in this case. Moreover, the court is confident that the experienced attorneys handling this case will craft cogent presentations to aid the jury in this process.

*Synopsys, Inc.*, 2006 WL 1452803, at *4.

Here, the jury need not immerse itself in an "obscure and highly technical field" (*see Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 837 (S.D.N.Y. 1998)) in order to

---

[7] The Third Circuit has recognized that antitrust trials carry unique risks which caution against bifurcation of liability and damages. *Bonjorno v. Kaiser Aluminum*, 752 F.2d at 816 ("[B]ifurcation of trial resulting in different juries determining liability and damages raises serious questions under . . . *Gasoline Products* . . . ."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1182 (3d Cir. 1993) (warning of significant risk that bifurcated trial will confuse the damages jury into revisiting issues of causation and antitrust injury) (quoting *Link v. Mercedes-Benz*, 550 F.2d 860, 875 (3d Cir. 1977) (Gibbons, J., dissenting)). Because bifurcation would significantly and unjustly increase the risk that antitrust injury will be litigated twice – a clear violation of the Seventh Amendment – bifurcation would be inappropriate here.

9

REDACTED

evaluate the economic concepts central to Plaintiffs' claims. The parties have been afforded the opportunity to present lay evidence, expert testimony and argument on all issues in the case. The two week trial provides an ample opportunity for counsel to synthesize economic and other technical concepts with precision for the jury. *Cf. id.* Counsel for both parties are capable of providing cogent arguments streamlined to fit well within the two-week trial period. *Synopsys, Inc.*, 2006 WL 1452803, at *4. As such, this Court need not be concerned that the jury will be confused absent the bifurcation of liability and damages in this case.

### III.  Conclusion

For the foregoing reasons and each of them, Plaintiffs respectfully request that the Court deny Defendants' motion to bifurcate the trial of this action into separate liability and damages phases.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*Of Counsel:*

Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W., Suite 500
Grand Rapids, Michigan 49503
(616) 742 3930

Dated:  May 27, 2008

*/s/ Karen E. Keller*
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
bflinn@ycst.com
kkeller@ycst.com

*Attorneys for Plaintiffs*

10

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on June 9, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Lawrence C. Ashby, Esquire
> Philip Trainer, Jr., Esquire
> Carolyn Hake, Esquire
> Ashby & Geddes
> 500 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on June 9, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Bradley I. Ruskin, Esquire
> Jennifer R. Scullion, Esquire
> PROSKAUER ROSE
> 1585 Broadway
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*

C. Barr Flinn  (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*

# EXHIBIT
# 1



FIND

HOME    ATP EVENTS    LIVE SCORES    RESULTS    NEWS    PLAYERS    RANKINGS & STATS    TOURNAMENTS    VIDEO    FANTASY    SHOP

NEWS

**ATP NEWS**                                                                August 31, 2007

## ATP Unveils New Top Tier Of Events For 2009

*New York, U.S.A.* – The ATP, governing body of the men's professional tennis circuit, announced today eight additional venues that have been awarded "1000" status for the new-look 2009 ATP Tour. The eight are Indian Wells, Miami, Rome, Madrid, Cincinnati, Canada, Shanghai and Paris. The "1000" tournaments will replace the existing Masters Series, and these eight tournaments will join the ninth "1000" event, Monte Carlo, to make up the top tier of the new ATP Tour structure.

The eight tournaments named will attract a mandatory player field, ensuring guaranteed top player participation at all events. The commitment will be backed by new rules and sanctions that include suspension for missed mandatory tournaments.

Launching in 2009, the ATP Tour will undergo its largest set of changes since its creation in 1990. As well as new tournaments and a record breaking level of prize money, the ATP will also introduce a new brand look and identity based on extensive consumer research and designed to make the Tour more fan friendly by linking tournaments to their winners ranking point levels of either "1000", "500" or "250".

The new look 2009 calendar will also ensure increased investment into men's tennis. Between them the "1000" tournaments alone will bring over $500m of facility investment into new stadia builds or existing facility upgrade. The new builds include the spectacular Caja Magica in Madrid, the proposed new indoor arena in Paris and the recently completed Qi Zhong stadium in Shanghai.

"The 2009 ATP Tour is about the world's best tennis players performing in the world's very best stadiums at the right times of the season and we have now created a top tier that will showcase our sport, deliver substantially increased investment into our facilities and will attract more broadcast and sponsor support," said Etienne de Villiers, Executive Chairman of the ATP. "Additionally, by creating more combined events we are taking the sport to a new level. I believe we now have a standard of top tier event that the sport, its players, its sponsors and above all its fans truly deserve."

The ATP also announced that by 2011 six of the nine "1000" level tournaments will be combined events. Cincinnati and Rome will become combined ATP and WTA tournaments and in addition Canada will have the ATP and WTA tournaments running simultaneously in Toronto and Montreal.

The ATP Tour has continued to work closely on its plans with all branches of the sport. Larry Scott, Sony Ericsson WTA Tour Chairman said: "I applaud Etienne and the ATP Board for taking bold steps that are great for tennis. There is a shared vision for the future of our sport, including a focus on combined events at the top of both Tours."

In addition to the "1000s", the ATP Board this week also announced that 22 applications have been received from tournaments wishing to become one of ten proposed events that will make up the second tier of the 2009 calendar – the "500s". The successful applicants will be announced after further review.

Offering 500 points for each champion, the "500" level tournaments will attract increased prize money levels of $1m, will spark increased facility investment around the world and will attract more broadcasting partner opportunities globally.

The new look calendar, with revised scheduling and mini swings running into each Grand Slam and the ATP Tour Finals, will ensure the season is more understandable for fans and media, more appealing for sponsors and healthier for players. The 2009 calendar will be backed by a record multi million dollar global marketing and promotional spend. The final calendar will be announced in Shanghai at the Tennis Masters Cup.

The Tour will conclude in November 2009 at the new look ATP Tour Finals, to be held at the iconic O2 Arena in London.

Get inside the game with the 2008 Official Guide to Professional Tennis today.

BUY NOW



2008 OFFICIAL GUIDE TO PROFESSIONAL TENNIS

DEPOSITION
EXHIBIT
383
2·15·08



About ATP     Partners     Charity     Press Room     Terms & Conditions     Privacy Policy     Contact

Copyright © ATP Tour, Inc. 2007. All Rights Reserved.

REDACTED

# Redacted in its entirety
# Exhibits 2 through 6