IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

REDACTED

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) et al., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-178-GMS |
| v. | ) ) | **CONFIDENTIAL -** |
| ATP TOUR, INC. et al., | ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 3
TO EXCLUDE OPINIONS OF GARY KLEINRICHERT**

*Of Counsel:*
Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W., Suite 500
Grand Rapids, Michigan 49503
(616) 742 3930

Dated: May 27, 2008

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6692
bflinn@ycst.com
kkeller@ycst.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

REDACTED

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) et al., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-178-GMS |
| v. | ) ) | **CONFIDENTIAL - FILED UNDER SEAL** |
| ATP TOUR, INC. et al., | ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 3 TO EXCLUDE OPINIONS OF GARY KLEINRICHERT

Defendants' Motion in Limine No. 3 (the "Motion") should be denied because it fails to distinguish the issues of "causation" and "calculation of damages" and, in effect, seeks to exclude Kleinrichert's conclusions even though his methodologies are sound.

### I.     Preliminary Statement.

At trial, Plaintiffs will prove that Defendants' anticompetitive conduct, breaches of fiduciary duty and tortious activities have damaged Plaintiffs. Plaintiffs are competent to testify, and have and will do so, that these actions have caused damage to their business and property.[1] Gary G. Kleinrichert, an expert in asset and business valuation, via the utilization of appropriate methodology, has calculated the amount of these damages resulting from Defendants' anticompetitive actions and breaches of fiduciary duties. Kleinrichert utilized three validated and generally accepted methodologies to assess the losses to Plaintiffs' business and property.

---

[1] Plaintiffs have testified, and will testify at trial, that their business and property have been effectively destroyed by Defendants' actions. *See, e.g.*, D.I. 112 at 3-4 (enumerating injuries to Plaintiffs caused by the Brave New World Plan).

1

REDACTED

Specifically, he used generally accepted methodologies to calculate: (1) the difference between the value of Hamburg's former membership rights and the value of its rights under the Brave New World Plan (the "Plan"); (2) the diminution in value of Hamburg's capital investments as a result of the Plan; and (3) the damages to Plaintiffs' business on a discounted cash flow basis as a result of the Plan. (D.I. 128, Exs. 1 & 12.) Each methodology appropriately values the damage to business and property stemming from the Plan.

## II.    Argument.

Defendants' Motion is predicated on the assumption that Plaintiffs must connect each alleged antitrust violation to a distinct measure of damages. In doing so, Defendants improperly confuse the burdens relative to "causation" and "calculation of damages." Causation is a distinct element of liability, which involves proof of a nexus between the acts alleged and an antitrust injury. *See REA v. Ford Motor Co.*, 560 F.2d 554, 557 (3d Cir. 1977), cert. denied, 434 U.S. 923 (1977). "Once a jury has properly found causation of antitrust injury from unlawful activity, however, *the damages in the case may be determined without strict proof of what act caused which injury* as long as the damages are not based on speculation or guesswork." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 813 (3d Cir. 1984) (emphasis added).

Kleinrichert's opinions relate to calculation of damages -- not causation. "[T]o do a damage calculation, [an expert] must assume some set of liability and then perform a damage calculation as a result of that liability." (Ex. 1 at 71.)[2] Kleinrichert's report expressly assumes that "the allegations against the ATP are proven at trial" and that the judge or jury will "find[] that the ATP is liable for damages suffered by the GTF Plaintiffs as a result of the ATP's actions." (D.I. 128 at Ex. 1, p. 2.) From these assumptions, Kleinrichert calculates the damages

---

[2] Relevant portions of Kleinrichert's deposition testimony are attached hereto as Exhibit 1.

2

to Plaintiffs' business and assets that would result from the anticompetitive effects of the Plan and the breaches of duty associated with it. Contrary to Defendants' assertions, therefore, neither Plaintiffs nor Kleinrichert need provide strict causational proofs. Kleinrichert's damage analysis is admissible because it utilized appropriate methodologies.

Moreover, when an antitrust injury is of an indivisible nature, the courts permit a "relaxed standard of proof" in calculating damages. *In re Lower Lake Erie Iron Ore*, 998 F.2d 1144, 1176 (3d Cir. 1993) ("[t]he relaxed measure of proof is afforded to the amount"). Pursuant to this relaxed standard, disaggregation is unnecessary where, as here, the damages caused by Defendants' antitrust violations cannot be separately calculated. *Lepage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003); *Bonjorno*, 752 F.2d at 813 ("proof of damages does not require distinguishing the various acts by the defendants").

The antitrust injury in this matter is indivisible. Defendants' anticompetitive actions and breaches of duty, in their aggregate, are forcing the Hamburg tournament out of business and rendering its assets valueless. Plaintiffs' injury results from the combination, merger, and interaction of Defendants' numerous antitrust violations -- including, among other things, player commitment rules, the downgrade of the Hamburg tournament (including its status and week), and pooling of broadcast rights. Plaintiffs (and Kleinrichert), therefore, have no evidentiary obligation to distinguish between acts. Even if they did, however, such an alleged deficiency is not methodological, and is not properly the basis of a *Daubert* motion.

Defendants also argue that part of Kleinrichert's opinion, in which he values the Hamburg membership using the Shanghai transaction as a proxy, is unreliable. To prevail against a *Daubert* challenge, Plaintiffs need not "demonstrate by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a

3

preponderance of evidence that their opinions are reliable." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994). An expert opinion is reliable under Rule 702 if it is based on "good grounds," *i.e.*, if it is based on the methods and procedures of science. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). As *Daubert* indicates, "*[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate.*" 509 U.S. at 594 (emphasis added); *see also In re Paoli*, 35 F.3d at 742 ("An expert's testimony is admissible so long as the *process or technique* [as opposed to the conclusion] the expert used in formulating the opinion is reliable.").

Fair market value of property "is established by contemporaneous sales of like property." *Matter of Bankers Trust Co.*, 658 F.2d 103, 106 (3d Cir. 1981). This is exactly what Kleinrichert did by using the Shanghai transaction as a proxy: $         represents a portion of the amount which the ATP garnered by, in effect, taking Plaintiffs' membership and selling it to another entity.[3] It is the most contemporaneous and most analogous transaction by which the value can be calculated; it is also the lowest market value Kleinrichert considered.[4] Moreover, Defendants have, themselves, repeatedly, over time, used contemporaneous sales of like property as a basis for calculating the value of tournaments.[5] In a business setting, therefore, Defendants utilize Kleinrichert's methodology to value "business and property" such as that at issue here.

---

[3] Kleinrichert describes and analyzes the complete transaction in his report: "After allegedly seizing the Hamburg Membership, . . . the ATP sold 10 years of rights that were a component of the Hamburg Membership as a Master 1000 sanction to Shanghai. In return, Shanghai transferred to the ATP the sanction for the 2009 Tennis Masters Cup (worth            based on the amount originally paid by Shanghai) and agreed to pay to the ATP         years starting in 2007." (D.I. 128 at Ex. 1, p. 20.)

[4] Kleinrichert also considered an offer to purchase the Indian Wells membership for           and an independent valuation of the same membership at $         (D.I. 128 at Ex. 1, p. 22 n.77).

[5] *E.g.*, Ex. 2 (using "historical deal values" to value tournaments); Ex. 3 (using "sales history" to value tournaments); Ex. 4 (using supposed "recent sale value" to purportedly value Hamburg and

4

REDACTED

Finally, Defendants argue that Kleinrichert's failure to adjust the amount of the Shanghai transaction in relation to the value of Plaintiffs' membership was improper.[6] These arguments are veiled attacks on Kleinrichert's conclusion, and are not proper bases for exclusion.[7] *In re Paoli*, 35 F.3d at 742. Regardless, record evidence supports Klienrichert's conclusion.[8]

Dated: May 27, 2008

*Of Counsel:*
Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W., Suite 500
Grand Rapids, Michigan 49503
(616) 742 3930

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP


*/s/ Karen E. Keller*
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6692
bflinn@ycst.com
kkeller@ycst.com

*Attorneys for Plaintiffs*

---

Monte Carlo; valuing the Shanghai membership by reference to the Indian Wells membership); Ex. 6 at 2 (valuing Miami tournament "based on competitive offers").

[6] Defendants argue that the Shanghai transaction is so dissimilar to the Hamburg membership that monetary adjustments are required. (D.I. 128 at 4-5.) Defendants do not contest, however, the methodologies Kleinrichert employed to reach his conclusion that the memberships are "similar" enough in time and substance that adjustments are not necessary. (Ex. 1 at 92-93.) Defendants do not contest, for example, Kleinrichert's comparison of the tiers of tournaments under the former system to those under the Plan (D.I. 128 at Ex. 1, pp. 13-17); Defendants also do not contest Kleinrichert's consideration of the differences between the set of rights sold to Shanghai and the set of rights taken from Hamburg (for example, he considered that the Shanghai sanction is limited to 10 years, whereas the Hamburg membership existed indefinitely). (Ex. 1 at 95-96.) While Defendants are entitled to contest Kleinrichert's conclusion, disagreement with Kleinrichert's conclusions is not a proper basis to exclude expert testimony.

[7] Defendants' allegation that Kleinrichert's "but for" world assumes Plaintiffs benefit from the Plan is also a veiled attack on Kleinrichert's conclusion that former Masters tournaments are "similar" to Masters 1000 tournaments under the Plan. (D.I. 128 at Ex. 1, pp. 13-16.) This allegation is also factually incorrect: Kleinrichert testified, repeatedly, that his "but for" world assumed a set of rules that existed "prior to the calendar changes and other allegations in the case, ultimately which evolve into a Brave New World plan." (Ex. 1 at 38, 49-50, 62-63, 69.)

[8] Record evidence confirms that Kleinrichert's valuation of the Hamburg membership at is a reasonable market value. *E.g.*, Ex. 5 (offer to buy Indian Wells membership for ); Ex. 6 at 2 (Miami membership valued at based on competitive offers).

5

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on June 9, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Lawrence C. Ashby, Esquire
> Philip Trainer, Jr., Esquire
> Carolyn Hake, Esquire
> Ashby & Geddes
> 500 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on June 9, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Bradley I. Ruskin, Esquire
> Jennifer R. Scullion, Esquire
> PROSKAUER ROSE
> 1585 Broadway
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

> */s/ Karen E. Keller*
> C. Barr Flinn  (No. 4092)
> Karen E. Keller (No. 4489)
> James L. Higgins (No. 5021)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> kkeller@ycst.com

> *Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*

# EXHIBIT
# 1

1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF DELAWARE
 2

 3

DEUTSCHER TENNIS BUND          )
 4  (GERMAN TENNIS FEDERATION),  )
    ROTHENBAUM SPORTS GMBH        )
 5  TENNIS, AND QATAR TENNIS      )
    FEDERATION,                   )
 6                                )
                Plaintiffs,       )
 7                                )
            -v-                   ) CAUSE NO.
 8                                ) 07-178 (GMS)
                                  )
 9  ATP TOUR, INC.,               )
    ETIENNE de VILLIERS,          )
10  CHARLES PASARELL,             )
    GRAHAM PEARCE, JACCO ELTINGH, )
11  PERRY ROGERS, AND             )
    IGGY JANOVIC,                 )
12                                )
                Defendants.       )
13

14

15

16        The deposition upon oral examination of
    GARY G. KLEINRICHERT, a witness produced and sworn
17  before me, Michele K. Dew, CRR-RPR, Notary Public in and
    for the County of Marion, State of Indiana, taken on
18  behalf of the Defendants at the offices of Ice Miller,
    One American Square, 35th Floor, Indianapolis, Indiana,
19  on February 12, 2008, at 8:20 a.m., pursuant to the
    Federal Rules of Civil Procedure.
20

21

22

23

24

25
```

38

```
 1      even reference the Brave New World or Masters 1000
 2      events.
 3   Q  So for purposes of determining the Brave New World,
 4      you considered that to be one in which essentially
 5      the status quo continued?
 6           MR. MacGILL:  Objection.  Vague.
 7   A  For purposes of determining the value of the rights
 8      held by the plaintiffs, I assumed that there would be
 9      a set of rules, the combination of which would be
10      similar to those that existed prior to the calendar
11      changes and other allegations in the case, ultimately
12      which evolve into a Brave New World plan, I believe.
13   Q  Did you make any attempt to allocate the damages
14      among the different plaintiffs in this case?
15   A  My calculations pertain to the operation of the GTF
16      tournament.  I have not done a separate calculation
17      of damages for the Qatar tournament.  So in that, my
18      calculation of damages pertain to the various
19      plaintiffs as it relates to their interest in the GTF
20      tournament.
21   Q  The damage figure that you ultimately reached, did
22      you make any attempt to allocate that among the
23      individual plaintiffs?
24   A  As it relates to their damage suffered from the
25      allegations pertaining to the GTF tournament, I did
```

49

```
 1   A   That's correct.
 2   Q   So in your but for world, tournaments are entitled to
 3       retain their spot in the calendar indefinitely; is
 4       that correct?
 5   A   Well, this tournament had the right to retain its
 6       status.
 7   Q   What about other tournaments?
 8   A   My understanding is there are some separate
 9       arrangements with various other tournaments.  I mean,
10       the ATP may have some agreements with tournaments
11       that are specific, so...
12   Q   In general, do other tournaments in your but for
13       world have the right to retain their spot in the
14       calendar?
15   A   In general, the but for world would be similar to the
16       way it had been prior to the calendar changes in the
17       Brave New World.  So a tournament would have a right
18       to a calendar week of the same week or a similar
19       week, an equal value.
20   Q   So in your but for world, would Plaintiffs have the
21       right to move their tournament to a different week in
22       the calendar?
23   A   Again, this but for world, as we've said, is similar
24       to the way it was prior to the Brave New World.  So
25       to the extent they had that right previously, they
```

50

1    would have that right now in the but for world.  To

2    the extent they didn't have that right, then they

3    wouldn't.

4         Now, there may be a matter of dispute as to

5    whether they do or don't have that right to move it,

6    but to the extent that right existed, it would be

7    similar under this but for world.

8  Q  Do you understand Plaintiffs' allegations to be that

9    they had unlimited right to retain their week on the

10    calendar and also had freedom to change to another

11    week on the calendar?  Do you understand that to be

12    what Plaintiffs are alleging?

13  A  I understand that they had the right to their

14    calendar week.  I just don't recall if they also

15    allege they had the right to move it to other spots.

16    Now, they may have had that right as well, but if

17    they had that right, if that's a matter of legal

18    dispute, then the but for world would be similar to

19    that but for world at that time.

20  Q  Do you think it's relevant to your analysis to

21    determine whether in the but for world Plaintiffs

22    would have the right to move their tournament to

23    another week in the calendar?

24  A  Well, the plaintiffs, I understand, believe that the

25    optimal week, to my understanding, for them for their

62

1   A   Sure.  Allegations in the Complaint are what are

2       alleged.  Evidence presented in the case is what

3       ultimately, through discovery and through the

4       presentation of evidence, comes into court.

5   Q   Okay.  Would you turn to page 14 of DX 158?

6   A   (The witness complied.)

7   Q   You have a section entitled Comparison of Current and

8       Brave New World Tournament Structure.  In the

9       sentence that carries over to the next page, you

10      write, "In return for the increased financial

11      commitment, the Masters 1000 events enjoy exclusive

12      calendar spots (there will be no other tournaments

13      the week of a Masters 1000 event), compulsory player

14      participation, pooling of broadcast and sponsorship

15      rights and revenue sharing with all other

16      Masters 1000 events."

17          See that?

18  A   I do.

19  Q   Now, in your but for world, would the tournaments in

20      the tier of which Hamburg would be a member in that

21      but for world enjoy exclusive calendar spots?

22          MR. MacGILL:  Objection.  Vague.

23  A   Well, again -- I think you've asked me this question

24      many times and I've answered the same each time and I

25      will continue to do so -- in the but for world, the

63

1    set of circumstances around potential restrictions as

2    it relates to rules associated with players,

3    tournaments, revenue sharing, points, and the other

4    such of restrictions would be similar to where they

5    would have been prior to changes leading up to and

6    including the Brave New World.

7  Q  So you can't answer my question whether in the but

8    for world the top-tier events enjoyed exclusive

9    calendar spots?

10  A  Are you asking me a factual question with respect to

11    whether or not Masters Series events prior to the

12    implementation of the Brave New World and then

13    Masters 1000 events, if those Masters Series events

14    included exclusive calendar spots?  Are you asking me

15    a factual question?

16  Q  No.  I'm asking you about the but for world that you

17    used to assess damages in this case.

18  A  But that's the same question.

19  Q  Only if you say it's the same question.  I'm asking

20    about the but for world.  You had to construct the

21    but for world so you could assess what the value of

22    Plaintiffs' rights would be in that world.  In

23    constructing and determining what that but for world

24    looked like, did you assume that Plaintiffs would

25    have an exclusive calendar spot?  Yes or no.

69

1    exists today pre-Brave New World extended forward; is

2    that correct?

3  A  Say that again.

4  Q  The but for world that you used for assessing damages

5    in DX 158 is the world that exists today extended

6    forward without the Brave New World components; is

7    that correct?

8  A  That's true.  I assumed a but for world and a set of

9    rules and restrictions to the extent they existed

10    which in their entirety would be a similar level of

11    restriction.  So I suppose in that but for world you

12    could change a particular restriction and another

13    restriction, but in their entirety the effect on

14    value would be similar to the set of rules which

15    existed prior to changes leading up to and including

16    those spelled out in the Brave New World.

17  Q  The world that existed prior to those changes?

18  A  Sure, yes.

19  Q  Okay.  Turn to page 17, please.

20  A  (The witness complied.)

21  Q  Actually, turn back to page 16, please.

22  A  (The witness complied.)

23  Q  You have a Summary of Changes to Membership Status

24    under the Brave New World Plan.  Do you see that

25    section?

71

1    Hamburg membership.

2         MR. MacGILL:   What is the question?

3    Q   You understand that it's Defendants' contention that

4        they didn't appropriate anything at all from Hamburg?

5    A   I understand that, yes.

6    Q   So all I'm asking is if the Court were to conclude

7        there was no appropriation or if there was an

8        appropriation that it was not wrongful, either of

9        those possible scenarios.  If the Court did not agree

10       with Plaintiffs that there was an appropriation that

11       was wrongful, how would that affect your damages?

12   A   It would impact my damages.

13   Q   How would it affect your damages?

14   A   It would reduce the damages.

15   Q   How would it reduce the damages?

16   A   Well, what I need to also understand is what the

17       Court would then determine was wrongful.  The

18       appropriation of the Hamburg membership is kind of at

19       the center and at the core of almost all of the

20       allegations.  So, of course, to do a damage

21       calculation, you must assume some set of liability

22       and then perform a damage calculation as a result of

23       that liability.

24            If the Court were to determine there was no

25       wrongful appropriation of the Hamburg membership,

92

1    could have been transferred to Shanghai are

2    coextensive with the rights that ATP sold to

3    Shanghai?

4  A  I believe they're similar.

5  Q  In what respect are they not coextensive?

6  A  Well, we could go through, you know, every particular

7    right which was transferred from ATP to Shanghai

8    compared to every right held by GTF which could be

9    transferred to Shanghai, but my understanding of such

10    rights are that they were similar.

11  Q  Let's do that exercise.  Let's go through the rights

12    that Shanghai acquired from ATP.  What do you

13    understand those rights to be?

14  A  The rights as described in the agreement we just

15    looked at (indicating).

16  Q  What are those rights?

17  A  You're asking me to paraphrase the rights of

18    Defendants' Exhibit 159?  I guess I don't understand

19    your question.

20  Q  I'm asking you to explain the basis for your

21    conclusion that the GTF Plaintiffs had rights that

22    could be valued the same as the rights that ATP sold

23    to Shanghai.  That's what I'm asking you to do.

24  A  Well, the right to organize and stage an 8-day,

25    56-draw ATP Masters Series tournament is a right

93

1     similar to the right, I understand, that was held by

2     the GTF to host a ATP Masters Series tournament from

3     2009 through 2018.  I understand that the GTFs allege

4     that they had that right at least through that period

5     of time and thereafter.  So if you just look at just

6     the first paragraph, which is kind of the basis of

7     the rest of the agreement, I understand that right to

8     be a right that the GTF Plaintiffs allege they held.

9  Q  And do you understand that Defendants' view is

10    different; that GTF does not have a right to host a

11    Masters Series tournament?

12  A  Sure, yes.

13  Q  Do you understand that?

14  A  Yes.  I mean, that's a critical element of the

15    lawsuit.

16  Q  And if it were concluded that GTF did not have a

17    right to hold a tournament at a specified level,

18    would it be appropriate to measure the value of what

19    GTF held by reference to the transaction between ATP

20    and Shanghai?

21       MR. MacGILL:  Object to the form of the

22    question.

23       THE WITNESS:  I may have to have that read back.

24  Q  If Defendants are correct that GTF does not have a

25    right to hold a tournament at any specific level,

95

1    don't have a right to any particular tier; correct?

2  A  I understand that they allege that.

3  Q  And this document transfers to Shanghai a ten-year

4     guarantee to be a Tier I tournament, correct, a

5     Masters Series tournament?

6        MR. MacGILL:  Object to the form of the

7     question.

8  A  Can you describe what you mean by "guarantee?"  I

9     don't see the word "guarantee" here.  I mean, there

10    are provisions in Section 5 that are what they are.

11    I don't see them as a guarantee.

12 Q  Mr. Kleinrichert, to the extent that Plaintiffs are

13    determined not to have had the same rights as owners

14    of the Hamburg membership that ATP granted to

15    Shanghai in this transaction, do you believe it would

16    nevertheless be appropriate to use the value of that

17    transaction to value the Hamburg membership?

18 A  Yes.  As long as such rights are similar, the primary

19    right here obviously being the right to host an ATP

20    Masters Series tournament, which is what it says on

21    the very first line.  There could be other

22    differences in rights and obligations in this

23    agreement compared to the rights ultimately held by

24    the GTF.  That doesn't make this agreement an invalid

25    basis for determining the right of the GTF rights, as

96

1    long as there's a meaningful comparison of the

2    primary rights being exchanged.

3  Q  And if the primary rights being exchanged can't be

4    meaningfully compared, it wouldn't be appropriate to

5    use the value of this transaction to assess the value

6    of Plaintiffs' rights, would it?

7      MR. MacGILL:  Object to the form of the

8    question.

9  A  Of course not.  If this document was transferring the

10    right to a water polo event, it probably wouldn't be

11    meaningful, so of course.

12  Q  Now, if you value Plaintiffs' rights based on the

13    value of the transaction between ATP and Shanghai,

14    you're valuing what Plaintiffs could have realized

15    had they transferred their rights to Shanghai instead

16    of ATP; correct?

17  A  You're valuing the right held in their possession

18    that they had the ability to transfer to Shanghai,

19    sure.

20  Q  And in valuing that right, would you take into

21    account any specific circumstances of Plaintiffs that

22    might reduce the value of that right?

23  A  You would take into consideration the specific

24    circumstances of what you'd believe the parties would

25    negotiate.

REDACTED

# Redacted in its Entirety

## Exhibits 2 through 6