REDACTED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), et al., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 07-178-GMS |
| | ) | |
| v. | ) | **CONFIDENTIAL -** |
| | ) | **FILED UNDER SEAL** |
| ATP TOUR, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 4
TO EXCLUDE EVIDENCE OF DAMAGES**

*Of Counsel:*

Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

Daniel Gravelyn
300 Ottawa Avenue N.W., Suite 500
Grand Rapids, Michigan 49503
(616) 742 3930

Dated: May 27, 2008

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
bflinn@ycst.com
kkeller@ycst.com

*Attorneys for Plaintiffs*



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), et al., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-178-GMS |
| v. | ) ) | **CONFIDENTIAL -** |
| ATP TOUR, INC., et al., | ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 4
TO EXCLUDE EVIDENCE OF DAMAGES**

Defendants incorrectly allege that Plaintiffs' damage theory, relating to damages for interference with Plaintiffs' contractual relations, "had not been disclosed" prior to service of Plaintiffs' Itemized Statement of Damages. (D.I. 130 at 2.) This damage theory was expressly disclosed to Defendants by the allegations of Plaintiffs' initial Complaint:

> Plaintiffs have been damaged in that their ownership interests, property rights and contractual relationships as heretofore stated will be significantly impaired by the ATP mandating a change in the scheduling of the GTF Tournament, and via the ATP's Brave New World. Additionally, the GTF has been damaged in that the ATP Defendants' conduct, in interfering with these business relationships, without justification, limits the GTF's ability to negotiate favorable terms with respect to its ongoing business relationships for calendar years 2007 and beyond.

(Compl. ¶ 142.) Thereafter, it was disclosed by Plaintiffs' Amended Complaint (Am. Compl. ¶ 212) and by testimony of Hamburg Tournament Director Carl-Uwe Steeb, who, among others, testified that former sponsors were insisting, *inter alia*, on an "option to cancel the contract if [Hamburg is] not a Masters Series in 2009 anymore." (Ex. 1 at 284.) It is disingenuous for Defendants to allege "trial by ambush" when this damage theory has been consistently and repeatedly disclosed to Defendants from the initial pleading stage forward. (D.I. 130 at 4.)

1

REDACTED

Defendants' Motion also disregards the practical realities of this litigation, including the context in which the evidence supporting this theory has been generated. In the months prior to the 2008 Hamburg Tournament – which ended just nine days ago – Plaintiffs executed more than sponsorship and broadcasting contracts. Consistent with Plaintiffs' ongoing duty to supplement their discovery responses, these contracts were produced to Defendants on April 22 and May 4, 2008.[1] The documents were also identified on Plaintiffs' proposed exhibit list, which Defendants received more than two weeks prior to filing their Motion. Plaintiffs will submit to the jury that the value of these contracts, combined with the value of additional contracts that were finalized on the eve of the 2008 Tournament, establish Plaintiffs' contractual damages for the calendar year 2009 and forward.

Negotiations regarding these contracts were either in their initial stages, or had not yet begun, when Defendants deposed Plaintiffs' witnesses in late 2007. Nonetheless, Plaintiffs were as forthcoming as possible regarding the damages that would be caused to their contractual relations if the Brave New World Plan (the "Plan") was announced and perceived in the relevant markets as going forward. For example, DTB President George von Waldenfels testified that "if ATP's plans were realized, that is if [Hamburg is] downgraded and moved to July, we would

---

[1] For example, the              contract was produced to Defendants on April 22, 2008 -- *one day* after it was executed. (Ex. 2.) Moreover, contracts relating to previous year's tournaments were produced prior to the discovery deadline. In stark contrast, Defendants produced thousands of pages of important documents after the close of discovery in December of 2007 that were created late in 2006 or in the first seven months of 2007, and produced nineteen pages documents on May 21, 2008 that were created in December, 2007 relating, *inter alia*, to the "key" condition that the

      (This document would have been of interest to Plaintiffs in December, 2007 when Etienne de Villiers was denying, under oath, that any meaningful connection existed between the *See* de Villiers Dep. 530-537. A copy of the recently produced document and de Villiers' relevant deposition testimony are attached hereto as Exs. 3 & 4.

2

REDACTED

lose considerable sponsorship." (Ex. 5 at 282.) Moreover, Steeb testified that certain sponsors, such as Eon Hanse, were already refusing to consider a customary two year agreement with Plaintiffs. (Ex. 1 at 284.) Steeb also informed Defendants of Plaintiffs' decision, by necessity, to postpone any attempts to sell broadcasting and sponsorship contracts for 2009 – in which the Brave New World contemplates downgrading Hamburg – until the issues regarding Hamburg's status and week had been resolved. (Ex. 1 at 286-87.)

Defendants fail to recognize that the materials at issue in their Motion – including documents and deposition testimony related to contracts for the 2008 tournament – were not generated until *after* the discovery cut off. (By contrast, Defendants have continued to produce key documents, including numerous documents created in 2006 and earlier, in bits and pieces.) Contrary to Defendants' contention, Plaintiffs "clearly were not under an obligation to produce documents that did not yet exist" when they responded to Defendants' requests for production prior to the December 2007 discovery cut off. *Taylor v. Union Institute*, 30 Fed. Appx. 443, 451 (6th Cir. 2002). Instead, Plaintiffs have a duty to supplement their discovery responses after the discovery deadline if they learn that their response or document production "is in some material respect incomplete or incorrect." Fed. R. Civ. P. 26(e). Plaintiffs have satisfied this duty by supplementing their document production in a timely manner.[2] Plaintiffs also testified truthfully and completely about the existence of the damages that these documents now evidence. There is no proper basis for excluding evidence merely because it was recently generated.[3]

---

[2] Defendants' claim that Plaintiffs have attempted "trial by ambush" is disingenuous. (D.I. 130 at 4.) Defendants have received the documents relevant to Plaintiffs' contractual claims. Defendants' failure to review these documents creates no ground for excluding them.

[3] The ATP has also produced documents generated by the ATP over the past few months and added them to its proposed exhibit list. In this regard, Defendants' discovery conduct belies their argument.

3

Similarly, Defendants fail to recognize that Kleinrichert's discounted cash flow analysis was generated after the reply brief deadline *out of necessity*, and produced as soon as practicable. The situation arose because Defendants' damages expert, Peter Greenhalgh, stated in his responsive report that a cash flow analysis "conceptually . . . could be" an appropriate way to measure Plaintiffs' damages, but that "this valuation method is not suitable for this litigation." (Ex. 6 at ¶¶ 33-34.) As a result, Plaintiffs (and Kleinrichert) opted not to produce a discounted cash flow analysis prior to the Court's February 1, 2008 reply deadline.[4] During Greenhalgh's February 6, 2008 deposition, however, Greenhalgh--for the first time--affirmatively opined that a discounted cash flow analysis was "the only way to value a business." (Ex. 7 at 33.) When asked directly whether he was offering an affirmative opinion, Greenhalgh replied: "[I]t's certainly my opinion that if liability were found . . . [a discounted cash flow analysis] would be an appropriate methodology to begin to estimate what damages might be." (Ex. 7 at 255.)

Immediately upon learning of Greenhalgh's newly introduced opinion, counsel for Plaintiffs asked Kleinrichert to perform a discounted cash flow analysis in reply thereto. The completed analysis was produced to Defendants on February 11, 2008 – just three business days after Greenhalgh's deposition and prior to Kleinrichert's deposition. Again, Kleinrichert's analysis is not excludable. It was appropriately and timely generated and produced as part of Plaintiffs' continuing Fed. R. Civ. P. 26(e) duty to supplement after the close of discovery.

Even if its disclosure was untimely (which it was not), preclusion pursuant to Fed. R. Civ. P. 37(c) would not be an appropriate remedy because there was "substantial justification"

---

[4] Defendants admit and do not dispute that a discounted cash flow analysis served prior to the Court's February 1, 2008 deadline would have been proper. (D.I. 130 at 3; D.I. 130 at Ex. 13, p. 2: "[Kleinrichert's analysis] could have and should have been proffered . . . in a properly served reply report on February 1.")

4

REDACTED

for Plaintiffs' delay and any such delay was "harmless."[5]  As explained above, Greenhalgh's failure to articulate his opinions in his report made it impossible for Kleinrichert to file by the reply deadline.  Moreover, Defendants received the analysis prior to Kleinrichert's February 12, 2008 deposition and spent substantial time during the deposition questioning him about the contents and reasoning behind the analysis.  (Ex. 8 at 187-202.)  Any alleged, potential prejudice that may have resulted from Kleinrichert's additional analysis was thereby eliminated.[6]

       For these reasons and each of them, Defendants' Motion should be denied.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*Of Counsel:*

Robert D. MacGill  
Hamish S. Cohen  
Jennifer Westerhaus Adams  
Matthew B. Barr  
BARNES & THORNBURG LLP  
11 South Meridian Street  
Indianapolis, Indiana 46204  
(317) 236-1313  

Daniel Gravelyn  
300 Ottawa Avenue N.W., Suite 500  
Grand Rapids, Michigan 49503  
(616) 742 3930  

Dated:  May 27, 2008

*/s/ Karen E. Keller*
C. Barr Flinn (No. 4092)  
Karen E. Keller (No. 4489)  
The Brandywine Building  
1000 West Street, 17th Floor  
Wilmington, DE 19801  
(302) 571-6600  
bflinn@ycst.com  
kkeller@ycst.com  

*Attorneys for Plaintiffs*

---

[5] Implicitly, Defendants seek relief pursuant to Fed. R. Civ. P. 37(c)(1).  Such preclusion, however, invokes the harshest of standards: "[p]recluding expert testimony under [Rule 37(c)(1)] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard for the requirements of Rule 26(a)(2)(B)."  *DiPirro v. United States*, 43 F. Supp. 2d 327, 340 (W.D.N.Y. 1999).  Defendants have not and cannot allege bad faith or callous disregard -- Plaintiffs disclosed opinions as soon as reasonably possible and, in any event, in advance of Kleinrichert's deposition and well in advance of trial.

[6] To the extent substantive defects existed (which fact is expressly denied), these defects were also remedied, or could have been remedied, at Kleinrichert's deposition.

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on June 9, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Lawrence C. Ashby, Esquire
> Philip Trainer, Jr., Esquire
> Carolyn Hake, Esquire
> Ashby & Geddes
> 500 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on June 9, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Bradley I. Ruskin, Esquire
> Jennifer R. Scullion, Esquire
> PROSKAUER ROSE
> 1585 Broadway
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen E. Keller*
C. Barr Flinn  (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*



# Redacted in its Entirety

# Exhibits 1 through 3

# EXHIBIT
# 4

530

1                    Etienne de Villiers

2    period.

3         Q        What did Mr. Tiriac say?

4         A        My best recollection was that Mr.

5    Tiriac got very upset with me and said words to

6    the effect of "I don't want to have anything more

7    to do with tennis.  I will let Gerard deal with

8    tennis.  I am done," and walked out.

9         Q        When did you next meet with Mr.

10   Tiriac?

11        A        I haven't met with Mr. Tiriac.

12        Q        Now, you reported this meeting with

13   Mr. Tiriac to all members of the management

14   committee and the ATP board in early

15   December 2006; agreed?

16        A        If you could show me the

17   correspondence, I would be able to refresh my

18   memory, but I don't recall dates.

19                 (Plaintiffs' Exhibit Number 376

20        marked for identification as of this date.)

21        Q        Exhibit 376 has been handed to you by

22   the reporter.

23                 Is this an e-mail, Mr. de Villiers,

24   you sent on Saturday, December 2nd, 2006, to all

25   management committee and all ATP board regarding

531

                    Etienne de Villiers

2  your meeting with Mr. Tiriac, this e-mail of that

3  date, sir?

4         A       It appears to so.

5                 MR. MAC GILL:  I would offer into

6         evidence Exhibit 376.

7                 MR. RUSKIN:  We will reserve our

8         objections at this time and deal with it at

9         the appropriate time and the appropriate

10        place.

11 BY MR. MAC GILL:

12        Q       And you sent this in the ordinary

13 course of your business at the ATP as a part of

14 your role as chairman of the board?

15        A       I did.

16        Q       And you sent it to all members of the

17 ATP board, including the management committee?

18        A       I did.

19        Q       Now, Mr. de Villiers, one of the

20 things you say in paragraph numbered one, you say

21 but, "but equally, did not open the prospect of a

22 sale."

23                Do you see those words?

24        A       Yes, I do.

25        Q       You were talking, you had it in mind,

532

```
 1                Etienne de Villiers
 2   now that you have seen this e-mail, you went --
 3   one of the subjects you were going to talk to him
 4   about eventually was extinguishing the Kitzbuhel
 5   membership?
 6                MR. RUSKIN:  Objection to form.
 7        A      I don't know that you could glean
 8   that from here.
 9        Q      Well, but you knew that based on --
10   that's what you were going to propose.
11        A      We were considering a number of
12   events that we felt needed -- we felt that to make
13   sense of the Post Wimbledon clay court swing, that
14   we needed to buy back one of the events to make
15   the other events in that week more viable.
16        Q      And, ultimately, in the months that
17   followed, you, Mr. Young, and others agreed that
18   the Madrid award would be tied to the
19   extinguishment of the Kitzbuhel sanction?
20        A      They were never conditional, and we
21   would not never allow that to be conditional.
22        Q      No, I didn't say conditional.
23   Related.
24        A      You are implying conditional, and we
25   would never be hostage to fortune.
```

533

1                    Etienne de Villiers

2              If the -- if we could not buy back

3      the -- if we could not buy back the Kitzbuhel

4      event, we would look to agreeing to buy back

5      the -- another event in that time period.

6         Q      Are you denying that you expressly

7      discussed with your management team a tying

8      together of the award of Madrid with the

9      extinguishment or termination of the Kitzbnhel

10     membership?

11        A      Yes.

12        Q      Now, prior to the time of the actual

13     sale -- let me be really precise here.

14             Are you denying to the court and jury

15     that you and your management team agreed that you

16     would tie the award of the Madrid sanction to the

17     retirement or extinguishment of the Kitzbnhel

18     membership?

19        A      What I will concede is that we would

20     try our best endeavors to get the two done

21     together, but on terms and conditions that made

22     sense to the ATP and to -- and responsible -- with

23     responsibility for the fiduciary duties of the

24     tour.

25        Q      All right.  Now, are you now

534

1              Etienne de Villiers

2 remembering that you did, in fact, tie those two

3 events together at the time of the negotiations

4 prior to the actual agreement, which is Exhibit

5 375?

6              MR. RUSKIN:  Objection.  Asked and

7       answered and he's testified.  You can

8       answer.

9       A       I object.  At no point did we tie the

10 two together.

11      Q       The two issues together?

12      A       I explained to you that we did not

13 make them conditional.  We explained that we would

14 try to get them both done at the same time.

15      Q       But you did tie, you and your

16 management, you, personally, and your management

17 team tied these two, or put these two things

18 together, the Madrid award and Kitzbnhel

19 membership extinguishment, prior to the time of

20 Exhibit 375, the contract; agreed?

21              MR. RUSKIN:  You have now asked this

22       three times.  We have answered this

23       question.

24      Q       And the answer is no?

25      A       No.

535

Etienne de Villiers

1

2      Q      When you actually did the document,

3  did consider the extinguishment of Kitzbnhel and

4  the sale of Kitzbuhel on the award of Madrid,

5  didn't you?  You actually did that in the

6  document.

7      A      In the document, 375?

8      Q      Yes.  I mean, that's what you did.

9             You have read it earlier; right?

10     A      I never saw this, I have not seen

11  sight of this.

12     Q      You read it --

13     A      I read it, yes.

14     Q      -- on the record here.

15     A      I did not see it.  I did not see --

16     Q      Let me read this to you.

17     A      -- before it was signed.

18     Q      What, look at paragraph numbered one,

19  sir, where there is an acknowledgment, conditions

20  to sale.

21             "Member is also the owner of a

22  tournament class membership with respect to the

23  ATP tournament held in Madrid, Spain, and has

24  submitted an application to ATP for a Masters 1000

25  event to be held in Madrid starting in 2009."

536

Etienne de Villiers

1    That's what it says; right?  Agreed?

2    And then it continues:  "ATP and

3    member agree that the sale of the tournament class

4    membership, with respect to the Kitzbnhel

5    tournament, as set forth in this agreement, shall

6    be conditioned upon the acceptance of such

7    application and execution of an agreement between

8    member and ATP related to granting member a

9    Masters 1000 event in Madrid, Spain, starting in

10   2009."

11   Do you agree that that is what that

12   document says in those sentences?

13   A       I agree that's what it says.

14   Q       Do you now understand and remember

15   that at the time of the negotiation and the actual

16   contract, that these two events, Kitzbnhel

17   extinguishment and Madrid award, were tied

18   together?

19   A       I don't remember, when, at what point

20   this became a contractual matter.

21   Q       August 30, 2007.

22   A       I understand, that that's when it

23   became, but I have no recollection of when and how

24   this document was drawn.

537

                        Etienne de Villiers

1
2       Q       When did you award, when did you
3   award the Masters 1000 to Madrid?  Same day;
4   right?
5       A       I don't recall.
6       Q       It was at the U.S. Open 2007.  Wasn't
7   it the same day?  Didn't you sign this document on
8   the same day you awarded the application, the
9   Madrid sanction?
10      A       I don't recall.  I don't recall.
11      Q       Within a few days -- okay, if you
12  can't remember whether it was the same day, was it
13  within a few days after August 30, 2007, the date
14  on which 375 was executed, that you awarded the
15  Madrid sanction?
16      A       I recall that the awards of the
17  sanctions were around about that time.
18      Q       All right.
19      A       And I also recall that we had a
20  number of issues that were -- that we had with Mr.
21  Tiriac, and -- but what I do not have is a
22  recollection nor an awareness of the actual
23  dynamics that occurred between those decisions and
24  how it became a contractual matter.
25      Q       Back to Exhibit 373, Dubai/Doha, the

# EXHIBIT
# 5

00282

1

2 the way it is. And I always expressed my conviction

3 that a U.S. court would decide in our favor and

4 represent our interests. I, also, said that it could

5 be that ATP may regain its senses.

6     Q.    Have any sponsors refused to sponsor any

7 of the 2007 or 2008 because of the ATP restructuring

8 plans designed to commence in 2009?

9     A.    I wouldn't know of any such person who

10 expressed that. Again, 2007 and 2008 in particular

11 is still secure, and this is how I expressed it to

12 people and how they knew it anyway. And I always

13 expressed my intention to fight for 2009.

14         The problem for our sponsors was, indeed,

15 the press conference held by ATP here at the US Open

16 in New York when they said these are the eight sites

17 but Hamburg is not decided yet, and Hamburg is no

18 longer part of the Masters series. That became a

19 problem.

20         And I'm convinced that if ATP's plans

21 were to be realized, that is if we were downgraded

22 and moved into July, we would lose considerable

23 sponsorship.

24     Q.    Did the press conference -- I take it the

25 press conference you think has had some effect on

**vonWaldenfels, Georg 9-19-2007**                    **Page 282**

00283
1

2   whether or not people will be willing to sponsor in

3   2009 and thereafter?

4       A.    Many media reported Hamburg is no longer

5   the site for the Masters.  And of course many people

6   don't read, you know, the entire press release issued

7   by ATP, but they may read an AP release or, know,

8   just another sound byte type of release.  And in that

9   kind of press release it said Hamburg is no longer a

10  site for a Masters tournament and that, of course, is

11  a loss of confidence and a loss of standing for

12  Hamburg.

13      Q.    All of your sponsors are aware that

14  Hamburg will be a Masters event in 2008.  Yes?

15      A.    Well, we made sure to emphasize again and

16  again that 2008 was still guaranteed because there

17  were, of course, you know, uncertainties and what

18  will happen even in 2008, but we made sure that

19  sponsors would know that 2008 there is no change.

20      Q.    And no sponsors have refused to go

21  forward in 2008 because of the possible plan

22  beginning in 2009.  Correct?

23      A.    No, I mean I don't know of any such

24  persons or any such decision, but that is why it is

25  so very important for me to reestablish that trust

**vonWaldenfels, Georg 9-19-2007**                    **Page 283**

REDACTED

# Redacted in its Entirety

# Exhibit 6

# EXHIBIT
# 7

33

PETER R. GREENHALGH

2   and determining that if they stay negative the

3   book value is impaired, by his very own logic the

4   book value is impaired notwithstanding the Brave

5   New World.

6          Q       Are you saying as a -- strike that.

7                  Are you saying that the only way to

8   value a business is to look at discount, the

9   present value of discounted cash flows?

10         A       If you are going to have a correct

11  answer, if you have another way, it better come up

12  with the same result; otherwise, it's not the

13  right answer.

14                 There could be other methods that get

15  you to that, but they better represent the present

16  -- the discounted present value of future profits.

17  That is the value of firms.

18         Q       Won't you admit that businesses have

19  assets that may make the businesses a lot more

20  valuable than the discounted cash flow?

21         A       That suggests those businesses should

22  sell those assets if true.

23         Q       Is that true or not?

24         A       I just answered the question.

25         Q       Businesses can have assets that make

254

PETER R. GREENHALGH

1

2    Q     And you had no evidence to support

3  those words, did you, sir?

4    A     Well, you are ignoring everything I

5  have said in the last five minutes.  It is his

6  premise that Hamburg would have sold.  If that

7  premise is correct, then the statement he did not

8  take into account that there would be others.  It

9  necessarily follows logically from his assertion.

10         If you are telling me his premise is

11  counter factual, then the whole Shanghai

12  computation should be disregarded.

13    Q     You state in your report that the

14  economic loss to plaintiffs could be expressed as

15  a difference between the cash flow they would

16  receive as an ATP Masters 1000 tournament and the

17  cash flow they would receive as an ATP 500

18  tournament.

19         Do you recall writing those words?

20    A     Yes.

21    Q     All right.  What's unclear to us,

22  sir, is whether that is an opinion of yours or

23  that is just surplusage in the report.  Is that an

24  opinion of yours?

25    A     Well, it's certainly my opinion that

255

PETER R. GREENHALGH

1
2  if liability were found, non antitrust
3  liability --
4      Q     Non-antitrust liability?
5      A     Yes.
6            -- that that would be an appropriate
7  methodology to begin to estimate what damages
8  might be, if you attribute all of the loss in the
9  value to the finding of liability.
10           Now, first, you have to find that
11 liability, and you have to determine if injunctive
12 relief would prevent any loss.
13           If you overcome those two hurdles,
14 then this would be an appropriate methodology to
15 estimating damages.
16     Q     Okay.  So, that is, in fact, an
17 opinion of yours?  It's not just a conceptual
18 musing or surplusage in your report?
19           MR. UNDERWOOD:  Object to the form of
20     the question.
21     A     It was never intended to be a musing.
22 It was an opinion.
23     Q     All right.  Well, I mean, you begin
24 paragraph 33, "Conceptually, the economic loss to
25 plaintiffs could be expressed," not should be, but

255

                    PETER R. GREENHALGH

2  if liability were found, non antitrust

3  liability --

4        Q      Non-antitrust liability?

5        A      Yes.

6               -- that that would be an appropriate

7  methodology to begin to estimate what damages

8  might be, if you attribute all of the loss in the

9  value to the finding of liability.

10              Now, first, you have to find that

11 liability, and you have to determine if injunctive

12 relief would prevent any loss.

13              If you overcome those two hurdles,

14 then this would be an appropriate methodology to

15 estimating damages.

16       Q      Okay.  So, that is, in fact, an

17 opinion of yours?  It's not just a conceptual

18 musing or surplusage in your report?

19              MR. UNDERWOOD:  Object to the form of

20       the question.

21       A      It was never intended to be a musing.

22 It was an opinion.

23       Q      All right.  Well, I mean, you begin

24 paragraph 33, "Conceptually, the economic loss to

25 plaintiffs could be expressed," not should be, but

256

PETER R. GREENHALGH

2  "could be expressed as the difference between the

3  cash flow they would receive as an ATP Masters

4  1000 tournament and the cash flow that they would

5  receive as an ATP 500 tournament."

6          Your words; right?

7      A      Correct.

8      Q      All right.  And now we know, based on

9  your testimony, that that is an opinion that you

10  have reached based on your work in this matter, an

11  actual opinion; right?

12     A      Correct.

13     Q      All right.  Now, did you make such a

14  calculation?

15     A      No.  I reviewed calculations, the

16  only ones that were in the record that attempted

17  to do that.

18     Q      And you write, "this is the approach

19  taken in ATP documents that attempted to

20  conceptualize, outside the context of litigation,

21  the amount of potential compensation that might be

22  paid to tournaments that ultimately had their

23  status changed as a part of the Brave New World."

24          Again, your words in your report;

25  right?

REDACTED

# Redacted in its Entirety
# Exhibit 8