IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------- X
DEUTSCHER TENNIS BUND (GERMAN
TENNIS FEDERATION), ROTHENBAUM
SPORT GMBH, and QATAR TENNIS
FEDERATION,

      Plaintiffs,

 against

ATP TOUR, INC., ETIENNE DE VILLIERS,
CHARLES PASARELL, GRAHAM PEARCE,
JACCO ELTINGH, PERRY ROGERS, and IGGY
JOVANOVIC,

      Defendants.
------------------------------------- X

**REDACTED**
**PUBLIC VERSION**

C.A. No. 07-178-GMS

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION *IN LIMINE* NO. 1 TO EXCLUDE EXPERT OPINIONS PROFFERED BY ANDREW ZIMBALIST**

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Carolyn S. Hake (I.D. #3839)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
chake@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

Dated: June 2, 2008

{00221169;v1}

Plaintiffs' opposition to Defendants' motion to exclude the opinion testimony of Andrew Zimbalist misapprehends the requirements of Daubert and Rule 702, mischaracterizes Defendants' arguments, and fails to offer support for the admissibility of Zimbalist's opinions.

Plaintiffs erroneously claim that Defendants' only argument is that Zimbalist should be excluded for failing to obtain pricing data to conduct econometric testing to define the relevant markets. (Opp. Br. 1.) The crucial point is that Zimbalist failed to employ a recognized and reliable methodology to analyze cross-elasticity of demand (*i.e.*, product substitutability) in defining the relevant markets at issue, and thus failed to comply with the dictates of *Daubert*. To that end, Zimbalist acknowledged that he "needed" to obtain ticket pricing data "to do the work that [he] was doing," even discussed with counsel his desire for the data, but did not collect the data needed to perform the cross-elasticity testing he wanted to conduct. (Ex. A, pp. 13-14, 68-69). The "reliability" threshold governing expert testimony under *Daubert* is not relaxed or excused due to an inability to obtain data required to conduct a particular test.[1]

Lacking the necessary ticket pricing data, Zimbalist turned to an ad hoc, made-for-litigation "test" to define the relevant markets. But his approach completely fails to assess the relevant "product substitutability" question in a controlled and testable fashion. As discussed in Defendants' moving brief, Zimbalist's methodology is unreliable at each step of the process. First, he started with a product definition ("top tier men's professional tennis") that he admitted "is not precise" (D.I. 122, Ex. 4, p. 21), making it impossible to identify the producers, buyers, and/or sellers of the product, as well as its potential substitutes. Second, he opined that ATP's current "ISG" tournaments are the closest substitute, without offering any criteria for making this determination beyond his assertion that this was "apparent" based on the fact that "some" top

---

[1] D.I. 122 at 3 n.5; *Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 448-49 (3d Cir. 2003) (expert testimony excluded where expert relied upon "guestimate" instead of primary data).

players typically participate in these tournaments. (D.I. 122, Ex. 2, pp. 29-30). Third, he "compared" ISG events to ATP's current "Masters Series" tournaments across a set of self-selected "practical indicia", although he employed no recognized standards for choosing the appropriate "indicia" to analyze, and/or evaluating the "indicia" to determine whether the products are in fact substitutes. Finally, after concluding that ISG events are not substitutes for "top tier men's professional tennis" under this "test," Zimbalist did not examine any other potential substitutes, due to his "predisposition" to believe that other professional tennis and sports products do not compete with each other — even though he was aware of record evidence to the contrary. (D.I. 122, Ex. 2, pp. 30-32, 76-77).[2] Plaintiffs do not dispute any of these facts.

Instead, Plaintiffs vaguely assert that Zimbalist's analysis of "both qualitative and quantitative indicia" is itself a methodology supporting his market definition conclusions. (Opp. Br., p. 3). But examining such "indicia" without any set of identifiable standards to determine (1) which products to analyze for substitutability, and (2) whether the products are in fact close substitutes, is meaningless, and hardly methodological. None of the sources Plaintiffs cite to support the purported "general acceptance" of Zimbalist's methodology even remotely suggest that antitrust markets can be reliably defined using market performance data alone — without an examination of cross-elasticity principles based upon controlled standards or "indicia" that actually address and assess product substitutability.[3] Indeed, while Zimbalist readily admitted

---

[2] Plaintiffs note that Zimbalist made changes to his deposition transcript through an errata sheet. (Opp. Br., at 3 n.6.) Putting aside the fact that Defendants had not received the errata sheet prior to filing their motion, none of the changes modify Zimbalist's methodology in any way.

[3] *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 325-26 (1962) (practical indicia may be used to assess "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"; holding that District Court properly found that "medium-priced" and "low-priced" shoes compete within same product market under this test); D.I. 122, Ex. 4, § 1.11 (relevant product markets are defined using SSNIP test, and evidence showing "the likely reaction of buyers to a price increase"); D.I. 131, Ex. 3, pp. 5, ("product market definition

2

that two products that sell for different prices are not necessarily in different antitrust markets (D.I. 122, Ex. 2, p. 67), he focused upon price difference between Masters Series and ISG events to conclude that they are not within the same market here. (D.I. 122, Ex. 1, pp. 10-11).

Moreover, Plaintiffs' suggestion that Defendants' expert Jonathan Walker used the same method to analyze the relevant markets is just wrong. To the contrary, in concluding that the relevant markets at issue include markets for live entertainment, sponsorship, and broadcast rights, Walker analyzed evidence of *actual substitution* by consumers of assorted tennis and non-tennis products for ATP tennis events in each of these markets, as well as *Plaintiffs' witnesses' own admissions* that the Hamburg tournament competes with non-tennis products in all of these markets. (Ex. B, pp. 25, 28-38). Zimbalist simply disregarded this evidence in conducting his "practical indicia test." (D.I., Ex. 2, pp. 31-32.)[4]

Plaintiffs' effort to downplay the significance of *Kentucky Speedway, LLC v. NASCAR, Inc.*, 2008 WL 113987 (E.D. Ky. Jan. 7, 2008) by noting that Zimbalist's report therein is under seal simply ignores Zimbalist's admission *in his deposition in this action* that he used the same "practical indicia" test in that case that he used here, and that the court in its (published) opinion held that his work could not withstand the *Daubert* inquiry.

---

depends critically upon demand-side substitution — *i.e.*, consumers' willingness to switch from one product to another in reaction to price changes"); *cf.* D.I. 131, Ex. 1, p. 1 (market definition based upon qualitative assessments often leads to the possibility of errors).

[4] Plaintiffs further claim that Zimbalist's consideration of "barriers to entry and anticompetitive conduct" is a second "methodology" supporting his opinions on market definition. (Opp. Br. 5.). However, Plaintiffs' own source for this proposition makes clear that analysis of these factors is required separate and apart from the process of defining the relevant markets. (D.I. 131, Ex. 3, pp. 5, 12). Indeed, Zimbalist never suggests anything to the contrary. Moreover, Plaintiffs' claim that Walker "admitted" to the existence of barriers to entry and anticompetitive conduct in this case simply misstates his testimony. *See, e.g.*, Ex. C, pp. 183-84 (there are no barriers to entry that would affect Plaintiffs' ability to stage a tournament outside of ATP tour).

                      ASHBY & GEDDES

                      */s/ Tiffany Geyer Lydon*

                      _____
                      Philip Trainer, Jr. (I.D. #2788)
                      Carolyn S. Hake (I.D. #3839)
                      Tiffany Geyer Lydon (I.D. #3950)
                      500 Delaware Avenue, 8th Floor
                      P.O. Box 1150
                      Wilmington, Delaware 19899
                      (302) 654-1888
                      ptrainer@ashby-geddes.com
                      chake@ashby-geddes.com
                      tlydon@ashby-geddes.com

                      *Attorneys for Defendants*

*Of Counsel:*

Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000

Dated: June 2, 2008

4

# EXHIBIT A

2/22/2008 Zimbalist, Andrew

```
1                           VOLUME I
                      PAGES:    1 - 227
2                     EXHIBITS: 161 - 162
3           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
4
                      C.A. NO.  07-178-GMS
5
6
7     * * * * * * * * * * *    *
                               *
8  DEUTSCHER TENNIS BUND (GERMAN    *
   TENNIS FEDERATION) and           *
9  ROTHENBAUM SPORTS GMBH TENNIS    *
   and QATAR TENNIS FEDERATION,     *
10                Plaintiffs,       *
                                    *
11 vs.                              *
                                    *
12 ATP TOUR, INC., ETIENNE DE       *
   VILLIERS, CHARLES PASARELL       *
13 GRAHAM PEARCE, JACCO ELTINGH,    *
   PERRY ROGERS, and IGGY JOVANOVIC,*
14                Defendants.       *
                                    *
15    * * * * * * * * * * *    *
16
17
18           DEPOSITION OF ANDREW ZIMBALIST, taken on
19 behalf of the Defendant, pursuant to the Massachusetts
20 Rules of Civil Procedure, before Karen Borreson, RPR,
21 Notary Public within and for the Commonwealth of
22 Massachusetts, at the Clarion Hotel & Conference
23 Center, 1 Atwood Drive, Northampton, Massachusetts, on
24 Friday, February 22, 2008, commencing at 9:00 a.m.
25
```

1

1  from the tournaments; I wanted to get the breakdown of
2  television ratings and CPM data for broadcasting.  I
3  wanted to get additional information about sponsorship
4  contracts.  I wanted to get additional information
5  about capacity at the -- at the various ATP tennis
6  venues.  That's what occurs to me, as I sit here.
7  There are probably some other things that I asked for.
8       Q.   Did you receive the information as you
9  requested?
10      A.   Well, I received some of it.  I -- I didn't
11 receive most of it.
12      Q.   Did you ever discuss with counsel or with Mr.
13 Kosicki or anyone who worked for him trying to obtain
14 some of that information other than through the
15 discovery process?
16      A.   Yes.
17      Q.   What discussions did you have?
18      A.   Well, I -- I -- I asked George to go to the --
19 the ATP website and -- and if there were separate
20 websites for the tournaments to see if they could
21 obtain ticket price data from the websites.  And I'm
22 pretty sure the -- the response that I got back was
23 that some -- some of them had ticket prices for the
24 current year, but not for previous years.
25           And I -- I needed ticket prices for much

1  more than just one year to do the work that I was
2  doing, so that -- that didn't work. I'm not sure if I
3  asked George to look for anything else off the
4  websites.
5      Q.  Do you know how much time you've spent working
6  on this matter?
7      A.  Yes. I -- almost exactly 185 hours up to
8  today.
9      Q.  Up until today. Do you know how much time Mr.
10 Kosicki and his people have spent working on this
11 case?
12     A.  No.
13     Q.  Do you have any idea of how much Analysis
14 Group as billed for its work in this case?
15     A.  No. It's not something that I concern myself
16 with.
17     Q.  Do you have the responsibility to review the
18 bills from the Analysis Group --
19     A.  No.
20     Q.  -- for work that they've done in assisting
21 you?
22     A.  No. I haven't seen any bills.
23     Q.  Those go directly to the attorneys?
24     A.  That's my understanding.
25     Q.  So at some point you reached some opinions --

```
 1      A.   I could not estimate cross elasticity demands.
 2   I was not given the price data.
 3      Q.   Did you make any estimate to conduct a SSNIP
 4   test?
 5      A.   I could not do that for the same reason.
 6      Q.   Moving over to Page 7, you refer to the
 7   cellophane fallacy.  Did you conduct any analysis to
 8   determine whether the cellophane fallacy would affect
 9   any analysis in this case?
10      A.   I could not do that, again, because I was not
11   given a price data.
12      Q.   Did you discuss with counsel trying to obtain
13   the price data that would be necessary to create to
14   estimate cross elasticity demand or demand a SSNIP
15   test?
16      A.   Yes.
17      Q.   Did you ever discuss whether the data -- in
18   Footnote 7, you refer to the data was produced to
19   Pricewaterhouse and Deliotte, Footnote 7?
20      A.   Yes.
21      Q.   Did you ever discuss with counsel whether they
22   might subpoena that data from Pricewaterhouse or
23   Deliotte?
24      A.   I -- I wouldn't -- I would never suggest to
25   them that they subpoena anything.  That's their
```

1   decision.  I told them that I -- I wanted to get the
2   data and they -- I know that they had tried.  I don't
3   know what methods they used to get it.
4       Q.   And since they didn't get the data, you
5   couldn't do either the cross elasticity demand or a
6   SSNIP test?
7       A.   That's correct.
8       Q.   On the bottom of Page 7 you say, "Based on the
9   evidence, in the instant litigation, I have reached
10  the conclusion that the relevant product market is the
11  production of top-tier men's professional tennis."
12  Correct?
13      A.   Correct.
14      Q.   Now, in that sentence you don't mention the
15  live market for top-tier men's professional tennis, do
16  you?
17      A.   Not in that sentence, no.
18      Q.   You don't mention the player services for
19  top-tier men's professional tennis?
20      A.   No.  This, again, is making a general
21  categorization of the product that's at issue in the
22  case.
23      Q.   And you don't mention the hosting market for
24  top-tier men's professional tennis, correct?
25      A.   That's correct.

# EXHIBIT B

**REDACTED**

# EXHIBIT C

2/14/2008 Walker, Jonathan

```
                IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF DELAWARE

        --------------------------------X

        DEUTSCHER TENNIS BUND (GERMAN

        TENNIS FEDERATION) and

        ROTHENBAUM SPORTS GMBH TENNIS,

        and QATAR TENNIS FEDERATION,

                    Plaintiffs,

              VS.                       Case No. 07-178-GMS

        ATP TOUR, INC., ETIENNE DE

        VILLIERS, CHARLES PASAELL,

        GRAHAM PEARCE, JACCO ELTINGH,

        PERRY ROGERS and IGGY JOVANOVIC,

                    Defendants.

        --------------------------------X


              DEPOSITION OF JONATHAN WALKER, Ph.D.

                      New York, New York

                      February 14, 2008


        Reported by:
        Bonnie Pruszynski, RMR
```

1

**2/14/2008 Walker, Jonathan**

```
 1                Jonathan Walker, Ph.D.
 2  tournament is going to be played in 2009?
 3       A     I have forgotten the -
 4       Q     Madrid is two weeks before the French
 5  Open.
 6       A     Okay.
 7       Q     And you know that that's when Hamburg
 8  has been played for many years, two weeks before
 9  the French Open?
10       A     Yes.
11       Q     Did you become aware that under the
12  deal that was made here that, in connection with
13  that particular deal, Madrid got put in Hamburg's
14  week?  Did you come to learn that in connection
15  with your work here?
16             MR. UNDERWOOD:  Object to the form of
17        the question.
18       A     It is my understanding that there was
19  a reshuffling, which included Madrid occurring in
20  time, in the same place that Hamburg occurs in
21  time today.
22       Q     All right.  With that hypothetical,
23  are there barriers -- strike that.
24             Are there barriers which would
25  effectively prevent Hamburg's ability to stage a
```

```
1               Jonathan Walker, Ph.D.
2    tournament during that same week at its same
3    facility in Hamburg, Germany.
4               MR. UNDERWOOD:  Object the form of
5       the question.
6       A       I think, again, if you want to talk
7    to sort of barriers in generic terms, sort of in
8    everyday layman's terms --
9       Q       I'm speaking in economic terms.
10      A       No.  There are no barriers to entry,
11   because consideration of barriers to entry
12   requires some consideration of a relevant
13   antitrust market, and entry into this market is
14   not limited to tennis tournaments.  So, when you
15   speak of barriers to entry into the market in
16   which the Madrid tournament competes or the
17   markets in which the Madrid tournaments compete, I
18   think you have got to look at all the potential
19   entrants and not just tennis tournaments.  So, no
20   there are no barriers to entry as a economist
21   would evaluate that term or interpret that term.
22      Q       Let's move from the theoretical to
23   the practical just for a minute if you don't mind,
24   and look, specifically, at Hamburg wanting to
25   compete for player services in the same week as
```