IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), ROTHENBAUM SPORT GMBH, and QATAR TENNIS FEDERATION,<br><br>Plaintiffs,<br><br>vs.<br><br>ATP TOUR, INC., ETIENNE DE VILLIERS, CHARLES PASARELL, GRAHAM PEARCE, JACCO ELTINGH, PERRY ROGERS, and IGGY JOVANOVIC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No.  07-178-GMS |

**MOTION FOR JUDGMENT AS A MATTER OF LAW
BY DEFENDANTS ETIENNE DE VILLIERS, CHARLES
PASARELL, GRAHAM PEARCE, JACCO ELTINGH,
PERRY ROGERS AND IGGY JOVANOVIC ON ALL
CLAIMS OF PERSONAL LIABILITY FOR DAMAGES**

*Of Counsel*:
PROSKAUER ROSE LLP
Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
1585 Broadway
New York, NY 10036-8299
212-969-3000

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Stephen R. Neuwirth
51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7100

Dated:  July 30, 2008

ASHBY & GEDDES
Philip Trainer, Jr. (I.D. #2788)
Tiffany Geyer Lydon (I.D. #3950)
Toni-Ann Platia (I.D. #5051)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
ptrainer@ashby-geddes.com
tlydon@ashby-geddes.com
tplatia@ashby-geddes.com

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

ARGUMENT....................................................................................2

I.  JUDGMENT AS A MATTER OF LAW IS PROPER DURING TRIAL ..............2

II.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO JUDGMENT
AS A MATTER OF LAW ON ALL SHERMAN ACT CLAIMS.........................3

III.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO JUDGMENT
AS A MATTER OF LAW ON CLAIMS FOR BREACH OF
FIDUCIARY DUTIES.......................................................................7

   A.  No evidence the individual defendants were interested or lacked
independence..........................................................................8

   B.  No evidence the individual defendants did not act in good faith,
lacked a rational business purpose, or were grossly negligent ..................12

IV.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO JUDGMENT
AS A MATTER OF LAW ON THE CLAIMS FOR CONVERSION AND
CONTRACTUAL INTERFERENCE ..................................................15

   A.  Individual directors cannot be liable for intentional interference
with contract..........................................................................15

   B.  No evidence of dominion or ownership by the Directors supports
Plaintiffs' conversion claims.......................................................16

CONCLUSION................................................................................17

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                       **Page**

*A & D Supermarkets, Inc., No. 2 v. United Food and Commercial
    Workers Local Union 880*, 732 F. Supp. 770 (N.D. Ohio 1989) ......................................3

*Alfred v. Caterpillar, Inc.*, 262 F.3d 1083 (10th Cir. 2001)....................................2

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533 (Del. 1996) ...................................16

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)................................................7, 14

*Bullen v. Chaffinch*, 336 F. Supp 2d 342 (D. Del. 2004)........................................2

*Cede & Co. v. Technicolor, Inc.*, 634 A2d 345 (Del. 1993) ..............................................8

*Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134 (Del. Ch. 1994),
    *aff'd*, 663 A.2d 1156 (Del. 1995) .......................................................8

*Drug, Inc. v. Hunt*, 168 A. 87 (Del. 1933) ............................................................16

*Eichorn v. AT & T Corp.*, 248  F.3d 131 (3d Cir. 2001).......................................3

*Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001)..........................................7, 8, 14, 15

*Flynn v. Bass Bros. Enterprises, Inc.*, 744 F.2d 978 (3d Cir. 1984)....................................2

*Gierlinger v. Gleason*, 160 F.3d 858 (2nd Cir. 1998)............................................2

*Goodwin v. Live Entertainment, Inc.*, 1999 WL 64265 (Del. Ch. Jan. 25, 1999)..............8, 9

*In re Emerging Communications, Inc. S'holders Litig.*, 2004 WL 1305745
    (Del. Ch. June 4, 2004) ...............................................................14

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005) ...........................12

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)................................7, 12

*McGowan v. Ferro*, 859 A.2d 1012 (Del. Ch. 2004).........................................16

*Murphy Tugboat Co. v. Shipowners and Merchant Towboat*, 467 F. Supp. 841
    (N.D. Cal. 1979), *aff'd*, 658 F.2d 1256 (9th Cir. 1981)............................................3, 6, 7

*President & Fellows of Harvard Coll. v. Glancy*, 2003 WL 21026784
    (Del. Ch. Mar. 21, 2003).................................................................8

## TABLE OF AUTHORITIES

**Cases**                                                          **Page**

*Reifert v. South Central Wisconsin MLS Corp.*, 368 F. Supp 2d 912
   (W.D. Wis. 2005)....................................................................................................3

*Shearin v. E.P. Hutton Group, Inc.*, 652 A.2d 578 (Del. Ch. 1994)...................................15

*Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971)...................................................12

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ......................................3

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999).............................................................................15

*Walter v. Holiday Inns, Inc.*, 985 F.2d 1232 (3d Cir. 1993) ...............................................2

*Young v. West Coast Indus. Relations Assoc., Inc.*, 763 F. Supp. 64 (D. Del. 1991) ........15

*Zirn v. VLI Corp*, 1989 WL 79963 (Del. Ch. July 17, 1989)............................................16


**Other Authorities**

15 U.S.C. §§ 1, 2 ............................................................................................................1, 3

Fed. R. Civ. P 50(a) .........................................................................................................1, 6

8 <u>Del.C.</u> § 102(b)(7)......................................................................................................7, 14

8 <u>Del.C.</u> § 141(a).............................................................................................................14

*9A Wright & Miller*, Federal Practice & Procedure §§ 2521, 2524 (3d ed. 1995) ..............2

## Introduction

Plaintiffs failed in their case-in-chief to adduce evidence from which the jury could reasonably find personal liability as to any of the six individual Defendants, all present or former directors of ATP Tour, Inc. These individual Defendants accordingly seek judgment as a matter of law under Fed. R. Civ. P. 50(a) as to all claims seeking to hold them personally liable.

Application of Rule 50(a) is appropriate in the midst of a trial if plaintiffs have failed to meet the legal requirements for liability. *See* Point I, *infra*. That is the case here, where application of Rule 50(a) is necessary to ensure both fairness and efficiency.

First, to establish personal liability of directors under the antitrust laws, the Plaintiffs needed to demonstrate that the directors *knowingly* participated in a *per se* Sherman Act violation. Plaintiffs have not come close to meeting this heavy burden. Plaintiffs adduced no evidence that any of the directors knowingly violated the antitrust laws, let alone a *per se* violation. The evidence showed that Defendants' conduct was not only authorized by the ATP Bylaws, but also was encouraged by Plaintiffs themselves. The individual Defendants, therefore, are entitled to judgment on Counts I – IV of the First Amended Complaint. *See* Point II, *infra*.

Second, as to Plaintiffs' fiduciary duty claims, Delaware law is clear that the Directors' conduct in this case is protected by the business judgment rule. Plaintiffs could only have overcome the business judgment rule presumption by making a threshold showing that the individual Defendants acted in bad faith, with gross negligence, without a rational business purpose, or with self-interest. Plaintiffs utterly failed to meet this threshold burden, and thus individual Defendants are entitled to judgment on Counts V – VII. Since the burden under Delaware law only shifts to director defendants if plaintiffs first overcome the business judgment

rule presumption, it would be unjust to leave this issue unresolved and force the individual Defendants to defend against a *prima facie* case Plaintiffs never established. *See* Point III, *infra*.

Finally, Plaintiffs' claim for contractual interference (Count VIII) is precluded because directors acting within their organizational role cannot be liable for inducing a breach of contract. The conversion claims similarly fail, as there is no evidence the individual Defendants exercised personal dominion over a property interest of Plaintiffs (Count IX). *See* Point IV, *infra*.

**Argument**

**I.**    **JUDGMENT AS A MATTER OF LAW IS PROPER DURING TRIAL.**

Rule 50(a) "is conceived as a device to save the time and trouble involved in a lengthy jury determination where there is clear insufficiency on one side of the case or the other." *See 9A Wright & Miller*, Federal Practice & Procedure § 2521 (3d ed. 1995), citing *Flynn v. Bass Bros. Enterprises, Inc.*, 744 F.2d 978 (3d Cir. 1984); *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083 (10th Cir. 2001). A court may grant a Rule 50(a) motion at any time during trial. *Gierlinger v. Gleason*, 160 F.3d 858, 869 (2nd Cir. 1998); *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1234 (3d Cir. 1993) (affirming district court's ruling, "[a]fter plaintiffs presented their case, [granting] Holiday's motion for judgment as a matter of law on the breach of fiduciary duty claim").

The question under Rule 50 "is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party." *9A Wright & Miller*, Federal Practice & Procedure §2524 (3d ed. 1995); see *Bullen v. Chaffinch*, 336 F. Supp 2d 342, 346 (D. Del. 2004).

## II.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL SHERMAN ACT CLAIMS.

Organizational agents, such as corporate directors, are subject to far more limited antitrust liability than the organization itself. *See, e.g., Murphy Tugboat Co. v. Shipowners and Merchant Towboat*, 467 F. Supp. 841 (N.D. Cal. 1979), *aff'd*, 658 F.2d 1256 (9th Cir. 1981). Agent antitrust liability is limited "to cases of participation in inherently wrongful conduct" – that is, conduct *per se* unlawful under the Sherman Act. *Id*. at 852-53. To hold organizational agents to a higher standard would be unduly harsh, since the behavior "proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct." *Id*. at 853 (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 440 (1978)); *see also A&D Supermarkets, Inc., No. 2 v. United Food and Commercial Workers, Local Union 880*, 732 F. Supp. 770 (N.D. Ohio 1989) (citing *Murphy* and dismissing Sherman Act claims against individual officers where plaintiff did not make particularized allegations of knowingly wrongful conduct).[1]

According to the Third Circuit, a *per se* violation involves "agreements whose nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 138 (3d Cir. 2001).

Plaintiffs here failed to introduce any evidence of an agreement so plainly anticompetitive as to constitute a *per se* antitrust violation. Plaintiffs also failed, in any event, to introduce evidence that *any* of the individual defendants knowingly engaged in such a violation. Plaintiffs did not even ask any questions from which such evidence could have been adduced.

---

[1]    *See also Reifert v. South Central Wisconsin MLS Corp.*, 368 F. Supp 2d 912, 914 (W.D. Wis. 2005) ("individuals who ratify unlawful corporate acts may escape liability if, under all the facts and circumstances it is not clear that the conduct was unlawful per se").

Plaintiffs' case also brought out substantial evidence inconsistent with any knowing antitrust violation by the ATP directors. For example, the evidence showed that the ATP Bylaws expressly authorized the Board to re-categorize tournaments and to increase or decrease the player commitment requirements set forth in the ATP Tour rules. *See* Trial Tr. 1216:18-1217:18. In setting the player commitment rules under the Brave New World plan (the "BNW" or the "Plan"), the Directors relied on this authority. *Id.* 1217:16-18. The evidence showed that Plaintiffs entered into a contract expressly acknowledging that "the dates on which the [Hamburg] tournament is held and the classification of the tournament . . . are determined by ATP *in its sole discretion.*" *Id.* 632:22-633:10 (emphasis added); *see also id.* 607:4-9 (Plaintiffs understood ATP's authority to reclassify tournaments and adjust the tournament schedule).

The evidence also showed that Plaintiffs themselves encouraged ATP to adopt most of the features of the Brave New World plan. Walter Knapper, Hamburg tournament director, agreed in a 2006 letter to the ATP that "the strength of the Masters Series concept is vital to the success of the ATP Tour" and that "the survival and growth of the Masters Series entity is the lynchpin to the future success of the ATP Tour." DTX 745; *see also* Trial Tr. 574:3-6 and 574:23-25. That letter, signed by Mr. Knapper, also "commended [the ATP] for having the courage to maintain [its] insistence that meaningful reform is impossible without a revised calendar." DTX 745; *see also* Trial Tr. 577:19-21. Recognizing that "changes are long overdue," the letter contemplated a decrease in the Masters Series to eight members and "a mandatory player commitment for ALL of the events." DTX 745; *see also* Trial Tr. 574:19 and 579:7-11.[2] Mr. Knapper asserted in the letter that "the mandatory commitment is so integral to

---

[2] Mr. Steeb acknowledged as well that his view has been that penalties should be much stiffer to ensure that players fulfill their player commitments. *See* Trial Tr. 1285:1-4.

the identity of the Masters Series that any dilution thereof will be disastrous," *id*. 580:24-581:1;

DTX 745, and "there must be a significant and meaningful dichotomy between the Masters

Series and the next level of ATP event in terms of ranking and points." DTX 745; *see also* Trial

Tr. 580:24-581:1 and 585:21-23. Plaintiffs thus themselves recognized at that time that

"Hamburg was at least a possibility to be in the second tier," Trial Tr. 577:7-13, and Plaintiffs

"understood from the beginning that any reforms are bound to leave some stakeholders unhappy,

or even compromised," *id*. 578:3-5.

Plaintiffs' case also confirmed that the Directors had legitimate business reasons for their

decisions regarding the Hamburg tournament. Mr. Pasarell, for example, explained that he

considered the applications of Hamburg, Rome and Madrid for an event during week 18, and

concluded that Rome had the best application because (among other things) it offered a

combined men's and women's event. In his judgment, Mr. Pasarell believed that tennis was

unique among professional sports in permitting fans to see both men and women, and that

combined events would draw the greatest fan interest. *See* Trial Tr. 1248:25 – 1250:15. Mr.

Jovanovic similarly reviewed the applications and concluded, in his judgment, that Rome was

the best: "[T]hey had this fantastic application which showed how they were going to grow their

site, how they were going to update their site. It was going to be exactly what we had been

asking for in the Brave New World, which was top players playing top events in top venues.

And Rome fit that bill." *Id*. 1092:9-14. By contrast, in Mr. Jovanovic's judgment, the Hamburg

application, "[i]n a nutshell, didn't make the cut, in my opinion." *Id*. 1092:24-25. Mr. Jovanovic

noted the "limitations of what [Hamburg] could do" and the "players' reactions to Hamburg in

the past." *Id*. 1093:1-9. Mr. Jovanovic explained that he believes Hamburg can be successful

with a summer clay court tournament, as contemplated by the BNW plan, noting that many

5

European clay court players would want to take advantage of that opportunity. *Id.* 1093:17-1094:7. Mr. Steeb admitted he played summer clay tournaments precisely because he was a "clay court player." *Id.* 1283:2-20.

In addition, PTX 1375, introduced by Plaintiffs' during Mr. Steeb's testimony, showed that Germany ranked low in television coverage. *See* PTX 1375; Trial Tr. 1277:8 – 1279:16. DTX 781 not only showed that Hamburg's gate receipts have been down, but also that Hamburg had been overstating its seating capacity. DTX 781; Trial Tr. 1287:10 – 1290:10. Mr. Steeb also testified as to factors that players used to decide at which tournaments to play, *see id.* 1257:1-17, and these overlapped with the factors the ATP Board considered in evaluating the tournaments to be placed in different tiers in the BNW plan. Mr. de Villiers also described the factors about the Hamburg market -- television opportunities, weather, etc. -- that he had considered, as well as the various factors -- stadium, combined events, fan support -- that figured in acceptance of Madrid's application for a combined event. *See* de Villiers 7/30 Trial Testimony.

The record thus confirmed Plaintiffs' contemporaneous recognition of legitimate business purposes supporting the BNW plan. Plaintiffs presented no evidence of any knowing purpose to violate the antitrust laws.[3] The record here is thus similar to that in *Murphy Tugboat*, where the Court granted a J.N.O.V. motion:

> While [the individual defendant] must be assumed, as chief executive officer, knowingly to have approved or ratified the policy of refusing to work vessels with competitors, that policy also cannot be said to be inherently wrongful. It violates no *per se* prohibition, is supported by legitimate business considerations, and is simply evidence of monopolization or an attempt to monopolize when viewed in the light of all the surrounding facts and circumstances. In the absence of

---

[3] To the extent one ATP board member had raised purported antitrust concerns (PTX 36), Mr. de Villiers confirmed he had addressed these concerns with counsel, and, in any event, the board member's letter is insufficient to establish any knowing effort by the directors to engage in a *per se* violation of U.S. antitrust law.

evidence of knowing approval of inherently wrongful acts, [he] cannot be held personally liable for the corporate defendants' violation of Section 2.

467 F. Supp. at 853-54.

## III.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON CLAIMS FOR BREACH OF FIDUCIARY DUTIES.

Delaware's business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *see also In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006).

To avoid application of the rule, the Plaintiffs bear an initial burden to prove the Directors "are interested or lack independence relative to the decision, did not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Id.*; *Emerald Partners*, 787 A.2d at 91. Only if a plaintiff meets its threshold burden must the defendant then demonstrate that the conduct at issue was "entirely fair" to the corporation and its shareholders. *Disney*, 906 A.2d at 52. As shown below, Plaintiffs here failed to meet their threshold burden.

At the same time, even were the Court to conclude that Plaintiffs successfully rebutted the presumption of the business judgment rule by establishing a potential violation of the duty of care, ATP's Certificate of Incorporation contains a provision, in accordance with 8 *Del. C.* § 102(b)(7), that exculpates the individual Defendants, as a matter of law, from any monetary liability. Indeed, the Delaware Supreme Court has explained that where the plaintiff has only presented evidence of a potential duty of care violation, the existence of a Section 102(b)(7) charter provision obviates the need for a trial "even if the presumption of the business judgment

7

rule is rebutted" by that claim. *Emerald Partners*, 787 A.2d at 92. Thus, it is entirely proper and, in fact, necessary for the Court to grant the motion of the individual Defendants even if it were to conclude that their conduct resulted in a violation of the duty of care.

### A.    No evidence the individual defendants were interested or lacked independence.

To show director self-interest or lack of independence, a plaintiff must make two showings. First, the plaintiff must establish that the directors had material self-interests in the challenged transaction. *Goodwin v. Live Entertainment, Inc.*, 1999 WL 64265, at *25 (Del. Ch. Jan. 25, 1999); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993). The Delaware courts define "material" to mean that "the alleged benefit was significant enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform his duties." *President & Fellows of Harvard Coll. v. Glancy*, 2003 WL 21026784, at *21 (Del. Ch. Mar. 21, 2003) (internal quotations omitted). Materiality is to be determined under the subjective "actual person" standard: "Under such a test of materiality the court would be required to determine *not* how or whether a reasonable person in the same or similar circumstances of exercising a corporate responsibility would be affected by a financial interest of the same sort as present in the case, but whether *this* director in fact was or would likely be affected." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1151 (Del. Ch. 1994) (emphasis in original), *aff'd*, 663 A.2d 1156 (Del. 1995). This standard requires examination of whether the allegedly conflicted director had "some special characteristic that [made] him…especially susceptible to or immune to opportunities for self-enrichment or…evidence that [any of such directors] in fact behaved differently in this instance than one would expect a reasonable person in the same or similar circumstances to act." *Cinerama*, 663 A.2d at 1167 (quoting the lower court's decision, 663 A.2d at 1151).

Second, the plaintiff must also show that the materially self-interested members either: "a) constituted a majority of the board; b) controlled and dominated the board as a whole; or (c) (i) failed to disclose their interests in the transaction to the board; and (ii) a reasonable board member would have regarded the existence of their material interests as a significant fact in the evaluation of the proposed transaction." *Goodwin*, 1999 WL 64265, at *25. "Absent such a showing, the mere presence of a conflicted director or an act of disloyalty by a director, does not deprive the board of the business judgment rule's presumption of loyalty." *Id.*

Here, Plaintiffs have failed to satisfy this two-part standard, apparently believing that the mere allegation of a non-material, unrelated interest is sufficient to meet their burden. To the extent that Plaintiffs adduced evidence indicating that Mr. de Villiers received bonuses, or could receive them in the future, Plaintiffs never showed – nor could they – that Mr. de Villiers would receive any bonus from the adoption of the BNW plan itself. *See, e.g.,* Trial Tr. 644:11 – 645:17 (no connection between bonus and adoption of BNW). In fact, Mr. de Villiers testified that he wanted to forego any incentive compensation in connection with adoption of the BNW plan, as reflected in his memo to the ATP board compensation committee (PTX 229) asking that he not receive any incentive compensation for 2007. *See* de Villiers 7/30 Trial Testimony. Mr. de Villiers also has no absolute right to receive any such bonus in subsequent years.[4]

Nor did Plaintiffs present any evidence that any bonuses were, in the context of Mr. de Villiers' annual income and net worth, "of such value to have made it difficult for him to examine" the BNW plan "on the basis of its merits." *See Goodwin*, 1999 WL 64265, at *26. To

---

[4] To the extent that Mr. de Villiers received a "bonus" between $100,000 and $200,000 for his work as an officer of the ATP in 2006, *id.* 645:6-21, Mr. de Villiers accepted the bonus as part of the ATP's existing compensation plan, which is calculated based on the incremental revenues of the organization during that particular year.

the contrary, Mr. de Villiers explained that he had been fortunate at Disney and did not take the ATP job for money, and the evidence in Plaintiffs' direct case showed that Mr. de Villiers' work in connection with the BNW was "for the right reasons and that [his] compensation is independent of and not affected by any action [he took]." Trial Tr. 644:21-25.

To the extent Plaintiffs adduced evidence that Mr. Jovanovic had an arrangement with an ATP member, Tennis Canada, beginning in July 2007, whereby he was compensated for introducing Emirates Airlines as a sponsor, *id.* 976:22-25; 977:1-20, the record was equally clear that Tennis Canada's position as a 1000 level event under the Plan had already been established in advance of Mr. Jovanovic's even joining the ATP Board in January 2006. *Id.* 1088:2-8. Mr. Jovanovic would not receive any increased revenue that might accrue to Tennis Canada pursuant to the BNW plan. *Id.* 1091:5-11. Nor could Mr. Jovanovic's contract from July 2007 have influenced any of his votes months earlier in January 2007. To the extent Mr. Jovanovic acted as a consultant to the Abu Dhabi Tennis Authority, he did not share any information learned as an ATP board member, *see id.* 986:18 – 994:21, and at the time of Mr. Jovanovic's July 21, 2007 presentation to Abu Dhabi, the Qatar Tennis Federation had not even submitted its application for the Doha Tournament to become a 500 series event under the Plan. *Id.* 1084:17-22.

Mr. Jovanovic was paid $12,500 in 2007 by Tennis Canada, *id.* 982:24, and conceivably could earn a maximum of $45,000 in 2008, *id.* 1089:13-18. And Mr. Jovanovic was paid approximately $28,000 to $30,000 for his work with Abu Dhabi. *Id.*1000:20-21. But, Mr. Jovanovic testified that, while these amounts are significant, they were not material to his overall financial condition. *See, e.g., id.* 1090:12-22.

As to Mr. Pasarell, there was no evidence that his 22% ownership interest in the Indian Wells tournament, *id.* 1133:6-8, gave him a direct financial interest in the BNW plan. What the

evidence showed is that Mr. Pasarell's ownership interest in Indian Wells pre-dated his membership on the ATP Board, *id.* 1131:12-16; that four years before any consideration of the BNW plan, the Indian Wells tournament and ATP had entered into an agreement, preserving the tournament's top tier sanction for 51 years, as a means to facilitate loans for the construction of a new Indian Wells tennis stadium, *id.* 1168:21-25 and 1215:13-18; and the Indian Wells tournament was already successful without the benefits of the BNW plan. *Id.* 1212:7-11; *see also id.* 1187:22-1188:13 (during each of the last 10 to 12 years, on average, 9.2 of the top 10 tennis professionals have participated in the Indian Wells tournament, and only three tournaments – including two grand slams – have a higher average); *id.* 1209:22-25 (Indian Wells has the largest attendance of any non-Grand Slam event in the world). Thus, when Mr. Pasarell voted in favor of the BNW plan, he did not do so "because I thought it was going to help Indian Wells. Indian Wells did not need any help." *Id.* 1191:9-16. Rather, he voted for the BNW plan because "I wanted to make sure that more tournaments had the same kind of success that both Miami and Indian Wells have had. I wanted to make sure the other Masters Series would also get the same kind of player participation, and that was really what motivated most of my votes." *Id.* 1195:19-24. Mr. Pasarell also explained that he supported Rome's application for week 18 over Hamburg, even though one could argue that a combined event in Rome could create some competition for the combined event at Mr. Pasarell's Indian Wells tournament. Mr. Pasarell testified that he nonetheless felt a combined Rome event would benefit tennis and the ATP. *Id.* 1250:16-25.

In any event, Plaintiffs failed to show that Messrs. de Villiers, Jovanovic and Pasarell

(who did not constitute a majority of the board) controlled or dominated the board as a whole.[5]

Nor did Plaintiffs show that these directors failed to disclose their interests to the board *and* that

a reasonable board member would have regarded the existence of their interests as a significant

fact in the evaluation of the Plan.  To the extent that Director Jovanovic's arrangement with

either the Canadian tournament or Abu Dhabi was not disclosed to every director,[6] Plaintiffs

failed to establish that either agreement would have been a significant fact in the board's

evaluation of the proposed transaction.  *See* Trial Tr. 1247:5-12 (Mr. Jovanovic's contracts with

Tennis Canada and the Abu Dhabi Tennis Authority made no difference on how Mr. Pasarell

voted on the BNW plan).  Plaintiffs have not even suggested that the alleged "interests" of

Messrs. Pasarell and de Villiers were not disclosed to the ATP Board.

**B.     No evidence the individual defendants did not act in good faith, lacked a
rational business purpose, or were grossly negligent.**

Plaintiffs offered no evidence at trial establishing bad faith;[7] lack of a rational business

purpose;[8] or gross negligence.[9]  Those individual Defendants the Plaintiffs did call testified that

---

[5] Indeed, the ATP Board is composed of seven directors, six of whom voted in favor of the BNW plan.  Director Franulovic voted against its adoption – a further indication of the lack of control or domination of the Board by any particular member.

[6] Mr. Jovanovic testified that he did disclose the Abu Dhabi contract to the board members.  *See* Trial Tr. 1108:14-18.

[7] Bad faith in this context requires, for example, evidence that "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *Disney,* 906 A.2d at 67.

[8] "A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose."  *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

[9] Delaware courts define gross negligence to mean "reckless indifference to or a deliberate disregard of the stockholders" or actions that are "without the bounds of reason."  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005).

they acted in good faith, in what they understood to be the interest of the ATP and its constituents, and for legitimate business purposes.

By way of example, Mr. de Villiers explained the various business reasons for pursuit of the BNW plan. *See* de Villiers 7/30 Trial Testimony. Mr. Rogers testified that based on the research conducted by the ATP and the members of its Board, the structure of the Plan "was intended to provide a more predictable product [*i.e.* tennis] for the sponsors and broadcasters." Trial Tr. 712:16-17. Mr. Jovanovic testified that the Board, relying on extensive research, concluded that when looking on a global scale, compared to other sports, "we were falling behind . . . ." *Id.* 1068:8-14. The conclusions of the research were further supported by Mr. Jovanovic's approximately 20 weeks of travelling around the world interviewing players. *Id.* 1073:6-12; *see also* PTX 1059. The Plan, among other things, organized the ATP events around the four Grand Slam tournaments, Trial Tr. 1069:1-4, increased player prize money and bonus pools, *id.* 1069:13-1070:7, and established profit sharing for television revenues, *id.* 1070:11-20.[10] Mr. Pasarell explained that under the BNW, "if the tour grows, I think the Masters Series, the 500s and even the 250s will increase the value, because the tour will get bigger. The sport will get bigger. It is the concept of the rising tide. Everybody grows." *Id.* 1190:2-8.

---

[10] Similarly, in evaluating the applications of Doha and Dubai for membership as a 500 level event, the ATP Board considered a number of objective factors relevant to its selection, including the attendance records at each arena, Trial Tr. 928:20-25, the marketing and promotion plans for the tournaments, *id.* 933:21-934:4, and the awards received by the tournaments from the ATP, *id.* 938:8-16. The record establishes a number of variances significant to the evaluation process, including a difference of more than 3 times the number of people in attendance, *id.* 936:12-17, and the difference in the number of awards received by each tournament, with Doha receiving just 1 award compared to Dubai's receipt of 18 awards during the same period of time, *id.* 938:8-16.

As discussed above, moreover, virtually all of the elements of the BNW were expressly authorized by the ATP Bylaws and/or reflected the principles and approaches encouraged by the tournament directors, including the director of the Hamburg tournament. *See* pp.4-5, *supra*. Mr. de Villiers explained the large amounts of time the board spent considering elements of the BNW plan. *See* de Villiers 7/30 Trial Testimony.

Mr. Knapper's own testimony confirmed that Plaintiffs' dispute with the ATP is, in the end, a disagreement of judgment, and Mr. Knapper noted that there "not always can be agreement on everything." Trial Tr. 601:10-16. Delaware law, however, does not recognize a cause of action for breach of fiduciary duty where the plaintiffs merely disagreed with the judgment of the directors. Indeed, directors of Delaware corporations are charged with the task of managing "the business and affairs of every corporation organized under" its laws. 8 *Del. C.* § 141(a). Here, Plaintiffs have failed to meet their threshold burden to overcome the presumption that the Directors exercised their judgment in good faith and for a proper purpose. *Aronson*, 473 A.2d at 812.

At the same time, Delaware law compels dismissal of the claims for individual liability against Directors Eltingh, Rogers and Pearce, who are not even alleged to have acted with any self-interest or lack of independence. The Delaware Court of Chancery has explained that "the liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability [under their charter's section 102(b)(7) provision] for that breach, can vary for each director." *In re Emerging Communications, Inc. S'holders Litig.*, 2004 WL 1305745, at \*38 (Del. Ch. June 4, 2004). The Delaware Supreme Court similarly explained in *Emerald Partners v. Berlin* that "in actions against the directors of Delaware corporations with a Section 102(b)(7) charter provision," where

the plaintiff has only presented evidence of a potential duty of care violation (and insufficient evidence to establish violations of the duty of loyalty or good faith), the proper invocation of such a provision can obviate the need for a trial. 787 A.2d 85, 92 (Del. 2001). This is true "even if the presumption of the business judgment rule is rebutted by a duty of care violation, since liability for duty of loyalty violations or violations of good faith are not at issue." *Id.*

Thus, even were this Court to determine that the decision to adopt the BNW plan is not entitled to the presumption of the business judgment rule (and thus evaluated under the more strict "entire fairness" standard of review), each director's conduct must be evaluated on an individual basis. It is indisputable that Plaintiffs have failed to present any evidence with respect to any alleged self-interest or lack of care on the parts of Messrs. Eltingh, Rogers and Pearce. Even if their approval of the BNW could be considered a violation of their duty of care, the ATP's 102(b)(7) charter provision protects each of the Defendants from any monetary liability.

## IV.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE CLAIMS FOR CONVERSION AND CONTRACTUAL INTERFERENCE.

### A.  Individual directors cannot be liable for tortious interference with contract.

"[E]mployees acting within the scope of their employment are identified with the defendant himself so that they may ordinarily advise the defendant to breach his own contract without themselves incurring liability in tort. This rationale is particularly compelling when applied to corporate officers as 'their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability.'" *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1182-83 (Del.Ch. 1999) (quoting *Young v. West Coast Indus. Relations Assoc., Inc.*, 763 F. Supp. 64, 77 (D. Del.1991); *see also Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994) (stating directors cannot be held

15

personally liable for inducing a breach of contract by their corporations when they act within their role).

Here, Plaintiffs have failed to adduce any evidence to suggest that the individual Defendants acted outside their role as directors of ATP in approving the BNW plan. Accordingly, the directors cannot, as a matter of law, be held personally liable for tortious interference with contract.

**B.    No evidence of dominion or ownership by the Directors supports Plaintiffs' conversion claims.**

"[C]onversion requires that, at the time of the alleged conversion: (a) plaintiff held a property interest in the [property]; (b) plaintiff had a right to possession of the [property]; and (c) the defendant converted plaintiff's [property]." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996) (citing *Drug, Inc. v. Hunt,* 168 A. 87, 93-94 (Del. 1933)). Conversion requires a showing of an "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *McGowan v. Ferro,* 859 A.2d 1012, 1040-41 (Del. Ch. 2004) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 678 A.2d 533, 536 (Del. 1996)). Far from being inconsistent with any right Plaintiffs may have held in their ATP memberships, the individual Defendants acted in accordance with the powers granted to them by ATP's Bylaws, *see, e.g.,* Trial Tr. 1215:1-8; 1216:14-1217:18, a power specifically acknowledged by DTB upon its sale of a 25% interest in the Hamburg Tournament to QTF, *id.* 632:22-633:10.

Because Plaintiffs did not present any evidence that the individual Defendants committed any "wrongful act of dominion over [Plaintiffs' property]," or that Plaintiffs had "any right to an interest in" an ATP Membership level, the conversion claim here is precluded as a matter of law. *McGowan*, 859 A.2d at 1041. This claim also fails because Plaintiffs presented no evidence that any individual Defendant ever asserted an ownership interest over any of Plaintiffs' property. *Zirn v. VLI Corp.*, 1989 WL 79963, at *11 (Del. Ch. July 17, 1989)

(conversion claim fails as a matter of law where evidence demonstrated that "the individual directors never asserted any type of ownership interest" over plaintiff's property).

### Conclusion

For the foregoing reasons, individual Defendants Etienne de Villiers, Charles Pasarell, Graham Pearce, Jacco Eltingh, Perry Rogers and Iggy Jovanovic respectfully request that the Court enter judgment as a matter of law in their favor as to all claims seeking individual liability.

Dated: July 30, 2008

ASHBY & GEDDES

/s/ Philip Trainer, Jr.
_____
Philip Trainer, Jr. (I.D. #2788)
Tiffany Geyer Lydon (I.D. #3950)
Toni-Ann Platia (I.D. #5051)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
tlydon@ashby-geddes.com
tplatia@ashby-geddes.com

PROSKAUER ROSE LLP
Bradley I. Ruskin
Colin A. Underwood
Jennifer R. Scullion
Evan S. Greene
1585 Broadway
New York, NY 10036-8299
Phone: (212) 969-3000

Attorneys for Defendants

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Stephen R. Neuwirth
51 Madison Avenue, 22nd floor
New York, NY 10010
Phone: (212) 849-7100

Attorneys for Defendants Rogers and Eltingh