IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION) et al., <br><br> Plaintiffs, <br><br> v. <br><br> ATP TOUR, INC. et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 07-178-GMS <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW
AS TO RELEVANT PRODUCT AND GEOGRAPHIC MARKETS**

Dr. Zimbalist utilized appropriate, well-established methodology. Attacks on Dr. Zimbalist's choice of alternative products and the geographic range in which they are found go to the weight of his testimony, not its admissibility. Further, exclusion of Dr. Zimbalist is not an appropriate sanction, as Defendants have suffered no prejudice. Finally, even if Dr. Zimbalist is excluded, Plaintiffs' Section 1 antitrust claims survive because Defendants have committed *per se* violations of the Sherman Act.

**I.     Dr. Zimbalist Utilized Appropriate Methodology.**

The parties and experts agree that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). In making this determination, economists should utilize the "smallest market principle." Federal Trade Commission & U.S. Department of Justice Commentary on the Horizontal Merger Guidelines (2006) (the "Guidelines") That is, as the Merger Guidelines provide, a "relevant

1

market is a group of products and a geographic area that is no bigger than necessary to satisfy [the hypothetical monopolist] test." Guidelines, §1.0; Commentary, 6.

Pursuant to this principle, an economist should, as a matter of process, start with an hypothesis as to what constitutes the smallest possible market. The economist should then create an educated hypothesis as to what the closest substitute to this product might be and then test whether this product is, in fact, a substitute product. Pursuant to this methodology, "[a]gencies frequently conclude that a relatively narrow range of products or geographic space within a larger group describes the competitive arena within which significant anticompetitive effects are possible." Commentary, 6.

This is exactly what Dr. Zimbalist did.[1] He identified a reasonable, prospective market – that for top tier men's professional tennis. (Tr. 1314 - 15) (He followed the Guidelines). Then based on his knowledge of the relative industry, as developed via his own expertise and his review of the record evidence, he developed a hypothesis as to that product's closest substitute – second-tier men's professional tennis. (Tr. 1315). He then tested, via an application of qualitative and quantitative indicia, whether this product was a substitute, concluding that it was not. (Tr. 1318). This is appropriate methodology.

Dr. Zimbalist did not and could not practically have continued his analysis to test all possible substitutes. Such testing is not necessary: "[d]efining markets under the Guidelines' method does not necessarily result in markets that include the full range of functional substitutes from which customers choose." Commentary, 6. Accordingly, Dr. Zimbalist utilized

---

[1] Though Defendants' expert utilized substantially identical methodology to evaluate the existence of markets, i.e., qualitative and quantitative indicia, he actually started with the largest possible market – that for entertainment generally. As such Dr. Zimbalist's methodology more closely follows that established by the Guidelines.

appropriate methodology. Challenges to its application go to the weight, not the admissibility, of his testimony.

Similarly, the geographic market is described as the economically significant area of effective competition in which the relevant products are traded. *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381, 1392 (9th Cir. 1983). Like the NFL in *Los Angeles Memorial Coliseum Commission*, the ATP "has limited substitutes from a consumer standpoint." *Id.* Accordingly, "given the exceptional nature of the industry," a "precise market definition" is "especially difficult." *Id.* at 1394. Given these realities, Dr. Zimbalist made reasonable and appropriate geographic market determinations, *i.e.*, that the market for live tennis was local and regional, but that the markets for player services and sanctions were global. (Tr. 1460).

## II.    Even If Dr. Zimablist Is Excluded, Plaintiffs Maintain Section 1 Antitrust Claims.

Section 1 of the Sherman Act provides, "Every contract, combination in for form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. To prevail on a Section 1 claim, Plaintiffs need only prove that Defendants (1) participated in an agreement that (2) unreasonably restrained trade in the relevant market. *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998) ("*Law II*") (citations omitted).

Two analytical approaches are used to determine whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason. *Id.* The *per se* rule condemns practices that are entirely void of redeeming, competitive rationales." *Id.* (internal citations omitted). Once a practice is identified as illegal *per se*, a court need not examine the

practice's impact on the market or the procompetitive justifications for the practice advanced by a defendant before finding a violation of the antitrust law. *Id.*

The division of markets by horizontal competitors is *per se* illegal: "because of the deleterious effects of such agreements on competition and because of the lack of economic justifications for such agreements, it is *per se* unlawful under Section 1 of the Sharman Act for competitors who operate on the same level of distribution to agree among themselves on an allocation or division of markets." *American Motors Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1242 (3d Cir. 1975). The allocation of territories in order to minimize competition is a "classic example" of a *per se* violation. *United States v. Topco Assoc.*, 405 U.S. 596, 608 (1972).

In this instance, Defendants have engaged in the division of markets and territories (both geographic and "weeks" which are the "spine" of the tennis market. (*See, e.g.*, de Villiers, Tr. 1624-25). For example, they have divided calendar "territories" with the International Tennis Federation and the Grand Slams Committee to avoid competition with these entities, who they admitted, in their opening statement, are horizontal competitors of the ATP Tour, Inc. ("ATP"). (*See, e.g.*, PX1499, PX1500, PX432, PX716). Additionally, Defendants have divided up the market for player services. (*See, e.g.*, Rogers, Tr. 714:7 – 716:2, 717:19 – 717:24, 718:1 – 718:5; Pasarell, Tr. 1195:22 – 1195:24, 1212:7 – 1212:16; de Villiers, Tr. 1527:2 – 1527:11; Franulovic, 1703:23 – 1705:1; PX36). Finally, they have divided markets via agreements with the Women's Tennis Association. (de Villiers, Tr. 1642:16 – 1642:21) ("One of the first things I did was to talk to my colleague and competitor at the WTA and say, what are your plans? Where do you think you are going?").

Additionally, horizontal price-fixing is normally a practice condemned as illegal *pe se*. *Id.* At 1017; *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 436 n. 19 (1990) ("horizontal price fixing ... has been consistently analyzed as a *per se* violation for many years"). The Defendants have engaged in horizontal price fixing. Evidence has shown that Defendants have established and set the prize money paid by ATP Tournaments (*see, e.g.*, PX 1493); precluded ATP Masters Series Tournaments from paying guarantees, explicitly to keep them from competing with one another (; and, that the higher tier ATP Tournaments pay the lowest prize money to top players (*see, e.g.*, PX 1493; von Waldenfels, 401:13 – 401:19). It is the hallmark of a monopsony that it pays lower prices than the market would otherwise bear.[2] Masters Series Tournaments pay approximately $550,000 to Roger Federer to pay approximately 5 competitive matches. *Id.* Lower tier tournaments pay considerable appearance fees just to appear at their tournament. (Azmy, Tr. 909, 914:2 – 914:4). Special events pay over $1 million for Mr. Federer to play one non-competitive match. This is evidence of price fixing by a monopsony.

Finally, the ATP's reduction of output is *per se* illegal. According to one commentator, a truncated antitrust analysis remains applicable to "concerted refusals that upon brief inspection are unlikely to have any purpose other than the reduction of market output and attendant price increases. In that case, condemnation is in order without any inquiry into [market] power." Herbert Hovenkamp, Antitrust Law, ¶ 2203(a) (1999); *see e.g., Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc.* 227 F.3d 62, 74 (3rd Cir. 2000). There is evidence sufficient to go to

---

[2] The Defendants control both the consumer and producer aspects of this market. Via legislative fiat, they "channel" the players to certain tournaments while simultaneously setting the compensation those tournaments can pay to avoid any competition amongst them. Given this reality, Plaintiffs, non-cartel tournaments, have been injured and are proper party before the Court, as has been locked out of this market by Defendants, thereby causing them injury.

the finder of fact that the ATP has reduced the number of top-tier tournaments and has otherwise reduced output in markets relating thereto. (*See, e.g.*, de Villiers, Tr. 1526 – 1527).

Each of these actions would constitute *per se* violations of the Sherman Act. "However, the Supreme Court recognized in *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 23 (1979), that certain products require horizontal restraints ... to exist at all." *Law II*, 134 F.3d at 1017. Generally, courts have held that sports entities are such industries. *See, e.g., NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984). Within these industries, even *per se* violations are subject to a rule of reason analysis. *Law II*, 134 F.3d at 1020.

"No 'proof of market power' is required under this analysis, however, where the very purpose and effect of the challenged conduct is anticompetitive. *Id.*; *Board of Regents*, 46 U.S. at 110. "Thus, where a practice has obvious anticompetitive effects – as does price fixing [and horizontal market division] – **there is no need to prove that the defendant possesses market power**." *Law II* 134 F.3d at 1020 (emphasis added). "Rather, the court is justified in proceeding directly to the question of whether the procompetitive justification advanced for the restraint outweighs the anticompetitive effects under a 'quick look' rule of reason." *Id.*; *Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n*, 961 F.2d 667, 674 (7th Cir. 1992) (approving application of "quick look" rule of reason analysis that dispensed with market definition and assessment of market power in a case involving an output restriction established by the National Basketball Association).

Under this analysis, therefore, the court moves directly to an analysis of the defendant's proffered competitive justifications for the restraint because no elaborate industry analysis is necessary to reveal the anticompetitive character of an inherently suspect restraint. *Law v. NCAA*, 902 F. Supp. 1394, 1405 (D. Kan.1995) (*aff'd, Law II*, 134 F.3d 1010). Accordingly,

DB02:7034280.1                                                                                                                    066145.1001

Plaintiffs do not, as a matter of law, have to prove the existence of a market or the Defendants' market power therein in the sanctions and player services markets in relation to the Defendants' market divisions, price fixing and reductions of output. These actions are *per se* illegal.

Further, even if the Court finds that the products involved are of a type that requires horizontal agreements to exist at all, the agreements between the ITF, Grand Slams and ATP are still *per se* illegal. While intra-league cooperation may be necessary for a league to exist at all, there is no such necessity for inter-circuit cooperation. The ATP contends that it produces a product (called "ATP Tennis"). (*See, e.g.*, de Villiers 1677:13 – 1677: 18 (discussing "our product"); *see also* Tr. 202:18 – 202:24; 203:17 – 203:21; 231:15-231:22; 252:7 – 252:11). This product could exist *and* compete with the Grand Slams and/or ITF. Accordingly, there is no reason for the application of the rule of reason to this *per se* market division. It is *per se* illegal.

Even if the Court determines that the *per se* standard is inapplicable to all of Plaintiffs' claims, the Plaintiffs need not prove the existence of a relevant market or the Defendants' market power therein where Defendants have engaged in the division of markets, price fixing, output reductions or other activities of an inherently anticompetitive nature. As record evidence sufficient to go to the jury exists that such conduct has occurred in the player services and sanctions market, Plaintiffs maintain any and all Section 1 claims in relation thereto.

### III.    Exclusion Is Not An Appropriate Sanction.

First, as Dr. Zimbalist testified under oath, the outline was his work product based on an abstract of his report and his comments. (Tr. 1416 – 17) ("I asked him to prepare a document that was based upon my report. He sent me a document. I wrote him back and I said, this doesn't make sense, this is out of order, are you sure you want to talk about this?"). It was not an effort by counsel or Plaintiffs to put words into Dr. Zimbalist's mouth. (Tr.1418) ("I can only

remember one item in there where there was a suggestion of evidence from them. But the rest of the evidence is either in my report or it's things that I learned after I wrote my report from the new documents that I said we should enter into, or suggest we might enter my testimony.").

He printed the document in his home office and brought it with him to Delaware. (Tr. 1421) ("Most likely I printed it out in my office"). He took the transcript with him as a result of a misunderstanding, and he did not need it to testify fully and completely. (Tr. 1419) (Dr. Zimbalist stated that he looked at the document once and that "I had it with me as a function of a misunderstanding in the communication. I did not need that document."); (Tr. 1422) ("That document that you have is something that I brought.").

Second, Defendants have suffered no prejudice. Rather, they were provided with Dr. Zimbalist's work product, created by Dr. Zimbalist independently and via communications with counsel. They were provided four days to evaluate this outline prior to the continuation of Dr. Zimbalist's testimony. Additionally, they were provided two opportunities to conduct a voir dire of Dr. Zimbalist, including one conducted on Plaintiff's trial time, thereby costing Plaintiffs' almost 10% of their total allotted trial time in this matter. Defendants conducted a full and complete cross examination of Dr. Zimbalist on all topics, including the document, in front of the jury. Finally, as stated by Dr. Zimbalist, as recognized by Mr. Underwood and as illuminated by a reading of Dr. Zimbalist's reports, which were produced last January and February, it had no effect Dr. Zimbalist's methodology, approach or opinions.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
bflinn@ycst.com
kkeller@ycst.com

Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313

*Attorneys for Deutscher Tennis Bund (the German Tennis Federation), the Rothenbaum Sport GmbH, and the Qatar Tennis Federation*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on July 31, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Lawrence C. Ashby, Esquire (lashby@ashby-geddes.com)
> Philip Trainer, Jr., Esquire (ptrainer@ashby-geddes.com)
> Tiffany Geyer Lydon, Esquire (tlydon@ashby-geddes.com)
> Ashby & Geddes
> 500 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on July 31, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

> **BY E-MAIL**
>
> Bradley I. Ruskin, Esquire (bruskin@proskauer.com)
> Jennifer R. Scullion, Esquire (jscullion@proskauer.com)
> PROSKAUER ROSE
> 1585 Broadway
> New York, NY 10036

**BY E-MAIL**

Stephen Neuwirth (stephenneuwirth@quinnemanuel.com)
QUINN EMANUEL
51Madison Avenue 22nd Floor
New York, New York 10010

        YOUNG CONAWAY STARGATT & TAYLOR, LLP

        */s/ Karen E. Keller*
        C. Barr Flinn (No. 4092)
        Karen E. Keller (No. 4489)
        James L. Higgins (No. 5021)
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, Delaware 19801
        (302) 571-6600
        kkeller@ycst.com

        *Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*