IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEUTSCHER TENNIS BUND (GERMAN TENNIS FEDERATION), ROTHENBAUM SPORT GMBH, and QATAR TENNIS FEDERATION,<br><br>                Plaintiffs,<br><br>    v.<br><br>ATP TOUR, INC., ETIENNE DE VILLIERS, CHARLES PASARELL, GRAHAM PEARCE, JACCO ELTINGH, PERRY ROGERS, and IGGY JOVANOVIC,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 07-178-GMS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS OF PERSONAL LIABILITY FOR DAMAGES**

    **I.**    **The Individual Defendants Are Liable Under the Sherman Act.**

Corporate directors are individually liable "for corporate actions that violate the antitrust laws if they authorize or participate in unlawful acts." *Brown v. Donco Enterprises, Inc.*, 783 F.2d 644, 646 (6th Cir. 1986). Pursuant to this standard, individual liability may be imposed where corporate agents (1) "are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends" and where individual defendants (2) "exerted influence so as to shape corporate intentions." *Id.* at 646; *see also In re Southeastern Milk Antitrust Litigation*, No. 2:08:MD-1000, 2008 WL 2117159, at n.8 (E.D. Tenn. May 20, 2008) (adopting *Brown* analysis) (rejecting *Murphy Tugboat* as proper basis for assessing liability of individual defendants).

Plaintiffs have introduced evidence establishing that the Director Defendants have actively and knowingly participated in a scheme, the Brave New World plan, designed to achieve

1

anticompetitive ends. *See generally* Plaintiffs' Response to Defendants' Motion for Judgment As a Matter of Law As To Relevant Produce and Geographic Markets. ATP management and certain of its Directors have admitted that the Brave New World was designed with the express purpose to "channel" top players to selected events through the use of "carrots and sticks." (Trial Tr. 650:19 – 652:17; Trial Tr. 665:18 – 666:9; Trial Tr. 668:24 – 669:10; Trial Tr. 671:25 – 672:6.) The result of this effort to channel players is clear from ATP internal documents, playing histories, and the testimony of the Director Directors: because the Brave New World mandates 16 events (4 Grand Slams, 8 ATP 1000s, and 4 ATP 500s) in a manner that will make it impossible for tournaments outside these favored categories, or outside the ATP, to compete for top players – who only play 16 to 17 tournaments per year on average, plus Davis Cup. (Trial Tr. 672:10 – 673:17; PTX 1457; Trial Tr. 1709:9 – 1710:11.)

The individual Director Defendants have admitted that they actively and knowingly sought to pass restrictions on player movement and other anticompetitive aspects associated with the Brave New World, and that they were aware of the anticompetitive effects these restrictions would have on ability of non-favored tournaments to procure players for their events. Below, with citation and brief parenthetical explanation, we summarize just a few of the numerous admissions on these points by Defendants:

    Rogers:    Trial Tr. 707:2 – 708:7, 710:20 – 711:3 (admits intention to exchange 8 of 8 for media pooling); Trial Tr. 714:7 – 716:2 (admits intention to channel players to ATP 1000s and ATP 500s, but not ATP 250s); Trial Tr. 717:19-24 (admission that ATP 1000 tournaments do not have to compete for players under BNW); Trial Tr. 718:1-5 (admission that ATP 250s will compete on different terms than ATP 1000s and ATP 500s under BNW).

    Jovanovic:    Trial Tr. 710:20 – 711:3 (admits intention to exchange 8 of 8 for media pooling); 1092:9-14 (admits intention to have the top players play the "top" events under the BNW); Trial Tr. 1025:25 – 1026:6 (admission that 8 of 8 is reinforced by suspensions and incentivized through bonus pool); Trial Tr. 1026:13 – 1027:3 (admission that ATP uses ranking points to effectively require players to play Grand Slams).

Pasarell:   Trial Tr. 1178:7 – 1179:11 (admission of collusion between ATP, Grand Slams, and Davis Cup to apportion markets); Trial Tr. 1185:22 – 1186:1 (admission that ranking incentives and penalties affect player participation); Trial Tr. 1186:20 – 1187:13 (admission that BNW is designed to "get[] players to play tournaments that they should play"); Trial Tr. 1195:22-24 ("I wanted to make sure that the other Masters Series would also get the same kind of player participation, and that was really what motivated most of my votes."); Trial Tr. 1204:24 – 1205:14 (admission that special events rule restricts player participation); Trial Tr. 1212:7-16 ("[M]y desire for supporting this is I wanted the other Masters Series to basically have the same [as Indian Wells] and try to pass some rules that would hopefully get that kind of player participation.").

Eltingh:   Trial Tr. 710:20 – 711:3 (admits intention to exchange 8 of 8 for media pooling); Trial Tr. 952:17-25 (admission that BNW forces Top 50 players to play ATP 1000s); Trial Tr. 953:1-4 (admission that BNW requires players to play Grand Slam events).

de Villiers:   Trial Tr. 1527:2-11 (admission that ATP 1000s do not have to compete for players under BNW); 1569:17-24 (admission that ATP has "understanding" with ITF that ATP will not compete during Davis Cup weeks); Trial Tr. 1605:11-18 (admits that 8 of 8, ranking system, and bonus system largely direct players to ATP 1000s and ATP 500s); Trial Tr. 1605:20-24 (admission that ATP and Grand Slams conspired on ranking points); Trial Tr. 1605:25 – 1606:3 (admission that special event rule was passed as part of BNW).

Plaintiffs have also introduced evidence sufficient to demonstrate that the individual Director Defendants exerted influence over ATP Tour, Inc. so as to shape corporate intentions in a manner that favored their desired anticompetitive conduct. Specifically, record evidence demonstrates that each of the Director Defendants voted for, and authorized, the anticompetitive elements of the Brave New World that are at issue in this lawsuit. Trial Tr. 655:20 – 656:9 (2009 Masters Format); Trial Tr. 657:4-6 (prize money increase and revenue sharing); Trial Tr. 657:12-14 (additional term of commitment); Trial Tr. 657:15-17 (bonus pool). Similarly, each Defendant while on the Board of Directors has failed to repeal, or attempt to repeal, other "carrots and sticks" existing as part of the Brave New World plan, including, but not limited to, the ranking system, entry system, special events rule, various pooling agreements, and Bylaw

Section 5.16. Such evidence, combined with Defendants' established knowledge of the individual and collective effect of these restrictions on player services, is a sufficient basis for finding liability against each of the individual Defendants, and for denying the instant Motion as to the antitrust claims.

In addition, record evidence establishes that the Director Defendants intended to lock up the market for tournament sanctions, and prevent competition for a period of 10 years for the ATP 1000s and 5 years for the ATP 500s. Trial Tr. 657:18-21 (category protection term, for 10 and 5 years, respectively, and fee passed by 6-1 Board vote); Trial Tr. 1201:22 – 1202:9 (Pasarell admits Board understanding of 10-year sanction protection for ATP 1000s); Trial Tr. 1710:12 – 1711:7 (Franulovic admits that category/sanction protection creates barriers to entry). By their actions, the Director Defendants have knowingly and intentionally taken actions to prevent competition for sanctions during those periods of time.

Defendants argue that the more restrictive *Murphy Tugboat* standard should apply to an assessment of individual liability for antitrust claims rather than the established *Brown* standard. Plaintiffs disagree, and note that Defendants' standard has not been adopted in the Third Circuit or expressly adopted in any other Circuit Court. Regardless, even if the more restrictive *Murphy Tugboat* standard applied in the Third Circuit (which it does not), Plaintiffs have established *per se* antitrust violations sufficient to warrant individual liability against each of the Director Defendants. Defendants have engaged in conduct that normally constitutes a *per se* violation as set forth in Section II of Plaintiffs' Response to Defendants' Motion for Judgment As a Matter of Law As To Relevant Produce and Geographic Markets. This Section is incorporated herein by reference. Even if the Court finds *Murphy Tugboat* is persuasive, therefore, Plaintiffs' antitrust claims against the individual Director Defendants cannot be dismissed in their entirety.

Finally, Defendants argue that Plaintiffs, in order to establish individual liability under the Sherman Act, must prove that Defendants "believed they were violating the antitrust laws." (Trial Tr. 1780.) This is incorrect and a misstatement of law. Even the *Murphy Tugboat* court, upon which Defendants rely, expressly rejected this proposition, holding that individual liability does not require "proof of unlawful intent . . . to impose civil liability on officers." *Id.* at 853 n.7. Rather, the appropriate and relevant analysis is whether the individual director Defendants knowingly authorized conduct that illegally restricts competition. *Id.* at 852 (liability may be found for "knowing approval or ratification of unlawful acts"); *Brown*, 783 F.2d at 646.

Here, the individual Defendants, by their own admissions in record evidence, expressly intended to restrict competition and monopolize the markets for player services and sanctions through passage and implementation of the Brave New World plan. While Defendants spend much of their Motion arguing that the Director Defendants acted on the basis of ATP bylaws, former letters by Plaintiffs, and alleged "legitimate business purposes" for downgrading Hamburg, none of these motivations precludes liability against an individual Director Defendant who has admitted, as each has, that he knowingly and intentionally furthered anticompetitive purposes and caused the ATP to do the same.[1]

## II.  The Business Judgment Rule Does Not Insulate the Directors From Liability.

There is sufficient evidence for the jury to conclude that the business judgment rule does not protect the director defendants from liability. As a threshold matter, it should be understood that directors of a Delaware not-for-profit membership corporation owe their fiduciary duties to the members of the not-for-profit. *Baring v. Watergate East, Inc.*, 2004 Del. Ch. LEXIS 148, at *20-21 (Del. Ch. 2004).

---

[1] The Bylaws, for example, regardless of what they say, do not provide the individual Defendants with free reign to enter into contracts, combinations, and conspiracies in restraint of trade.

First, the business judgment rule does not protect the members of a board of directors if one of the directors has a material undisclosed interest in the transaction. 8 *Del. C.* § 144(a) (interested director transaction not "void or voidable" if the "material facts as to the director's . . . interest . . . are disclosed . . . to the board of directors."); *see Summit Metals, Inc. v. Gray*, C.A. No. 00-387-JJF, 2002 U.S. Dist. LEXIS 15599 (D. Del. Aug. 20, 2002) (finding transaction subject to entire fairness review under 8 *Del. C.* § 144 where defendant had interests connected with the buyer and seller); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citing 8 *Del. C.* § 144(a)(1) and stating that the business judgment rule has no role in the context of demand futility where "director interest is present, and the transaction is not approved by a majority consisting of the disinterested directors"); *Cinerama, Inc. v. Technicolor, Inc.*, No. 8358, 20 Del. J. Corp. L. 277, 318 (Winter 1995) (finding "compliance with the terms of Section 144 does not restore to the board the presumption of the business judgment rule; it simply shifts the burden to plaintiff to prove unfairness"). Defendants have conceded that the business judgment rule gives way in the face of a material undisclosed director interest. Tr. 1780:24-1781:16.

There is evidence that, when the board considered the Brave New World, director defendant Iggy Jovanovic had a material undisclosed interest in contracts with Tennis Canada and Abu Dhabi. Tennis Canada is a party favored under the Brave New World. Specifically, Jovanovic was under contract with Tennis Canada, pursuant to which he would be paid a percentage of the sponsorship revenue obtained by Tennis Canada from sponsors that Jovanovic introduced to Tennis Canada. Tr. 976:16 - 977: 25; 980: 2 - 10; 1020:6 - 1021:7; 982:12 - 983: 1; 975:18-25; 981:19-25. As to Abu Dhabi, there is evidence that Jovanovic had a consulting agreement with the Abu Dhabi Tourism Board, to assist Abu Dhabi possibly in acquiring an ATP

tournament. His presentation featured the Doha tournament on his "hit list." Tr. 986:9 - 988:13; 989:8 - 11; 992:2 - 993:2; Tr. 993:24 - 994:5.

There also is evidence that Jovanovic's clients were favored under the Brave New World, at the expense of Hamburg and Doha. Tr. 1695:19 - 1696:12. No North American Masters tournament, including Tennis Canada, was required to submit an application to retain its classification. Nor was any North American tournament downgraded. There is also evidence that Tennis Canada benefitted from the reduction in the number of Masters tournaments, particularly with respect to the 8-of-8 player commitment for those tournaments. *E.g.*, Tr. 1212:7 - 1213:2. Jovanovic testified that he did not disclose the Tennis Canada contract to the board. Tr. 1108:19 - 21. Finally, there is evidence that the $70,000 that Jovanovic earned from the contracts was material to him. He testified that it "is a significant sum of money." Tr. 1110: 4 - 1111:10.

Second, the business judgment rule does not protect a director who has breached any fiduciary duty. *In re Ply Gem Indus., Inc. Shareholders Litig.*, 2001 Del. Ch. LEXIS 84, at *27 (June 26, 2001). Defendants concede that this is true. *See* Motion for Judgment as a Matter of Law by Director Defendants at 7 (citing *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001)); *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006)). Here there is ample evidence of breaches.

A. **Evidence of Breaches of Loyalty**

Delaware law supports the proposition that a per se breach of a corporation's charter constitutes a breach of fiduciary duty. *See Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 914 (Del. Ch. 2007) ("to the extent a director knowingly backdated a stock option in violation of the company's charter, that director's action is ultra vires and is not the product of valid business judgment"). The ATP's Articles of Incorporation provide that "Each player tour board

7

representative shall meet the qualifications that on the date of becoming a director, and thereafter during his term ... (ii) he does not ... perform services for ... an entity or an affiliate of an entity that possesses or controls an ownership interest in a tournament class member or membership." Tr. 970:8 - 971:12.

Defendant Iggy Jovanovic testified that he was familiar with this provision. *Id.* He testified that he was aware of what was expected of him as a member of the Board of Directors when he was first elected in 2005 and that his service was regulated in part by the articles and bylaws of the corporation. Tr. 968:6 - 969:19. Nonetheless, he entered into the agreements with Tennis Canada and Abu Dhabi Tourism Authority in contravention of the express provisions of the ATP's articles of incorporation. Tr. 976:16 - 977: 25; Tr. 986:9 - 987:7. Again, he did so knowing that he should act in a manner loyal to the player and tournament members of the corporation. Tr. 985:17-23. A jury could conclude that Mr. Jovanovic's knowing contravention of the express provisions of the ATP's charter constituted a violation of his duty of loyalty to the members.

### B. Evidence of Defendants' Breaches of the Duty of Due Care

Record evidence confirms that Defendants have failed to make a good faith effort to be informed and exercise appropriate business judgment. Defendants' pursuit of the BNW, with knowledge of its illegality, is "without the bounds of reason," and therefore violates the duty of due care, as demonstrated *supra*.

In addition, Defendant Etienne de Villiers and others admitted that the ATP Board members "understood that there was a provision in the TPL agreement that prohibited downgrades of any member prior to December 31, 2009." Specifically, § 28.5 of the TPL agreement established that "the ATP shall not, on or prior to 31 December 2009, downgrade the

tournament class status or terminate the Sanction of any [Masters Series] member other than for Cause ..." *E.g.*, Tr. 1529:4 - 1531:11; 1532:6 - 1534:14. Defendants voted intentionally to downgrade Hamburg despite their awareness of the TPL's prohibition against such a downgrade. This vote fell outside the scope of their agency and constituted a breach of their duty of "due care," because it was not "entirely fair" to all members of the ATP.

The ATP is a not-for-profit corporation organized under § 501(c)(6) of the tax code, and its Bylaws provide that it may not act in a manner that violates its tax status. *See* Bylaws, § 2.3 (limiting the ATP's powers to activities within the scope of § 501(c)(6)). IRC §501(c)(6) provides that no part of the net earnings of a corporation organized under that section may inure to the benefit of any private shareholder or individual. Under the "private inurement" doctrine, none of the income or assets of a tax-exempt organization may be permitted to directly or indirectly unduly benefit an individual or other person who has a close relationship to the organization, particularly those who are in a position to exercise a significant degree of control over it. *See* Bruce R. Hopkins, THE LAW OF TAX-EXEMPT ORGANIZATIONS 484 (2003). Because the BNW was designed specifically to increase revenues to the "premium tour" tournaments-- benefiting in particular Board member Pasarell's Indian Wells tournament--the plan violates the "private inurement" doctrine and thus exceeds the ATP's powers under its Bylaws. A jury could conclude, based on this evidence, that the Director Defendants' votes in favor of the Brave New World are inconsistent with their fiduciary duties.

C. **Evidence of Defendants' Breaches of the Duty of Good Faith**

Record evidence confirms that the Director Defendants, Mr. de Villiers in particular, represented to the ATP's membership that the application process for the ATP 1000 and ATP 500 sanctions would be subject to an "open and transparent" bidding process. TX 220. In

reality, the application process was a sham: Deloitte representatives complained to COO Philip Galloway that the ATP's application process, as designed, was "primarily subjective," not the objective, "scorecard" approach that the tournaments expected. Tr. 678: 18 - 681:10. Further, the ATP had predetermined the outcome of the application process by virtue of the criteria it selected; required only European tournaments to compete in the bid process for certain of the BNW Masters 1000 sanctions; and did not require other Masters tournaments to bid for Masters 1000 sanctions at all. *See, e.g.*, Tr. 1695:19 - 1696:12.

Further, the jury may decide from the evidence that the ATP had decided to downgrade the Hamburg tournament well before the application process began. In April of 2006, ATP employees observed that the ATP should "offer some reasoning" for the Hamburg downgrade, "like bad weather, lack of TV, etc." TX 297. By October 30, 2006, de Villiers discussed with certain Board and management members that the ATP would be "hammering Germany with Hamburg and Stuttgart downgrades." TX 138. In March of 2007, before the DTB's application for its ATP 1000 sanction had even been submitted, de Villiers offered the DTB € 4-8 million in exchange for its downgrade. Tr. 340:16 - 342:5.[2]

In addition, the ATP negotiated secretly with the "preferred" Dubai tournament, offering it the opportunity to improve its application over the superior Doha application, despite the fact that Doha had initially offered a $10 million bid premium and the Dubai tournament had offered a total financial commitment of only $2 million. Tr. 1560:19 - 1563:3. The ATP did all of things

---

[2] Two weeks before Mr. de Villiers' meeting with the GTF, the ATP had executed a memorandum of understanding with a Chinese entity to organize a Masters 1000 tournament in Shanghai for a total fee of some $29.8 million. Tr. 344:14 - 345:10. De Villiers made the offer to the GTF despite the Director Defendants' agreement to "provide compensation for tournaments that are downgraded to be funded by financial contributions from tournaments that are upgraded" -- an agreement that he did not disclose to Dr. von Waldenfels at their March, 2007 meeting. Tr. 343:7 - 344:3.

even though it had explicitly represented to its fiduciaries that the application process would be open, transparent, and based upon objective criteria. *See* TX 220.

Further, as stated above, record evidence confirms that the ATP's purposeful failures to disclose material interactions to its membership and purposeful attempts to mislead its membership constitute breaches of the duty of good faith. For example, Player officer Andre Silva wrote to the player members of the Board, de Villiers, and Philip Galloway, exhorting them to "[s]ell them on your views, do not let their views dictate the conversation." Tr. 852: 23 - 854:13. Board member Perry Rogers confirmed his agreement with this communication principle: "Guys, this is simple. Andre is right." TX 138. In addition, the ATP failed to disclose to its members the minutes from its January 18, 2007 Board Meeting, which included an agreement by the Board that the Masters 1000 events would be subject to recategorization on a year-to-year basis. TX 225. The summary of those minutes, which was in fact circulated to the members, specifically omitted all mention of this agreement. TX 524.

Finally, the evidence demonstrates that Defendants have knowingly violated the antitrust laws of the United States, on the belief that they could obtain sufficient monopoly proceeds to create a "war chest" to cover any and all liabilities. This tactic was suggested by Ray Moore, Mr. Pasarell's business partner, to de Villiers. *E.g.*, TX 439. This is in fact what the ATP has done: the Board has decided to compensate downgraded tournaments with fees generated from tournaments that improve their status in the BNW. The jury may conclude that this knowing antitrust violation constitutes a breach of the Director Defendants' fiduciary duties.

Defendants argue that plaintiffs must prove that a majority of the directors lacked independence in approving the Brave New World. This is not so: if a director breached his fiduciary duty, that director will be liable for any damages caused by his breach. Due to the

DB02:7034442.1    066145.1001

ATP's super-majority voting requirements for transactions of this type, the transaction could not be approved without the vote of defendant Pasarell. For this reason, if the jury finds that Pasarell's vote was affected by his breach of fiduciary duty, it should also find that the Brave New World was caused by the breach. The same would be true if the jury finds that two of the Player directors breached duties.

### III.    Record Evidence Confirms The Defendants' Tortious Interference with Plaintiffs' Prospective Contractual or Business Relationships.

Plaintiffs' tortious interference claim requires evidence of (1) the reasonable probability of a business opportunity; (2) the intentional interference by defendant with the opportunity; (3) causation; and (4) damages, all of which must be considered in light of defendants' privilege to compete or protect his business in a fair and lawful manner. *See Lipson v. Anesthesia Servs.*, 790 A.2d 1261, 1284 (Del. Super. 2001). Evidence of each of these elements is present in the record. The prospective business relations which are subject to the protection of this cause of action are any of potential pecuniary value to the plaintiff, such as those between Plaintiffs and their current broadcast partners and sponsors. *Id.* Further, the "privilege to compete" does not apply to illegal conduct or conduct that should have been precluded by the relationship between the plaintiff and the defendant. *Id.*

In determining whether interference is proper, courts applying Delaware law look to the following seven factors: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interest of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the societal interests in protecting the freedom of action and contractual relationships of the actor; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relationship between the parties. *Id.* at 1287; Restatement (Second)

of Torts, § 767. Pursuant to these factors, the nature of the Director Defendants' conduct is critical.

Carl-Uwe Steeb, current tournament director of the Hamburg tournament, testified that one of the reasons that hosting a lower-tier event in Hamburg in July is not economically feasible is that it was very difficult to get sponsors to agree to host the lower-tier event. Tr. 1272:7 - 1273:1. Each Director Defendant's vote in favor of the Brave New World was a volitional act. Finally, and critically, it is plain from the other evidence in the record that the Director Defendants' votes in favor of the Brave New World were cast in knowing violation of the antitrust laws of the United States, as argued and noted herein. As a result, the jury may conclude from the evidence that the Director Defendants tortiously interfered with Plaintiffs' contracts and business relationships.

Defendants cite *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1182-83 (Del.Ch. 1999) and *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994) for the proposition that individual directors cannot be liable for tortious interference with a contract. Their reliance on these cases is misplaced, however: each case holds that a director or officer will not be found liable for tortious interference where the alleged interference is with the corporation's own contract. In the instant case, however, the allegation is that the Director Defendants have tortiously interfered with third-party contracts between Plaintiffs and potential sponsors. Based on evidence in the record, and especially in light of the evidence of the illegal nature of the Director Defendants' conduct under both antitrust and fiduciary duty principles, a jury could find from the evidence that the Director Defendants tortiously interfered with the Plaintiffs' prospective sponsor relationships.

IV. **Record Evidence Confirms the Defendants' Conversion of the GTF's Property Rights.**

Under Delaware law, the tort of conversion is defined as "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *Data Mgmt. Int'l, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super. 2007) (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)). "Because conversion is an intentional tort, there is a general duty grounded in tort law to refrain from converting another's property." *Id.* The ongoing relationship and course of dealing between two parties affects property rights and remedies. *E.g., Ishimaru v. Fung*, 2005 WL 2899680, AT *17 (Del. Ch.2006 ) (unpublished opinion).

Here, the record confirms that the GTF owns a Championship Division Membership pursuant to the ATP's Bylaws (Tr. 290:8 - 291:9); the GTF owns the Rothenbaum stadium through a daughter corporation (Tr. 290:12-25); the QTF owns part of the Championship Division Membership of the Hamburg tournament (Tr. 293: 5 - 294:4). The record also confirms the continuing nature of these membership rights: ATP Bylaw 5.7 provides for their automatic renewal (Tr. 304:11 - 306: 22), as does the ATP's course of dealing with its tournament members (Tr. 310:1 - 311:1 & TX 1406). The ATP paid value to and received value from third parties for specific calendar and sanction protections. *E.g.,* Tr. 1169:23 - 1170:18. The ATP sold components of the Hamburg Membership to Shanghai and Ion Tiriac in a series of related transactions. Tr. 646:6 - 648:6. These transactions were approved by vote of the Director Defendants, including Mr. Pasarell, whose Indian Wells tournament will, along with the other Masters 1000 tournaments, benefit from all of the transactions that comprise the Brave New World. Dr. von Waldenfels testified that the ATP's decision to downgrade it to a 500-level tournament and move the tournament week to July would financially destroy the Hamburg

tournament. Tr. 346:23 - 348:24. Based upon this evidence, a jury could conclude that, at a minimum, Mr. Pasarell's vote for the Brave New World will result in the accrual of at least part of the value of the Hamburg tournament to the Indian Wells tournament, an act of dominion converting Hamburg's membership rights.

---

*Of Counsel:*

Robert D. MacGill
Hamish S. Cohen
Jennifer Westerhaus Adams
Matthew B. Barr
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313



Dated: July 31, 2008

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Karen E. Keller*
C. Barr Flinn (No. 4092)
Karen E. Keller (No. 4489)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
bflinn@ycst.com
kkeller@ycst.com
jhiggins@ycst.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on July 31, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Lawrence C. Ashby, Esquire (lashby@ashby-geddes.com)
>Philip Trainer, Jr., Esquire (ptrainer@ashby-geddes.com)
>Tiffany Geyer Lydon, Esquire (tlydon@ashby-geddes.com)
>Ashby & Geddes
>500 Delaware Avenue
>P.O. Box 1150
>Wilmington, DE 19899

I further certify that on July 31, 2008, I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

>Bradley I. Ruskin, Esquire (bruskin@proskauer.com)
>Jennifer R. Scullion, Esquire (jscullion@proskauer.com)
>PROSKAUER ROSE
>1585 Broadway
>New York, NY 10036

**BY E-MAIL**

Stephen Neuwirth (stephenneuwirth@quinnemanuel.com)
QUINN EMANUEL
51Madison Avenue 22nd Floor
New York, New York 10010

        YOUNG CONAWAY STARGATT & TAYLOR, LLP

        */s/ Karen E. Keller*
        C. Barr Flinn (No. 4092)
        Karen E. Keller (No. 4489)
        James L. Higgins (No. 5021)
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, Delaware 19801
        (302) 571-6600
        kkeller@ycst.com

        *Attorneys for Deutscher Tennis Bund (the German Tennis Federation), Rothenbaum Sports GMBH and Qatar Tennis Federation*